```
Fill in this information to identify the case:

United States Bankruptcy Court for the:
                    Southern District of Texas

Case number (if known): _____    Chapter ___11___
```

☐ Check if this is an amended filing

## Official Form 201

## Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.**

| | |
|---|---|
| **1. Debtor's name** | Galleria 2425 Owner, LLC |
| **2. All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as names* | |
| **3. Debtor's federal Employer Identification Number (EIN)** | 3 6 – 4 8 9 6 7 3 8 |

**4. Debtor's address**

Principal place of business

1001 West Loop South
Number        Street

Houston, TX 77027
City                          State    ZIP Code

Harris
County

Mailing address, if different from principal place of business

Number        Street

City                          State    ZIP Code

Location of principal assets, if different from principal place of business

Number        Street

City                          State    ZIP Code

| | |
|---|---|
| **5. Debtor's website (URL)** | |
| **6. Type of debtor** | ☐ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br><br>☐ Partnership (excluding LLP)<br><br>☑ Other. Specify:  Limited Liability Company |

Debtor    Galleria 2425 Owner, LLC                        Case number *(if known)* _____
        Name

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. §101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. §781(3))

☑ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes .
    5    3    1    1

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first subbox. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box

*Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check **all** that apply:*

    ☑ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ A plan is being filed with this petition.

    ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☐ No

☑ Yes. District _Southern District of Texas_ When _7/5/2023_ Case number _23-60036_
                                    MM / DD / YYYY

       District _____ When _____ Case number _____
                                     MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☑ No

☐ Yes. Debtor _____ Relationship _____

       District _____ When _____
                                       MM / DD / YYYY

       Case number, if known _____

Debtor    Galleria 2425 Owner, LLC
_____    Case number (if known) _____
Name

| 11. Why is the case filed in *this district*? | Check all that apply: |
|---|---|
| | ☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district. |
| | ☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district. |

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____

| Number | Street |
|---|---|

_____

City                                    State        ZIP Code

**Is the property insured?**

☐ No

☐ Yes.    Insurance agency    _____

Contact name    _____

Phone    _____

---

## Statistical and administrative information

| 13. Debtor's estimation of available funds? | Check one: |
|---|---|
| | ☐ Funds will be available for distribution to unsecured creditors. |
| | ☑ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors. |

**14. Estimated number of creditors**

☑ 1-49        ☐ 50-99          ☐ 1,000-5,000     ☐ 5,001-10,000      ☐ 25,001-50,000    ☐ 50,000-100,000
☐ 100-199    ☐ 200-999        ☐ 10,001-25,000                        ☐ More than 100,000

**15. Estimated assets**

☐ $0-$50,000                    ☐ $1,000,001-$10 million        ☐ $500,000,001-$1 billion
☐ $50,001-$100,000              ☑ $10,000,001-$50 million       ☐ $1,000,000,001-$10 billion
☐ $100,001-$500,000             ☐ $50,000,001-$100 million      ☐ $10,000,000,001-$50 billion
☐ $500,001-$1 million           ☐ $100,000,001-$500 million     ☐ More than $50 billion

Debtor    Galleria 2425 Owner, LLC
Name                                                    Case number (if known)

**16. Estimated liabilities**

- [ ] $0-$50,000
- [ ] $50,001-$100,000
- [ ] $100,001-$500,000
- [ ] $500,001-$1 million

- [ ] $1,000,001-$10 million
- [ ] $10,000,001-$50 million
- [x] $50,000,001-$100 million
- [ ] $100,000,001-$500 million

- [ ] $500,000,001-$1 billion
- [ ] $1,000,000,001-$10 billion
- [ ] $10,000,000,001-$50 billion
- [ ] More than $50 billion

---

## Request for Relief, Declaration, and Signatures

**WARNING --**    Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

- ■ The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

- ■ I have been authorized to file this petition on behalf of the debtor.

- ■ I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    12/05/2023
                MM/ DD/ YYYY

**X** /s/ Dward Darjean                                   Dward Darjean
Signature of authorized representative of debtor         Printed name

Title                    Manager

**18. Signature of attorney**

**X**          /s/ James Q. Pope                  Date   12/05/2023
Signature of attorney for debtor                        MM/ DD/ YYYY

James Q. Pope
Printed name

The Pope Law Firm
Firm name

6161 Savoy Drive 1125
Number        Street

Houston                                    TX         77036
City                                       State      ZIP Code

(713) 449-4481                             jamesp@thepopelawfirm.com
Contact phone                              Email address

24048738                                   TX
Bar number                                 State

---

Official Form 201            **Voluntary Petition for Non-Individuals Filing for Bankruptcy**          000004    page **4**

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | Galleria 2425 Owner, LLC |
| United States Bankruptcy Court for the: | Southern District of Texas |
| Case number (if known): | |

☐ Check if this is an
amended filing

## Official Form 204

# Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders    12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | 2425 WL, LLC<br>13498 Pond Springs Rd.<br>Austin, TX 78729 | | | | $25,092,415.80 | $17,500,000.00 | $7,592,415.80 |
| 2 | Ali Choudhry<br>1001 West Loop South 700<br>Houston, TX 77027 | | | | | | $960,000.00 |
| 3 | Ash Automated Control Systems, LLC<br>PO Box 1113<br>Fulshear, TX 77441 | | HVAC Repair | | | | $1,548.31 |
| 4 | Caz Creek Lending<br>118 Vintage Park Blvd No. W<br>Houston, TX 77070 | | Tax Lien | | $800,238.37 | $17,500,000.00 | $800,238.37 |
| 5 | Cirro Electric<br>PO Box 60004<br>Dallas, TX 75266 | | | | | | $27,000.00 |
| 6 | City of Houston<br>PO Box 1560<br>Houston, TX 77251 | | | | | | $7,500.00 |
| 7 | CNA Insurance Co<br>PO Box 74007619<br>Chicago, IL 60674 | | | | | | $63,216.48 |
| 8 | Datawatch Systems<br>4520 East West Highway 200<br>Bethesda, MD 20814 | | | | | | $18,626.10 |

Debtor    Galleria 2425 Owner, LLC                              Case number *(if known)*
          Name

| # | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
|---|---|---|---|---|---|---|---|
| 9 | Firetron<br>PO Box 1604<br>Stafford, TX 77497 | | | | | | $30,040.34 |
| 10 | First Insurance Funding<br>450 Skokie Blvd<br>Northbrook, IL 60062 | | | | | | $5,507.36 |
| 11 | Gulfstream Legal Group<br>1300 Texas St<br>Houston, TX 77002 | | | | | | $57,799.06 |
| 12 | Harris County Tax Assessor<br>PO Box 4622<br>Houston, TX 77210 | | | | $957,825.16 | $17,500,000.00 | $957,825.16 |
| 13 | HNB Construction, LLC<br>521 Woodhaven<br>Ingleside, TX 78362 | | | | | | $58,207.11 |
| 14 | Lexitas<br>PO Box Box 734298 Dept 2012<br>Dallas, TX 75373 | | | | | | $2,813.33 |
| 15 | MacGeorge Law Firm<br>2921 E 17th St Blgd D Suite 6<br>Austin, TX 78702 | | | | | | $34,445.48 |
| 16 | National Bank of Kuwait<br>299 Park Ave. 17th Floor<br>New York, NY 10171 | | | Disputed | $26,000,000.00 | $17,500,000.00 | $26,000,000.00 |
| 17 | Nationwide Security<br>2425 W Loop S 300<br>Houston, TX 77027 | | | | | | $32,549.70 |
| 18 | Nichamoff Law Firm<br>2444 Times Blvd 270<br>Houston, TX 77005 | | | | | | $46,984.22 |
| 19 | TKE<br>3100 Interstate North Cir SE 500<br>Atlanta, GA 30339 | | | | | | $57,881.13 |
| 20 | Zindler Cleaning Service Co<br>2450 Fondren 113<br>Houston, TX 77063 | | | | | | $2,110.88 |

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

IN RE: **Galleria 2425 Owner, LLC**

CASE NO

CHAPTER **11**

**VERIFICATION OF CREDITOR MATRIX**

The above named Debtor hereby verifies that the attached list of creditors is true and correct to the best of his/her knowledge.

Date ____12/05/2023____    Signature _____/s/ Dward Darjean_____

Dward Darjean, Manager

000007

2425 WL, LLC
13498 POND SPRINGS RD.
AUSTIN, TX 78729

ADT
PO BOX 382109
PITTSBURGH, PA 15251

ALI CHOUDHRY
1001 WEST LOOP SOUTH 700
HOUSTON, TX 77027

ASH AUTOMATED CONTROL
SYSTEMS, LLC
PO BOX 1113
FULSHEAR, TX 77441

CAZ CREEK LENDING
118 VINTAGE PARK BLVD NO. W
HOUSTON, TX 77070

CFI MECHANICAL, INC
6109 BRITTMOORE RD
HOUSTON, TX 77041

CIRRO ELECTRIC
PO BOX 60004
DALLAS, TX 75266

CITY OF HOUSTON
PO BOX 1560
HOUSTON, TX 77251

CNA INSURANCE CO
PO BOX 74007619
CHICAGO, IL 60674

COMCAST
PO BOX 60533
CITY OF INDUSTRY, CA 91716

DATAWATCH SYSTEMS
4520 EAST WEST HIGHWAY 200
BETHESDA, MD 20814

ENVIRONMENTAL COALITION
INC
PO BOX 1568
STAFFORD, TX 77497

FERGUSON FACILITIES
SUPPLIES
PO BOX 200184
SAN ANTONIO, TX 78220

FIRETRON
PO BOX 1604
STAFFORD, TX 77497

FIRST INSURANCE FUNDING
450 SKOKIE BLVD
NORTHBROOK, IL 60062

GULFSTREAM LEGAL GROUP
1300 TEXAS ST
HOUSTON, TX 77002

HARRIS COUNTY TAX
ASSESSOR
PO BOX 4622
HOUSTON, TX 77210

HNB CONSTRUCTION, LLC
521 WOODHAVEN
INGLESIDE, TX 78362

KINGS 111 EMERGENCY
COMMUNICATIONS
751 CANYON DRIVE, SUITE 100
COPPELL, TX 75019

LEXITAS
PO BOX BOX 734298 DEPT 2012
DALLAS, TX 75373

LOGIX FIBER NETWORKS
PO BOX 734120
DALLAS, TX 75373

MACGEORGE LAW FIRM
2921 E 17TH ST BLGD D SUITE 6
AUSTIN, TX 78702

MUELLER WATER TREATMENT
1500 SHERWOOD FOREST DR.
HOUSTON, TX 77043

NATIONAL BANK OF KUWAIT
299 PARK AVE. 17TH FLOOR
NEW YORK, NY 10171

NATIONWIDE SECURITY
2425 W LOOP S 300
HOUSTON, TX 77027

NICHAMOFF LAW FIRM
2444 TIMES BLVD 270
HOUSTON, TX 77005

TKE
3100 INTERSTATE NORTH CIR SE 500
ATLANTA, GA 30339

WASTE MANAGEMENT
PO BOX 660345
DALLAS, TX 75266

ZINDLER CLEANING SERVICE
CO
2450 FONDREN 113
HOUSTON, TX 77063

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | **Chapter 11** |
| Debtor. | § | |
| | § | |

**NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK BRANCH'S**
**EMERGENCY MOTION TO ENFORCE THE GATE-KEEPING**
**PROVISIONS OF THE CONFIRMED CHAPTER 11 PLAN**

---

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have no reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the Court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

**Emergency Relief has been requested if the Court considers the motion on an emergency bases, then you will have less than 21 days to answer. If you object to the requested relief or if you believe that the emergency consideration is not warranted, you should file an immediate response.**

---

**TO THE HONORABLE JEFFREY P. NORMAN, U.S. BANKRUPTCY JUDGE:**

National Bank of Kuwait, S.A.K.P. New York Branch ("NBK") files this Emergency

Motion to Enforce the gate-keeping provisions in the confirmed and unstayed chapter 11 plan [*see*

ECF No. 566 (the "Plan" and "Confirmation Order")] (the "Motion") and states as follows:

**PRELIMINARY STATEMENT**

1. The Plan, which was confirmed pursuant to the Court's June 22, 2024 Confirmation

Order, imposes certain gate-keeping obligations on parties that are prosecuting or intend to

prosecute claims against parties who received releases of estate claims under the confirmed Plan, including NBK.

2.      Although more than 3 months have passed since entry of the Confirmation Order, two parties, Naissance Galleria, LLC ("Naissance") and the Debtor's principal Ali Choudhri, with pending actions against NBK that relate to the Debtor (the "Pending Actions") have neither dismissed the pending actions nor have they come to this Court to satisfy the prerequisites for continuing the Pending Actions. The Pending Actions, on their face, assert claims that are identical to or very similar to, claims that have been dismissed with prejudice by this Court in, for example, Adversary No. 23-03263. [Case No. 23-0326, ECF No. 26].

3.      Accordingly, NBK requests that the Court enforce the terms of the Plan and Confirmation Order by staying the pending litigation described below and ordering the plaintiffs to show cause why those actions are pursuing colorable claims that are not estate claims that have been released, including establishing an expedited briefing schedule.

**LOCAL RULE 9013-1(i) STATEMENT REGARDING EMERGENCY RELIEF**

4.      NBK seeks emergency relief on or before October 18, 2024 because one of the Pending Actions is currently set for trial on November 18, 2024. Ruling on this motion sufficiently before November 18, 2024, is appropriate to avoid unnecessary cost and expenses and to conserve judicial resources across both State and Federal Courts. Efforts to move this November 18 trial date or otherwise obtain the voluntary dismissal of this action with Naissance, the plaintiff in that action, have been unsuccessful. The undersigned certifies that these facts in support of emergency relief are accurate.

000010

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b).  The Court retained jurisdiction to enforce the terms of the Plan and otherwise to enter orders to assist in the implementation of the Plan pursuant to Article X of the Plan and Confirmation Order. The Court has the inherent power to enforce its Confirmation Order and the general power to issues orders in aid of implementation of the confirmed Plan pursuant to 11 U.S.C. §§ 105(a) and 1142.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND REGARDING THE PENDING ACTIONS

7.      The Debtor, Naissance, and Choudhri have asserted causes of action against NBK primarily arising from NBK's alleged breach of the Confidential Settlement Agreement ("CSA") that remain pending and are subject to the gate-keeping provisions of the Plan and Confirmation Order. Those Pending Actions include:

- *Naissance Galleria, LLC v. Zaheer, et al*, Cause No. 2023-43755 pending in the District Court of Harris County, Texas, 80th Judicial District ("Naissance I").[1]

- *Naissance Galleria, LLC v. NBK*, Cause No. 2023-41091 pending in the District Court of Harris County, Texas, 129th Judicial District ("Naissance II").[2]

- *Galleria 2425, LLC, Naissance Galleria, LLC and Choudhri v. NBK*, Adversary Case No. 23-06009, which was filed in connection with the Debtor's prior, dismissed chapter 11 case ("Galleria I").[3]

---

[1]  *See* Ex. 1, Plaintiff's Second Amended Petition & Emergency Application for Temporary Restraining Order Against Defendant NBK.

[2]  *See* Ex. 2, Plaintiff's Original Petition and Request for Temporary Restraining Order. Naissance II is set for trial on November 18, 2024 [*see* Ex. 3, Trial Preparation Order]. Because of the imminent trial setting, NBK seeks emergency relief.

[3]  The previous bankruptcy case was dismissed by the Honorable Christopher Lopez on November 1, 2023 for cause on the Court's own motion. [ECF No. 565 at 2 (citing Case No. 23-60036)]. The adversary proceeding was filed on or about September 19, 2023 and a summons was requested but never served. [*see* Ex. 4, Adversary Case No. 23-06009 Docket Sheet]. Because Case No. 23-60036 has been dismissed and the summons never served, the prior chapter 11 case, including Adversary case No. 23-06009, should be closed.

- Adversary Case No. 23-03263, *Choudhri v. NBK and Zaheer* and Ali Choudhri's Second Amended Petition in Intervention ("Choudhri Intervention").

8. The Pending Actions assert the same basic facts and claims which this Court has found meritless. *See e.g.*, ECF No. 565 at 16 (finding the claims "are not viable"); *Id.* at 17 (holding the "the record in this case does not support his sizable but *implausible claims*." (emphasis added)). Specifically, the Court noted in its Memorandum Opinion confirming the Plan that the claims asserted by Debtor, Choudhri, and Naissance against NBK in Adversary No. 23-03263[4] are the same as those asserted in the first bankruptcy in Galleria I, ECF No. 1, namely, breach of the CSA, tortious interference with contract, tortious interference with business relations, fraud and fraudulent inducement/lender liability, fraudulent conveyance, estoppel, breach of good faith and fair dealing and unjust enrichment. [ECF No. 565 at 2-3].

9. They also reflect claims investigated by the Chapter 11 trustee that he found to be "weak to non-existent." [Ex. 5, 6/19/2024 Hr'g Tr. at 122:4-9; 129:9-15; 129:22-130:13].

**THE PLAN'S GATE-KEEPING PROVISIONS**

10. The Court confirmed the Plan on June 22, 2024. [ECF No. 566] Although the Confirmation Order has been appealed, it has not been stayed.

11. The Plan and Confirmation Order include gate-keeping requirements that require parties who either are prosecuting or intend to prosecute claims against any party released of estate claims under the Plan, including specifically NBK, to the extent those claims relate to the Debtor to first obtain a ruling from the Bankruptcy Court that it is pursuing a colorable non-estate claim that has not been released by the confirmed Plan. [ECF No. 566 at 5; Plan, Art. IX(E).]

[4] The Court referenced Adversary No. 23-34815 in its Order. [ECF No. 565 at 3]. However, the removed case is Adversary No. 23-03263.

12.     The Debtor, Naissance and Choudhri all were served with the Plan and Confirmation Order. [ECF No. 572]

### THE PENDING ACTIONS SHOULD BE STAYED AND THE PLAINTIFFS REQUIRED TO SHOW CAUSE WHY THEY SHOULD PROCEED

13.     The Pending Actions are all actions subject to the gate-keeping requirements of the Plan and Confirmation Order because they assert claims against NBK related to the Debtor. It therefore is incumbent on the plaintiffs in the Pending Actions to obtain a ruling from the Court that they are prosecuting colorable, non-estate claims. Yet, in the three months since the Plan was confirmed, none of the plaintiffs in the Pending Actions have complied with those gate-keeping requirements or voluntarily dismissed them.

14.     This lack of action by the Plaintiffs has required NBK to seek relief to enforce the terms of the Plan and to stay the Pending Actions. The potential harm to NBK as the result of this inaction is clear. Naissance I is scheduled for trial in about 45 days. The remaining Pending Actions are active cases on various court dockets that require attention to ensure rights, claims and defenses are not lost, even though they should not be proceeding at all.

15.     Although NBK believes that none of the Pending Actions assert claims that have not been released by the Plan or that are otherwise colorable, to give effect to and enforce the terms of the Plan, two forms of relief are appropriate at this time.

16.     First, the Court should stay the Pending Actions (or, if the Court were so inclined, order the removal of those actions pending in State Court to the Bankruptcy Court and then stay them) pending satisfaction by the plaintiffs in the Pending Actions of the gate-keeping requirements in the Plan.

000013

17.     Second, the Court should require those plaintiffs to demonstrate that the Pending Actions assert non-estate, colorable claims against NBK and if they fail to do so, to require the Pending Actions be dismissed.

18.     In the absence of this relief, the plaintiffs seem intent not to comply with the requirements of the Plan to NBK's detriment.

## RESERVATION OF RIGHTS

19.     NBK reserves all rights, claims, causes of action and remedies, in law or in equity, under the Plan and Confirmation Order. NBK further reserves the right to amend this Motion.

## NOTICE

20.     In addition to service of this motion by ECF/PACER, NBK will give notice to the plaintiffs in the Pending Actions and their counsel of record in those Pending Actions to the extent known.

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion and award NBK all other relief in law or in equity to which it has shown itself entitled. A proposed Order granting the Motion is attached as Exhibit 6.

000014

DATED: October 2, 2024

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Charles C. Conrad*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-   *and*  -

Andrew M. Troop (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

**Counsel for National Bank of Kuwait, S.A.K.P., New York Branch**

7

000015

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on October 2, 2024, a true and correct copy of this document was served via the Court's CM/ECF system to all parties who are deemed to have consented to ECF electronic service, via email and/or U.S. first class mail, postage paid to all counsel in the Pending Actions and listed below, and also by mailing, first class, postage prepaid, to each of the parties on the attached service list.

Matías J. Adrogué
Leila M. El-Hakam
Matías J. Adrogué PLLC
1629 West Alabama Street
Houston, TX 77006
service@mjalawyer.com
*Counsel for Plaintiff in Naissance I*

James Q. Pope
The Pope Law Firm
6161 Savoy Drive Ste 1125
Houston, TX 77036
jamesp@thepopelawfirm.com
*Counsel for Plaintiff in Naissance I*

Rodney Drinnon
McCathern Houston
2000 West Loop South Ste 1850
Houston, TX 77027
rdrinnon@mccathernlaw.com
*Counsel for Defendant Azeemeh Zaheer in Naissance I*

David Tang
6711 Stella Link #343
West University Place, TX 77005
dtangattorney@gmail.com
*Counsel for Defendant Azeemeh Zaheer in Naissance I*

Omar Khawaja
Law Offices of Omar Khawaja, PLLC
5177 Richmond Ave, Ste 1065
Houston, TX 77056
omar@attorneyomar.com
*Counsel for Plaintiff in Naissance II*

David Tang
6711 Stella Link #343
West University Place, TX 77005
dtangattorney@gmail.com
*Counsel for Plaintiff in Naissance II*

Bradley Parker
2127 Bolsover Street
Houston, TX 77005
*Defendant in Naissance II*

Melissa S. Hayward
Hayward PLLC
10501 N. Central Expy Ste 106
Dallas, TX 75231
mhayward@haywardfirm.com
*Counsel for Plaintiffs in Galleria I*

James Q. Pope
The Pope Law Firm
6161 Savoy Drive Ste 1125
Houston, TX 77036
jamesp@thepopelawfirm.com
*Counsel for Plaintiffs in Galleria I*

  */s/ Charles C. Conrad*  
  Charles C. Conrad

8

# **<u>EXHIBIT 1</u>**

000017

11/29/2023 10:01 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 82040972
By: Domonique Palmer
Filed: 11/29/2023 10:01 AM

**CAUSE NO. <u>2023-43755</u>**

| | | |
|---|---|---|
| **NAISSANCE GALLERIA, LLC** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **AZEEMEH ZAHEER** | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | **80TH JUDICIAL DISTRICT** |

<u>**PLAINTIFF'S SECOND AMENDED PETITION & EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER AGAINST DEFENDANT NATIONAL BANK OF KUWAIT S.A.K.P.**</u>

Naissance Galleria, LLC ("***Plaintiff***") files this Amended Petition and Emergency Application for Temporary Restraining Order against National Bank of Kuwait S.A.K.P., New York Branch (individually as "***NBK***", or collectively as "***Defendant***") and, in support, submit the following:

**I.**
**<u>DISCOVERY PLAN</u>**

1.     Discovery should be conducted pursuant to Level 2 of Rule 190.3 of the Texas Rules of Civil Procedure.

**II.**
**<u>PARTIES</u>**

2.     Naissance Galleria, LLC ("***Plaintiff***") is a limited liability company doing business in Texas and is mezzanine lender to Galleria 2425 JV, LLC ("JV"). The JV is the sole member of

Page | 1

000018

Galleria 2425 Owner, LLC (Owner"), which is the 100% owner of the building located at 2425 West Loop S., Houston, Texas 77027 ("*2425 Building*").

3.      Azeemeh Zaheer ("**Zaheer**"), is an individual who resides, and has appeared and is represented by counsel Rodney Drinnon, 2000 West Loop South, Suite 1850, Houston, Texas 77027 and David Tang, 6711 Stella Link, #343, West University Place, Texas 77005. **ZAHEER HAS APPEARED.**

4.      National Bank of Kuwait, S.A.K.P., New York Branch ("*NBK*") is a banking corporation organized under the laws of Kuwait, acting through its New York Branch.  This party may be served through its counsel, Charles Conrad, Two Houston Center, 909 Fannin, Suite 2000, Houston, Texas 77010-1018, and via email: charles.conrad@pillsburylaw.com. **CITATION IS REQUESTED**.

<div align="center">

**III.**
**INTRODUCTION**

</div>

5.      Defendant Zaheer was previously the managing member of Naissance Galleria LLC, however on or about July 3, 2020, Defendant Zaheer assigned all control of Naissance Galleria, LLC to Ali Choudhri.  On or about July 3, 2020, Defendant Zaheer ceased having any "powers, rights, privileges, duties and discretion" as it pertains to Plaintiff Naissance Galleria LLC. Defendant Zaheer sent an email correspondence to Plaintiff's current managing member regarding her transfer of interest to Plaintiff's current managing member, which for all intents and purposes terminated and ratified the interest transfer by Defendant Zaheer for Naissance Galleria LLC.

Page **2** of **29**

6.     Plaintiff Naissance Galleria LLC has been operating under the control of its current managing member since the execution of the assignment on July 3, 2020 and it is unconscionable to discover that Defendant Zaheer, three (3) years after executing the assignment is now suddenly asserting that she manages and has control over Naissance Galleria LLC.  Moreover, Defendant Zaheer retained counsel and initiated litigation against third parties on behalf of Naissance Galleria, LLC three (3) years after executing the assignment.  Most shockingly is that fact that, without any appearance or objection by Zaheer, the managing member of Naissance Galleria, Ali Choudhri, who has controlled Naissance Galleria LLC since around July 2020, has initiated lawsuits against Defendant Bank of Kuwait, and has entered into a sealed confidential settlement agreement on behalf of Naissance Galleria, LLC with Defendant Bank of Kuwait which is the subject of another litigation.

7.     A lawsuit was originally filed against NBK, a party who has been shown to be willing to engage in bad faith actions amounting to lender liability, because of its repeated attempts to make outside deals with third parties to specifically deprive the JV and Owner of their ownership interest, and Plaintiff of its collateral interest in the 2425 Building, in any way it can.

8.     Galleria 2425 Owner, LLC, filed bankruptcy to preserve the asset, which NBK vehemently opposed, and fought to have dismissed from the bankruptcy court. However, at the hearing on NBK's motion to dismiss, Galleria 2425 Owner, LLC was successful in defending against dismissal, and the bankruptcy case moved forward.

9.     Galleria 2425 Owner, LLC promptly proposed a plan in the bankruptcy court, which was characterized as a "really smart" plan that "check[ed] all the boxes" for plan confirmation, according to Judge Lopez.

000020

10.     Then, after Defendant NBK lost its motion to dismiss, true to its pattern of behavior, it continued to engage in more bad faith actions by conspiring with Azeemeh Zaheer, and perhaps other yet unknown parties, to create confusion that caused havoc and further disrupted the bankruptcy case.

11.     Notably, Judge Manor, in this matter, which is referenced in NBK's letter to Judge Lopez, did issue a Temporary Injunction, **which maintained the status quo of Choudhri's management and control of Naissance Galleria, LLC, but limited any actions that could be taken by Choudhri on behalf of Naissance Galleria, LLC to only those which are also approved by Zaheer, until a trial resolves the issue once and for all.**

12.     After the Temporary Injunction was in place establishing Choudhri's control of Naissance Galleria, LLC, Counsel David Tang and Rodney Drinnon acting for Azeemeh Zaheer, appeared in violation of this TRO and purported to act for Naissance Galleria, LLC. They appeared on behalf of Naissance Galleria, LLC, at two separate hearings in the bankruptcy court, on or about October 12th, 2023 and November 1st, 2023. Even more egregiously, these same parties, again acting in express violation of the Temporary Injunction, filed a motion to lift the stay in the bankruptcy court, which is entirely against the fiduciary interests of plaintiff, and they request for Judge Lopez to rule against the this Court and find that Zaheer had control of, and could act for Naissance Galleria, LLC.

13.     When the parties to the state court litigation returned to appear before this Court on November 13th, 2023, Judge Manor confirmed that her Temporary Injunction did not give Zaheer any right to act as the manager of Naissance Galleria, LLC, and confirmed that Choudhri was in control, subject to Zaheer's approval during the pendency of trial.

14.     All of these actions, including the actions taken by Zaheer in direct violation of this Court's temporary injunction, gave rise to Judge Lopez's serious concerns about the ability to move forward with the bankruptcy case without resolution in the state court action. Judge Lopez stated in the November 1st, 2023 Status Conference the following:

> "I don't have anything to qualify it in state court issues. I don't know. There's just a lot of confusing stuff, and my gut tells me that I need to dismiss this case and let you all go figure this out in State Court, because there's not enough here, and there's real concerns that I have…".

15.     The fact that Zaheer, allegedly acting on behalf of Naissance filed these appearances and motions in violation of the Temporary Injunction not only makes these actions unlawful, but there could be no other purpose aside from attempting to cause the dismissal of the bankruptcy case brought by Galleria 2425 Owner, LLC, which is an action that, logically, would be counter to the company's fiduciary interests.

16.     In its letter, NBK cleverly attempts to confuse the court by implying that Ms. Zaheer had control of Naissance Galleria, LLC because the order says that management decisions could not be made without her approval. This is exact same argument Zaheer made before being shut down by this Court itself, stating that its Temporary Injunction left Mr. Choudhri in control, subject to Zaheer's approval, in order to freeze all actions of the parties until trial, except that Mr. Choudhri's actions on behalf of Naissance Galleria, LLC in the instant suit have been expressly permitted.

17.     Judge Weems in the 281st Civil District Court has handled cases related Galleria 2425 Owner, LLC for years, and is well aware that Ms. Zaheer has been entirely absent from any of these proceedings until on or about July 5th, 2023, when Mr. Tang appeared, allegedly for

Unofficial Copy Office of Marilyn Burgess District Clerk

Naissance Galleria, LLC, before that Court's ancillary docket, attempting to stop the foreclosure by NBK, at which hearing Judge Weems questioned the absence of Ms. Zaheer over the last several years, and denied the TRO, as it was not believable to Judge Weems that Zaheer had authority to act on behalf of Naissance Galleria, LLC.

18.     From July 3rd, 2020, the date of signing, until or July 5th, 2023, Defendant Zaheer did not make any claims of control over Naissance Galleria, LLC, did not attempt to object to or interfere with Mr. Choudhri's management of the company, and did not make allegations of forgery regarding the assignment of the company to Choudhri. These allegations are absurd, as Defendant Zaheer has been entirely absent from the company's management for years.

19.     **As a result of this conspiracy by the Defendant Bank of Kuwait and Defendant Zaheer falsely acting on behalf of Plaintiff Naissance Galleria LLC the emergency status conference requested by NBK resulted in the dismissal of the bankruptcy case.**

20.     **What's interesting is that, if Ms. Zaheer was authentically the manager of Naissance Galleria, LLC, and acting in the best interests of the company, she would not have worked tirelessly to have the bankruptcy case dismissed. Any intent it has is behind the NBK debt and will be wiped out.**

21.     Any actions by a manager would be a breach of fiduciary unless there is a back room deal.

22.     Now that NBK has re-posted the 2425 Building for foreclosure, Plaintiff will suffer irreparable harm as a result of the defendants' actions.

Unofficial Copy Office of Marily Burgess District Clerk

## IV.
## FACTUAL BACKGROUND

23.    In 2018, Defendant NBK loaned certain funds to Galleria Owner 2425, LLC  and at the same time NBK has continually interfered with the Plaintiff's ability to lease the 2425 Building to produce revenue and Plaintiff's ability to sell the 2425 Building to pay NBK off.  Every time NBK has so interfered, it has then blamed the Plaintiff for its inability supposedly to meet some of the loan terms.  What is now occurring is a simply a continuation of the long term interference, because Defendant National Bank of Kuwait simply wants to own the building instead of being paid off.

24.    For example, in January 2021, Plaintiff Ali Choudhri, who is vilified by NBK in various pleadings, had the building at 2425 West Loop South, Houston, Texas, the main asset of the Plaintiff, had serious parties interested in building for a purchase price of $85 million, more than enough to clear NBK's debt.  A letter dated January 15, 2021 from SIBS International and two purchase contracts which would have paid off not only NBK, but left the Plaintiff with a great deal of value.  **NBK, rather than facilitate this sale, disclosed confidential information and sales issued a formal notice of default**, while the SIBS International deal was in progress, killing that deal.

25.    **The same was true with regard to NBK's interference with efforts  to lease space in the building to provide revenue so it could operate and make loan payments.**  By August 2021, this situation had become untenable due to NBK's refusal to approve new tenants and new leases, prompting the Plaintiff on August 13, 2021 to send NBK a detailed letter regarding lease-up and renewal prospects for discussions, none of which, it seemed NBK would approve.

000024

- **Healthcare Service Organization**

  - •Size: 130,000+ RSF – large client requirement in their preliminary planning stages: •Industry: Healthcare Service Organization •Type of use: Administration Offices •Direct/Sublease •Commencement date: Q3/2023 •Term:5-10 yrs.   They are specifically VERY interested in amenities available, for example: deli, gym, day care, conference center (# of seats), training center (# of seats).

- **Invesco**

  - We met with the team twice and are actively pursuing them for 2425.   They are interested in a 157-month lease term for 208,830 SF of Net Rental Area.

- **Financial Services Firm**

  - Office •AREA: West Houston (610 West, Hwy 290, Beltway 8) •SPACE: Open Concept •SIZE: Approximately 20,000 – 25,000 rsf •PARKING: 5/1000 ratio •OCCUPANCY: Late 2Q22/Early3Q22 •TERM: 36-60 months with renewal options •This tenant is currently at 24 Greenway on their top floor and have been looking at other A buildings.

- **Beyond Finance**

  - We are discussing a 68-month lease term for +/- 40,000 rentable SF.

- **Banco Affirme**

  - We submitted a 64-month lease term for 4,545 SF of Net Rental Area.

- **Walls Bank (existing tenant)**

  - Renew 3,054 SF of rental space for 60-month term starting January 1, 2022.

- **Others (working directly with ownership)**

  - ResMed (https://www.resmed.com/en-us/), interested in the entire building, working directly with Dr. Peter Farrell, Founder and Chairman

  - Healthstore Holdings (https://www.healthstore.com/), interested in a 15-year term with 80,000 SF in phase 1 and 75,000 SF in 12 months as phase 2.

  - Immunicom (https://immunicom.com/), interested in at least two full floors, moving HQ from San Diego, CA

26.     Below is an August 16, 2021 email from counsel for the Plaintiff to NBK forwarding multiple leases for approval that **NBK had failed to approve or even respond to.**

000025



manny.gardberg@hklaw.com <manny.gardberg@hklaw.com>
To: mona.dajani@pillsburylaw.com
Cc: ali@jetallcompanies.com, Bruce.Merwin@hklaw.com, Charles.Jackson@hklaw.com


Mona, Please see attached. Best, Manny

**Manny Gardberg | Holland & Knight**
Associate
Holland & Knight LLP
811 Main Street, Suite 2500 | Houston, Texas 77002
Phone 713.653.8615 | Fax 713.654.1871
manny.gardberg@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**7 attachments**

_HK Letter re Notice - 8 13 2021.pdf
52K

_Unanimous Consent - January 2021.pdf
854K

2425 Galleria Owner - Operating Budget 2021 (July).pdf
232K

ttps://mail.google.com/mail/u/0/?ik=37856133f6&view=pt&search=all&permmsgid=msg-f%3A1708280571

/15/22, 8:10 PM                                    Jetall Companies Mail - National Bank of

NBK - 2425WLS Leasing Prospect List.pdf
100K

NBK - Proposal 2021.08.13 final.pdf
562K

PSA - 2425 West Loop South.pdf
535K

Purchase - SIBS - 2425 West Loop South Offer letter Updated.pdf
42K

This lack of approval, or finding obstacles to approve, was not new. In September 2019, Related Group had reached out to lease the parking garage located at the 2425 Building to be used for overflow, for parking up to 110 spaces. **NBK's authorized representative Michael Carter would not approve this lease** (note "nbkny" email address below– *i.e.* National Bank of Kuwait, New York Branch), which would have generated a great deal of revenue for the Plaintiff.

From: Michael Carter <Michael.Carter@nbkny.com>
Date: Monday, 23 September 2019 at 13:22
To: Azeemeh Zaheer <azeemeh@naissancecapital.co.uk>, Lisa Walker
<Lisa.Walker@nbkny.com>
Subject: RE: LOI

My primary concern is that the tenant determines when the commencement date is, presumably because they have zoning and building department approvals to complete as well as financing to arrange, which is understandable, however there does not appear to be an outside expiration date for the Commencement date. It appears they could tie up these space permanently without having to pay rent. I think you should have an outside date for Commencement.

27.    The situation became so untenable that in September 2021, Galleria 2425 Owner, LLC  initiated a lawsuit against NBK.

28.    In good faith, even during the pendency of this litigation, the Galleria 2425 Owner, LLC was still trying to get tenants into the building and get NBK's approval to do so, so it would not claim additional breaches of loan agreements.  **On July 2, 2022,  Galleria 2425 Owner, LLC sent NBK five leases for approval, which NBK did not approve.**

29.    *Defendant Bank of Kuwait and Galleria Owner 2425 LLC litigated for eleven (11) months until August 22, 2022, when they entered into a Confidential Settlement Agreement.*  The entire Confidential Settlement Agreement will be submitted to the Court *in camera* at the appropriate time, and the Plaintiff – Naissance Galleria should be allowed to use it in this case since the breach of that Settlement Agreement by NBK is not only actionable, but was also devastating to Plaintiff.  Because NBK has a way of interpreting any action of the Plaintiff as one to breach or avoid some purported contractual obligation or other, when the reverse is entirely true, the Confidential Settlement Agreement has not been attached.  **NBK has prevented  Galleria**

Page **10** of 29

000027

**2425 Owner, LLC's successful performance under any and all agreements it has with NBK, including the Confidential Settlement Agreement.**

30.    The Confidential Settlement Agreement permitted a timeframe in which **Galleria 2425 Owner, LLC** could sell the 2425 Building, and **Galleria 2425 Owner, LLC** was successful in receiving a hard Letter of Intent dated January 17, 2023 to purchase the building from Caldwell Soames.  Again, while these negotiations were ongoing, **NBK took actions which interfered with the continuation and closing of that transaction, including issuing a notice of foreclosure on March 29, 2023 in breach of the Confidential Settlement Agreement, which Galleria 2425 Owner, LLC believes was done intentionally to prevent the sale.**  The sale would have cleared the Bank of Kuwait debt as it stood at that time and left great value for **Galleria 2425 Owner, LLC  and** Plaintiff.  Plaintiff believes that Bank of Kuwait recognized that greater value and wanted to take it for itself by foreclosure in a "loan to own" gambit.

31.    There are tremendous factual inaccuracies that NBK represents to state and federal courts and they continue into these proceedings.  For example, in its Motion to Dismiss the ~~Plaintiff's~~ Bankruptcy, while it is absolutely true that temporary restraining orders were filed to attempt to prevent a foreclosure by NBK and its takeover of the 2425 Building, they were also **granted by this Court.  The facts presented that NBK had not allowed the Galleria 2425 Owner, LLC to lease up the building to generate revenue, and had killed two transactions that Galleria 2425 Owner, LLC was working on that would have cleared NBK and left value for the Galleria 2425 Owner, LLC.**

32.    Additionally, NBK posted for foreclosure in 2023 early, and against an extended grace period that this Court had given Galleria 2425 Owner, LLC, which silenced the bidding process and interest in the 2425 Building completely.  No one wants to buy a building posted for

000028

foreclosure.  **Plaintiff believes that NBK knew this and did it on purpose to prevent the Galleria 2425 Owner, LLC from successfully selling the property and paying off the loan, so NBK could foreclose and become the owner of the 2425 Building.**

33.     The absolute opposite is true.  Representatives of Defendant NBK have admitted in writing that the following substantial payments have been made to Defendant NBK well after March 6, 2021:

   a)     $801,509.42 paid by  Galleria 2425 Owner, LLC to Defendant NBK on August 27, 2022;

   b)     $80,000 paid by Galleria 2425 Owner, LLC to Defendant NBK on April 18, 2023;

   c)     $80,000 paid by Galleria 2425 Owner, LLC to Defendant NBK on May 10, 2023.

This is almost One Million Dollars ($1,000,000) that not only does NBK not give credit to  Galleria 2425 Owner, LLC for having made the payments, but again, it vilifies it, saying exactly the opposite that no payments (zero) have been made since March 6, 2021.

34.     After NBK's disclosures of the situation created by the Confidential Settlement and the wrongful posting for foreclosure during an extension of that agreement, potential buyers of the property who would otherwise become good prospects to negotiate a sale with **Galleria 2425 Owner, LLC** , became potential purchasers of the NBK Note and began negotiating with NBK. NBK interfered with these potential purchases and with these business relationships.  At least the following were interfered with in this fashion:

   a)     Globix Investment,

   b)     Ironwood Commercial Realty,

   c)     Shah Firm, LLC, and

d)    Jeb Brown Law.

**B.    Azeemeh Zaheer Decides She Wants the Building.**

35.    On June 26, 2023, Defendant Zaheer filed a lawsuit in the name of Naissance Galleria, LLC ("**Naissance**"), which she purported to control, in the 157th Judicial District Court in Harris County, Texas referenced by case number 2023-39006 against Brad Parker ("**Parker**") as an initial step in Zaheer pursuit of a hostile takeover of the 2425 Building.

36.    On July 5, 2023,  Defendant Zaheer and also in the name of Naissance, filed a second lawsuit in the 129th Judicial District Court in Harris County, Texas referenced by case number 2023-41091 against Parker and NBK at the request of Zaheer, to further the defendants' hostile takeover attempt of the 2425 Building.  Zaheer sought injunctive relief, but that request for an emergency temporary restraining order was denied.

37.    On or about July 5, 2023, Galleria 2425 Owner, LLC commenced a Chapter 11 bankruptcy proceeding in the Southern District of Texas, referenced by case number 23-60036. NBK sought to dismiss the bankruptcy proceeding, but its motion to dismiss was denied on September 26, 2023.  The Chapter 11 Plan should have been approved and would have substantially reduced the value of Bank of Kuwait's secured debt, which Bank of Kuwait decided it would not allow, just as it had decided not to allow the prior sales of the building that had been lined up by Galleria 2425 Owner, LLC.

**C.    Azeemeh Zaheer is a False Representative of Naissance.**

38.    Azeemeh Zaheer at one time had a business relationship with Ali Choudhri, both of which appeared to have ended mutually for a time.  Azeemeh Zaheer filed an Application for Temporary Injunction in the 80th Judicial District Court for Harris County against Naissance

000030

Galleria, LLC, which was a mezzanine lender to an LLC ("**LLC**") two steps up in the building's ownership chain.

39.    Azeemeh Zaheer had signed, as the authorized representative of the Managing Member of Naissance Galleria, LLC an Assignment of the management rights of that LLC to Ali Choudhri.  In response, Mr. Choudhri stepped into Naissance's shoes, covered its expenses, and did a miraculous job of negotiating the aforementioned settlement with Bank of Kuwait after the Assignment.  Azeemeh Zaheer made this assignment for a number of reasons, but most of them stemmed from her ineffective management of the building and her fear of exposure to Bank of Kuwait and certain individuals affiliated with the Bank of Kuwait because of her poor performance.

40.    After Mr. Choudhri received the Assignment and had negotiated the successful settlement with Bank of Kuwait and the building looked as if it might succeed (a period of years), Azeemeh Zaheer decided she wanted to misappropriate the value that Mr. Choudhri had just preserved and to an extent had just created.  First, she claimed the Assignment was invalid and sought and received a Temporary Injunction on September 21, 2023 from the 80th Judicial District Court in Harris County.  This Temporary Injunction basically only created a stalemate with respect to the management of Naissance Galleria, LLC to preserve the status quo until a trial in January. Mr. Choudhri is still the manager of Naissance Galleria, LLC, not Azeemeh Zaheer, although she did have some approval rights under the injunction.  Mr. Choudhri, as the manager of Naissance Galleria LLC, is only required to obtain approval from Zaheer for his actions.  Zaheer DOES NOT have any control of the entity.  Moreover, this was confirmed at a hearing on November 13, 2023 before Judge Manor in the 80th Judicial District Court.

000031

**D.    Azeemeh Decides to Conspire with Bank of Kuwait So It Could Foreclose On the Building.**

41.    After the September 21, 2023 entry of the Temporary Injunction, some ironic, if not strange, events start taking place with respect to Ms. Zaheer and the Galleria 2425 Owner, LLC.  First, it is against Azeemeh Zaheer and Naissance's financial interests if the Bank of Kuwait forecloses.

42.    Second, on information and belief, Zaheer caused a copy of the Temporary Injunction Entered on September 21, 2023 by the 80th Judicial District Court in Harris County to be sent to counsel for the Bank of Kuwait, who in turn immediately wrote a letter to Judge Lopez, the Bankruptcy Judge in charge of Galleria 2425 Owner, LLC's Bankruptcy, and the Judge who has approval authority over Galleria 2425 Owner, LLC's Plan.  (Not exactly helpful in getting a Plan of Reorganization approved.)

43.    Third, Zaheer's attorneys (Mr. Tang and Mr. Drinnon) show up without any forewarning at the October 12, 2023 status conference in the Bankruptcy Court about the plan, claiming Azeemeh Zaheer now is the manager of Naissance Galleria, LLC and they have been hired by her to represent Naissance Galleria, LLC, all by virtue of the Temporary Injunction.

44.    They again made pleas to the court regarding Zaheer's desire to take over the 2425 Building, stating the Temporary Injunction gave them sole authority to represent Naissance, and Naissance did not want to sue the Bank of Kuwait for breach of the Settlement Agreement as it had already done under Mr. Choudhri's rightful management.

000032

E.    **Zaheer Changes Sides to Make a Deal with the Bank of Kuwait and Extort Money from Mr. Choudhri.**

45.    Progressively, Azeemeh Zaheer's behavior becomes more inexplicable as she instructs her attorneys to: (1) take the position that the Temporary Injunction put her in charge of Naissance (it did not);[1] (2) that Naissance Galleria, LLC could or had already become the owner of Galleria 2425 Owner, LLC) and as the new owner, they might want to take the bankruptcy in another direction.

46.    <u>The only explanation for Zaheer's extraordinary behavior, which appears self-destructive, is Zaheer sees the opportunity to make a deal with the Bank of Kuwait or extort Mr. Choudhri, who will lose millions of dollars of equity in the building if a foreclosure takes place</u>.

47.    This created an environment of confusion for the Bankruptcy Court, which was by Defendants' design, and it was a concerted effort by the Defendants to have the bankruptcy case dismissed, allowing the Bank of Kuwait to foreclose.  Defendant NBK would not be impeded by the bankruptcy and Zaheer could tell Mr. Choudhri, "I will not go along with your reorganization plan unless you pay me millions of dollars" while making a deal with the Bank of Kuwait to block the Plan of Reorganization in the event no payment was received from Mr. Choudhri.

48.    The Defendants are working in concert, to achieve the same end.  Specifically, the Defendants have devised, and intended to devise, a scheme or artifice to seize the 2425 Building

---

[1] At a hearing had in the issuing court (the 80th Judicial District Court) on Monday, November 13, 2023, the Court confirmed her Temporary Injunction Order had not turned control of Naissance over to Zaheer and Zaheer had no authority to authorize attorneys to make the filing and take the action they had on behalf of Naissance Galleria, LLC in the Bankruptcy.

Page **16** of 29

by any means necessary.  Defendants will stop at nothing to see the Plaintiff lose any interest it

has in  the 2425 Building

49.    Defendants' scheme has involved false representations of material information,

including but not limited to misrepresentations concerning the Plaintiff and the purpose and effects

of the Temporary Injunction.

**F.    False Representations by Zaheer's Agents are Successful in Getting Galleria 2425 Owner LLC's Bankruptcy Dismissed.**

50.    The Bankruptcy Court scheduled a Status Conference for  Galleria 2425 Owner,

LLC's Bankruptcy Case for November 1, 2023.  Azeemeh's agents, on October 31, 2023, only

hours before the Status Conference, filed an Emergency Motion.  This Motion contained many

misrepresentations, some of which follow:

    a)    Even though Zaheer had no right to or standing necessary to file anything on behalf of  Naissance, and the Temporary Injunction gave Zaheer no such rights, statements were made in their Emergency Motion directly to the contrary, stating Azeemeh Zaheer was in, Choudhri was out.

    b)    The filing stated flatly at one point that the Assignment had been found to be forged – it had not.

    c)    The filing stated that, because of the Temporary Injunction, Naissance was now controlled exclusively by Zaheer, who could make Naissance become the Owner of the Bankrupt.  (The issuing court on Monday, November 13, 2023, ruled from the bench it said no such thing.)

These  misrepresentations  had  the  desired  effect,  and  the  Bankruptcy  Court  dismissed  the

Bankruptcy, green-lighting the Bank of Kuwait to foreclose.

**G.    Abdullatif is Choudhri's Competitor and Wants to Ruin Him.**

51.    Choudhri has been in the real estate investment and management business for the

last 20 years.  The regular course of Choudhri's business involves numerous aspects of real estate

development.   These  activities  include  real  estate  and  business  acquisitions  and  dispositions,

000034

seeking and obtaining financing, and developing and managing commercial and residential properties. He regularly raises capital for these activities through the issuance of equity and/or debt. It is also within his normal course of business to enter into transactions with borrowers, lenders, and investors to support the purchase, development, and operations of real estate properties.

52. Choudhri at times conducts his real estate investment and management business through the use of special purpose entities, such as Plaintiff Galleria Owner 2425, LLC. Choudhri runs a management company, Jetall Companies, Inc. ("*Jetall*"), to provide employees and management services to entities for purposes of operating real estate investments.

53. Abdullatif has provided financing for numerous third-party claims against Choudhri, including interfering with Choudhri's final divorce proceedings in both Pakistan Supreme Court and Harris County District Court by soliciting Choudhri's ex-wife for her legal claims against Choudhri and/or his entities and to gain access to Choudhri's protected financial disclosures.

54. Upon information and belief, Abdullatif is also financing the litigation expenses of Zaheer against Choudhri in the dispute over the building owned by Plaintiff. Zaheer has agreed to the enterprise course of action aimed at destroying Choudhri's business, and either taking possession of the 2425 Building or extorting money from him to agree to a plan of reorganization.

55. On more than one occasion, Abdullatif resorted to violence and threats against Choudhri and/or his family, friends, and associates. Mr. Choudhri had another real estate venture involving an entity called Dalio. Abdullatif was present at Dalio's foreclosure proceeding, where a friend accompanying him assaulted one of Choudhri's lawyers. On another occasion, Abdullatif and his associates used firearms to hold Choudhri and his associates hostage.

Page **18** of 29

56.     Abdullatif also formed an association with others in his illegal efforts to destroy Choudhri's business.  These individuals include but are not limited to Chris Wyatt, former Chief Operating Officer of Jetall ("**Wyatt**").

57.     Wyatt was hired by Jetall in 2019.  In the course of his employment, Wyatt oversaw legal and litigation matters for Jetall.  He was provided confidential information concerning Jetall's and its client's real estate transactions, finances and debt leverage on properties, and litigation management strategies.  As a Jetall representative, Wyatt was regularly involved in and provided access to privileged information and communications, including information subject to attorney-client and work product privileges.  Wyatt signed a non-disclosure agreement at the beginning of his employment prohibiting him from disclosing confidential information and requiring him to return all files upon his termination.

58.     Wyatt's employment at Jetall ended in December 2020.  When he left Jetall, Wyatt stole corporate files including electronic communications and secretly recorded privileged phone communications between Choudhri and his attorneys.

59.     Jetall obtained a restraining order in January 2021 enjoining Wyatt from disclosing or divulging confidential information obtained through his course of employment with Jetall.

60.     Abdullatif met with Wyatt immediately following Wyatt's departure from Jetall. Abdullatif, directly and through his lawyers, received confidential and privileged information from Wyatt.  This information included but is not limited to illegal recordings of Choudhri's conversations with attorneys.

61.     Upon information and belief, Abdullatif and  his agents were aware that Wyatt was a former employee of Jetall who was involved in confidential and privileged communications and that a restraining order was entered enjoining Wyatt from disclosing confidential information.

Page **19** of **29**

62.    Abdullatif and his agents have used the illegally obtained information and recordings as part of Abdullatif's scheme to destroy Choudhri's business.  Abdullatif retained Wayne Dolcefino ("***Dolcefino***") as a "consultant" to publish on the internet a series of hit pieces on Choudhri.  Dolcefino advertises that his services included "litigation support," and Abdullatif has utilized Dolcefino in the course of his numerous lawsuits asserted against Choudhri and his businesses.

63.    Information illegally obtained from Wyatt is included in many of Dolcefino's hit pieces.  Dolcefino continues to publish these hit pieces on the internet, including videos posted in May 2023.

64.    Abdullatif, with the assistance of Drinnon, now representing Azeemeh Zaheer, has made several false claims against his competitor, Choudhri, in many ways, two of the most egregious being:

a)    Hiring Dolcefino to create video "hit pieces" about Choudhri, his business, his marital status, and inappropriate character based upon his actions during that marital status. This video contained "over the top" falsehoods, e.g. that he was still married and had been for years. It was commercial speech designed to designate a competitor (Choudhri) and give Abdullatif a competitive advantage, and was introduced into interstate commerce by release to major television (broadcast and cable) networks and by placing on the internet where it still resides today, making it available to the potential customers and lenders that are competed for; and

b)    Placing multiple improper Lis Pendens on the record title to properties owned by Choudhri or his business entities, which created a double negative effect on Choudhri's ability to conduct business by hampering his ability to find new lenders or renewing existing loans because the security for them was impaired and making it impossible to sell those properties to raise new capital on his own. These Lis Pendens were "over the top" misrepresentations because they were illegal and did not assert valid interests in the subject properties.  The Lis Pendens were also introduced into interstate commerce because they were filed of record and were available "online" over the internet to any potential customer for commercial real estate in the Houston area.

Page **20** of **29**

000037

**V.**
**CAUSES OF ACTION**

**COUNT 1:  BREACHES OF CONFIDENTIAL SETTLEMENT AGREEMENT**

65.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

66.    Plaintiff and Defendant reached a valid and enforceable agreement expressly set forth in the Confidential Settlement Agreement.  Pursuant to the Confidential Settlement Agreement, Defendant agreed to keep the contents and terms of the parties' agreement completely confidential.

67.    Defendant breached the Confidential Settlement Agreement by disclosing its contents and terms to third parties in violation of the agreement's express confidentiality provisions.  These disclosures prevented the sale of the 2425 Building and chilled the market for other buyers..  The same is true for NBK's wrongful, early filing of a notice of foreclosure on the 2425 Building, also in violation of the Confidential Settlement Agreement.

68.    Plaintiff hereby sues NBK for these breaches of the Confidential Settlement Agreement.  The damages for these breaches are the amounts of money that the Plaintiff would have made from the contemplated transaction

**COUNT 2:  TORTIOUS INTERFERENCE WITH CONTRACT**

69.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

000038

70.     As alleged, NBK tortiously interfered with the SIBS International contract and the Caldwell Soames Inc. contract, causing damages to the Plaintiff, but for NBK's interference, would have been paid to the Plaintiff.

71.     Zaheer, tortiously interfered with Plaintiff's contract with NBK, and with Plaintiff's bankruptcy proceeding.

**COUNT 3:  TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

72.     Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

73.     After NBK's disclosures of the situation created by the confidential settlement and the wrongful posting for foreclosure during a judicial extension of the grace period contained in that agreement, potential buyers of the property who would otherwise have become good prospects to negotiate a sale with Galleria 2425 Owner, LLC became instead potential purchasers from NBK of the NBK note and began contacting and negotiating or attempting to negotiate with NBK instead of Galleria 2425 Owner, LLC  NBK interfered with these potential purchasers and with these potential business relationships.  At least the following were interfered with in this fashion:

a)     Globix Investment,
b)     Ironwood Commercial Realty,
c)     Shah Firm, LLC, and
d)     Jeb Brown Law.

74.     Zaheer,  has interfered with the Plaintiff's relationship with NBK

75.     This interference by the Zaheer damaged Plaintiff in amounts to be determined after discovery

Page **22** of **29**

## COUNT 4:  FRAUD AND FRAUDULENT INDUCEMENT

76.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

77.    NBK never had any intention of living up to the Confidential Settlement Agreement.  The Galleria 2425 Owner, LLC was winning the lawsuit against NBK, so NBK induced the Plaintiff into entering into the Confidential Settlement Agreement which NBK had no intention of living up to.  This fraud works as an estoppel against NBK.  Plaintiff hereby sues NBK for fraud and fraudulent inducement

78.    NBK knew at the time it entered into the Confidential Settlement Agreement it would deflect and tortiously interfere with the Galleria 2425 Owner, LLC's attempts to sell the 2425 Building so NBK would be able to foreclose on the building and take all of the value instead of just the value of the amounts otherwise owed at the time.  The fraud, fraud in the inducement, and subsequent interference for all of which Plaintiff hereby sues NBK.

## COUNT 5:  BUSINESS DISPARAGEMENT

79.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

80.    The posting of the 2425 Building during any negotiation periods and/or the extended grace period when actual buyers were moving toward concluding a deal and when other potential buyers were expressing interest in the 2425 Building, constituted business disparagement against the Plaintiff for which Plaintiff hereby sues NBK.

81.    The efforts of Zaheerto make false accusations and representations about the Plaintiff's ownership interests, management, and decision making abilities constituted business disparagement against the Plaintiff for which the Plaintiff hereby sues Zaheer,

Page **23** of 29

82.    The business disparagement by the Defendants damaged Plaintiff in amounts to be determined after discovery.

## COUNT 6:  UNJUST ENRICHMENT

83.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

84.    If NBK is allowed to foreclose on the 2425 Building it will make an unconscionable profit and succeed in its "loan to own" gambit.  The amount of its unjust enrichment for which Plaintiff hereby sues NBK is the difference between what NBK would have been owed (but for its breaches of the Confidential Settlement Agreement) under the Confidential Settlement Agreement and the true value of the building, for which Plaintiff hereby sue NBK.

## COUNT 7:  CONSPIRACY

85.    Defendants Zaheer,in combination with NBK, agreed to work in concert with each other in order to interfere with Plaintiff's bankruptcy case, and to have it dismissed by making fraudulently claiming they had control over Naissance Galleria, LLC.

86.    Defendants Zaheer, and NBK acted with the intent to harm plaintiff.

87.    To accomplish the object of their agreement Zaheer, and NBK intentionally or negligently mischaracterized the effect of the state court temporary injunction, in order to confuse and disrupt Plaintiff's bankruptcy case, which resulted in dismissal.

88.    The agreement to engage in this conduct proximately caused injury to plaintiff. Plaintiff's interests in Galleria 2425 Owner, LLC's sole asset, instead of being protected through a bankruptcy action, has now been posted for foreclosure on December 5th, 2023, which will irreparably harm Plaintiff.

000041

## COUNT 8:  ATTORNEYS' FEES

89.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

90.    Plaintiff hereby sue Defendants for its reasonable and necessary attorneys' fees under breach of contract and under any statutory or common law right to recover same.

## VI.
## APPLICATION FOR TEMPORARY INJUNCTION OR ORDER

91.    The Defendants have conspired with each other and others, or worked in parallel courses to get the bankruptcy of Plaintiff 2425 Galleria Owner, LLC dismissed so that Bank of Kuwait is not prohibited by the automatic stay from foreclosing.  If a foreclosure takes place, the equity of Plaintiff will be wiped out and Plaintiff will have no assets and no adequate remedy at law to return the retrieve the assets or its value.

92.    Temporary injunctive relief is necessary until such time as the merits of this case can be decided and the status quo is maintained pending resolution on the merits.

## APPLICATION FOR TEMPORARY RESTRAINING ORDER

93.    Plaintiff's application for a temporary restraining order is authorized by Tex. Civ. Prac. & Rem. Code §65.011(1) which allows applicants to the relief sought to restrain the Defendants from prejudicial acts; by Tex. Civ. Prac. & Rem. Code §65.011(3) which allows applicants to the relief sought under the principles of equity and laws of Texas related to injunctions; by Tex. Civ. Prac. & Rem. Code § 65.011(5) which allows applicants to the relief sought when irreparable injury to business, good will, reputation and personal property is threatened; and by Tex. Bus. Orgs. Code § 152.211(b), allowing partners in a partnership to obtain an injunction to enforce rights under the Texas Business Organizations Code.

000042

94.    As set forth above, an emergency hearing on Plaintiff's Application for Temporary Restraining Order is necessary to conserve the Plaintiff's business status and maintain the status quo during the pendency of this lawsuit. Plaintiff would suffer material injury by the delay necessary to give notice. Any delay necessary for notice would lead to imminent and irreparable injury to property.

95.    It is probable that Plaintiff will recover from Defendants after a trial on the merits because the facts set forth are verified and sets forth the Defendants wrongful conduct; and actions including seeking the sale of the business by the Defendants are wrongful and must be stopped.

96.    If Plaintiff's application is not granted, harm is imminent because 1) Galleria 2425 Owner, LLC's  sole asset will be foreclosed as a result of Defendants harmful actions on December 5th, 2023; 2) Defendants will continue to conspire with each other in a manner that is counter to the true interests of Naissance Galleria, LLC; and 3) Defendants will continue to  violate the Temporary Injunction, as they have already done on at least three occasions, in order to interfere with Plaintiff's lawful attempts to preserve the 2425 Building. These harms are imminent and would cause irreparable injury with no other adequate legal remedy.

97.    The harm that will result if the temporary restraining order is not issued is irreparable because Plaintiff has an interest in a unique piece of real estate which it will be wiped out in the event of foreclosure. Texas Courts repeatedly rule that "every piece of **real estate** is innately  [**8] unique. *See, e.g., Greater Houston Bank v. Conte*, 641 S.W.2d 407, 410 (Tex. App.--Houston [14th [*58]  Dist.] 1982, no writ) ("It is well established law that each and every piece of **real estate** is unique. Therefore, if appellants were allowed to foreclose appellees would be irreparably harmed, since **real estate** is so unique."); *El Paso Dev. Co. v. Berryman*, 729 S.W.2d 883, 888 (Tex. App.--Corpus Christi 1987, no writ) ("Every piece of **real estate** is unique,

Page 26 of 29

and if foreclosure were allowed before a full determination of the usury claim, appellee would be irreparably harmed."). *Kotz v. Imperial Capital Bank*, 319 S.W.3d 54, 57-58 (Tex. App.—San Antonio 2010, no pet.).

## VII. <u>JURY DEMAND</u>

98.     Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## VIII. <u>PRAYER</u>

99.     For the reasons set forth above, Plaintiff asks that the Court enter a Temporary Restraining Order, and after a hearing, a Temporary Injunction, enjoining the Defendants in the following manners:

a)      NBK is restrained from 1) Foreclosing on, posting, reposting, or otherwise selling at auction the 2425 Building; and 2) transferring any Note and/or lien it holds or may hold relating to the 2425 Building; or 3) or interfering with the Plaintiff's business in any manner, including by acting in concert with another party.

b)      Actual damages including economic injuries & consequential damages;

c)      Attorney's fees;

d)      Exemplary damages;

e)      Prejudgment and post judgment interest;

f)      Court costs; and

g)      All other relief to which Plaintiff is entitled under both law and equity.

Page **27** of **29**

000044

100.    Plaintiff is willing to post bond.


Respectfully submitted,

**MATÍAS J. ADROGUÉ PLLC**


By: _____
              Matías J. Adrogué
              Texas State Bar No. 24012192
              Leila M. El-Hakam
              Texas State Bar No. 24007147
              1629 West Alabama St.
              Houston, Texas 77006
              713-425-7270 *Telephone*
              713-425-7271 *Facsimile*
              service@mjalawyer.com
              **ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the above and foregoing has been served to all counsel of record by hand delivery, fax transmittal, Certified mail, return receipt requested, electronic mail, e-service, and/or U.S. Mail, on this the 29th day of November, 2023.


_____
Matías J. Adrogué


Page **28** of **29**

000045

JURAT

My name is Ali Choudhri, my date of birth is 01/24/1980. My office address is 1001 West Loop South, Suite 700, Houston, Texas 77027.  I declare under penalty of perjury that the facts and events set forth in the foregoing Amended Petition and Emergency Application for Temporary Restraining Order are within my personal knowledge and are true and correct.


Executed in Harris County, State of Texas, on November 29, 2023.


_____/s/Ali Choudhri_____
Ali Choudhri

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Matias Adrogue
Bar No. 24012192
mja@mjalawyer.com
Envelope ID: 82040972
Filing Code Description: Amended Filing
Filing Description: Plaintiff's Second Amended Petition & Application for TRO
Status as of 11/29/2023 10:18 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jerry CAlexander | | alexanderj@passmanjones.com | 11/29/2023 10:01:12 AM | SENT |
| Ruth NVera | | verar@passmanjones.com | 11/29/2023 10:01:12 AM | SENT |
| Sheryl Chandler | | chandlers@passmanjones.com | 11/29/2023 10:01:12 AM | SENT |
| Jennifer LMacGeorge | | jmac@jlm-law.com | 11/29/2023 10:01:12 AM | SENT |
| Jetall Legal | | legal@jetallcompanies.com | 11/29/2023 10:01:12 AM | SENT |
| Omar Khwaja | | service@attorneyomar.com | 11/29/2023 10:01:12 AM | SENT |
| James Pope | | jamesp@thepopelawfirm.com | 11/29/2023 10:01:12 AM | SENT |
| Omar Khawaja | 24072181 | Omar@attorneyomar.com | 11/29/2023 10:01:12 AM | SENT |
| David Tang | 24014483 | dtangattorney@gmail.com | 11/29/2023 10:01:12 AM | SENT |
| MacGeorge Law Firm Admin | | service@jlm-law.com | 11/29/2023 10:01:12 AM | SENT |

# EXHIBIT 2

000048

7/4/2023 12:36 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 77193010
By: Gerardo Perez
Filed: 7/5/2023 12:00 AM

CAUSE NO. _____

| | | |
|---|---|---|
| **NAISSANCE GALLERIA, LLC,** | § | **IN THE HARRIS COUNTY COURT** |
| **PLAINTIFF** | § | |
| | § | |
| **VS.** | § | **_____ JUDICIAL DISTRICT COURT** |
| | § | |
| **NATIONAL BANK OF KUWAIT,** | § | |
| **S.A.K.P, New York Branch, et al.** | § | |
| **DEFENDANTS.** | § | **HARRIS COUNTY, TEXAS** |

## PLAINTIFF'S ORIGINAL AND REQUEST FOR TEMPORARY RESTRAINING ORDER

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff NAISSANCE GALLERIA, LLC files this its Plaintiff's Original Petition and Temporary Restraining Order against Defendants NATIONAL BANK OF KUWAIT, S.A.K.P, New York Branch and BRAD PARKER, a/k/a BRADLEY PARKER and would respectfully show the following:

**I.**
## DISCOVERY LEVEL

Plaintiff pleads that discovery should be conducted in accordance with a discovery control plan Level 2 under Rule 190 of the Texas Rules of Civil Procedure.

**II.**
## PARTIES

Plaintiff NAISSANCE GALLERIA, LLC ("Plaintiff", "NAISSANCE", or "MEZZ" herein) is a Corporation doing business in Harris County, Houston, Texas.

Defendant BRAD PARKER, a/k/a BRADLEY PARKER ("PARKER" or "Defendant" is an individual residing in Harris County, Houston, Texas and may be personally served with process and this petition at 2127 Bolsover St., Houston, Texas 77005, or wherever he may be found. ***Issuance of citation is requested at this time.***

Defendant National Bank of Kuwait, S.A.K.P., New York Branch ("NBK") is a banking corporation organized under the laws of Kuwait, acting through its New York Branch. Defendant has not designated a registered agent for service of process in the State of Texas. As such, pursuant to Texas Civil Practice and Remedies Code §17.041-045, the Texas Secretary of State is Defendant's agent for service of process in this proceeding, which arises out of business Defendant has done in this state, and Defendant may be served through the Texas Secretary of State. ***Issuance of citation is requested at this time***

### III.
### JURISDICTION AND VENUE

Venue is mandatory in Harris County, Texas pursuant to Texas Civil Practice & Remedies Code § 15.020 because the agreement that forms the basis of this lawsuit constitutes a "major transaction," is in writing, and the parties thereto agreed that a suit arising from the agreement will be brought in Harris County, Texas. Venue is additionally proper in Harris County, Texas pursuant to Texas Civil Practice

2

& Remedies Code § 15.0115 because the Defendants transacted business in and around Harris County, Texas; the real estate which forms the basis of the claims asserted by Plaintiff is located in Harris County, Texas; and the agreement which forms the basis of this suit was executed and performable in Harris County, Texas.

## III.
## <u>FACTS/CAUSES OF ACTION</u>

Defendant NBK is the primary lender, loaning $51,675,000.00 to Galleria 2425 Owner, LLC ("Galleria Owner") secured by a deed of trust on real property and improvements located at 2425 West Loop South, Houston, Texas 77027.

Plaintiff NAISSANCE is the secondary lender, loaning $16,100,000.00 ("Mezz Loan") to Galleria 2425 JV, LLC ("Galleria JV"), secured by a pledge from and a first priority perfected security interest in all of Galleria JV's ownership interests in Galleria Owner, and further evidenced and secured by the documents and instruments set forth on Exhibit B attached hereto.

Co-Defendant Brad Parker also entered into a personal guaranty agreement (Exhibit C) in Plaintiff's favor for the full amount of the Mezz Loan.

Plaintiff and Defendant NBK then entered into an Intercreditor Agreement (Ex. D) which spelled out each respective party's position and obligations as it relates to the financing and potential default of the subject transaction.

Galleria Owner has defaulted the loan agreement with Defendant NBK and is seeking to, among other remedies, foreclose the real property and improvements located

3

at 2425 West Loop South, Houston, Texas 77027 on July 5, 2023 at 10:00 a.m.  (Exhibit A).

Under the Intercreditor Agreement, Defendant NBK was required to give notice of Galleria Owner's default under the senior note because Plaintiff has certain rights such as purchasing the note.  Defendant agreed to send notice to Plaintiff as follows:

> Section 16. Notices**. All notices, demands and requests required to be given hereunder shall be in writing and shall be given as follows: (a) by hand delivery; (b) by overnight nationwide commercial courier service; or (c) by telecopy transmission (other than for notices of default) with a confirmation copy to be delivered by duplicate notice in accordance with any of clause (a) or (b) above, in each case, to the party intended to receive the same at the following address(es):**
>
> To Mezzanine Lender:
>
> > Naissance Galleria, LLC
> > c/o Walkers Corporate Limited
> > Cayman Corporate Centre, 27 Hospital Road
> > George Town, Grand Cayman KY1-9008
> >
> > Cayman Islands Galleria 2425 JV LLC
>
> With a copy to:
>
> > Polsinelli
> > 2950 N Harwood Street, Suite 2100
> > Dallas TX 75201
> >
> > Attention: Brian Bullard, Esq.
> > Tel: 214.397.0030

(Ex. D). Defendant NBK has not served any notice to Plaintiff NAISSANCE on Galleria Owner's default and subsequent Notice of Foreclosure for July 5, 2023.

000052

More importantly, once the property is foreclosed, Plaintiff's right to purchase the senior loan is terminated as follows:

> The right of Mezzanine Lender to purchase the Senior Loan shall automatically terminate (i) upon a transfer of the Premises by foreclosure sale, sale by power of sale or delivery of a deed in lieu of foreclosure or (ii) if a Purchase Option Event ceases to exist.

(Ex. D).

Consequently, Plaintiff will lose its right to purchase the loan and the equitable interest in real property and improvements located at 2425 West Loop South, Houston, Texas 77027.   As a matter of law, Plaintiff faces irreparable harm if it loses the opportunity to acquire an interest in the real property.

Co-Defendant Brad Parker has defaulted on his personal guaranty agreement with Plaintiff. Likewise, Galleria JV has defaulted on the loan agreement with Plaintiff NAISSANCE.  Plaintiff provided Galleria JV notice of its default, for which it has failed to cure and has subsequently failed to pay off the principal amount by the maturity date of May 23, 2023.

Thus, Plaintiff NAISSANCE has exercised its remedies under the Pledge Agreement including but not limited to:

000053

8.    **Rights of Lender.**

(a)    If an Event of Default (as defined in the Loan Agreement) shall occur, Lender shall have the right to receive any and all income, cash dividends, distributions, proceeds or other property received or paid in respect of the Pledged Securities and make application thereof to the Debt, in such order as Lender, in its sole discretion, may elect, in accordance with the Loan Documents. If an Event of Default shall occur, then all such Pledged Securities at Lender's option, shall be registered in the name of Lender or its nominee (if not already so registered), and Lender or its nominee may thereafter exercise (i) all voting, all regular membership and other rights pertaining to the Pledged Securities and (ii) any and all rights of conversion, exchange, and subscription and any other rights, privileges or options pertaining to such Pledged Securities as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Pledged Securities upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the organizational structure of Mortgage Borrower or upon the exercise by Pledgor or Lender of any right, privilege or option pertaining to such Pledged Securities, and in connection therewith, the right to deposit and deliver any and all of the Pledged Securities with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine), all without liability except to account for property actually received by it, but Lender shall have no duty to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(Section 8, Ex. B).

Essentially, Plaintiff is now the absolute owner of Galleria Owner through Galleria JV's 100% membership interest in Galleria Owner. Plaintiff can now also negotiate and assert any of its rights with Defendant NBK as the absolute owner of Galleria 2425 Owner, LLC.

Defendant Parker's Guaranty to Plaintiff is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.

Prior to suit, Plaintiff provided Defendant Parker with notice of events of default. These defaults were not cured and Plaintiff hereby seeks relief under Defendant Parker's guarantee.

All conditions precedent have occurred.

000054

Plaintiff and performed under the agreement and would not have made the loan without Defendant unconditionally guaranteeing the performance and payment to Plaintiff of the guaranteed obligations.

Defendants have breached the contract by failing to perform. Defendant Parker's conduct caused injury to Plaintiff, which resulted in actual and consequential damages within the jurisdictional limits of this Court.

## ATTORNEY'S FEES AND COST

As a result of the facts described above, Plaintiff has found it necessary to engage a licensed attorney in the investigation and prosecution of this action. Plaintiff is entitled to recover reasonable and necessary attorney's fees incurred in the prosecution of this action, and for such relief, Plaintiff seeks a recovery for the amount proven at trial. Plaintiff is also entitled to recover from Defendant all reasonable and necessary attorney's fees incurred in appealing to the court of appeals, if necessary, and incurred in appealing to the Texas Supreme Court, if necessary.

## V.
## APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

**A.    TEMPORARY RESTRAINING ORDER**

All allegations are incorporated herein.

The Plaintiff is entitled to Temporary Restraining Order to restrain further transfer, or any other disposition of the property, or taking possession or exercising any control over the property as follows:

7

a.   Plaintiff will suffer significant irreparable injury and loss.   The threatened damage which would be incurred would be significant and substantial as specified in the previous paragraphs and incorporated herein by reference.

b.   There is a substantial likelihood of success on the merits as specified since Defendant NBK has failed to give notice of the foreclosure as required by the Intercreditor Agreement.

c.   The threatened harm outweighs the harm and temporary restraining order would inflict on the Defendant.

Plaintiff is willing to post a bond in the amount the court deems appropriate.

For these reasons, Plaintiff asks the court. to issue a temporary restraining order preventing Defendant NBK, its attorneys, agents, successors and/or assigns from foreclosing on the real property located at 2425 West Loop South, Houston, Texas 77027.

Plaintiff's declaration affidavit that proves the allegations in this petition and Application  for  Temporary and Injunctive Relief attached and incorporated by reference as Plaintiff's Exhibit 1.

Unless Defendant NBK is restrained from the act complained of herein, Plaintiff will suffer irreparable harm, for which Plaintiff has no adequate remedy at law.

A trial court may enter temporary restraining orders with or without notice and hearing when the movant is threatened with immediate and irreparable harm.  Tex. R. Civ. P. 680.  A temporary restraining order serves to provide emergency relief and to preserve the *status quo* until a hearing may be had on a temporary injunction.  *Ex parte*

000056

*Pierce*, 161 Tex. 524, 342 S.W.2d 424, 426 (1961) (holding temporary restraining order may be granted without notice to the adverse party if it appears from facts shown by affidavit or verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing held).

It is essential that the Court act immediately, prior to notice on Defendant NBK and a hearing on the matter, because Defendant NBK has failed to give proper notice of the July 5, 2023 foreclosure.

In addition, a temporary restraining order is necessary to preserve the status quo until Plaintiff's claims are decided by a trial on the merits. *Smith v. Vial*, 555 S.W.2d 215, 216 (Tex. App.—Dallas 1977, no writ); *Branham v. Short*, 526 S.W.2d 639, 641 (Tex. App.—Fort Worth 1975, no writ). If Defendant NBK's conduct goes unrestrained, Plaintiff may lose the equitable rights in the subject real property.

Plaintiff is seeking a TRO and then a subsequent injunction because it will suffer a probable injury is one that is imminent, irreparable, and has no adequate remedy at law. *Harbor Perfusion, Inc. v. Floyd,* 45 S.W.3d 713, 716 (Tex.App.-Corpus Christi 2001, no pet.); *Tenet Health Ltd. v. Zamora,* 13 S.W.3d 464, 468 (Tex.App.-Corpus Christi 2000, pet. dism'd w.o.j.). Every piece of real estate is unique, and foreclosure can be an irreparable injury for which there is no adequate remedy at law. *El Paso Dev. Co. v. Berryman,* 729 S.W.2d 883, 888 (Tex.App.-Corpus Christi1987, no writ).

Plaintiff is therefore entitled to a temporary restraining order, enjoining DEFENDANT **NATIONAL BANK OF KUWAIT, S.A.K.P, New York Branch** from

000057

foreclosing its lien on real property and improvements located at 2425 West Loop South, Houston, Texas 77027.

## REQUEST FOR ORAL HEARING

Plaintiff asks the Court to set their application for temporary injunction, and after hearing the application, issue same against Defendants.

## VII.
## PRAYER

For these reasons set forth above, unless Defendant **NATIONAL BANK OF KUWAIT, S.A.K.P, New York Branch** is enjoined from following through the July 5, 2023 foreclosure, Plaintiff will suffer irreparable injury for which there is no adequate remedy at law.  Therefore, Plaintiff asks that the Court:

1. Issue a Temporary Restraining Order without a hearing and notice to restraining Defendant **NATIONAL BANK OF KUWAIT, S.A.K.P, New York Branch**, its agents, attorneys, or employees from foreclosing its interest in 2425 West Loop South, Houston, Texas 77027;

2. Issue a Temporary Injunction, after notice to Defendant NBK and a hearing, enjoining Defendant NBK, from the acts listed above;

3. Upon a trial on the merits, Plaintiff prays that they be entitled to judgment:

   a. Against Defendants for actual, compensatory, consequential damages;

   b. Pre-judgment and post-judgment interest at the rate allowed by law until paid;

   c. Reasonable and necessary attorney's fees and all costs of court and expenses incurred by Plaintiff (including expert fees) in the investigation and prosecution of this case; and

000058

d.  Such further relief at law or in equity, to which Plaintiff may by this pleading or proper amendment, thereto, show herself justly entitled.

Respectfully submitted,

**LAW OFFICES OF OMAR KHAWAJA, PLLC**

5177 Richmond Ave., Suite 1065
Houston, Texas 77056
(281) 888-2339 (phone)
(281) 888-2421 (fax)

_____/s/_____
OMAR KHAWAJA
State Bar No.: 24072181

Email: omar@attorneyomar.com

**E-Service Address:**
service@attorneyomar.com

_____
**David Tang**
**State Bar No. 24014483**
6711 Stella Link, #343
West University Pl., Texas 77005
(832) 287-2129
dtangattorney@gmail.com

**ATTORNEYS FOR PLAINTIFF NAISSANCE GALLERIA, LLC**

000059

# **<u>EXHIBIT 3</u>**

000060

Cause No. 202341091

TRPOX

| | | |
|---|---|---|
| NAISSANCE GALLERIA LLC | * | IN THE DISTRICT COURT OF |
| | * | |
| vs. | * | HARRIS COUNTY, TEXAS |
| | * | |
| NATIONAL BANK OF KUWAIT S A K | * | 129th JUDICIAL DISTRICT |

## TRIAL PREPARATION ORDER

[X]   **Pursuant to Rule 166** of the Texas Rule of Civil Procedure, before the Pretrial Conference scheduled for this case, the items that are checked below **must be furnished to opposing counsel in advance** with enough time to allow review for objections, and **brought with you** to the Pretrial Conference.

[X]   **Pursuant to Rule 166** of the Texas Rule of Civil Procedure, the items that are checked below must be **FILED BEFORE OR** by **11-11-2024**.

[X]   **Pursuant to Rule 166** of the Texas Rule of Civil Procedure, the items that are checked must be completed and ready for discussion with the court at the Pretrial Conference.

* * * * * *

[X]   **Party/Attorney List.**  Names, addresses, and phone numbers of each pro se party and attorney.

[X]   **Trial Witness List.**  The name, address, and telephone number of any person expected to testify at trial, and a brief statement of each identified person's connection with the case.

[X]   **Draft Jury Charge** (if a jury fee has been paid) or Findings of Fact and Conclusions of Law. Modifications may be submitted as the trial progresses.

[X]   **Exhibits.** An exhibit list is required. All exhibits must be pre-marked with inadmissible matters readacted (e.g. insurance). Objections to authenticity must be made pursuant to Rule 193.7.

[X]   **Deposition Excerpts or Edited Videotapes.**  Designate page and line in sequence to be used at trial.

[X]   **Motions in Limine.**

[X]   **Trial Scheduling.**  Estimated trial length, and potential attorney or witness conflicts or travel difficulties.

[X]   **Other.**

TRIAL: 11.18.24. RULE 166(G) MOTIONS. MOTIONS TO EXCLUDE
EXHIBITS/WITNESSES. DRAFT FINAL JUDGMENTS. MOTION FOR TRIAL CONTINUANCE
SHOULD BE FILED ASAP OR NO LATER THAN ONE WEEK BEFORE DOCKET CALL. FAILURE
TO OBEY MAY RESULT IN SANCTIONS.

Signed

BRADLEY PARKER

MICHAEL GOMEZ
JUDGE, 129TH DISTRICT COURT
DATE GENERATED : 8/27/2024

000061 JCV001

Cause No. 202341091

TRPOX

| NAISSANCE GALLERIA LLC | * | IN THE DISTRICT COURT OF |
| | * | |
| vs. | * | HARRIS COUNTY, TEXAS |
| | * | |
| NATIONAL BANK OF KUWAIT S A K | * | 129th JUDICIAL DISTRICT |

## TRIAL PREPARATION ORDER

[X]  **Pursuant to Rule 166** of the Texas Rule of Civil Procedure, before the Pretrial Conference scheduled for this case, the items that are checked below **must be furnished to opposing counsel in advance** with enough time to allow review for objections, and **brought with you** to the Pretrial Conference.

[X]  **Pursuant to Rule 166** of the Texas Rule of Civil Procedure, the items that are checked below must be **FILED BEFORE OR** by **11-11-2024.**

[X]  **Pursuant to Rule 166** of the Texas Rule of Civil Procedure, the items that are checked must be completed and ready for discussion with the court at the Pretrial Conference.

* * * * * *

[X]    **Party/Attorney List.**  Names, addresses, and phone numbers of each pro se party and attorney.

[X]    **Trial Witness List.**  The name, address, and telephone number of any person expected to testify at trial, and a brief statement of each identified person's connection with the case.

[X]    **Draft Jury Charge** (if a jury fee has been paid) or Findings of Fact and Conclusions of Law. Modifications may be submitted as the trial progresses.

[X]    **Exhibits.** An exhibit list is required. All exhibits must be pre-marked with inadmissible matters readacted (e.g. insurance). Objections to authenticity must be made pursuant to Rule 193.7.

[X]    **Deposition Excerpts or Edited Videotapes.**  Designate page and line in sequence to be used at trial.

[X]    **Motions in Limine.**

[X]    **Trial Scheduling.**  Estimated trial length, and potential attorney or witness conflicts or travel difficulties.

[X]    **Other.**

TRIAL: 11.18.24. RULE 166(G) MOTIONS. MOTIONS TO EXCLUDE
EXHIBITS/WITNESSES. DRAFT FINAL JUDGMENTS. MOTION FOR TRIAL CONTINUANCE
SHOULD BE FILED ASAP OR NO LATER THAN ONE WEEK BEFORE DOCKET CALL. FAILURE
TO OBEY MAY RESULT IN SANCTIONS.

Signed

BRAD (A/K/A PARKER, BRADLEY)
PARKER
2127 BOLSOVER ST
HOUSTON, TX 77005

MICHAEL GOMEZ
JUDGE, 129TH DISTRICT COURT
DATE GENERATED : 8/27/2024

3

000062 JCV001

TRPOX

Cause No. 202341091

| | | |
|---|---|---|
| NAISSANCE GALLERIA LLC | * | IN THE DISTRICT COURT OF |
| vs. | * | HARRIS COUNTY, TEXAS |
| NATIONAL BANK OF KUWAIT S A K | * | 129th JUDICIAL DISTRICT |

## TRIAL PREPARATION ORDER

[X]  **Pursuant to Rule 166** of the Texas Rule of Civil Procedure, before the Pretrial Conference scheduled for this case, the items that are checked below **must be furnished to opposing counsel in advance** with enough time to allow review for objections, and **brought with you** to the Pretrial Conference.

[X]  **Pursuant to Rule 166** of the Texas Rule of Civil Procedure, the items that are checked below must be **FILED BEFORE OR** by **11-11-2024**.

[X]  **Pursuant to Rule 166** of the Texas Rule of Civil Procedure, the items that are checked must be completed and ready for discussion with the court at the Pretrial Conference.

* * * * * *

[X]  **Party/Attorney List.** Names, addresses, and phone numbers of each pro se party and attorney.

[X]  **Trial Witness List.** The name, address, and telephone number of any person expected to testify at trial, and a brief statement of each identified person's connection with the case.

[X]  **Draft Jury Charge** (if a jury fee has been paid) or Findings of Fact and Conclusions of Law. Modifications may be submitted as the trial progresses.

[X]  **Exhibits.** An exhibit list is required. All exhibits must be pre-marked with inadmissible matters readacted (e.g. insurance). Objections to authenticity must be made pursuant to Rule 193.7.

[X]  **Deposition Excerpts or Edited Videotapes.** Designate page and line in sequence to be used at trial.

[X]  **Motions in Limine.**

[X]  **Trial Scheduling.** Estimated trial length, and potential attorney or witness conflicts or travel difficulties.

[X]  **Other.**

TRIAL: 11.18.24. RULE 166(G) MOTIONS. MOTIONS TO EXCLUDE
EXHIBITS/WITNESSES. DRAFT FINAL JUDGMENTS. MOTION FOR TRIAL CONTINUANCE
SHOULD BE FILED ASAP OR NO LATER THAN ONE WEEK BEFORE DOCKET CALL. FAILURE
TO OBEY MAY RESULT IN SANCTIONS.

Signed

DAVID TANG
6711 STELLA LINK #343
HOUSTON, TX 77005

MICHAEL GOMEZ
JUDGE, 129TH DISTRICT COURT
DATE GENERATED : 8/27/2024

24014483

000063 JCV001

TRPOX

Cause No. 202341091

| | | |
|---|---|---|
| NAISSANCE GALLERIA LLC | * | IN THE DISTRICT COURT OF |
| | * | |
| vs. | * | HARRIS COUNTY, TEXAS |
| | * | |
| NATIONAL BANK OF KUWAIT S A K | * | 129th JUDICIAL DISTRICT |

## TRIAL PREPARATION ORDER

[X]    **Pursuant to Rule 166** of the Texas Rule of Civil Procedure, before the Pretrial Conference scheduled for this case, the items that are checked below **must be furnished to opposing counsel in advance** with enough time to allow review for objections, and **brought with you** to the Pretrial Conference.

[X]    **Pursuant to Rule 166** of the Texas Rule of Civil Procedure, the items that are checked below must be **FILED BEFORE OR** by **11-11-2024**.

[X]    **Pursuant to Rule 166** of the Texas Rule of Civil Procedure, the items that are checked must be completed and ready for discussion with the court at the Pretrial Conference.

* * * * * *

[X]    **Party/Attorney List.**  Names, addresses, and phone numbers of each pro se party and attorney.

[X]    **Trial Witness List.**  The name, address, and telephone number of any person expected to testify at trial, and a brief statement of each identified person's connection with the case.

[X]    **Draft Jury Charge** (if a jury fee has been paid) or Findings of Fact and Conclusions of Law. Modifications may be submitted as the trial progresses.

[X]    **Exhibits.** An exhibit list is required. All exhibits must be pre-marked with inadmissible matters readacted (e.g. insurance). Objections to authenticity must be made pursuant to Rule 193.7.

[X]    **Deposition Excerpts or Edited Videotapes.**  Designate page and line in sequence to be used at trial.

[X]    **Motions in Limine.**

[X]    **Trial Scheduling.**  Estimated trial length, and potential attorney or witness conflicts or travel difficulties.

[X]    **Other.**

TRIAL: 11.18.24. RULE 166(G) MOTIONS. MOTIONS TO EXCLUDE
EXHIBITS/WITNESSES. DRAFT FINAL JUDGMENTS. MOTION FOR TRIAL CONTINUANCE
SHOULD BE FILED ASAP OR NO LATER THAN ONE WEEK BEFORE DOCKET CALL. FAILURE
TO OBEY MAY RESULT IN SANCTIONS.

Signed

CHARLES CLAYTON CONRAD
909 FANNIN ST., SUITE 2000
HOUSTON, TX 77010

MICHAEL GOMEZ
JUDGE, 129TH DISTRICT COURT
DATE GENERATED : 8/27/2024

24040721

JCV001

# **EXHIBIT 4**

000065

# U.S. Bankruptcy Court
## Southern District of Texas (Victoria)
## Adversary Proceeding #: 23-06009

*Assigned to:* Bankruptcy Judge Christopher M. Lopez          *Date Filed:* 09/19/23
*Lead BK Case:* 23-60036
*Lead BK Title:* Galleria 2425 Owner LLC
*Lead BK Chapter:* 11
*Demand:*

*Nature[s] of Suit:* 02 Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)

### Plaintiff
-----------------------
**Galleria 2425 Owner, LLC**                    represented by **James Q. Pope**
c/o Melissa S. Hayward                                           The Pope Law Firm
Hayward PLLC                                                     6161 Savoy Drive
10501 N. Central Expy., Ste. 106                                Ste 1125
Dallas, TX 75231                                                Houston, TX 77036
                                                                713-449-4481
                                                                Email: ecf@thepopelawfirm.com
                                                                *LEAD ATTORNEY*

### Plaintiff
-----------------------
**Naissance Galleria LLC**                      represented by **James Q. Pope**
                                                                (See above for address)
                                                                *LEAD ATTORNEY*

### Plaintiff
-----------------------
**Ali Choudhri**                                represented by **James Q. Pope**
1001 W. Loop South                                              (See above for address)
Suite 700                                                       *LEAD ATTORNEY*
Houston, TX 77027

V.

### Defendant
-----------------------
**National Bank of Kuwait, S.A.K.P., New York Branch**   represented by **National Bank of Kuwait, S.A.K.P., New York Branch**
                                                                PRO SE

| Filing Date | # | Docket Text |
|-------------|---|-------------|
|             |   |             |

000066

| 09/19/2023 | [1](#) <br> (40 pgs; 4 docs) | Adversary case 23-06009. Nature of Suit: (02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))) Complaint by Galleria 2425 Owner, LLC, Naissance Galleria LLC, Ali Choudhri against National Bank of Kuwait, S.A.K.P., New York Branch. Fee Amount $350 (Attachments: # [1](#) Adversary Cover Sheet # [2](#) Exhibit A # [3](#) Exhibit B) (Hayward, Melissa) (Entered: 09/19/2023) |
|---|---|---|
| 09/19/2023 | | Receipt of Complaint( [23-06009](#)) [cmp,cmp] ( 350.00) Filing Fee. Receipt number A24739952. Fee amount $ 350.00. (U.S. Treasury) (Entered: 09/19/2023) |
| 10/09/2023 | [2](#) <br> (2 pgs) | Request for Issuance of Summons on National Bank of Kuwait, S.A.K.P., New York Branch. (Hayward, Melissa) (Entered: 10/09/2023) |
| 10/13/2023 | [3](#) <br> (2 pgs) | Summons Issued on National Bank of Kuwait, S.A.K.P., New York Branch Date Issued 10/13/2023. (RebeccaBecknal) (Entered: 10/13/2023) |

## PACER Service Center

### Transaction Receipt

#### 10/01/2024 17:29:35

| PACER Login: | pwsp0438 | Client Code: | 054391-0000008-19105 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 23-06009 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| Billable Pages: | 1 | Cost: | 0.10 |

# **EXHIBIT 5**

000068

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3    In re                      )  CASE NO: 23-34815 (JPN)
                                 )
 4    GALLERIA 2425 Owner, LLC,  )  Houston, Texas
                                 )
 5            Debtor.            )  Wednesday, June 19, 2024
                                 )
 6                               )  9:00 a.m. to 4:54 p.m.
      -----------------------------)

 7

 8                               TRIAL

 9          BEFORE THE HONORABLE JEFFREY P. NORMAN
                 UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For Debtor:              REESE W. BAKER, ESQ.
                               Baker & Associates
13                             950 Echo Lane, Suite 300
                               Houston, TX 77024
14
      For 2425 WL, LLC:        H. GRAY BURKS, IV, ESQ.
15                             BurksBaker, PLLC
                               950 Echo Lane, Suite 300
16                             Houston, TX 77024

17                             STEPHEN SATHER, ESQ.
                               Barron & Newburger, P.C.
18                             7320 North Mopac Expressway
                               Suite 400
19                             Austin, TX 78731

20    For Ali Choudhri,        ALI CHOUDHRI
      pro se:                  2425 West Loop South, 11th Floor
21                             Houston, TX 77027

22    For the Trustee:         R.J. SHANNON, ESQ.
                               Shannon & Lee LLP
23                             2100 Travis Street, Suite 1525
                               Houston, TX 77002

24

25    For National Bank of     ANDREW M. TROOP, ESQ.
```

```
 1   Kuwait, S.A.K.P., New      PATRICK E. FITZMAURICE, ESQ.
     York Branch:               Pillsbury Winthrop Shaw Pittman
 2                              31 West 52nd Street
                                New York, NY 10019-6131
 3                              CHARLES C. CONRAD, ESQ.
                                Pillsbury Winthrop Shaw Pittman
 4                              Two Houston Center
                                909 Fannin, Suite 2000
 5                              Houston, TX 77010-1028

 6   Court Reporter:            TRACEY CONRAD

 7   Transcribed by:            Veritext Legal Solutions
                                330 Old Country Road, Suite 300
 8                              Mineola, NY 11501
                                Tel: 800-727-6396
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   Transcript produced by transcription service.
```

```
 1                              INDEX

 2   TRIAL WITNESSES       DIRECT    CROSS   REDIRECT   RECROSS

 3   MICHAEL CARTER          34       67       104       108

 4   CHRISTOPHER MURRAY     111      145       179       182

 5   ALLEN HOLLIMAN        185      187

 6   ALI CHOUDHRI         195      231       233

 7

 8   TRIAL EXHIBITS                                    RECEIVED

 9   Exhibit 508-7                                        45

10   Exhibit 501-01                                       59

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

000071

```
1              MR. FITZMAURICE:  Okay.  You can take this one
2    down.  Thank you.
3    BY MR. FITZMAURICE:
4    Q    Mr. Murray, are you aware of whether or not the debtor
5    has asserted claims against the National Bank of Kuwait?
6    A    Yes.
7    Q    In the course of your duties in this case as the
8    Chapter 11 trustee, have you investigated those claims?
9    A    Yes.
10             MR. FITZMAURICE:  I'm just going to grab a
11   document from the table if that's okay.
12             THE COURT:  That's fine.  Feel free.
13             MR. FITZMAURICE:  Always at the bottom of the
14   pile.
15   BY MR. FITZMAURICE:
16   Q    So Mr. Murray, I'd like to discuss with you the things
17   that you did to investigate the debtor's claims against the
18   bank.  Did you discuss the nature of those claims with the
19   debtor's counsel?
20   A    Yes.
21   Q    Now the debtor has more than one counsel.  Is there --
22   can you let us know who you spoke to?
23   A    At different points I spoke to Mr. Baker, I spoke to
24   Mr. Choudhri personally, spoke to Ms. Hayward, spoke with
25   Mr. Alexander.  At some point I think we spoke, but Mr.
```

```
 1              MR. BURKS:  Based only his view of the settlement

 2   agreement?

 3              THE COURT:  I overruled the objection, Mr. Burks.

 4   You don't get to reargue the objection.  Please sit down.

 5   Thank you.  Go ahead.  You can answer the question.

 6   BY MR. FITZMAURICE:

 7   Q    Do you recall the question?

 8   A    I think it was what my -- ask again.

 9   Q    Yes.  After -- as a result of the investigation that

10   you performed in connection with reviewing the estate's

11   claims against the bank, did you form a view as to the

12   enforceability of the settlement agreement?

13   A    Yes.

14   Q    And what was that view?

15   A    That it was likely enforceable.

16   Q    In conducting your investigation, were you looking for

17   factual support for the concept that the settlement

18   agreement could be rescinded?

19   A    Yes.

20   Q    Did you find any?

21   A    No.

22   Q    Are you aware that Mr. Choudhri and the debtor assert

23   claims against the bank that relate to events that occurred

24   after August 22nd of 2022?

25   A    Yes.
```

1    Q    And I'll just represent to you that's the date of the

2    settlement agreement.  We can look at it, but the document's

3    in evidence.  Did they provide you any factual support for

4    those claims?

5    A    They told me what their allegations were, yes.

6    Q    Did they provide you with any documentary evidence in

7    support of those claims?

8    A    No.

9    Q    Did you form a view as to the factual support for those

10    claims?

11    A    Yes.

12    Q    What was that?

13    A    That it was weak to non-existent.

14    Q    In connection with your investigation into the estate's

15    claims against the National Bank of Kuwait, did you form a

16    view as to the voracity of Mr. Choudhri?

17    A    Yes.

18    Q    What was that?

19    A    I did not think I could rely on the voracity of things

20    Mr. Choudhri told me.

21    Q    Have you read the plan that NBK has filed in this case?

22    A    Yes.

23    Q    Do you understand that the plan reflects a compromise

24    or settlement of estate claims against the bank?

25    A    Yes.

1    But quite clearly, this is a case that is now over 18 months

2    old, and I agree that it is a case that needs to come to a

3    conclusion one way or the other.

4            I am hopeful, Mr. Murray, that I will get some

5    findings of fact and conclusions of law and an order either

6    confirming the plan or not to you by the time that you have

7    your auction.  That's the goal.  All right.

8            It's just been a really, really bad week.  I mean,

9    I will say that I'm not typically as busy as I've been this

10   week.  I have a huge panel tomorrow that's 61 pages.  I

11   contested confirmation hearings in the afternoon.  And I

12   have a Galveston docket on Friday.  So I will work as I can

13   and as I'm allowed to given what limited time I have, but I

14   promise you that I'll get something to you that you can look

15   at, agree with, disagree, and appeal as you feel necessary.

16           All right.  Thank you.  We're adjourned today.

17           CLERK:  All rise.

18           (Whereupon these proceedings were concluded at

19   4:54 PM)

20

21

22

23

24

25

```
 1                C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6   [signature: Sonya L. Ledanski Hyde]

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date  June 25, 2024
```

# **EXHIBIT 6**

000077

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 OWNER, LLC** | § | |
| | § | **Chapter 11** |
| Debtor. | § | |

**ORDER GRANTING EMERGENCY MOTION TO**
**ENFORCE THE GATE-KEEPING PROVISIONS OF THE**
**CONFIRMED CHAPTER 11 PLAN**

CAME ON FOR CONSIDERATION the Emergency Motion to Enforce the Gate-Keeping

Provisions of the Confirmed Chapter 11 Plan ("Motion") filed by National Bank of Kuwait,

S.A.K.P., New York Branch ("NBK"). In the Motion, NBK seeks an order staying the pending

actions identified below because, among other things, the plaintiffs in those actions are required

obtain an order from this Court that the claims they have asserted against NBK are colorable non-

estate claims. They have not done so. Having considered the Motion, any responses related

thereto, the record of the chapter 11 case, and all other evidence before it, and after due

deliberation, the Court **ORDERS** that

  1. The following actions (the "Pending Actions") are stayed pending further order of

this Court:

- *Naissance Galleria, LLC v. Zaheer, et al*, Cause No. 2023-43755 pending in the District Court of Harris County, Texas, 80th Judicial District.

- *Naissance Galleria, LLC v. NBK*, Cause No. 2023-41091 pending in the District Court of Harris County, Texas, 129th Judicial District.

- *Galleria 2425, LLC, Naissance Galleria, LLC and Choudhri v. NBK*, Adversary Case No. 23-06009 pending in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division.

- Adversary Case No. 23-03263 in which Ali Choudhri's Second Amended Petition in Intervention remains pending.

2. The plaintiffs in the Pending Actions, Debtor, Naissance Galleria, LLC, and Ali Choudhri shall file any written response to the Motion on or before October 11, 2024, showing cause why the claims asserted in their respective Pending Actions are colorable, non-estate claims.

3. Any written reply to a filed response shall be due on or before October 17, 2024.

4. The Motion shall be heard on October ___, 2024 at _____ a.m./p.m. in Courtroom ____, United States Court House, 515 Rusk St., Houston, Texas.

5. NBK shall serve a copy of this order on the Plaintiffs and their counsel of record, in the Pending Actions within two business day of the entry of this Order.

6. NBK shall file a copy of this Order in each of the Pending Actions within two business days of the entry of this Order.

Signed: _____, 2024.


_____
Honorable Jeffrey P. Norman
United States Bankruptcy Judge

2

Submitted by:

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Charles C. Conrad*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-  *and*  -

Andrew M. Troop (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

***Counsel for National Bank of Kuwait, S.A.K.P., New York Branch***

**IN RE GALLERIA 2425 OWNER, LLC, CASE NO. 23-34815**
**SERVICE LIST (a/o July 2, 2024)**

**Debtor:**
Galleria 2425 Owner, LLC
1001 West Loop South Ste 700
Houston, TX 77027

**Debtor's Counsel:**
Reese W. Baker
Baker & Associates
950 Echo Lane Ste 300
Houston, TX 77024

James Q. Pope
The Pope Law Firm
616 Savoy Drive Ste 1125
Houston, TX 77036

**U.S. Trustee:**
Office of United States Trustee
Attn: Jana Smith Whitworth
515 Rusk Street Suite 3516
Houston, TX 77002

**Chapter 11 Trustee:**
Christopher R. Murray
602 Sawyer Street Ste 400
Houston, TX 77007

**Chapter 11 Trustee's Counsel:**
R. J. Shannon
Shannon & Lee LLP
2100 Travis Street Ste 1525
Houston, TX 77002

**Governmental Entities:**
Harris County Tax Assessor
P O Box 4622
Houston, TX 77210

Harris County, et al.
P O Box 2928
Houston, TX 77252-2928

**Twenty Largest Creditors:**
Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070

Cirro Electric
P O Box 60004
Dallas, TX 75266

City of Houston
P O Box 1560
Houston, TX 77251-1560

City of Houston Water Department
P O Box 1560
Houston, TX 77251-1560

Datawatch Systems
Suite 200
4520 East West Highway
Bethesda, MD 20814

Firetron
10101A Stafford Centre Dr.
Stafford, TX 77477

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062

Gulfstream Legal Group
1300 Texas Street
Houston, TX 77002
(*Returned to Sender / Unable to Forward*)

Gulfstream Legal Group
720 N Post Oak Rd Ste 355
Houston, TX 77024

Hayward PLLC
10501 N Central Expy Ste 106
Dallas, TX 75231-2203

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362

Houston Community College System
c/o Tara Grundemeier
Linebarger, Groggan, Blair & Sampson
P O Box 3064
Houston, TX 77253-3064

Houston Independent School District
P O Box 4668
Houston, TX 77210
(*Returned to Sender / Unable to Forward*)

Lexitas
P O Box 734298 Dept 2012
Dallas, TX 75373

Nationwide Security
2425 W Loop South Ste 300
Houston, TX 77027
(*Returned to Sender / Unable to Forward*)

Nichamoff Law Firm
2444 Times Blvd Ste 270
Houston, TX 77005

T&R Mechanical
21710 White Oak Drive
Conroe, TX 77306-8848
(*Returned to Sender / Unable to Forward*)

TKE
3100 Interstate North Cir SE 500
Atlanta, GA 30339

Zindler Cleaning Service Co.
2450 Fondren Ste 113
Houston, TX 77063

**Other Creditors / Interest Holders:**
2425 WL, LLC
60 West 2nd Street
Freeport, NY 11746

ADT
P O Box 382109
Pittsburgh, PA 15251

Ali Choudhri
1001 West Loop South 700
Houston, TX 77027

Ash Automated Control Systems, LLC
P O Box 1113
Fulshear, TX 77441

CFI Mechanical, Inc.
6109 Brittmoore Rd
Houston, TX 77041

CNA Insurance Company
P O Box 74007619
Chicago, IL 60674

Comcast
P O Box 60533
City of Industry, CA 91716

Environmental Coalition Inc.
P O Box 1568
Stafford, TX 77497

Ferguson Facilities Supplies
P O Box 200184
San Antonio, TX 78220

Jetall Companies Inc.
2425 West Loop South Ste 1100
Houston, TX 77027-4210

Kings 111 Emergency Communications
751 Canyon Drive Suite 100
Coppell, TX 75019

Logix Fiber Networks
P O Box 734120
Dallas, TX 75373

4868-8377-7229.v1
000082

Mueller Water Treatment
1500 Sherwood Forest Dr
Houston, TX 77043

Smart Office Solutions
6623 Theall Road
Houston, TX 77066-1213
(*Returned to Sender / Unable to Forward*)

Waste Management
P O Box 660345
Dallas, TX 75266

Metwall Design Solutions LLC
10931 Day Road
Houston, TX 77043-4901

US Retailers LLC d/b/a Cirro Energy
Attn: Bankruptcy Department
P O Box 3606
Houston, TX 77253-3606

Naissance Galleria, LLC
c/o Law Office of Nima Taherian
701 N Post Oak Rd Ste 216
Houston, TX 77024

H.N.B. Construction, LLC
c/o Malcolm D. Dishongh
P O Box 2347
Humble, TX 77347-2347

CC2 TX, LLC
14800 Landmark Blvd Ste 400
Dallas, TX 75254

MacGeorge Law Firm
2921 E 17th St Bldg D Ste 6
Austin, TX 78702
(*Returned to Sender / Unable to Forward*)

MacGeorge Law Firm
701 Tillery Street Ste 12
Austin, TX 78702

**Executory Contract Counterparties:**

2425 West Loop LLC dba Metwall Design
Solutions LLC
2425 West Loop South Ste 800
Houston, TX 77027-4214
(*Returned to Sender / Unable to Forward*)

2425 WL, LLC
13498 Pond Springs Rd
Austin, TX 78729-442
(*Returned to Sender / Unable to Forward*)

2425 WL, LLC
700 Lavaca Street Ste 1401
Austin, TX 78701
(*Returned to Sender / Unable to Forward*)

Bankable Equities
2425 West Loop South Ste 600
Houston, TX 77027-4203

Boho Lounge
2425 West Loop South Ste 100
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

CNA Insurance Company
P O Box 74007619
Chicago, IL 60674

Eyebrows 4UTX LLC
2425 West Loop South Ste 340b
Houston, TX 77027-4205

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062

G3 Global Services LLC
2425 West Loop South Ste 310
Houston, TX 77027-4208

Galloworks
2425 West Loop South Ste 400
Houston, TX 77027-4205

3

Jetall Companies Inc.
2425 West Loop South Ste 1100
Houston, TX 77027-4210

Kudrath Enterprises PLLC
2425 West Loop South Ste 350
Houston, TX 77027-4208

Nationwide Investigations & Security Inc.
2425 West Loop South Ste 300
Houston, TX 77027-4207
(*Returned to Sender / Unable to Forward*)

Shah Sloan LLC
2425 West Loop South Ste 501, 503 and 523
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

SIBS International Inc.
2425 West Loop South Ste 900
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

SIBS International Inc.
2425 West Loop South Ste 350
Houston, TX 77027
(*Returned to Sender / Unable to Forward*)

SprintCom Inc.
2425 West Loop South, Rooftop
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

St. Christopher Holdings GP LLC
2425 West Loop South Ste 700
Houston, TX 77027-4205

UL Therapy
2425 West Loop South Ste 315
Houston, TX 77027-4211
(*Returned to Sender / Unable to Forward*)

Uptown Cosmetic and Implant Dentistry
2425 West Loop South Ste 333
Houston, TX 77027-4211

**Parties Requesting Notice:**
Jeannie Lee Andressen
Tara Grundemeier
Linebarger Goggan Blair & Sampson LLP
P O Box 3064
Houston, TX 77253-3064
*Counsel for City of Houston, Houston
Community College System, and Houston
ISD*

Rodney Lee Drinnon
McCathern Houston
2000 West Loop South Ste 1850
Houston, TX 77027
*Counsel for Rodney Drinnon*

Susan Fuertes
Harris County Attorney's Office
P O Box 2928
Houston, TX 77252-2928
*Counsel for Harris County, Attn: Property
Tax Division*

James Robert MacNaughton
Porter & Powers PLLC
5900 Memorial Drive Ste 305
Houston, TX 77027
*Counsel for 2425 West Loop, LLC*
(*Returned to Sender / Unable to Forward*)

James Robert MacNaughton
Porter & Powers PLLC
1776 Yorktown St Ste 300
Houston, TX 77056
*Counsel for 2425 West Loop, LLC*
(*Returned to Sender / Unable to Forward*)

James Robert MacNaughton
Porter Firm, PLLC
2221 S. Voss Road, Suite 200
Houston, TX 77057
*Counsel for 2425 West Loop, LLC*

4

Stephen Wayne Sather
Mark E. Smith
Barron Newburger, P.C.
7320 N Mopac Expy Ste 400
Austin, TX 78731
*Counsel for 2425 WL, LLC*

Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road Ste 850
Dallas, TX 75251
*Counsel for CC2 TX, LLC*

Broocks Wilson
Kean Miller LLP
711 Louisiana Suite 1800
Houston, TX 77002
*Counsel for Sonder USA Inc.*

Ali Choudhri
2425 West Loop South 11th Floor
Houston, TX 77027

David Tang
6711 Stella Link #343
West University Place, TX 77005
*Counsel for Azeemeh Zaheer*

Omar Khawaja
5177 Richmond Ave Ste 1065
Houston, TX 77056
*Counsel for Azeemeh Zaheer*

4868-8377-7229.v1
000085

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
October 02, 2024
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-34815** |
| **GALLERIA 2425 OWNER, LLC,** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | **CHAPTER 11** |

<u>**ORDER SETTING HEARING**</u>

Hearing is set on the Emergency Motion to Enforce the Gate-Keeping Provisions of the Confirmed Chapter 11 Plan (ECF No. 758) at 1:30 p.m. on October 10, 2024, in Courtroom 403, United States Courthouse, 515 Rusk St., Houston, Texas.  The response deadline is 5:00 p.m. on October 9, 2024.  Requested relief that is unopposed by written response prior to the response deadline may be ruled on without the necessity of a hearing.  The Court may grant or deny any relief sought in any motion/application or objection without hearing based on responsive pleadings.  The movant shall serve a copy of this order on all affected parties within 24 hours and file a certificate of service; **or** file and serve a hearing notice within 24 hours, which must include the response deadline.

**Parties should reference the Court's website for in person hearing requirements and connection instructions for virtual appearances.**[1]

**SO ORDERED**.

SIGNED 10/02/2024

_____
Jeffrey Norman
United States Bankruptcy Judge

---

[1] https://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-jeffrey-p-norman

1 / 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |
| | § | |

**SUPPLEMENT TO NATIONAL BANK OF KUWAIT, S.A.K.P, NEW YORK
BRANCH'S EMERGENCY MOTION TO ENFORCE THE GATE-KEEPING
PROVISIONS OF THE CONFIRMED CHAPTER 11 PLAN
Related to ECF Nos. 758, 759 and 760**

**TO THE HONORABLE JEFFREY P. NORMAN, U.S. BANKRUPTCY JUDGE:**

National Bank of Kuwait, S.A.K.P., New York Branch ("NBK") files this supplement to its Emergency Motion to Enforce the gate-keeping provisions in the confirmed and unstayed chapter 11 plan [*see* ECF No. 758] (the "Motion") to advise the Court that one of the lawsuits identified in the Motion was nonsuited earlier today on October 8, 2024, and so relief with respect to that lawsuit no longer appears required as requested in the Motion.

1.    NBK filed the Motion on October 2, 2024 seeking two forms of relief in aid of enforcing and implementing the gate-keeping provisions of the confirmed plan of reorganization for the Debtor [see ECF No. 566] (the "Plan"):  (a) a stay of the four actions identified in paragraph 7 of the Motion; and (b) entry of an order compelling the plaintiffs or proposed plaintiff-intervenor in those actions to comply with the gate-keeping provisions in the confirmed Plan by demonstrating that the claims asserted are colorable, non-estate claims against NBK.

2.    One of the identified actions in the Motion is *Naissance Galleria, LLC v. NBK*, Cause No. 2023-41091 pending the District Court of Harris County, Texas, 129th Judicial District ("Naissance II").

000087

3.      Earlier today, the Naissance II plaintiff filed the *Plaintiff's Motion for Nonsuit* attached as Exhibit A, stating that "Naissance Galleria, LLC wishes to nonsuit its claims against Defendant NATIONAL BANK OF KUWAIT, S.A.K.P., New York Branch and respectfully requests [the Harris County District Court] to dismiss same." Based on the *Plaintiff's Motion for Nonsuit*, it appears that no relief is required for Naissance II in respect of the Motion.

4.      NBK has filed this supplement to advise the Court and other interested parties of developing facts in advance of the hearing on the Motion scheduled for Thursday, October 10, 2024 at 1:30 p.m. (prevailing Central Time).

DATED: October 8, 2024              **PILLSBURY WINTHROP SHAW PITTMAN LLP**

                                    */s/ Andrew M. Troop*
                                    Charles C. Conrad
                                    Texas State Bar No. 24040721
                                    Ryan Steinbrunner
                                    Texas State Bar No. 24093201
                                    609 Main Street Suite 2000
                                    Houston, TX 77002
                                    Telephone: (713) 276-7600
                                    Facsimile: (713) 276-7634
                                    charles.conrad@pillsburylaw.com
                                    ryan.steinbrunner@pillsburylaw.com

                                    -    *and* -

                                    Andrew M. Troop (Bar No. MA547179)
                                    Patrick E. Fitzmaurice (admitted *pro hac vice*)
                                    Kwame O. Akuffo (admitted *pro hac vice)*
                                    31 West 52nd Street
                                    New York, NY 10019-6131
                                    Telephone: (212) 858-1000
                                    Facsimile: (212) 858-1500
                                    andrew.troop@pillsburylaw.com
                                    patrick.fitzmaurice@pillsburylaw.com
                                    kwame.akuffo@pillsburylaw.com

                                    ***Counsel for National Bank of Kuwait, S.A.K.P., New York Branch***

000088

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on October 8, 2024, a true and correct copy of this document was served via the Court's CM/ECF system to all parties who are deemed to have consented to ECF electronic service, via email and/or U.S. first class mail, postage paid to all counsel in the Pending Actions and listed below, and also by mailing, first class, postage prepaid, to each of the parties on the attached service list.

Matías J. Adrogué
Leila M. El-Hakam
Matías J. Adrogué PLLC
1629 West Alabama Street
Houston, TX 77006
service@mjalawyer.com
*Counsel for Plaintiff in Naissance I*

James Q. Pope
The Pope Law Firm
6161 Savoy Drive Ste 1125
Houston, TX 77036
jamesp@thepopelawfirm.com
*Counsel for Plaintiff in Naissance I*

Rodney Drinnon
McCathern Houston
2000 West Loop South Ste 1850
Houston, TX 77027
rdrinnon@mccathernlaw.com
*Counsel for Defendant Azeemeh Zaheer in Naissance I*

David Tang
6711 Stella Link #343
West University Place, TX 77005
dtangattorney@gmail.com
*Counsel for Defendant Azeemeh Zaheer in Naissance I*

Omar Khawaja
Law Offices of Omar Khawaja, PLLC
5177 Richmond Ave, Ste 1065
Houston, TX 77056
omar@attorneyomar.com
*Counsel for Plaintiff in Naissance II*

David Tang
6711 Stella Link #343
West University Place, TX 77005
dtangattorney@gmail.com
*Counsel for Plaintiff in Naissance II*

Bradley Parker
2127 Bolsover Street
Houston, TX 77005
*Defendant in Naissance II*

Melissa S. Hayward
Hayward PLLC
10501 N. Central Expy Ste 106
Dallas, TX 75231
mhayward@haywardfirm.com
*Counsel for Plaintiffs in Galleria I*

James Q. Pope
The Pope Law Firm
6161 Savoy Drive Ste 1125
Houston, TX 77036
jamesp@thepopelawfirm.com
*Counsel for Plaintiffs in Galleria I*

 */s/ Andrew M. Troop*
Andrew M. Troop

3

**<u>EXHIBIT A</u>**

## CAUSE NO. <u>2023-41091</u>

| | | |
|---|---|---|
| **NAISSANCE GALLERIA, LLC,** | § | **IN THE HARRIS COUNTY COURT** |
| **PLAINTIFF** | § | |
| | § | |
| **VS.** | § | **129th JUDICIAL DISTRICT COURT** |
| | § | |
| **NATIONAL BANK OF KUWAIT,** | § | |
| **S.A.K.P, New York Branch, et al.** | § | |
| **DEFENDANTS.** | § | **HARRIS COUNTY, TEXAS** |

## PLAINTIFF'S MOTION FOR NONSUIT

Plaintiff NAISSANCE GALLERIA, LLC files this its motion for nonsuit and would respectfully show the Court as follows:

Naissance Galleria, LLC wishes to nonsuit its claims against Defendant NATIONAL BANK OF KUWAIT, S.A.K.P, New York Branch and respectfully requests this Court to dismiss same[1].

Respectfully submitted,

LAW OFFICES OF OMAR KHAWAJA, PLLC

5177 Richmond Ave., Suite 1065
Houston, Texas 77056
(281) 888-2339 (phone)
(281) 888-2421 (fax)

_____/s/_____
OMAR KHAWAJA
State Bar No.: 24072181

---

[1] A plaintiff's nonsuit is effective immediately upon filing. *See Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862-63 (Tex. 2010).

Email: omar@attorneyomar.com

**E-Service Address:**
**service@attorneyomar.com**

_____

**David Tang**
**State Bar No. 24014483**
6711 Stella Link, #343
West University Pl., Texas 77005
(832) 287-2129
**dtangattorney@gmail.com**

**ATTORNEYS FOR PLAINTIFF NAISSANCE GALLERIA, LLC**

## CERTIFICATE OF SERVICE

I hereby certify a true and correct copy of the foregoing was served via electronic means  on this the 8th day of October 2024.

_____

**David Tang**

2

**IN RE GALLERIA 2425 OWNER, LLC, CASE NO. 23-34815**
**SERVICE LIST (a/o October 7, 2024)**

**Debtor:**
Galleria 2425 Owner, LLC
1001 West Loop South Ste 700
Houston, TX 77027

**Debtor's Counsel:**
Reese W. Baker
Baker & Associates
950 Echo Lane Ste 300
Houston, TX 77024

James Q. Pope
The Pope Law Firm
616 Savoy Drive Ste 1125
Houston, TX 77036

**U.S. Trustee:**
Office of United States Trustee
Attn: Jana Smith Whitworth
515 Rusk Street Suite 3516
Houston, TX 77002

**Chapter 11 Trustee:**
Christopher R. Murray
602 Sawyer Street Ste 400
Houston, TX 77007

**Chapter 11 Trustee's Counsel:**
R. J. Shannon
Shannon & Lee LLP
2100 Travis Street Ste 1525
Houston, TX 77002

**Governmental Entities:**
Harris County Tax Assessor
P O Box 4622
Houston, TX 77210

Harris County, et al.
P O Box 2928
Houston, TX 77252-2928

**Twenty Largest Creditors:**
Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070

Cirro Electric
P O Box 60004
Dallas, TX 75266

City of Houston
P O Box 1560
Houston, TX 77251-1560

City of Houston Water Department
P O Box 1560
Houston, TX 77251-1560

Datawatch Systems
Suite 200
4520 East West Highway
Bethesda, MD 20814

Firetron
10101A Stafford Centre Dr.
Stafford, TX 77477

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062

Gulfstream Legal Group
1300 Texas Street
Houston, TX 77002
(*Returned to Sender / Unable to Forward*)

Gulfstream Legal Group
720 N Post Oak Rd Ste 355
Houston, TX 77024

Hayward PLLC
10501 N Central Expy Ste 106
Dallas, TX 75231-2203

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362

Houston Community College System
c/o Tara Grundemeier
Linebarger, Groggan, Blair & Sampson
P O Box 3064
Houston, TX 77253-3064

Houston Independent School District
P O Box 4668
Houston, TX 77210
(*Returned to Sender / Unable to Forward*)

Lexitas
P O Box 734298 Dept 2012
Dallas, TX 75373

Nationwide Security
2425 W Loop South Ste 300
Houston, TX 77027
(*Returned to Sender / Unable to Forward*)

Nichamoff Law Firm
2444 Times Blvd Ste 270
Houston, TX 77005

T&R Mechanical
21710 White Oak Drive
Conroe, TX 77306-8848
(*Returned to Sender / Unable to Forward*)

TKE
3100 Interstate North Cir SE 500
Atlanta, GA 30339

Zindler Cleaning Service Co.
2450 Fondren Ste 113
Houston, TX 77063

**Other Creditors / Interest Holders:**
2425 WL, LLC
60 West 2nd Street
Freeport, NY 11746

ADT
P O Box 382109
Pittsburgh, PA 15251

Ali Choudhri
1001 West Loop South 700
Houston, TX 77027

Ash Automated Control Systems, LLC
P O Box 1113
Fulshear, TX 77441

CFI Mechanical, Inc.
6109 Brittmoore Rd
Houston, TX 77041

CNA Insurance Company
P O Box 74007619
Chicago, IL 60674

Comcast
P O Box 60533
City of Industry, CA 91716

Environmental Coalition Inc.
P O Box 1568
Stafford, TX 77497

Ferguson Facilities Supplies
P O Box 200184
San Antonio, TX 78220

Jetall Companies Inc.
2425 West Loop South Ste 1100
Houston, TX 77027-4210

Kings 111 Emergency Communications
751 Canyon Drive Suite 100
Coppell, TX 75019

Logix Fiber Networks
P O Box 734120
Dallas, TX 75373

2

Mueller Water Treatment
1500 Sherwood Forest Dr
Houston, TX 77043

Smart Office Solutions
6623 Theall Road
Houston, TX 77066-1213
(*Returned to Sender / Unable to Forward*)

Waste Management
P O Box 660345
Dallas, TX 75266

Metwall Design Solutions LLC
10931 Day Road
Houston, TX 77043-4901

US Retailers LLC d/b/a Cirro Energy
Attn: Bankruptcy Department
P O Box 3606
Houston, TX 77253-3606

Naissance Galleria, LLC
c/o Law Office of Nima Taherian
701 N Post Oak Rd Ste 216
Houston, TX 77024

H.N.B. Construction, LLC
c/o Malcolm D. Dishongh
P O Box 2347
Humble, TX 77347-2347

CC2 TX, LLC
14800 Landmark Blvd Ste 400
Dallas, TX 75254

MacGeorge Law Firm
2921 E 17th St Bldg D Ste 6
Austin, TX 78702
(*Returned to Sender / Unable to Forward*)

MacGeorge Law Firm
701 Tillery Street Ste 12
Austin, TX 78702

**Executory Contract Counterparties:**

2425 West Loop LLC dba Metwall Design
Solutions LLC
2425 West Loop South Ste 800
Houston, TX 77027-4214
(*Returned to Sender / Unable to Forward*)

2425 WL, LLC
13498 Pond Springs Rd
Austin, TX 78729-442
(*Returned to Sender / Unable to Forward*)

2425 WL, LLC
700 Lavaca Street Ste 1401
Austin, TX 78701
(*Returned to Sender / Unable to Forward*)

Bankable Equities
2425 West Loop South Ste 600
Houston, TX 77027-4203

Boho Lounge
2425 West Loop South Ste 100
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

CNA Insurance Company
P O Box 74007619
Chicago, IL 60674

Eyebrows 4UTX LLC
2425 West Loop South Ste 340b
Houston, TX 77027-4205

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062

G3 Global Services LLC
2425 West Loop South Ste 310
Houston, TX 77027-4208

Galloworks
2425 West Loop South Ste 400
Houston, TX 77027-4205

3

Jetall Companies Inc.
2425 West Loop South Ste 1100
Houston, TX 77027-4210

Kudrath Enterprises PLLC
2425 West Loop South Ste 350
Houston, TX 77027-4208

Nationwide Investigations & Security Inc.
2425 West Loop South Ste 300
Houston, TX 77027-4207
(*Returned to Sender / Unable to Forward*)

Shah Sloan LLC
2425 West Loop South Ste 501, 503 and 523
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

SIBS International Inc.
2425 West Loop South Ste 900
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

SIBS International Inc.
2425 West Loop South Ste 350
Houston, TX 77027
(*Returned to Sender / Unable to Forward*)

SprintCom Inc.
2425 West Loop South, Rooftop
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

St. Christopher Holdings GP LLC
2425 West Loop South Ste 700
Houston, TX 77027-4205

UL Therapy
2425 West Loop South Ste 315
Houston, TX 77027-4211
(*Returned to Sender / Unable to Forward*)

Uptown Cosmetic and Implant Dentistry
2425 West Loop South Ste 333
Houston, TX 77027-4211

**Parties Requesting Notice:**

Jeannie Lee Andressen
Tara Grundemeier
Linebarger Goggan Blair & Sampson LLP
P O Box 3064
Houston, TX 77253-3064
*Counsel for City of Houston, Houston
Community College System, and Houston
ISD*

Rodney Lee Drinnon
McCathern Houston
2000 West Loop South Ste 1850
Houston, TX 77027
*Counsel for Rodney Drinnon*

Susan Fuertes
Harris County Attorney's Office
P O Box 2928
Houston, TX 77252-2928
*Counsel for Harris County, Attn: Property
Tax Division*

James Robert MacNaughton
Porter & Powers PLLC
5900 Memorial Drive Ste 305
Houston, TX 77027
*Counsel for 2425 West Loop, LLC*
(*Returned to Sender / Unable to Forward*)

James Robert MacNaughton
Porter & Powers PLLC
1776 Yorktown St Ste 300
Houston, TX 77056
*Counsel for 2425 West Loop, LLC*
(*Returned to Sender / Unable to Forward*)

James Robert MacNaughton
Porter Firm, PLLC
2221 S. Voss Road, Suite 200
Houston, TX 77057
*Counsel for 2425 West Loop, LLC*

4

Stephen Wayne Sather
Mark E. Smith
Barron Newburger, P.C.
7320 N Mopac Expy Ste 400
Austin, TX 78731
*Counsel for 2425 WL, LLC*
*(Withdrawn 10/7/24*

J. Carl Cecere
Cecere PC
6035 McCommas Blvd
Dallas, TX 75206
*Counsel for 2425 WL, LLC*

Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road Ste 850
Dallas, TX 75251
*Counsel for CC2 TX, LLC*

Broocks Wilson
Kean Miller LLP
711 Louisiana Suite 1800
Houston, TX 77002
*Counsel for Sonder USA Inc.*

Ali Choudhri
2425 West Loop South 11th Floor
Houston, TX 77027

David Tang
6711 Stella Link #343
West University Place, TX 77005
*Counsel for Azeemeh Zaheer*

Omar Khawaja
5177 Richmond Ave Ste 1065
Houston, TX 77056
*Counsel for Azeemeh Zaheer*

4866-9881-8541.v1
000097

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 OWNER, LLC** | § | |
| | § | **Chapter 11** |
| Debtor. | § | |

**AGREED ORDER GRANTING EMERGENCY MOTION TO**
**ENFORCE THE GATE-KEEPING PROVISIONS OF THE**
**CONFIRMED CHAPTER 11 PLAN**

CAME ON FOR CONSIDERATION the Emergency Motion to Enforce the Gate-Keeping Provisions of the Confirmed Chapter 11 Plan ("Motion") filed by National Bank of Kuwait, S.A.K.P., New York Branch ("NBK"). And the Court having considered the Response of Ali Choudhri to the Motion (the "Response") in which Mr. Choudhri does not oppose the relief sought in the Motion, and the Court having further considered the record of the chapter 11 case, and all other evidence before it, and with the consent of NBK and the plaintiffs in the Pending Actions (defined below), and after due deliberation, the Court **ORDERS** that

1. The Motion is granted as and to the extent set forth herein.

2. The following actions (the "Pending Actions")[1] are stayed as to all claims asserted against NBK pending further order of this Court:

    - Naissance Galleria, LLC v. Zaheer, et al, Cause No. 2023-43755 pending in the District Court of Harris County, Texas, 80th Judicial District.

---

[1] NBK had initially sought to stay the action styled as *Naissance Galleria, LLC v. NBK*, Cause No. 2023-41091 pending in the District Court of Harris County, Texas, 129th Judicial District but the Plaintiff in that action nonsuited its claims therein. To the extent the Plaintiff in that action re-files its claims against NBK, then NBK may file a copy of this Order in that action as provided herein.

- *Galleria 2425, LLC, Naissance Galleria, LLC and Choudhri v. NBK*, Adversary Case No. 23-06009 pending in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division.

- Adversary Case No. 23-03263 in which Ali Choudhri's Second Amended Petition in Intervention remains pending.

2.    Each plaintiff in the Pending Actions shall file a motion seeking a ruling, and showing cause why, the claims asserted in their respective Pending Actions are colorable, non-estate claims (each a "Show Cause Motion") no later than October 30, 2024.  The failure to timely file a Show Cause Motion by a plaintiff shall be deemed to be an admission by that plaintiff that its Pending Action is an estate claim, or is not a colorable, non-estate claim, and the appropriate Pending Action shall be permanently stayed, removed if necessary to this Court, and dismissed with prejudice.

3.    Any written response to a Show Cause Motion shall be filed on or before November 12, 2024.

4.    Any reply in further support of a Show Cause Motion shall be filed on or before November 22, 2024.

5.    Any timely filed Show Cause Motion shall be heard on December ____, 2024 at _____ a.m./p.m. in Courtroom ____, United States Court House, 515 Rusk St., Houston, Texas.

6.    NBK shall serve a copy of this order on the Plaintiffs and their counsel of record, in the Pending Actions within two business day of the entry of this Order.

7.    NBK shall file a copy of this Order in each of the Pending Actions within two business days of the entry of this Order.

4870-9327-3835.v5
000099

Signed: _____, 2024.


_____
Honorable Jeffrey P. Norman
United States Bankruptcy Judge

Submitted by:

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

_/s/ Charles C. Conrad_
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-    _and_    -

Andrew M. Troop (Bar No. MA547179)
Patrick E. Fitzmaurice (Admitted _pro hac vice_)
Kwame O. Akuffo (Admitted _pro hac vice_)
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

**_Counsel for National Bank of Kuwait, S.A.K.P., New York Branch_**


**CECERE PC**

_/s/ J. Carl Cecere_
J. Carl Cecere (Admitted _pro hac vice_)
Texas State Bar No. 24050397
6035 McCommas Blvd
Dallas, TX 75206
Telephone 469-600-9455
ccecere@cecerepc.com
**_Counsel for 2425 WL, LLC and Ali Choudhri_**

3

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
October 10, 2024
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 OWNER, LLC** | § | |
| | § | **Chapter 11** |
| Debtor. | § | |

---

**AGREED ORDER GRANTING EMERGENCY MOTION TO
ENFORCE THE GATE-KEEPING PROVISIONS OF THE
CONFIRMED CHAPTER 11 PLAN**

---

CAME ON FOR CONSIDERATION the Emergency Motion to Enforce the Gate-Keeping Provisions of the Confirmed Chapter 11 Plan ("Motion") filed by National Bank of Kuwait, S.A.K.P., New York Branch ("NBK"). And the Court having considered the Response of Ali Choudhri to the Motion (the "Response") in which Mr. Choudhri does not oppose the relief sought in the Motion, and the Court having further considered the record of the chapter 11 case, and all other evidence before it, and with the consent of NBK and the plaintiffs in the Pending Actions (defined below), and after due deliberation, the Court **ORDERS** that

1.  The Motion is granted as and to the extent set forth herein.

2.  The following actions (the "Pending Actions")[1] are stayed as to all claims asserted against NBK pending further order of this Court:

    •   Naissance Galleria, LLC v. Zaheer, et al, Cause No. 2023-43755 pending in the District Court of Harris County, Texas, 80th Judicial District.

---

[1] NBK had initially sought to stay the action styled as *Naissance Galleria, LLC v. NBK*, Cause No. 2023-41091 pending in the District Court of Harris County, Texas, 129th Judicial District but the Plaintiff in that action nonsuited its claims therein. To the extent the Plaintiff in that action re-files its claims against NBK, then NBK may file a copy of this Order in that action as provided herein.

- *Galleria 2425, LLC, Naissance Galleria, LLC and Choudhri v. NBK*, Adversary Case No. 23-06009 pending in the U.S. Bankruptcy Court for the Southern District of Texas, Victoria Division.

- Adversary Case No. 23-03263 in which Ali Choudhri's Second Amended Petition in Intervention remains pending.

2.  Each plaintiff in the Pending Actions shall file a motion seeking a ruling, and showing cause why, the claims asserted in their respective Pending Actions are colorable, non-estate claims (each a "Show Cause Motion") no later than October 30, 2024. The failure to timely file a Show Cause Motion by a plaintiff shall be deemed to be an admission by that plaintiff that its Pending Action is an estate claim, or is not a colorable, non-estate claim, and the appropriate Pending Action shall be permanently stayed, removed if necessary to this Court, and dismissed with prejudice.

3.  Any written response to a Show Cause Motion shall be filed on or before November 12, 2024.

4.  Any reply in further support of a Show Cause Motion shall be filed on or before November 22, 2024.

5.  Any timely filed Show Cause Motion shall be heard on December 3, 2024 at 9:00 a.m. in Courtroom 403, United States Court House, 515 Rusk St., Houston, Texas [parties by email may seek to reschedule this date, if they have pending conflicts].

6.  NBK shall serve a copy of this order on the Plaintiffs and their counsel of record, in the Pending Actions within two business day of the entry of this Order.

7.  NBK shall file a copy of this Order in each of the Pending Actions within two business days of the entry of this Order.

Signed: October 10, 2024

Jeffrey P. Norman
United States Bankruptcy Judge

2

Submitted by:

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

/s/ Charles C. Conrad
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-   *and*   -

Andrew M. Troop (Bar No. MA547179)
Patrick E. Fitzmaurice (Admitted *pro hac vice*)
Kwame O. Akuffo (Admitted *pro hac vice*)
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

***Counsel for National Bank of Kuwait, S.A.K.P., New York Branch***

**CECERE PC**

/s/ J. Carl Cecere
J. Carl Cecere (Admitted *pro hac vice*)
Texas State Bar No. 24050397
6035 McCommas Blvd
Dallas, TX 75206
Telephone 469-600-9455
ccecere@cecerepc.com
***Counsel for 2425 WL, LLC and Ali Choudhri***

3

## THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| GALLERIA 2425 OWNER, LLC, | ) | Case No. 23-34815 |
| | ) | |
| Debtor. | ) | |
| | ) | |

---

## MOTION TO COMPLY WITH THE GATEKEEPING PROVISIONS OF THE CONFIRMED CHAPTER 11 PLAN

---

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR RESPECTIVE ATTORNEYS.**

**To the Honorable Court:**

Ali Choudhri[1] hereby files this motion to comply with the gatekeeping provisions of the confirmed Chapter 11 Plan (Dkt. No. 566) (the "Plan") and would respectfully show as follows:

1.     When the National Bank of Kuwait, S.A.K.B., New York Branch ("NBK" or the "Bank") proposed a plan of reorganization in this case (Dkt. No. 194), the Bank snuck several provisions into its proposed plan that exist solely for its own benefit. The Bank included itself among the "Exculpated Parties" that enjoy the Plan's exculpation provision, and among the "Released Parties" covered by the Plan's third-party release, even though the Bank is not a debtor in bankruptcy and has no connection to the Debtor, Galleria 2425 WL Owner, LLC or the bankruptcy estate other than as a lender. (*See* Plan arts. I(A)(39) & (78); *id.* IX(C) & (D)) The Bank also granted itself the benefit of the Plan's gatekeeping provision, requiring parties to *any* litigation against the Bank bearing a relationship to this bankruptcy—pending in any court, anywhere—to receive approval from this Court before that litigation can continue. And the parties must obtain that approval according to a procedure and standards appearing nowhere in the Bankruptcy Code or the rules of state or federal procedure requiring them to demonstrate those claims

---

[1] Naissance Galleria, LLC has also raised claims against the Bank, but as the result of an injunction entered in state court which is presently on appeal, Choudhri is not currently permitted to take action on Naissance's behalf. *See* Appellant's Opening Br. at 12, *Naissance Galleria, LLC v. Zaheer*, No. 01-23-00727-CV (Tex. App. Dec. 18, 2023) For that reason, Choudhri is filing this motion solely on his own behalf but provides information on the claims brought by Naissance Galleria, LLC for informational purposes. And because of the factually intertwined nature of the claims asserted by Choudhri and Naissance, the Court should give Naissance's claims the same treatment as Choudhri's for purposes of satisfying the gatekeeping provision.

2

are "colorable." No legitimate bankruptcy purpose is furthered by extending this gatekeeping provision to the Bank. And the litigation subjected to the gatekeeping provision has no connection to, or effect on, the Debtor, the estate, or the Plan's consummation. Instead, extending the gatekeeping provision to the Bank is simply the Bank's reward for proposing the plan that the Court approved, a plan that already richly rewards the Bank with the right to credit bid on the valuable asset at the center of this bankruptcy—at a foreclosure sale the Bank itself arranged.

2.      The Bank now demands that the Court enforce the terms of the Plan's gatekeeping provision and invites the Court to dismiss claims against the Bank in the following three pending cases (the "Challenged Litigation"):

> *Naissance Galleria, LLC v. Zaheer, et al*., Cause No. 2023-43755, pending in the 80th District Court of Harris County, Texas;

> *Galleria 2425, LLC, Naissance Galleria, LLC and Choudhri v. NBK*, Adversary Case No. 23-06009, pending in this Court; and

> *Choudhri v. NBK and Zaheer*, Adversary Case No. 23-03263, pending in this Court.

(*See* Dkt. No. 758 at 2-3; Dkt. No. 771)

3.      But the Court should reject the Bank's invitation. Gatekeeper provisions certainly have their uses. And the Plan's gatekeeping provision may have some legitimate use in protecting the Trustee in this case. But the Bank's demand to invoke that protection for itself is a bridge too far. This Court's gatekeeping services are not a party favor that the Bank can obtain simply by participating in the bankruptcy. Nor are they a convenience

3

whereby the Bank can shed liabilities simply because it would like to be rid of them. The only legitimate purposes for a gatekeeping order include protecting the Debtor, the estate, and the implementation of a bankruptcy plan. None of those purposes are served here. Allowing the Bank to make use of the Plan's gatekeeping provision would therefore contravene longstanding precedent, exceed the confines of the Bankruptcy Code, and violate fundamental limits on bankruptcy courts' jurisdiction. Accordingly, the Plaintiffs should not be forced to satisfy the Plan's gatekeeping provision before proceeding.

4.     But even if the Court did stretch its gatekeeping powers to protect the Bank, there should be no doubt that each of the cases among the Challenged Litigation satisfies the gatekeeping provision's requirements. This Court has already declined to exercise jurisdiction over one of these cases—finding that it would not "affect assets of the bankruptcy estate"—and the Court should not revisit that decision to exercise jurisdiction over that case now. (Order, Adv. No. 23-03259 (Bankr. S.D. Tex. Jan. 11, 2024) [Dkt No. 24]) All three cases concern a core set of operative facts regarding uncontroversial lender-liability claims that are colorable under any standard, which is why no *other* court has dismissed them. This Court should not be the first. The Challenged Litigation should be permitted to proceed.

## BACKGROUND

5.     The plan of reorganization that the Bank proposed (Dkt. No. 194) and the Court confirmed (Dkt. No. 566) contains several provisions that protect the Bank and other non-debtors from claims against other non-debtors. The Plan's "Exculpation" provision covers specified "Exculpated Parties," which are defined to include the Bank (Plan art.

I(A)(39)), protecting them from liability arising from conduct relating to the bankruptcy itself, including such actions as "filing, negotiating, prosecuting, administering, formulating, implementing, soliciting support or acceptance of, confirming or consummating" the Plan, the Purchase Agreement, or the property to be distributed under the Plan (*id*. art. IX(C)).

6.    The Plan's "Estate Releases" covers certain "Released Parties," which are also defined to include the Bank (Plan, art. I(A)(78)), granting them protection from claims by "the Debtor" or the "Estate" concerning "the money borrowed by the Debtor" (*id*. art. IX(D).

7.    By their terms, neither of these provisions apply to the Challenged Claims. While the Bank is both an Exculpated Party and a Released Party, neither of the Plaintiffs in those cases, Ali Choudhri and Naissance Galleria, LLC (*see* Dkt. 758 at 2) qualify as "the Debtor" or part of the "Estate." Ali is the "Debtor's principal." (*Id*.) And Naissance is provided mezzanine financing for the Debtors' purchase of the property at issue. So the Plan's Estate Release provision does not apply to these claims. The Exculpation provision does not apply either, because these claims arose before the bankruptcy and therefore do not concern any Released Party's conduct during the bankruptcy.

8.    Yet oddly, the Plan's gatekeeper provision provides protection that is broader than both the Estate Releases and Exculpation provisions. That gatekeeping provision pertains to any "Person who has held, holds, or may hold Claims" that are "in any way *related* to the Debtor," so long as they are brought "against any Released *Party*"—even if the claims themselves are not released under the Estate Releases. (Plan, Art. IX(E)) And

5

the gatekeeper provision does not merely apply to claims challenging conduct occurring *during* the bankruptcy but covers claims that "arose *before* the Petition Date." (*Id.*) For these claims, the parties must seek "notice and a hearing" wherein the parties must demonstrate to the Court that the claims asserted are valid before they can proceed. (Plan, Art. IX(E)) And to demonstrate the validity of that claim, the party must demonstrate that the claim is "colorable" and that the party "has standing and is otherwise entitled to assert" it. (*Id.*)

9.      The gatekeeper provision therefore purports to convey to the Bankruptcy Court the authority to approve, control, adjudicate, and ultimately terminate claims in pending litigation—including cases pending in other courts—merely because that litigation is "related to the Debtor," according to a test and a procedure appearing nowhere in the Code or the federal rules. It allows the Bank to make use of this power to have the Court dismiss claims that are not even released under the Plan. And the Bank now invokes this provision to have the Court terminate all the Plaintiffs' litigation against the Bank—even when the courts where that litigation is pending would allow that litigation to proceed, and even where the litigation at issue would not have any effect on the bankruptcy estate itself. That is not something the Court can do—nor is it something the Court *should* do.

<div align="center">ARGUMENT</div>

I.      **The Bank cannot invoke the Plan's gatekeeping provision to dismiss any of the claims against the Bank in the Challenged Litigation.**

10.      The Court should not dismiss any of the claims asserted against the Bank in the Challenged Litigation because none of those claims can properly be subject to the Plan's gatekeeping provision. So the Plaintiffs are not required to obtain the Court's

<div align="center">6</div>

approval before pursuing them. And even if the Plaintiffs are required to obtain the Court's gatekeeping approval to proceed on these claims, Plaintiffs can readily make the showing required to obtain that approval, because Plaintiffs' claims are grounded in theories of lender liability personal to them that have long been recognized under Texas law. That makes them colorable by any standard.

### A. Bankruptcy courts' gatekeeping powers can only be invoked to protect trustees and other court-appointees—not private parties serving in no official bankruptcy capacity like the Bank.

11. The first problem with the Bank's invocation of the Court's gatekeeping authority is that the Bank's demand exceeds the limited authority that bankruptcy courts possess to approve, control, adjudicate, or terminate claims in pending litigation. There is nothing in the Bankruptcy Code that conveys such gatekeeping power to bankruptcy courts. Instead, that power is derived from the century-old Supreme Court case, *Barton v. Barbour*, 104 U.S. 126 (1881). "Under the '*Barton* doctrine,' the bankruptcy court may require a party to 'obtain leave of the bankruptcy court before initiating [or maintaining] an action in district court *when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity*.'" *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 439 (5th Cir. 2022) (quoting *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015) (emphasis added)). The *Barton* doctrine was created to "prevent trustees from being subject to legal proceedings that interfere with their ability to administer the estate." *In re Cir. City Stores, Inc.*, 557 B.R. 443, 447 (Bankr. E.D. Va. 2016); *see also generally* COLLIER ON BANKRUPTCY ¶ 10.01 (16th ed. 2023) (citing and discussing cases). The doctrine therefore

7

serves to protect trustees and other bankruptcy-court appointees from vexatious and harassing litigation that could drain the estate and hamper bankruptcy plan implementation.

12.    There are several reasons why the Bank cannot legitimately invoke the *Barton* doctrine to have the Court terminate any claims against the Bank in the Challenged Litigation. For one thing, because the *Barton* doctrine exists only to protect trustees and other bankruptcy-court appointees, it cannot be invoked by private parties like the Bank that are not serving in any official court-appointed capacity. Indeed, in *Highland Capital*, the Fifth Circuit refused to "extend gatekeeping protections to non-debtors," including Highland's interim CEO. *Matter of Highland Cap.*, 48 F.4th at 435–39 (vacating gatekeeping provision "as to all parties *except* Highland Capital, the Committee and its members, and the Independent Directors for conduct within the scope of their duties"). And the Fifth Circuit's only recent opinion that actually applies the *Barton* doctrine did so in the context of a trustee, not a private corporation with no official bankruptcy role. *See In re Foster*, No. 22-10310, 2023 WL 20872, at *5–*6 (5th Cir. Jan. 3, 2023). For this reason alone, the Bank is not entitled to invoke the Bankruptcy Court's gatekeeping authority.

13.    Furthermore, not only are *Barton*'s gatekeeping protections reserved for actors appointed to serve in official bankruptcy capacities, they only protect those actors for actions taken within the scope of their "official duties."[2] But the Bank has no official

---

[2] *In re Ondova Ltd. Co.,* 914 F.3d 990, 993 (5th Cir. 2019); *see also In re Christensen*, 598 B.R. 658, 665 (Bankr. D. Utah 2019); *Phoenician Mediterranean Villa, LLC v. Swope (In re J & S Props., LLC)*, 545 B.R. 91, 105 (Bankr. W.D. Pa. 2015). A typical example is litigation against a receiver who seizes or otherwise attempts to administer property that is not receivership property,

duties in implementing the Plan or overseeing the Debtor's dissolution. The foreclosure sale at the center of the bankruptcy will be conducted and overseen by the Liquidation Trustee. (*See* Plan, art. VI(A)) The only duties that the Plan specifically assigns to the Bank are purely ministerial. And the only substantive right that the Plan provides to the Bank is the completely voluntary (and unofficial) right to credit bid the amount of its debt at the foreclosure sale for its own private benefit, which comes with a contractual promise to pay certain junior claims if its bid is successful. (*See* Plan, Introduction) The Challenged Litigation does not contest the Bank's exercise of any of these powers, rights, or responsibilities conveyed under the Plan. That litigation pertains only to the Bank's pre-bankruptcy conduct that arose long before the Plan was ever proposed. For this additional reason, *Barton* does not apply.

14.    Indeed, the only reason the Plan contains gatekeeping protections for the Bank is that the Bank *proposed* the Plan—and thus snuck that protection into the Plan for itself, demanding it as a condition to undertaking its minimal responsibilities in implementing the Plan. And the Bank did not seek this protection to benefit the estate, but simply to allow it to escape litigation it would rather not face. That is not a legitimate use of *Barton* gatekeeping powers. The Fifth Circuit has held that even when private parties face "exposure" to truly "vexatious" and frivolous litigation, bankruptcy courts are not empowered to use gatekeeping powers to halt it. *See Highland Capital Mgmt*., 48 F.4th at

---

but actually belongs to a third party. *See In re DMW Marine, LLC,* 509 B.R. 497, 506 (Bankr. E.D. Pa. 2014) (citations omitted).

000112

430, 440 n.19. And as explained below—the Challenged Litigation is neither vexatious nor frivolous.

**B.     Bankruptcy courts' gatekeeping powers have been significantly constrained by the Supreme Court's decision in *Purdue Pharma*.**

15.     In any event, whatever gatekeeping powers bankruptcy courts possess have been significantly constrained by the Supreme Court's recent decision in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024) ("*Purdue Pharma*"), which held that "[t]he bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seek to discharge claims against a nondebtor without the consent of affected claimants." *Id*. A bankruptcy court's exercise of its gatekeeping authority to dismiss litigation against non-debtors is the functional equivalent of the non-consensual releases outlawed by *Purdue Pharma*—especially when used to dismiss litigation pending in other courts. Both involve exercises of authority to control, adjudicate, and ultimately terminate claims in litigation without consent, and without consideration—and *Purdue Pharma* confirms that this something that bankruptcy courts are not empowered to do.

16.     For all these reasons, allowing the Bank to terminate the Challenged Litigation would exceed the Court's legitimate authority to impose gatekeeping conditions under *Barton*. If the Bank wants to halt this litigation, it can do so through established procedural mechanisms in the Challenged Litigation.

**C.     The Court would exceed its jurisdiction by dismissing the Challenged Litigation.**

17.     The Court would also exceed its jurisdiction by using the gatekeeping powers

10

provided under the Plan to adjudicate and dismiss the Challenged Litigation. The Bank seeks only to dismiss litigation against itself, and dismissing that litigation affects only the Bank—having no conceivable effect on the Debtor or the estate. Indeed, on January 11, 2024, this Court remanded one of the proceedings among the Challenged Litigation— Cause No. 2023-43755—back to the 80th District Court of Harris County because it determined that "all the causes of action constitute claims rooted in Texas state law," "there are no bankruptcy issues or claims in the state court litigation," and "there has been no showing that the remand would affect assets of the bankruptcy estate." (Case No. 23-03259 [Dkt No. 24] (Bankr. S.D. Tex. Jan. 11, 2024)) The same is true of the other cases in the Challenged Litigation—because, as the Bank insists, these cases all share the same "basic facts and claims." (Dkt. No. 758 at 4) But that shared lack of connection to the estate deprives the Court of jurisdiction to resolve any of these cases through its gatekeeping powers.

18.    As the Fifth Circuit recognized in *Highland Capital*, the question of whether a claim may be resolved by a bankruptcy court through exercise of gatekeeping powers under *Barton* is entirely separate from the question of whether the Court has *jurisdiction* to resolve that litigation. 48 F.4d at 439 (holding, after approving of a gatekeeping provision to protect certain court-appointed officials, that "the bankruptcy court, faced with pre-approval of a claim" on remand, would still have "to determine whether it had subject matter jurisdiction over that claim in the first instance."). That makes sense, because the mere fact that the Plan contains a gatekeeping provision does not confer jurisdiction to resolve claims under that gatekeeping power: "[P]arties cannot confer subject matter

11

jurisdiction on federal courts," including through a bankruptcy plan. *Randall & Blake Inc. v. Evans*, 196 F.3d 579 (5th Cir. 1999).

19.     Instead, "[j]urisdiction for bankruptcy cases is rooted in the provisions of 28 U.S.C. § 1334." *Matter of Walker*, 51 F.3d 562, 568 (5th Cir. 1995) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 303 (U.S.1995) (stating that "[t]he jurisdiction of the bankruptcy courts ... is grounded in and limited by statute")). And a "third-party action" between two non-debtors "does not create 'related to' jurisdiction" under section 1334 "when the asset in question is not property of the estate and the dispute has no effect on the estate." *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 753 (5th Cir. 1995). Accordingly, because the claims against the Bank asserted in the Challenged Litigation do not have any effect on the estate, the Court lacks jurisdiction to hear them—much less dismiss them.

20.     It does not matter that the Plan's gatekeeper provision requires that the dispute must be "related to the Debtor" to fall within its scope. (Plan, art. IX(E)). Mere "shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action 'related to' the bankruptcy." *In re Zale Corp.*, 62 F.3d at 753. Accordingly, a mere factual interrelationship between the Challenged Litigation and the arguments asserted in the bankruptcy does not convey jurisdiction to the Court to resolve that litigation.

21.     The Bankruptcy Court therefore lacks the power to require the Plaintiffs to comply with the gatekeeping orders to maintain that litigation, and the Plaintiffs in the Challenged Litigation are not required to obtain this Court's permission before maintaining it. *See Tufts v. Hay*, 977 F.3d 1204, 1210-11 (11th Cir. 2020) ("Thus, under the

12

'conceivable effects' test for section 1334(b), the Bankruptcy Court did not have jurisdiction to consider Tufts's action, and Tufts counsel were not required to obtain leave from that court before filing this action in the District Court.").

## II.    The claims raised against the Bank satisfy the Plan's gatekeeping provision because they raise colorable lender-liability claims that the Plaintiffs have standing to pursue.

22.    Yet even if the Plaintiffs' claims against the Bank in the Challenged Litigation may be properly subjected to the Plan's gatekeeping provision, those claims satisfy the gatekeeping provision's standard for obtaining this Court's permission to maintain those claims.

23.    The remaining two actions include claims against the Bank, but these claims easily satisfy the gatekeeping provision's low threshold for maintaining a claim. Two of these cases originated in state court, and one was remanded in January. (Case No. 23-03259 [Dkt No. 24] (Bankr. S.D. Tex. Jan. 11, 2024)) The final case is an adversary proceeding that the Debtor filed in this court in conjunction with its original bankruptcy. *See* **Exhibit 1** (Original Complaint, No. 23-06009 (Bankr. S.D. Tex. Sept. 19, 2023) [Dkt. No. 1]) And the claims raised against the Bank in both cases are "colorable."

24.    The term "colorable" is not defined in the Plan or in the gatekeeping provision, but it nevertheless invokes the exceptionally low standard for determining whether a defendant has been fraudulently joined to avoid diversity jurisdiction. *See Overholt v. Purina Animal Nutrition LLC*, Case No. 1:14-CV-1216, 2015 WL 1631855, at *2 (W.D. Mich. Apr. 13, 2015) ("Under the fraudulent joinder rule, courts may disregard the citizenship of parties against whom there is no 'colorable' cause of action."). This

13

standard is "similar to, but more lenient than, the analysis applicable to a Rule 12(b)(6) motion to dismiss." *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 433 (6th Cir. 2012). And even under a Rule 12(b)(6) analysis, the standard that courts apply is decidedly lenient and plaintiff-friendly, requiring a court to evaluate the sufficiency of plaintiff's complaint by accept[ing] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and alteration omitted). The Court must resolve all disputed questions of fact and ambiguities in the controlling state law in favor of the non-removing party. *Coyne*, 183 F.3d at 493. And to be "colorable," a claim need not meet "the stricter 12(b)(6) pleadings under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Overholt*, 2015 WL 1631855, at *7-8.

25.    Plaintiffs' remaining claims against the Bank readily meet this lenient standard. The cases concern a common core of operative facts underlying all three cases in the Challenged Litigation relating to the Bank's efforts to foreclose on the Debtor's property so it could obtain that property for itself. *See* The Bank loaned the Debtor over $50 million to purchase the property (Dkt. No. 565 at 4), but throughout the life of the loan, the Bank made it progressively more difficult for the Debtor to pay that loan back. As Plaintiffs have alleged in the state court proceedings, the Bank inserted itself directly into the Debtor's business operations, interfering with those business operations in numerous unjustified ways. **Exhibit 2** (Plaintiff's Sixth Amended Petition, No, 2023-22748 (Harris County Dist. Ct. Dec. 18, 2023). And the pleadings in Case No. 23-6009, the adversary proceeding which remains pending in this Court, contains similar allegations of

14

interference by the Bank. (Ex. 1, ¶¶9-21)

26.    For example, the Bank thwarted the Debtor's efforts on at least *five* different occasions to sell interests in the building that would have cleared the Bank's debt—often through strategic declarations of defaults or foreclosure postings designed to discourage prospective buyers. (*See* Ex. 2, ¶¶ 22, 31- 33) The Bank likewise refused to approve or ignored at least *nine* different offers to lease space in the building, thereby preventing the Debtor from raising funds to pay off the loan, eventually forcing the Debtor to bring suit. (*Id.* ¶¶23, 27)

27.    After the parties settled their litigation through a Confidential Settlement Agreement (Dkt. No. 403-4) hat reduced the principal amount due under the loan, Plaintiff alleged that the Bank improperly disclosed the terms of the Confidential Settlement Agreement in direct violation of its express confidentiality obligations by disclosing the new loan balance to potential purchasers of the property, thereby revealing the Debtor's financial struggles, improperly impacting these prospective buyers' evaluation of the property's market value, "chill[ing] the market" for the property, and converting these potential buyers who would have negotiated a sale with the Debtor into potential purchasers of the Bank's note. (*See* Ex. 2, ¶¶28-29, 63-64)

28.    The Bank also actively attempted to wrest control of the Debtor and its property from Choudhri by interfering with Choudhri's control of Naissance. The Bank worked in league with Azeema Zaheer, Choudhri's ex-girlfriend, who acted as his agent in running Naissance until Ali exercised his right to take over control of the company from her. (*See* Ex. 2, ¶¶ 36-46) And these efforts by the Bank and Zaheer were all part of a larger

15

effort by Choudhri's disgruntled business partner, Osama Abdullatif, to seize Choudhri's business interests by brute force and fraud. Abdullatif has arranged to have hard drives seized from Choudhri's companies (**Exhibit 3** at 1 [Declaration of Quanell X Farrakhan No. 1]) He has also even arranged for Choudhri to be accused of a murder-for-hire plot to kill Abdullatif himself, which authorities dismissed as "a hoax." (*Id.*; *see also* **Exhibit 4** [Quanell X Farrakhan Aff. No. 2]) And Omar Khawaja, an attorney and close business associate of Abdullatif, admits to representing Abdullatif and Zaheer in furtherance of Abdullatif's avowed goal of seizing all of Choudhri's business interests through litigation—under their theory: "If [Ali] own[s] it, we own it." (**Exhibit 5** [Deposition of Omar Khawaja] at 23: 30: 17-21; 163:8-165:2; 194:3-6)

29.    Plaintiffs supported these allegations with voluminous documentary evidence, including examples of lease proposals that were rejected or ignored and elicit communications between Bank representatives and Zaheer. (*See* Ex. 2, pp. 6-7, 8, 9) Indeed, Plaintiffs produced a key document in their pleadings in which the Bank encouraged Zaheer to "stay on" until the Bank could find a "suitable replacement for her," even after Choudhri had exercised his right to regain control over the company, thereby demonstrating the Bank's intentional efforts to interfere with Choudhri's management of Naissance. (*See* Dkt. No. 88-29 at 1-2) The operative pleadings in these actions raise numerous claims against the Bank, including breach of contract, tortious interference, fraud, business disparagement, breach of the duty of good faith and fair dealing, unjust enrichment, and conspiracy. *See* Ex. 2, ¶¶ 62, 104)

30.    The Plaintiffs have also alleged how the Debtor, Naissance, and Choudhri all

16

experienced independent injuries from the Bank's conduct: While the Debtor was deprived of its right to survive and thrive as an ongoing business, Naissance and Choudhri suffered their own loss of a significant asset. And this establishes that Naissance and Choudhri each have standing to pursue claims against the Bank independently.

31.    While the facts alleged in the Challenged Litigation paint an extraordinary factual picture, they nevertheless present classic lender liability claims that have long been recognized under Texas law. Such lender-liability claims frequently involve both breach-of-contract *and* tort claims. *See Williams v. National Mortg. Co.*, 903 S.W.2d 398, 404 (Tex. Ct. App. 1995); *Jones v. First Nat'l Bank of Anson*, 846 S.W.2d 107, 109 (Tex. Ct. App. 1992, no writ) (concerning causes of action for breach of duty of good faith and fair dealing, breach of fiduciary duty, negligent misrepresentation, conversion, estoppel, and violations of the Deceptive Trade Practices Act); *Lamar Sav. Ass'n v. White*, 731 S.W.2d 715, 717-18 (Tex. Ct. App. 1987) (causes of action for breach of contract, breach of fiduciary duty, usury, duress, estoppel, and tortious interference).

32.    And courts have found such lender-liability claims to be viable under factual circumstances that are virtually identical to those at issue in this case. Texas courts have found that lenders can be held liable for wrongful defaults and wrongful acceleration. *See, e.g.*, *Rey v. Acosta*, 860 S.W.2d 654 (Tex. Ct. App. 1993); *Dixon v. Brooks*, 604 S.W.2d 330, 334 (Tex. Ct. App. 1980). Courts also routinely permit lenders to be held liable in the

17

context of improper refusals to approve leases.[3] And courts have even allowed borrowers to maintain claims that banks have conspired with others to interfere with their borrowers' businesses. *See, e.g.*, *State Nat'l Bank v. Farah Mfg. Co*., 678 S.W.2d 661 (Tex. Ct. App. 1984). Indeed, the Bankruptcy Court for the Northern District of Texas recently found a lender liable under factual circumstances that are equally extreme to this case. *See Bailey Tool & Mfg. Co.*, *et al. v. Republic Bus. Credit (In re Bailey Tool & Mfg. Co.)*, Adv. No. 16-03025-SGJ (Bankr. N.D. Tex. December 23, 2021) (holding lender liable under numerous theories for, among other things, taking aggressive action to protect its interests, impacting the company's liquidity, and communicating in secret with the company's customers to have them pay the bank instead of the company). These cases demonstrate that the legal theories that Plaintiffs have asserted are well-founded in Texas law, and the allegations, while extraordinary, are hardly implausible. And that is why no court has ever dismissed them. That makes them colorable.

33. And while, during plan confirmation, the Court concluded that these claims were "implausible" and "not viable" (Dkt. No. 565 at 17), Plaintiffs respectfully submit that these determinations should not be the Court's final word on the matter. During plan confirmation, the Plaintiffs were not permitted to present, and the Court was not permitted to hear, a full airing of the evidence to support the Plaintiffs' claims. It heard a mere summary. But even in that limited summary, the Court heard testimony from two of the

---

[3] *See, e.g*., Metropolitan Corporate Counsel, *Liability Awaits the Unwary: Lenders and Leasing Decisions* (Dec. 13, 2004), https://bit.ly/4e6fGe7.

000121

state's most respected attorneys, Tom Phillips, former Chief Justice of the Texas Supreme Court, and Jerry Alexander, both of whom felt the claims were so strong that they were both willing to take the case on contingency. (*See* Dkt. No. 570) While the Court discounted that testimony because the lawyers explained only that the Debtor "had claims" but never "explained how or why these claims arose," those questions are answered by the operative pleadings in the pending litigation, which provide extensive factual detail and evidence regarding the origin and basis for these claims. (Dkt. No. 565 at 17)

34.    The Court made barely any mention of the factual or legal merits of those claims. Instead, the Court simply found the claims incredible, questioning why the Debtor had "never been able" to pay the note, determining that it was unlikely likely that the Bank had "breached" the Settlement Agreement first, excusing the Debtor's own failure to pay, and challenging Choudhri's credibility as a witness. (Dkt. No. 565 at 17) But the first of these holdings ignore the Plaintiffs' factual allegations—which the Court must accept as true—that the Bank interfered with the Debtor's ability to pay the note. And the latter two should not weigh in the balance in determining whether Plaintiffs' claims against the Bank are "colorable," which requires examining solely the allegations pleaded and setting aside questions of witness credibility. Indeed, the fact that two well-respected Texas attorneys are willing to pursue the litigation on a contingency basis provides ample evidence that the claims are in fact "colorable."

35.    Finally, while the Court expressed concern about the motivations behind these various pieces of litigation, concluding that they were primarily meant "to postpone a real estate foreclosure" (Dkt. No. 565 at 16), those concerns are unfounded. Lender

19

liability claims are frequently asserted in efforts to halt foreclosure. *See, e.g.*, *Williams*, 903 S.W.2d at 404; *Jones*, 846 S.W.2d at 109. And the factual context in which those claims arose does not undercut their viability.

<div align="center">

CONCLUSION

</div>

For these reasons, Ali Choudhri respectfully requests that this Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan be granted, and that none of the claims in the challenged litigation should be dismissed.

Respectfully submitted,

*/s/ J. Carl Cecere*

J. Carl Cecere
State Bar No. 13268300
(admitted pro hac vice)
**Cecere PC**
6035 McCommas Blvd.
Dallas, TX 75206
Telephone: 469-600-9455
ccecere@cecerepc.com

*Counsel for 2425 WL, LLC and Ali Choudhri*

<div align="center">

20

</div>

CERTIFICATE OF SERVICE

The undersigned certifies that on October 30, 2024, a true and correct copy of the foregoing was served via the Court's CM/ECF system to all parties who are deemed to have consented to ECF electronic service, and via email, including to each of the parties listed below.

Matías J. Adrogué
Leila M. El-Hakam
Matías J. Adrogué PLLC
1629 West Alabama Street
Houston, TX 77006
service@mjalawyer.com

*Putative Counsel for Naissance Galleria, LLC*

Omar Khawaja
Law Offices of Omar Khawaja, PLLC
177 Richmond Ave,
  Ste 1065
Houston, TX 77056
omar@attorneyomar.com

*Putative Counsel for Naissance Galleria, LLC*

Rodney Drinnon
McCathern
Houston 2000 West Loop South
  Ste 1850
Houston, TX 77027
rdrinnon@mccathernlaw.com

*Counsel for Azeemeh Zaheer*

David Tang
6711 Stella Link #343
West University Place, TX 77005
dtangattorney@gmail.com

*Counsel for Azeemeh Zaheer*

*/s/ J. Carl Cecere*

**J. Carl Cecere**

21

000124

EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | |
|---|---|
| *In re:* § | |
| § | |
| **GALLERIA 2425 OWNER, LLC** § | **Case No. 23-60036** |
| § | **(Chapter 11)** |
| *Debtor*, § | |
| § | |
| _____ § | |
| § | |
| **GALLERIA 2425 OWNER, LLC,** § | |
| **NAISSANCE GALLERIA, LLC, AND** § | |
| **ALI CHOUDHRI** § | |
| § | |
| *Plaintiffs*, § | **Adversary No. _____** |
| § | |
| **v.** § | **CONTAINS JURY DEMAND** |
| § | |
| **NATIONAL BANK OF KUWAIT, S.A.K.P.,** § | |
| **NEW YORK BRANCH** § | |
| § | |
| *Defendant*. § | |

## GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH

COME NOW Galleria 2425 Owner, LLC, Naissance Galleria, LLC, and Ali Choudhri ("***Plaintiffs***"), and make and file this their Original Complaint against National Bank of Kuwait, S.A.K.P., New York Branch ("***Defendant***"), and for same show the Court as follows:

## I.
## JURISDICTION AND VENUE

1.      This Court has personal jurisdiction over the Defendant named in this Complaint due to the fact that the Defendant transacts business in the State of Texas, including entering into a contract with a resident of the State of Texas performable in whole or in part within the State of Texas, or have committed a tort in whole or in part in Texas and are thus subject to the Texas Long

**GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S**      **PAGE 1 OF 14**
**ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.**

000126

Arm Statute, Section 17.042 of the Texas Civil Practice and Remedies Code. The Court also has

personal jurisdiction over the Defendants pursuant to 29 U.S.C. §1132(f).

2.        The Court has subject matter jurisdiction of this Adversary Proceeding pursuant to

28 U.S.C. § 1334.

3.        This adversary proceeding constitutes a core proceeding under 28 U.S.C. §

157(b)(2)(A), (B), (C), (D), (H),  and (O) because it will determine the amount of NBK's claim

against the Debtor. To the extent the Court determines that any of the claims asserted herein are

not core, the Plaintiffs hereby request and demand a trial by jury.

4.        Venue of the Bankruptcy Case and the Adversary Proceeding is appropriate in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.
## PARTIES

### A.        Galleria 2425 Owner, LLC.

5.        Galleria 2425 Owner, LLC ("*Debtor*") is a limited liability company doing business

in Texas and is the owner of the building located at 2425 West Loop S., Houston, Texas ("*2425

Building*"). It is the Debtor in the bankruptcy case in which this Adversary is filed.

6.        Naissance Galleria, LLC is a limited liability company doing business in Harris

County, Houston, Texas.

7.        Ali Choudhri is an individual residing in Harris County, Texas.

8.        Defendant National Bank of Kuwait, S.A.K.P., New York Branch ("*NBK*") is a

banking corporation organized under the laws of Kuwait, acting through its New York Branch.

Defendant has not designated a registered agent for service of process in the State of Texas, but

under Rule 7004(a)(8) of the Federal Rules of Bankruptcy Procedure, NBK may be served by

mailing a copy of the Complaint to Corporation Service Company, 299 Park Avenue, New York,

**GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S**          **PAGE 2 OF 14**
**ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.**

000127

New York 10171. Plaintiff requests that the clerk issue citation at this time. NBK has also filed a motion to dismiss the bankruptcy of Debtor and it and its counsel will be served by ECF in that proceeding.

### III.
### FACTUAL BACKGROUND

9.      In 2018, Defendant NBK loaned certain funds to Debtor. There have been various disputes between the Debtor and NBK about the timeliness of payments and the extent and validity of Defendant's security, but the gravamen of Debtor's Complaint is NBK has continually interfered with the Debtor's ability to lease the 2425 Building to produce revenue and Debtor's ability to sell the 2425 Building to pay NBK off. Every time NBK has so interfered, it has then blamed the Debtor for its inability supposedly to meet some of the loan terms.

10.      For example, in January 2021, Plaintiff Ali Choudhri, who is vilified by NBK in various pleadings, had the building at 2425 West Loop South, Houston, Texas, the asset of the Debtor, sold for a purchase price of $85 million, more than enough to clear NBK's debt. Attached hereto as **Exhibit 1** is a letter dated January 15, 2021 from SIBS International and two purchase contracts which would have paid off not only NBK, but left the Debtor and the other Plaintiffs with a great deal of value. NBK, rather than facilitate this sale, issued a formal notice of default to the Debtor and its intent to accelerate the loan on June 29, 2021, while the SIBS International deal was in progress, killing that deal.

11.      The same was true with regard to NBK's interference with the Debtor's attempt to lease space in the building to provide revenue so it could operate and make loan payments. By August 2021, this situation had become untenable due to NBK's refusal to approve new tenants and new leases, prompting the Debtor on August 13, 2021 to send NBK a detailed letter regarding lease-up and renewal prospects for discussions, none of which, it seemed NBK would approve.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S                    PAGE 3 OF 14
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

000128

- **Healthcare Service Organization**

    - •Size: 130,000+ RSF – large client requirement in their preliminary planning stages: •Industry: Healthcare Service Organization •Type of use: Administration Offices •Direct/Sublease •Commencement date: Q3/2023 •Term:5-10 yrs. They are specifically VERY interested in amenities available, for example: deli, gym, day care, conference center (# of seats), training center (# of seats).

- **Invesco**

    - We met with the team twice and are actively pursuing them for 2425. They are interested in a 157-month lease term for 208,830 SF of Net Rental Area.

- **Financial Services Firm**

    - Office •AREA: West Houston (610 West, Hwy 290, Beltway 8) •SPACE: Open Concept •SIZE: Approximately 20,000 – 25,000 rsf •PARKING: 5/1000 ratio •OCCUPANCY: Late 2Q22/Early3Q22 •TERM: 36-60 months with renewal options •This tenant is currently at 24 Greenway on their top floor and have been looking at other A buildings.

- **Beyond Finance**

    - We are discussing a 68-month lease term for +/- 40,000 rentable SF.

- **Banco Affirme**

    - We submitted a 64-month lease term for 4,545 SF of Net Rental Area.

- **Walls Bank (existing tenant)**

    - Renew 3,054 SF of rental space for 60-month term starting January 1, 2022.

- **Others (working directly with ownership)**

    - ResMed (https://www.resmed.com/en-us/), interested in the entire building, working directly with Dr. Peter Farrell, Founder and Chairman

    - Healthstore Holdings (https://www.healthstore.com/), interested in a 15-year term with 80,000 SF in phase 1 and 75,000 SF in 12 months as phase 2

    - Immunicom (https://immunicom.com/), interested in at least two full floors, moving HQ from San Diego, CA

12. Reproduced below is an August 16, 2021 email from counsel for the Debtor to NBK forwarding multiple leases for approval that NBK had failed to approve or even respond to.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

PAGE 4 OF 14

000129



This lack of approval, or finding obstacles to approve, was not new. In September 2019, Related Group had reached out to lease the parking garage located at the 2425 Building to be used for overflow, for parking up to 110 spaces. NBK's authorized representative Michael Carter would not approve this lease (note "nbkny" email address below– *i.e.* National Bank of Kuwait, New York Branch), which would have generated a great deal of revenue for the Debtor.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

PAGE 5 OF 14

000130

> **From:** Michael Carter <Michael.Carter@nbkny.com>
> **Date:** Monday, 23 September 2019 at 13:22
> **To:** Azeemeh Zaheer <azeemeh@naissancecapital.co.uk>, Lisa Walker
> <Lisa.Walker@nbkny.com>
> **Subject:** RE: LOI
>
> My primary concern is that the tenant determines when the commencement date is, presumably because they have zoning and building department approvals to complete as well as financing to arrange, which is understandable, however there does not appear to be an outside expiration date for the Commencement date. It appears they could tie up these space permanently without having to pay rent. I think you should have an outside date for Commencement.

13.     The situation became so untenable that in September 2021, Debtor initiated a lawsuit against NBK.

14.     In good faith, even during the pendency of this litigation, the Debtor was still trying to get tenants into the building and get NBK's approval to do so, so it would not claim additional breaches of loan agreements.  On July 2, 2022, the Debtor sent NBK five leases for approval, which NBK did not approve.

15.     The parties litigated for eleven (11) months until August 22, 2022, when they entered into a Confidential Settlement Agreement.  The entire Confidential Settlement Agreement will be submitted to the Court *in camera* at the appropriate time, and the Debtor should be allowed to use it in this Adversary since the breach of that Settlement Agreement by NBK is not only actionable, but was also devastating to Debtor.  Because NBK has a way of interpreting any action of the Debtor as one to breach or avoid some purported contractual obligation or other, when the reverse is entirely true, the Confidential Settlement Agreement has not been attached.  NBK has prevented Debtor's successful performance under any and all agreements it has with NBK, including the Confidential Settlement Agreement.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S          PAGE 6 OF 14
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

000131

16.     The Confidential Settlement Agreement permitted a timeframe in which Debtor could sell the 2425 Building, and Debtor was successful in receiving a hard Letter of Intent dated January 17, 2023 to purchase the building from Caldwell Soames.  A true and correct copy of that hard Letter of Intent is attached hereto as **Exhibit 2**.  Again, while these negotiations were ongoing, NBK took actions which interfered with the continuation and closing of that transaction, including issuing a notice of foreclosure on March 29, 2023 in breach of the Confidential Settlement Agreement, which Debtor believes was done intentionally to prevent the sale.  The sale would have cleared the Bank of Kuwait debt as it stood at that time and left great value for the other Plaintiffs.  Debtor believes that Bank of Kuwait recognized that greater value and wanted to take it for itself by foreclosure in a "loan to own" gambit.

17.     There are tremendous factual inaccuracies that NBK represents to courts and continues into these proceedings.  For example, in its Motion to Dismiss the Debtor's Bankruptcy, while it is absolutely true that temporary restraining orders were filed to attempt to prevent a foreclosure by NBK and its takeover of the 2425 Building, they were also **granted**.  The facts presented that NBK had not allowed the Debtor to lease up the building to generate revenue and had killed two transactions that Debtor was working on that would have cleared NBK and left value for the Debtor and the other Plaintiffs.

18.     Additionally, NBK posted for foreclosure in 2023 early, and against an extended grace period that a State Court had given Debtor, which chilled the bidding process and interest in the 2425 Building completely.  No one wants to buy a building posted for foreclosure.  Debtor believes that NBK knew this and did it on purpose to prevent the Debtor from successfully selling the property and paying off the loan, so NBK could foreclose and become the owner of the 2425 Building.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S          PAGE 7 OF 14
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

000132

19.     Not the least of the misstatements that NBK makes about the Debtor are those hard statements that the Debtor has not made any payments to NBK since March 6, 2021. This is stated both in paragraph 13 of NBK's Motion to Dismiss Debtor's Bankruptcy, and in NBK's Mr. Carter's Declaration (paragraph 8 of Declaration of Michael Carter).

20.     The absolute opposite is true. Representatives of NBK have admitted in writing that the following substantial payments have been made to NBK well after March 6, 2021:

    a)     $801,509.42 paid by Debtor to NBK on August 27, 2022;

    b)     $80,000 paid by Debtor to NBK on April 18, 2023;

    c)     $80,000 paid by Debtor to NBK on May 10, 2023.

This is almost One Million Dollars ($1,000,000) that not only does NBK not give credit to the Debtor for having made the payments, but again, it vilifies it, saying exactly the opposite that no payments (zero) have been made since March 6, 2021.

21.     After NBK's disclosures of the situation created by the Confidential Settlement and the wrongful posting for foreclosure during an extension of that agreement, potential buyers of the property who would otherwise become good prospects to negotiate a sale with Debtor, became potential purchasers of the NBK Note and began negotiating with NBK. NBK materially breached the Confidential Settlement Agreement and interfered with these potential purchases and with these business relationships.

**IV.**
**CAUSES OF ACTION**

**COUNT 1:  BREACHES OF CONFIDENTIAL SETTLEMENT AGREEMENT**

22.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S    PAGE 8 OF 14
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

000133

23.     Debtor and the other two Plaintiffs and Defendant reached a valid and enforceable agreement expressly set forth in the Confidential Settlement Agreement.  Pursuant to the Confidential Settlement Agreement, Defendant agreed to keep the contents and terms of the parties' agreement completely confidential.  Debtor dismissed its very good claims in the Lawsuit against Defendant in reliance upon Defendant's promises, including but not limited to, Defendant's promise to uphold the confidentiality obligations set forth in the Confidential Settlement Agreement.

24.     Defendant breached the Confidential Settlement Agreement by disclosing its contents and terms to third parties in violation of the agreement's express confidentiality provisions.  These disclosures prevented Debtor from closing on the sale of the 2425 Building and chilled the market for other buyers for Debtor's property.  The same is true for NBK's wrongful, early filing of a notice of foreclosure on the 2425 Building, also in violation of the Confidential Settlement Agreement.

25.     Debtor and all Plaintiffs hereby sue NBK for these breaches of the Confidential Settlement Agreement.  The damages for these breaches are the amounts of money that the Debtor would have made from the contemplated transaction, which is in excess of Fifty Million Dollars ($50,000,000).

## COUNT 2:  TORTIOUS INTERFERENCE WITH CONTRACT

26.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

27.     As alleged, NBK tortiously interfered with the SIBS International contract (**Exhibit 1**) and the Caldwell Soames Inc. contract (**Exhibit 2**), causing damages to the Debtor and the other two Plaintiffs in the net amounts of the contracts which, but for NBK's interference,

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

PAGE 9 OF 14

000134

would have been paid to the Debtor and the other two Plaintiffs. These damages are excess of Fifty Million Dollars ($50,000,000), for which the Debtor hereby sues NBK.

### COUNT 3: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

28. Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

29. After NBK's disclosures of the situation created by the confidential settlement and the wrongful posting for foreclosure during a judicial extension of the grace period contained in that agreement, potential buyers of the property who would otherwise have become good prospects to negotiate a sale with Debtor, became instead potential purchasers from NBK of the NBK note and began contacting and negotiating or attempting to negotiate with NBK instead of the Debtor.

30. This interference by NBK damaged Debtor in amounts to be determined after discovery, but which exceed the minimum jurisdictional limits of this Honorable Court.

### COUNT 4: FRAUD AND FRAUDULENT INDUCEMENT/LENDER LIABILITY

31. Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

32. NBK never had any intention of living up to the Confidential Settlement Agreement. The Debtor was winning the lawsuit against NBK, so NBK induced the Debtor into dismissing its lawsuit and entering into the Confidential Settlement Agreement which NBK had no intention of living up to. This fraud works an estoppel against NBK (see Count 6, "ESTOPPEL"). Plaintiffs hereby sue NBK for the fraud and fraudulent inducement and alleges it constitutes the basis for an action for Lender Liability.

33. NBK knew at the time it entered into the Confidential Settlement Agreement it would deflect and tortiously interfere with the Debtor's attempts to sell the 2425 Building so NBK

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

PAGE 10 OF 14

000135

would be able to foreclose on the building and take all of the value instead of just the value of the amounts otherwise owed at the time. The fraud, fraud in the inducement, lender liability, and subsequent interference for all of which Plaintiffs hereby sue NBK. These actions by NBK have damaged the Debtor and the other two Plaintiffs in an amount of at least Thirty Million Dollars ($30,000,000).

## COUNT 5: FRAUDULENT CONVEYANCE

34.    Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

35.    The funds paid by the Debtor to NBK:

    a)    $801,509.42 paid Debtor to NBK on August 27, 2022;

    b)    $80,000 paid by Debtor to NBK on April 18, 2023; and

    c)    $80,000 paid by Debtor to NBK on May 10, 2023

were fraudulently induced by NBK and were payments for which the Debtor received nothing in return and constitute fraudulent conveyances in violation of U.S.C. § 544, 548, and 550 and TEX. BUS. & COMM. CODE §§ 24.001, *et seq.*, for which the Debtor hereby sues NBK to recover all such amounts.

## COUNT 6: ESTOPPEL

36.    Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

37.    NBK is estopped from claiming Debtor owes any more than the amount stated and agreed to in the Confidential Settlement Agreement because of its fraud and fraudulent inducement alleged previously.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

PAGE 11 OF 14

000136

## COUNT 7: BUSINESS DISPARAGEMENT

38.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

39.     The posting of the 2425 Building during any negotiation periods and/or the extended grace period when actual buyers were moving toward concluding a deal and when other potential buyers were expressing interest in the 2425 Building, constituted business disparagement against the Debtor for which Debtor hereby sues NBK. The damages are the net amount of money the Debtor would have received in the sales had they occurred.

## COUNT 8: BREACH OF GOOD FAITH AND FAIR DEALING

40.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

41.     Every contract has a duty of good faith and fair dealing engrafted upon it, especially in a lender/borrower relationship, and even more so when the lender is based in the State of New York as NBK is.

42.     NBK breached its duty of good faith and fair dealing by:

      a)      Inducing Plaintiffs to dismiss their State Court lawsuit;

      b)      Inducing Plaintiffs to enter into the Confidential Settlement Agreement;

      c)      Tortiously interfering with Debtor's performance under the Confidential Settlement Agreement;

      d)      Tortiously interfering with third-party contracts;

      e)      Not approving tenant leases or contracts for sale; and

      f)      deflecting buyers so Debtor could not sell the 2425 Building.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

PAGE 12 OF 14

000137

43.     Plaintiffs hereby sue NBK for breach of duty of good faith and fair dealing.  The damages are for the value of the amounts that would have been recovered in the state court litigation and/or the value of the deals lost for leases and/or sales of the 2425 Building.

### COUNT 9:  UNJUST ENRICHMENT

44.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

45.     If NBK is allowed to foreclose on the 2425 Building it will make an unconscionable profit and succeed in its "loan to own" gambit.  The amount of its unjust enrichment for which Plaintiffs hereby sue NBK is the difference between what NBK would have been owed (but for its breaches of the Confidential Settlement Agreement) under the Confidential Settlement Agreement and the true value of the building, for which Plaintiffs hereby sue NBK.

### COUNT 10:  ATTORNEYS' FEES

46.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

47.     Plaintiffs hereby sue NBK for their reasonable and necessary attorneys' fees under breach of contract and under any statutory or common law right to recover same.

### PRAYER

WHEREFORE, premises considered, Plaintiffs pray that Defendants be cited to appear herein as provided by law and that upon hearing:

1.     NBK not be allowed to foreclose on the 2425 Galleria Building;

2.     Plaintiffs recover their damages and attorneys' fees as alleged.

Dated: September 19, 2023

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S          PAGE 13 OF 14
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

000138

Respectfully submitted,

**HAYWARD PLLC**

By: /s/ Melissa S. Hayward
    Melissa S. Hayward
      Texas Bar No. 24044908
      MHayward@HaywardFirm.com
10501 North Central Expy., Suite 106
Dallas, Texas 75231
(972) 755-7100 (telephone/facsimile)
**PROPOSED COUNSEL FOR THE DEBTOR**

By: /s/ James Q. Pope
    James Q. Pope
      State Bar No. 24048738
      jamesp@thepopelawfirm.com
**THE POPE LAW FIRM**
6161 Savoy Drive, Suite 1125
Houston, Texas 77036
(713) 449-4481 Telephone
(281) 657-9693 Facsimile
**COUNSEL FOR PLAINTIFFS ALI CHOUDHRI AND NAISSANCE GALLERIA LLC**

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that the foregoing was filed with the Court and served via the Court's CM/ECF system upon all of the parties registered to receive such notice on September 19, 2023.

          */s/ Melissa S. Hayward*
          Melissa S. Hayward

**GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.**    **PAGE 14 OF 14**

000139

EXHIBIT 2

000140

12/17/2023 7:53 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 82647538
By: Bonnie Lugo
Filed: 12/18/2023 12:00 AM

## CAUSE NO. <u>2023-22748</u>

| | | |
|---|---|---|
| **GALLERIA 2425 OWNER, LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Plaintiff,* | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **NATIONAL BANK OF KUWAIT,** | § | |
| **S.A.K.P., NEW YORK BRANCH,** | § | |
| | § | |
| *Defendant.* | § | **281ST JUDICIAL DISTRICT** |

## <u>PLAINTIFF'S SIXTH AMENDED PETITION</u>

Galleria 2425 Owner, LLC ("***Plaintiff***") files this Sixth Amended Petition against Defendant National Bank of Kuwait S.A.K.P., New York Branch (individually as "***NBK***", or collectively as "***Defendants***"), and Azeemeh Zaheer (individually as "***Zaheer***", or collectively as "***Defendants***") and, in support, submit the following:

### I.
### <u>DISCOVERY PLAN</u>

1.    Discovery should be conducted pursuant to Level 2 of Rule 190.3 of the Texas Rules of Civil Procedure.

### II.
### <u>PARTIES</u>

2.    Galleria 2425 Owner, LLC ("***Plaintiff***") is a limited liability company doing business in Texas and is the owner of the building located at 2425 West Loop S., Houston, Texas ("***2425 Building***").

Page **1** of **29**

3.      National Bank of Kuwait, S.A.K.P., New York Branch ("***NBK***") is a banking corporation organized under the laws of Kuwait, acting through its New York Branch. NBK HAS APPEARED WITH COUNSEL.

4.      Azeemeh Zaheer ("**Zaheer**"), is an individual who resides, and may be personally served at 5513 Kansas Street, Houston, Texas 77007.

## III.
## INTRODUCTION

5.      This suit was originally filed against NBK, a party who has been shown to be willing to engage in bad faith actions, and who repeatedly attempts to make outside deals with third parties, specifically to deprive the plaintiff of its ownership interest in the 2425 Building in any way it can.

6.      Plaintiff, Galleria 2425 Owner, LLC, filed bankruptcy to preserve the asset, which NBK vehemently opposed, and fought to have dismissed from the bankruptcy court. However, at the hearing on NBK's motion to dismiss, Plaintiff was successful in defending against dismissal, and the bankruptcy case moved forward.

7.      Plaintiff promptly proposed a plan in the bankruptcy court, which was characterized as a "really smart" plan that "check[ed] all the boxes" for plan confirmation, according to Judge Lopez.

8.      Then, after NBK lost its motion to dismiss, it filed a letter in the bankruptcy case (Document 77) which made the bankruptcy court aware of litigation that was irrelevant to Galleria 2425 Owner, LLC's pursuit of its ongoing bankruptcy case. The state court litigation referenced by NBK is, in the words of Judge Lopez "an unrelated case involving Ms. Zahire [sic] and Naissance and Mr. Choudhri". The case is about a dispute over control of an entity called

Naissance Galleria, LLC, which is an entity that provided a mezzanine loan to Galleria 2425 Owner, LLC's sole member and is party to an intercreditor agreement with NBK. Upon information and belief, certain of the investors in Naissance Galleria LLC are substantial clients of or investors in NBK. Naissance Galleria LLC was also a party to the very settlement agreement with NBK at issue in this suit. Importantly, Naissance Galleria, LLC does not have any membership in, or control over Galleria 2425 Owner, LLC, or any of its members or managers.

9. Notably, the state court, in the litigation referenced in NBK's letter to Judge Lopez, did issue a Temporary Injunction, which maintained the status quo of Choudhri's management and control of Naissance Galleria, LLC, but limited any actions that could be taken by Choudhri on behalf of Naissance Galleria, LLC to only those which are also approved by Zaheer, until a trial resolves the issue once and for all.

10. After the Temporary Injunction was in place establishing Choudhri's control of Naissance Galleria, LLC, Zaheer directed her counsel, while purporting to act for Naissance Galleria, LLC, to appear at two separate hearings in the bankruptcy court, on or about October 12, 2023 and November 1, 2023, and on the eve of a November 1 status conference filed an emergency motion in the bankruptcy court, requesting for Judge Lopez to rule against the state court and find that Zaheer had control of, and could act for Naissance Galleria, LLC. Judge Lopez thereafter sua sponte dismissed the bankruptcy case during the November 1, 2023 status conference.

11. When the parties to the state court litigation returned to appear before Judge Manor on November 13, 2023, Judge Manor confirmed that her Temporary Injunction did not give Zaheer any right to act as the manager of Naissance Galleria, LLC, and confirmed that Choudhri was in control, subject to Zaheer's approval during the pendency of trial.

12.    All of these actions, gave rise to Judge Lopez's serious concerns about the ability to move forward with the bankruptcy case without resolution in the state court action. Judge Lopez stated, in the Status Conference held on November 1, 2023, the following:

"I don't have anything to qualify it in state court issues. I don't know. There's just a lot of confusing stuff, and my gut tells me that I need to dismiss this case and let you all go figure this out in State Court, because there's not enough here, and there's real concerns that I have…".

13.    However, since Naissance Galleria, LLC has no ownership or control over the Plaintiff or any of its members or managers, these filings and appearances are just a smoke screen. The fact that they were also filed in violation of the Temporary Injunction not only makes these actions unlawful, but there could be no other purpose aside from attempting to cause the dismissal of the bankruptcy case brought by Galleria 2425 Owner, LLC, which is an action that, logically, would be counter to the company's interests.

14.    In its letter inviting the Naissance dispute and Ms. Zaheer's counsel into the bankruptcy proceedings, NBK cleverly attempts to confuse the court by implying that Ms. Zaheer had control of Naissance Galleria, LLC because the order says that management decisions could not be made without her approval. Ms. Zaheer's counsel then accepted NBK's invitation to create confusion and disruption, appearing at the October 13 emergency status conference purporting to represent Naissance Capital LLC.

15.    As this Court has handled cases related to Galleria 2425 Owner, LLC for years, it is well aware that Ms. Zaheer has been entirely absent from any of these proceedings until on or about July 5th, 2023, when Naissance Galleria, LLC appeared, allegedly controlled by Azeemeh

Zaheer, before this Court's ancillary docket, attempting to stop the foreclosure by NBK, at which hearing this Court itself questioned the absence of Ms. Zaheer over the last several years.

16.    Ms. Zaheer signed the assignment giving control over Naissance Galleria, LLC to Mr. Choudhri on July 3rd, 2020. Ms. Zaheer did not make any claims of control over Naissance Galleria, LLC, did not attempt to object to Mr. Choudhri's management of the company for three (3) years. These allegations are absurd, as Ms. Zaheer has been entirely absent from the company's management for years.

17.    As a result of this conspiracy by the defendants, the emergency status conference requested by NBK resulted in the dismissal of the bankruptcy case.

18.    What's interesting is that, if Ms. Zaheer was sincerely the manager of Naissance Galleria, LLC, she would not have worked to have the bankruptcy case dismissed.

19.    Such actions, if they had been taken by a legitimate manager for Naissance Galleria, LLC, would be a breach of fiduciary duty to the company, *unless there was a back room deal NBK*.

20.    Now that NBK has re-posted the 2425 Building for foreclosure, Plaintiff will suffer irreparable harm as a result of the defendants' actions.

**IV.**
**FACTUAL BACKGROUND**

21.    In 2018, NBK loaned certain funds to Plaintiff.  NBK has continually interfered with the Plaintiff's ability to lease the 2425 Building to produce revenue and Plaintiff's ability to sell the 2425 Building to pay NBK off.  Every time NBK has so interfered, it has then blamed the Plaintiff for its inability supposedly to meet some of the loan terms.

Page **5** of **29**

000145

22.    For example, in January 2021, Plaintiff Ali Choudhri, who is vilified by NBK in various pleadings, had serious parties interested in acquiring interests in the building more than enough to clear NBK's debt.  A letter dated January 15, 2021, from SIBS International, and two purchase contracts would have paid off not only NBK, but left the Plaintiff with a great deal of value.  **NBK, rather than facilitate this sale, issued a formal notice of default to the Plaintiff and its intent to accelerate the loan on June 29, 2021**, while the SIBS International deal was in progress, killing that deal.

23.    **The same was true with regard to NBK's interference with the Plaintiff's attempt to lease space in the building to provide revenue so it could operate and make loan payments.**  By August 2021, this situation had become untenable due to NBK's refusal to approve new tenants and new leases, prompting the Plaintiff, on August 13, 2021, to send NBK a detailed letter regarding lease-up and renewal prospects for discussions, none of which, it seemed NBK would approve.

- **Healthcare Service Organization**

  - •Size: 130,000+ RSF – large client requirement in their preliminary planning stages:  •Industry: Healthcare Service Organization •Type of use: Administration Offices •Direct/Sublease •Commencement date: Q3/2023 •Term:5-10 yrs.  They are specifically VERY interested in amenities available, for example: deli, gym, day care, conference center (# of seats), training center (# of seats).

- **Invesco**

  - We met with the team twice and are actively pursuing them for 2425.  They are interested in a 157-month lease term for 208,830 SF of Net Rental Area.

- **Financial Services Firm**

  - Office •AREA: West Houston (610 West, Hwy 290, Beltway 8) •SPACE: Open Concept •SIZE: Approximately 20,000 – 25,000 rsf •PARKING: 5/1000 ratio •OCCUPANCY: Late 2Q22/Early3Q22 •TERM: 36-60 months with

renewal options •This tenant is currently at 24 Greenway on their top floor and have been looking at other A buildings.

- **Beyond Finance**

  - We are discussing a 68-month lease term for +/- 40,000 rentable SF.

- **Banco Affirme**

  - We submitted a 64-month lease term for 4,545 SF of Net Rental Area.

- **Walls Bank (existing tenant)**

  - Renew 3,054 SF of rental space for 60-month term starting January 1, 2022.

- **Others (working directly with ownership)**

  - ResMed (https://www.resmed.com/en-us/), interested in the entire building, working directly with Dr. Peter Farrell, Founder and Chairman

  - Healthstore Holdings (https://www.healthstore.com/), interested in a 15-year term with 80,000 SF in phase 1 and 75,000 SF in 12 months as phase 2.

  - Immunicom (https://immunicom.com/), interested in at least two full floors, moving HQ from San Diego, CA

24.     Below is an August 16, 2021 email from counsel for the Plaintiff to NBK

forwarding multiple leases for approval that **NBK had failed to approve or even respond to.**



25.    This lack of approval, or finding obstacles to approve, was not new.  In September 2019, Related Group had reached out to lease the parking garage located at the 2425 Building to be used for overflow, for parking up to 110 spaces.  **NBK's authorized representative Michael Carter would not approve this lease** (note "nbkny" email address below– *i.e.* National Bank of Kuwait, New York Branch), which would have generated a great deal of revenue for the Plaintiff.

From: Michael Carter <Michael.Carter@nbkny.com>
Date: Monday, 23 September 2019 at 13:22
To: Azeemeh Zaheer <azeemeh@naissancecapital.co.uk>, Lisa Walker
<Lisa.Walker@nbkny.com>
Subject: RE: LOI

My primary concern is that the tenant determines when the commencement date is, presumably because they have zoning and building department approvals to complete as well as financing to arrange, which is understandable, however there does not appear to be an outside expiration date for the Commencement date. It appears they could tie up these space permanently without having to pay rent. I think you should have an outside date for Commencement.

26.    The situation became so untenable that in September 2021, Plaintiff initiated a lawsuit against NBK.

27.    In good faith, even during the pendency of this litigation, the Plaintiff was still trying to get tenants into the building and get NBK's approval to do so, so it would not claim additional breaches of loan agreements. **On July 2, 2022, the Plaintiff sent NBK five leases for approval, which NBK did not approve.**

28.    *The parties litigated for eleven (11) months until August 22, 2022, when they entered into a Confidential Settlement Agreement.* **NBK has prevented Plaintiff's successful performance under any and all agreements it has with NBK, including the Confidential Settlement Agreement.**

29.    The Confidential Settlement Agreement permitted a timeframe in which Plaintiff could sell the 2425 Building, or seek refinancing, and Plaintiff was successful in obtaining a buyer for the building.  Upon closing this transaction, Plaintiff would have retained a forty-five (45%) ownership interest in the 2425 Building. However, **NBK again took actions which interfered with the continuation and closing of that transaction, including issuing a notice of foreclosure**

**on March 29, 2023 in breach of the Confidential Settlement Agreement, which Plaintiff believes was done intentionally to prevent the sale.**  The sale would have cleared the NBK debt as it stood at that time and left great value for the Plaintiff.  Plaintiff believes that NBK recognized that greater value and wanted to take it for itself by foreclosure in a "loan to own" gambit.

30.    There are tremendous factual inaccuracies that NBK represents to state and federal courts and they continue into these proceedings.  For example, in its Motion to Dismiss the Plaintiff's Bankruptcy, while it is absolutely true that temporary restraining orders were filed to attempt to prevent a foreclosure by NBK and its takeover of the 2425 Building, NBK fails to note that such requests were also **granted by this Court** based upon showings that **NBK had not allowed the Plaintiff to lease up the building to generate revenue, and had killed at least two transactions that Plaintiff was working on that would have cleared NBK and left value for the Plaintiff.**

31.    Additionally, NBK posted for foreclosure in 2023 early, and against an extended grace period that this Court had given Plaintiff, which silenced the bidding process and interest in the 2425 Building completely.  No one wants to buy a building posted for foreclosure.  **Plaintiff believes that NBK knew this and did it on purpose to prevent the Plaintiff from successfully selling the property and paying off the loan, so NBK could foreclose and take the 2425 Building for itself so it can open a Houston location.**

32.    After NBK's disclosures of the situation created by the Confidential Settlement and the wrongful posting for foreclosure during an extension of that agreement, potential buyers of the property who would otherwise become good prospects to negotiate a sale with Plaintiff, became potential purchasers of the NBK Note and began negotiating with NBK.  NBK interfered with

these potential purchases and with these business relationships.  At least the following were interfered with in this fashion:

a)    Globix Investment,

b)    Ironwood Commercial Realty,

c)    Shah Firm, LLC, and

d)    Jeb Brown Law.

## B.    Azeemeh Zaheer Decides She Wants the Building.

33.    On June 26, 2023, Zaheer, filed a lawsuit in the name of Naissance Galleria, LLC ("*Naissance*"), despite having assigned control over such entity several years prior., in the 157th Judicial District Court in Harris County, Texas referenced by case number 2023-39006 against Brad Parker ("*Parker*") as an initial step in Zaheer's pursuit of a hostile takeover of the 2425 Building.

34.    On July 5, 2023, Zaheer, again acting in the name of Naissance, filed a second lawsuit in the 129th Judicial District Court in Harris County, Texas referenced by case number 2023-41091 against Parker and NBK, to further her hostile takeover attempt of the 2425 Building. Zaheer sought injunctive relief, but that request for an emergency temporary restraining order was denied.

35.    On or about July 5, 2023, Plaintiff commenced a Chapter 11 bankruptcy proceeding in the Southern District of Texas, referenced by case number 23-60036.  NBK sought to dismiss the bankruptcy proceeding, but after a full day evidentiary hearing its motion to dismiss was denied on September 26, 2023.  The Chapter 11 Plan could have been approved and would have substantially reduced the value of NBK's secured debt. So, after its motion to dismiss was denied,

NBK changed tactics and decided to invite Ms. Zaheer and her counsel into the bankruptcy case to cause confusion and disruption. NBK decided it could not allow its debt to be restructured under the bankruptcy code, just as it had decided it could not allow the prior sales of the building that had been lined up by Plaintiff.

**C.    Azeemeh Zaheer is a False Representative of Naissance.**

36.    Azeemeh Zaheer at one time had a business and personal relationship with Ali Choudhri, both of which appeared to have ended mutually for a time. Azeemeh Zaheer sought injunctive relief in the 80th Judicial District Court for Harris County against Naissance Galleria, LLC, which was a mezzanine lender to an LLC ("**LLC**") two steps up in the chain.

37.    Azeemeh Zaheer had signed, as the authorized representative of the Managing Member of Naissance Galleria, LLC an Assignment of the management rights of that LLC to Ali Choudhri. In response, Mr. Choudhri stepped into Naissance's shoes, covered its expenses, and did a miraculous job of negotiating the aforementioned settlement with NBK after the Assignment. Azeemeh Zaheer made this assignment for a number of reasons, but most of them stemmed from her ineffective management of the building and her fear of exposure to NBK and certain individuals affiliated with NBK because of her poor performance.

38.    After Mr. Choudhri received the Assignment and had negotiated the successful settlement with NBK and the building looked as if it might succeed (a period of years), Azeemeh Zaheer decided she wanted to misappropriate the value that Mr. Choudhri had just preserved and to an extent had just created. First, she claimed the Assignment was invalid and sought and received a Temporary Injunction, on September 21, 2023, from the 80th Judicial District Court in Harris County. This Temporary Injunction basically only created a stalemate with respect to the management of Naissance Galleria, LLC to preserve the status quo until a trial in January. Mr.

Choudhri is still the manager of Naissance Galleria, LLC, not Azeemeh Zaheer, although she did have some approval rights under the injunction. Mr. Choudhri, as the manager of Naissance Galleria LLC and is only required to obtain approval from Zaheer for his actions. Zaheer DOES NOT have any control of the entity. Moreover, this was confirmed at a hearing on November 13, 2023 before Judge Manor in the 80th Judicial District Court.

**D.    Azeemeh Decides to Conspire with NBK So It Could Foreclose On the Building.**

39.    After the September 21, 2023 entry of the Temporary Injunction, some ironic, if not strange, events start taking place with respect to Ms. Zaheer and the Plaintiff. First, it is against Azeemeh Zaheer and Naissance's financial interests if NBK forecloses.

40.    Second, on information and belief, Zaheer caused a copy of the Temporary Injunction Entered on September 21, 2023 by the 80th Judicial District Court in Harris County to be sent to counsel for NBK, who used it to interfere with the Plaintiff's ability to reorganize under the bankruptcy code and confirm a chapter 11 plan.

41.    Third, Zaheer's directed her counsel to appear without any forewarning at the October 12, 2023 status conference, in the Bankruptcy Court about the plan, claiming Azeemeh Zaheer now is the manager of Naissance Galleria, LLC and they have been hired by her to represent Naissance Galleria, LLC, all by virtue of the Temporary Injunction.

```
  6          MR. DRINNON:  Okay.  I represent Mr. Abdullatif in
  7    other cases but not this one.  I tend to get hired because I
  8    have sued Mr. Choudhri successfully in numerous
  9    jurisdictions and cases . . . .
```

Page **13** of 29

### E.     Zaheer Changes Sides to Make a Deal with the NBK

42.     Progressively, Azeemeh Zaheer's behavior becomes more inexplicable as she: (1) takes the position that the Temporary Injunction put her in charge of Naissance (it did not);[1] (2) that Naissance Galleria, LLC could or had already become the owner of the Debtor building (2425 Galleria Owner, LLC, Plaintiff herein) and as the new owner, they did not wish to pursue claims asserted in the bankruptcy case against NBK by Plaintiff and Naissance for breaching the settlement agreement  and would want to take the bankruptcy in another direction.

43.     This created an environment of confusion for the Bankruptcy Court, which was by Defendants' design, and it was a concerted effort by the Defendants to have the bankruptcy case dismissed, allowing NBK to foreclose.  Defendant NBK would not be impeded by the bankruptcy and Zaheer could tell Mr. Choudhri: "I will not go along with your reorganization plan unless you pay me millions of dollars" while making a deal with NBK to block the Plan of Reorganization in the event no payment was received from Mr. Choudhri.

44.     The Defendants are working in concert, to achieve the same end.  Specifically, the Defendants have devised, and intended to devise, a scheme or artifice to seize the 2425 Building by any means necessary.  Defendants will stop at nothing to see the Plaintiff lose possession of the 2425 Building, and upon information and belief, the driving force behind their efforts is Osama Abdullatif ("***Abdullatif***").

---

[1] At a hearing had in the issuing court (the 80th Judicial District Court) on Monday, November 13, 2023, the Court confirmed her Temporary Injunction Order had not turned control of Naissance over to Zaheer and Zaheer had no authority to authorize attorneys to make the filing and take the action they had on behalf of Naissance Galleria, LLC in the Bankruptcy.

Page **14** of 29

45.     Defendants' scheme has involved false representations of material information, including but not limited to misrepresentations concerning the Plaintiff and the purpose and effects of the Temporary Injunction.

46.     On November 29, 2023, Azeemeh appeared, through counsel, at an emergency hearing where Naissance Galleria, LLC's Application for Temporary Restraining Order was being heard before the Harris County District Court Ancillary Judge.  Naissance Galleria, LLC sought an emergency temporary restraining order, to enjoin NBK from proceeding with the foreclosure sale scheduled for December 5, 2023, in an effort to protect its interests in the 2425 Building. However, Azeemeh, through counsel, argued against entry of the temporary restraining order, and worked alongside NBK to ensure its denial, leaving the 2425 Building subject to foreclosure. Azeemeh's stance is bizarre, considering Azeemeh, improperly acting as manager for Naissance Galleria, LLC, sought an emergency temporary restraining order to stop NBK from foreclosing on the 2425 Building in July 2023[2].

**F.     False Representations by Zaheer's Agents are Successful in Getting Plaintiff's Bankruptcy Dismissed.**

47.     The Bankruptcy Court scheduled a Status Conference for the Plaintiff's Bankruptcy Case for November 1, 2023.  Azeemeh's agents, on October 31, 2023, only hours before the Status Conference, filed an Emergency Motion.  This Motion contained many misrepresentations, some of which follow:

        a)     Even though Zaheer had no right to or standing necessary to file anything on behalf of Naissance, and the Temporary Injunction gave Zaheer no such rights, statements were made in their Emergency Motion directly to the contrary, stating Azeemeh Zaheer was in, Choudhri was out.

---

[2] See Cause No. 2023-41091: Naissance Galleria LLC v. National Bank of Kuwait S.A.K.P., New York Branch, transcript from the July 5, 2023 Temporary Restraining Order hearing is attached.

000155

    b)      The filing stated flatly at one point that the Assignment had been found to be forged – it had not.

    c)      The filing stated that, because of the Temporary Injunction, Naissance was now controlled exclusively by Zaheer, who could make Naissance become the Owner of the Bankrupt.  (The issuing court on Monday, November 13, 2023, ruled from the bench it said no such thing.)

These misrepresentations had the desired effect, and the Bankruptcy Court dismissed the Bankruptcy, green-lighting NBK to foreclose.

## G.    Abdullatif is Choudhri's Competitor and Wants to Ruin Him.

48.    Choudhri has been in the real estate investment and management business for the last 20 years.  The regular course of Choudhri's business involves numerous aspects of real estate development.  These activities include real estate and business acquisitions and dispositions, seeking and obtaining financing, and developing and managing commercial and residential properties.  He regularly raises capital for these activities through the issuance of equity and/or debt.  It is also within his normal course of business to enter into transactions with borrowers, lenders, and investors to support the purchase, development, and operations of real estate properties.

49.    Choudhri at times conducts his real estate investment and management business through the use of special purpose entities, such as Plaintiff Galleria Owner 2425, LLC.  Choudhri runs a management company, Jetall ("*Jetall*"), to provide employees and management services to entities for purposes of operating real estate investments.

50.    Abdullatif has provided financing for numerous third-party claims against Choudhri, including interfering with Choudhri's final divorce proceedings in both Pakistan Supreme Court and Harris County District Court by soliciting Choudhri's ex-wife for her legal claims against Choudhri and/or his entities and to gain access to Choudhri's protected financial

disclosures.  Abdullatif has filed several dozen Lis Pendens against Choudhri, and his properties, and has sponsored litigation against Choudhri in several dozen cases.

51.    Upon information and belief, Abdullatif is also financing the litigation expenses of Zaheer against Choudhri in the dispute over the building owned by Plaintiff.  Abdullatif, Zaheer, and others have all agreed to the enterprise course of action aimed at destroying Choudhri's business, including taking possession of the 2425 Building.

52.    On more than one occasion, Abdullatif resorted to violence and threats against Choudhri and/or his family, friends, and associates.  Mr. Choudhri had another real estate venture involving an entity called Dalio.  Abdullatif was present at Dalio's foreclosure proceeding, where a friend accompanying him assaulted one of Choudhri's lawyers. On another occasion, Abdullatif and his associates used firearms to hold Choudhri, and his associates, hostage.

53.    Abdullatif also formed an association with others in his illegal efforts to destroy Choudhri's business.   These individuals include but are not limited to Chris Wyatt, former paralegal of Jetall ("**Wyatt**").

54.    Wyatt was hired by Jetall in 2019.  In the course of his employment, Wyatt oversaw legal and litigation matters for Jetall.  He was provided confidential information concerning Jetall's and its client's real estate transactions, finances and debt leverage on properties, and litigation management strategies.  As a Jetall representative, Wyatt was regularly involved in and provided access to privileged information and communications, including information subject to attorney-client and work product privileges.  Wyatt signed a non-disclosure agreement at the beginning of his employment prohibiting him from disclosing confidential information and requiring him to return all files upon his termination.

55.    Wyatt's employment at Jetall ended in December 2020.  When he left Jetall, Wyatt stole corporate files including electronic communications and secretly recorded privileged phone communications between Choudhri and his attorneys.

56.    Jetall obtained a restraining order in January 2021 enjoining Wyatt from disclosing or divulging confidential information obtained through his course of employment with Jetall.

57.    Abdullatif met with Wyatt before, during and after Wyatt's departure from Jetall. Abdullatif, directly and through his lawyers, received confidential and privileged information from Wyatt.   This information included but is not limited to illegal recordings of Choudhri's conversations with attorneys.

58.    Upon information and belief, Abdullatif and his lawyers were aware that Wyatt was a former employee of Jetall who was involved in confidential and privileged communications and that a restraining order was entered enjoining Wyatt from disclosing confidential information.

59.    Abdullatif and his agents have used the illegally obtained information and recordings as part of Abdullatif's scheme to destroy Choudhri's business.  Abdullatif retained Wayne Dolcefino ("***Dolcefino***") as a "consultant" to publish on the internet a series of hit pieces on Choudhri.  Dolcefino advertises that his services included "litigation support," and Abdullatif has utilized Dolcefino in the course of his numerous lawsuits asserted against Choudhri and his businesses.

60.    Information illegally obtained from Wyatt is included in many of Dolcefino's hit pieces.  Dolcefino continues to publish these hit pieces on the internet, including videos posted in May 2023.

61.    Abdullatif has made several false claims against his competitor, Choudhri, in many ways, two of the most egregious being:

Page **18** of 29

a)  Hiring Dolcefino to create video "hit pieces" about Choudhri, his business, his marital status, and inappropriate character based upon his actions during that marital status. This video contained "over the top" falsehoods, e.g. that he was still married and had been for years. It was commercial speech designed to designate a competitor (Choudhri) and give Abdullatif a competitive advantage, and was introduced into interstate commerce by release to major television (broadcast and cable) networks and by placing on the internet where it still resides today, making it available to the potential customers and lenders that are competed for; and

b)  Placing multiple improper Lis Pendens on the record title to properties owned by Choudhri or his business entities, which created a double negative effect on Choudhri's ability to conduct business by hampering his ability to find new lenders or renewing existing loans because the security for them was impaired and making it impossible to sell those properties to raise new capital on his own. These Lis Pendens were "over the top" misrepresentations because they were illegal and did not assert valid interests in the subject properties. The Lis Pendens were also introduced into interstate commerce because they were filed of record and were available "online" over the internet to any potential customer for commercial real estate in the Houston area.

## V.
## CAUSES OF ACTION

### COUNT 1:  BREACHES OF CONFIDENTIAL SETTLEMENT AGREEMENT

62.  Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

63.  Plaintiff and NBK reached a valid and enforceable agreement expressly set forth in the Confidential Settlement Agreement.  Pursuant to the Confidential Settlement Agreement, NBK agreed to keep the contents and terms of the parties' agreement completely confidential.  Plaintiff dismissed its very good claims in the Lawsuit against NBK in reliance upon NBK's promise to uphold the confidentiality obligations set forth in the Confidential Settlement Agreement.

64.  NBK breached the Confidential Settlement Agreement by disclosing its contents and terms to third parties in violation of the agreement's express confidentiality provisions.  These

Page **19** of **29**

disclosures prevented Plaintiff from closing on the sale of the 2425 Building and chilled the market for other buyers for Plaintiff's property. The same is true for NBK's wrongful, early filing of a notice of foreclosure on the 2425 Building, also in violation of the Confidential Settlement Agreement.

65.     Plaintiff hereby sues NBK for these breaches of the Confidential Settlement Agreement, including monetary damages for such breaches and injunctive relief preventing NBK from foreclosing on the building because Civil Practices & Remedies Code Section 65.011 authorizes injunction relief when: 1) the applicant is entitled to a writ of injunction under the principles of equity and the laws of Texas relating to injunctions. Texas Civil Practices & Remedies Code Section 65.011(3); See Butnaru v. Ford Motor Co., 84 S.W.3rd 198, 210 (Tex. 20002); and 2) when irreparable injury to real or personal is threatened, irrespective of any remedy of law. Tex. Civ. Practice & Remedies Code Section 65.011(5).

66.     Plaintiff requests injunctive relief as allowed pursuant to *CytoGenix, Inc. v. Waldroff*, 213 S.W.3d 479, 487 (Tex.App.—Houston, [1st Dist.] 2006, pet. denied), and *L Series, L.L.C. v. Holt*, 571 S.W.3d 864, 876 (Tex.App.—Fort Worth 2019, pet. denied) due to Defendant's breach.

### COUNT 2: <u>TORTIOUS INTERFERENCE WITH CONTRACT</u>

67.     Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

68.     As alleged, NBK tortiously interfered with the SIBS International contract and the Caldwell Soames Inc. contract, causing damages to the Plaintiff in the net amounts of the contracts which, but for NBK's interference, would have been paid to the Plaintiff.

69.     Zaheer has tortiously interfered with Plaintiff's contract with NBK, and abused process by interfering in Plaintiff's bankruptcy proceeding.

**COUNT 3:  <u>TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS</u>**

70.     Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

71.     After NBK's disclosures of the situation created by the confidential settlement and the wrongful posting for foreclosure during a judicial extension of the grace period contained in that agreement, potential buyers of the property who would otherwise have become good prospects to negotiate a sale with Plaintiff, became instead potential purchasers from NBK of the NBK note and began contacting and negotiating or attempting to negotiate with NBK instead of the Plaintiff. NBK interfered with these potential purchasers and with these potential business relationships.  At least the following were interfered with in this fashion:

        a)     Globix Investment,
        b)     Ironwood Commercial Realty,
        c)     Shah Firm, LLC, and
        d)     Jeb Brown Law.

72.     Zaheer have interfered with the Plaintiff's relationship with NBK and/or entered into a relationship with Zaheer and their antics caused the dismissal of Plaintiff's Chapter 11 bankruptcy proceeding, which was otherwise proceeding to a cram-down restructuring under Chapter 11 of the bankruptcy code

73.     This interference by the Defendants damaged Plaintiff in amounts to be determined after discovery, but which exceed the minimum jurisdictional limits of this Honorable Court.

## COUNT 4:  COMMON LAW FRAUD/LENDER LIABILITY

74.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

75.    NBK never had any intention of living up to the Confidential Settlement Agreement.  The Plaintiff was winning the lawsuit against NBK, so NBK induced the Plaintiff into dismissing its lawsuit and entering into the Confidential Settlement Agreement which NBK had no intention of living up to.  This fraud works an estoppel against NBK (see Count 6, "ESTOPPEL").  Plaintiff hereby sues NBK for fraud and fraudulent inducement and alleges it constitutes the basis for an action for Lender Liability.

76.    NBK knew at the time it entered into the Confidential Settlement Agreement it would deflect and tortiously interfere with the Plaintiff's attempts to sell the 2425 Building so NBK would be able to foreclose on the building and take all of the value instead of just the value of the amounts otherwise owed at the time.  Plaintiff accordingly sues NBK for its fraud, fraud in the inducement, lender liability, and subsequent interference with the settlement agreement. Plaintiff seeks benefit of the bargain damages for the fraud related to the enforceable contract. Plaintiff requests injunctive relief as allowed pursuant to *CytoGenix, Inc. v. Waldroff*, 213 S.W.3d 479, 487 (Tex.App.—Houston, [1st Dist.] 2006, pet. denied), and *L Series, L.L.C. v. Holt*, 571 S.W.3d 864, 876 (Tex.App.—Fort Worth 2019, pet. denied) due to Defendant's breach.

## COUNT 5:  FRAUDULENT TRANSFER

77.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

78.    The funds paid by the Plaintiff to NBK:

   a)    $801,509.42 paid Plaintiff to NBK on August 27, 2022;

      b)      $80,000 paid by Plaintiff to NBK on April 18, 2023; and

      c)      $80,000 paid by Plaintiff to NBK on May 10, 2023

were fraudulently induced by NBK and were payments for which the Plaintiff received nothing in return and constitute fraudulent conveyances in violation of U.S.C. § 544, 548, and 550 and TEX. BUS. & COMM. CODE §§ 24.001, *et seq.*, for which the Plaintiff hereby sues NBK to recover all such amounts.  In addition, the Loan Agreement between NBK and Plaintiff set aside reserve funds to cover certain events of default related to the anchor tenant. Due to COVID-19, this provision of the Loan Agreement activated, and Plaintiff's loan payments were being drawn down from the reserve funds. However, NBK intentionally depleted Plaintiff's reserve funds, and transferred Plaintiff's funds to itself prior to the time when they were actually due. Plaintiff requests an injunction pursuant to Sec. 24.008.

## COUNT 6:  ESTOPPEL

79.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

80.    NBK is estopped from claiming Plaintiff owes any more than the amount stated and agreed to in the Confidential Settlement Agreement because of its fraud and fraudulent inducement alleged previously.

## COUNT 7:  BUSINESS DISPARAGEMENT

81.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

82.    The posting of the 2425 Building during any negotiation periods and/or the extended grace period when actual buyers were moving toward concluding a deal and when other

potential buyers were expressing interest in the 2425 Building, constituted business disparagement against the Plaintiff for which Plaintiff hereby sues NBK.

83.    The efforts of Zaheer to make false accusations and representations about the Plaintiff's ownership interests, management, and decision-making abilities constituted business disparagement against the Plaintiff for which the Plaintiff hereby sues Zaheer.

84.    The business disparagement by the Defendants damaged Plaintiff in amounts to be determined after discovery, but which exceed the minimum jurisdictional limits of this Honorable Court.

## COUNT 8: <u>BREACH OF GOOD FAITH AND FAIR DEALING</u>

85.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

86.    Every contract has a duty of good faith and fair dealing engrafted upon it, especially in a lender/borrower relationship, and even more so when the lender is based in the State of New York as NBK is.

87.    NBK breached its duty of good faith and fair dealing by:

    a)    Inducing Plaintiff to dismiss their State Court lawsuit;

    b)    Inducing Plaintiff to enter into the Confidential Settlement Agreement;

    c)    Tortiously interfering with Plaintiff's performance under the Confidential Settlement Agreement;

    d)    Tortiously interfering with third-party contracts;

    e)    Not approving tenant leases or contracts for sale; and

    f)    deflecting buyers so Plaintiff could not sell the 2425 Building.

Page **24** of **29**

88.     Plaintiff hereby sues NBK for breach of duty of good faith and fair dealing.  The damages are for the value of the amounts that would have been recovered in the state court litigation and/or the value of the deals lost for leases and/or sales of the 2425 Building.

## COUNT 9:  UNJUST ENRICHMENT

89.     Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

90.     If NBK is allowed to foreclose on the 2425 Building it will make an unconscionable profit and succeed in its "loan to own" gambit.  The amount of its unjust enrichment for which Plaintiff hereby sues NBK is the difference between what NBK would have been owed (but for its breaches of the Confidential Settlement Agreement) under the Confidential Settlement Agreement and the true value of the building, for which Plaintiff hereby sue NBK.

## COUNT 10:  CONSPIRACY

91.     Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

92.     Defendants agreed to work in concert with each other in order to interfere with Plaintiff's bankruptcy case, and to have it dismissed by making fraudulently claiming Azeemeh had control over Naissance Galleria, LLC.

93.     Defendants acted with the intent to harm plaintiff by disrupting its bankruptcy proceedings and ultimately obtaining a sua-sponte dismissal of such proceeding based upon their allegations

94.     To accomplish the object of their agreement Defendants intentionally or negligently mischaracterized the effect of the state court temporary injunction, in order to confuse and disrupt Plaintiff's bankruptcy case, which resulted in dismissal.

95.     The agreement to engage in this conduct proximately caused injury to plaintiff. Plaintiff's sole asset and its ability to reorganize its affairs under Chapter 11 of the bankruptcy code, has now been posted for foreclosure on December 5ᵗʰ, 2023, instead of being protected through its reorganization proceedings. A foreclosure will irreparably harm Plaintiff.

### COUNT 11:   FEDERAL MISREPRESENTATION OF SERVICES AND UNFAIR COMPETITION UNDER THE LANHAM ACT

96.     Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

97.     Section 43 of the Lanhan Act provides civil relief to any person damaged by the acts of another with connection to "any goods or services," who uses any "false designation of origin, false, or misleading description of fact, or false or misleading representation of fact" that either is either "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person," or "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 41 U.S.C. § 1125(a)(1).

98.     To establish a prima facie claim under § 43 of the Lanham Act of 1946, a plaintiff must establish  that: (1) the defendant made a "false or misleading statement of fact," (2) the statement "either deceived or had the capacity to deceive a substantial segment of potential consumers," (3) the deception was "material, in that it is likely to influence the consumer's purchasing decision," (4) the goods, services, or commercial activities must be "in interstate commerce," and finally, (5) "as a result of the statement at issue," there was injury to the plaintiff

Page **26** of **29**

000166

or the plaintiff "is likely to be injured." *IQ Prod. Co. v. Pennzoil Prod. Co*., 305 F.3d 368, 375 (5th Cir. 2002).

99.     NBK and the Plaintiff entered into a settlement agreement in the spring of 2023.  The settlement agreement was confidential. Thereafter, NBK made misleading statements about the confidential settlement agreement that deceived others, the actions were material, the actions were in interstate commerce and resulted in injury to the Plaintiff.  Since the settlement agreement was and may still be confidential, further information about the actions could be argued to be a breach of the confidentiality provisions.

100.    Further, NBK made misleading statements on the potential leases in the building owned by the Plaintiff.  The Plaintiff had numerous potential leases, NBK refused to approve the leases, the actions of NBK were misleading, the actions were deceptive as to both the Plaintiff and the potential leases, the actions were material in influencing the potential tenants in future relations with the Plaintiff, many of the larger proposed tenants were or are national companies in interstate commerce and the actions caused injury to the Plaintiff.

101.    Further, the Plaintiff and principally its owner purchase liens on properties and to purchase properties oftentimes at foreclosure sales, but other times as purchasers from willing sellers. Many of these properties are worth millions of dollars.  Buying properties worth millions of dollars is a very capital-intensive business. Consequently, Choudhri must maintain good reputations to assure that lenders will lend him money and buyers will enter into contracts to purchase their properties since the primary sources of capital necessary to keep this business functioning are capital from lenders and proceeds from the sales of their existing properties.

102.    The capital utilized in the leases and businesses comes from and flows through interstate commerce and at times through international commerce, and the purchasers or some of

their members are oftentimes citizens of states other than Texas or countries other than the United States of America.

103.     NBK has engaged in false advertising in violation of Section 43(a) of the Lanham Act as described above and possibly in other ways.

104.     These acts and others were in violation of 15 USC § 1125(a), Section 43a of the Lanham Act.

## COUNT 12:  <u>ATTORNEYS' FEES</u>

105.     Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

106.     Plaintiff hereby sues Defendants for its reasonable and necessary attorneys' fees under breach of a written contract under Civil Practice and Remedies Code §38.001, under the fee shifting agreement of the contract, and under any statutory or common law right to recover same.

## VI.<u> JURY DEMAND</u>

107.     Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## VII.<u> PRAYER</u>

108.     For the reasons set forth above, Plaintiff asks that the Court enter a judgment relief in the following manners:

a)     Actual damages including economic injuries & consequential damages;

b)     Attorney's fees;

c)     Exemplary damages;

d)     Prejudgment and post judgment interest;

e)     Court costs; and

       f)      All other relief to which Plaintiff is entitled under both law and equity.

Respectfully submitted,

The Pope Law Firm
6161 Savoy Drive, Suite 1125
Houston, Texas 77036
Ph: 713-449-4481
Fx: 281-657-9693
jamesp@thepopelawfirm.com

By: /s/ James Q. Pope
     James Q. Pope
     TBN: 24048738
     Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on December 17, 2023, a copy of the foregoing was served on interested parties by electronic service using the court's electronic noticing system.

By: /s/ James Q. Pope
     James Q. Pope

Page **29** of **29**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

James Pope on behalf of James Pope
Bar No. 24048738
jamesp@thepopelawfirm.com
Envelope ID: 82647538
Filing Code Description: Amended Filing
Filing Description: Plaintiff Sixth Amended Petition
Status as of 12/18/2023 9:54 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jerry CAlexander | | alexanderj@passmanjones.com | 12/17/2023 7:53:14 PM | SENT |
| Ruth NVera | | verar@passmanjones.com | 12/17/2023 7:53:14 PM | SENT |
| Sheryl Chandler | | chandlers@passmanjones.com | 12/17/2023 7:53:14 PM | SENT |
| James Pope | | jamesp@thepopelawfirm.com | 12/17/2023 7:53:14 PM | SENT |
| James Quantrele Pope | 24048738 | ecf@thepopelawfirm.com | 12/17/2023 7:53:14 PM | SENT |
| Rodney Lee Drinnon | 24047841 | rdrinnon@mccathernlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Robin Harrison | | rharrison@hicks-thomas.com | 12/17/2023 7:53:14 PM | SENT |
| Charles Conrad | | charles.conrad@pillsburylaw.com | 12/17/2023 7:53:14 PM | SENT |
| Nancy Jones | | nancy.jones@pillsburylaw.com | 12/17/2023 7:53:14 PM | SENT |
| Simone Nunez | | snunez@mccathernlaw.com | 12/17/2023 7:53:14 PM | SENT |
| David Clark | | dclark@mccathernlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Danielle Chester | | dchester@mccathernlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Haseeb Dada | | hdada@mccathernlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Averyll  Mauch | | amauch@Mccathernlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Gage Fender | | gage@clouthierlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Jennifer LMacGeorge | | jmac@jlm-law.com | 12/17/2023 7:53:14 PM | SENT |
| Jackie Marlowe | | jmarlowe@hicks-thomas.com | 12/17/2023 7:53:14 PM | SENT |
| Jetall Legal | | legal@jetallcompanies.com | 12/17/2023 7:53:14 PM | SENT |
| MacGeorge Law Firm Admin | | service@jlm-law.com | 12/17/2023 7:53:14 PM | SENT |
| Clouthier Law | | info@clouthierlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Ryan Steinbrunner | | ryan.steinbrunner@pillsburylaw.com | 12/17/2023 7:53:14 PM | SENT |
| Elizabeth Klingensmith | | liz.klingensmith@pillsburylaw.com | 12/17/2023 7:53:14 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

James Pope on behalf of James Pope
Bar No. 24048738
jamesp@thepopelawfirm.com
Envelope ID: 82647538
Filing Code Description: Amended Filing
Filing Description: Plaintiff Sixth Amended Petition
Status as of 12/18/2023 9:54 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Elizabeth Klingensmith | | liz.klingensmith@pillsburylaw.com | 12/17/2023 7:53:14 PM | SENT |
| Angela McGinnis | | angela.mcginnis@pillsburylaw.com | 12/17/2023 7:53:14 PM | SENT |
| Ali Choudhri | | ali@jetallcompanies.com | 12/17/2023 7:53:14 PM | SENT |

Associated Case Party: Ali Choudhri

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ali Choudhri | | legal@jetallcompanies.com | 12/17/2023 7:53:14 PM | SENT |

EXHIBIT 3

# EXHIBIT

# B

Unofficial Copy Office of Marilyn Burgess District Clerk

## DECLARATION OF QUANELL X

I, Quanell X Farrakhan, am a person over the age of eighteen (18) years and am competent to give this declaration. I have personal knowledge of the facts set forth in this declaration, and such facts are true and correct.

In October 2020, I met with Osama Abdullatif. During that meeting, Mr. Abdullatif told me he had text messages from Chris Wyatt. Mr Abdullatif said he felt like Mr. Wyatt was trying to extort him. I understood Mr. Wyatt to be a former employee of Ali Choudhri. Mr. Abdullatiff told me that he Mr. Wyatt wanted to sell Mr. Choudhri's business records/files and property.

Mr. Abdullatif said he had in his phone text messages from Mr. Wyatt where Mr. Wyatt asked Mr. Abdullatif to pay $200,000 in exchange for assisting and selling information and property to Mr. Abdullatif. Mr. Abdullatif told me he wanted to pay Mr. Wyatt for information and business records/files of Mr. Choudhri.

During this meeting Mr. Abdullatif showed me his phone and told me about a series of text messages from Chris Wyatt. The messages identified specific documents Mr. Wyatt was able to steal from his employer, Jetall companies, prior to his resignation. Wyatt's messages also touted his personal knowledge of Jetall's business operations and its President Ali Choudhri. Wyatt apparently believed his stolen documents and information were extremely valuable. The series of text messages culminated with a request by Wyatt for $200,000.00 in exchange for his cooperation, information and the stolen property. Based on the text messages Mr. Abdullatif told me and related discussions, Mr. Wyatt asked Mr. Abdullatif to pay $200,000 in exchange for assisting Mr. Abdullatif and providing him with documents and information belonging to Ali Choudhri. Mr. Wyatt asked Mr. Abdullatif to pay $200,000 in exchange for assisting Mr. Abdullatif and providing him with documents and information belonging to Ali Choudhri.

My date of birth is _12·7·70_ , and my address is _10061 Rebel Rd_ . I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas, on the _29_ day of December, 2020.

Quanell X Farrakhan

ALEJANDRA PEREZ
Notary Public, State of Texas
Comm. Expires 06-28-2023
Notary ID 129933928

1

EXHIBIT 4

000175

# EXHIBIT 14

### THIRD DECLARATION OF QUANELL X

I, Quanell X Farrakhan, am a person over the age of eighteen (18) years and am competent to give this declaration. I have personal knowledge of the facts set forth in this declaration, and such facts are true and correct.

On approximately January 20, 2021, I received the text attached as Exhibit A hereto from Wayne Dolcefino.

In regards to my prior Declarations and discussions of meetings with Osama Abdullatif, Abdullatif informed me in one of the meetings that Chris Wyatt had told him that Ali Choudhri had hired me to kill Abdullatif. Since this was obviously false, I spoke with officers from the Houston Police Department concerning these allegations and they confirmed to me that they had dismissed Wyatt's false accusations against me and Choudhri as a hoax.

My date of birth is December 7, 1970, and my address is 10061 Rebel Road, Houston, TX 77016.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas, on the 25TH day of January, 2021.

Quanell X Farrakhan

1



that brother you can intimidate with this foolishness

Delivered

The evidence.  Go to war

Yesterday 6:22 PM

We will be reporting the falsities in your affidavit to the da. You disappoint me

https://youtu.be/LhRO1mxeWh8

  iMessage 

EXHIBIT 5

# In the Matter Of:

TEXAS REIT LLC

24-10120-smr

# OMAR KHAWAJA

*September 11, 2024*

1      IN THE UNITED STATES BANKRUPTCY COURT

2      FOR THE WESTERN DISTRICT OF TEXAS

3      AUSTIN DIVISION

4

5 In re:         Chapter 11

6 TEXAS REIT, LLC        Case No.

7 Debtor        24-10120-smr

8

9

10

11      REMOTE DEPOSITION OF

12      OMAR KHAWAJA

13

14

15

16      September 11, 2024
     10:15 a.m.

17

18

19      5051 Westheimer, Suite 1200
     Houston, Texas

20

21

22

23

24

25      Cheryl Madriaga, Shorthand Reporter

1            APPEARANCES OF COUNSEL:

2

On behalf of Debtor, Texas Reit, LLC:

3

    STEPHEN W. SATHER, ESQ.
4     BARRON & NEWBURGER, P.C.
    7320 N. Mopac Expy, Suite 400
5     Austin, TX 78731
    (512) 476-9103
6     ssather@bn-lawyers.com

7

On behalf of Deponent, Omar Khawaja:

8

    MICHAEL BALLASES, ESQ.
9     HOOVER SLOVACEK, LLP
    5051 Westheimer, Suite 1200
10     Houston, Texas 77056
    (713) 977-8686
11     ballases@hooverslovacek.com

12

On behalf of Dalio Holdings I and II, LLC:

13

    LORI A. HOOD, ESQ.
14     SHACKELFORD, MCKINLEY & NORTON, LLP
    717 Texas Avenue, 27th Floor
15     Houston, TX 77002
    (832) 669-6081
16     lhood@shackelford.law

17

Also Present:

18

    Dwayne Mason, Esq., Greenberg Traurig, LLP -
19     prospective counsel for Dalio Holdings I and II, LLC

20     Ali Chouhdri, pro se - in his individual capacity

21     Gene McCubbin - assistant to Lori Hood

22     Tammy Luu - assistant to Ali Choudhri

23     Osama Abdullatif - noticed deponent

24     John Quinlan - noticed deponent

25

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    3

1                    INDEX TO EXAMINATION

2  EXAMINATION                              PAGE

3  Examination by Mr. Sather                6
   Examination by Ms. Hood                  47
4  Examination by Ms. Hood                  72
   Examination by Mr. Choudhri             126
5  Reporter's Certificate               229

6

7                    INDEX OF EXHIBITS

8  DEBTOR'S        DESCRIPTION                PAGE

9
   Exhibit 1    Proof of Claim              9
10
   Exhibit 2    Supplemental Notice of Lis      35
11              Pendens for 8052 Westheimer

12  Exhibit 3    Supplemental Notice of Lis     37
                Pendens for 8098 Westheimer
13
   Exhibit 4    Adversary Complaint - George Lee    38
14
   Exhibit 5    Debtor's Objection to Claim     44
15
   Exhibit 6    Motion for Leave to Withdraw    45
16              Claim Number 9

17

18

19

20

21

22

23

24

25

OMAR KHAWAJA                                           September 11, 2024
TEXAS REIT LLC                                                          4

1                  P R O C E E D I N G S

2              THE REPORTER:  We are on the record.  The date

3     is September 11th, 2024.  This begins the deposition

4     of Omar Khawaja.

5              My name is Cheryl Madriaga, representing

6     Esquire Deposition Solutions.

7              Will counsel please state their name on the

8     record and whom they represent?

9              MR. SATHER:  Stephen Sather --

10             MR. BALLASES:  Michael Ballases --

11             MR. SATHER:  -- attorney for --

12             MR. BALLASES:  -- (unintelligible) Khawaja --

13             THE REPORTER:  Sorry --

14             MR. BALLASES:  -- John Quinlan, and Osama

15     Abdullatif.

16             THE REPORTER:  Okay.  Sorry.  I just had two

17     people speaking at once.  Could I start with one

18     counsel, please?

19             MR. BALLASES:  Sure.  Michael Ballases,

20     counsel of record for the deponent, Omar Khawaja, also

21     John Quinlan, also Osama Abdullatif.

22             THE REPORTER:  Thank you.

23             MR. SATHER:  Stephen Sather --

24             MR. BALLASES:  You're welcome.

25             MR. SATHER:  -- for Texas REIT, LLC, the

1  debtor in this case.

2        MS. HOOD:  Lori Hood of Dalio Holdings, a

3  creditor in the case.

4        MR. CHOUDHRI:  Ali Choudhri, a creditor in the

5  case.

6        THE REPORTER:  Okay.  Is there anything else,

7  or are we ready to have me swear in the witness?

8        MR. BALLASES:  Now, there are other people on

9  the call.  They need to make an appearance.

10        MR. MASON:  This is Dwayne Mason, prospective

11  counsel for Dalio with Greenberg Traurig.

12        MR. MCCUBBIN:  Gene McCubbin, assistant to

13  Lori Hood.

14        MR. BALLASES:  Okay.  I'm going to object --

15  this is Michael Ballases.  I'm going to object to Lori

16  Hood, her assistant, Ali Choudhri, and Dwayne Mason

17  being present on the call.  They're not -- they don't

18  represent Texas REIT.  They're not parties, they don't

19  have standing, and they cannot participate.  And this

20  is not a creditors' meeting.  So I want that to be on

21  the record.

22        MR. SATHER:  All right.  Your objection is

23  noted.  Let's proceed.

24        THE REPORTER:  Okay.  And just before we go on

25  the record, I just ask that we please do our best not

1    to speak over one another.

2          Mr. Khawaja, please keep your voice nice and

3    loud, allow counsel to finish his completely before

4    you begin your answer, and all answers must be verbal.

5    Thank you.

6          MR. CHOUDHRI:  Just confirming, Madam Court

7    Reporter, we are on the record; right?

8          THE REPORTER:  Yes, we are.

9          MR. SATHER:  All right.

10          MR. CHOUDHRI:  Okay.

11          MR. SATHER:  If you would swear in the

12    witness, please.

13                OMAR KHAWAJA,

14    having been first duly sworn, was examined and

15    testified as follows:

16                EXAMINATION

17          MR. BALLASES:  Real quick before we get

18    started -- this is Michael Ballases -- I assume we

19    have an agreement to take this deposition by the

20    Federal Rules of Civil Procedure and also the Court's

21    limiting instruction.

22          MR. SATHER:  Yes.

23          MR. BALLASES:  Okay.

24    BY MR. SATHER:

25       Q.  All right.  Mr. Khawaja, have you ever given a

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    7

1   deposition before?

2       A.  I don't think so, no.

3       Q.  All right.  But are you familiar with the

4   process for taking a deposition, sir?

5       A.  Yes.  Yes, I am.

6       Q.  And do you understand that your testimony

7   today is under oath?

8       A.  Yes, I do.

9       Q.  And is there anyone present in the room with

10  you where you are giving your testimony?

11      A.  Yes, my attorney, Michael Ballases, and the

12  other two parties, Osama Abdullatif and John Quinlan.

13      Q.  All right.  And, Mr. Khawaja, do you

14  understand that you cannot confer with any of the

15  parties in the room with respect to your answers?

16      A.  Yes, I do.

17      Q.  Tell me what you do for a living.

18      A.  I'm an attorney.

19      Q.  And are you familiar with a company called

20  Texas REIT, LLC?

21      A.  Yes, I am.

22      Q.  And how are you familiar with Texas REIT, LLC?

23      A.  So an entity that Ali Choudhri owns.

24      Q.  Okay.

25      A.  Or controls.

OMAR KHAWAJA                                                    September 11, 2024
TEXAS REIT LLC                                                                    8

1      Q.  And have you ever entered into a business

2  transaction with Texas REIT, LLC?

3      A.  No, I have not.

4      Q.  Do you claim to be an owner of Texas REIT,

5  LLC?

6      A.  No, I don't.

7      Q.  Have you ever filed a notice of lis pendens on

8  behalf of any party against Texas REIT, LLC?

9      A.  I may have, yes.

10     Q.  Okay.  And are you familiar with what a notice

11  of lis pendens is?

12     A.  Yes.

13     Q.  Are you familiar with Ali Choudhri, who is

14  present here today?

15     A.  Yes.

16     Q.  And how are you familiar with Mr. Choudhri?

17     A.  I have litigation against him.  He's defrauded

18  me.  He's defrauded people I know.  I represent people

19  against him.  And, you know, we're sitting here in

20  this case today, so I know him because I am a party in

21  this case.

22     Q.  All right.  Are you familiar with Jetall

23  Companies?

24     A.  Yes.

25     Q.  And how are you familiar with Jetall

1  Companies?

2      A.  It's an entity that Ali Choudhri controls or

3  owns, and I have judgments against them.

4          MR. SATHER:  All right.  I'm going to share my

5  screen and show Exhibit 1.

6          (Debtor's Exhibit No. 1 was marked for

7  identification.)

8      Q.  (BY MR. SATHER)  I have previously provided

9  this document to the court reporter and your counsel.

10         And so can you see Exhibit Number 1 on the

11  screen, sir?

12     A.  Yes, I do.

13         THE WITNESS:  Do you have a physical copy too,

14  Michael?

15     Q.  (BY MR. SATHER)  All right.  Now, are you

16  familiar -- are you aware that this is a proof of

17  claim filed with the United States Bankruptcy Court?

18     A.  Yes, I am.

19     Q.  And are you one of the claimants listed on

20  this proof of claim?

21     A.  I am.

22     Q.  And as I read the proof of claim, there are

23  three individuals who are listed as the current

24  creditor:  John Quinlan, Omar Khawaja, and Osama

25  Abdullatif.  What is the relationship between the

OMAR KHAWAJA                                         September 11, 2024
TEXAS REIT LLC                                                        10

1  three individuals with respect to the proof of claim?

2      A.  They're just judgment orders.

3      Q.  Okay.  But do each of you assert the claim

4  jointly and severally, or do each of you have

5  different pieces of the claim?

6      A.  You know, jointly and severally.

7      Q.  All right.  Now, do you have an agreement

8  between the three of you as to how any monies received

9  on the claim will be divided?

10     A.  Not particularly.  I mean, you know, we don't

11  have a written agreement, from my understanding.

12     Q.  Okay.  Now, if I could go --

13         MR. BALLASES:  (Unintelligible) Ballases.  I'm

14  going to object.  You're violating -- you're being

15  harassing and oppressive and that you're violating the

16  Court's limiting instruction.

17         I'm going to give you a little bit of leeway

18  to get into all this just because it's background, but

19  the purpose of this deposition is for you to ascertain

20  why my clients filed the proof of claim and why they

21  now want to withdraw it.  And so I'll give you some

22  leeway, but I'm just letting you know.

23         MR. SATHER:  All right.  I disagree with that

24  contention.  I've listened to Judge Robinson's ruling.

25  I think it's broader.  But I'm going to continue on,

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    11

1    and if we run into a problem, we may have to take that

2    up with the Court.  But let me move on with my

3    questions.

4        Q.  (BY MR. SATHER)  Mr. Khawaja, did you sign the

5    proof of claim?

6        A.  I don't recall signing it.  I may have.  I

7    don't know.

8        Q.  Okay.  Did you authorize filing the proof of

9    claim?

10       A.  Yes, I did.

11       Q.  Did you read the proof of claim before it was

12   filed?

13       A.  Yes.

14       Q.  What steps did you take to ensure that the

15   proof of claim was accurate?

16       A.  I read it.

17       Q.  All right.  Now, I'm going to go down to Box 7

18   on the claim, and that has a dollar amount.  Do you

19   see that?

20       A.  Yes.

21       Q.  And do you know how that number was

22   calculated?

23       A.  I don't recall.

24       Q.  Going to page 8 of 54, there is a summary of

25   damages.  Does that refresh your recollection as to

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    12

1   how the proof of claim numbers were calculated?

2       A.  Can you enlarge it just a little bit so I can

3   look at it carefully?

4       Q.  Sure I can.  It does depend on my ability to

5   work this.  Does that help?

6       A.  Yeah, that -- that helps.  Thank you.

7       Q.  And so do you know where -- and let me scroll

8   up here.

9       A.  Sure.

10      Q.  Do you know where these numbers came from?

11      A.  This appears to be numbers that my counsel

12  provided.

13      Q.  And for the record, who is your counsel who

14  provided the numbers?

15      A.  Michael Ballases with Hoover Slovacek.

16      Q.  And have you taken any steps personally to

17  verify that these amounts are correct?

18      A.  I mean, I looked at the judgments before we

19  filed them.

20      Q.  Anything else?

21      A.  That's it.

22      Q.  Now I'm going to go to Box 9 and -- now, on

23  this page, it asks:  Is any -- all or any part of the

24  claim secured?  And it's not checked, but I'd like to

25  go to a subsequent page.  It may be a prior page.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    13

1   Excuse me.

2        Okay.  Here we go.  Looking at Box 9, do you

3   see where the box of, Is the claim secured, checked

4   "Yes."  Do you see that, sir?

5        A.  I do see that.

6        Q.  What is the basis for the claim being secured

7   according to the proof of claim?

8        A.  I mean, I'd have to ask my attorney.

9        Q.  Okay.  But it says -- and I believe this is

10  probably a typo, but it says "les pendens."  You think

11  that's a reference to filing of a notice of lis

12  pendens?

13       A.  It could be.

14       Q.  And is it your contention that filing a notice

15  of lis pendens creates an interest in property?

16       A.  It doesn't create -- it doesn't create an

17  interest in property.

18       Q.  All right.  What do you believe that it does?

19       A.  It secures a potential claim against property.

20       Q.  Okay.  Now, it's my understanding that the

21  proof of claim is based upon three separate judgments.

22  Is that your understanding?

23       A.  I think that's accurate.

24       Q.  Now, would you agree with me that none of

25  these judgments were taken against Texas REIT, LLC,

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                  14

1   the debtor in this case?

2       A.  I believe that's correct.

3       Q.  Now, I'm going to go down and look at the

4   different judgments, and I'm going to ask you some

5   questions about them.  And actually I'm just going to

6   start with the summary here.

7           Number 1 is -- Judgment 1 is called the "Davy

8   and Heil Judgment."  Do you see that?

9       A.  I do.

10      Q.  And this appears to be -- actually, I am going

11  to go to the judgment.  I apologize.  This appears to

12  be a judgment in a case from the Court of Appeal

13  styled Jetall Companies, Inc., Appellant, versus

14  Richard Heil, Todd Oakum, and Renee Davy, formerly

15  known as Renee Davy, formally known as Renee Oakum.

16          Do you see that?

17      A.  I do.

18      Q.  Now, you were not a party to this judgment,

19  were you, sir?

20      A.  I was not.

21      Q.  And what is your connection to the judgment

22  that would give you the authority to submit a proof of

23  claim in this case?

24      A.  The judgment was assigned to me.

25      Q.  Okay.  And is that -- was that a written

1  assignment of judgment?

2      A.  Yes.

3      Q.  And I will represent to you that the

4  assignment of judgment is not part of the proof of

5  claim.  Do you know why that assignment was not

6  included?

7      A.  I don't know why.

8      Q.  And if we were to look at the assignment of

9  the judgment, would the assignee be just Omar Khawaja,

10  or would it be someone else?

11      A.  I believe my assignment would have my name on

12  it.  I'm not sure about the other assignments.

13      Q.  Okay.  So for this particular judgment, it was

14  assigned to you, Omar Khawaja?

15      A.  I don't have it in front of me.  It's possible

16  that Mr. Abdullatif and Mr. Quinlan's name are on the

17  assignment.

18      Q.  All right.  How much did you pay to have the

19  judgment assigned to you?

20      A.  I don't recall.

21      Q.  And did you pay anything to acquire the

22  judgment?

23      A.  Yes, I did.

24      Q.  Now, do you agree with me that this judgment

25  is against Jetall Companies and not Texas REIT?

1          MR. BALLASES:  Objection.  Form.

2      A.  This particular judgment is against Jetall;

3  that is correct.

4      Q.  (BY MR. SATHER)  All right.  And so do you

5  contend that Texas REIT, LLC, is liable for a judgment

6  against Jetall Companies, Inc.?

7      A.  Yes, I do.

8      Q.  And why do you contend that, sir?

9      A.  Because all of the entities that Mr. Choudhri

10  either controls or is involved in are essentially

11  shell companies for his own personal finances, so

12  any --

13      Q.  (Unintelligible)

14      A.  Any company are -- I'm sorry.  Would you like

15  me to continue, or --

16      Q.  Yes, please.

17      A.  -- do you want to --

18      Q.  I did not mean to cut you off.

19      A.  Sorry.  I was saying any entity that

20  Mr. Choudhri controls or owns is treated as if it is

21  his own personal asset with no respect for the

22  corporate form and, I believe, is responsible for --

23  one entity is responsible for the other entity's

24  conduct.

25      Q.  Now I'd like to scroll down to the second

OMAR KHAWAJA                                                    September 11, 2024
TEXAS REIT LLC                                                              17

1   judgment.  And this document says it's a judgment from

2   the 14th Court of Appeals in Jetall Companies, Inc.

3   Versus Hoover Slovacek, LLP.  Are you familiar with

4   this judgment?

5       A.  Yes, I am.

6       Q.  Is Hoover Slovacek the law firm that is

7   representing you today in connection with this

8   deposition?

9       A.  Yes, it is.

10          MR. BALLASES:  Objection.  Form.

11      Q.  (BY MR. SATHER)  You can answer.

12      A.  Yes.

13      Q.  What is your connection to -- your connection,

14  if any, to this judgment?

15      A.  I believe I acquired it.

16      Q.  Did you acquire it by way of a written

17  assignment?

18      A.  Yes.

19      Q.  And did you pay any consideration to Hoover

20  Slovacek to acquire their judgment?

21      A.  Yes.

22      Q.  And how much did you pay them to acquire this

23  judgment?

24      A.  I don't recall how much I paid.

25      Q.  And is it a regular part of your business to

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    18

1    purchase judgments?

2        A.  Yes, it is.

3        Q.  Now, I may have asked this already, in which

4    case I apologize, but do you have a written assignment

5    of judgment?

6        A.  Yes -- yes, I believe there is one.  I don't

7    have it in front of me.

8        Q.  Is there a reason that assignment was not

9    included with the proof of claim?

10       A.  I don't know.

11       Q.  And do you know whether the assignment would

12   have been in favor of you, John Quinlan, Osama

13   Abdullatif, or some combination of the three of you?

14       A.  I believe all three of us.  It was assigned to

15   all three of us on the same instrument.

16       Q.  Now, do you agree with me that this judgment

17   is against Jetall Companies and not Texas REIT, LLC?

18       A.  Yes.

19       Q.  And why do you contend that Texas REIT, LLC,

20   is liable for a judgment against Jetall Companies?

21       A.  Because Texas REIT, LLC, is an alter ego of

22   Jetall Companies, Inc.

23       Q.  Now I'm going to go to the third judgment.

24   And this is a judgment in a case -- well, first of

25   all, do you see the judgment that I have up on the

1   screen?

2        A.  I do.

3        Q.  And that appears to be a judgment in a case,

4   Osama Abdullatif, individually, and Abdullatif &

5   Company, LLC, versus Ali Choudhri and Houston Real

6   Estate Properties, LLC; is that correct?

7        A.  That's correct.

8        Q.  And do you have an interest in this judgment,

9   or is this just Mr. Abdullatif's judgment?

10       A.  This particular judgment is Mr. Abdullatif's

11  judgment.

12       Q.  All right.  So do you have any interest in

13  this judgment whatsoever?

14       A.  No, I do not.

15           MR. BALLASES:  Objection.  Form.

16       Q.  (BY MR. SATHER)  All right.  Do you assert an

17  interest in the judgment in Cause Number 2013-41273?

18       A.  No.

19           MR. BALLASES:  Objection.  Form.

20       Q.  (BY MR. SATHER)  Now, of the three judgments

21  we went through, you assert an interest in the first

22  two, but not the third; is that correct?

23           MR. BALLASES:  Objection.  Form.

24       A.  That's correct.

25       Q.  (BY MR. SATHER)  Now, continuing down in the

1   claim, there is a copy of an adversary proceeding that

2   was filed in the United States Bankruptcy Court for

3   the Southern District of Texas.  Are you familiar with

4   this adversary proceeding?

5       A.  Vaguely.

6       Q.  Okay.  And I see that you are named as one of

7   the movants in the adversary proceeding.  Do you see

8   that?

9       A.  Yes, I do.

10      Q.  Did you authorize the adversary proceeding to

11  be filed listing you as one of the participants?

12      A.  Yes, I did.

13      Q.  Did you read it before it was signed?

14      A.  Yes, I did.

15      Q.  Now, so what is your understanding of the role

16  that this adver -- or that this original complaint

17  plays with respect to the proof of claim that was

18  filed on your behalf?

19      A.  I mean, I'm not a bankruptcy attorney.  We're

20  doing whatever we need to do to try to collect our

21  judgment.

22      Q.  So you're an attorney; right?

23      A.  Yes.

24      Q.  And you -- when you represent clients, you

25  file pleadings on their behalf; correct?

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    21

1       A.  That's correct.

2       Q.  And -- but your clients need to understand

3    what you're filing for them, don't they?  Isn't that

4    part of the rules regarding filing lawsuits?

5       A.  Yes.

6       Q.  What steps did you take to familiarize

7    yourself with the allegations in this adversary

8    proceeding?

9       A.  I reviewed the judgments, and I reviewed the

10   complaint.

11      Q.  And after reviewing them, did you conclude

12   that the allegations were true and correct?

13      A.  Yes, I did.

14      Q.  Now I'm going to read you a statement in

15   paragraph 1 of the adversary proceeding, which says:

16          This lawsuit shall prove that Jetall

17          Companies, Inc., Arabella PH 3201, LLC,

18          9201 Memorial Drive, LLC, 2727 Kirby 26L,

19          LLC, Texas REIT, LLC, Dalio Holdings I,

20          LLC, Dalio Holdings II, LLC, Houston Real

21          Estate Properties, LLC, Shahnaz Choudhri,

22          Ali Choudhri, Shepherd-Huldy

23          Development I, LLC, Shepherd-Huldy

24          Development II, LLC, and Galleria Loop

25          Note Holder, LLC, (collectively the

1          Choudhri defendants) are alter egos of

2          each other and intentionally acting in a

3          manner to defraud creditors and evade

4          legal obligations through a series of

5          fraudulent transfers.  The evidence will

6          demonstrate that Ali Choudhri is the

7          puppeteer controlling his web of business

8          entities, which hold his various

9          properties and other assets.  This web

10          includes Houston Real Estate Properties,

11          LLC, and Jetall Companies, Inc., as well

12          as the other named defendants.

13   Did I read that correctly?

14      A.  Yes, you did.

15      Q.  Do you have an understanding of what it means

16   to say that one person or company is the alter ego of

17   another person or company?

18      A.  Yes.

19      Q.  And what is your understanding?

20      A.  That one entity pays the debts or obligations

21   of another.  They commingle funds, commingle assets.

22   One principal is taking actions on behalf of any of

23   the various alter egos at any given time with no

24   respect for the corporate form.  Yeah, that's my --

25   that's my understanding.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                 23

1       Q.  All right.  Now, is it your contention that

2   each of the 13 persons and companies named as

3   defendants is the alter ego of every other one of the

4   persons and companies named?

5       A.  That's what --

6           MR. BALLASES:  Objection.  Form.

7       A.  Yes.

8       Q.  (BY MR. SATHER)  So are you contending that

9   Texas REIT is the alter ego of Jetall Companies?

10          MR. BALLASES:  Objection.  Form.

11      A.  That's what it says.  Yes.

12      Q.  (BY MR. SATHER)  And are you alleging that

13  Texas REIT is the alter ego of Arabella PH 3201, LLC?

14      A.  Yes.

15          MR. BALLASES:  Objection.  Form.

16      Q.  (BY MR. SATHER)  Are you alleging that Texas

17  REIT is the alter ego of Dalio I Holdings (sic), LLC?

18          MR. BALLASES:  Objection.  Form.

19      A.  Yes.

20      Q.  (BY MR. SATHER)  And would your answers be the

21  same if I went through all of the rest of the names of

22  the defendants in this case?

23      A.  Yes, because Ali Choudhri controls all of

24  them.

25      Q.  All right.  And so are you alleging that Ali

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                                24

1   Choudhri and Shahnaz Choudhri are alter egos of each

2   other?

3       A.  Yes.

4          MR. BALLASES:  Objection.  Form.

5       Q.  (BY MR. SATHER)  So are you -- it's your

6   contention that any company or entity in which Ali

7   Choudhri has an interest is an alter ego of Ali

8   Choudhri?

9          MR. BALLASES:  Objection.  Form.

10      A.  I don't know if there's any.  I mean, are

11  there entities that I don't know about?  I don't know.

12      Q.  (BY MR. SATHER)  Were you aware that there was

13  an amended complaint filed that names 17 defendants?

14      A.  I believe --

15          MR. BALLASES:  Objection.  Form.

16      A.  I believe so.

17      Q.  (BY MR. SATHER)  And is it your contention

18  that each of the 17 defendants is the alter ego of

19  each of the other 17 defendants?

20      A.  If that's what the petition says, yes, that's

21  my contention.

22      Q.  The complaint alleges that each of the claimed

23  alter egos were, quote (Reading:)  ...intentionally

24  acting in a manner to defraud creditors and evade

25  legal obligations through a series of fraudulent

OMAR KHAWAJA                                                September 11, 2024
TEXAS REIT LLC                                                            25

1    transfers.

2            Did I read that right?

3        A.  Yes, you did.

4        Q.  So are you claiming that every one of these 13

5    or 17 persons and companies listed made fraudulent

6    transfers to each and every other one of the persons

7    and companies listed?

8        A.  Yes.

9        Q.  So, for example, are you claiming that Shahnaz

10   Choudhri made fraudulent transfers to 2727 Kirby 26L,

11   LLC?

12       A.  I don't know about that.

13       Q.  As we sit here today, do you know of any

14   fraudulent transfers that any of these defendants made

15   to Texas REIT, LLC, the debtor in this case?

16       A.  I don't.

17       Q.  And so with respect to that particular

18   allegation about making fraudulent transfers, you're

19   not aware of any involving the debtor in this case;

20   correct?

21       A.  I'm not aware of any sitting as -- as I'm

22   sitting here right now.  But any specific one?  No.

23       Q.  And what would you need to do --

24            THE WITNESS:  Oh, Mr. Sather, I'm sorry.  I

25   need to just take a quick restroom break if you don't

1    mind.

2          MR. SATHER:  All right --

3          MR. CHOUDHRI:  No.  No.  No.  Hold on.  Let's

4    finish this line of questioning.  Please ask your

5    question --

6          MR. SATHER:  Mr. Choudhri -- Mr. Choudhri,

7    it's my questions.  I decide whether we're going to

8    take a bathroom break or not.

9          I don't have a problem with taking a break,

10   but do not discuss your testimony with your attorney

11   while we're off the record.

12         THE WITNESS:  Not a problem.

13         MR. SATHER:  All right.  And so five minutes?

14         THE WITNESS:  Five minutes should be good.

15         MR. SATHER:  All right.  Madam Reporter, we

16   will be off the record for five minutes.

17         THE REPORTER:  Off the record.

18         (A recess was taken.)

19         THE REPORTER:  All right.  We are back on the

20   record.

21     Q.  (BY MR. SATHER)  And, Mr. Khawaja, I want to

22   follow up on something I asked you earlier.  When I

23   asked you how you knew Ali Choudhri, you said that he

24   defrauded you.  Can you tell me what transaction that

25   he defrauded you with regard to?

1          MR. BALLASES:  Objection.  Form.

2      A.  It was an apartment complex that my family

3   owned.

4      Q.  (BY MR. SATHER)  And was it you personally, or

5   was it your family?

6          MR. BALLASES:  I'm going to instruct the

7   witness not to answer.  He's here to answer the basis

8   for his proof of claim and why he wants to withdraw

9   it.  That's not a part of his claim.  It's not alleged

10   in any of the documents, and therefore, it's outside

11   the scope of the judge's limiting instruction.

12      Q.  (BY MR. SATHER)  Is this prior transaction --

13   have anything to do with this case?

14      A.  I'm sorry.  Can you repeat that question?

15      Q.  Yes.  Does the prior transaction where you say

16   Mr. Choudhri defrauded you or your family -- does that

17   have anything to do with the proof of claim against

18   Texas REIT?

19      A.  No.

20      Q.  Now, earlier I asked you about whether your

21   business involved purchasing judgments, and I also --

22   you also testified that you're an attorney.  Are those

23   separate businesses that you're involved in?

24      A.  No.

25      Q.  And so do you purchase judgments through your

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                      28

1   law firm?

2       A.  Yes.

3       Q.  And about how many judgments have you

4   purchased in, say, the last five years?

5           MR. BALLASES:  Objection.  Form.

6       A.  I don't know.  I'm not sure, to be honest with

7   you.

8       Q.  (BY MR. SATHER)  More than ten?

9       A.  No, probably not more than ten.

10      Q.  And --

11          MR. BALLASES:  Objection.  Form.

12      Q.  (BY MR. SATHER)  -- have you -- do you

13  purchase judgments against anyone other than entities

14  related to Ali Choudhri?

15          MR. BALLASES:  Objection.  Form.

16      A.  Not that I can recall.

17      Q.  (BY MR. SATHER)  All right.  So when we talk

18  about your purchase of judgments, that -- at least as

19  you recall today, those relate to your dealings with

20  Ali Choudhri.

21      A.  Yes.

22      Q.  And how would you describe your relationship

23  with Mr. Choudhri?

24          MR. BALLASES:  Objection.  Form.

25      A.  What do you -- what do you mean?

1      Q.  (BY MR. SATHER)  Is it cordial?  Unpleasant?

2   Adversarial?

3          MR. BALLASES:  Objection.  Form.

4      A.  He owes me money.  I mean, that's about it.

5      Q.  (BY MR. SATHER)  Going back to the adversary

6   proceeding that's part of the proof of claim, I'm

7   going to go to paragraph 22.  And it's kind of a long

8   paragraph, so I'm just going to read you some

9   sentences towards the end where it says, quote

10  (Reading:)  Choudhri views HREP, Jetall, and himself,

11  as well as the other named defendants, as one and the

12  same and utilizes them in such a fashion.  In other

13  words, there is unity between Choudhri, HREP, Jetall,

14  and his other business entities such that the

15  separateness of the business entities has ceased, and

16  thus this Court should treat the Choudhri defendants

17  accordingly to protect plaintiffs/the creditors.  And

18  this is where the lawsuit begins.

19          So did I read that correctly?

20      A.  Yes.

21      Q.  And so what is the basis for your statement

22  that Mr. Choudhri views all of the Choudhri defendants

23  as one and the same?

24          MR. BALLASES:  Objection.  Form.

25      A.  It's in the petition, Counsel.  All of the

OMAR KHAWAJA                                     September 11, 2024
TEXAS REIT LLC                                                  30

1  bases that we have are listed out in very clear, you

2  know, language, just like you read.

3      Q.  (BY MR. SATHER)  Can you articulate what any

4  of those bases are?

5      A.  It's -- I mean --

6         MR. BALLASES:  Objection.  Form.

7      A.  -- do you want me to -- do you want me to

8  start reading the petition for you?  I'm happy to read

9  it for you, but it's in the petition.

10     Q.  (BY MR. SATHER)  I'm asking you -- I mean,

11  without reading the petition, do you know what the

12  basis for the allegations is?

13     A.  I mean the -- without reading the petition,

14  the purpose of the petition was to articulate the

15  basis of the petition.  So it's in the petition

16  itself.  I'm happy to read through the petition for

17  you if you'd like me to, but in -- in plain language,

18  he treats every entity that he controls or owns as a

19  personal piggy bank, just like the petition states.

20  And that's the basis of the alter ego claim that we're

21  making.

22     Q.  All right.  And so your allegation is also

23  that he views his mother as one and the same with

24  himself?

25         MR. BALLASES:  Objection.  Form.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    31

1      A.  Yes.

2      Q.  (BY MR. SATHER)  Now, you obviously don't

3   contend that they're the same person; right?  You --

4   they are different human beings.

5          MR. BALLASES:  Objection.  Form.

6          (Crosstalk)

7      A.  Sorry.  Is that a -- was that -- do you really

8   want me to answer that question?  I'm not sure.

9      Q.  (BY MR. SATHER)  Yes, I do.  I wouldn't have

10   asked it if I --

11      A.  You mean like Norman Bates, that kind of thing

12   or -- is that what -- I'm sorry.  It's just a

13   stupid --

14      Q.  (BY MR. SATHER)  I just want you to

15   acknowledge that these are two different human beings,

16   sir.

17      A.  Yes, sir.  Yes, they're two different human

18   beings.

19      Q.  And so is it your contention that there's no

20   separateness between, say, Houston Real Estate

21   Properties, LLC, and Texas REIT, LLC?

22          MR. BALLASES:  Objection.  Form.

23      A.  Again, I'm gonna -- I'm gonna refer you back,

24   Mr. Sather, to the petition.  That's what the petition

25   states.

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                        32

1      Q.  (BY MR. SATHER)  All right.  And you contend

2  that -- and you stand by the allegations in the

3  petition.

4      A.  Yes, sir.  I stand by each and every

5  allegation in the petition.

6          MR. BALLASES:  Objection.  Form.

7      Q.  (BY MR. SATHER)  And so is everything that you

8  know about this allegation of alter ego contained in

9  the petition?

10      A.  I mean, we don't -- I don't believe we

11  finished discovering the process, sir, so we're -- I'm

12  sure we're gonna get to learn a lot more about the

13  alter-ego basis on which Mr. Choudhri operates and the

14  other defendants.

15      Q.  And so did the petition set forth all of the

16  bases that you knew about at the time it was filed?

17      A.  In a good faith manner, yes.

18      Q.  All right.  What does that mean, "in a good

19  faith manner"?

20          MR. BALLASES:  Objection.  Form.

21      A.  To the best of our ability, right, on some --

22  on some evidence that we've been able to muster.

23      Q.  (BY MR. SATHER)  Did you intentionally omit

24  any bases for making an allegation of alter ego?

25      A.  No.

1        MR. BALLASES:  No, I instruct the client not
2   to answer, simply because you're invading attorney
3   work product, legal privileges.  What we decided to
4   put in or not in our petition is subject to work
5   product and privilege.  Don't invade our privilege,
6   please.
7        Q.  (BY MR. SATHER)  All right.  Do you know of
8   any evidence that you decided not to include in the
9   petition?
10        MR. BALLASES:  Same assertion of privilege.
11        Q.  (BY MR. SATHER)  You can answer, sir.
12        MR. BALLASES:  It's work product and
13   privilege.  I'm instructing him not to answer.  It's
14   invading a legal privilege that he enjoys.
15        THE REPORTER:  And I'm sorry.  Counsel, if I
16   could just get you to just speak up a little bit as
17   well.  You're just sounding a little bit muffled.
18        MR. BALLASES:  Yes, ma'am.
19        THE REPORTER:  Thank you.
20        Q.  (BY MR. SATHER)  I'd like to go to
21   paragraph 23 where it says (Reading:)  Plaintiffs are
22   upstanding, honest, and respectable businessmen, real
23   estate developers, attorneys, and/or a combination of
24   all.
25        Which of those categories do you fall into,

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                      34

1   sir?

2       A.  (Reading:)  Plaintiffs are upstanding, honest,

3   respectable businessmen, attorneys --

4           A combination.

5       Q.  Okay.  A combination of what?

6       A.  Of all.

7       Q.  Okay.  So you're a businessman, real estate

8   developer, and attorney?

9       A.  But I'm also upstanding, honest, and

10  respectable.

11      Q.  Okay.  Now, was it upstanding, honest, and

12  respectable for you to sponsor Mr. Choudhri's ex-wife

13  to claim to still be married to him and file notices

14  of lis pendens against all of his properties?

15          MR. BALLASES:  I'm going to instruct the

16  client not to answer.  You are violating the Court's

17  limiting instruction as to this deposition, and the

18  purpose of this deposition is to find the basis for

19  the filing of the proof of claim and why we are

20  willing to withdraw it now.  I'll let you go on and

21  get past that, but I'm going to start putting stops to

22  it if this is the kind of stuff we're going to have.

23      Q.  (BY MR. SATHER)  Okay.  But it's your

24  contention that you are, in fact, an upstanding,

25  honest, and respectable businessman, real estate

OMAR KHAWAJA                                         September 11, 2024
TEXAS REIT LLC                                                       35

1    developer, and attorney, sir.

2        A.  Yes --

3            MR. BALLASES:  Objection.  Form.

4            MR. SATHER:  Now, I'm going to move on to a

5    different exhibit, Exhibit Number 2, assuming I can

6    bring it up on the screen.

7            (Debtor's Exhibit No. 2 was marked for

8    identification.)

9        Q.  (BY MR. SATHER)  Actually, one thing I didn't

10   ask you, Mr. Khawaja:  How old of a man are you?

11       A.  46.

12       Q.  And are you licensed to practice law in the

13   state of Texas?

14       A.  Yes, I am.

15       Q.  And when were you licensed?

16           MR. BALLASES:  Objection.  Form.

17       A.  2010.

18       Q.  (BY MR. SATHER)  I've brought up on the screen

19   what we've marked as Exhibit 2, which is titled

20   "Supplemental Notice of Lis Pendens."  Are you

21   familiar with this document?

22           MR. BALLASES:  Mr. Sather, we don't have

23   copies of that.  Could you please e-mail that to

24   myself and Steve Leyh and any other exhibits you'd

25   like to use?

1        MR. SATHER:  Sure.  Those should've been

2    provided to you in a ShareFile yesterday.

3        MR. BALLASES:  Could you resend them?

4        MR. SATHER:  I will -- yes, I will resend

5    those --

6        MR. BALLASES:  Please send them to Steve and

7    myself.

8        MR. SATHER:  My computer is lagging just a

9    little bit, so it'll take a second for them to load.

10   But I had tried to provide these to you ahead of time

11   so we could avoid this.

12       Okay.  And as you can see from the screen

13   share, I have sent the e-mail to you.

14       THE WITNESS:  Michael, I think he's addressing

15   you on the e-mail.

16       MR. BALLASES:  That's fine.

17   Q.  (BY MR. SATHER)  Now, what we've marked as

18   Exhibit Number 2 is a supplemental notice of lis

19   pendens.  And I'm going to scroll down to the end of

20   it, and do you see the real property description

21   there?

22   A.  I do, yes.

23   Q.  And are you aware that that is real property

24   owned by Texas REIT, LLC?

25   A.  Yes.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    37

1      Q.  And are you familiar with this notice of

2  lis pendens?

3      A.  I believe I looked at it before it was filed,

4  yes.

5      Q.  And it looks like it's filed by

6  Mr. Abdullatif, and he is one of the parties to the

7  proof of claim; correct?

8      A.  Yes.

9         MR. BALLASES:  Objection.  Form.

10      Q.  (BY MR. SATHER)  And did you approve of the

11  filing of this notice?

12      A.  I must have if it was filed.

13      Q.  And what's your understanding of the purpose

14  of this notice?

15      A.  To make sure that we secure any proceeds that

16  could potentially come to Ali Choudhri or his entities

17  that he owes to us.

18      Q.  And do you know why it was filed?

19      A.  For that reason.

20         MR. SATHER:  I'm going to show you another lis

21  pendens which we have marked as Exhibit Number 3.

22         (Debtor's Exhibit No. 3 was marked for

23  identification.)

24      Q.  (BY MR. SATHER)  And are you familiar with

25  this document?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    38

1      A.  Exhibit Number 3.  Sorry.  Yes.

2      Q.  And I see this was signed by Osama Abdullatif

3  as well.

4      A.  Yes.

5      Q.  And would your questions be the same -- or

6  your answers be the same with regard to this notice of

7  lis pendens as with the prior one?

8      A.  Yes.

9          MR. SATHER:  I'm going to switch gears now and

10  go to Exhibit Number 4, which is an adversary

11  complaint filed by George Lee against Texas REIT, LLC,

12  and Ali Choudhri -- or at Exhibit 4.  Excuse me.

13          (Debtor's Exhibit No. 4 was marked for

14  identification.)

15      Q.  (BY MR. SATHER)  Do you know George Lee?

16          MR. BALLASES:  I'm going to object to this

17  line of questioning and instruct the witness not to

18  answer as it exceeds the scope of the limited

19  deposition the judge granted you.  This has nothing to

20  do with our proof of claim or adversary proceeding.

21      Q.  (BY MR. SATHER)  Are you going to take your

22  counsel's advice?

23      A.  I am.

24      Q.  So let me just ask you by way of background.

25  Do you know George Lee?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                39

1          MR. BALLASES:  Objection.  Form.  Same -- same

2     instruction.

3     Q.  (BY MR. SATHER)  Are you refusing --

4          MR. CHOUDHRI:  So (unintelligible) --

5     Q.  (BY MR. SATHER)  -- to answer that you know

6     George Lee?

7          MR. BALLASES:  Objection to form.  Same

8     objection; this has nothing to do with our claim, and

9     you're exceeding the scope of the limited deposition

10    the judge granted.

11     A.  I'm taking my counsel's advice.

12          MR. CHOUDHRI:  I just want to make sure the

13    record is clear.  Are you instructing the witness not

14    to answer?

15          MR. SATHER:  Mr. Choudhri, let me --

16          MR. BALLASES:  Mr. Choudhri, please be quiet.

17    You're not a party involved in this.  You have no

18    standing to be here.

19          MR. SATHER:  He actually does under the

20    Court's ruling.  But, Mr. Ballases --

21          MR. CHOUDHRI:  Wait a second.  Wait -- wait --

22    wait a second.  I want to get this on the record.

23          Mr. Ballases, I am here, and I have a standing

24    to object.  Okay?  And so --

25          MR. BALLASES:  (Unintelligible)

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024

40

1        MR. CHOUDHRI:  -- I have a standing to be

2   here.  So are you telling me on the record that you

3   are not going to cooperate and allow me to ask

4   questions on a deposition that I've cross-noticed?

5        MR. BALLASES:  That is correct.  You have no

6   party -- you're not a party in this proceeding.  You

7   have no standing.  We've also objected to your

8   cross-notice, so you better bet your bottom dollar.

9        MR. CHOUDHRI:  Okay.  Besides betting my

10  bottom dollar, Mr. Ballases, you understand that the

11  Honorable Judge Robinson made a ruling --

12        MR. BALLASES:  You're wasting your time --

13        MR. CHOUDHRI:  -- and said that --

14        MR. BALLASES:  -- (unintelligible) with the

15  judge's ruling.  Why don't you let your counsel ask

16  questions.

17        MR. CHOUDHRI:  No, no.  I'm here representing

18  myself pro se as a creditor.  I have filed a proof of

19  claim.  I'm a creditor.  I have standing.

20        Are you saying on the record that you are

21  going to instruct your client not to answer any of my

22  questions?  I just want to get this on the record so

23  it's clear.  Are you instructing your client not to

24  answer any questions, and is your client going to take

25  your advice?

1      MR. BALLASES:  Yeah, so the way this

2   proceeding words, there's a court reporter who writes

3   down everything we say.  I've been clear in my speech

4   and what I say in my objections.  If you're confused,

5   you can ask the court reporter to read it back, or you

6   can just take better notes.  Be quiet, and let your

7   counsel ask questions.

8      MR. CHOUDHRI:  So just so the record is

9   crystal clear, Mr. Ballases, you are instructing your

10  client, Omar Khawaja, who is a deponent today, to not

11  answer any questions that I'm gonna have, and you're

12  also obstructing my ability to object or make any

13  objections in this deposition.  Is that all correct?

14  I just want to make sure the record is very crystal

15  clear.

16     MR. BALLASES:  Let Mr. Sather ask his

17  questions.  Please be quiet.

18     MR. CHOUDHRI:  Sir, I just want to clarify,

19  because I have a right to be here and object, and you

20  are --

21     MR. BALLASES:  Let --

22     MR. CHOUDHRI:  -- telling me to be quiet.

23     MR. BALLASES:  -- (unintelligible) questions.

24  So let your counsel ask questions.  You're wasting

25  everybody's time.

1         MR. CHOUDHRI:  Okay.  Just so the record is

2   clear, you are refusing to allow me to participate and

3   object and ask questions in this deposition that I've

4   cross-noticed; is that correct?  So we're clear, is

5   that correct or not?

6         MR. BALLASES:  You are not a party.  You do

7   not --

8         THE REPORTER:  I'm --

9         MR. BALLASES:  Let me make it very clear for

10  you.  You are not a party to this dispute.  You are

11  not an attorney.  You lack standing.  This is not a

12  creditors' meeting.  We've objected to your

13  cross-notice.  Is that clear enough for you, buddy?

14        MR. CHOUDHRI:  Mr. Sather, please proceed.

15  We'll -- we'll deal with this on the record later and

16  deal with the Court.

17        And -- and as you know, Mr. Ballases, counsel

18  for Dalio is also on the line.  Are you also objecting

19  for them -- for Dalio's counsel to ask questions?  Is

20  that your --

21        MR. BALLASES:  Yeah.

22        MR. CHOUDHRI:  -- position?

23        MR. BALLASES:  Yeah.

24        MR. CHOUDHRI:  And you're gonna instruct your

25  client, Omar Khawaja, to not answer questions --

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                      43

1          MR. BALLASES:  Mr. Choudhri, my point is you

2    like to play attorney, but you're not an attorney, and

3    you don't know the legal procedure or the rules or

4    regulations of court.  So please be quiet and let the

5    deposition proceed.  You're wasting everybody's time.

6          MR. CHOUDHRI:  Okay, Mr. Ballases.  You don't

7    have to be disrespectful.  I was -- you know, the

8    rules apply to all of us.  If I'm pro se or if -- or

9    if you're a lawyer, the rules apply equally.  And I

10   have to follow the rules, just like you have to follow

11   the rules.  And when a judge makes a ruling, it

12   applies, and it says what it says.  We all got to

13   honor it.  But you're refusing to honor the judge's

14   ruling.  I understand that.  You're refusing to honor

15   what --

16         MR. BALLASES:  (Unintelligible)

17         MR. CHOUDHRI:  -- Judge Robinson said on his

18   oral order.

19         THE REPORTER:  Sorry.  Just one person at a

20   time.

21         Mr. Ballases, I can hear you speaking in the

22   background, but I can't hear what you're saying while

23   Mr. Choudhri is speaking.

24         So just one person at a time if you'd like

25   this on the record, please.

1          MR. BALLASES:  Mr. Sather, please continue.

2      Q.  (BY MR. SATHER)  Mr. Khawaja, I have brought

3   back up Exhibit Number 1, the proof of claim.  When

4   you authorized the proof of claim to be filed, did you

5   understand that it was being filed under penalty of

6   perjury?

7      A.  Yes.

8      Q.  And as a lawyer, do you know what penalty of

9   perjury means?

10     A.  Yes.

11         MR. BALLASES:  Objection.  Form.

12     Q.  (BY MR. SATHER)  Now, what was your purpose in

13  filing the proof of claim?

14     A.  The purpose in filing the proof of claim?  I

15  mean, it's to collect monies that are owed to us.

16     Q.  Any other purpose?

17     A.  No, that's it.

18     Q.  Now, I'm going to show you Exhibit Number 5,

19  and I'm going to try to make it bigger.

20         (Debtor's Exhibit No. 5 was marked for

21  identification.)

22     Q.  (BY MR. SATHER)  Were you aware that Texas

23  REIT, LLC, filed an objection to the proof of claim?

24     A.  Yes.

25     Q.  And were you aware that you have not filed a

1  response to this objection to proof of claim?

2    A. No.

3    Q. And do you see that this was filed with

4  negative notice language?

5    A. I'm not sure what that means, sir.

6    Q. Okay. Fair question.

7      Next, I'd like to show you what we've marked

8  as Exhibit Number 6, which is --

9    A. Yes.

10    Q. -- a motion for leave to withdraw Claim

11  Number 9.

12     (Debtor's Exhibit No. 6 was marked for

13  identification.)

14    Q. (BY MR. SATHER) Do you see that?

15    A. Yes, sir, I do.

16    Q. And what is your understanding of the reason

17  why you filed a -- well, let me ask you this: Did you

18  authorize the motion for leave to withdraw Claim

19  Number 9?

20    A. I did.

21    Q. And why did you authorize the claim to be

22  withdrawn?

23    A. It appears there's no money in Texas REIT,

24  LLC.

25    Q. Any other reason?

1    A.  No, sir.  That's it.

2        Q.  And do you understand that the consequence of

3    withdrawing the claim means that you're not able to

4    assert a claim to any of the property in the Texas

5    REIT bankruptcy estate?

6        MR. BALLASES:  Objection.  Form.  You're going

7    beyond the scope of the limited purpose of this

8    deposition.

9        MR. SATHER:  I don't believe so.

10       Q.  (BY MR. SATHER)  Are you aware that Texas REIT

11   has objected to withdrawal of the proof of claim

12   unless it is withdrawn with prejudice?

13       A.  I wasn't aware of that, no.

14       Q.  All right.  Do you know what "with prejudice"

15   means?

16       A.  Yes, I do.

17       Q.  And you understand that if the claim is

18   withdrawn with prejudice, you can never make these

19   allegations against Texas REIT again.

20       A.  Yes, I understand that.

21       MR. SATHER:  All right.  At this point I will

22   pass the witness.  I know there are other counsel

23   present who wish to ask questions, and so I'm not

24   concluding the deposition.  I'm giving the other

25   parties present an opportunity to ask their questions.

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                      47

1    BY MS. HOOD:

2        Q.  Mr. Khawaja, my name is Lori Hood, and I

3    represent Dalio Holdings.  Nice to meet you.

4            MR. BALLASES:  Ms. Hood --

5        A.  Nice to meet you.

6            MR. BALLASES:  -- I'm going to go ahead and

7    just object.  I'm not going to let you ask questions.

8    You're not a party to this dispute, and you lack

9    standing to be here.  This isn't a creditors' meeting,

10   and so -- and of course, your notice was just filed

11   this morning, which we're going to object to.  So I'm

12   not going to let you ask questions.

13           MS. HOOD:  All right.  Mr. Ballases, my notice

14   was this morning because you failed to give notice to

15   all the creditors that this was taking place.

16           In my understanding -- and my client is a

17   creditor.  In my understanding of the judge's ruling,

18   it allows for creditors to be in attendance at this

19   deposition and to ask questions of your clients as to

20   the basis and motivation of their filing the proof of

21   claim.  We can argue all day long about whether you

22   agree with that or not.  If you don't allow me to take

23   questions -- ask questions today, then we're going to

24   have a do-over because we're going to go back to the

25   Court and seek a motion to compel your client's

1    attendance at a deposition where I will ask my

2    questions.

3              MR. BALLASES:  So that's not the Court's

4    order.  The Court's order was to allow Mr. Sather to

5    take questions -- or to ask questions to determine the

6    basis to -- as to why we filed the proof of claim and

7    why it has been requested to be withdrawn.

8              It is not for creditors to ask questions.  The

9    creditors -- this isn't a creditors' meeting, and so

10   I'm not going to let you ask -- I mean, you can ask

11   him, but I'm going to instruct him not to answer

12   because I think you're violating the Court's ruling,

13   and I'm going to abide by the Court's ruling.

14             MS. HOOD:  So you're -- no matter what

15   question I ask him, you're going to tell him not to

16   answer me?

17             MR. BALLASES:  Yes, ma'am.

18             MS. HOOD:  Okay.  And that's --

19             MR. BALLASES:  You're violating the Court's

20   ruling, and I want to abide by it.

21             MS. HOOD:  All right.  So you want to abide by

22   the Court's ruling, and we have a difference of

23   opinion as to the impact and the breadth of the

24   Court's ruling.

25             I'm going to tell you I'm going to file a

1   motion to compel your client's attendance at a

2   deposition where I'm going to be allowed to ask

3   questions.  And when I do so, I'm going to ask for

4   compensation of my attorney's fees.  Do you understand

5   that?

6          MR. BALLASES:  I understand.

7          MS. HOOD:  All right.  And just to be clear on

8   the record, Madam Court Reporter, Mr. Ballases is

9   stating to me on the record that he's going to

10  instruct his client not to answer any of my questions

11  that I have prepared for today, all relating to the

12  filing of the proof of claim and the motivation for

13  filing the proof of claim and the motivation for

14  withdrawing the proof of claim, all of which go into

15  the merits of the judge's order.

16          And I'm objecting to Mr. Ballases' refusal to

17  allow me to take questions -- or ask questions of his

18  client and putting him on notice that I am going to

19  seek my attorney's fees as compensation for me having

20  to do a do-over with his client.

21          MR. BALLASES:  For the record -- so again,

22  this is Michael Ballases -- I believe Ms. Hood is

23  misinterpreting the judge's ruling.  She's not a party

24  to this -- her client is not a party to this dispute.

25  They lack standing.  This is not a creditors' meeting.

1  The basis of this deposition was for a limited purpose

2  to allow the debtor to inquire as to why we filed the

3  proof of claim and why we now want to withdraw it.  We

4  are abiding by the judge's ruling, and we will not

5  deviate from it.

6          MS. HOOD:  Mr. Ballases, please don't put

7  words in my mouth.  And just because, you know, we're

8  here taking a deposition doesn't mean you always have

9  to get the last word in.  We are in a disagreement

10  about your statements.  You're not going to allow --

11  you're going to instruct your client not to answer my

12  questions.  There's not much I can do about it if he's

13  going to sit here and not answer my questions.

14          I will go back to the Court and ask for him to

15  reappear and answer my questions related to the

16  subject of this deposition of which I represent a

17  creditor, and we are entitled to ask questions.

18          Your client's proof of claim has unnecessarily

19  complicated the underlying chapter proceeding and

20  gummed up a lot of other issues with regard to the

21  debtor's property, and even today they haven't

22  withdrawn their -- or released their lis pendens.  So

23  there's a lot to talk to him about with regard to the

24  filing of the proof of claim, the motivation, and

25  everything else.  And I've read the judge's

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                    51

1   instructions on this issue, and I believe I'm

2   completely within my rights to ask these questions.

3          And you really don't have to answer, because I

4   don't need you to answer.  We're in a disagreement,

5   and I'm going to file the motion to compel.  So I

6   do --

7          MR. BALLASES:  (Unintelligible)

8          MS. HOOD:  I do not -- I do not pass the

9   witness.  I reserve my rights.

10         MR. CHOUDHRI:  And --

11         MR. BALLASES:  Thank you for telling me --

12         MR. CHOUDHRI:  -- I would like to make the

13   record -- I would also like to make the record very

14   clear.

15         So the record is clear, Mr. Khawaja, are you

16   taking your attorney's -- are you following your

17   attorney's instructions, and are you going to refuse

18   to answer any questions asked by Lori Hood or by my --

19   or any questions that I may ask you?

20         MR. BALLASES:  So no question's on the table,

21   Mr. Choudhri, so I think you're confused --

22         MR. CHOUDHRI:  Mr. Ballases -- Mr. Ballases,

23   please --

24         (Crosstalk)

25         THE REPORTER:  Sorry.  Just --

1          MR. CHOUDHRI:  Hang on a second.  I just

2   want --

3          THE REPORTER:  Sorry.  One at a time, please.

4   Thank you.

5          MR. CHOUDHRI:  I just want to make sure that,

6   Mr. Ballases, your client can affirm that he's taking

7   your instructions, and he's not going to answer any

8   questions, so we don't have to sit here and ask

9   questions if your instructions are going to be for him

10  to not answer any of my questions that I've properly

11  cross-noticed this deposition on pursuant to the

12  Court's order.  I just want to make sure the record is

13  clear that your client's not answering any questions

14  that I may ask.

15         MR. BALLASES:  For the record, the record is

16  clear.  I made the same objection that I made to

17  Ms. Hood as to you.  You are not a party.  You do not

18  have standing.  You're not an attorney.  This isn't a

19  creditors' meeting.  We are here to answer --

20         MR. CHOUDHRI:  Okay --

21         MR. BALLASES:  -- the debtor's questions about

22  the proof of claim --

23         MR. CHOUDHRI:  I'm --

24         MR. BALLASES:  -- and that's it.

25         MR. CHOUDHRI:  Okay.  We have the audio of the

1   order, oral ruling of Judge Robinson.  I would like to

2   play that at this point for the record.  So, please,

3   if we can play that for the record --

4        MR. BALLASES:  That's not --

5        (Crosstalk)

6        THE REPORTER:  I'm --

7        MR. CHOUDHRI:  Tammy or Gene, can y'all play

8   that?

9        THE REPORTER:  I'm sorry.  Sorry.  I have two

10  people speaking at once.  I can hear Mr. Ballases, and

11  I can hear Mr. Choudhri.  Could I please just get one

12  speaker on the record at a time.

13       MR. CHOUDHRI:  So I was speaking --

14       MR. BALLASES:  That's not --

15       MR. CHOUDHRI:  -- and --

16       (Crosstalk)

17       THE REPORTER:  Sorry.

18       MR. CHOUDHRI:  So the quote from the ruling

19  is -- and I'm quoting the judge (Reading:)  I'm going

20  to grant the motion as to the date and time of the

21  examinations, and my order is going to be very simple.

22  It's going to say that.  It's also going to further

23  order that the debtor and any creditor -- any other

24  creditor, for that matter, that cross-noticed this

25  deposition is permitted to take a deposition --

1          -- participate.  So I just want to be clear,

2   Mr. Ballases.  I want to give you one more chance so

3   we can conclude --

4          MR. BALLASES:  It's not unclear --

5          MR. CHOUDHRI:  -- and complete the deposition.

6          (Crosstalk)

7          MR. CHOUDHRI:  Can I finish?

8          MR. BALLASES:  You're being --

9          MR. CHOUDHRI:  Mr. --

10          MR. BALLASES:  You're being investigated

11  (unintelligible).  You're being investigated by the

12  Department of Justice.  You've been found by courts to

13  file lawsuits for improper purposes and harassment.

14  You're founded by courts and juries to have committed

15  fraud and libel, and you were just, on Monday, held by

16  Judge Norman to be a forger and a liar.  So anything

17  you say, I don't believe --

18          MS. HOOD:  How about if I -- how about if I

19  say it?

20          (Crosstalk)

21          THE REPORTER:  Sorry.  I'm sorry.  No --

22  sorry.  Sorry.  I need one person speaking at a time.

23  The record is not clear when I have multiple speakers.

24  Thank you.

25          MR. CHOUDHRI:  So let me just respond,

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    55

1   Mr. Ballases.  First of all, you are supporting

2   perjury.  Okay?  Mr. Ballases, your client has

3   solicited --

4         MR. BALLASES:  (Unintelligible)

5         MR. CHOUDHRI:  -- solicited people -- so,

6   please, all of this is all supported and solicited by

7   your client, and we'll get to the bottom of it --

8         MR. BALLASES:  (Unintelligible)

9         MR. CHOUDHRI:  -- which is why your client

10  doesn't want to answer questions.  I understand that.

11        THE WITNESS:  You'll be a great jailhouse

12  lawyer.

13        MR. CHOUDHRI:  This is proper --

14        THE REPORTER:  I'm sorry --

15        MR. BALLASES:  Can we start the next --

16        MR. CHOUDHRI:  Sorry?

17        MR. BALLASES:  -- deposition?  Can we start --

18        MR. CHOUDHRI:  Hold on.

19        MR. BALLASES:  -- the next deposition --

20        THE WITNESS:  You're going to be a great

21  lawyer --

22        MR. BALLASES:  -- if Mr. Sather doesn't have

23  any more questions?

24        THE WITNESS:  You'll be a great lawyer in

25  jail, man.

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                              56

1          MR. CHOUDHRI:  Okay.  So -- so that's your

2    goal --

3          MR. BALLASES:  (Unintelligible)

4          MR. CHOUDHRI:  -- going around telling

5    people --

6          THE REPORTER:  I'm sorry --

7          MR. BALLASES:  -- let's jump to the next

8    witness --

9          MR. CHOUDHRI:  Please --

10          THE REPORTER:  I'm sorry.  Sorry.  Sorry.  I

11    am not getting Mr. Ballases' words on the record.

12          Mr. Ballases, if you have something to say, I

13    need just one speaker at a time.  I'm not getting

14    anything you're saying at this point.

15          MR. BALLASES:  Okay.  What I'm saying is --

16          MR. CHOUDHRI:  Please, Mr. Ballases, go ahead.

17          MR. BALLASES:  -- (unintelligible) remains the

18    same.  And if Mr. Sather has more questions, we're

19    happy to answer them.  If he doesn't, then let's go to

20    the next witness.

21          MR. CHOUDHRI:  No, no.  We're -- we're not --

22    we're not playing any games here.  Please play the

23    audio from the Court's ruling.  Let's do that right

24    now --

25          MR. BALLASES:  Okay (unintelligible) --

OMAR KHAWAJA                                     September 11, 2024
TEXAS REIT LLC                                                    57

1          MR. CHOUDHRI:  -- so the record is crystal

2   clear.

3          THE WITNESS:  This is getting ridiculous.

4          MR. BALLASES:  I'm going to end the deposition

5   if Mr. Sather doesn't have any more questions, and we

6   can jump to --

7          MR. CHOUDHRI:  You can't end the deposition --

8          (Crosstalk)

9          MR. CHOUDHRI:  Unless all parties agree to go

10  off the record, we stay on the record.  That's the

11  rule, Mr. Ballases.  The rule applies to everyone.

12         Please play --

13         MR. BALLASES:  (Unintelligible)

14         MR. CHOUDHRI:  -- the audio --

15         (Crosstalk)

16         MR. CHOUDHRI:  Please play the audio --

17         MR. BALLASES:  I'm going to shut it down if

18  you don't take control of your client in the

19  deposition.  Your choice, Mr. Sather.

20         MR. CHOUDHRI:  I'm here as a creditor.  We're

21  going to play the audio --

22         MR. BALLASES:  (Unintelligible) Okay.

23         MR. CHOUDHRI:  Mr. --

24         MR. BALLASES:  We're going to -- we're all

25  ready to go forward with the next witness.  We're

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
58

1  here, and we're ready to go forward.

2      Mr. Sather, if you have more questions, let me

3  know, and he will stay and answer them.

4      MR. SATHER:  I am adjourning the deposition --

5      MR. CHOUDHRI:  I have the floor.  I have the

6  floor.  I'm a creditor.  I've cross-noticed this

7  deposition.  Please play --

8      MR. BALLASES:  (Unintelligible)

9      MR. CHOUDHRI:  -- the oral ruling from the

10  Court right now.  Go ahead.

11      MR. BALLASES:  Mr. Sather --

12      (Crosstalk)

13      (Audio file played.)

14      THE REPORTER:  I'm sorry.  Sorry.  I -- I'm

15  sorry.  Mr. McCubbin, I cannot hear anybody when I

16  have multiple speakers at once.  I don't know if you

17  want this on the record, but it's going in as

18  crosstalk because it's not coming through clearly.

19      MR. CHOUDHRI:  Yes, Madam Court Reporter.

20      MR. BALLASES:  Mr. Sather --

21      MR. CHOUDHRI:  I have the floor.

22      MR. BALLASES:  -- (unintelligible) the

23  questioning --

24      MR. CHOUDHRI:  Please stop interrupting,

25  Mr. Ballases.

1          MR. BALLASES:  -- (unintelligible) not going

2    to the next witness.

3          MR. CHOUDHRI:  I am -- I am making the record.

4    Mr. Ballases, please let me speak, and please don't

5    interrupt me.  Okay?  Please --

6          MR. BALLASES:  Okay --

7          MR. CHOUDHRI:  -- play the audio ruling of

8    Judge Robinson --

9          MR. BALLASES:  We're going to --

10          MR. CHOUDHRI:  -- so it's clear on the record.

11    Go ahead.

12          (Audio file played.)

13          MR. CHOUDHRI:  No, we're -- we're --

14          (Audio file continues playing.)

15          MR. MCCUBBIN:  He just said any other

16    creditor (unintelligible) --

17          THE REPORTER:  I'm sorry, Mr. McCubbin.  You

18    just cut out for a second.

19          MR. MCCUBBIN:  He just said --

20          MR. CHOUDHRI:  Go and play that,

21    Mr. McCubbin --

22          MR. MCCUBBIN:  -- any other creditor --

23          MR. CHOUDHRI:  -- just so the record is clear.

24    Please go ahead --

25          MR. MCCUBBIN:  The judge just stated any other

1   creditor.  I can replay it.

2        MR. CHOUDHRI:  Please replay it for the record

3   so the record is crystal clear, and it's the judge --

4        So, Madam Court Reporter, so the record is

5   clear, we are about to begin playing the oral ruling

6   of Judge Robinson.

7        THE REPORTER:  Okay.  So are you wanting me to

8   transcribe --

9        MR. CHOUDHRI:  Yes.

10        THE REPORTER:  -- this audio into the record?

11        MR. CHOUDHRI:  Yes.  Yes, Madam Court

12   Reporter.  He's about -- we're about to play the

13   judge's ruling -- oral ruling on the record so that

14   way we can have a simple and clean completion of this

15   deposition and end this shenanigan and argument with

16   Mr. Ballases.

17        Please, Mr. -- please, sir, please proceed

18   with the record -- the audio ruling of Judge Robinson.

19   Go ahead.

20        (Audio file played.)

21        THE REPORTER:  I'm sorry.  Sorry --

22        (Audio file continues playing.)

23        THE REPORTER:  Sorry.  The audio is not clear.

24   The audio is not crystal clear.  I hear Mr. Sather

25   responding on the audio, and it's not clear.

1          Typically in a transcript, we do not

2    transcribe audio played.

3          MR. BALLASES:  And I'm going to object --

4          MR. CHOUDHRI:  Time out.

5          MR. BALLASES:  I'm objecting --

6          MR. CHOUDHRI:  We're going to e-mail you --

7    Court Reporter, we're going to e-mail you this audio

8    right now, and he's going to adjust the volume and

9    play it again.

10          Go ahead.  Play it again, please.

11          And, Court Reporter, let us know if you're

12    getting a clear --

13          MR. BALLASES:  Mr. Sather --

14          MR. CHOUDHRI:  -- read on it.  Okay?

15          MR. BALLASES:  -- take control of the depo.

16    This is a waste of time.  It's a waste of the client's

17    time --

18          MR. CHOUDHRI:  Mr. Ballases, please -- please

19    stop talking.

20          MR. BALLASES:  -- (unintelligible) control of

21    the deposition --

22          MR. CHOUDHRI:  I have the floor --

23          MR. SATHER:  You don't have it yet,

24    Mr. Choudhri.

25          (Crosstalk)

MR. BALLASES: Let's just jump to the next witness. I'm not allowing the questions to be asked. So it's not going to change. We're just wasting time --

MR. CHOUDHRI: We're playing the oral ruling of Judge Robinson. Please, Mr. Ballases, be quiet so we can play the ruling of Judge --

MR. BALLASES: (Unintelligible)

MR. CHOUDHRI: -- Judge Robinson's ruling.

MR. BALLASES: (Unintelligible) we're not going to play -- we're not -- that's not how depositions work, Mr. Choudhri. I'm sorry you like to play an attorney --

MR. CHOUDHRI: Well, please --

MR. BALLASES: -- but that's not how this works. So either I'm going to --

MR. CHOUDHRI: No. No, no. Please stop.

MR. BALLASES: Again, I'm going to get off -- if you'd like to have another -- if you'd like to ask questions of my other clients, I'm happy to do that, and you're happy to ask questions, Mr. Sather. But these shenanigans are not --

MR. CHOUDHRI: If your --

MR. BALLASES: -- going to happen.

MR. CHOUDHRI: -- responses, Mr. Ballases, is

gonna -- the shenanigans are yours, Mr. Ballases. If your responses are gonna be the same and you're not going to allow cross-notice creditors who are here, want to ask questions, then let's clarify this right now so we can complete the deposition properly, Mr. Ballases. Please don't obstruct the discovery right now.

Go ahead and play the oral ruling of Judge Robinson.

MR. BALLASES: I'm going to object --

(Audio file played.)

THE REPORTER: I'm sorry. I'm sorry. I cannot hear when Mr. Ballases is speaking --

MR. CHOUDHRI: Mr. Ballases --

THE REPORTER: I need one person --

MR. CHOUDHRI: Mr. Ballases --

THE REPORTER: -- at a time.

MR. CHOUDHRI: -- intentionally -- Mr. Ballases intentionally interferes, interrupts when we play the ruling of Judge Robinson that is gonna clarify this issue that cross-notice creditors are not allowed to participate and ask questions.

So please play the ruling of Judge Robinson.

And, Mr. Ballases, please refrain and be quiet, because the court reporter cannot take

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                64

1    different people talking at the same time.

2         So please play the audio of Judge Robinson.

3         THE REPORTER:  Sorry --

4         MR. CHOUDHRI:  Go ahead.

5         THE REPORTER:  Sorry.  One second, please,

6    before you play it.

7         Mr. Sather, this is your deposition

8    transcript.  Normally if I can't hear, I can't

9    transcribe what's being said.  It would need to be

10   transcribed separately, because I'm not transcribing

11   this on the record right now if I cannot hear it

12   clearly.

13        MR. SATHER:  All right.  If you're unable to

14   hear it clearly, I suggest that we move on.  The judge

15   said what he said.  I do have one more question for --

16        MR. CHOUDHRI:  Hold on, Mr. Sather.  Just one

17   second, please, before we conclude anything here.  I

18   do want to take a break before we do conclude

19   anything, but I want to play this, and I think he can

20   do it a little bit louder.

21        Let's try if you can hear it again.  Ms. Court

22   Reporter, let's try one more time.

23        MR. BALLASES:  (Unintelligible)

24        MR. CHOUDHRI:  Go ahead.  Play the recording.

25        THE REPORTER:  I'm sorry.  Mr. Ballases --

1        MR. BALLASES:  The court reporter is saying

2   (unintelligible).

3        THE REPORTER:  I'm sorry.  Mr. Ballases, could

4   you please repeat that?

5        MR. BALLASES:  Sure.  I just was telling

6   Mr. Choudhri that you have instructed him you cannot

7   take it down in this manner, and so I'm just trying to

8   tell him that he's wasting more time.

9        Mr. Sather --

10        MR. CHOUDHRI:  Mr. Ballases, that's not what

11   she said.

12        MR. BALLASES:  -- if you want to go --

13        MR. CHOUDHRI:  Mr. Ballases, we're going to

14   try for her to hear it.  Okay?

15        MR. BALLASES:  Okay.  Call us when you're

16   ready --

17        MR. CHOUDHRI:  So she's being very cooperative

18   and polite.

19        Please, Mr. Ballases, be quiet.

20        Go ahead, Mr. -- sir.  Please play the -- play

21   the audio for the judge's ruling.

22        (Audio file played.)

23        MR. MCCUBBIN:  He said, And any other

24   creditor.

25        MR. CHOUDHRI:  Can you please --

MR. SATHER: Madam Reporter --
MR. CHOUDHRI: Please play the -- please play the whole recording.
MR. MCCUBBIN: The recording is starting --
MR. SATHER: Okay. Stop. Stop.
Madam Reporter, were you able to get the last excerpt?
MR. BALLASES: Ms. Court Reporter, you told us you couldn't take anything down in that manner. It'd have to be transcribed by the person who noticed the deposition, Mr. Sather. I assume you're going to stick by what you stated earlier.
THE REPORTER: Okay. It's not crystal clear. And because it's being played, I'm not sure where the audio and where it is stopping.
MR. CHOUDHRI: Well, let's take a five-, ten-minute break. Let's e-mail it to you, Madam Court Reporter, and so we can be efficient, and that way we don't have to interrupt the deposition and come back a different day and go seek court intervention. We can save the Court's time and not bother the Court.
But if Mr. Ballases insists that we have to bother the Court, then we'll seek emergency relief from the Court. But why don't we go ahead and e-mail you right now.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    67

1          And let's not allow anybody to bully anybody

2    here.  So, Mr. Ballases, please don't put words in her

3    mouth.

4          So let's go ahead and take -- because at this

5    point, this is -- I've cross-noticed the depo, and I

6    want the record to be clear.  If Mr. Ballases is going

7    to continue to not allow questions despite the order

8    by the judge being shown and heard for him -- so the

9    record is clear.  But we'll go ahead and take a --

10   let's go and take a ten-minute break.

11         Madam Court Reporter, we're going to e-mail

12   you the audio oral ruling of Judge Robinson so we can

13   have a smooth deposition and complete discovery, and

14   no one can obstruct this process.  Okay?  So can you

15   provide your e-mail address, Madam Court Reporter,

16   just so I have it?

17         MR. BALLASES:  Mr. Sather, are we moving on to

18   the next witness?

19         MR. SATHER:  Yeah, I don't think this is

20   productive.  Mr. Ballases has indicated that he is not

21   going to allow you to ask questions regardless of what

22   the Court ruled, and so it is my intent at this time

23   to adjourn the deposition subject to any future

24   rulings from Judge Robinson.  If Judge Robinson

25   allows --

1        MR. CHOUDHRI:  Well --

2        MR. SATHER:  -- the other parties to ask

3   questions, I may have -- I reserve the right to ask

4   follow-up questions.

5        MR. CHOUDHRI:  So -- so I --

6        MR. BALLASES:  Would you like to ask --

7        MR. CHOUDHRI:  No, no.  Hold --

8        MR. BALLASES:  Would you like to proceed --

9        (Crosstalk)

10        THE REPORTER:  I'm sorry.  I can't --

11        MR. BALLASES:  -- with Osama Abdullatif or

12   John Quinlan next?

13        THE REPORTER:  Mr. Ballases -- sorry --

14        MR. CHOUDHRI:  Hang on a second.

15        THE REPORTER:  -- Mr. Ballases --

16        MR. CHOUDHRI:  I have --

17        THE REPORTER:  -- could you --

18        MR. CHOUDHRI:  -- contacted the Court.  I'll

19   be e-mailing the Court right now.  We are not

20   suspending this deposition.  I want to go ahead and

21   pause the deposition.  We are going to contact the

22   Court.  Okay?

23        Madam Court Reporter, would you give us your

24   e-mail address, please?

25        THE REPORTER:  And I just want to note,

1  Mr. Ballases, I did not get anything you just said as

2  you were speaking at the same time as Mr. Choudhri.

3  So do you have anything to put on the record?

4          MR. BALLASES:  Myself, me?

5          THE REPORTER:  Yes.  I did not get what you

6  were saying while -- after what Mr. Sather said.

7          MR. BALLASES:  Sure.  I just asked Mr. Sather

8  if we're ready to move to the next witness.  I think

9  he indicated he was before Mr. Choudhri interrupted.

10  And so that's all I'm asking.

11         MR. CHOUDHRI:  So --

12         MR. BALLASES:  Do we want to move to the next

13  witness, Steve?

14         MR. CHOUDHRI:  So this part is -- at this

15  moment, I'd like to e-mail the court reporter the

16  judge's oral ruling, and let's take a 15-minute break.

17  And I've already reached out to the Court.  The Court

18  has asked for us to e-mail the Court for relief so we

19  can complete the deposition and not waste the Court's

20  time or disrupt the deposition and have to come back a

21  different day.  Everybody's schedules are -- are very

22  important.

23         Mr. Ballases, in the event we are able to

24  resume or reschedule the deposition, can you provide

25  us dates?

1        MR. BALLASES:  Steve, can we move on?  Can you

2   control your client to any degree?  I mean --

3        MR. SATHER:  Mr. Choudhri --

4        MR. CHOUDHRI:  I'm not his client.

5        MR. SATHER:  -- is not my client in his

6   individual capacity, and therefore --

7        MR. BALLASES:  I understand he's a principal

8   of Texas REIT, the debtor.

9        MR. SATHER:  He's also asserting his right to

10  appear as a pro se creditor and that I do not have any

11  control over that capacity.  If he wishes to contact

12  the Court, that is his business.

13       MR. BALLASES:  I understand that, but you've

14  noticed the deposition.  Do we want to proceed with

15  the next witness?  I've got my --

16       MR. CHOUDHRI:  And we --

17       MR. BALLASES:  -- clients here.  We've

18  rearranged our schedules for you.  Do you want to take

19  the deposition or not?  It's up to you, Steve.

20       MR. SATHER:  I want to proceed --

21       MR. CHOUDHRI:  We are resuming.  We are

22  pausing the deposition, and we're going to have a

23  conversation, and we'll come back in 15 minutes on the

24  record.

25       But in the meantime, Court Reporter, can I

1    have your e-mail address so we can e-mail you the

2    audio ruling of the judge?  And I think that'll solve

3    any issues and resolve the -- the objection or

4    position that Mr. Ballases is taking that the judge

5    said something the judge didn't say, so it's clear.

6    If I can get your e-mail address, we can e-mail you

7    the audio right now, and we can resume.

8           Let's -- let's resume the deposition at noon.

9    It's 11:40 right now.

10          THE REPORTER:  Okay.  May I go off the record,

11   please?  If we're pausing?

12          MR. CHOUDHRI:  Please.

13          MR. SATHER:  Yes, you may.  Yes.

14          MR. BALLASES:  Yes, you can go off the record.

15          THE REPORTER:  Okay.  So I am off the record.

16          (Discussion held off the record.)

17          (A recess was taken.)

18          THE REPORTER:  Back on the record.

19          MR. BALLASES:  So this is Michael Ballases,

20   counsel for John Quinlan, Omar Khawaja, and Osama

21   Abdullatif.  There is no written order, but I did

22   listen to the recording, and it appears he did say

23   "creditors."  And so I was mistaken, and so I will

24   allow creditors to ask questions, however, in the

25   limited capacity that he stated in the oral hearing.

1   So we can go forth with Mr. Khawaja.

2           Ms. Hood, if you want to ask questions, go for

3   it.

4           MS. HOOD:  Thanks.  Okay.  Steve, I may use

5   your exhibits, so if you can have those by the --

6           MR. SATHER:  I'm happy to --

7           MS. HOOD:  -- by the ready for me, I

8   appreciate it.

9           MR. SATHER:  -- put them up on the screen if

10  you need them.

11          MS. HOOD:  Thank you.

12  BY MS. HOOD:

13      Q.  Mr. Khawaja, my name is Lori Hood.  We've

14  never met before; correct?

15      A.  That's correct.

16      Q.  And I understand that you are an attorney

17  licensed in the state of Texas; correct?

18      A.  That's also correct.

19          MR. BALLASES:  Objection.  Form.

20      Q.  (BY MS. HOOD)  And do you practice law?

21      A.  Yes, ma'am.

22          MR. BALLASES:  Objection.  Form.

23      Q.  (BY MS. HOOD)  And do you have -- where do you

24  practice law?

25          MR. BALLASES:  Objection --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    73

1      A.  At my own law firm.

2      Q.  (BY MS. HOOD)  And what is the name of that

3  law firm?

4      A.  The Law Offices of -- and my name.

5      Q.  And where is that?  Where are your offices

6  located?

7          MR. BALLASES:  Objection.  Form.

8      A.  On Richmond and Sage.

9          MS. HOOD:  If you'll -- thanks, Steve.  Can

10  you scroll down, Steve?

11          MR. SATHER:  Certainly.

12      Q.  (BY MS. HOOD)  In the proof -- if I understand

13  your testimony correctly, you stated that your proof

14  of claim is based upon some judgments that you had

15  assigned to you by virtue of purchasing those

16  judgments from third parties; is that correct?

17          MR. BALLASES:  Objection.  Form.

18      A.  Yes.

19          MS. HOOD:  Mr. Ballases, what is the basis of

20  your objection?

21          MR. BALLASES:  Asked and answered.  We've gone

22  through all this.

23          MS. HOOD:  And I understand that,

24  Mr. Ballases, but you were objecting quite frequently

25  to Mr. Sather's questions, and I just want to make

1   sure that the record is clear with regard to what your

2   objection is.  I didn't know what your objection was

3   during his questioning, and so I'm just trying to make

4   sure that if the question needs to be rephrased or has

5   come out at a different angle, that the question is

6   clear to your client and that we're not going to deal

7   with objections in the transcript later on.  Is that

8   fair?

9        MR. BALLASES:  I'm going to make my objections

10   according to the rules.  You can respond how you think

11   appropriate pursuant to the rules.

12        MS. HOOD:  Okay.  I appreciate that.

13        Oops.  What's that?  No, take that down.

14        MR. SATHER:  Sorry.

15   Q.  (BY MS. HOOD)  All right.  So -- okay.  So

16   this proof of claim is your individual proof of claim;

17   is that correct?

18   A.  My individual proof of claim?  It looks like

19   my name is on there as well as Mr. Quinlan's and

20   Mr. Abdullatif's.

21   Q.  Right.  But this isn't a proof of claim you

22   filed on behalf of your law office; correct?

23   A.  Oh, yeah.  Yeah, that's filed on my behalf,

24   correct.  Mm-hmm.

25   Q.  And if I understand your testimony, the value

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                      75

1   of the property that is included in Section 9 consists

2   of the total of the three judgments that form the

3   basis of your proof of claim; correct?

4       A.  That's right.

5       Q.  And you've used these three judgments as the

6   basis for filing an adversary action in the Southern

7   District but also attached the adversary action to

8   your proof of claim; is that correct?

9       A.  That sounds correct.

10      Q.  Okay.  So if I can drill down, we've got --

11  the basis for your proof of claim was, one, three

12  judgments and, two, an adversary action; is that

13  correct?

14      A.  That sounds correct.

15      Q.  All right.  And the basis of the adversary

16  action were the three judgments; is that correct?

17          MR. BALLASES:  Objection.  Form.

18      A.  Sorry.  Can you repeat the question?

19      Q.  (BY MS. HOOD)  Yeah.  The basis of your

20  adversary action is the three judgments that you claim

21  you're unable to collect; is that correct?

22      A.  That's correct.

23          MR. BALLASES:  I'm going to object to form.

24          MS. HOOD:  And what is the basis of your

25  objection?

1          MR. BALLASES:  I think it's vague and

2    ambiguous and misstates the evidence.  I mean, the

3    petition or the complaint speaks for itself.

4          MS. HOOD:  So last time I checked, documents

5    don't talk.  So let me correct my question just to

6    make it clear.

7       Q.  (BY MS. HOOD)  Mr. Khawaja, in your adversary

8    action which is attached to your proof of claim, you

9    reference three judgments; is that correct?

10      A.  Yes.

11      Q.  And you testified earlier, when Mr. Sather was

12   asking you questions, that the reason you brought the

13   adversary action was your inability to collect on

14   those judgments and that somehow all of these related

15   entities are alter egos of Mr. Choudhri; correct?

16      A.  Yes.

17      Q.  Okay.  Let me drill down on the judgments.

18          You state that you're an assignee of two of

19   these judgments; is that correct?

20      A.  That's correct.

21          MR. BALLASES:  Objection.  Form.

22          MS. HOOD:  All right.  What is the basis of

23   your objection?

24          MR. BALLASES:  Asked and answered.  This has

25   been already discussed and answered clearly by

1  Mr. Sather.

2       MS. HOOD:  Okay.  I disagree --

3       MR. BALLASES:  You're just rehashing --

4       MS. HOOD:  -- but -- okay.  Let me finish.

5    Q.  (BY MS. HOOD)  You have --

6       MS. HOOD:  Steve, can you go to the basis of

7  the damages that were attached?  And thank you for

8  being my paralegal.  I appreciate it.

9    Q.  (BY MS. HOOD)  All right.  So Judgment

10  Number 1, you have an assigned interest in; correct?

11    A.  Yes.

12       MR. BALLASES:  Objection.  Form.

13    Q.  (BY MS. HOOD)  Before you purchased your

14  assignment, did you do any due diligence on the

15  underlying pleadings in the case?

16       MR. BALLASES:  Objection.  Form.

17    A.  Yes.

18    Q.  (BY MS. HOOD)  And because you did underlying

19  due diligence in the case, you understand that nowhere

20  in that case is there any allegation of fraudulent

21  transfer; correct?

22    A.  In which case?

23    Q.  Judgment Number 1, Davy versus Heil.

24    A.  I mean, I didn't get into the facts of that

25  case.  There's a final judgment, I purchased it, and

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                              78

1   it was assigned to me.  Why do I care what happened in

2   that case?

3        Q.  Okay.  Well, I just asked you if you looked at

4   the underlying pleadings in the case, and you said

5   yes.  So now your testimony is that you did not look

6   at the underlying pleadings.

7        A.  I mean, I skimmed through them.

8        Q.  And as you were skimming through them, did you

9   understand that there was no cause of action for

10  fraudulent transfers?

11       A.  I don't recall.

12       Q.  Have you read the judgment?

13       A.  Yes, I have.

14       Q.  And did you read it before you purchased it?

15       A.  Yes, I did.

16       Q.  And do you understand that nowhere in that

17  judgment is there a finding of fraudulent transfers?

18       A.  Okay.  If you say so.

19       Q.  Well, no, I'm asking you if you've read it and

20  if you understand that.

21          MR. BALLASES:  Objection.  Form.

22       A.  I mean, if there isn't, I'm gonna take your

23  word for it and say there isn't.

24       Q.  (BY MS. HOOD)  Okay.  Well, take my word for

25  it.  There isn't.

OMAR KHAWAJA                                                September 11, 2024
TEXAS REIT LLC                                                            79

1          Did you purchase this judgment at a discount?

2          MR. BALLASES:  Objection.  Form.

3      A.  I don't recall.

4          MS. HOOD:  What's the basis for your

5   objection?

6          MR. BALLASES:  Lacking relevance.  The purpose

7   of the deposition is to understand why the proof of

8   claim was filed and why it is now being withdrawn.

9          MS. HOOD:  All right.  Well, I think --

10          (Crosstalk)

11          MR. BALLASES:  (Unintelligible) an underlying

12   matter in the Southern District.

13          MS. HOOD:  All right.  I disagree with your

14   analysis, but we can argue that another day.

15      Q.  (BY MS. HOOD)  So you don't recall how much

16   you purchased the judgment for.

17      A.  Correct.

18      Q.  And you are one of three assignees of this

19   judgment; correct?

20      A.  That's correct.

21          MR. BALLASES:  Objection.  Form.

22      Q.  (BY MS. HOOD)  Before you purchased the

23   judgment, did you have an agreement with the other two

24   claimants, Mr. Quinlan and Mr. Abdullatif, as to why

25   you were purchasing the judgment?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    80

1         MR. BALLASES:  Objection.  Form.

2      A.  Did I have an agreement as to why we were

3   purchasing the judgment?  I mean, the purpose of

4   purchasing the judgment is to collect on a judgment,

5   so that was the agreement.

6      Q.  (BY MS. HOOD)  So you sat down with the other

7   two gentlemen, and the three of you decided to

8   purchase this judgment together.

9      A.  I don't recall if we sat down together

10  anywhere and had that -- a sit-down discussion about

11  what was gonna happen.  I think maybe that did.

12     Q.  Maybe it did, or maybe it didn't?

13     A.  Yeah.  Maybe it was a phone call; maybe it was

14  a sit-down meeting.

15     Q.  When did you --

16        MR. BALLASES:  And just for the record --

17     Q.  (BY MS. HOOD)  Can you tell us when the

18  judgment --

19        MR. BALLASES:  Just so that I have --

20        THE REPORTER:  I'm sorry.  I'm sorry.

21        MS. HOOD:  Sorry.

22        THE REPORTER:  I hear somebody else speaking.

23        MR. BALLASES:  Sure.  I just -- I wanted to

24  caution Ms. Hood.

25        You're getting real close to attorney-client

1    privilege and/or work product legal privilege.  So I

2    don't think you're there yet, but you're close, so I

3    just wanted to warn you to keep that in mind.

4        Q.  (BY MS. HOOD)  Sure.  And, Mr. Khawaja, please

5    understand that I don't want to know what you talked

6    about with your lawyers, okay, ever, or what your

7    lawyers have discussed with you regarding their

8    strategy.  Okay?  So if you feel like you have to

9    reveal that kind of information in response to my

10   question, I don't want to know that stuff.  Okay?

11            And certainly you understand as a lawyer that

12   you have the right to discuss this kind of response

13   with your lawyer prior to answering; right?

14       A.  Yes.

15       Q.  Can you tell us when you -- when you purchased

16   the judgment?

17       A.  Sometime before this proof of claim was filed.

18   I don't recall exactly when, no.

19       Q.  Do you recall the year?

20       A.  I think it was --

21            MR. BALLASES:  Objection.  Form.

22       A.  I think it was 2023.

23       Q.  (BY MS. HOOD)  And how did it come about that

24   this judgment came across your desk to be purchased?

25            MR. BALLASES:  Objection.  Form.

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                        82

1       Q.  (BY MS. HOOD)  You can answer.

2       A.  I mean, that's -- that's privileged

3    information that I'm not gonna discuss.

4           MR. BALLASES:  I'll go ahead and assert the

5    attorney work product, attorney-client privilege.  I'm

6    going to instruct him not to answer.

7       Q.  (BY MS. HOOD)  How do you typically learn of

8    judgments that are available for you to purchase?

9       A.  I would say typically it is something that's

10   brought to my attention by a third party.

11       Q.  And which third party brought this particular

12   judgment to your attention?

13          MR. BALLASES:  Objection.  Form.  Assertion of

14   attorney-client and work product legal privileges.

15   Instruct client not to answer.

16       Q.  (BY MS. HOOD)  Did Mr. Abdullatif bring this

17   judgment to your attention?

18          MR. BALLASES:  Same assertion of privilege,

19   same instruction to the client not to answer.  It

20   violates attorney-client and attorney work product.

21       Q.  (BY MS. HOOD)  Mr. Khawaja, do you have any

22   sort of agreement with Mr. Abdullatif or Mr. Quinlan

23   regarding a joint prosecution of this proof of claim?

24       A.  We do.

25       Q.  And is that in writing?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                      83

1          MR. BALLASES:  Also joint litigation

2    privilege, I'll assert.

3          Q.  (BY MS. HOOD)  Okay.

4          A.  I'm not gonna answer.

5          Q.  Is your -- is your agreement in writing?

6          MR. BALLASES:  Instruct client not to answer.

7    He doesn't need to give work product, attorney-client,

8    or joint litigation privilege information away.

9          Q.  (BY MS. HOOD)  Back to my question.

10   Mr. Khawaja, do you have an agreement in writing with

11   Mr. Abdullatif and Mr. Quinlan with regard to pursuing

12   this proof of claim?

13          MR. BALLASES:  I'm going object again to the

14   question and assert the legal privileges of

15   attorney-client, work product, also joint litigation

16   privilege and instruct the client not to answer.

17          Q.  (BY MS. HOOD)  Mr. Khawaja, are you adhering

18   to your -- to your counsel's instruction?

19          A.  I am.

20          Q.  And refusing to answer my question?

21          A.  On advice of counsel, yes.

22          Q.  With regard to this particular Davy-Heil

23   judgment, do you know Mr. Heil?

24          A.  I don't.

25          Q.  Do you know Mr. Oakum?

1    A.  I don't.

2    Q.  Do you know Renee Davy?

3    A.  Not personally.

4    Q.  Not personally?  How else would you know her?

5    A.  I've seen videos of her online.

6    Q.  Doing what?

7    A.  Stating that Mr. Choudhri's a fraud and a

8  thief and shouldn't be trusted.

9    Q.  Have you ever spoken to her?

10    A.  I have not.

11    Q.  When you purchased this judgment, who did you

12  pay?

13        MR. BALLASES:  Objection.  Form.

14        I'm going to also -- it's harassing and

15  oppressive.  I'm also going to assert the

16  attorney-client, attorney work product, and joint

17  litigation privilege and instruct the client not to

18  answer.

19    Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

20  follow your attorney's instruction and not answer my

21  question?

22    A.  I am.

23    Q.  When you guys purchased your assignment of

24  this judgment, the Davy-Heil judgment, did you each

25  provide separate payment, or did it come from one

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    85

1  source?

2      MR. BALLASES:  I'm going to assert the same

3  objection and the same assertions of legal privilege

4  and instruct the client not to answer, as I did to the

5  question before.

6      Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

7  follow your counsel's instruction and refuse to answer

8  my question?

9      A.  I am.

10     Q.  Mr. Khawaja, when you purchased your interest

11 in this judgment, did you purchase it via wire

12 transfer or a check?  Cash?  How did you purchase it?

13     MR. BALLASES:  I'm going to assert the same

14 legal objections and the same assertions of legal

15 privilege and instruct client not to answer, as I did

16 with the previous question.

17     Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

18 adhere to your client's (sic) instruction and refuse

19 to answer my question?

20     A.  My counsel's.  Yes, I am.

21     Q.  Mr. Khawaja, do you know a gentleman by the

22 name of Wayne Dolcefino?

23     A.  I've seen him online.

24     Q.  And was it one of Mr. Dolcefino's videos in

25 which Ms. Davy appeared?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                  86

1      A.  I think so, yes.

2          MR. BALLASES:  Objection.  Form.

3      Q.  (BY MS. HOOD)  Have you ever met

4   Mr. Dolcefino?

5      A.  I've met him, yes.

6          MR. BALLASES:  Objection --

7      Q.  (BY MS. HOOD)  In connection with any of your

8   cases related to Mr. Choudhri?

9      A.  No.

10         MR. BALLASES:  Objection.  Form.

11     Q.  (BY MS. HOOD)  With regard to this Judgment

12  Number 1 that was assigned to you, how much of -- how

13  much do you own of this judgment?

14         THE WITNESS:  I think that goes to the

15  privilege again.

16         MR. BALLASES:  I'm going to object to the

17  question as being oppressive and harassing and assert

18  the attorney-client, attorney work product, and joint

19  litigation privilege and instruct him not to answer.

20     Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

21  adhere to your lawyer's instruction not to answer my

22  question?

23     A.  I am.

24     Q.  As you sit here today, you're not going to

25  tell me how much of this $501,513.85 judgment that you

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                      87

1    own.

2         MR. BALLASES:  Objection.  Form.

3         A.  On advice of counsel, I will not answer that

4    question.

5         Q.  (BY MS. HOOD)  And you testified that you

6    purchased this judgment sometime last year; correct?

7         MR. BALLASES:  Objection.  Form.

8         A.  I believe so, yes.

9         Q.  (BY MS. HOOD)  Okay.  And what have you done

10   to try and collect this judgment?

11        A.  Well, we filed --

12        MR. BALLASES:  Objection.  Form.

13        A.  -- in Bankruptcy Court or, I guess, in our

14   proof of claims.  And I think -- I think that's it at

15   this stage.

16        Q.  (BY MS. HOOD)  Have you filed any

17   post-judgment discovery in the underlying lawsuit in

18   the 152nd?

19        A.  I don't -- I don't -- I'm not aware of that.

20        Q.  Have you hired a lawyer to pursue

21   post-judgment discovery or collection of this

22   judgment?

23        A.  The only lawyer I've hired is Mr. Ballases.

24        Q.  And you're certainly not aware of Mr. Ballases

25   doing anything to try to collect this judgment outside

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                88

1   of the bankruptcy action; correct?

2        MR. BALLASES:  Objection.  Form.

3     Q.  (BY MS. HOOD)  You can answer.

4     A.  I'm not aware.

5     Q.  As an attorney in the state of Texas,

6   certainly you're aware of the fact that, as a judgment

7   creditor, you have the right to pursue post-judgment

8   collection efforts within the confines of the Court

9   that issued the judgment; correct?

10    A.  Sure.

11    Q.  And you've chosen not to avail yourselves of

12  those opportunities; correct?

13       MR. BALLASES:  I'm going to go ahead and

14  object to the question as misleading, also oppressive

15  and harassing, and assert attorney-client, attorney

16  work product, and joint litigation privilege.

17       What we do for collection, you do not get to

18  ask about to aid Mr. Choudhri and Jetall and his

19  companies to hide assets any further.  So we're not

20  going to answer that.

21       MS. HOOD:  All right.  I object to any

22  commentary about me helping anybody do anything.  All

23  right?  I'm here representing a creditor, and I'm

24  trying to determine the basis for the filing of this

25  proof of claim.  And part of that issue is any attempt

1    by the judgment creditor to collect the judgment

2    outside of filing a proof of claim in a bankruptcy

3    action, that has nothing to do with the underlying

4    judgment.

5        Q.  (BY MS. HOOD)  Mr. Khawaja, do you personally

6    know of any action taken in the public forum by you to

7    collect this judgment outside of this bankruptcy

8    action?

9        A.  I'm not aware of any.

10          MR. BALLASES:  I'm further going to instruct

11   you:  Don't answer any more questions regarding what

12   we've done to collect because that gets into attorney

13   work product, also attorney-client, and joint

14   litigation privilege.

15          THE WITNESS:  I understand.

16          MS. HOOD:  And certainly, Mr. Ballases, I

17   appreciate the nuances and everything else.  And

18   again, I don't want to know anything about your

19   strategy or anything else.  That's why I asked for

20   public record, because I can't find anything in the

21   public record that shows any attempt to try to collect

22   this judgment.  And so I'm just trying to clarify and

23   get commentary and testimony from your client

24   confirming that.

25          MR. BALLASES:  I appreciate that, but we don't

1    need to get into anything that could aid your client

2    or the principal who owns your client to hide assets

3    any further.

4         MS. HOOD:  I'm going to object to the sidebar

5    commentary there.

6      Q.  (BY MS. HOOD)  The judgment that you bought,

7    the judgment debtor is Jetall Companies, Inc.;

8    correct?

9      A.  Correct.

10        Q.  Certainly that judgment does not include my

11   client as a judgment debtor; correct?

12        A.  Yeah, it's not -- does not include?  Correct.

13        Q.  It certainly doesn't include Mrs. Choudhri as

14   a judgment debtor; correct?

15        A.  It does not include them as a judgment debtor,

16   correct.

17        Q.  It doesn't include Texas REIT as a judgment

18   debtor either; right?

19        A.  Correct.

20        Q.  On Judgment Number 2, I think you testified

21   that you don't own any part of that judgment; correct?

22        A.  Judgment Number 2, I believe I do own part of

23   it.

24        Q.  The Abdullatif judgment?

25        A.  Okay.  No, I do not.  Sorry.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    91

1      Q.  Okay.  Are you aware of the fact that that

2   judgment has been bonded around?

3      A.  I'm not aware of --

4         MR. BALLASES:  Objection.  Form.

5      A.  I'm not aware of that.

6      Q.  (BY MS. HOOD)  And when you filed the proof of

7   claim that included Judgment Number 2, did you do any

8   due diligence on that judgment in order to satisfy

9   yourself that that judgment was not bonded around?

10        MR. BALLASES:  Objection.  Form.

11     A.  I -- minimally, not -- minimally.

12     Q.  (BY MS. HOOD)  What do you mean "minimally"?

13     A.  Meaning it was a final judgment, and that's

14  how I -- that was what I understood it to be.

15     Q.  Certainly as a lawyer in the state of Texas,

16  you understand that when a judgment is superceded,

17  that that stays any collection activities; correct?

18        MR. BALLASES:  I'm going to object to the

19  question as misleading and harassing and oppressive.

20     Q.  (BY MS. HOOD)  You can answer --

21     A.  I'm not aware of that --

22     Q.  You're not aware of that?

23     A.  I'm not aware of that being -- I'm not aware

24  of the judgment being superceded.

25     Q.  And did you take any independent actions to

1  determine whether or not this judgment, which is on

2  appeal, had been superceded?

3      A.  No.

4      Q.  Judgment Number 3, this HSLLP judgment.

5      A.  Yes.

6      Q.  All right.  That judgment, when did you

7  purchase that judgment?

8      A.  I think 2023, if I recall correctly.

9      Q.  And how did you become aware that that

10  judgment was available to purchase?

11          MR. BALLASES:  Objection.  Form.  Harassing

12  and oppressive.  I'm also going to assert

13  attorney-client, attorney work product, and joint

14  litigation privilege and instruct the client not to

15  answer.

16      Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

17  adhere to your client's -- excuse me -- to your

18  lawyer's instructions?

19      A.  I am.

20      Q.  And if I understand your testimony, you are

21  one of three owners also of this judgment; is that

22  correct?

23          MR. BALLASES:  Objection.  Form.

24      A.  That's correct.

25      Q.  (BY MS. HOOD)  And can you tell me how you

1  paid for the purchase of this judgment?

2       MR. BALLASES:  I'm going to object to the

3  question again as harassing and oppressive, assert the

4  attorney-client legal privilege, the work product

5  legal privilege, and the joint litigation legal

6  privilege and instruct the client not to answer.

7     Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

8  adhere to your lawyer's instruction?

9     A.  Yes.

10     Q.  Mr. Khawaja, can you tell me whether you paid

11  for -- excuse me.  Strike that.

12       Can you tell me who you paid when you

13  purchased this assignment of this judgment?

14       MR. BALLASES:  I'm going to assert the same

15  objection I just levied to the prior question as well

16  as the same assertion of legal privileges to the prior

17  question and instruct the client not to answer, just

18  like the prior question.

19     Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

20  adhere to your lawyer's instruction and not answer my

21  question as to who you paid for the purchase of this

22  judgment?

23     A.  I am.

24     Q.  I see that this judgment -- the judgment

25  creditor is Hoover Slovacek; correct?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    94

1      A.  That appears correct.

2      Q.  And that's the same law firm that is

3  representing you here today; correct?

4      A.  That's correct.

5          MR. BALLASES:  Objection.  Form.

6      Q.  (BY MS. HOOD)  Do you have any joint defense

7  agreements with Hoover Slovacek?

8          MR. BALLASES:  Objection.  Form.  I think --

9  well, objection.  Form.

10     A.  I'm not aware.

11     Q.  (BY MS. HOOD)  Do you have any prosecution

12  agreements with Hoover Slovacek?

13         MR. BALLASES:  Objection.  Form.

14     A.  I'm not aware of any.

15     Q.  (BY MS. HOOD)  At the time that you purchased

16  this judgment, were you represented by Hoover

17  Slovacek?

18         MR. BALLASES:  Objection.  Form.

19     A.  At the time I purchased the judgment, I was

20  represented by nobody.

21     Q.  (BY MS. HOOD)  So you were representing

22  yourself?

23     A.  Correct.

24     Q.  Who drafted the assignments?

25         MR. BALLASES:  Objection.  Form.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                      95

1      A.  I think that's a privileged answer.

2          MR. BALLASES:  Also assert the same legal

3   privileges we asserted in the previous questions,

4   which would be attorney-client, attorney work product,

5   and joint litigation and instruct the client not to

6   answer.

7      Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

8   adhere to your lawyer's instructions and not answer my

9   question?

10     A.  Yes.

11     Q.  When you purchased the assignment of this

12  judgment and the other two also purchased their

13  portion of the judgment, was it all done at one time?

14         MR. BALLASES:  Objection.  Form.

15         I'm also going to assert the same legal

16  privileges and instruct the client not to answer, as I

17  did with the previous question.

18     Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

19  adhere to your client's instruction and not answer my

20  question as to the timing of the purchase of the

21  assignment by the three of you?

22     A.  Yes.

23     Q.  Did you purchase the assignment of this

24  judgment from Mr. Abdullatif?

25         MR. BALLASES:  Objection.  Form.  Same

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    96

1  objections, same assertions of legal privilege, same

2  instruction not to answer based on those legal

3  privileges as the question before.

4      Q.  (BY MS. HOOD)  Are you going to follow your

5  lawyer's instruction and not answer my question as to

6  who you purchased the assignment from?

7      A.  Yes.

8      Q.  When you purchased the assignment and you were

9  representing yourself, what lawyers did you deal with

10  for the other purchasers?

11      MR. BALLASES:  Objection.  Form.  I'm also

12  going to assert the same attorney work product and

13  attorney -- joint litigation legal privilege and

14  instruct the client not to answer.

15      Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

16  adhere to your lawyer's instructions and not answer my

17  questions?

18      A.  Yes.

19      Q.  Okay.  When you purchased your assignment, was

20  Mr. Abdullatif represented by counsel?

21      MR. BALLASES:  Objection.  Form.

22      Asserting the same legal privileges as the

23  previous question and instructing client not to answer

24  as I did with the previous question.

25      Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                  97

1  adhere to your client's instruction -- or to your

2  lawyer's instruction and not answer my question as to

3  whether or not Mr. Abdullatif had a lawyer at the time

4  of the purchase?

5      A.  Yes.

6      Q.  At the time you purchased your assignment of

7  this judgment, was Mr. Quinlan represented by counsel?

8        MR. BALLASES:  Objection.  Form.

9        I'm also going to assert the same legal

10 privileges as I did before and instruct the client not

11 to answer.

12     Q.  (BY MS. HOOD)  Mr. Khawaja, are you adhering

13 to your counsel's instructions and not answering my

14 question as to whether or not Mr. Quinlan was

15 represented by counsel at the time of the assignment

16 of the judgment?

17     A.  Yes.

18     Q.  Does your assignment include just your

19 signature, or is it an assignment that includes the

20 other purchasers' signatures?

21        MR. BALLASES:  I'm going to object to the

22 question -- object to the form of the question.

23 Excuse me.

24     A.  I don't -- I don't recall.

25     Q.  (BY MS. HOOD)  Do you have a physical copy, or

1    do you have the original of this assignment?

2        A.  I believe I do somewhere, not with me today.

3    I'm sure it was provided to me.

4        Q.  The copy or the original?

5        A.  The copy.

6        Q.  Do you know who holds the original of the

7    assignment?

8        A.  I don't.

9        Q.  Because you don't know who holds the original

10   of the assignment, you can't tell us whether or not

11   the assignment has been paid; correct?

12           MR. BALLASES:  Objection.  Form.

13           I'm going to assert the attorney-client and

14   attorney work product and attorney joint -- or excuse

15   me -- joint litigation privilege and instruct the

16   client not to answer.

17       A.  I'm going to follow advice of counsel.

18       Q.  (BY MS. HOOD)  And as you sit here today, you

19   can't tell us who holds the original of this

20   assignment.

21       A.  I can't.

22           MR. BALLASES:  Objection.  Form.

23       Q.  (BY MS. HOOD)  You can't?

24       A.  I cannot.

25           MR. BALLASES:  Objection.  Form.

OMAR KHAWAJA                                         September 11, 2024
TEXAS REIT LLC                                                      99

1      Q.  (BY MS. HOOD)  Can you tell me why you didn't

2   include a copy of the assignment with your proof of

3   claim?

4         MR. BALLASES:  Objection.  Form.

5         Just -- and I'm -- and I apologize because I

6   know I'm not supposed to talk right now, but it's

7   attached to the actual complaint in the Southern

8   District, so you can pull it up.  It's public record.

9         MR. CHOUDHRI:  Mr. Ballases, please stop

10  coaching the witness.

11        MR. BALLASES:  Be quiet.

12        MR. CHOUDHRI:  I'm sorry.  Mr. Khawaja, did

13  you say something?

14        MS. HOOD:  Okay --

15        MR. BALLASES:  No, I told you to be quiet.

16  This is Mr. Ballases.

17        MS. HOOD:  Okay.  This is my time.  Okay?  You

18  guys can bicker and do your little boy thing when I'm

19  not talking.

20      Q.  (BY MS. HOOD)  So if I understand correctly,

21  this adversary action, which is based upon two

22  judgments that you claim to have an assignment in, was

23  originally filed in the Southern District of Texas; is

24  that correct?

25      A.  That's correct.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                     100

1      Q.  And then you took that adversary and used it

2   as -- as an exhibit to your proof of claim that you

3   then filed in this action; correct?

4      A.  That's correct.

5      Q.  And if I understand your testimony, along with

6   this adversary action, you filed lis pendens against

7   the debtor's property in this action; correct?

8      A.  That's correct.

9      Q.  And if I remember the lis pendens, you did not

10  sign that lis pendens; correct?

11     A.  Correct.

12     Q.  Did Mr. Abdullatif have your permission to

13  sign that lis pendens that was filed against the

14  debtor's property in this action?

15     A.  Yes.

16     Q.  And when did you give him permission to file

17  that lis pendens?

18     A.  I'm not sure.  I'm assuming sometime before it

19  was filed.

20     Q.  Was it done prior to the time that you brought

21  the adversary action in the Southern District of

22  Texas?

23     A.  I don't know.

24        MS. HOOD:  Steve, my trustee paralegal, can

25  you bring up the first lis pendens, the supplemental

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    101

1  lis pendens, which I think is Exhibit -- yeah --

2  Exhibit 2, yeah.  Can you go down to the signature

3  page?

4      MR. SATHER:  Yes.

5      Q.  (BY MS. HOOD)  All right.  So Exhibit 2 is the

6  supplemental lis pendens that you authorized

7  Mr. Abdullatif to file against the debtor's property

8  in this action; correct?

9      A.  That's correct.

10     Q.  All right.  And the date of that says

11  August 22nd, 2023.  Do you agree with me?

12     A.  Yes.

13     Q.  Okay.  And would it be fair to say that you

14  gave Mr. Abdullatif your authority to sign on your

15  behalf somewhere around August 22nd, 2023?

16     A.  It could've been before that, but it sounds

17  correct.

18     Q.  Did you have a conversation with

19  Mr. Abdullatif about the filing of the lis pendens?

20     MR. BALLASES:  I'm going to object to the

21  question.  I'm also going to assert the

22  attorney-client, attorney work product, and joint

23  litigation privilege and instruct the client not to

24  answer.

25     A.  On advice of counsel, I'm not answering any

1    questions regarding my conversations with

2    Mr. Abdullatif or Mr. Quinlan.

3       Q.  (BY MS. HOOD)  Did you prov -- the authority

4    that you provided to Mr. Abdullatif for you -- for him

5    to sign on your behalf this lis pendens, was that

6    given verbally or in writing?

7          MR. BALLASES:  Objection.  Form.

8          Same assertion of legal privilege, same

9    instruction not to answer.

10      Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

11   adhere to your client's (sic) instructions and not

12   answer my question about how you gave permission to

13   Mr. Abdullatif --

14      A.  Yes, I am.

15         MS. HOOD:  Steve, can you bring up the --

16   Exhibit Number 3?

17      Q.  (BY MS. HOOD)  Exhibit Number 3 is the second

18   supplemental lis pendens that was filed also on the

19   debtor's property, and it looks to me that that also

20   is dated August 22nd, 2023.  Is that accurate?

21      A.  That looks accurate.

22      Q.  All right.  And is it fair to say that you

23   again gave Mr. Abdullatif permission or authorized him

24   to sign on your behalf somewhere around August 22nd of

25   2023?

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                        103

1        A.  Or prior to that, yes.

2        Q.  Certainly you didn't give him permission to

3    file it before you actually were an owner in the

4    judgment; correct?

5        A.  That's correct.

6        Q.  And again, just to summarize your testimony,

7    you think you recall purchasing your assignment in

8    this judgment sometime in 2023; correct?

9        A.  That's correct.

10        Q.  So we've got somewhere between January and

11    August 22nd that you purchased your interest in this

12    judgment; correct?

13        A.  That sounds right.

14        MR. BALLASES:  Ms. Hood, I don't mean to

15    derail your testimony, but if you look at the

16    complaint itself, it says when he obtained the

17    assignment.  It's February 17th, 2023.  You can read

18    it for yourself.  It's Exhibit 1.

19        MS. HOOD:  So I appreciate that, Mr. Ballases.

20    I'm trying to get your client's testimony on these

21    issues, not what's in a document that you wrote.  I

22    want his testimony, but I appreciate it.  He said he

23    couldn't recall, and that's fine with me.

24        Q.  (BY MS. HOOD)  On this judgment that you

25    purchased from Hoover Slovacek, prior -- prior --

1    sorry; my mouth is not working -- prior to your

2    purchase of the assignment, did you review the

3    underlying pleadings related to the lawsuit?

4        A.  Not really.

5        Q.  Can you be more specific than "not really"?

6    Is that you didn't look at them at all, or you kind of

7    looked at them?

8        A.  I may have briefly skimmed through them.

9        Q.  And by skimming through them, were you aware

10   that there were no causes of action for fraudulent

11   transfer, et cetera, against Jetall?

12       A.  No, I wasn't, but I'll take your word for it

13   that there were not.

14       Q.  And would you agree with me that the judgment

15   debtor in Judgment Number 3 is Jetall Companies, Inc.?

16       A.  Yes.

17       Q.  And the judgment debtor is not Arabella PH

18   3201; correct?

19       A.  No, they're an alter ego of Jetall Companies.

20           MS. HOOD:  Objection.  Non-responsive.

21       Q.  (BY MS. HOOD)  Arabella PH 3201 is not a

22   judgment debtor; correct?

23           MR. BALLASES:  Objection.  Form.

24       A.  That's correct.

25       Q.  (BY MS. HOOD)  9201 Memorial Drive is not a

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    105

1    judgment creditor; correct?

2        A.  Correct.

3           MR. BALLASES:  Objection.  Form.

4        Q.  (BY MS. HOOD)  2727 Kirby 26L, LLC, is not a

5    judgment debtor; correct?

6           MR. BALLASES:  Objection.  Form.

7        A.  Correct.

8        Q.  (BY MS. HOOD)  Texas REIT, LLC, is not a

9    judgment debtor; correct?

10       A.  Correct.

11          MR. BALLASES:  Objection.  Form.

12       Q.  (BY MS. HOOD)  Dalio Holdings I is not a

13   judgment debtor; correct?

14       A.  Correct.

15          MR. BALLASES:  Objection.  Form.

16       Q.  (BY MS. HOOD)  Dalio Holdings II is not a

17   judgment debtor; correct?

18       A.  Correct.

19          MR. BALLASES:  Objection.  Form.

20       Q.  (BY MS. HOOD)  Houston Real Estate Properties,

21   LLC, is not a judgment debtor; correct?

22       A.  (Unintelligible)

23          MR. BALLASES:  Objection.  Form.

24          THE REPORTER:  Sorry.  Was that "correct"?

25       Q.  (BY MS. HOOD)  What was your -- yeah, I didn't

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    106

1   hear your --

2       A.  That's correct.

3       Q.  -- answer either.  Yeah.

4       A.  Correct.  Correct.

5          MR. BALLASES:  And I object to the form.

6       Q.  (BY MS. HOOD)  Shahnaz Choudhri is not a

7   judgment debtor; correct?

8       A.  Correct.

9          MR. BALLASES:  Objection.  Form.

10      Q.  (BY MS. HOOD)  Ali Choudhri is not a judgment

11  debtor; correct?

12      A.  Correct.

13         MR. BALLASES:  Objection.  Form.

14      Q.  (BY MS. HOOD)  Shepherd-Huldy Development I is

15  not a judgment debtor; correct?

16      A.  Correct.

17         MR. BALLASES:  Objection.  Form.

18      Q.  (BY MS. HOOD)  Shepherd-Huldy Development II

19  is not a judgment debtor; correct?

20      A.  Correct.

21         MR. BALLASES:  Objection.  Form.

22      Q.  (BY MS. HOOD)  Galleria Loop Note Holder, LLC,

23  is not a judgment debtor; correct?

24      A.  Correct.

25         MR. BALLASES:  Objection.  Form.

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
107

1    Q.  (BY MS. HOOD)  What due diligence did you do,

2    if any, before you alleged in this adversary action,

3    which forms the basis of your proof of claim, that my

4    client, Dalio Holdings, LLC, is the alter ego of

5    Houston Real Estate Properties?

6    A.  What due diligence did I do personally?

7    Q.  Yeah.

8    A.  I mean, I think it's stated pretty clearly in

9    the petition what evidence we have.  There's a whole

10   court history of fraudulent transfers, commingling of

11   assets; you know, fraudulent, unethical conduct that

12   we have available as public record as to Mr. Choudhri

13   and, by extension, your client's conduct.  And that's

14   the due diligence I did to make these claims.

15   Q.  Okay.  So you based your due diligence off

16   your allegation that this is all public record.

17   A.  That's correct.

18      MR. BALLASES:  Objection.  Form.

19   Q.  (BY MS. HOOD)  What public records did you

20   look at?

21   A.  Well, if you -- everything that's stated in

22   the petition.  If you look at Lawsuit 2013-41273,

23   Harris County District Court, he was found to have

24   committed fraud, filed a fraudulent lien, and there

25   was no promissory note, and that was an entity that he

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                108

1   controlled, HREP.  If you look at -- on February 16th,

2   2017, in Case Number 2017-1 --

3       Q.  Let's go -- let's go back to the first one.

4   You --

5           MR. BALLASES:  I'm going to --

6       Q.  (BY MS. HOOD)  -- said that there was a --

7           THE REPORTER:  I'm sorry.

8       Q.  (BY MS. HOOD)  You claim to have a finding --

9           (Crosstalk)

10      Q.  (BY MS. HOOD)  You claim there's a finding of

11  fraud --

12          MR. BALLASES:  Ms. Hood --

13          THE REPORTER:  Sorry --

14          MR. BALLASES:  -- can you let my client answer

15  the question, please?

16          MS. HOOD:  I -- it's my question-and-answer,

17  and if I want to cut him off, I can.

18          MR. BALLASES:  Okay.  So you want to --

19          MS. HOOD:  I want to -- I want to drill down

20  on the first one.  Well, he's referencing a pleading

21  that I'm assuming that you wrote, so I just want to

22  find out what he knows personally about some of this

23  stuff.

24          MR. BALLASES:  Objection (unintelligible).

25      Q.  (BY MS. HOOD)  So you reference a lawsuit --

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
109

1   hang on.  Let me find it.

2        Is that the lawsuit involving HREP?

3   A.  Yes.

4   Q.  Okay.  And were you involved in that lawsuit?

5   A.  I was not.

6   Q.  So everything you know about that lawsuit, you

7   read as a matter of public record.

8   A.  That's correct.

9   Q.  Was there a finding of fraudulent transfers in

10  that case?

11       MR. BALLASES:  Objection.  Form.

12  A.  Other fraud, but I don't know if fraudulent

13  transfer was part of that.

14  Q.  (BY MS. HOOD)  I didn't see it.

15       MR. BALLASES:  Objection.  Sidebar.

16  Q.  (BY MS. HOOD)  All right.  That's the first

17  lawsuit that you said you looked at for public record

18  in order to determine that my client is somehow the

19  alter ego of all these other things; correct?

20  A.  That's correct.

21  Q.  Okay.  What other -- what other public records

22  did you review?

23  A.  There's also these videos by a guy named Wayne

24  Dolcefino I saw.

25  Q.  So you looked at videos.

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                      110

1      A.  Yes.

2      Q.  Anything else you reviewed?

3      A.  I think just generally people in the community

4  know that your client commits fraud.  He's known as a

5  fraudster.

6      Q.  Who are these --

7      A.  So many people have approached me.

8      Q.  Okay.  Who are these people?

9      A.  Yeah, I can't -- many people that he's

10  defrauded over the years.

11     Q.  Name one.

12     A.  Well, Judge Norman is one.  I don't know if

13  you know him.  He's in the Southern District.

14     Q.  Okay.  Who else?

15     A.  Let's see.  Who else in the community have

16  called him a fraudster?

17          Judge Landrum, Judge Michael Landrum in the

18  Harris County District Court, 164th District Court.

19  He considers your client a fraud.

20     Q.  And is that in relation to the HREP case?

21     A.  I just think generally.

22     Q.  Okay.  So Judge Landrum has spoken to you

23  about Mr. Choudhri being a fraudster?

24     A.  It's in a final judgment.  I can read that for

25  you if you'd like.

1    Q.  No, I'm asking --

2    A.  Do you want me to read it to you?

3    Q.  No, no, no.  I'm asking you.  You said people

4  have told you; many people have told you.  So I'm

5  asking who --

6    A.  Yes.

7    Q.  -- who's had a conversation with you about

8  Mr. Choudhri being a fraudster?  And you've said Judge

9  Norman, and I'm assuming you didn't --

10    A.  Yes.

11    Q.  -- talk personally with Judge Norman.  That's

12  out of an opinion; right?

13    A.  Yes.

14    Q.  Okay.  The same as --

15    A.  Members of the community --

16    Q.  Okay.  So who --

17    A.  I'm sorry --

18      THE REPORTER:  Sorry.  One at a time, please.

19  Thank you.

20    Q.  (BY MS. HOOD)  What community?

21      MR. BALLASES:  Objection.  Form.

22    A.  The real estate community, the Pakistani

23  community, basically anyone Mr. Choudhri has come in

24  contact with and done business with, people from those

25  communities.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                  112

1      Q.  (BY MS. HOOD)  Okay.  So we've got the real

2   estate community.  We've got the Pakistani community.

3      A.  His family members.  His own family members

4   have said the same.

5      Q.  Family members.

6          All right.  So who in the real estate

7   community have you had a specific conversation with

8   that have informed you that he's -- that he -- that my

9   client fraudulently -- my client, Dalio, is -- has

10   been the recipient or the instigator of fraudulent

11   transfers such that they're the alter ego of

12   Mr. Choudhri?

13      A.  Harold Polk.

14      Q.  Who?

15      A.  So just a -- Harold Polk.

16      Q.  And who is Mr. Polk?

17      A.  Somebody that your client knows that he ripped

18   off, I guess.

19      Q.  Well, how do you know him?

20      A.  He came to me and told me that your client

21   ripped him off.

22      Q.  Okay.  He came to you just out of the blue?

23      A.  Yeah.  I mean, you know, I don't know why he

24   came to me, but yeah, he did.

25      Q.  When did you have this --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    113

1      A.  He probably saw the --

2      Q.  When did you have this conversation with

3  Mr. Polk?

4      A.  Years ago.

5          MR. BALLASES:  Objection.  Form.

6      A.  I can't remember.

7      Q.  (BY MS. HOOD)  Years ago?  Okay.

8      A.  Yes.

9      Q.  Okay.  Who else?

10         MR. BALLASES:  Objection.  Form.

11      A.  I don't -- I can't recall.  I mean, a lot of

12  people.  A lot of people.

13         MR. BALLASES:  I'm going to object to the

14  question as exceeding the scope of the judge's

15  limiting order.

16         Can we please just stick to the basis for the

17  proof of claim and why we are willing to withdraw it?

18         MS. HOOD:  Objection.  Sidebar.

19         I've asked him, what due diligence did he do

20  in order to craft together the adversary proceeding,

21  which was attached to the proof of claim as evidence

22  supporting his proof of claim.  And I've got, so far,

23  two public lawsuits and some people in the community

24  that have spoken to him, one of whose name is Harold

25  Polk.  And he can't remember anybody else's name

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                            114

1   because there's just so many over so many years.

2       Q.  (BY MS. HOOD)  Is that correct?

3           MR. BALLASES:  No, he's identified several

4   people.

5           I'm going to object to sidebar.

6           If you want to engage in discovery in the

7   Southern District, we can do that, but right now we're

8   just trying to understand why we filed the proof of

9   claim and why we're willing to withdraw it.

10          MS. HOOD:  Yeah, I understand.

11          And I object to your sidebar.

12      Q.  (BY MS. HOOD)  Mr. Khawaja, certainly your

13  lawyer and Mr. Abdullatif had your permission to file

14  this proof of claim; correct?

15          MR. BALLASES:  Objection.  Form.

16      A.  Yes.

17      Q.  (BY MS. HOOD)  And you understand the proof of

18  claim was filed under penalty of perjury.

19      A.  Yes.

20          MR. BALLASES:  Objection.  Form.

21      Q.  (BY MS. HOOD)  And you understand that the

22  amount in the proof of claim is based upon these three

23  judgments; correct?

24      A.  Yes.

25      Q.  And we've run through the three judgments, and

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
115

1    one of which you don't even have an interest in;

2    correct?

3        A.  Yes, that's correct.

4        Q.  And you don't know anything about the

5    substance of that judgment; correct?

6        A.  That's (unintelligible).

7            MR. BALLASES:  Objection.  Form.

8            MS. HOOD:  Excuse me.  What was the answer?

9        A.  That was correct.

10       Q.  (BY MS. HOOD)  Do you own an assigned interest

11   in any other judgment related to any of these entities

12   that you claim are alter egos of Mr. Choudhri?

13       A.  I don't think so.

14           MR. BALLASES:  I object to the form of the

15   question.

16       Q.  (BY MS. HOOD)  Is it your habit to -- strike

17   that.

18           If one of these judgments became available to

19   purchase, would you buy it?

20           MR. BALLASES:  Objection.  Form.

21       A.  I don't know.  I don't know how much money

22   your client has.  It just depends.  Collectibility

23   matters, so...

24       Q.  (BY MS. HOOD)  Collectibility matters?

25       A.  Yes.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                116

1      Q.  Did collectibility matter to you when you

2  purchased the assignment of the judgments that form

3  the basis of your proof of claim?

4      A.  Yes.

5         MR. BALLASES:  Objection.  Form.

6      Q.  (BY MS. HOOD)  Did you do any due diligence

7  prior to filing your proof of claim in this lawsuit as

8  to the debtor's ability to pay these judgments?

9      A.  Yes.

10         MR. BALLASES:  Objection.  Form.

11      Q.  (BY MS. HOOD)  What due diligence did you do?

12      A.  Reviewed public documents, spoke to people,

13  watched videos of Wayne Dolcefino online.

14      Q.  Okay.  So the public documents that you

15  reviewed prior to filing your proof of claim in this

16  lawsuit --

17      A.  Yes.

18      Q.  -- that -- let me finish -- that supported

19  your proof of claim regarding collectibility were

20  public records and the --

21      A.  Yes.

22      Q.  -- Dolcefino videos.

23      A.  That's correct.

24         MR. BALLASES:  Objection.  Form.

25      Q.  (BY MS. HOOD)  When did you learn that your

1    proof of claim was uncollectible?

2          MR. BALLASES:  Objection.  Form.

3      A.  I think the Texas REIT judge in that case said

4    that there wasn't enough money in the Texas REIT

5    matter to pay us.

6      Q.  (BY MS. HOOD)  When you filed your proof of

7    claim, how much money was in Texas REIT?

8          MR. BALLASES:  Objection.  Form.

9      A.  I'm not sure.  No idea.

10      Q.  (BY MS. HOOD)  If I understand correctly,

11    bankrupt debtors have to file documents that outline

12    their assets; correct?

13      A.  Yes.

14          MR. BALLASES:  Objection.  Form.

15      Q.  (BY MS. HOOD)  Did you look at any of those

16    filings by the debtor?

17      A.  I believe I did, but a lot of what your client

18    files is fraudulent, so -- or the debtor in this case.

19    So it's hard to trust those documents.

20          MS. HOOD:  Objection.  Non-responsive.

21      Q.  (BY MS. HOOD)  Did you look at any of the

22    documents filed by the debtor, the accounting

23    documents, prior to filing your proof of claim?

24          MR. BALLASES:  Objection.  Form.

25      A.  Yes.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    118

1      Q.  (BY MS. HOOD)  Which documents did you look

2   at?

3      A.  I'm sure I reviewed the schedules.  I don't --

4   I can't recall specifically what I looked at.

5          MR. BALLASES:  I'm going to go ahead on this

6   line of questioning and instruct him not to answer

7   because it gets into attorney work product.

8          MS. HOOD:  I'm just asking what he looked at.

9   I don't want to know what you looked at or what you

10   talked to him about.

11          MR. BALLASES:  I understand.

12          MR. CHOUDHRI:  I'm gonna object.

13          Mr. Ballases, you continue to coach the

14   witness, so I'm gonna object.  Please stop coaching

15   the witness.

16          MR. BALLASES:  What's your legal basis, sir,

17   for your objection?

18          MR. CHOUDHRI:  Mr. Ballases, because you're

19   making sidebar, coaching the witness.  Keep your

20   objections limited.  Don't coach the witness.  You've

21   been doing it throughout the whole depo, and you're

22   also objecting on a frivolous basis.  But regardless,

23   please stop coaching the witness.

24          MR. BALLASES:  Okay.  So what's your formal

25   objection for the record?

1          MR. CHOUDHRI:  For the record, you're

2     improperly coaching the witness.  Refrain your

3     objections --

4          MR. BALLASES:  Okay.

5          MR. CHOUDHRI:  -- to just objections.

6          MR. BALLASES:  I want to make sure.  Okay.  I

7     just want to make sure your formal objection was on

8     the record.

9          THE WITNESS:  He's just buying time for his

10    lawyer to make up questions.

11         MS. HOOD:  What?  Mr. --

12         MR. CHOUDHRI:  Mr. Khawaja, what did you say?

13         MS. HOOD:  Yeah.  Excuse me, Mr. Choudhri.

14    This is my time.

15      Q.  (BY MS. HOOD)  First of all, there's no

16    requirement that I pepper you incessantly directly.

17    I'm going through my notes.  I don't need time to come

18    up with questions for you.

19         I'd actually like it if you would answer my

20    questions, but you've chosen not to do that.  So I'm

21    going through my notes to see if I can actually ask

22    some questions that you would be kind enough to answer

23    relating to your proof of claim and why you filed it.

24    So when you --

25         MR. BALLASES:  (Unintelligible) and what

1    you're doing, okay, or your sidebar.  And we are

2    answering questions.  I'm sorry you don't like them.

3         MS. HOOD:  You're not answering them.  You're

4    objecting.

5    Q.  (BY MS. HOOD)  At the time that you filed your

6    proof of claim, you had satisfied yourself that you'd

7    be able to collect your judgments through this debtor.

8    A.  Yes.

9         MR. BALLASES:  Objection.  Form.

10   Q.  (BY MS. HOOD)  Do you understand that in order

11   to collect your judgments through this debtor, you

12   would have to win on your adversary claim regarding

13   the alter egos?

14   A.  Yes.

15   Q.  And if I read your adversary complaint, it's

16   your assertion that Mr. Choudhri keeps his entities

17   devoid of assets in order to keep creditors from

18   collecting their judgments.  Is that a fair statement?

19   A.  I mean, I think that's one of many tactics

20   that he uses, but yes.

21   Q.  And certainly you have these judgments at your

22   ready; correct?

23        MR. BALLASES:  Objection.  Form.

24   A.  Yeah.  I'm sorry.  I didn't -- I didn't quite

25   understand the question.

1    Q.  (BY MS. HOOD)  Yeah, bad question.

2         You have these judgments that you own that you

3    could go out and try to collect absent filing

4    documents in Bankruptcy Court; correct?

5    A.  I guess.

6    Q.  And you've not chosen to pursue any

7    post-judgment collection of these judgments in Texas

8    State Court; correct?

9         MR. BALLASES:  Objection.  Form.

10         I'm going to instruct the client not to

11    answer.

12         You're invading attorney-client, work

13    privilege -- attorney-client, and you're also getting

14    into joint litigation privilege.  We're not going to

15    help Mr. Choudhri hide more assets.

16    A.  On advice of counsel, I will not answer that

17    question.

18    Q.  (BY MS. HOOD)  It's not -- okay.  The question

19    is this.  Okay?  Based upon public records, I find no

20    activity by you to collect these judgments in Texas

21    State Courts; is that an accurate statement?

22    A.  Yes.

23         MR. BALLASES:  I object to the form.

24    Q.  (BY MS. HOOD)  And rather than pursue

25    opportunities in State Court, you and your co-owners

1   have chosen to pursue unrelated third parties in

2   Bankruptcy Court; correct?

3        MR. BALLASES:  Objection.  Form.

4        A.  No, that's not correct.  "Unrelated"?  What do

5   you mean "unrelated"?  What is that supposed to mean?

6        Q.  (BY MS. HOOD)  Texas (sic) Real Estate

7   Properties, LLC, is not a judgment debtor; correct?

8   You've already admitted this.

9        A.  Does that mean -- you said "unrelated."

10  That's not -- they're very related.

11       Q.  In your mind, but they don't -- they're not a

12  party to the judgment; correct?

13       MR. BALLASES:  Objection.  Sidebar.

14       A.  In reality and on public record.

15       Q.  (BY MS. HOOD)  The debtor in this case is not

16  a judgment debtor; correct?

17       A.  Asked and answered.

18       Q.  Okay.  Now you're objecting to your own

19  questions?  Are you a lawyer or a witness?

20       A.  I am a lawyer, but I mean --

21       Q.  Okay.  Answer my question.

22       A.  -- just answering --

23       Q.  Answer my question.

24       A.  No, I'm not gonna answer that question.

25       Q.  This debtor is not a judgment debtor to you;

1    correct?

2        THE WITNESS:  Do you want me to answer?

3        MR. BALLASES:  Objection.  Form.

4        You can answer.

5    A.  No.

6    Q.  (BY MS. HOOD)  And yet you chose to pursue

7    this debtor to try to collect your judgments that are

8    in the name of others; correct?

9    A.  This -- yes.  This debtor is an alter ego of

10   all the other debtor -- all the other defendants in

11   this case.

12   Q.  Tell me where there's a finding by a court of

13   law that this debtor is the alter ego of one of the

14   two entities in which you hold an assigned interest.

15   A.  We will prove it in this case.

16   Q.  Okay.  That's not my question.  Tell me where

17   I can find as a matter of law that Ali Choudhri and

18   Houston Real Estate Properties, LLC, are one and the

19   same.

20       MR. BALLASES:  Objection.  Form.

21   A.  We don't have that.

22   Q.  (BY MS. HOOD)  Tell me where I can find as a

23   matter of public record that Jetall is one and the

24   same with this debtor.

25       MR. BALLASES:  Objection --

1    A.  Based on his testimony in multiple cases.

2        MR. BALLASES:  Objection.  Form.

3        Q.  (BY MS. HOOD)  Tell me where I can find as a

4   matter of public record a finding by a trier of fact

5   that Jetall Companies is one and the same as this

6   debtor.

7        MR. BALLASES:  Objection.  Form.

8    A.  I don't -- I'm not sure if we'll find that.

9        Q.  (BY MS. HOOD)  There isn't one, is there?

10       MR. BALLASES:  Objection.  Form.

11    A.  We have multiple public record documents

12   indicating that Ali Choudhri is one and the same as

13   all of his entities.

14       Q.  (BY MS. HOOD)  And there's not a finding by a

15   trier of fact that this debtor is one and the same

16   with Jetall Companies, is there?

17    A.  Only admissions by your client.  That's it.

18       MR. BALLASES:  Objection.  Form.

19       Q.  (BY MS. HOOD)  There's no finding by a trier

20   of fact that this debtor is one and the same as Jetall

21   Companies; correct?

22       MR. BALLASES:  Objection.  Form.

23       (Phone ringing.)

24    A.  (Unintelligible)

25       THE REPORTER:  I'm sorry.  I'm sorry.  I

1  did -- sorry.  I did not hear your answer.  Could you

2  please restate your answer?

3      A.  I said -- I said, Correct, not by a trier of

4  fact, but by admissions through your client.

5          MS. HOOD:  Objection.  After "correct" --

6  objection.  Non-responsive after "correct."

7          Mr. Khawaja, I fully expect to go back to the

8  Court and try to get him to compel you to answer some

9  of my questions that I think were improperly objected

10  to, and so I can go through that with your lawyer

11  through motion practice.  I appreciate your time

12  today.  Based upon whether or not the other lawyers

13  and Mr. Choudhri have questions, I may or may not get

14  another pass at you, and I appreciate your time.

15          THE WITNESS:  Thank you.

16          MS. HOOD:  I'm going to pass the witness to

17  the next creditor in line, and I reserve my right to

18  come back and ask questions -- follow-up questions if

19  I deem necessary.

20          THE REPORTER:  Sorry.  Just before we go to

21  Mr. Choudhri, would it be possible to just take two

22  minutes to go to the bathroom?

23          MS. HOOD:  Oh, absolutely.  You're in charge.

24  You're the one doing the hard work.

25          THE REPORTER:  Thank you.  Just two minutes.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                  126

1   Thanks.

2          MR. CHOUDHRI:  Absolutely, Cheryl.  Take your

3   time.

4          THE REPORTER:  Thank you.

5          (A recess was taken.)

6   BY MR. CHOUDHRI:

7      Q.  Mr. Khawaja, good afternoon.  How are you?

8      A.  I'm good, man.  Just -- let's get to your

9   questions.  I don't -- we don't have time for

10  formalities.  Thank you.

11     Q.  Mr. Khawaja, you're not looking at -- first of

12  all, who is present with you in the room there?

13         MR. BALLASES:  We've already answered that.

14         Objection.  Form.

15         We're also having trouble hearing you, so you

16  might want to turn up your volume --

17     A.  Yeah, you need to turn your speaker up.

18     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, can you hear

19  me now?

20     A.  Better, but you still need to speak up a

21  little bit.

22     Q.  So can you identify who's in the room there

23  with you, Mr. Khawaja?

24         MR. BALLASES:  Objection.  Form.

25     A.  Mr. Quinlan is here; my attorney, Michael

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    127

1   Ballases.

2      Q.  Is Osama Abdullatif in the room with you?

3      A.  He has --

4         MR. BALLASES:  Objection.  Form.

5      A.  He's not in the room, like, at this minute.

6      Q.  (BY MR. CHOUDHRI)  But throughout this

7   deposition, you've had Osama Abdullatif and John

8   Quinlan sitting in the room with you, present;

9   correct?

10     A.  Yes.

11        MR. BALLASES:  Objection.  Form.

12        We've already answered that and said that.

13  Quit wasting everybody's time.

14        MR. CHOUDHRI:  Mr. Ballases, I would ask you

15  to please calm down and allow me to ask my questions.

16        MR. BALLASES:  Objection.  Sidebar.

17     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you had -- as

18  we started this deposition, you had said that I had

19  defrauded you?

20     A.  Ali, I'm sorry.  You're really going to have

21  to turn up your sound because I can't hear you and

22  neither can the people in the room.

23        MR. CHOUDHRI:  Is everybody -- can everybody

24  hear me okay?

25        Cheryl, can you hear me?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                      128

1         THE REPORTER:  I can hear you.

2         MR. CHOUDHRI:  Okay.  Maybe it's only

3    Mr. Khawaja who can't hear me, then.

4         THE WITNESS:  Osama, can you hear him?

5         MR. BALLASES:  It's difficult to hear you.

6         MR. ABDULLATIF:  No, I can't hear him without

7    hearing aid.

8      A.  Mr. Quinlan can't hear you and neither can

9    Osama, and they need to hear you.

10     Q.  (BY MR. CHOUDHRI)  Well, the court reporter

11   can hear me.  If they want me to come closer, they

12   can.  I would actually object to them even being there

13   and handing you notes, but we'll try to --

14        MR. BALLASES:  Objection.  Sidebar.

15        MR. CHOUDHRI:  -- get on with the deposition.

16        MR. BALLASES:  (Unintelligible)

17        MR. CHOUDHRI:  The court reporter could hear

18   me just fine.

19        THE WITNESS:  Okay.

20     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, how do you

21   know John Quinlan?

22        MR. BALLASES:  Objection.  Form.

23     A.  I'm not gonna answer that question.

24     Q.  (BY MR. CHOUDHRI)  You're not gonna answer the

25   question of how you know John Quinlan?

1    A.  I -- I met him in the real estate community.

2    Q.  When did you meet Mr. Quinlan?

3        MR. BALLASES:  Objection.

4        Ali, can you show yourself?  If you're going

5   to be asking questions, you need to show yourself.

6        THE WITNESS:  Yes.

7        MR. BALLASES:  Thank you.

8        MR. CHOUDHRI:  Okay.  Can you all see me now?

9   Is that okay?

10       MR. BALLASES:  Yes.

11   Q.  (BY MR. CHOUDHRI)  Okay.  Mr. Khawaja, you

12  were present earlier during the deposition when you

13  were being asked questions.  Did you happen to listen

14  to Judge Robinson's oral ruling?

15       MR. BALLASES:  Objection.  Form.

16   A.  I don't know what that has to do with

17  anything.

18   Q.  (BY MR. CHOUDHRI)  The deposition that we're

19  here on, Mr. Khawaja, is --

20   A.  Yes.

21   Q.  -- subject to a court order.  Do you

22  understand that?

23       MR. BALLASES:  Objection.  Form.

24       This has nothing to do with the proof of

25  claim.  Move on.

1     A.  Please get to the proof of claim,

2   Mr. Choudhri.

3     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, this is my

4   deposition.  I get to ask you questions, and you can

5   answer them.  This is my opportunity.

6         MR. CHOUDHRI:  And so, again, Court Reporter,

7   would you please repeat the question?

8         THE REPORTER:  The question is (Reading:)  The

9   deposition that we're here on, Mr. Khawaja, is subject

10   to a court order.  Do you understand that?

11    A.  I didn't -- I have not seen a court order.

12    Q.  (BY MR. CHOUDHRI)  Are you aware, earlier

13   today, that an oral ruling on an audio from the Court

14   was sent to your attorney, Michael Ballases?

15    A.  It -- it may have been.

16        MR. BALLASES:  Objection.  Form.

17    Q.  (BY MR. CHOUDHRI)  And are you aware, whether

18   written or oral, we are here pursuant to a court

19   order?  Are you aware of that?

20        MR. BALLASES:  Objection.  Form.

21    A.  Might -- that might be the case.

22    Q.  (BY MR. CHOUDHRI)  But you're not aware that

23   we're here pursuant to a court order.

24        MR. BALLASES:  Objection.  Form.

25    A.  It could possibly be the case.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                131

1      Q.  (BY MR. CHOUDHRI)  But you don't know?

2      A.  I don't know.

3      Q.  And I've asked you earlier as how you know

4   Mr. Quinlan, and your answer was you're not going to

5   answer that; is that correct?

6          MR. BALLASES:  Objection.  Form.

7      A.  I think I told you after -- after that that I

8   met him in the real estate community.

9      Q.  (BY MR. CHOUDHRI)  And when did you meet him?

10         MR. BALLASES:  Objection.  Form.

11         Are you going to ask every question two or

12   three times?  Ask good questions.

13         MR. CHOUDHRI:  Mr. --

14     A.  I can't remember.

15         MR. CHOUDHRI:  Mr. Ballases -- Mr. Ballases,

16   for the record, I would ask you to please stop

17   interfering and obstructing the deposition.

18         MR. BALLASES:  Objection.  Sidebar.

19         So I would just request that you comply with

20   the judge's instruction to tailor the questions

21   narrowly to the reasons why the proof of claim was

22   filed and why it was withdrawn and not ask why he

23   knows people and who he knows people and not ask

24   things three times.

25     Q.  (BY MR. CHOUDHRI)  Is John Quinlan a

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    132

1   co-claimant on the proof of claim?

2      A.  I believe so.

3         MR. BALLASES:  Objection.  Form.

4      Q.  (BY MR. CHOUDHRI)  Is Osama Abdullatif a

5   co-claimant on the proof of claim?

6         MR. BALLASES:  Objection.  Form.

7      A.  I believe so, yes.

8      Q.  (BY MR. CHOUDHRI)  When did you meet Osama

9   Abdullatif?

10        MR. BALLASES:  Objection.  Form.

11     A.  Maybe 2010.  2009 or '10, something like that.

12  I'm not sure.  Around the time you deprived me of my

13  property, I think.

14     Q.  Which property is that, Mr. Khawaja?

15     A.  The Avondale property.

16        MR. BALLASES:  Objection.  Form.

17     Q.  (BY MR. CHOUDHRI)  Can you tell us a little

18  bit about that, because you've mentioned it several

19  times in this deposition, and so I'd like you to tell

20  us a little more about the Avondale property.

21     A.  No --

22        MR. BALLASES:  Objection.  Form.

23        I'm going to instruct him not to answer

24  because you're violating the judge's instruction as to

25  this limited deposition.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    133

1        Please stick to the proof of claim and the

2   reason why it's being withdrawn.

3        MR. CHOUDHRI:  Mr. Ballases, he's opening the

4   door.  He's answering my questions.  I have a right to

5   ask him questions.  Okay?

6        MR. BALLASES:  Yeah, so you're not a lawyer.

7   You don't know what you're talking about.

8        MR. CHOUDHRI:  Mr. Ballases, please be

9   respectful, sir.  I know it's difficult, but please be

10  respectful.

11       Q.  (BY MR. CHOUDHRI)  Mr. Khawaja --

12       MR. BALLASES:  I am.

13       Q.  (BY MR. CHOUDHRI)  -- are you going to answer

14  my --

15       MR. BALLASES:  I'm respecting my client --

16       Q.  (BY MR. CHOUDHRI)  -- questions --

17       MR. CHOUDHRI:  Mr. Ballases, please stop

18  disrupting the deposition.

19       Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you said you

20  met Mr. Osama Abdullatif when I deprived you of your

21  property.  Is that -- did I hear that correct?

22       MR. BALLASES:  Objection.  Form.

23       A.  Yes.

24       MR. BALLASES:  I'm going to instruct you not

25  to answer.

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
134

1      We're not going to talk about this.

2      THE WITNESS:  Okay.  Sorry.

3      MR. BALLASES:  It has nothing to do with the

4   proof of claim.  It has nothing to do for the reason

5   for filing it.  It has nothing --

6      A.  Ali, we can grab a cup of coffee afterwards.

7   You can ask me all about that.  Let's please stick to

8   the purpose of this.  Okay?

9      MR. CHOUDHRI:  Let's have some decorum,

10   gentlemen.  This is a formal deposition.  I'm asking

11   the questions.  Mr. Khawaja just said yes, so why the

12   proof of claim was filed is very relevant.  And

13   Mr. Khawaja just answered that, so I have an

14   opportunity to explore that.

15      Mr. Ballases, you have a law license.  You

16   have to follow the creed that you've been licensed by,

17   so please don't frivolously object and coach the

18   witness.  Okay?  I --

19      MR. BALLASES:  Objection.  Sidebar.

20      MR. CHOUDHRI:  -- would like -- if everybody

21   wants, I'm happy to play the audio of the judge's oral

22   ruling so Mr. Khawaja is aware -- and so are you,

23   Mr. Ballases -- and we don't have to waste more time

24   like we did this morning about what the scope of the

25   deposition is about.  Would you like me to do that,

1   Mr. Ballases, so you can stop --

2          MR. BALLASES:  Objection.  Sidebar --

3          MR. CHOUDHRI:  -- interfering --

4          MR. BALLASES:  The only reason you're asking

5   questions is because I heard it.  So why don't you be

6   quiet and focus on asking questions if it's relevant

7   to the judge's scope.  Thank you.

8          MR. CHOUDHRI:  Madam Court Reporter, do you

9   have a -- do you have an ability to play at a certain

10  point of the audio?  Is that something you're able to

11  do for us?

12         THE REPORTER:  I am actually not authorized to

13  be playing audio or sharing exhibits during the

14  deposition.

15         MR. CHOUDHRI:  Okay.  Well, maybe we can then

16  play the audio at 23 minutes and 14 seconds, and then

17  we'll play it at 28 minutes and 12 seconds.

18     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you -- you

19  have indicated that you have not heard the oral

20  ruling, why we're here, by Judge Robinson; is that

21  correct?

22     A.  Let's assume for purposes of this question I

23  have.  What would you like me to answer?

24     Q.  Well, I just want to clarify because you keep

25  not answering, and Mr. Ballases keeps interfering and

1    interrupting, so I want to go ahead and get the

2    judge's ruling on the record, so --

3       A.  Just ask me the questions that you want the

4    answers to.  I'm happy to answer the questions.

5       Q.  Were you present or on the phone when the

6    hearing took place with Judge Robinson?

7       A.  I was not.

8          MR. BALLASES:  Objection.  Form.

9          MR. CHOUDHRI:  Let's go ahead and play at

10   23 minutes and 14 seconds.

11          Gene, can you play that right now?

12          MR. BALLASES:  So just for the record, we --

13   as I've told your counsel, we have to cut if off at

14   4:30.  If this is how you want to use your time, by

15   all means.  It's your dime.

16          MR. CHOUDHRI:  Mr. Ballases, you've been

17   interfering with the depo all day, and we're going to

18   do this by the rules and what the rules -- the federal

19   rules are and the timing.  So if you want to walk out

20   of a depo, that's really your choice --

21          MR. BALLASES:  (Unintelligible)

22          MR. CHOUDHRI:  -- and you'll suffer the

23   consequences.

24          THE REPORTER:  Okay.  So just before we play

25   the audio, as I let everybody know in the e-mail, I

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
137

1   cannot transcribe anything I cannot clearly hear.  If

2   you would like a separate transcription of this audio,

3   then you can contact our office.

4        MR. CHOUDHRI:  No -- no problem, Cheryl.

5   We'll do the best we can.

6        THE REPORTER:  Okay.  Thank you.

7        MR. CHOUDHRI:  And I'm sure you will too.  And

8   if it works, great.

9        THE REPORTER:  Thank you.

10       MR. CHOUDHRI:  So while we're getting ready to

11  do that -- go ahead, Gene.  Are you ready?

12       MR. MCCUBBIN:  Yeah.  You said 23:14.

13       MR. CHOUDHRI:  Correct, at 23 minutes and

14  14 seconds.  Let's start there.

15       MR. MCCUBBIN:  Yeah, this is, I think, 23:10.

16  Here we go.

17       (Audio file played.)

18       MR. MCCUBBIN:  There you go.

19       MR. CHOUDHRI:  Would you go to 23 minutes and

20  18 -- 28 minutes and 12 seconds, please?

21       MR. MCCUBBIN:  Yeah, give me a second.

22       MR. CHOUDHRI:  28 minutes and 12 seconds.

23  Let's get that on the record.  Go ahead.

24       MR. MCCUBBIN:  Okay.

25       (Audio file played.)

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                    138

1          MR. MCCUBBIN:  There you go.

2      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, were you able

3   to hear the judge, Robinson?

4      A.  Yes.

5      Q.  Does that help you understand a little more

6   about what we're here about?

7      A.  What's your question?

8      Q.  Did you --

9          MR. BALLASES:  Objection (unintelligible) --

10     Q.  (BY MR. CHOUDHRI)  -- hear him say motivations

11  of filing the proof of claim?  Do you understand what

12  that means, motivations of filing the proof --

13     A.  Yes.

14     Q.  -- of claim?  Okay.

15     A.  Yes.

16     Q.  So again, I want to go back to some of my

17  questions, Mr. Khawaja.  You said that I defrauded you

18  of your property.

19     A.  Yes.

20     Q.  So can you explain how I defrauded you of your

21  property?  I want to understand the motivations here.

22     A.  I think we got a trial --

23         MR. BALLASES:  Objection.  Form.

24     A.  -- on that case coming up in a month.  Let's

25  wait till trial.  Let's wait till we get to trial on

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                        139

1   that.

2       Q.  (BY MR. CHOUDHRI)  Well, Mr. Khawaja, you

3   filed this proof of claim in the Texas REIT bankruptcy

4   case; correct?

5       A.  Yes.

6           MR. BALLASES:  Objection.  Form.

7       Q.  (BY MR. CHOUDHRI)  And so your motivation,

8   when I asked you earlier -- and we can go back and

9   have the court reporter reread some of your answers

10  earlier in the deposition.  I've taken notes as well.

11  I just want to make sure the record is good and clear;

12  there's no confusion.

13          MR. BALLASES:  Objection.  Form.

14          Objection.  Sidebar.

15      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, I just want to

16  understand today; you're under no medication.  Right?

17      A.  Yes.

18          MR. BALLASES:  Objection.  Form.

19      Q.  (BY MR. CHOUDHRI)  And you're here and able to

20  answer truthfully under oath?

21      A.  Yes.

22          MR. BALLASES:  Objection.  Form.

23      A.  Yes.

24      Q.  (BY MR. CHOUDHRI)  And you understand you're

25  under oath as if you were in a courtroom; correct?

1          MR. BALLASES:  Objection.  Form.

2     A.  Like I'm in front of a jury, yes.

3     Q.  (BY MR. CHOUDHRI)  Or a judge.

4     A.  Or a judge.

5     Q.  Okay.  So, Mr. Khawaja, can you tell us about

6  when you say, You defrauded me of my property, and you

7  said Avondale.  Did I hear that correctly?

8          MR. BALLASES:  Objection --

9     A.  Mr. Choudhri, here's the thing --

10         MR. BALLASES:  Objection.  Form.

11         I'm going to instruct my client not to answer

12  because it exceeds the scope of the deposition as to

13  what -- the judge's order.

14         Plus, as I understand it, based on what was

15  just said --

16         THE WITNESS:  There's a trial coming.

17         MR. BALLASES:  -- he got a trial coming up,

18  and I'm not going to let you ask him -- get a second

19  deposition of him in a wholly separate matter that's

20  irrelevant to our proof of claim.  Move along, please,

21  sir.

22         MR. CHOUDHRI:  Mr. Ballases, you have been

23  disrupting this deposition the entire time.  You

24  refused to let me answer -- ask questions, Ms. Lori

25  Hood.  We had to send you the audio.  You misstated

1   what the judge said.  You continue to disrupt the

2   deposition.  We're allowed -- I played the audio

3   ruling.  The judge says the motivation of filing the

4   proof of claim, and he says, Because you defrauded me

5   of my property, Avondale.  So I have a right to get

6   into that.

7          When he answers a question, Mr. Ballases, I

8   have a right to explore that because that's his

9   answer.  He opened the door.  Throughout this depo, he

10  opened the door, Mr. Ballases, so I am entitled to ask

11  those questions.  And if you're going to continue --

12         MR. BALLASES:  (Unintelligible)

13         MR. CHOUDHRI:  -- to instruct him wrongfully

14  to not answer that, then just instruct him, but stop

15  doing what you're doing and making talking objections.

16  Either object or instruct him not to answer, and we'll

17  keep moving on.  But keep your objections limited to

18  what's correct and not frivolous --

19         MR. BALLASES:  What's your legal objection,

20  sir -- what's your legal objection, sir, because I

21  didn't hear it.

22         MR. CHOUDHRI:  You continue to do sidebars

23  throughout the deposition and disrupt and frustrate

24  the deposition.  We're trying to have a smooth

25  deposition; you continue to have sidebars.  So please

1  refrain from that, Mr. Ballases.

2      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, when you

3  said --

4          MR. BALLASES:  Objection.  Sidebar.

5      Q.  (BY MR. CHOUDHRI)  -- you -- Mr. Khawaja, what

6  is the Avondale property?

7          MR. BALLASES:  Objection.  Form.

8          This has nothing do to with the proof of claim

9  or the withdrawal --

10         (Crosstalk)

11     A.  We're getting ready to stop this depo -- you

12  need to get to your questions.  We're not talking

13  about cases that are going to trial.  You know better

14  than that.  I'm not doing it.  So get to the questions

15  you have about this proof of claim.  I'm happy to

16  answer those, or we're done.

17     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, are you going

18  to comply with the Court's order on this --

19     A.  Yes.

20     Q.  -- now getting into motivations for filing the

21  claim?  And when asked, you said, Because you

22  defrauded me of my property.

23     A.  No, I didn't.  That's not true.  You asked

24  me --

25     Q.  That's not --

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                             143

1      A.  -- when did I meet Osama -- you asked me when

2   did I meet Osama Abdullatif, and I said, Around the

3   time you defrauded me of my property.

4      Q.  And when I -- when you said "my property,"

5   you're defining your property as Avondale; is that

6   correct?

7          MR. BALLASES:  Objection.  Form.

8      A.  Yeah, I'm not going to -- again, we're getting

9   ready to shut the depo down, so it's up to you.

10     Q.  (BY MR. CHOUDHRI)  So you're refusing to

11  answer these questions; correct?

12     A.  I'm refusing to answer questions that are

13  outside the scope of what you're permitted to ask,

14  correct.

15         MR. BALLASES:  Objection.  Form.

16     A.  You're not an attorney.

17     Q.  (BY MR. CHOUDHRI)  So because I'm not an

18  attorney, I can't ask you questions per the Court's

19  ruling --

20     A.  Outside --

21     Q.  -- is your objection?

22     A.  -- of the scope -- outside of the scope,

23  you're not.  That's correct.

24     Q.  So are you saying motivations for filing the

25  claim and you opening the door is outside the scope?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                144

1    A.  Yes.

2    Q.  Okay.

3        MR. BALLASES:  Objection.  Form.

4    Q.  (BY MR. CHOUDHRI)  And you're gonna refuse --

5    you're gonna refuse to answer any of those questions;

6    correct?

7        MR. BALLASES:  Objection.  Form.

8    A.  You've only asked me one that I'm not gonna

9    talk about because there's a trial coming up.  I think

10   the judge will understand that.  Your -- if your --

11   any of the attorneys that you're paying that are here

12   with you would care to speak up, they'll tell you,

13   Mr. Choudhri, you can't ask those questions.  So you

14   should ask them too.

15       MR. BALLASES:  I object to the form of the

16   question.

17   Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, did you -- you

18   mentioned Wayne Dolcefino; correct?

19   A.  Yes.

20       MR. BALLASES:  Objection.  Form.

21   Q.  (BY MR. CHOUDHRI)  And, Mr. Khawaja, is

22   somebody in the room coaching you?  Because you keep

23   looking at somebody else and talking and -- who's in

24   front of you right now that you keep looking at and

25   talking --

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                          145

1     A.  I don't need to be coached to answer your

2   silly questions, no.

3          MR. BALLASES:  Objection.  Sidebar.

4     A.  I can answer them with my eyes closed.  Do you

5   want me to do that?

6     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you can answer

7   them however you want.  I just want you to answer them

8   truthfully --

9     A.  Yes.

10    Q.  -- and honestly.

11    A.  Yes.

12    Q.  When did you meet Mr. Ballases?

13         MR. BALLASES:  Objection.  Form.

14    A.  I don't know, to be hon -- but, you know, you

15   understand he's my attorney, and this is all --

16   anything I discussed with him, ever, including when I

17   met him or where I met him, is protected by

18   attorney-client privilege.  You can't ask me those

19   questions.

20    Q.  (BY MR. CHOUDHRI)  So are you going to refuse

21   to answer my question on when you met Mr. Ballases?

22    A.  Yes, I am.

23    Q.  Mr. Khawaja, are you aware -- let's --

24         MR. CHOUDHRI:  Steve, are you there?  Would

25   you pull up that proof of claim, Steve?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    146

1          MR. SATHER:  Just give me just a moment.  I
2   need to turn my sharing back on.
3          MR. CHOUDHRI:  No problem.
4          THE REPORTER:  And just while he's doing that,
5   Mr. Khawaja, could you spell Avondale for me, please?
6          THE WITNESS:  A-V-O-N-D-A-L-E.
7          THE REPORTER:  Thank you.
8          MR. SATHER:  Okay.  I'm there.
9          MR. CHOUDHRI:  Would you go down, Mr. Sather?
10   Just scroll down a little bit, please.  Keep going.
11   Go to paragraph 9.  Stop right there.
12       Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, what does
13   Number 9 say on the proof of claim?
14       A.  9 --
15          MR. CHOUDHRI:  Time out.  Time out.  Before we
16   go there, Mr. Sather, would you scroll up just for a
17   second a little bit?  Stop right there.
18       Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, what does that
19   captioning say?  It starts at "24-10120."  Would you
20   read that, please, into the record?
21       A.  24-1010 (sic), and this is at Number 4?  Oops.
22   Sorry.  One second here.
23          MR. BALLASES:  Steve, would you mind -- this
24   is Michael Ballases.  Will you make it bigger?  I
25   can't read it on the screen.  Please.

1      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, my question is

2  to you.

3         MR. BALLASES:  Thank you.

4         MR. CHOUDHRI:  Stop, please.

5      Q.  (BY MR. CHOUDHRI)  What does it say?  Claim

6  Number -- what exactly does that say?  Would you read

7  that -- that entire header --

8      A.  (Reading:)  Read the --

9      Q.  -- into the record?

10      A.  (Reading:)  Read the instructions before

11  filling out this form.  This form is for making a --

12      Q.  No --

13      A.  (Reading:)  -- claim for payment in a

14  bankruptcy case --

15      Q.  No.

16      A.  Which one?

17      Q.  No, Mr. Khawaja.  No, Mr. Khawaja.  Look on

18  top where it says -- where it has a case number,

19  starts off with a case number.  And then --

20      A.  Yes.

21      Q.  -- that's what -- would you read what's

22  highlighted, Mr. Khawaja, into the record?

23      A.  Yeah, twenty -- okay.  (Reading:)

24  24-10120-smr, Claim Number 9-1, filed 06/04/24, Main

25  Document page 1 of 3.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                              148

1    Q.  Yes.  Is that what you authorized to be filed?

2    A.  Yes.

3        MR. BALLASES:  Objection.  Form.

4        MR. CHOUDHRI:  Scroll down, Mr. Sather.

5   Scroll down, Mr. Sather.  Okay.  Stop right there.

6    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, what does it

7   say on paragraph 9?

8    A.  (Reading:)  Is all or part of the claim

9   secured?  Yes.  The claim is secured by a lien on

10  property.

11       Is that what you're referring to?

12   Q.  Yes.

13       MR. CHOUDHRI:  Stop right there.

14   Q.  (BY MR. CHOUDHRI)  So it's your contention

15  that your claim is secured by a lien on the property;

16  is that correct?

17   A.  I believe so, if that's what we filed.

18   Q.  Okay.  And you understand -- at least what

19  you're representing here is that a lis pendens is a

20  lien on property; correct?

21   A.  I'm assuming that's what we're referring to,

22  yes.

23   Q.  Okay.  Mr. Khawaja, you're familiar with the

24  property Texas REIT that --

25   A.  Yes.

1    Q.  Let me strike that.  Let me strike that.  It's

2  a bad question.  Let me clear the record here.  Okay?

3        Mr. Khawaja, you're aware that debtor, Texas

4  REIT, LLC, is in the Western District of the

5  Bankruptcy Court.

6        MR. BALLASES:  Objection.  Form.

7    A.  I guess.  I mean, that's -- if that's where

8  you chose to file it.  I'm not sure.

9    Q.  (BY MR. CHOUDHRI)  You understand --

10       A.  The property's located here in Houston, Harris

11  County.

12       Q.  So my question, Mr. Khawaja, is that you are

13  aware that Texas REIT is the debtor that's in

14  bankruptcy in the Western District.

15       A.  Yes.

16       Q.  And Texas REIT owns a property.  Are you

17  familiar with the property that Texas REIT owns?

18       A.  Yes.

19       Q.  What do you know about the property that Texas

20  REIT owns?

21        MR. BALLASES:  Objection.  Form.

22       A.  That you have defrauded your partners out of

23  money in that property, that it's -- Walgreens left.

24  It's falling apart; a lot of homeless, a lot of crack

25  addicts in the area now.  It's not maintained

1    properly.  It's part of this case, that there's a

2    judgment against you on it, and it's basically -- and

3    it's in Houston, yeah.  It's in Houston, Texas, too.

4        Q.  Anything else that you want to add to it?

5        A.  No, that's it.

6        Q.  When did you become familiar with this

7    property?

8        A.  I think in the course of just monitoring

9    litigation against you.

10       Q.  And remind me what kind of lawyer you are,

11   Mr. Khawaja.

12           MR. BALLASES:  Objection.  Form.

13       A.  I do plaintiff's work.

14       Q.  (BY MR. CHOUDHRI)  Is that personal injury

15   mainly, what your --

16       A.  Yes.

17       Q.  -- focus is?

18       A.  Yes, correct.

19       Q.  Personal injury attorney?

20       A.  Yes, correct.

21           MR. BALLASES:  Objection.  Form.

22       Q.  (BY MR. CHOUDHRI)  And, Mr. Khawaja, so you

23   became familiar with this property through the course

24   of litigation, you said?

25       A.  Yes, just monitoring litigation.

OMAR KHAWAJA                                           September 11, 2024
TEXAS REIT LLC                                                        151

1      Q.  When did you first become familiar with this

2   property?

3      A.  I couldn't say --

4         MR. BALLASES:  Objection.  Form.

5      A.  I couldn't say when.

6      Q.  (BY MR. CHOUDHRI)  Were you involved in any

7   way, shape, or form of filing any lis pendenses (sic)

8   on this property?

9      A.  No.

10        MR. BALLASES:  Objection.  Form.

11     Q.  (BY MR. CHOUDHRI)  You've never been involved

12  of filing any lis pendenses on this property?

13     A.  You mean --

14        MR. BALLASES:  Objection.  Form.

15     A.  You mean other than the one that's in this --

16  or is part of the bankruptcy case?

17     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, my question is

18  very simple.  Are you or have you ever been involved

19  in filing, directly or indirectly, lis pendenses

20  against the property that the debtor owns?

21     A.  Not to my -- not to my understanding, no.

22        MR. BALLASES:  Objection.  Form.

23     A.  I'm not sure what that has to do with the

24  scope of this deposition either, by the way.

25     Q.  (BY MR. CHOUDHRI)  Do you know what a

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                 152

1    bankruptcy stay is, Mr. Khawaja?  Do you know what an

2    automatic --

3        A.  Yes.

4        Q.  -- stay is?

5        A.  Yes.

6            THE REPORTER:  I'm sorry.  Do you know what

7    a --

8            MR. BALLASES:  Objection.  Form.

9            THE REPORTER:  -- what is?  I'm sorry.  Mr. --

10           MR. CHOUDHRI:  An automatic -- an automatic

11   stay.

12           THE REPORTER:  Okay.  Thank you.

13       A.  You have more experience than I do on that,

14   but I do know what it is, yes.

15       Q.  (BY MR. CHOUDHRI)  Have you violated any

16   automatic stays?

17           MR. BALLASES:  Objection.  Form.

18       A.  No, absolutely not.

19       Q.  (BY MR. CHOUDHRI)  Do you believe filing --

20   okay.  Who is Hira Azhar?

21           MR. BALLASES:  Objection.  Form.  And instruct

22   the client not to answer --

23           THE WITNESS:  (Unintelligible)

24           MR. BALLASES:  -- because it has nothing to

25   do --

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    153

1      A.  It's not --

2          MR. BALLASES:  -- with our proof of claim or

3    the withdrawal of it, and it exceeds the judge's

4    limitations on this depo.  So I'm going to object to

5    the question as harassing and oppressive and instruct

6    the client not to answer.

7          THE WITNESS:  Thank you.

8      Q.  (BY MR. CHOUDHRI)  Did you participate with

9    Hira Azhar of filing a lis pendens against the subject

10   property?

11         MR. BALLASES:  Same objection, same assertions

12   of privilege, same assertions of -- same objections

13   and same instruction not to answer.

14     Q.  (BY MR. CHOUDHRI)  You can answer,

15   Mr. Khawaja.  What's your answer?

16     A.  I will not answer on advice of counsel.

17     Q.  Are you aware of any lis pendenses filed by

18   Hira Azhar against the debtor's property?

19         MR. BALLASES:  Objection.  Same objections,

20   same assertions of privilege, same instruction not to

21   answer.  This has nothing to do with the proof of

22   claim in this matter or the reason for withdrawal.

23     A.  I'm not going to answer.

24     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, has it been

25   your motivation to prevent me or any of my entities

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                 154

1   from transacting business?

2        MR. BALLASES:  Objection.  Form.

3     A.  No.

4     Q.  (BY MR. CHOUDHRI)  Is it your -- is it your

5   habit to contact people that me or my entities are

6   doing business with and tell them not to do business

7   with me?

8     A.  Never --

9        MR. BALLASES:  Objection.  Form.

10    A.  Never done that.

11       MR. BALLASES:  Can we please ask questions

12   about the purpose for the deposition today, the reason

13   for the filing of the proof of claim and the reason

14   for the withdrawal, sir?

15       MR. CHOUDHRI:  Mr. Ballases, stop wasting

16   time.  Keep it to objections.

17    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, do you -- what

18   is your phone number?

19       MR. BALLASES:  Object -- don't answer that.

20   Objection --

21    Q.  (BY MR. CHOUDHRI)  Your cell --

22    A.  You know my number.  You've called me.

23       MR. BALLASES:  Objection.  Stop.  Stop.

24       I'm going to instruct you not to answer.  Your

25   cell phone is not relevant to this proceeding today.

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                      155

1  You don't need to give it on the record.

2          It's oppressive -- objection of oppressive and

3  harassing.

4     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, are you not

5  gonna answer the question about what your cell phone

6  is on the record today --

7     A.  Correct.

8     Q.  You refuse to answer --

9     A.  Yeah, on advice of counsel --

10         THE REPORTER:  I'm sorry --

11    A.  On advice of counsel --

12         THE REPORTER:  Just --

13    A.  On advice of counsel --

14         THE REPORTER:  -- one person --

15         THE WITNESS:  Sorry.

16         THE REPORTER:  -- at a time, please.  Thank

17  you.

18         THE WITNESS:  On answering the question that

19  Mr. Choudhri just asked, on advice of counsel, I will

20  not answer that question.

21    Q.  (BY MR. CHOUDHRI)  Isn't it true that you've

22  been involved with over 50 lis pendenses relating to

23  Texas REIT or any other entity that I have ownership

24  or control of?

25    A.  No --

1         MR. BALLASES:  Objection.  Form.

2     A.  -- not true.

3     Q.  (BY MR. CHOUDHRI)  You have not participated

4  in any slander of title or fraudulent liens or

5  lis pendenses on any properties that Texas REIT or I

6  own or control.

7         MR. BALLASES:  Objection.  Form.

8     A.  Correct.

9     Q.  (BY MR. CHOUDHRI)  You've not participated or

10  been involved with any filing of any lis pendenses

11  relating to the debtor's property.

12     A.  That's correct.

13         MR. BALLASES:  Objection.  Form.

14         Are you referring to -- aside from the lis

15  pendens filed --

16         MR. CHOUDHRI:  Sir -- no, Mr. Ballases.  Stop.

17  Stop.  Stop coaching the witness.

18         I'm going to object to you, your sidebar.

19         You're continually coaching the witness.

20  Please stop.

21     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, do you use --

22         MR. BALLASES:  (Unintelligible)

23     Q.  (BY MR. CHOUDHRI)  -- text messaging as a form

24  of communication --

25         (Crosstalk)

1    THE REPORTER:  Sorry.  I'm sorry.  I'm getting

2  two speakers again.

3    MR. BALLASES:  Sure.  I just -- I'm just

4  trying to help Mr. Choudhri answer questions --

5    MR. CHOUDHRI:  No, please don't help.

6    MR. BALLASES:  -- on our --

7    MR. CHOUDHRI:  Please don't help me.  I don't

8  need your help, Mr. Ballases.  Please stop talking.

9  Object and limit your objections.  Stop talking.

10    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, do you use

11  text messaging as a form of communication?

12    MR. BALLASES:  Objection.  Form.

13    A.  Occasionally, sure.  I think we all do.

14    Q.  (BY MR. CHOUDHRI)  Have you texted Wayne

15  Dolcefino?

16    A.  No.

17    MR. BALLASES:  Objection.  Form.

18    Q.  (BY MR. CHOUDHRI)  Have you received any text

19  messages from Wayne Dolcefino?

20    A.  No.

21    MR. BALLASES:  Objection.  Form.

22    Q.  (BY MR. CHOUDHRI)  What's your answer,

23  Mr. Khawaja?

24    A.  No.

25    MR. BALLASES:  Objection.  Form.

1    Q.  (BY MR. CHOUDHRI)  Have you ever paid Wayne

2   Dolcefino directly or indirectly, in any way?

3        MR. BALLASES:  Objection.  Form.

4    A.  (Unintelligible) no.

5        MR. BALLASES:  I'm going to -- your answer is

6   what?

7        THE WITNESS:  My answer is no.

8        MR. BALLASES:  The answer is no, but I'm going

9   to instruct him not to answer any more questions that

10   have nothing to do with the scope and purpose of this

11   deposition pursuant to the judge's instruction.

12        MR. CHOUDHRI:  Stop frivolously objecting,

13   Mr. Ballases.  He said he learned based on Wayne

14   Dolcefino's videos, so I definitely have an

15   opportunity to get into the line of questions that I

16   need to get into, and you're going to continue to

17   object and instruct him not to answer.  Is that what

18   you're going to say on the record?

19        MR. BALLASES:  Objection.  Sidebar.

20    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, just so the

21   record is clear, you have not ever, in any way, shape,

22   or form, paid Wayne Dolcefino any amount of money or

23   consideration?

24    A.  I'm not answering that question.

25        MR. BALLASES:  Objection.  Form.

1        I'm going to instruct the client --

2        MR. CHOUDHRI:  I --

3        MR. BALLASES:  -- not to answer because it is

4   oppressive and harassing and has nothing to do with

5   the limited scope of the deposition, and he's already

6   answered it.

7        Move along.

8     Q.  (BY MR. CHOUDHRI)  Are you not going to answer

9   any questions relating to Wayne Dolcefino?

10     A.  That means, yes, I'm not going to answer any

11   questions relating to Wayne Dolcefino.  He has nothing

12   to do with this case at all.

13     Q.  Well, can I ask you why?  When Ms. Hood was

14   asking you, you mentioned that you -- you mentioned

15   Wayne Dolcefino and how you --

16     A.  He --

17        MR. BALLASES:  Objection.  Form.

18        (Crosstalk)

19        THE REPORTER:  I'm sorry.  One at a time,

20   please.

21        THE WITNESS:  I'm sorry.  Go ahead.

22        MR. BALLASES:  Objection.  Form, for the

23   record.

24     A.  Well, can I answer?  You asked very -- she

25   asked me very specifically where did I learn about the

1  potential for the claims that -- the basis of the

2  claims that we filed against you in this case, and I

3  answered, Through multiple sources, including Wayne

4  Dolcefino.  That's a factual answer.

5      Q.  (BY MR. CHOUDHRI)  And have you paid Wayne

6  Dolcefino any amount of money --

7          MR. BALLASES:  Objection.  Form.

8      Q.  (BY MR. CHOUDHRI)  -- or consideration,

9  directly or indirectly --

10          (Crosstalk)

11          MR. BALLASES:  -- (unintelligible) not to

12  answer your question.

13          MR. CHOUDHRI:  Mr. Ballases --

14          THE REPORTER:  I'm --

15          MR. CHOUDHRI:  Mr. Ballases, would you please

16  let the court reporter take her turn -- please take

17  turns.  When I'm asking the question, wait till my

18  question is over before you need to --

19          MR. BALLASES:  So you've asked -- you've asked

20  this question three times, and he's answered it three

21  times.  And all three times, I've told him -- I've

22  objected and told him not to answer.  So you don't

23  need to ask it a fourth time.

24          It's on the record clear.  I know you're not

25  an attorney, and you're not familiar with this, but

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                            161

1   it's on the record and it's clear, I promise.  Move

2   along.

3       Q.  (BY MR. CHOUDHRI)  So the record is clear,

4   when I've asked you, Have you been -- have you paid

5   Wayne Dolcefino any amount of money, directly or

6   indirectly, or any consideration, your answer is:  I'm

7   not going to answer that question.  Is that -- is that

8   clear --

9           MR. BALLASES:  Objection --

10      Q.  (BY MR. CHOUDHRI)  -- for the record?

11          MR. BALLASES:  Objection.  Form.  I've --

12      A.  I'm not going to answer that question.

13          MR. BALLASES:  -- objected --

14      A.  I've already asked it -- answered.

15          MR. BALLASES:  -- to the form.  It's

16  oppressive and harassing.  The client's already

17  answered it.  I'm instructing him not to answer

18  because it's exceeding the scope of the deposition,

19  and it's oppressive and harassing, and it's asked and

20  answered.

21          Did you hear me, Mr. Choudhri?

22          MR. CHOUDHRI:  Mr. Ballases, throughout today,

23  you have been frustrating this deposition.

24          MR. BALLASES:  Objection.  Sidebar.

25          MR. CHOUDHRI:  You have been disrupting -- so

OMAR KHAWAJA                                  September 11, 2024
TEXAS REIT LLC                                                162

1   please refrain from your -- your sidebar and your

2   objections.  Limit to your objections as form.

3      Q.  (BY MR. CHOUDHRI)  So, Mr. Khawaja --

4         MR. BALLASES:  Objection.  Sidebar.

5      Q.  (BY MR. CHOUDHRI)  -- have you paid --

6   Mr. Khawaja, have you paid -- no, let me back up.

7         Mr. Khawaja, who is Wayne Dolcefino?  What

8   does he do?

9         MR. BALLASES:  Objection --

10     A.  I'm not going to answer these questions.

11        MR. BALLASES:  Objection.  Form.

12     A.  I'm sorry.  You've got to move on to the

13  claim -- claim questions, Ali, or we're gonna end

14  this.

15     Q.  (BY MR. CHOUDHRI)  So, Mr. Khawaja, are you

16  going to tell me that you're not going to describe --

17     A.  Yes.

18     Q.  -- who Wayne --

19     A.  I'm not going to.

20     Q.  -- Dolcefino is, and you're not --

21     A.  Correct.

22        MR. BALLASES:  Objection.  Form.

23        I'm going to instruct him not to answer

24  because your questions are oppressive and harassing,

25  and they exceed the scope of the limited deposition.

1        I'm instructing him not to answer.  I'm doing

2   it, Mr. Ballases.

3        Q.  (BY MR. CHOUDHRI)  Are you taking his

4   instructions and not answering any questions as it

5   relates to Wayne Dolcefino, Mr. Khawaja?

6        A.  Yes, sir.  Yes.  I'm not.  I will follow

7   advice of counsel.

8        Q.  Who is Chris Wyatt, Mr. Khawaja?

9        A.  Again, that has nothing to do with this case.

10       Q.  So Chris Wyatt has nothing to do with this

11   case.  So -- I want the record clear.

12       A.  I -- Chris Wyatt is a witness, and he is a --

13   he was your former chief financial officer, and that's

14   how I know him -- or chief operating officer.

15       Q.  Has he ever given you documents from the

16   Jetall server?

17       A.  From the Jetall server?  I don't -- I don't

18   know that.  I don't know the answer to that question.

19       Q.  Has Mr. Wyatt --

20       A.  I don't know what the Jetall server is.

21       Q.  Has Mr. Wyatt ever given you any documents?

22       A.  No.

23       Q.  Mr. Chris Wyatt has never given you any

24   documents; that's a true statement?

25       A.  I cannot discuss anything pertaining to Chris

1    Wyatt because of attorney-client privilege, so we're

2    not talking about Chris Wyatt.

3        Q.  What is the privilege, Mr. Khawaja, with you

4    and Chris Wyatt?

5        A.  Attorney-client privilege.

6        Q.  Is Chris Wyatt an attorney?

7        A.  No, no.  I'm the attorney; he's the client.

8    He sought counsel from me, which I provided,

9    pertaining to this case, and I will not discuss

10   anything further regarding him.

11       Q.  Pertaining to this case, the case we're here

12   for today.

13       A.  No, pertaining to other matters involving you

14   and him.

15       Q.  So Chris Wyatt is your client; is that

16   correct?

17       A.  Yes.

18           MR. BALLASES:  Objection --

19       Q.  (BY MR. CHOUDHRI)  And Hira Azhar is your

20   client; correct?

21       A.  Yes.

22       Q.  And Azeemah Zaheer is your client; correct?

23       A.  Yes.

24           MR. BALLASES:  Objection.  Form.

25       Q.  (BY MR. CHOUDHRI)  And Osama -- and Osama

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    165

1    Abdullatif is your client; correct?

2        A.  Yes.

3           MR. BALLASES:  Objection.  Form.

4        Q.  (BY MR. CHOUDHRI)  Is David Tang your client?

5        A.  No.

6           MR. BALLASES:  Objection.  Form.

7        A.  He's just a friend.

8        Q.  (BY MR. CHOUDHRI)  Is Rodney Drinnon your

9    client?

10          MR. BALLASES:  Objection.  Form.

11       A.  No.

12       Q.  (BY MR. CHOUDHRI)  Is Harold Polk --

13       A.  He's an attorney.

14       Q.  -- your client?  Is Harold Polk your client?

15          MR. BALLASES:  Objection.  Form.

16       A.  No, he's not.

17       Q.  (BY MR. CHOUDHRI)  Harold Polk is not your

18   client.

19       A.  Correct.

20          MR. BALLASES:  Objection.  Form.

21       Q.  (BY MR. CHOUDHRI)  How did you meet Chris

22   Wyatt?

23          MR. BALLASES:  Objection.  Form.

24       A.  Yeah, I can't talk about that.  I'm sorry.

25       Q.  (BY MR. CHOUDHRI)  Why can't you talk about

1   how you met Chris Wyatt?

2       A.  That's protected.

3       Q.  By what?

4       A.  Attorney-client privilege.

5       Q.  Are you refusing to answer when you met Chris

6   Wyatt?

7       A.  Yes.

8       Q.  When did the attorney-client privilege start

9   with Chris Wyatt?

10          MR. BALLASES:  Objection.  Form.

11      A.  Since I met him.

12      Q.  (BY MR. CHOUDHRI)  And when did you meet him?

13          MR. BALLASES:  Objection.  Form.

14      A.  Sometime after he left your employment.

15      Q.  (BY MR. CHOUDHRI)  You never met him while he

16  was employed as a paralegal for me?

17      A.  No.

18          MR. BALLASES:  Objection.  Form.

19      Q.  (BY MR. CHOUDHRI)  You never saw him come to

20  court in the divorce case when you were representing

21  the -- Hira Azhar?

22          MR. BALLASES:  Objection.  Form.

23      A.  No, I didn't, actually, to be honest with you.

24  No.

25      Q.  (BY MR. CHOUDHRI)  And you're not aware that

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                    167

 1  Chris Wyatt worked on the case that Jetall has against

 2  Khawaja?

 3      A.  No --

 4         MR. BALLASES:  Objection.  Form.

 5      A.  -- I'm not aware of that.

 6      Q.  (BY MR. CHOUDHRI)  You're not aware of that --

 7      A.  If he --

 8      Q.  -- is that correct?

 9      A.  Correct.  If he did, he never discussed it

10  with me.

11      Q.  So you're not aware that Chris Wyatt did legal

12  work for me while he was employed for me.

13         MR. BALLASES:  Objection.  Form.

14      A.  No.

15      Q.  (BY MR. CHOUDHRI)  Isn't it true that Jetall

16  Companies has a judgment against Khawaja?

17         MR. BALLASES:  Objection.  Form.

18      A.  "Against Khawaja," what does that mean?

19      Q.  (BY MR. CHOUDHRI)  Against Khawaja Partners.

20      A.  Possibly.

21         MR. BALLASES:  Objection.  Form.

22      Q.  (BY MR. CHOUDHRI)  And that judgment has not

23  been appealed and not been superceded.

24      A.  Yes.

25      Q.  Is that one --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                     168

1          MR. BALLASES:  Objection.  Form.

2       Q.  (BY MR. CHOUDHRI)  -- of your motivations,

3   Mr. Khawaja?

4          MR. BALLASES:  Objection.  Form.

5       A.  No.

6       Q.  (BY MR. CHOUDHRI)  So Jetall owns an asset --

7   Jetall Companies owns an asset, and that's a judgment

8   against Khawaja Partners; correct?

9          MR. BALLASES:  Objection.  Form.

10       A.  I don't know if Jetall owns an asset or --

11   Jetall doesn't seem to be doing too well right now.

12       Q.  (BY MR. CHOUDHRI)  And how do you know that?

13          MR. BALLASES:  Objection.  Form.

14       A.  I mean, there was a great article about you

15   the other day in The Real Deal.  I don't know if you

16   saw that.

17       Q.  (BY MR. CHOUDHRI)  Have you spoken to The Real

18   Deal?

19       A.  I haven't --

20          MR. BALLASES:  Objection.  Form.

21       A.  -- but I read that article.

22          THE REPORTER:  Sorry --

23       A.  It's not a good look.

24       Q.  (BY MR. CHOUDHRI)  You haven't spoken --

25          THE REPORTER:  Sorry.  Sorry.  Just one at a

1   time, please.  Thank you.

2       A.  I haven't, no.

3       Q.  (BY MR. CHOUDHRI)  Has anybody on your behalf,

4   indirectly or directly, spoken to The Real Deal?

5          MR. BALLASES:  Objection.  Form.

6       A.  No, but a lot of people sent me that article,

7   like real estate -- people in real estate, legal.  A

8   lot of people sent it to me.

9       Q.  (BY MR. CHOUDHRI)  And Chris Wyatt testified

10  at the that hearing; correct?

11         MR. BALLASES:  Objection.  Form.

12      A.  I don't --

13         MR. BALLASES:  What hearing are you talking

14  about, sir?  I mean, come on.

15         MR. CHOUDHRI:  Mr. Ballases --

16      A.  You're all over the place.

17         MR. CHOUDHRI:  -- can you --

18      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, The Real Deal

19  quotes an order and mentions Chris Wyatt.

20         MR. BALLASES:  Objection.  Form.

21      A.  Okay.  Anything else you want to share with me

22  about the article?  I mean, that's fine.

23      Q.  (BY MR. CHOUDHRI)  And so have you paid Chris

24  Wyatt any money?

25      A.  No.

1          MR. BALLASES:  Objection.  Form.

2      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you had

3   mentioned that you're in the business of buying

4   judgments.  Do you recall that line of testimony

5   earlier?

6      A.  Yes.

7      Q.  And you've bought less than ten judgments; is

8   that correct?

9      A.  I think so.

10      Q.  And your answers earlier were -- and I just

11   want to make sure the record is clear --

12          MR. BALLASES:  Objection.  Sidebar.

13      Q.  (BY MR. CHOUDHRI)  -- that the only --

14   Mr. Khawaja, are you done looking at your phone?

15      A.  Yes.  Sorry.  Go ahead.

16          MR. CHOUDHRI:  Just for the record, throughout

17   the deposition, Mr. Khawaja has been continuing to

18   look at his phone and make communications with other

19   people in the room and has constantly looked at his

20   phone throughout the entire duration of this

21   deposition.

22      Q.  (BY MR. CHOUDHRI)  So, Mr. Khawaja, I just ask

23   you to please refrain from looking at your phone.

24   Okay?

25          MR. BALLASES:  Objection.  Sidebar.

1          Don't instruct my client anything, and you are

2    incorrect with your assertions.

3          MR. CHOUDHRI:  Mr. Ballases, please stop

4    talking.

5       Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, can you please

6    stop looking at your phone?

7          MR. BALLASES:  Objection.  Sidebar.

8       A.  I've got a sick relative in the hospital right

9    now.  That's what I'm worried about, so...

10      Q.  (BY MR. CHOUDHRI)  Well, I'm sorry about your

11   relative.  I hope they get better.

12         Mr. Khawaja, which judgments -- strike that.

13         Mr. Khawaja, it's your contention that any

14   entity that I -- at least if I heard your testimony

15   correctly earlier, that any entity that Ali Choudhri

16   has ownership or control in is an alter ego.  Is that

17   your contention --

18      A.  Of Ali --

19      Q.  -- Mr. Khawaja?

20      A.  Yes, it is.

21         MR. BALLASES:  Objection.  Form.

22      Q.  (BY MR. CHOUDHRI)  So any entity that Ali

23   Choudhri has any ownership or control of is an alter

24   ego of Ali Choudhri; correct?

25      A.  I believe that -- I believe that to be the

OMAR KHAWAJA                                                September 11, 2024
TEXAS REIT LLC                                                         172

1  case, yes.

2      MR. BALLASES:  Objection.  Form.

3      Q.  (BY MR. CHOUDHRI)  Okay.  Mr. Khawaja, which

4  judgments have you acquired?

5      MR. BALLASES:  Objection.  Form.

6      A.  You mean other than yours?  Other than the

7  Jetall judgments?

8      Q.  (BY MR. CHOUDHRI)  Again, Mr. Khawaja --

9      A.  Are you there?

10     Q.  -- I believe your answers earlier were that

11  you have not acquired any judgments other than

12  judgments relating to Jetall or Ali Choudhri.

13     A.  I think that's --

14     Q.  Is that true?

15     A.  -- correct.  That's true.

16     MR. BALLASES:  Objection.  Form.

17     Q.  (BY MR. CHOUDHRI)  So what I want to do is I

18  want to go down, because your contention is Texas REIT

19  is an alter ego of Ali Choudhri; correct?

20     A.  Yes.

21     MR. BALLASES:  Objection.  Form.

22     Q.  (BY MR. CHOUDHRI)  So basically what you're

23  saying is any obligations of Ali Choudhri or any of

24  Ali Choudhri's entities are the obligations of Texas

25  REIT; is that correct?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    173

1      A.  Yes.  That's correct, yes.

2      Q.  So it's just basically one big pot.

3      A.  That's the way you've treated them, yes.

4      Q.  And that's your contention, and that's the --

5      A.  I believe the evidence will show that.  Yes.

6      Q.  And outside what's in your pleading, you don't

7   have any other evidence that --

8         MR. BALLASES:  Objection.  Form.

9      A.  Well, we've got to do discovery -- we have to

10  do discovery, sir, which you're obstructing, but yes.

11     Q.  (BY MR. CHOUDHRI)  Okay.  So the record is

12  clear, outside your pleading, there's no other

13  evidence other than the discovery you're yet to do.

14        MR. BALLASES:  Objection.  Form.

15     Q.  (BY MR. CHOUDHRI)  Is that correct?

16     A.  We're in the -- we're in the middle of

17  discovery.

18        MR. BALLASES:  Objection.  Form.

19     Q.  (BY MR. CHOUDHRI)  Is that correct?

20        MR. BALLASES:  Objection.  Form.

21     A.  Outside the pleading?  The pleading contains a

22  lot of evidence.  I don't know if you've seen the

23  attachments or not, but there's a lot.  There's a lot

24  more that will have to be done.

25     Q.  (BY MR. CHOUDHRI)  And so you're refusing to

1   answer any questions relating to Chris Wyatt; correct?

2     A.  Yes.

3        MR. BALLASES:  Objection.  Form.

4     A.  That's -- that encompasses attorney-client

5   privilege.  Correct.

6     Q.  (BY MR. CHOUDHRI)  So anything I would ask you

7   today about Chris Wyatt, you would refuse to answer.

8     A.  That's correct.

9        MR. BALLASES:  Objection.  Form.

10    Q.  (BY MR. CHOUDHRI)  Who drafted the affidavit

11  that was attached to the petition that's attached to

12  this proof of claim that Chris Wyatt signed?

13       MR. BALLASES:  Objection.  Form.

14    A.  I have no idea.

15    Q.  (BY MR. CHOUDHRI)  You don't know --

16    A.  It wasn't me.

17    Q.  -- who drafted -- it wasn't you.  Was it

18  Mr. Ballases?

19       MR. BALLASES:  Objection.  Form.

20       Instructing not to answer.  It violates

21  attorney work product, attorney-client privilege.

22    A.  I'm not answering on advice of counsel.

23    Q.  (BY MR. CHOUDHRI)  Does Mr. Ballases or Hoover

24  Slovacek represent Chris Wyatt?

25    A.  I don't think so.

1    Q.  Does Ashish Mahendru represent Chris Wyatt?

2        MR. BALLASES:  Objection.  Form.

3    A.  I don't know.  I mean, ask Ashish.

4    Q.  (BY MR. CHOUDHRI)  Did you refer Chris Wyatt

5   to Ashish Mahendru?

6        MR. BALLASES:  Objection.  Form.

7    A.  I mean, again, I just told you I'm not

8   answering any questions about Chris Wyatt.

9    Q.  (BY MR. CHOUDHRI)  So can you explain to me

10  why the adversary where you claim alter ego and

11  fraudulent transfer has an attachment of Chris Wyatt

12  as a declaration?

13    A.  I mean, he had some evidence that you are an

14  alter ego, that you have alter egos that operate under

15  you, so he provided it.  It's evidence.

16    Q.  Do you hold any -- do you hold any contingency

17  claims or rights of any adverse parties to Ali

18  Choudhri or any of his related entities?

19        MR. BALLASES:  Objection.  Form.

20    A.  Do I hold any -- I mean, if I did, it's

21  attorney-client privilege, so I'm not answering that.

22    Q.  (BY MR. CHOUDHRI)  So any contingency claims

23  you hold against --

24    A.  Right.

25    Q.  -- Texas REIT or any other entity --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    176

1      A.  Yes.

2      Q.  -- or party relating to Ali Choudhri is --

3   you're not going to answer because it's

4   attorney-client privilege?

5      A.  Yes.

6         MR. BALLASES:  Objection.  Form.

7      A.  And outside the scope of what you're allowed

8   to ask me about.

9      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, do you have

10  surveillance on me or any of my entities or companies?

11        MR. BALLASES:  Objection.  Form.

12        I'm going to instruct you not to answer.  It's

13  harassing and oppressive.  It has nothing to do with

14  the limited scope of this deposition.

15     A.  I'm not answering that.

16     Q.  (BY MR. CHOUDHRI)  Do you have any agreement

17  with George Lee?

18        MR. BALLASES:  Objection.  Form.

19     A.  I don't.

20        MR. BALLASES:  It's not relevant to the

21  limited scope of this deposition; therefore, I'm going

22  to instruct him not to answer.

23     A.  I should be asking you that question.  It's

24  gonna come up in trial.

25     Q.  (BY MR. CHOUDHRI)  Do you have any text

1    messages between you and George Lee?

2        MR. BALLASES:  Object --

3    A.  No --

4        MR. BALLASES:  Objection.  Form.

5    A.  -- I'm not gonna talk about that.

6        MR. BALLASES:  And I'm going to instruct

7    him not to --

8    A.  It has nothing to do with this.

9        MR. BALLASES:  I'm going to instruct you not

10   to answer.  It violates the scope of this deposition

11   that the judge indicated.  It's harassing and

12   oppressive.  This isn't a free-for-all discovery.

13       THE WITNESS:  Yeah.

14       MR. BALLASES:  It's just about why the proof

15   of claim was filed or why it's being withdrawn.

16   Q.  (BY MR. CHOUDHRI)  So is it your contention

17   that you have information you've received from Chris

18   Wyatt that has to do with the basis of your claim?

19       MR. BALLASES:  Objection.  Form.

20   A.  I mean, he provided an affidavit in this case,

21   so...

22   Q.  (BY MR. CHOUDHRI)  So again, when did he

23   become your client, and when did you establish that

24   attorney-client privilege?

25       MR. BALLASES:  Objection.  Form.

OMAR KHAWAJA                                  September 11, 2024
TEXAS REIT LLC                                              178

1      A.  I'm not sure when.

2      Q.  (BY MR. CHOUDHRI)  Do you have text messages

3   between you and Chris Wyatt?

4         MR. BALLASES:  Objection.  Form.

5      A.  I mean, if I did, I wouldn't disclose them to

6   you, and nor would a court compel me to.  It's

7   attorney-client privilege.

8      Q.  (BY MR. CHOUDHRI)  Well, here's the thing,

9   Mr. Khawaja.  Here's the thing.  There's something

10  called a privilege log, right?  I'm entitled to know

11  if you have communications.  I'm not asking you --

12        MR. BALLASES:  Objection.  Sidebar.

13     Q.  (BY MR. CHOUDHRI)  -- about the content of

14  your communications.

15        MR. CHOUDHRI:  Mr. Ballases, please stop

16  interrupting.

17     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, I'm not asking

18  you about the contents of your --

19        MR. BALLASES:  (Unintelligible)

20     Q.  (BY MR. CHOUDHRI)  Let me finish my question

21  before you answer.  Okay?

22        I'm asking you not about -- so we're very

23  clear, I'm not eliciting or asking you for privileged

24  information.  I'm asking you if there are

25  communications, not the contents.  Do you have --

1    A.  Even if it existed --

2    Q.  -- communications with Chris -- can I finish?

3        Do you have communications with Chris Wyatt,

4  yes or no?

5        MR. BALLASES:  Objection.  Form.

6    A.  Even if it existed, I would not disclose that

7  to you, nor would I be compelled to, nor is it a part

8  of this case.

9    Q.  (BY MR. CHOUDHRI)  So why are you adding the

10  declaration of Chris Wyatt as a part of this case?

11        MR. BALLASES:  Objection.  Form.

12    A.  It's evidence.

13    Q.  (BY MR. CHOUDHRI)  Well, do you understand

14  what a sword --

15    A.  It's evidence of the alter (unintelligible).

16    Q.  -- and shield is?

17        THE REPORTER:  I'm sorry --

18    Q.  (BY MR. CHOUDHRI)  It's evidence of the alter

19  ego?

20        I'm sorry.  Finish your question -- your

21  answer, Mr. Khawaja.  It's --

22    A.  It's evidence --

23    Q.  -- evidence of what?

24    A.  -- of the alter ego.  It's evidence of the

25  alter ego.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                              180

1    Q.  So Chris Wyatt has evidence of the alter ego.

2  That's your answer?

3    A.  Yes.

4    Q.  And you're refusing to answer any questions

5  about Chris Wyatt.

6    A.  I'm not gonna talk about any attorney-client

7  privileged communications.  Correct.

8    Q.  So do you have any communications with Chris

9  Wyatt, yes or no?

10    MR. BALLASES:  Objection.  Form.

11    A.  I'm not gonna talk about it.

12    MR. BALLASES:  Objection.  Form.

13    MR. CHOUDHRI:  Mr. Ballases, being emphatic on

14  your objection doesn't change the objection.

15    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja --

16    MR. BALLASES:  Objection.  Sidebar.

17    Q.  (BY MR. CHOUDHRI)  -- are you refusing to --

18  are you refusing to answer the mere fact that

19  communications exist between you and Chris Wyatt?

20    MR. BALLASES:  Objection.  Form.

21    A.  I'm telling you that if they do exist -- I'm

22  not confirming that they do or don't, but they would

23  be privileged.  That's it.  And this is not the

24  case --

25    Q.  (BY MR. CHOUDHRI)  So how did --

OMAR KHAWAJA                                              September 11, 2024
TEXAS REIT LLC                                                           181

1       A.  This is not the case that you're going to get

2   any of that information.

3       Q.  Now, you'll agree with me that Chris Wyatt --

4   that in your petition in adversary that you've

5   attached to this proof of claim, you've attached a

6   declaration of Chris Wyatt, true or false?

7       A.  True.

8       Q.  And you're refusing to provide me any

9   communications or the fact that any communications

10  even exist between you and Chris Wyatt, true?

11          MR. BALLASES:  Objection.  Form.

12      A.  True.

13      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, would you

14  please stop looking at your phone?

15      A.  I'm not looking at my phone.  I'm looking at

16  the petition that you just asked me about, the

17  adversary.

18          MR. BALLASES:  Objection.  Sidebar.

19          Don't instruct my client again.

20      A.  This is the adversary petition I'm reading.

21      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, what

22  contingency claims, if any, do you hold, indirectly or

23  directly, against me or any of my entities?

24          MR. BALLASES:  Objection.  Form.

25      A.  Outside the scope of this discussion.  I'm not

1   answering.

2       Q.  (BY MR. CHOUDHRI)  So, Mr. Khawaja, it's your

3   contention that Texas REIT is an alter ego of every

4   one of those entities that I have interest in;

5   correct?  That's your contention.

6           MR. BALLASES:  Objection.  Form.

7       Q.  (BY MR. CHOUDHRI)  You're refusing to answer

8   what claims -- so is your statement or answer here,

9   under oath, that you're refusing to answer what

10  motivations and rights or claims or contingencies you

11  have against Texas REIT?  Now, when I --

12          MR. BALLASES:  Objection.  Form.

13      Q.  (BY MR. CHOUDHRI)  -- say "Texas REIT," that

14  applies to any and all entities that I have ownership

15  in, directly or indirectly; correct?

16      A.  Yes, based on alter ego.  Yeah, I'm not gonna

17  give you any -- whether I have any contingency-related

18  litigation against you on that.  If I do, you'll find

19  out about it at some point.

20      Q.  So you're refusing to disclose any claims you

21  have against the debtor.

22          MR. BALLASES:  Objection.  Form.

23      A.  Any claims I have against the debtor?  I don't

24  have any claims against the debtor other than the ones

25  I presented in this case.

1    Q.  (BY MR. CHOUDHRI)  So when you have

2  contingencies or claims against me, under your theory,

3  those would be claims against the debtor as well.

4        MR. BALLASES:  Objection.  Form.

5    A.  I don't know about that.

6    Q.  (BY MR. CHOUDHRI)  Do you use WhatsApp?

7    A.  Yes.

8        MR. BALLASES:  Objection.  Form.

9    Q.  (BY MR. CHOUDHRI)  Have you communicated --

10    A.  We're in some group -- we're in some groups

11  together on WhatsApp, I think.  Yes.

12    Q.  Mr. Khawaja, did you come to me for a job?

13        MR. BALLASES:  Objection.  Form.

14    A.  A job?  I'm not talking about that, no.

15    Q.  (BY MR. CHOUDHRI)  You never came to me for a

16  job.

17    A.  No.  Look, that's outside the scope of this

18  conversation.

19        MR. CHOUDHRI:  Mr. Osama Abdullatif needs to

20  stop talking in the background and coaching the

21  witness.

22        MR. BALLASES:  Objection.  Sidebar.

23        MR. CHOUDHRI:  Mr. Ballases, please stop.

24  Control Mr. Osama --

25        MR. BALLASES:  Objection.  Sidebar.

1        MR. CHOUDHRI:  -- (unintelligible) your

2   witnesses.

3      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja --

4        MR. BALLASES:  Objection.  Sidebar.

5      Q.  (BY MR. CHOUDHRI)  -- would you mind sharing

6   the camera around your office there?

7      A.  We're not gonna do that.

8      Q.  You're not gonna do that?  Okay.  You're

9   refusing to do that.

10        MR. BALLASES:  Objection.  Sidebar.

11        Objection.  Form.

12      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, did you ever

13   seek employment from Jetall Companies?

14        MR. BALLASES:  Objection.  Form.

15        I'm going to instruct the client not to

16   answer.  It's harassing and oppressive.  It exceeds

17   the limited scope of this deposition per the judge's

18   instructions.

19        Stop wasting time, sir.

20      Q.  (BY MR. CHOUDHRI)  You can answer,

21   Mr. Khawaja.

22      A.  On advice of counsel, I'm not gonna answer

23   that question.  Sorry.

24      Q.  Are you upset at Jetall Companies in any way,

25   shape, or form?

OMAR KHAWAJA                                                September 11, 2024
TEXAS REIT LLC                                                          185

1      A.  No.

2      Q.  Are you upset at Ali Choudhri in any shape,

3  way, or form?

4      A.  I mean, I want the money that I'm owed.  Just

5  pay me the money that you owe.  This will -- this will

6  go away.  It's nothing personal.

7      Q.  And how much money would it take to make this

8  go away?

9         MR. BALLASES:  Objection.  Form.

10         We're not -- I'm going to instruct my client

11  not to answer.  It has nothing do with the limited

12  scope of this deposition and exceeds what the judge's

13  orders were.

14      Q.  (BY MR. CHOUDHRI)  Are you going to answer the

15  question, Mr. Khawaja?

16      A.  I'm gonna follow the advice of counsel and not

17  answer.

18      Q.  So you say this is about money; Just pay me

19  the money you owe me, and I'll go away.  But you won't

20  tell me what that amount is.  Is that your answer?

21         MR. BALLASES:  Objection.  Form.

22      A.  Yeah, we're not --

23         MR. CHOUDHRI:  Is Osama Abdullatif --

24      A.  -- in a settlement --

25      Q.  (BY MR. CHOUDHRI)  No, this is not a

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                       186

1   settlement.  I'm asking you -- again, this is not

2   settlement discussion.  This is a deposition under

3   oath on the record.

4        I'm asking you a follow-up to your answer that

5   this is not personal; it's about money.  That's all

6   you want.  You want money, and you'll go away.  That's

7   what you said.  Did I hear -- did I hear your

8   answer --

9        MR. BALLASES:  Objection --

10   Q.  (BY MR. CHOUDHRI)  -- incorrectly, or do we

11   need the court reporter to repeat your answer?

12        MR. BALLASES:  Objection.  Form.

13        Objection.  Sidebar.

14   Q.  (BY MR. CHOUDHRI)  Are you answering the

15   question --

16   A.  You need to move along, sir.  I'm not going to

17   answer that question.

18        MR. CHOUDHRI:  Ms. Court Reporter, would you

19   read back his statement or his answer earlier:  This

20   is not personal; it's just money; if you pay me the

21   money you owe me, I'll go away.

22        Would you read that back into the record so

23   it's clear?  There's been a lot of objections, and

24   I've been distracted.

25        THE REPORTER:  I'll need a minute to go

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                            187

1   through and find that answer.

2        MR. CHOUDHRI:  Take your time.  No problem.

3        Mr. Khawaja is not on the screen any longer,

4   for the record.

5        MR. BALLASES:  Yeah, he is.

6        MR. CHOUDHRI:  Mr. --

7        THE REPORTER:  Sorry.  Just off the record.  I

8   just need to go off the record because I can't type

9   and look for the testimony at the same time.

10       MR. CHOUDHRI:  So why don't we take a five --

11       THE WITNESS:  Can you see me?

12       MR. CHOUDHRI:  I'll tell you what.  Why don't

13   we do this, Ms. Court Reporter.  It looks like we've

14   been going for a little bit here.  So it's 2:42.  Why

15   don't we come back in 15 minutes at 3:00.

16       MR. BALLASES:  No, we'll take a five-minute

17   break.

18       THE WITNESS:  We'll take a five-minute break,

19   and that's it.  We're done.

20       MR. CHOUDHRI:  Again, Mr. Khawaja, this is my

21   deposition.  I get to ask questions.  And with all due

22   respect, you really don't dictate the -- but if you

23   need to take a break, I'm happy to let you take a

24   break --

25       THE WITNESS:  I'll take a five-minute break,

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
188

 1  and that's it.

 2       No?  Okay.  No, we don't need a break.  Thank

 3  you.

 4       MR. CHOUDHRI:  So, Court Reporter, while

 5  you're looking for the answer, let's go and take a

 6  five-minute break.  We'll come back in five minutes.

 7  We're off the record.

 8       (A recess was taken.)

 9       THE REPORTER:  So we are back on the record.

10  And I just please ask everybody, in order to keep the

11  record clear, please, one speaker at a time.

12       And, Mr. Khawaja, if your counsel does have an

13  objection, just please allow him to make the objection

14  and then answer afterwards, just so I don't have both

15  of you speaking.  Thank you.

16       THE WITNESS:  All right.  Thank you.

17       MR. BALLASES:  So just for the record,

18  Ms. Court Reporter, we've looked at the live schedule

19  that was filed by the debtor under declaration of

20  penalty and was signed by Mr. Ali Choudhri, and it

21  does not list Mr. Choudhri as a debtor anywhere on

22  here, and therefore -- or excuse me -- as a creditor

23  anywhere on here.  And so, therefore, him not being a

24  creditor based upon his own sworn document, he has no

25  legal basis to continue to ask questions here today.

OMAR KHAWAJA                                         September 11, 2024
TEXAS REIT LLC                                                       189

1          So I'd like to have -- if Ms. Hood or

2    Mr. Sather have any more questions, I'd like to finish

3    it up.  Mr. Khawaja does have to go because he has a

4    relative who is probably passing away relatively soon

5    in the hospital.  We can then move on --

6          MR. CHOUDHRI:  So --

7          MR. BALLASES:  -- with the next deponents.

8          MS. HOOD:  So --

9          MR. CHOUDHRI:  So, Mr. Ballases --

10   Mr. Ballases, this is my deposition.  If you want --

11   if there is a life/death situation, I'm not -- I'm

12   happy to work with you and Mr. Khawaja on schedules.

13   I have no problem doing that.  Family's important.  So

14   if we need to reset this deposition to tomorrow or

15   another day, I'm happy to accommodate that.

16          But what I don't want to do is have you

17   control the deposition and who can ask questions and

18   who can't, because I'm in the middle of my questioning

19   of Mr. Ballases (sic).  So --

20          MR. BALLASES:  Okay.  So --

21          MR. CHOUDHRI:  -- let's continue on with the

22   questions.

23      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, are you ready

24   to answer more questions?

25          THE WITNESS:  What do you think, Michael?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    190

1         MR. BALLASES:  It's up to you.  If you've got

2    to go to the hospital, then --

3      A.  Okay.  I can go for a little bit longer.

4         MR. CHOUDHRI:  Okay.  Madam Court Reporter,

5    would you please read the answer back while we took a

6    break?

7         THE REPORTER:  Okay.  One second.  Okay.  So

8    the question and answer was (Reading:)  Question:  Are

9    you upset at Ali Choudhri in any way, shape, or form?

10        Answer:  I mean, I want the money that I'm

11   owed.  Just pay me the money that you owe.  This will

12   go away.  It's nothing personal.

13     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, did she read

14   your answer correctly and accurately?

15     A.  Yes.

16     Q.  And so to follow up on that answer, what is

17   the amount of the money that you claim you're owed?

18     A.  Well, there's a certain amount of -- there's a

19   certain amount that's claimed in the judgment that

20   probably has gone up since we filed it.  And, you

21   know, you can go through that.  Your attorney can

22   discuss that with my attorney if you want to make an

23   offer.  Someone will --

24     Q.  I'm not asking about a settlement,

25   Mr. Khawaja.  I'm just asking about how much money

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
191

1   you're owed, because I can go to the oral ruling

2   that -- from Judge Robinson about how you came up with

3   the number, how you calculated it, and what that

4   number is.  And that's what we're here today to ask

5   you questions about on your proof of claim.

6          So you said, Owe me -- pay me the money you

7   owe, so my question is --

8     A.  Right.

9     Q.  -- what are you claiming you're owed?

10    A.  Do you have a copy of the adversary?

11    Q.  Go ahead, Mr. Khawaja.  What is the amount of

12  money you're owed?  That's my question.  Do you know?

13    A.  Yeah, it's somewhere north of $500,000.  Give

14  me one second here.

15         The total amount is $4,847,894.68.

16    Q.  I'm sorry.  Would you repeat that again?  The

17  total amount that you're owed is what?

18    A.  $4,847,894.68.

19    Q.  Sorry.  There's somebody talking in the

20  background.  I think Osama's helping you and talking,

21  so --

22         MR. BALLASES:  Objection.  Sidebar.

23    Q.  (BY MR. CHOUDHRI)  So what is the total amount

24  that you need to be paid so you can go away?

25         MR. BALLASES:  Objection.  Form.

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                      192

1      A.  $4,847,894.68.

2      Q.  (BY MR. CHOUDHRI)  Okay.  Thank you for your

3    answer, Mr. Khawaja.

4         And you stand behind that number as being

5    truthful, accurate with all lawful offsets?

6      A.  I mean, I don't -- I don't know what that

7    means, but yeah, it's truthful, for sure.

8      Q.  Okay.

9      A.  There are no offsets.

10      Q.  There are no offsets?

11      A.  No.

12      Q.  Is that what you said?

13         Okay.  So there are no offsets; is that

14    correct?

15      A.  That's correct.

16      Q.  Okay.  Mr. Khawaja, is that the basis of -- so

17    let me just kind of set the table for a second.

18         So we said this earlier, and I just want to

19    make sure that I don't have to go through a list of,

20    you know, all these entities and all these other

21    parties.

22         So when we talk about Texas REIT, when you

23    answer the question that -- against Texas REIT, your

24    position is that any entity that I have ownership,

25    directly in or indirectly, is an alter ego of Texas

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                        193

1   REIT; correct?

2          MR. BALLASES:  Objection.  Form.

3      A.  Alter ego of Ali Choudhri.  Yes.

4      Q.  (BY MR. CHOUDHRI)  Okay.  So --

5      A.  And Jetall Companies.

6      Q.  -- that's the basis?

7          THE REPORTER:  I'm sorry?

8      Q.  (BY MR. CHOUDHRI)  And Jetall.  So when the --

9          THE REPORTER:  And who?  Sorry.

10         THE WITNESS:  Sorry.  Of Ali Choudhri and

11  Jetall Companies.

12         THE REPORTER:  Thank you.

13     Q.  (BY MR. CHOUDHRI)  And so that is the basis of

14  several lis pendenses that have been filed; is that

15  correct?

16     A.  I don't know about several.  There's one

17  that's filed in this case.

18     Q.  Well, if you contend that any and all

19  liabilities and assets of Texas REIT's are alter egos

20  of Ali Choudhri, you have -- in this adversary that is

21  the basis of your proof of claim -- back up.

22         This proof -- the adversary is the basis of

23  your proof of claim; correct?

24     A.  Yes.

25     Q.  So in that adversary, you have filed many lis

1　pendenses on various properties, true or false?

2　　A.　Yes.

3　　Q.　And what real property interest do you contend

4　that you own in any of these properties?

5　　A.　We're a judgment creditor.　So if you own it,

6　we own it.

7　　Q.　So it's your contention that -- again, I just

8　want to get the whole scope here.　It's your

9　contention that, based on the fact that you're a

10　judgment creditor, you have real property interest in

11　all these various properties, true or false?

12　　A.　Yes.

13　　Q.　Is that true?

14　　A.　True.

15　　Q.　Outside of that, do you have any other real

16　property interest that you contend you own in any of

17　these properties?

18　　A.　No.

19　　Q.　And do you know where I live?

20　　　MR. BALLASES:　Objection.　Form.

21　　A.　I think you live in 9201 Arabella.

22　　Q.　(BY MR. CHOUDHRI)　9201 Arabella?

23　　　MR. BALLASES:　Objection.　Form.

24　　A.　Let me see here.　Ninety -- sorry -- 9201.

25　You live at Arabella PH, whatever property Arabella PH

1  3201, LLC, owns.  At the Arabella, I think, unless you

2  moved.

3      Q.  (BY MR. CHOUDHRI)  And you have knowledge that

4  I've lived there for how long?

5          MR. BALLASES:  Objection.  Form.

6      A.  I mean, I guess at least a few years.  Maybe

7  two.

8      Q.  (BY MR. CHOUDHRI)  And are you aware that --

9      A.  You sold your house and then -- I think so.  I

10  mean, look, I -- I'm not sure, to be honest with you.

11  I think you live there.  I can find out if you want me

12  to.

13      Q.  So you said I sold my house?

14          MR. BALLASES:  Ali, can -- Mr. Choudhri, can

15  you put yourself on the screen again so we know it's

16  you asking questions?

17      Q.  (BY MR. CHOUDHRI)  So you said --

18          MR. BALLASES:  Thank you.

19      Q.  (BY MR. CHOUDHRI)  -- I sold my house,

20  Mr. Khawaja, that you know I sold my house?

21      A.  Yeah.

22          MR. BALLASES:  Objection.  Form.

23      A.  You sold the River Oaks house; right?

24      Q.  (BY MR. CHOUDHRI)  I'm asking you,

25  Mr. Khawaja.  You said I sold my house.  What do you

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                196

1   mean by that?

2      A.  Yes.  I think you sold your River --

3         MR. BALLASES:  Objection.  Form.

4      A.  I think you sold the River Oaks house, and

5   then you moved.

6      Q.  (BY MR. CHOUDHRI)  And how do you know that?

7         MR. BALLASES:  Objection.  Form.

8      A.  I think -- I mean, that's just -- that's the

9   rumors.

10     Q.  (BY MR. CHOUDHRI)  And who told you that?

11        MR. BALLASES:  Objection.  Form.

12     A.  I think it was in The Real Deal.

13     Q.  (BY MR. CHOUDHRI)  Is that where you -- are

14  you saying that's where you know about it?

15     A.  Possibly.

16        MR. BALLASES:  Objection.  Form.

17     A.  I don't know, to be honest with you.

18     Q.  (BY MR. CHOUDHRI)  Do you know who Kevin

19  Powers is?

20        MR. BALLASES:  Objection.  Form.

21     A.  He's an attorney.  Yes.

22     Q.  (BY MR. CHOUDHRI)  Have you communicated with

23  Kevin Powers?

24        MR. BALLASES:  Objection.  Form.

25     A.  I think he called me once or twice, but no

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                        197

1   real communication with him.

2       Q.  (BY MR. CHOUDHRI)  Have you ever texted him or

3   received texts from him?

4           MR. BALLASES:  Objection.  Form.

5       A.  Not that I recall.  I don't think so.

6       Q.  (BY MR. CHOUDHRI)  Do you know who WCW is?

7           MR. BALLASES:  Objection.  Form.

8       A.  Some entity that you owe money, I think.

9       Q.  (BY MR. CHOUDHRI)  Do you know who Steven Wu

10  is?

11      A.  Another guy that you --

12          MR. BALLASES:  Objection.  Form.

13      A.  -- that you owe money to.

14      Q.  (BY MR. CHOUDHRI)  And your contention is I

15  owe money to Steven Wu?

16      A.  You owe money --

17          MR. BALLASES:  Objection.  Form.

18      A.  -- to a lot of people, including me, but yes.

19      Q.  (BY MR. CHOUDHRI)  And what do you know about

20  what I owe to Steven Wu?

21          MR. BALLASES:  Objection.  Form.

22      A.  That you defrauded him, and they have --

23  they're seeking to recover the money that you owe them

24  and --

25      Q.  (BY MR. CHOUDHRI)  And how much money is

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                   198

1  that --

2    A.  -- defrauded them in the Texas REIT --

3       THE REPORTER:  I'm sorry --

4    Q.  (BY MR. CHOUDHRI)  I defrauded in the Texas

5  REIT case, you said?

6    A.  Yes.  I think some Texas REIT case.  I'm not

7  sure which one, but it's millions of dollars.

8    Q.  And so is it Steven Wu that you contend that I

9  defrauded?

10   A.  Yes.

11      MR. BALLASES:  Objection.  Form.

12   Q.  (BY MR. CHOUDHRI)  And Steven Wu is owed money

13  by Texas REIT is your contention?

14      MR. BALLASES:  Objection.  Form.

15   A.  Yes, and there's probably many other creditors

16  out there I'm not aware of.

17   Q.  (BY MR. CHOUDHRI)  Which creditors are you

18  aware of?

19      MR. BALLASES:  Objection.  Form.

20   A.  Only the ones that I would know.  I mean, I'm

21  one of them.  So, I mean, whoever's listed in these

22  schedules, I guess.

23   Q.  (BY MR. CHOUDHRI)  Have you contacted TIG

24  Romspen?  Do you know who Romspen is?

25   A.  No.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                     199

1          MR. BALLASES:  Objection.  Form.

2      A.  I know who they are, but I have not -- I read

3  about them in The Real Deal, but I've not contacted

4  them.

5      Q.  (BY MR. CHOUDHRI)  Do you know who Mansoor

6  Chaudhry is?

7      A.  Yes.

8      Q.  Do you have an attorney-client privilege with

9  him?

10     A.  No, I don't.

11         MR. BALLASES:  Objection.  Form.

12     Q.  (BY MR. CHOUDHRI)  Have you ever texted him or

13  received texts from him?

14     A.  No.

15         MR. BALLASES:  Objection.  Form.

16     A.  I mean, yes, he's texted me.  Yes, he has.

17     Q.  (BY MR. CHOUDHRI)  So when did you meet

18  Mansoor Chaudhry?

19     A.  Maybe two years --

20         MR. BALLASES:  Objection.  Form.

21     Q.  (BY MR. CHOUDHRI)  Under what circumstance?

22         MR. BALLASES:  Objection.  Form.

23     A.  He's a -- he has a title company, and I've

24  done some title work with him.

25     Q.  (BY MR. CHOUDHRI)  So you do some title work

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                       200

1   with him?

2       A.  Yes.

3           MR. BALLASES:  Objection.  Form.

4       Q.  (BY MR. CHOUDHRI)  What is the name of his

5   title company?

6           MR. BALLASES:  Objection.  Form.

7       A.  I think it's called Transact Title.

8       Q.  (BY MR. CHOUDHRI)  And is Transact Title a

9   tenant at 1001 West Loop?

10          MR. BALLASES:  Objection.  Form.

11      A.  Yes.

12      Q.  (BY MR. CHOUDHRI)  And have you filed a lis

13  pendens against 1001 West Loop?

14          MR. BALLASES:  Objection.  Form.

15      A.  If it's an alter ego of yours -- no, I don't

16  think so.  Maybe not.

17      Q.  (BY MR. CHOUDHRI)  You're looking at Osama to

18  answer the questions.  Do you understand this

19  deposition is me asking you, not Osama answering the

20  questions?  You understand that; right?

21          MR. BALLASES:  Objection.  Sidebar.

22          Don't pretend like you know what's happening

23  over here.

24          Objection.  Sidebar.

25      A.  I'm not looking at anybody.  But I don't know.

1  Do you want me to file a lis pendens on 1001 West

2  Loop?

3      Q.  (BY MR. CHOUDHRI)  As we sit here today, are

4  you telling me that you have not caused any lis

5  pendens to be filed on 1001?

6      A.  No.  I don't know.  I don't think so.

7      Q.  Do you contend 1001, the property, 1001, or

8  the entity that owns 1001, is an alter ego of Ali

9  Choudhri or Texas REIT?

10      A.  Yes.  Yes, it is.

11      Q.  Do you contend --

12      A.  Even if it's not listed by -- even if it's not

13  here, it is -- anything that you control or own is an

14  alter ego, because that's how you operate.

15      Q.  Okay.  Do you know who BridgeCo is,

16  Mr. Khawaja?

17      A.  Yes.

18         MR. BALLASES:  Objection.  Form.

19      Q.  (BY MR. CHOUDHRI)  Have you spoken to anybody

20  at BridgeCo?

21      A.  No.

22         MR. BALLASES:  Objection.  Form.

23      Q.  (BY MR. CHOUDHRI)  But you've sued BridgeCo;

24  correct?

25      A.  Yes.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                  202

1          MR. BALLASES:  Objection.  Form.

2      Q.  (BY MR. CHOUDHRI)  And are you aware that

3   BridgeCo made six loans?

4      A.  Yeah.

5          MR. BALLASES:  Objection.  Form.

6      Q.  (BY MR. CHOUDHRI)  Do you know which

7   properties BridgeCo made loans on?

8      A.  There were --

9          MR. BALLASES:  Objection.  Form.

10      A.  -- some properties in Austin and some

11   properties in Houston, but I don't know -- I couldn't

12   tell you it's this one or that one.

13      Q.  (BY MR. CHOUDHRI)  And you contend those

14   properties are alter egos of Ali Choudhri or Texas

15   REIT.

16          MR. BALLASES:  Objection.  Form.

17      A.  I mean, they would be.  If you own them, they

18   would be.  But I don't know if we're making that claim

19   in this case anymore.

20      Q.  (BY MR. CHOUDHRI)  Have you sued Cypress

21   BridgeCo and Magnolia BridgeCo in this case?

22      A.  I think we did.  And I'm not sure if we still

23   have maintained those claims.  But I know they

24   foreclosed on their interest.

25      Q.  So you're aware that BridgeCo foreclosed on

1   the properties that you filed lis pendenses on.

2       A.  Yes.

3       Q.  And you realize that a lis pendens frustrates

4   and interferes with the sale of a property.

5           Please don't look at Osama for an answer.  I

6   know you really want to.

7           MR. BALLASES:  Objection --

8           MR. CHOUDHRI:  But, Mr. Abdullatif, would you

9   please stop helping Mr. Khawaja?

10          MR. BALLASES:  Objection.  Sidebar.

11          You don't know what you're talking about.

12          (Crosstalk)

13          MR. CHOUDHRI:  Madam Court Reporter, did you

14  get -- did --

15          (Crosstalk)

16          THE REPORTER:  Sorry.  What is your question,

17  Mr. Choudhri?

18          MR. CHOUDHRI:  What did Osama say?  I couldn't

19  hear him.

20          THE REPORTER:  I couldn't hear him either.  If

21  I can't hear him, I can't transcribe him.  And he's

22  not on the record.  Like, he's not --

23      A.  Let's please continue with the deposition.

24          MR. CHOUDHRI:  Mr. Osama Abdullatif, I can

25  hear you in the background calling me a liar.  That's

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                              204

1    unprofessional.

2          MR. BALLASES:  Objection.  Sidebar.

3          Ask your question, or I'll --

4      A.  Or we're gonna cut this -- or we're gonna shut

5    this thing down.

6      Q.  (BY MR. CHOUDHRI)  So, Mr. Khawaja, you're

7    aware -- let me back up.

8          You're in the real estate business as well;

9    right?

10         MR. BALLASES:  Objection.  Form.

11     A.  Not really.  A little bit.

12     Q.  (BY MR. CHOUDHRI)  Do you own real estate

13   outside of your home?

14     A.  Yes.

15     Q.  Which real estate?

16         MR. BALLASES:  Objection.  Form.

17     A.  I'm not gonna get -- I'm not gonna get into

18   that.

19     Q.  (BY MR. CHOUDHRI)  Are you refusing to answer

20   the question about what real estate you own --

21     A.  Yes, I'm --

22     Q.  -- outside of your house?

23     A.  I am -- I am refusing to answer that.

24         MR. BALLASES:  I'm instructing him not to

25   answer because it's outside the scope of the limited

1  deposition that the judge ordered.

2     Q.  (BY MR. CHOUDHRI)  So, Mr. Khawaja, we've

3  already established many, many, many times it's your

4  contention that any entity I own or control is an

5  alter ego of Texas REIT; correct?

6     A.  Yes.

7        MR. BALLASES:  Objection.  Form.

8     Q.  (BY MR. CHOUDHRI)  And so you're also aware,

9  Mr. Khawaja, that when you file a lis pendens on a

10  piece of property, you have to meet certain elements

11  to have a lis pendens on a piece of property.  Are you

12  aware of that?

13     A.  Yes.

14     Q.  And do you know what those elements are?

15        MR. BALLASES:  Objection.  Form.

16     A.  I don't.

17     Q.  (BY MR. CHOUDHRI)  You're unaware what the

18  elements are to file a lis pendens against real

19  property.

20     A.  I'm not sure.

21        MR. BALLASES:  Objection.  Form.

22     Q.  (BY MR. CHOUDHRI)  You're unaware, or you're

23  aware?

24     A.  I'm not aware.

25        MR. BALLASES:  Objection.  Form.

1      MR. CHOUDHRI:  Mr. Ballases, it doesn't change

2  by you yelling on the objection, so --

3      MR. BALLASES:  Objection.  Sidebar.

4    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, how many

5  lawsuits have you been involved in where you have

6  instructed, sponsored litigation against Texas REIT or

7  any other entity that I own or control?

8      MR. BALLASES:  Objection.  Form.

9    A.  I don't know.  I don't -- I don't think many

10  at all.  Not as many as I could.  That's for sure.

11    Q.  (BY MR. CHOUDHRI)  And so you have filed a lis

12  pendens against a property at 2232 Swift Boulevard.

13  Are you aware of that?

14    A.  Yes.  Yes.

15    Q.  And you contend 2232 Swift Boulevard -- that

16  property and any interest in that property is an alter

17  ego of Texas REIT?

18    A.  Or Ali Choudhri.

19      MR. BALLASES:  Objection.  Form.

20    A.  Or Ali Choudhri.

21    Q.  (BY MR. CHOUDHRI)  Texas REIT or Ali --

22    A.  Or Jetall.

23    Q.  -- Choudhri; correct?

24    A.  Or Jetall.

25    Q.  Sorry?

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                    207

1        A.  Or Jetall Companies, Inc.

2        Q.  Okay.  So basically any and all entities that

3   I have any ownership in -- directly, indirectly --

4   it's an alter ego, and that's what you believe.

5        A.  I believe the evidence will show that, yes.

6           MR. BALLASES:  Objection.  Form.

7        Q.  (BY MR. CHOUDHRI)  But as we sit here today,

8   you don't have any evidence --

9        A.  No, we have plenty --

10          MR. BALLASES:  Objection.  Form.

11       A.  We've been talking about it all day.

12          MR. BALLASES:  Objection.  Form.

13       Q.  (BY MR. CHOUDHRI)  So outside of whatever we

14  talked about today, you don't have any other evidence.

15          MR. BALLASES:  Objection.  Form.

16       A.  Not until we get into the discovery, which

17  you're obstructing, but yes.

18       Q.  (BY MR. CHOUDHRI)  So this is your opportunity

19  to tell --

20       A.  You'll find out more after you and, I think,

21  your mom's deposition coming up.

22       Q.  Oh, okay.  So you've sued my mom; correct?

23       A.  Yes.  Don't try to get out of that deposition

24  either.  I'm gonna have a court reporter, translator,

25  everything.  So don't try to get out of that.

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
208

1    Q.  Mr. Khawaja, have you -- let me pull this up.

2  Hold on.

3        Have you contacted anybody related to QB Loop

4  Property?

5        MR. BALLASES:  Objection.  Form.

6    A.  No.

7    Q.  (BY MR. CHOUDHRI)  Have you contacted --

8    A.  What's going on with that?

9        THE WITNESS:  Sorry.  Sorry.

10    A.  I have not.

11    Q.  (BY MR. CHOUDHRI)  Have you contacted -- would

12  you dispute if third parties made statements that you

13  contacted them and told them not to do business with

14  me?

15        MR. BALLASES:  Objection.  Form.

16    A.  I would dispute that, yeah.  I mean, tell

17  them -- who said that I said that?

18        MR. BALLASES:  Objection.  Form.

19    Q.  (BY MR. CHOUDHRI)  Have you ever contacted

20  anybody who I do business with, or any of my related

21  entities, and told them not to do business with me?

22        MR. BALLASES:  Objection.  Form.

23    A.  I mean, that's outside the scope of what we're

24  talking about, but no, unless I was specifically

25  asked.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                209

1    Q.  (BY MR. CHOUDHRI)  Have you contacted Anwar

2    Qadeer (phonetic) in relation to --

3    A.  No.

4        MR. BALLASES:  Objection.  Form.

5    A.  No.  Are you trying to sue Anwar now?  No.

6    Q.  (BY MR. CHOUDHRI)  Have you contacted Qasim --

7    Abdul Qasim (phonetic)?

8        MR. BALLASES:  Objection --

9    A.  Abdul Qasim?

10   Q.  (BY MR. CHOUDHRI)  Abdul Qasim.

11       THE REPORTER:  Sorry.  One at a time, please.

12   A.  I never contacted -- no, he's a friend of --

13       THE REPORTER:  Sorry.  One at a time, please.

14       Mr. Khawaja, could you please repeat your

15   answer?

16   A.  I have not.

17       MR. BALLASES:  Objection.  Form.

18       Please stick to the limited purpose of this

19   deposition.

20   Q.  (BY MR. CHOUDHRI)  And --

21   A.  Don't get those guys in trouble.

22   Q.  -- Mr. Khawaja, are you -- are you -- are you

23   done laughing?

24   A.  Yes.  Yes.

25   Q.  Thank you.  You understand this is a serious

1    situation we're here, right?  This is a deposition.

2    It's not a joke --

3       A.  Oh, very much.

4          MR. BALLASES:  Objection.  Sidebar.

5       A.  Very much.  Very much so.

6       Q.  (BY MR. CHOUDHRI)  And, Mr. Khawaja, you're

7    taking this serious; correct?

8       A.  Oh, yeah, absolutely.

9          MR. BALLASES:  Objection.  Sidebar.

10      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, can you tell

11   me why -- you know, why you believe that the BridgeCo

12   entities are an alter ego of Texas REIT?

13         MR. BALLASES:  Objection.  Sidebar.

14         No, excuse me.  I'm gonna go ahead, and I'm

15   gonna actually object to this exceeding the scope of

16   the deposition that the judge ordered and instruct him

17   not to answer.

18      A.  I'm gonna take the advice of counsel.

19      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you're not

20   going to answer the question, I understand; is that

21   correct?

22      A.  Yes.

23      Q.  Mr. Khawaja, are you aware that when a lis

24   pendens is filed on a property, a property -- the

25   title is clouded, and it interferes with the ability

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    211

1    for the property to be sold or refinanced?

2        A.  I mean --

3            MR. BALLASES:  Objection.  Form.

4        A.  -- you filed many of those, so you're pretty

5    aware of what it does, so yes.

6        Q.  (BY MR. CHOUDHRI)  And besides whatever we've

7    covered today, you don't have any other -- are you --

8        A.  Plans?

9        Q.  -- familiar with the -- sorry?

10       A.  Other plans?  I don't know.  I'm just trying

11   to guess what you were gonna say.

12       Q.  I'm sorry, Mr. Khawaja.  What was your

13   statement?

14       A.  I said -- you said, You don't have any other,

15   and then you just trailed off.  So I said, What,

16   plans?

17       Q.  What -- so I think I've asked this earlier,

18   and you've refused to answer.  I just want to make

19   sure the record is clear.  You're refusing to answer

20   any contingency claims or any claims you own or hold,

21   indirectly or directly, against me or any of my

22   entities.  You're refusing to answer any of those

23   questions.

24       A.  Yes --

25           MR. BALLASES:  Objection --

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
212

1    A.  -- that's correct.

2        MR. BALLASES:  Objection.  Form.

3    Q.  (BY MR. CHOUDHRI)  And you're aware that

4  2727 Kirby was foreclosed on.

5        MR. BALLASES:  Objection.  Form.

6    A.  That's what I understand.

7    Q.  (BY MR. CHOUDHRI)  And you're aware that

8  that's one of the properties you filed a lis pendens

9  on.

10       MR. BALLASES:  Objection.  Form.

11   A.  Sure.  You owe a lot of money on it.

12   Q.  (BY MR. CHOUDHRI)  Is there money owed to you

13  on 2727 Kirby?

14   A.  I mean, it's an alter --

15       MR. BALLASES:  Objection.  Form.

16   A.  -- ego of Jetall Companies, so yeah, we

17  should've gotten something out of it.

18   Q.  (BY MR. CHOUDHRI)  Is that why you filed a

19  lis pendens, so you could get something out of it?

20       MR. BALLASES:  Objection.  Form.

21   A.  To prevent you from committing fraudulent

22  transfers and defrauding people like you do.

23   Q.  (BY MR. CHOUDHRI)  And so let's elaborate.

24  How do I defraud people?

25       MR. BALLASES:  Objection.  Form.

1    A.  I mean -- I mean, come on.

2    Q.  (BY MR. CHOUDHRI)  I just want to --

3        (Crosstalk)

4    A.  You really want me to answer that question?

5    Q.  (BY MR. CHOUDHRI)  Absolutely.  Go ahead.

6        MR. BALLASES:  Objection.  Sidebar.

7        It's not the opportunity to ask an improper

8  question.

9        THE WITNESS:  No.

10       MR. BALLASES:  It is your opportunity to ask

11  about why a proof of claim was filed and why it was

12  withdrawn.  You are mistaken, and you're exceeding the

13  Court's order.  Please stick to the Court's limited

14  deposition order.

15    Q.  (BY MR. CHOUDHRI)  Are you going to refuse to

16  answer the question, Mr. Khawaja?

17    A.  Yes.

18       MR. BALLASES:  Objection.  Form.

19    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you're aware

20  that following the filing of lis pendenses on various

21  properties, those properties were foreclosed after you

22  filed those lis pendenses, true or false?

23       MR. BALLASES:  Objection.  Form.

24    A.  After -- I mean, what does that mean, after I

25  filed those lis pendenses?  You lost those properties

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                214

1   because you refused to pay on them, like you've done

2   on so many properties throughout your entire life.

3         So, you know, you excel at losing properties.

4   That's what happened.  That's what happened to

5   2425 West Loop.  Don't try to put that on me unless

6   you want more lawsuits.  We're happy to oblige.

7      Q.  (BY MR. CHOUDHRI)  Do you --

8      A.  Yes.

9         MR. BALLASES:  Objection.  Sidebar.

10     A.  No, I'm not done.  I'm just getting started.

11     Q.  (BY MR. CHOUDHRI)  So continue on.  I'm

12   listening.

13        MR. BALLASES:  There's no question on the

14   table.

15     Q.  (BY MR. CHOUDHRI)  You're just getting

16   started?

17        THE REPORTER:  I'm sorry --

18     Q.  (BY MR. CHOUDHRI)  What do you mean by "just

19   getting started" --

20        THE REPORTER:  I'm sorry.  Mr. Ballases, what

21   was your objection or your comment?

22        MR. BALLASES:  Objection.  Form.

23        There was no question on the table.

24     Q.  (BY MR. CHOUDHRI)  Go ahead, Mr. Khawaja.  If

25   you want to talk, you can talk.  You said you're just

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
215

1   getting started --

2        MR. BALLASES:  Objection.  Sidebar.

3     A.  Stick --

4     Q.  (BY MR. CHOUDHRI)  Do you want to --

5     A.  Stick to the questions, please.  Stick to the

6   questions.

7     Q.  You're answering -- you're answering the

8   questions, so I'm allowing you to finish your answers.

9   And you said --

10        MR. BALLASES:  Objection.  Sidebar.

11     Q.  (BY MR. CHOUDHRI)  -- you're just getting

12   started.  What do you mean by, "I'm just getting

13   started"?  That was your answer.

14     A.  Yes.  We have --

15     Q.  (Unintelligible)

16     A.  We have a lot of -- we have discovery to

17   complete in this case.

18     Q.  And so what do you mean, "I'm just getting

19   started"?  Elaborate on that --

20        MR. BALLASES:  Objection.  Form.

21     A.  Yeah, we need -- we have to complete

22   discovery.

23     Q.  (BY MR. CHOUDHRI)  And what evidence or

24   information do you have that my mom is an alter ego of

25   Texas REIT?

1          MR. BALLASES:  Objection.  Form.

2     A.  Have you reviewed the -- have you reviewed our

3  evidence in this case?  Have you looked at what we've

4  been able to uncover, or no?  I hope your attorneys

5  are sharing it with you.  There's a lot.

6     Q.  (BY MR. CHOUDHRI)  So what evidence do you

7  have that Shahnaz Choudhri is an alter ego --

8     A.  Yes.

9     Q.  -- of Texas REIT?

10     A.  There's money flowing through bank accounts.

11  There's checks that she's written to entities that you

12  control.  There's personal payments going out to her

13  from entities that you control.  I mean, there's a

14  lot.  There's a lot.  We're gonna get into all of

15  that.

16     Q.  And so the evidence is all within your

17  pleadings.  Is that --

18     A.  Not all of it.

19          MR. BALLASES:  Objection.  Form.

20     A.  Not all of it.  There's just something --

21  there's discovery.  There's subpoenas.  There's --

22  there's things.  There's a deposition coming up that

23  you're aware of that you're gonna try to get out of.

24  We're not gonna let you.

25     Q.  (BY MR. CHOUDHRI)  Have you made statements to

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    217

1   third parties that Judge Norman is gonna do whatever

2   you ask him to do because you have him on payroll?

3        MR. BALLASES:  Objection.  Form.

4        And objection.  Sidebar.

5     A.  Man, come on.  Don't do stuff like that.

6   That's gonna get you --

7     Q.  (BY MR. CHOUDHRI)  Have you made a

8   statement to anybody --

9     A.  -- in a lot of trouble.

10        THE REPORTER:  I'm sorry.

11     Q.  (BY MR. CHOUDHRI)  Have you made --

12        THE REPORTER:  One person at a time, please.

13     A.  That's -- that's gonna get you into a lot of

14   trouble with the FBI.  I wouldn't do that.  That's a

15   mistake on your part.

16     Q.  (BY MR. CHOUDHRI)  Have you ever made any

17   statements like that?  Have you ever made any

18   statements --

19     A.  No.

20     Q.  -- like that?

21        MR. BALLASES:  Objection.  Form.

22     A.  That's very dangerous of you to say that.  I'm

23   just warning you.  It's very dangerous.

24        MR. CHOUDHRI:  Mr. Ballases --

25     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                   218

1       THE WITNESS:  Make sure you get a copy of this

2   transcript, please --

3    Q.  (BY MR. CHOUDHRI)  -- you've never made --

4       THE WITNESS:  -- and provide that.

5    Q.  (BY MR. CHOUDHRI)  You --

6       THE REPORTER:  Sorry --  okay.

7    A.  I would stop if I were you.  I would stop

8   right now if I were you.

9    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, please.  I'm

10  asking the questions.  Okay?

11   A.  Yeah, you are.

12   Q.  Have you met with Anthony Gill or Kenneth

13  Shaitelman?

14      MR. BALLASES:  Objection.  Form.

15   A.  I'm not gonna --

16      (Crosstalk)

17      MR. BALLASES:  I'm going to instruct you not

18  to answer.  That has nothing to do with the proof of

19  claim that was filed or the reason that we've offered

20  to withdraw it, and therefore, I'm instructing not to

21  answer.  It exceeds the scope of the judge's order.

22      So I object to the form of the question.

23   A.  I'm not answering.

24   Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, were you

25  present on September 6, 2023, when Chris Wyatt, your

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                                219

1    client, testified on the stand in Judge Manor's court?

2         MR. BALLASES:  Objection --

3    A.  No.

4         MR. BALLASES:  Objection.  Form.

5    A.  I wasn't.

6    Q.  (BY MR. CHOUDHRI)  Were you present around

7    September 2023 in front of Judge Manor regarding a

8    case styled Naissance versus Zaheer?

9         MR. BALLASES:  Objection.  Form.

10    A.  I don't even know if I was or not, but that's

11   outside the scope of this purpose of this deposition,

12   so move on.

13    Q.  (BY MR. CHOUDHRI)  Are you aware that Chris

14   Wyatt, your client, testified that he has given you

15   my -- Jetall Companies' hard drive?

16        MR. BALLASES:  Objection.  Form.

17    A.  Not -- not in the -- within the scope of this

18   conversation -- I mean this deposition.  But if he

19   testified to that, I'd have to look back and see.

20   Maybe he did.

21    Q.  (BY MR. CHOUDHRI)  Is Chris Wyatt truthful?

22        MR. BALLASES:  Objection.  Form.

23    A.  You hired him.  What do you think?

24    Q.  (BY MR. CHOUDHRI)  Have you hired --

25        THE WITNESS:  Look, I'm done, Michael.  This

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                  220

1   is it.  This is getting into things --

2          MR. BALLASES:  Okay.

3          THE WITNESS:  -- that are unrelated.  So we

4   can --

5          MR. BALLASES:  And you've got to go see your

6   family --

7          THE WITNESS:  I have to go see my family --

8          MR. BALLASES:  Then we'll take it up with a

9   judge.

10         THE WITNESS:  Thank you.

11         (Crosstalk)

12      Q.  (BY MR. CHOUDHRI)  Are you going to walk out

13   of this deposition?

14         THE REPORTER:  I'm sorry --

15      A.  Yes.

16      Q.  (BY MR. CHOUDHRI)  No --

17         THE REPORTER:  Sorry.  One at a -- sorry.  One

18   at a time, please.  Thank you.

19         MR. CHOUDHRI:  I am not done with my --

20         THE WITNESS:  I have a medical --

21         MR. CHOUDHRI:  -- questions.

22         THE WITNESS:  -- emergency.

23      Q.  (BY MR. CHOUDHRI)  If you have a medical

24   emergency, we can agree to a rescheduling.  Your

25   medical emergency, Mr. Khawaja, is you have a family

1    member in the hospital; correct?

2        A.  Yes, I do.

3            MR. BALLASES:  You don't need to answer any

4    more questions.

5            He has to get out of here.  You took up enough

6    time --

7            THE WITNESS:  We'll take it up with a judge.

8        Q.  (BY MR. CHOUDHRI)  Mr. Khawaja --

9            MR. BALLASES:  Do you want a five-minute

10   break, or do you want to start?

11       Q.  (BY MR. CHOUDHRI)  Mr. Khawaja --

12           MR. BALLASES:  You go.  I got it.

13       Q.  (BY MR. CHOUDHRI)  -- the deposition is still

14   going.  Are you going to get up and walk out?

15           MR. CHOUDHRI:  Madam Court Reporter --

16           MR. BALLASES:  Yes, he's got to --

17           MR. CHOUDHRI:  -- would you --

18           MS. HOOD:  Okay.  If I can weigh in here, I

19   had some follow-up questions for him; very few, but I

20   do have follow-up questions.

21           MR. BALLASES:  How much time?  Like, how much

22   would you estimate, Ms. Hood?

23           MS. HOOD:  Ten minutes.

24           MR. BALLASES:  It's up to you.  If you've got

25   to get out of here --

1          MR. CHOUDHRI:  But I'm not done --

2          MS. HOOD:  But it's -- I need -- Mr. Choudhri

3    hasn't passed the witness.  But I did want to go on

4    the record that I do have a few more questions for

5    him.

6          MR. BALLASES:  Okay.  Well --

7          THE WITNESS:  We'll take it up if we need to

8    with a judge.

9          MR. BALLASES:  Okay.  Then unless we're going

10   to go directly to your ten minutes, then he's got to

11   get to the hospital.

12         MR. CHOUDHRI:  Mr. Ballases, if he's got to go

13   to the hospital, is there a mutually agreeable time

14   before he leaves that we can agree to maybe --

15         MR. BALLASES:  No.

16         MR. CHOUDHRI:  -- pick this up?

17         MR. BALLASES:  No.

18         MR. CHOUDHRI:  Are you not agreeing to resume

19   the deposition at a convenient time after his

20   emergency for his visitor -- for his family member in

21   the hospital?

22         MR. BALLASES:  I'm not right now.  You've had

23   plenty of time to ask questions.  You've asked

24   questions that had nothing to do with the limited

25   scope of the deposition.  I let you ask them.  I

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                223

1    probably shouldn't have.  And so you used your time as

2    you saw fit.

3            Do you all want to take a two-minute break or

4    five-minute break before we start the next one, or no?

5            MR. CHOUDHRI:  Mr. Ballases, I am -- this is

6    still my deposition that I'm asking questions on.  I

7    want the record to be clear.  Have you instructed your

8    witness to leave?  Have you instructed the witness to

9    leave --

10           MR. BALLASES:  He's gone.  Yes, he is gone.

11   He is gone.  I've instructed him to leave because he

12   has a family member who is dying.  I don't know how

13   much clearer I can make that.  Stop repeating

14   yourself.

15           MR. CHOUDHRI:  Well, Mr. Ballases --

16           MR. BALLASES:  So you can either --

17           MR. CHOUDHRI:  -- as you know -- can I finish

18   talking, please, before you keep --

19           MR. BALLASES:  No --

20           MR. CHOUDHRI:  -- cutting me off?

21           MR. BALLASES:  -- you can't.  You waste

22   everybody's time.

23           So we can start with the next deposition.

24           It's clear that --

25           MR. CHOUDHRI:  Mr. Ballases --

1       MR. BALLASES:  -- he's left, and it's clear

2   you want to ask questions.

3       So we can start with the next deposition now

4   or in two minutes.  Please make your decision.

5       Stephen, if you want to make it because you're

6   the lead, that's fine.

7       MS. HOOD:  Can I just say on the record that I

8   would like to finish my questioning of the deponent

9   when he has the next available opportunity that's

10  convenient for everybody so I can ask my four

11  questions.

12      MR. BALLASES:  And I would -- that's fine.

13  You can take it up with the Court.  He was on record

14  for five hours.  Take away maybe the 30 minutes where

15  we argued about the judge's oral order.  Four and a

16  half hours, that's plenty of time for this deposition

17  to go forward and for y'all to complete it.

18      We have two more people here, and I have till

19  4:30.  I'd like to get started to go as fast as

20  possible, but it's y'all's call.

21      MS. HOOD:  Okay.  Well, I'll just --

22      MR. CHOUDHRI:  Mr. Ballases, the time is --

23  the time is 3:30 p.m.  Is that --

24      Or, Court Reporter, would you just confirm

25  what time we have right now?

OMAR KHAWAJA                                         September 11, 2024
TEXAS REIT LLC                                                      225

1          MR. BALLASES:  No one needs to confirm the

2    time.  Do you want to get started with the next one or

3    not?  I mean, stop wasting everybody's time?

4          MS. HOOD:  I just want to -- for my part of

5    this, I wasn't -- I didn't adjourn the deposition with

6    regard to this deponent for my questioning.  I was

7    waiting for it to come back, to cycle around with me

8    again.  I have a few more questions for him, and I

9    want to finish those.

10          And I understand he's left, and I understand

11   the basis for it, and I wish all Godspeed to his

12   family member.  And I don't want to get involved in

13   any sort of issue about whether someone needs to

14   leave, doesn't need to leave, that sort of thing,

15   right?  I just -- and if we have to go back to the

16   judge for my four questions, I'm happy to do it.

17          I just want that on the record for me.  What

18   the other lawyer does and what Mr. Choudhri does --

19          MR. BALLASES:  (Unintelligible)

20          MS. HOOD:  -- I'm not in control of that.

21          MR. BALLASES:  I understand.  You've made

22   it -- you've put it on the record twice.  That's fine.

23   I understand, and I'll stipulate that you do have more

24   questions.

25          Do we want to go to the next witness now?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    226

1        MR. CHOUDHRI:  Mr. Ballases, would you at

2   least provide, subject to your client's availability,

3   times you're available to resume the deposition of

4   Omar Khawaja?

5        MR. BALLASES:  No.  No, I will not.  I've said

6   that twice now.

7        MR. CHOUDHRI:  Are you not --

8        MR. BALLASES:  Do we want to move to the next

9   deposition?

10        MR. CHOUDHRI:  Are you going to refuse to make

11   him available --

12        MR. BALLASES:  Stop wasting time.  I'm not

13   going to provide it unless we have an order from a

14   judge.  Do you understand?  Stop wasting time.  We've

15   got a limited amount --

16        MR. CHOUDHRI:  Well, I just want to --

17        MR. BALLASES:  -- of time --

18        MR. CHOUDHRI:  -- get this on the --

19        (Crosstalk)

20        MR. BALLASES:  -- basis to take a deposition.

21        Do we want to move to the next person or not?

22   Please tell me.

23        MR. CHOUDHRI:  Before --

24        MR. BALLASES:  I would say, Stephen, it's your

25   job to say it.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                        227

1          MR. SATHER:  Yeah, I'm prepared --

2          MR. CHOUDHRI:  Mr. --

3          MR. SATHER:  -- to move to the next --

4          MR. CHOUDHRI:  Mr. Ballases --

5          MR. SATHER:  -- witness --

6          MR. BALLASES:  All right.  Let's go.

7          MR. SATHER:  Who do you have --

8          MR. CHOUDHRI:  Mr. Ballases --

9          MR. SATHER:  -- up next?

10          THE REPORTER:  I'm sorry --

11          MR. BALLASES:  Osama.

12          THE REPORTER:  Okay.

13          MR. CHOUDHRI:  Mr. Ballases --

14          MR. BALLASES:  Osama's ready to go.

15          MR. CHOUDHRI:  Time out.  I just want to get

16    this on the record very clearly, Mr. Ballases.

17          MR. BALLASES:  Oh, Jesus.

18          MR. CHOUDHRI:  I just want to make it --

19          MR. BALLASES:  It's on the record clearly.

20    Stop wasting time.

21          MR. CHOUDHRI:  You are not willing to

22    cooperate to resume the deposition of Omar Khawaja

23    absent a court order.  Is that your position?

24          MR. BALLASES:  I've stated my position.  Let's

25    move forward.

OMAR KHAWAJA                                     September 11, 2024
TEXAS REIT LLC                                                    228

1          Let's take a two-minute break, and then

2   Osama's going to be in this chair.

3          THE REPORTER:  Okay.  So I am going off the

4   record.

5          (End of proceedings at 3:31 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 6

000408

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| GALLERIA 2425 OWNER, LLC, | ) | Case No. 23-34815 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

_____

**ORDER GRANTNG MOTION TO COMPLY WITH THE GATEKEEPING**
**PROVISIONS OF THE CONFIRMED CHAPTER 11 PLAN**
_____

BEFORE THE COURT is the Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan.

The Court hereby GRANTS the motion.

IT IS THEREFORE HEREBY ORDERED that the claims raised by Ali Choudhri and Naissance Galleria, LLC against the Bank can proceed in the following cases:

> *Naissance Galleria, LLC v. Zaheer, et al*., Cause No. 2023-43755, pending in the 80th District Court of Harris County, Texas;
>
> *Galleria 2425, LLC, Naissance Galleria, LLC and Choudhri v. NBK*, Adversary Case No. 23-06009, pending in this Court; and
>
> *Choudhri v. NBK and Zaheer*, Adversary Case No. 23-03263, pending in this Court.

Dated: _____

          UNITED STATES BANKRUPTCY COURT

EXHIBIT 7

**IN RE GALLERIA 2425 OWNER, LLC, CASE NO. 23-34815**
**SERVICE LIST (a/o July 2, 2024)**

**Debtor:**
Galleria 2425 Owner, LLC
1001 West Loop South Ste 700
Houston, TX 77027

**Debtor's Counsel:**
Reese W. Baker
Baker & Associates
950 Echo Lane Ste 300
Houston, TX 77024

James Q. Pope
The Pope Law Firm
616 Savoy Drive Ste 1125
Houston, TX 77036

**U.S. Trustee:**
Office of United States Trustee
Attn: Jana Smith Whitworth
515 Rusk Street Suite 3516
Houston, TX 77002

**Chapter 11 Trustee:**
Christopher R. Murray
602 Sawyer Street Ste 400
Houston, TX 77007

**Chapter 11 Trustee's Counsel:**
R. J. Shannon
Shannon & Lee LLP
2100 Travis Street Ste 1525
Houston, TX 77002

**Governmental Entities:**
Harris County Tax Assessor
P O Box 4622
Houston, TX 77210

Harris County, et al.
P O Box 2928
Houston, TX 77252-2928

**Twenty Largest Creditors:**
Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070

Cirro Electric
P O Box 60004
Dallas, TX 75266

City of Houston
P O Box 1560
Houston, TX 77251-1560

City of Houston Water Department
P O Box 1560
Houston, TX 77251-1560

Datawatch Systems
Suite 200
4520 East West Highway
Bethesda, MD 20814

Firetron
10101A Stafford Centre Dr.
Stafford, TX 77477

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062

Gulfstream Legal Group
1300 Texas Street
Houston, TX 77002
(*Returned to Sender / Unable to Forward*)

Gulfstream Legal Group
720 N Post Oak Rd Ste 355
Houston, TX 77024

Hayward PLLC
10501 N Central Expy Ste 106
Dallas, TX 75231-2203

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362

Houston Community College System
c/o Tara Grundemeier
Linebarger, Groggan, Blair & Sampson
P O Box 3064
Houston, TX 77253-3064

Houston Independent School District
P O Box 4668
Houston, TX 77210
(*Returned to Sender / Unable to Forward*)

Lexitas
P O Box 734298 Dept 2012
Dallas, TX 75373

Nationwide Security
2425 W Loop South Ste 300
Houston, TX 77027
(*Returned to Sender / Unable to Forward*)

Nichamoff Law Firm
2444 Times Blvd Ste 270
Houston, TX 77005

T&R Mechanical
21710 White Oak Drive
Conroe, TX 77306-8848
(*Returned to Sender / Unable to Forward*)

TKE
3100 Interstate North Cir SE 500
Atlanta, GA 30339

Zindler Cleaning Service Co.
2450 Fondren Ste 113
Houston, TX 77063

**Other Creditors / Interest Holders:**
2425 WL, LLC
60 West 2nd Street
Freeport, NY 11746

ADT
P O Box 382109
Pittsburgh, PA 15251

Ali Choudhri
1001 West Loop South 700
Houston, TX 77027

Ash Automated Control Systems, LLC
P O Box 1113
Fulshear, TX 77441

CFI Mechanical, Inc.
6109 Brittmoore Rd
Houston, TX 77041

CNA Insurance Company
P O Box 74007619
Chicago, IL 60674

Comcast
P O Box 60533
City of Industry, CA 91716

Environmental Coalition Inc.
P O Box 1568
Stafford, TX 77497

Ferguson Facilities Supplies
P O Box 200184
San Antonio, TX 78220

Jetall Companies Inc.
2425 West Loop South Ste 1100
Houston, TX 77027-4210

Kings 111 Emergency Communications
751 Canyon Drive Suite 100
Coppell, TX 75019

Logix Fiber Networks
P O Box 734120
Dallas, TX 75373

2

Mueller Water Treatment
1500 Sherwood Forest Dr
Houston, TX 77043

Smart Office Solutions
6623 Theall Road
Houston, TX 77066-1213
(*Returned to Sender / Unable to Forward*)

Waste Management
P O Box 660345
Dallas, TX 75266

Metwall Design Solutions LLC
10931 Day Road
Houston, TX 77043-4901

US Retailers LLC d/b/a Cirro Energy
Attn: Bankruptcy Department
P O Box 3606
Houston, TX 77253-3606

Naissance Galleria, LLC
c/o Law Office of Nima Taherian
701 N Post Oak Rd Ste 216
Houston, TX 77024

H.N.B. Construction, LLC
c/o Malcolm D. Dishongh
P O Box 2347
Humble, TX 77347-2347

CC2 TX, LLC
14800 Landmark Blvd Ste 400
Dallas, TX 75254

MacGeorge Law Firm
2921 E 17th St Bldg D Ste 6
Austin, TX 78702
(*Returned to Sender / Unable to Forward*)

MacGeorge Law Firm
701 Tillery Street Ste 12
Austin, TX 78702

**Executory Contract Counterparties:**

2425 West Loop LLC dba Metwall Design
Solutions LLC
2425 West Loop South Ste 800
Houston, TX 77027-4214
(*Returned to Sender / Unable to Forward*)

2425 WL, LLC
13498 Pond Springs Rd
Austin, TX 78729-442
(*Returned to Sender / Unable to Forward*)

2425 WL, LLC
700 Lavaca Street Ste 1401
Austin, TX 78701
(*Returned to Sender / Unable to Forward*)

Bankable Equities
2425 West Loop South Ste 600
Houston, TX 77027-4203

Boho Lounge
2425 West Loop South Ste 100
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

CNA Insurance Company
P O Box 74007619
Chicago, IL 60674

Eyebrows 4UTX LLC
2425 West Loop South Ste 340b
Houston, TX 77027-4205

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062

G3 Global Services LLC
2425 West Loop South Ste 310
Houston, TX 77027-4208

Galloworks
2425 West Loop South Ste 400
Houston, TX 77027-4205

3

Jetall Companies Inc.
2425 West Loop South Ste 1100
Houston, TX 77027-4210

Kudrath Enterprises PLLC
2425 West Loop South Ste 350
Houston, TX 77027-4208

Nationwide Investigations & Security Inc.
2425 West Loop South Ste 300
Houston, TX 77027-4207
(*Returned to Sender / Unable to Forward*)

Shah Sloan LLC
2425 West Loop South Ste 501, 503 and 523
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

SIBS International Inc.
2425 West Loop South Ste 900
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

SIBS International Inc.
2425 West Loop South Ste 350
Houston, TX 77027
(*Returned to Sender / Unable to Forward*)

SprintCom Inc.
2425 West Loop South, Rooftop
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

St. Christopher Holdings GP LLC
2425 West Loop South Ste 700
Houston, TX 77027-4205

UL Therapy
2425 West Loop South Ste 315
Houston, TX 77027-4211
(*Returned to Sender / Unable to Forward*)

Uptown Cosmetic and Implant Dentistry
2425 West Loop South Ste 333
Houston, TX 77027-4211

**Parties Requesting Notice:**

Jeannie Lee Andressen
Tara Grundemeier
Linebarger Goggan Blair & Sampson LLP
P O Box 3064
Houston, TX 77253-3064
*Counsel for City of Houston, Houston
Community College System, and Houston
ISD*

Rodney Lee Drinnon
McCathern Houston
2000 West Loop South Ste 1850
Houston, TX 77027
*Counsel for Rodney Drinnon*

Susan Fuertes
Harris County Attorney's Office
P O Box 2928
Houston, TX 77252-2928
*Counsel for Harris County, Attn: Property
Tax Division*

James Robert MacNaughton
Porter & Powers PLLC
5900 Memorial Drive Ste 305
Houston, TX 77027
*Counsel for 2425 West Loop, LLC*
(*Returned to Sender / Unable to Forward*)

James Robert MacNaughton
Porter & Powers PLLC
1776 Yorktown St Ste 300
Houston, TX 77056
*Counsel for 2425 West Loop, LLC*
(*Returned to Sender / Unable to Forward*)

James Robert MacNaughton
Porter Firm, PLLC
2221 S. Voss Road, Suite 200
Houston, TX 77057
*Counsel for 2425 West Loop, LLC*

Stephen Wayne Sather
Mark E. Smith
Barron Newburger, P.C.
7320 N Mopac Expy Ste 400
Austin, TX 78731
*Counsel for 2425 WL, LLC*

Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road Ste 850
Dallas, TX 75251
*Counsel for CC2 TX, LLC*

Broocks Wilson
Kean Miller LLP
711 Louisiana Suite 1800
Houston, TX 77002
*Counsel for Sonder USA Inc.*

Ali Choudhri
2425 West Loop South 11th Floor
Houston, TX 77027

David Tang
6711 Stella Link #343
West University Place, TX 77005
*Counsel for Azeemeh Zaheer*

Omar Khawaja
5177 Richmond Ave Ste 1065
Houston, TX 77056
*Counsel for Azeemeh Zaheer*

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

November 01, 2024

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-34815** |
| **GALLERIA 2425 OWNER, LLC,** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | **CHAPTER 11** |

<u>**ORDER DENYING MOTION**</u>

This matter is before the Court on the Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan (ECF No. 802) filed by Ali Choudhri. The movant incorrectly set this matter for hearing for a date that is not available for self-calendaring. Available dates are listed on the Court's website.[1] Additionally, Bankruptcy Local Rule 9013-1(c) requires pleadings that may be self-calendared, such as this one, to contain language identifying the time and place of the hearing after the required notice language.[2]

**THEREFORE, IT IS ORDERED** that the Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan is denied without prejudice.

SIGNED 11/01/2024

_____
Jeffrey Norman
United States Bankruptcy Judge

---

[1] The Court's website is located at: http://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-jeffrey-p-norman.

[2] "If the motion may be self-calendared, this language must be added at the end of the notice: There will be a hearing on this motion on [date] at [time] in courtroom _____, [address]."

000416

**THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| GALLERIA 2425 OWNER, LLC, | ) | Case No. 23-34815 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**MOTION TO COMPLY WITH THE GATEKEEPING PROVISIONS OF THE
CONFIRMED CHAPTER 11 PLAN**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**THERE WILL BE A HEARING ON THIS MOTION ON DECEMBER 18, 2024 AT 11:00 AM IN COURTROOM 403 AT 515 RUSK ST., HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR RESPECTIVE ATTORNEYS.**

000417

**To the Honorable Court:**

Ali Choudhri[1] hereby files this motion to comply with the gatekeeping provisions of the confirmed Chapter 11 Plan (Dkt. No. 566) (the "Plan") and would respectfully show as follows:

1.    When the National Bank of Kuwait, S.A.K.B., New York Branch ("NBK" or the "Bank") proposed a plan of reorganization in this case (Dkt. No. 194), the Bank snuck several provisions into its proposed plan that exist solely for its own benefit. The Bank included itself among the "Exculpated Parties" that enjoy the Plan's exculpation provision, and among the "Released Parties" covered by the Plan's third-party release, even though the Bank is not a debtor in bankruptcy and has no connection to the Debtor, Galleria 2425 WL Owner, LLC or the bankruptcy estate other than as a lender. (*See* Plan arts. I(A)(39) & (78); *id.* IX(C) & (D)) The Bank also granted itself the benefit of the Plan's gatekeeping provision, requiring parties to *any* litigation against the Bank bearing a relationship to this bankruptcy—pending in any court, anywhere—to receive approval from this Court before that litigation can continue. And the parties must obtain that approval according to a procedure and standards appearing nowhere in the Bankruptcy Code or the rules of state or federal procedure requiring them to demonstrate those claims

---

[1] Naissance Galleria, LLC has also raised claims against the Bank, but as the result of an injunction entered in state court which is presently on appeal, Choudhri is not currently permitted to take action on Naissance's behalf. *See* Appellant's Opening Br. at 12, *Naissance Galleria, LLC v. Zaheer*, No. 01-23-00727-CV (Tex. App. Dec. 18, 2023) For that reason, Choudhri is filing this motion solely on his own behalf but provides information on the claims brought by Naissance Galleria, LLC for informational purposes. And because of the factually intertwined nature of the claims asserted by Choudhri and Naissance, the Court should give Naissance's claims the same treatment as Choudhri's for purposes of satisfying the gatekeeping provision.

are "colorable." No legitimate bankruptcy purpose is furthered by extending this gatekeeping provision to the Bank. And the litigation subjected to the gatekeeping provision has no connection to, or effect on, the Debtor, the estate, or the Plan's consummation. Instead, extending the gatekeeping provision to the Bank is simply the Bank's reward for proposing the plan that the Court approved, a plan that already richly rewards the Bank with the right to credit bid on the valuable asset at the center of this bankruptcy—at a foreclosure sale the Bank itself arranged.

2.    The Bank now demands that the Court enforce the terms of the Plan's gatekeeping provision and invites the Court to dismiss claims against the Bank in the following three pending cases (the "Challenged Litigation"):

> *Naissance Galleria, LLC v. Zaheer, et al.*, Cause No. 2023-43755, pending in the 80th District Court of Harris County, Texas;
>
> *Galleria 2425, LLC, Naissance Galleria, LLC and Choudhri v. NBK*, Adversary Case No. 23-06009, pending in this Court; and
>
> *Choudhri v. NBK and Zaheer*, Adversary Case No. 23-03263, pending in this Court.

(*See* Dkt. No. 758 at 2-3; Dkt. No. 771)

3.    But the Court should reject the Bank's invitation. Gatekeeper provisions certainly have their uses. And the Plan's gatekeeping provision may have some legitimate use in protecting the Trustee in this case. But the Bank's demand to invoke that protection for itself is a bridge too far. This Court's gatekeeping services are not a party favor that the Bank can obtain simply by participating in the bankruptcy. Nor are they a convenience

3

whereby the Bank can shed liabilities simply because it would like to be rid of them. The only legitimate purposes for a gatekeeping order include protecting the Debtor, the estate, and the implementation of a bankruptcy plan. None of those purposes are served here. Allowing the Bank to make use of the Plan's gatekeeping provision would therefore contravene longstanding precedent, exceed the confines of the Bankruptcy Code, and violate fundamental limits on bankruptcy courts' jurisdiction. Accordingly, the Plaintiffs should not be forced to satisfy the Plan's gatekeeping provision before proceeding.

4.      But even if the Court did stretch its gatekeeping powers to protect the Bank, there should be no doubt that each of the cases among the Challenged Litigation satisfies the gatekeeping provision's requirements. This Court has already declined to exercise jurisdiction over one of these cases—finding that it would not "affect assets of the bankruptcy estate"—and the Court should not revisit that decision to exercise jurisdiction over that case now. (Order, Adv. No. 23-03259 (Bankr. S.D. Tex. Jan. 11, 2024) [Dkt No. 24]) All three cases concern a core set of operative facts regarding uncontroversial lender-liability claims that are colorable under any standard, which is why no *other* court has dismissed them. This Court should not be the first. The Challenged Litigation should be permitted to proceed.

<div align="center">BACKGROUND</div>

5.      The plan of reorganization that the Bank proposed (Dkt. No. 194) and the Court confirmed (Dkt. No. 566) contains several provisions that protect the Bank and other non-debtors from claims against other non-debtors. The Plan's "Exculpation" provision covers specified "Exculpated Parties," which are defined to include the Bank (Plan art.

<div align="center">4</div>

I(A)(39)), protecting them from liability arising from conduct relating to the bankruptcy itself, including such actions as "filing, negotiating, prosecuting, administering, formulating, implementing, soliciting support or acceptance of, confirming or consummating" the Plan, the Purchase Agreement, or the property to be distributed under the Plan (*id*. art. IX(C)).

6.      The Plan's "Estate Releases" covers certain "Released Parties," which are also defined to include the Bank (Plan, art. I(A)(78)), granting them protection from claims by "the Debtor" or the "Estate" concerning "the money borrowed by the Debtor" (*id*. art. IX(D).

7.      By their terms, neither of these provisions apply to the Challenged Claims. While the Bank is both an Exculpated Party and a Released Party, neither of the Plaintiffs in those cases, Ali Choudhri and Naissance Galleria, LLC (*see* Dkt. 758 at 2) qualify as "the Debtor" or part of the "Estate." Ali is the "Debtor's principal." (*Id*.) And Naissance is provided mezzanine financing for the Debtors' purchase of the property at issue. So the Plan's Estate Release provision does not apply to these claims. The Exculpation provision does not apply either, because these claims arose before the bankruptcy and therefore do not concern any Released Party's conduct during the bankruptcy.

8.      Yet oddly, the Plan's gatekeeper provision provides protection that is broader than both the Estate Releases and Exculpation provisions. That gatekeeping provision pertains to any "Person who has held, holds, or may hold Claims" that are "in any way *related* to the Debtor," so long as they are brought "against any Released *Party*"—even if the claims themselves are not released under the Estate Releases. (Plan, Art. IX(E)) And

5

the gatekeeper provision does not merely apply to claims challenging conduct occurring *during* the bankruptcy but covers claims that "arose *before* the Petition Date." (*Id.*) For these claims, the parties must seek "notice and a hearing" wherein the parties must demonstrate to the Court that the claims asserted are valid before they can proceed. (Plan, Art. IX(E)) And to demonstrate the validity of that claim, the party must demonstrate that the claim is "colorable" and that the party "has standing and is otherwise entitled to assert" it. (*Id.*)

9.    The gatekeeper provision therefore purports to convey to the Bankruptcy Court the authority to approve, control, adjudicate, and ultimately terminate claims in pending litigation—including cases pending in other courts—merely because that litigation is "related to the Debtor," according to a test and a procedure appearing nowhere in the Code or the federal rules. It allows the Bank to make use of this power to have the Court dismiss claims that are not even released under the Plan. And the Bank now invokes this provision to have the Court terminate all the Plaintiffs' litigation against the Bank—even when the courts where that litigation is pending would allow that litigation to proceed, and even where the litigation at issue would not have any effect on the bankruptcy estate itself. That is not something the Court can do—nor is it something the Court *should* do.

<p align="center">**ARGUMENT**</p>

**I.    The Bank cannot invoke the Plan's gatekeeping provision to dismiss any of the claims against the Bank in the Challenged Litigation.**

10.    The Court should not dismiss any of the claims asserted against the Bank in the Challenged Litigation because none of those claims can properly be subject to the Plan's gatekeeping provision. So the Plaintiffs are not required to obtain the Court's

approval before pursuing them. And even if the Plaintiffs are required to obtain the Court's gatekeeping approval to proceed on these claims, Plaintiffs can readily make the showing required to obtain that approval, because Plaintiffs' claims are grounded in theories of lender liability personal to them that have long been recognized under Texas law. That makes them colorable by any standard.

### A. Bankruptcy courts' gatekeeping powers can only be invoked to protect trustees and other court-appointees—not private parties serving in no official bankruptcy capacity like the Bank.

11.    The first problem with the Bank's invocation of the Court's gatekeeping authority is that the Bank's demand exceeds the limited authority that bankruptcy courts possess to approve, control, adjudicate, or terminate claims in pending litigation. There is nothing in the Bankruptcy Code that conveys such gatekeeping power to bankruptcy courts. Instead, that power is derived from the century-old Supreme Court case, *Barton v. Barbour*, 104 U.S. 126 (1881). "Under the '*Barton* doctrine,' the bankruptcy court may require a party to 'obtain leave of the bankruptcy court before initiating [or maintaining] an action in district court ***when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity***.'" *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 439 (5th Cir. 2022) (quoting *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015) (emphasis added)). The *Barton* doctrine was created to "prevent trustees from being subject to legal proceedings that interfere with their ability to administer the estate." *In re Cir. City Stores, Inc.*, 557 B.R. 443, 447 (Bankr. E.D. Va. 2016); *see also generally* COLLIER ON BANKRUPTCY ¶ 10.01 (16th ed. 2023) (citing and discussing cases). The doctrine therefore

7

serves to protect trustees and other bankruptcy-court appointees from vexatious and harassing litigation that could drain the estate and hamper bankruptcy plan implementation.

12.     There are several reasons why the Bank cannot legitimately invoke the *Barton* doctrine to have the Court terminate any claims against the Bank in the Challenged Litigation. For one thing, because the *Barton* doctrine exists only to protect trustees and other bankruptcy-court appointees, it cannot be invoked by private parties like the Bank that are not serving in any official court-appointed capacity. Indeed, in *Highland Capital*, the Fifth Circuit refused to "extend gatekeeping protections to non-debtors," including Highland's interim CEO. *Matter of Highland Cap.*, 48 F.4th at 435–39 (vacating gatekeeping provision "as to all parties *except* Highland Capital, the Committee and its members, and the Independent Directors for conduct within the scope of their duties"). And the Fifth Circuit's only recent opinion that actually applies the *Barton* doctrine did so in the context of a trustee, not a private corporation with no official bankruptcy role. *See In re Foster*, No. 22-10310, 2023 WL 20872, at *5–*6 (5th Cir. Jan. 3, 2023). For this reason alone, the Bank is not entitled to invoke the Bankruptcy Court's gatekeeping authority.

13.     Furthermore, not only are *Barton*'s gatekeeping protections reserved for actors appointed to serve in official bankruptcy capacities, they only protect those actors for actions taken within the scope of their "official duties."[2] But the Bank has no official

---

[2] *In re Ondova Ltd. Co.,* 914 F.3d 990, 993 (5th Cir. 2019); *see also In re Christensen*, 598 B.R. 658, 665 (Bankr. D. Utah 2019); *Phoenician Mediterranean Villa, LLC v. Swope (In re J & S Props., LLC)*, 545 B.R. 91, 105 (Bankr. W.D. Pa. 2015). A typical example is litigation against a receiver who seizes or otherwise attempts to administer property that is not receivership property,

duties in implementing the Plan or overseeing the Debtor's dissolution. The foreclosure sale at the center of the bankruptcy will be conducted and overseen by the Liquidation Trustee. (*See* Plan, art. VI(A)) The only duties that the Plan specifically assigns to the Bank are purely ministerial. And the only substantive right that the Plan provides to the Bank is the completely voluntary (and unofficial) right to credit bid the amount of its debt at the foreclosure sale for its own private benefit, which comes with a contractual promise to pay certain junior claims if its bid is successful. (*See* Plan, Introduction) The Challenged Litigation does not contest the Bank's exercise of any of these powers, rights, or responsibilities conveyed under the Plan. That litigation pertains only to the Bank's pre-bankruptcy conduct that arose long before the Plan was ever proposed. For this additional reason, *Barton* does not apply.

14.    Indeed, the only reason the Plan contains gatekeeping protections for the Bank is that the Bank *proposed* the Plan—and thus snuck that protection into the Plan for itself, demanding it as a condition to undertaking its minimal responsibilities in implementing the Plan. And the Bank did not seek this protection to benefit the estate, but simply to allow it to escape litigation it would rather not face. That is not a legitimate use of *Barton* gatekeeping powers. The Fifth Circuit has held that even when private parties face "exposure" to truly "vexatious" and frivolous litigation, bankruptcy courts are not empowered to use gatekeeping powers to halt it. *See Highland Capital Mgmt*., 48 F.4th at

but actually belongs to a third party. *See In re DMW Marine, LLC*, 509 B.R. 497, 506 (Bankr. E.D. Pa. 2014) (citations omitted).

9

430, 440 n.19. And as explained below—the Challenged Litigation is neither vexatious nor frivolous.

**B.    Bankruptcy courts' gatekeeping powers have been significantly constrained by the Supreme Court's decision in *Purdue Pharma*.**

15.    In any event, whatever gatekeeping powers bankruptcy courts possess have been significantly constrained by the Supreme Court's recent decision in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024) ("*Purdue Pharma*"), which held that "[t]he bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seek to discharge claims against a nondebtor without the consent of affected claimants." *Id*. A bankruptcy court's exercise of its gatekeeping authority to dismiss litigation against non-debtors is the functional equivalent of the non-consensual releases outlawed by *Purdue Pharma*—especially when used to dismiss litigation pending in other courts. Both involve exercises of authority to control, adjudicate, and ultimately terminate claims in litigation without consent, and without consideration—and *Purdue Pharma* confirms that this something that bankruptcy courts are not empowered to do.

16.    For all these reasons, allowing the Bank to terminate the Challenged Litigation would exceed the Court's legitimate authority to impose gatekeeping conditions under *Barton*. If the Bank wants to halt this litigation, it can do so through established procedural mechanisms in the Challenged Litigation.

**C.    The Court would exceed its jurisdiction by dismissing the Challenged Litigation.**

17.    The Court would also exceed its jurisdiction by using the gatekeeping powers

10

provided under the Plan to adjudicate and dismiss the Challenged Litigation. The Bank seeks only to dismiss litigation against itself, and dismissing that litigation affects only the Bank—having no conceivable effect on the Debtor or the estate. Indeed, on January 11, 2024, this Court remanded one of the proceedings among the Challenged Litigation— Cause No. 2023-43755—back to the 80th District Court of Harris County because it determined that "all the causes of action constitute claims rooted in Texas state law," "there are no bankruptcy issues or claims in the state court litigation," and "there has been no showing that the remand would affect assets of the bankruptcy estate." (Case No. 23-03259 [Dkt No. 24] (Bankr. S.D. Tex. Jan. 11, 2024)) The same is true of the other cases in the Challenged Litigation—because, as the Bank insists, these cases all share the same "basic facts and claims." (Dkt. No. 758 at 4) But that shared lack of connection to the estate deprives the Court of jurisdiction to resolve any of these cases through its gatekeeping powers.

18.    As the Fifth Circuit recognized in *Highland Capital*, the question of whether a claim may be resolved by a bankruptcy court through exercise of gatekeeping powers under *Barton* is entirely separate from the question of whether the Court has *jurisdiction* to resolve that litigation. 48 F.4d at 439 (holding, after approving of a gatekeeping provision to protect certain court-appointed officials, that "the bankruptcy court, faced with pre-approval of a claim" on remand, would still have "to determine whether it had subject matter jurisdiction over that claim in the first instance."). That makes sense, because the mere fact that the Plan contains a gatekeeping provision does not confer jurisdiction to resolve claims under that gatekeeping power: "[P]arties cannot confer subject matter

11

jurisdiction on federal courts," including through a bankruptcy plan. *Randall & Blake Inc. v. Evans*, 196 F.3d 579 (5th Cir. 1999).

19. Instead, "[j]urisdiction for bankruptcy cases is rooted in the provisions of 28 U.S.C. § 1334." *Matter of Walker*, 51 F.3d 562, 568 (5th Cir. 1995) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 303 (U.S.1995) (stating that "[t]he jurisdiction of the bankruptcy courts ... is grounded in and limited by statute")). And a "third-party action" between two non-debtors "does not create 'related to' jurisdiction" under section 1334 "when the asset in question is not property of the estate and the dispute has no effect on the estate." *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 753 (5th Cir. 1995). Accordingly, because the claims against the Bank asserted in the Challenged Litigation do not have any effect on the estate, the Court lacks jurisdiction to hear them—much less dismiss them.

20. It does not matter that the Plan's gatekeeper provision requires that the dispute must be "related to the Debtor" to fall within its scope. (Plan, art. IX(E)). Mere "shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action 'related to' the bankruptcy." *In re Zale Corp.*, 62 F.3d at 753. Accordingly, a mere factual interrelationship between the Challenged Litigation and the arguments asserted in the bankruptcy does not convey jurisdiction to the Court to resolve that litigation.

21. The Bankruptcy Court therefore lacks the power to require the Plaintiffs to comply with the gatekeeping orders to maintain that litigation, and the Plaintiffs in the Challenged Litigation are not required to obtain this Court's permission before maintaining it. *See Tufts v. Hay*, 977 F.3d 1204, 1210-11 (11th Cir. 2020) ("Thus, under the

12

'conceivable effects' test for section 1334(b), the Bankruptcy Court did not have jurisdiction to consider Tufts's action, and Tufts counsel were not required to obtain leave from that court before filing this action in the District Court.").

## II.    The claims raised against the Bank satisfy the Plan's gatekeeping provision because they raise colorable lender-liability claims that the Plaintiffs have standing to pursue.

22.    Yet even if the Plaintiffs' claims against the Bank in the Challenged Litigation may be properly subjected to the Plan's gatekeeping provision, those claims satisfy the gatekeeping provision's standard for obtaining this Court's permission to maintain those claims.

23.    The remaining two actions include claims against the Bank, but these claims easily satisfy the gatekeeping provision's low threshold for maintaining a claim. Two of these cases originated in state court, and one was remanded in January. (Case No. 23-03259 [Dkt No. 24] (Bankr. S.D. Tex. Jan. 11, 2024)) The final case is an adversary proceeding that the Debtor filed in this court in conjunction with its original bankruptcy. *See* **Exhibit 1** (Original Complaint, No. 23-06009 (Bankr. S.D. Tex. Sept. 19, 2023) [Dkt. No. 1]) And the claims raised against the Bank in both cases are "colorable."

24.    The term "colorable" is not defined in the Plan or in the gatekeeping provision, but it nevertheless invokes the exceptionally low standard for determining whether a defendant has been fraudulently joined to avoid diversity jurisdiction. *See Overholt v. Purina Animal Nutrition LLC*, Case No. 1:14-CV-1216, 2015 WL 1631855, at *2 (W.D. Mich. Apr. 13, 2015) ("Under the fraudulent joinder rule, courts may disregard the citizenship of parties against whom there is no 'colorable' cause of action."). This

13

standard is "similar to, but more lenient than, the analysis applicable to a Rule 12(b)(6) motion to dismiss." *Casias v. Wal-Mart Stores, Inc*., 695 F.3d 428, 433 (6th Cir. 2012). And even under a Rule 12(b)(6) analysis, the standard that courts apply is decidedly lenient and plaintiff-friendly, requiring a court to evaluate the sufficiency of plaintiff's complaint by accept[ing] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and alteration omitted). The Court must resolve all disputed questions of fact and ambiguities in the controlling state law in favor of the non-removing party. *Coyne*, 183 F.3d at 493. And to be "colorable," a claim need not meet "the stricter 12(b)(6) pleadings under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Overholt*, 2015 WL 1631855, at *7-8.

25.    Plaintiffs' remaining claims against the Bank readily meet this lenient standard. The cases concern a common core of operative facts underlying all three cases in the Challenged Litigation relating to the Bank's efforts to foreclose on the Debtor's property so it could obtain that property for itself. *See* The Bank loaned the Debtor over $50 million to purchase the property (Dkt. No. 565 at 4), but throughout the life of the loan, the Bank made it progressively more difficult for the Debtor to pay that loan back. As Plaintiffs have alleged in the state court proceedings, the Bank inserted itself directly into the Debtor's business operations, interfering with those business operations in numerous unjustified ways. **Exhibit 2** (Plaintiff's Sixth Amended Petition, No, 2023-22748 (Harris County Dist. Ct. Dec. 18, 2023). And the pleadings in Case No. 23-6009, the adversary proceeding which remains pending in this Court, contains similar allegations of

14

interference by the Bank. (Ex. 1, ¶¶9-21)

26.     For example, the Bank thwarted the Debtor's efforts on at least *five* different occasions to sell interests in the building that would have cleared the Bank's debt—often through strategic declarations of defaults or foreclosure postings designed to discourage prospective buyers. (*See* Ex. 2, ¶¶ 22, 31- 33) The Bank likewise refused to approve or ignored at least *nine* different offers to lease space in the building, thereby preventing the Debtor from raising funds to pay off the loan, eventually forcing the Debtor to bring suit. (*Id.* ¶¶23, 27)

27.     After the parties settled their litigation through a Confidential Settlement Agreement (Dkt. No. 403-4) hat reduced the principal amount due under the loan, Plaintiff alleged that the Bank improperly disclosed the terms of the Confidential Settlement Agreement in direct violation of its express confidentiality obligations by disclosing the new loan balance to potential purchasers of the property, thereby revealing the Debtor's financial struggles, improperly impacting these prospective buyers' evaluation of the property's market value, "chill[ing] the market" for the property, and converting these potential buyers who would have negotiated a sale with the Debtor into potential purchasers of the Bank's note. (*See* Ex. 2, ¶¶28-29, 63-64)

28.     The Bank also actively attempted to wrest control of the Debtor and its property from Choudhri by interfering with Choudhri's control of Naissance. The Bank worked in league with Azeema Zaheer, Choudhri's ex-girlfriend, who acted as his agent in running Naissance until Ali exercised his right to take over control of the company from her. (*See* Ex. 2, ¶¶ 36-46) And these efforts by the Bank and Zaheer were all part of a larger

15

effort by Choudhri's disgruntled business partner, Osama Abdullatif, to seize Choudhri's business interests by brute force and fraud. Abdullatif has arranged to have hard drives seized from Choudhri's companies (**Exhibit 3** at 1 [Declaration of Quanell X Farrakhan No. 1]) He has also even arranged for Choudhri to be accused of a murder-for-hire plot to kill Abdullatif himself, which authorities dismissed as "a hoax." (*Id.*; *see also* **Exhibit 4** [Quanell X Farrakhan Aff. No. 2]) And Omar Khawaja, an attorney and close business associate of Abdullatif, admits to representing Abdullatif and Zaheer in furtherance of Abdullatif's avowed goal of seizing all of Choudhri's business interests through litigation—under their theory: "If [Ali] own[s] it, we own it." (**Exhibit 5** [Deposition of Omar Khawaja] at 23: 30: 17-21; 163:8-165:2; 194:3-6)

29.     Plaintiffs supported these allegations with voluminous documentary evidence, including examples of lease proposals that were rejected or ignored and elicit communications between Bank representatives and Zaheer. (*See* Ex. 2, pp. 6-7, 8, 9) Indeed, Plaintiffs produced a key document in their pleadings in which the Bank encouraged Zaheer to "stay on" until the Bank could find a "suitable replacement for her," even after Choudhri had exercised his right to regain control over the company, thereby demonstrating the Bank's intentional efforts to interfere with Choudhri's management of Naissance. (*See* Dkt. No. 88-29 at 1-2) The operative pleadings in these actions raise numerous claims against the Bank, including breach of contract, tortious interference, fraud, business disparagement, breach of the duty of good faith and fair dealing, unjust enrichment, and conspiracy. *See* Ex. 2, ¶¶ 62, 104)

30.     The Plaintiffs have also alleged how the Debtor, Naissance, and Choudhri all

16

experienced independent injuries from the Bank's conduct: While the Debtor was deprived of its right to survive and thrive as an ongoing business, Naissance and Choudhri suffered their own loss of a significant asset. And this establishes that Naissance and Choudhri each have standing to pursue claims against the Bank independently.

31.    While the facts alleged in the Challenged Litigation paint an extraordinary factual picture, they nevertheless present classic lender liability claims that have long been recognized under Texas law. Such lender-liability claims frequently involve both breach-of-contract *and* tort claims. *See Williams v. National Mortg. Co.*, 903 S.W.2d 398, 404 (Tex. Ct. App. 1995); *Jones v. First Nat'l Bank of Anson*, 846 S.W.2d 107, 109 (Tex. Ct. App. 1992, no writ) (concerning causes of action for breach of duty of good faith and fair dealing, breach of fiduciary duty, negligent misrepresentation, conversion, estoppel, and violations of the Deceptive Trade Practices Act); *Lamar Sav. Ass'n v. White*, 731 S.W.2d 715, 717-18 (Tex. Ct. App. 1987) (causes of action for breach of contract, breach of fiduciary duty, usury, duress, estoppel, and tortious interference).

32.    And courts have found such lender-liability claims to be viable under factual circumstances that are virtually identical to those at issue in this case. Texas courts have found that lenders can be held liable for wrongful defaults and wrongful acceleration. *See, e.g.*, *Rey v. Acosta*, 860 S.W.2d 654 (Tex. Ct. App. 1993); *Dixon v. Brooks*, 604 S.W.2d 330, 334 (Tex. Ct. App. 1980). Courts also routinely permit lenders to be held liable in the

17

context of improper refusals to approve leases.[3] And courts have even allowed borrowers to maintain claims that banks have conspired with others to interfere with their borrowers' businesses. *See, e.g.*, *State Nat'l Bank v. Farah Mfg. Co.*, 678 S.W.2d 661 (Tex. Ct. App. 1984). Indeed, the Bankruptcy Court for the Northern District of Texas recently found a lender liable under factual circumstances that are equally extreme to this case. *See Bailey Tool & Mfg. Co.*, *et al. v. Republic Bus. Credit (In re Bailey Tool & Mfg. Co.)*, Adv. No. 16-03025-SGJ (Bankr. N.D. Tex. December 23, 2021) (holding lender liable under numerous theories for, among other things, taking aggressive action to protect its interests, impacting the company's liquidity, and communicating in secret with the company's customers to have them pay the bank instead of the company). These cases demonstrate that the legal theories that Plaintiffs have asserted are well-founded in Texas law, and the allegations, while extraordinary, are hardly implausible. And that is why no court has ever dismissed them. That makes them colorable.

33.    And while, during plan confirmation, the Court concluded that these claims were "implausible" and "not viable" (Dkt. No. 565 at 17), Plaintiffs respectfully submit that these determinations should not be the Court's final word on the matter. During plan confirmation, the Plaintiffs were not permitted to present, and the Court was not permitted to hear, a full airing of the evidence to support the Plaintiffs' claims. It heard a mere summary. But even in that limited summary, the Court heard testimony from two of the

---

[3] *See, e.g.*, Metropolitan Corporate Counsel, *Liability Awaits the Unwary: Lenders and Leasing Decisions* (Dec. 13, 2004), https://bit.ly/4e6fGe7.

000434

state's most respected attorneys, Tom Phillips, former Chief Justice of the Texas Supreme Court, and Jerry Alexander, both of whom felt the claims were so strong that they were both willing to take the case on contingency. (*See* Dkt. No. 570) While the Court discounted that testimony because the lawyers explained only that the Debtor "had claims" but never "explained how or why these claims arose," those questions are answered by the operative pleadings in the pending litigation, which provide extensive factual detail and evidence regarding the origin and basis for these claims. (Dkt. No. 565 at 17)

34.     The Court made barely any mention of the factual or legal merits of those claims. Instead, the Court simply found the claims incredible, questioning why the Debtor had "never been able" to pay the note, determining that it was unlikely likely that the Bank had "breached" the Settlement Agreement first, excusing the Debtor's own failure to pay, and challenging Choudhri's credibility as a witness. (Dkt. No. 565 at 17) But the first of these holdings ignore the Plaintiffs' factual allegations—which the Court must accept as true—that the Bank interfered with the Debtor's ability to pay the note. And the latter two should not weigh in the balance in determining whether Plaintiffs' claims against the Bank are "colorable," which requires examining solely the allegations pleaded and setting aside questions of witness credibility. Indeed, the fact that two well-respected Texas attorneys are willing to pursue the litigation on a contingency basis provides ample evidence that the claims are in fact "colorable."

35.     Finally, while the Court expressed concern about the motivations behind these various pieces of litigation, concluding that they were primarily meant "to postpone a real estate foreclosure" (Dkt. No. 565 at 16), those concerns are unfounded. Lender

19

liability claims are frequently asserted in efforts to halt foreclosure. *See, e.g.*, *Williams*, 903 S.W.2d at 404; *Jones*, 846 S.W.2d at 109. And the factual context in which those claims arose does not undercut their viability.

## CONCLUSION

For these reasons, Ali Choudhri respectfully requests that this Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan be granted, and that none of the claims in the challenged litigation should be dismissed.

Respectfully submitted,

*/s/ J. Carl Cecere*

J. Carl Cecere
State Bar No. 13268300
(admitted pro hac vice)
**Cecere PC**
6035 McCommas Blvd.
Dallas, TX 75206
Telephone: 469-600-9455
ccecere@cecerepc.com

*Counsel for 2425 WL, LLC and Ali Choudhri*

20

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 30, 2024, a true and correct copy of the foregoing was served via the Court's CM/ECF system to all parties who are deemed to have consented to ECF electronic service, and via US mail, including to each of the parties listed below.

Matías J. Adrogué
Leila M. El-Hakam
Matías J. Adrogué PLLC
1629 West Alabama Street
Houston, TX 77006
service@mjalawyer.com

*Putative Counsel for Naissance Galleria, LLC*

Omar Khawaja
Law Offices of Omar Khawaja, PLLC
177 Richmond Ave,
   Ste 1065
Houston, TX 77056
omar@attorneyomar.com

*Putative Counsel for Naissance Galleria, LLC*

Rodney Drinnon
McCathern
Houston 2000 West Loop South
   Ste 1850
Houston, TX 77027
rdrinnon@mccathernlaw.com

*Counsel for Azeemeh Zaheer*

David Tang
6711 Stella Link #343
West University Place, TX 77005
dtangattorney@gmail.com

*Counsel for Azeemeh Zaheer*

*/s/ J. Carl Cecere*

**J. Carl Cecere**

21

EXHIBIT 1

000438

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| *In re:* | § | |
| | § | |
| **GALLERIA 2425 OWNER, LLC** | § | **Case No. 23-60036** |
| | § | **(Chapter 11)** |
| *Debtor,* | § | |
| | § | |
| | § | |
| **GALLERIA 2425 OWNER, LLC,** | § | |
| **NAISSANCE GALLERIA, LLC, AND** | § | |
| **ALI CHOUDHRI** | § | |
| | § | |
| *Plaintiffs,* | § | **Adversary No. _____** |
| | § | |
| **v.** | § | **CONTAINS JURY DEMAND** |
| | § | |
| **NATIONAL BANK OF KUWAIT, S.A.K.P.,** | § | |
| **NEW YORK BRANCH** | § | |
| | § | |
| *Defendant.* | § | |

**GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC,
AND ALI CHOUDHRI'S ORIGINAL COMPLAINT AGAINST
<u>NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH</u>**

COME NOW Galleria 2425 Owner, LLC, Naissance Galleria, LLC, and Ali Choudhri

("***Plaintiffs***"), and make and file this their Original Complaint against National Bank of Kuwait,

S.A.K.P., New York Branch ("***Defendant***"), and for same show the Court as follows:

**I.
<u>JURISDICTION AND VENUE</u>**

1.       This Court has personal jurisdiction over the Defendant named in this Complaint

due to the fact that the Defendant transacts business in the State of Texas, including entering into

a contract with a resident of the State of Texas performable in whole or in part within the State of

Texas, or have committed a tort in whole or in part in Texas and are thus subject to the Texas Long

---

**GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S**
**ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.**                     **PAGE 1 OF 14**

000439

Arm Statute, Section 17.042 of the Texas Civil Practice and Remedies Code.  The Court also has

personal jurisdiction over the Defendants pursuant to 29 U.S.C. §1132(f).

2.      The Court has subject matter jurisdiction of this Adversary Proceeding pursuant to

28 U.S.C. § 1334.

3.      This adversary proceeding constitutes a core proceeding under 28 U.S.C. §

157(b)(2)(A), (B), (C), (D), (H),  and (O) because it will determine the amount of NBK's claim

against the Debtor.  To the extent the Court determines that any of the claims asserted herein are

not core, the Plaintiffs hereby request and demand a trial by jury.

4.      Venue of the Bankruptcy Case and the Adversary Proceeding is appropriate in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.
## PARTIES

### A.      Galleria 2425 Owner, LLC.

5.      Galleria 2425 Owner, LLC ("***Debtor***") is a limited liability company doing business

in Texas and is the owner of the building located at 2425 West Loop S., Houston, Texas ("***2425***

***Building***").  It is the Debtor in the bankruptcy case in which this Adversary is filed.

6.      Naissance Galleria, LLC is a limited liability company doing business in Harris

County, Houston, Texas.

7.      Ali Choudhri is an individual residing in Harris County, Texas.

8.      Defendant National Bank of Kuwait, S.A.K.P., New York Branch ("***NBK***") is a

banking corporation organized under the laws of Kuwait, acting through its New York Branch.

Defendant has not designated a registered agent for service of process in the State of Texas, but

under Rule 7004(a)(8) of the Federal Rules of Bankruptcy Procedure, NBK may be served by

mailing a copy of the Complaint to Corporation Service Company, 299 Park Avenue, New York,

**GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S**                     **PAGE 2 OF 14**
**ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.**

000440

New York 10171. Plaintiff requests that the clerk issue citation at this time. NBK has also filed a motion to dismiss the bankruptcy of Debtor and it and its counsel will be served by ECF in that proceeding.

## III.
## FACTUAL BACKGROUND

9.     In 2018, Defendant NBK loaned certain funds to Debtor. There have been various disputes between the Debtor and NBK about the timeliness of payments and the extent and validity of Defendant's security, but the gravamen of Debtor's Complaint is NBK has continually interfered with the Debtor's ability to lease the 2425 Building to produce revenue and Debtor's ability to sell the 2425 Building to pay NBK off. Every time NBK has so interfered, it has then blamed the Debtor for its inability supposedly to meet some of the loan terms.

10.     For example, in January 2021, Plaintiff Ali Choudhri, who is vilified by NBK in various pleadings, had the building at 2425 West Loop South, Houston, Texas, the asset of the Debtor, sold for a purchase price of $85 million, more than enough to clear NBK's debt. Attached hereto as **Exhibit 1** is a letter dated January 15, 2021 from SIBS International and two purchase contracts which would have paid off not only NBK, but left the Debtor and the other Plaintiffs with a great deal of value. NBK, rather than facilitate this sale, issued a formal notice of default to the Debtor and its intent to accelerate the loan on June 29, 2021, while the SIBS International deal was in progress, killing that deal.

11.     The same was true with regard to NBK's interference with the Debtor's attempt to lease space in the building to provide revenue so it could operate and make loan payments. By August 2021, this situation had become untenable due to NBK's refusal to approve new tenants and new leases, prompting the Debtor on August 13, 2021 to send NBK a detailed letter regarding lease-up and renewal prospects for discussions, none of which, it seemed NBK would approve.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

PAGE 3 OF 14

000441

- ◆ **Healthcare Service Organization**

  - ▪ •Size: 130,000+ RSF – large client requirement in their preliminary planning stages: •Industry: Healthcare Service Organization •Type of use: Administration Offices •Direct/Sublease •Commencement date: Q3/2023 •Term:5-10 yrs. They are specifically VERY interested in amenities available, for example: deli, gym, day care, conference center (# of seats), training center (# of seats).

- ◆ **Invesco**

  - ▪ We met with the team twice and are actively pursuing them for 2425. They are interested in a 157-month lease term for 208,830 SF of Net Rental Area.

- ◆ **Financial Services Firm**

  - ▪ Office •AREA: West Houston (610 West, Hwy 290, Beltway 8) •SPACE: Open Concept •SIZE: Approximately 20,000 – 25,000 rsf •PARKING: 5/1000 ratio •OCCUPANCY: Late 2Q22/Early3Q22 •TERM: 36-60 months with renewal options •This tenant is currently at 24 Greenway on their top floor and have been looking at other A buildings.

- ◆ **Beyond Finance**

  - ▪ We are discussing a 68-month lease term for +/- 40,000 rentable SF.

- ◆ **Banco Affirme**

  - ▪ We submitted a 64-month lease term for 4,545 SF of Net Rental Area.

- ◆ **Walls Bank (existing tenant)**

  - ▪ Renew 3,054 SF of rental space for 60-month term starting January 1, 2022.

- ◆ **Others (working directly with ownership)**

  - ▪ ResMed (https://www.resmed.com/en-us/), interested in the entire building, working directly with Dr. Peter Farrell, Founder and Chairman

  - ▪ Healthstore Holdings (https://www.healthstore.com/), interested in a 15-year term with 80,000 SF in phase 1 and 75,000 SF in 12 months as phase 2

  - ▪ Immunicom (https://immunicom.com/), interested in at least two full floors, moving HQ from San Diego, CA

12.     Reproduced below is an August 16, 2021 email from counsel for the Debtor to NBK

forwarding multiple leases for approval that NBK had failed to approve or even respond to.

**GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S**     **PAGE 4 OF 14**
**ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.**

000442



This lack of approval, or finding obstacles to approve, was not new. In September 2019, Related Group had reached out to lease the parking garage located at the 2425 Building to be used for overflow, for parking up to 110 spaces. NBK's authorized representative Michael Carter would not approve this lease (note "nbkny" email address below– *i.e.* National Bank of Kuwait, New York Branch), which would have generated a great deal of revenue for the Debtor.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

PAGE 5 OF 14

000443

> **From:** Michael Carter <Michael.Carter@nbkny.com>
> **Date:** Monday, 23 September 2019 at 13:22
> **To:** Azeemeh Zaheer <azeemeh@naissancecapital.co.uk>, Lisa Walker
> <Lisa.Walker@nbkny.com>
> **Subject:** RE: LOI
>
> My primary concern is that the tenant determines when the commencement date is, presumably because they have zoning and building department approvals to complete as well as financing to arrange, which is understandable, however there does not appear to be an outside expiration date for the Commencement date. It appears they could tie up these space permanently without having to pay rent. I think you should have an outside date for Commencement.

13.     The situation became so untenable that in September 2021, Debtor initiated a lawsuit against NBK.

14.     In good faith, even during the pendency of this litigation, the Debtor was still trying to get tenants into the building and get NBK's approval to do so, so it would not claim additional breaches of loan agreements.  On July 2, 2022, the Debtor sent NBK five leases for approval, which NBK did not approve.

15.     The parties litigated for eleven (11) months until August 22, 2022, when they entered into a Confidential Settlement Agreement.  The entire Confidential Settlement Agreement will be submitted to the Court *in camera* at the appropriate time, and the Debtor should be allowed to use it in this Adversary since the breach of that Settlement Agreement by NBK is not only actionable, but was also devastating to Debtor.  Because NBK has a way of interpreting any action of the Debtor as one to breach or avoid some purported contractual obligation or other, when the reverse is entirely true, the Confidential Settlement Agreement has not been attached.  NBK has prevented Debtor's successful performance under any and all agreements it has with NBK, including the Confidential Settlement Agreement.

**GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S**
**ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.**

**PAGE 6 OF 14**

000444

16.     The Confidential Settlement Agreement permitted a timeframe in which Debtor could sell the 2425 Building, and Debtor was successful in receiving a hard Letter of Intent dated January 17, 2023 to purchase the building from Caldwell Soames.  A true and correct copy of that hard Letter of Intent is attached hereto as **Exhibit 2**.  Again, while these negotiations were ongoing, NBK took actions which interfered with the continuation and closing of that transaction, including issuing a notice of foreclosure on March 29, 2023 in breach of the Confidential Settlement Agreement, which Debtor believes was done intentionally to prevent the sale.  The sale would have cleared the Bank of Kuwait debt as it stood at that time and left great value for the other Plaintiffs.  Debtor believes that Bank of Kuwait recognized that greater value and wanted to take it for itself by foreclosure in a "loan to own" gambit.

17.     There are tremendous factual inaccuracies that NBK represents to courts and continues into these proceedings.  For example, in its Motion to Dismiss the Debtor's Bankruptcy, while it is absolutely true that temporary restraining orders were filed to attempt to prevent a foreclosure by NBK and its takeover of the 2425 Building, they were also **granted**.  The facts presented that NBK had not allowed the Debtor to lease up the building to generate revenue and had killed two transactions that Debtor was working on that would have cleared NBK and left value for the Debtor and the other Plaintiffs.

18.     Additionally, NBK posted for foreclosure in 2023 early, and against an extended grace period that a State Court had given Debtor, which chilled the bidding process and interest in the 2425 Building completely.  No one wants to buy a building posted for foreclosure.  Debtor believes that NBK knew this and did it on purpose to prevent the Debtor from successfully selling the property and paying off the loan, so NBK could foreclose and become the owner of the 2425 Building.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S          PAGE 7 OF 14
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

000445

19.     Not the least of the misstatements that NBK makes about the Debtor are those hard statements that the Debtor has not made any payments to NBK since March 6, 2021. This is stated both in paragraph 13 of NBK's Motion to Dismiss Debtor's Bankruptcy, and in NBK's Mr. Carter's Declaration (paragraph 8 of Declaration of Michael Carter).

20.     The absolute opposite is true. Representatives of NBK have admitted in writing that the following substantial payments have been made to NBK well after March 6, 2021:

        a)      $801,509.42 paid by Debtor to NBK on August 27, 2022;

        b)      $80,000 paid by Debtor to NBK on April 18, 2023;

        c)      $80,000 paid by Debtor to NBK on May 10, 2023.

This is almost One Million Dollars ($1,000,000) that not only does NBK not give credit to the Debtor for having made the payments, but again, it vilifies it, saying exactly the opposite that no payments (zero) have been made since March 6, 2021.

21.     After NBK's disclosures of the situation created by the Confidential Settlement and the wrongful posting for foreclosure during an extension of that agreement, potential buyers of the property who would otherwise become good prospects to negotiate a sale with Debtor, became potential purchasers of the NBK Note and began negotiating with NBK. NBK materially breached the Confidential Settlement Agreement and interfered with these potential purchases and with these business relationships.

**IV.**
**CAUSES OF ACTION**

**COUNT 1:  BREACHES OF CONFIDENTIAL SETTLEMENT AGREEMENT**

22.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S                    PAGE 8 OF 14
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

000446

23.     Debtor and the other two Plaintiffs and Defendant reached a valid and enforceable agreement expressly set forth in the Confidential Settlement Agreement.  Pursuant to the Confidential Settlement Agreement, Defendant agreed to keep the contents and terms of the parties' agreement completely confidential.  Debtor dismissed its very good claims in the Lawsuit against Defendant in reliance upon Defendant's promises, including but not limited to, Defendant's promise to uphold the confidentiality obligations set forth in the Confidential Settlement Agreement.

24.     Defendant breached the Confidential Settlement Agreement by disclosing its contents and terms to third parties in violation of the agreement's express confidentiality provisions.  These disclosures prevented Debtor from closing on the sale of the 2425 Building and chilled the market for other buyers for Debtor's property.  The same is true for NBK's wrongful, early filing of a notice of foreclosure on the 2425 Building, also in violation of the Confidential Settlement Agreement.

25.     Debtor and all Plaintiffs hereby sue NBK for these breaches of the Confidential Settlement Agreement.  The damages for these breaches are the amounts of money that the Debtor would have made from the contemplated transaction, which is in excess of Fifty Million Dollars ($50,000,000).

**COUNT 2:  TORTIOUS INTERFERENCE WITH CONTRACT**

26.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

27.     As alleged, NBK tortiously interfered with the SIBS International contract (**Exhibit 1**) and the Caldwell Soames Inc. contract (**Exhibit 2**), causing damages to the Debtor and the other two Plaintiffs in the net amounts of the contracts which, but for NBK's interference,

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S                    PAGE 9 OF 14
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

000447

would have been paid to the Debtor and the other two Plaintiffs. These damages are excess of Fifty Million Dollars ($50,000,000), for which the Debtor hereby sues NBK.

## COUNT 3: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

28.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

29.     After NBK's disclosures of the situation created by the confidential settlement and the wrongful posting for foreclosure during a judicial extension of the grace period contained in that agreement, potential buyers of the property who would otherwise have become good prospects to negotiate a sale with Debtor, became instead potential purchasers from NBK of the NBK note and began contacting and negotiating or attempting to negotiate with NBK instead of the Debtor.

30.     This interference by NBK damaged Debtor in amounts to be determined after discovery, but which exceed the minimum jurisdictional limits of this Honorable Court.

## COUNT 4: FRAUD AND FRAUDULENT INDUCEMENT/LENDER LIABILITY

31.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

32.     NBK never had any intention of living up to the Confidential Settlement Agreement. The Debtor was winning the lawsuit against NBK, so NBK induced the Debtor into dismissing its lawsuit and entering into the Confidential Settlement Agreement which NBK had no intention of living up to. This fraud works an estoppel against NBK (see Count 6, "ESTOPPEL"). Plaintiffs hereby sue NBK for the fraud and fraudulent inducement and alleges it constitutes the basis for an action for Lender Liability.

33.     NBK knew at the time it entered into the Confidential Settlement Agreement it would deflect and tortiously interfere with the Debtor's attempts to sell the 2425 Building so NBK

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S                    PAGE 10 OF 14
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

000448

would be able to foreclose on the building and take all of the value instead of just the value of the amounts otherwise owed at the time. The fraud, fraud in the inducement, lender liability, and subsequent interference for all of which Plaintiffs hereby sue NBK. These actions by NBK have damaged the Debtor and the other two Plaintiffs in an amount of at least Thirty Million Dollars ($30,000,000).

<div align="center">

**COUNT 5: FRAUDULENT CONVEYANCE**

</div>

34.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

35.     The funds paid by the Debtor to NBK:

a)      $801,509.42 paid Debtor to NBK on August 27, 2022;

b)      $80,000 paid by Debtor to NBK on April 18, 2023; and

c)      $80,000 paid by Debtor to NBK on May 10, 2023

were fraudulently induced by NBK and were payments for which the Debtor received nothing in return and constitute fraudulent conveyances in violation of U.S.C. § 544, 548, and 550 and Tex. Bus. & Comm. Code §§ 24.001, *et seq.*, for which the Debtor hereby sues NBK to recover all such amounts.

<div align="center">

**COUNT 6: ESTOPPEL**

</div>

36.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

37.     NBK is estopped from claiming Debtor owes any more than the amount stated and agreed to in the Confidential Settlement Agreement because of its fraud and fraudulent inducement alleged previously.

Galleria 2425 Owner, LLC, Naissance Galleria, LLC, and Ali Choudhri's
Original Complaint Against National Bank of Kuwait, S.A.K.P.                    Page 11 of 14

000449

## COUNT 7:  BUSINESS DISPARAGEMENT

38.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

39.     The posting of the 2425 Building during any negotiation periods and/or the extended grace period when actual buyers were moving toward concluding a deal and when other potential buyers were expressing interest in the 2425 Building, constituted business disparagement against the Debtor for which Debtor hereby sues NBK.  The damages are the net amount of money the Debtor would have received in the sales had they occurred.

## COUNT 8:  BREACH OF GOOD FAITH AND FAIR DEALING

40.     Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

41.     Every contract has a duty of good faith and fair dealing engrafted upon it, especially in a lender/borrower relationship, and even more so when the lender is based in the State of New York as NBK is.

42.     NBK breached its duty of good faith and fair dealing by:

a)      Inducing Plaintiffs to dismiss their State Court lawsuit;

b)      Inducing Plaintiffs to enter into the Confidential Settlement Agreement;

c)      Tortiously interfering with Debtor's performance under the Confidential Settlement Agreement;

d)      Tortiously interfering with third-party contracts;

e)      Not approving tenant leases or contracts for sale; and

f)      deflecting buyers so Debtor could not sell the 2425 Building.

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S
ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

PAGE 12 OF 14

000450

43. Plaintiffs hereby sue NBK for breach of duty of good faith and fair dealing. The damages are for the value of the amounts that would have been recovered in the state court litigation and/or the value of the deals lost for leases and/or sales of the 2425 Building.

## COUNT 9: UNJUST ENRICHMENT

44. Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

45. If NBK is allowed to foreclose on the 2425 Building it will make an unconscionable profit and succeed in its "loan to own" gambit. The amount of its unjust enrichment for which Plaintiffs hereby sue NBK is the difference between what NBK would have been owed (but for its breaches of the Confidential Settlement Agreement) under the Confidential Settlement Agreement and the true value of the building, for which Plaintiffs hereby sue NBK.

## COUNT 10: ATTORNEYS' FEES

46. Plaintiffs repeat and reallege the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

47. Plaintiffs hereby sue NBK for their reasonable and necessary attorneys' fees under breach of contract and under any statutory or common law right to recover same.

## PRAYER

WHEREFORE, premises considered, Plaintiffs pray that Defendants be cited to appear herein as provided by law and that upon hearing:

1. NBK not be allowed to foreclose on the 2425 Galleria Building;

2. Plaintiffs recover their damages and attorneys' fees as alleged.

Dated: September 19, 2023

---

GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.

PAGE 13 OF 14

000451

Respectfully submitted,

**HAYWARD PLLC**

By: /s/ Melissa S. Hayward
    Melissa S. Hayward
     Texas Bar No. 24044908
     MHayward@HaywardFirm.com
10501 North Central Expy., Suite 106
Dallas, Texas 75231
(972) 755-7100 (telephone/facsimile)
**PROPOSED COUNSEL FOR THE DEBTOR**


By: /s/ James Q. Pope
    James Q. Pope
     State Bar No. 24048738
     jamesp@thepopelawfirm.com
**THE POPE LAW FIRM**
6161 Savoy Drive, Suite 1125
Houston, Texas  77036
(713) 449-4481 Telephone
(281) 657-9693 Facsimile
**COUNSEL FOR PLAINTIFFS ALI CHOUDHRI AND NAISSANCE GALLERIA LLC**


## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that the foregoing was filed with the Court and served via the Court's CM/ECF system upon all of the parties registered to receive such notice on September 19, 2023.


            */s/ Melissa S. Hayward*
            Melissa S. Hayward

**GALLERIA 2425 OWNER, LLC, NAISSANCE GALLERIA, LLC, AND ALI CHOUDHRI'S ORIGINAL COMPLAINT AGAINST NATIONAL BANK OF KUWAIT, S.A.K.P.**       **PAGE 14 OF 14**

000452

EXHIBIT 2

000453

12/17/2023 7:53 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 82647538
By: Bonnie Lugo
Filed: 12/18/2023 12:00 AM

## CAUSE NO. <u>2023-22748</u>

| | | |
|---|---|---|
| **GALLERIA 2425 OWNER, LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Plaintiff,* | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **NATIONAL BANK OF KUWAIT,** | § | |
| **S.A.K.P., NEW YORK BRANCH,** | § | |
| | § | |
| *Defendant.* | § | **281ST JUDICIAL DISTRICT** |

## <u>PLAINTIFF'S SIXTH AMENDED PETITION</u>

Galleria 2425 Owner, LLC ("***Plaintiff***") files this Sixth Amended Petition against Defendant National Bank of Kuwait S.A.K.P., New York Branch (individually as "***NBK***", or collectively as "***Defendants***"), and Azeemeh Zaheer (individually as "***Zaheer***", or collectively as "***Defendants***") and, in support, submit the following:

## I.
## <u>DISCOVERY PLAN</u>

1.     Discovery should be conducted pursuant to Level 2 of Rule 190.3 of the Texas Rules of Civil Procedure.

## II.
## <u>PARTIES</u>

2.     Galleria 2425 Owner, LLC ("***Plaintiff***") is a limited liability company doing business in Texas and is the owner of the building located at 2425 West Loop S., Houston, Texas ("***2425 Building***").

Page **1** of **29**

000454

3.    National Bank of Kuwait, S.A.K.P., New York Branch ("***NBK***") is a banking corporation organized under the laws of Kuwait, acting through its New York Branch. NBK HAS APPEARED WITH COUNSEL.

4.    Azeemeh Zaheer ("**Zaheer**"), is an individual who resides, and may be personally served at 5513 Kansas Street, Houston, Texas 77007.

### III.
### INTRODUCTION

5.    This suit was originally filed against NBK, a party who has been shown to be willing to engage in bad faith actions, and who repeatedly attempts to make outside deals with third parties, specifically to deprive the plaintiff of its ownership interest in the 2425 Building in any way it can.

6.    Plaintiff, Galleria 2425 Owner, LLC, filed bankruptcy to preserve the asset, which NBK vehemently opposed, and fought to have dismissed from the bankruptcy court. However, at the hearing on NBK's motion to dismiss, Plaintiff was successful in defending against dismissal, and the bankruptcy case moved forward.

7.    Plaintiff promptly proposed a plan in the bankruptcy court, which was characterized as a "really smart" plan that "check[ed] all the boxes" for plan confirmation, according to Judge Lopez.

8.    Then, after NBK lost its motion to dismiss, it filed a letter in the bankruptcy case (Document 77) which made the bankruptcy court aware of litigation that was irrelevant to Galleria 2425 Owner, LLC's pursuit of its ongoing bankruptcy case. The state court litigation referenced by NBK is, in the words of Judge Lopez "an unrelated case involving Ms. Zahire [sic] and Naissance and Mr. Choudhri". The case is about a dispute over control of an entity called

Naissance Galleria, LLC, which is an entity that provided a mezzanine loan to Galleria 2425 Owner, LLC's sole member and is party to an intercreditor agreement with NBK. Upon information and belief, certain of the investors in Naissance Galleria LLC are substantial clients of or investors in NBK. Naissance Galleria LLC was also a party to the very settlement agreement with NBK at issue in this suit. Importantly, Naissance Galleria, LLC does not have any membership in, or control over Galleria 2425 Owner, LLC, or any of its members or managers.

9.      Notably, the state court, in the litigation referenced in NBK's letter to Judge Lopez, did issue a Temporary Injunction, which maintained the status quo of Choudhri's management and control of Naissance Galleria, LLC, but limited any actions that could be taken by Choudhri on behalf of Naissance Galleria, LLC to only those which are also approved by Zaheer, until a trial resolves the issue once and for all.

10.      After the Temporary Injunction was in place establishing Choudhri's control of Naissance Galleria, LLC, Zaheer directed her counsel, while purporting to act for Naissance Galleria, LLC, to appear at two separate hearings in the bankruptcy court, on or about October 12, 2023 and November 1, 2023, and on the eve of a November 1 status conference filed an emergency motion in the bankruptcy court, requesting for Judge Lopez to rule against the state court and find that Zaheer had control of, and could act for Naissance Galleria, LLC. Judge Lopez thereafter sua sponte dismissed the bankruptcy case during the November 1, 2023 status conference.

11.      When the parties to the state court litigation returned to appear before Judge Manor on November 13, 2023, Judge Manor confirmed that her Temporary Injunction did not give Zaheer any right to act as the manager of Naissance Galleria, LLC, and confirmed that Choudhri was in control, subject to Zaheer's approval during the pendency of trial.

12.     All of these actions, gave rise to Judge Lopez's serious concerns about the ability to move forward with the bankruptcy case without resolution in the state court action. Judge Lopez stated, in the Status Conference held on November 1, 2023, the following:

> "I don't have anything to qualify it in state court issues. I don't know. There's just a lot of confusing stuff, and my gut tells me that I need to dismiss this case and let you all go figure this out in State Court, because there's not enough here, and there's real concerns that I have…".

13.     However, since Naissance Galleria, LLC has no ownership or control over the Plaintiff or any of its members or managers, these filings and appearances are just a smoke screen. The fact that they were also filed in violation of the Temporary Injunction not only makes these actions unlawful, but there could be no other purpose aside from attempting to cause the dismissal of the bankruptcy case brought by Galleria 2425 Owner, LLC, which is an action that, logically, would be counter to the company's interests.

14.     In its letter inviting the Naissance dispute and Ms. Zaheer's counsel into the bankruptcy proceedings, NBK cleverly attempts to confuse the court by implying that Ms. Zaheer had control of Naissance Galleria, LLC because the order says that management decisions could not be made without her approval. Ms. Zaheer's counsel then accepted NBK's invitation to create confusion and disruption, appearing at the October 13 emergency status conference purporting to represent Naissance Capital LLC.

15.     As this Court has handled cases related to Galleria 2425 Owner, LLC for years, it is well aware that Ms. Zaheer has been entirely absent from any of these proceedings until on or about July 5th, 2023, when Naissance Galleria, LLC appeared, allegedly controlled by Azeemeh

Zaheer, before this Court's ancillary docket, attempting to stop the foreclosure by NBK, at which hearing this Court itself questioned the absence of Ms. Zaheer over the last several years.

16.     Ms. Zaheer signed the assignment giving control over Naissance Galleria, LLC to Mr. Choudhri on July 3rd, 2020. Ms. Zaheer did not make any claims of control over Naissance Galleria, LLC, did not attempt to object to Mr. Choudhri's management of the company for three (3) years. These allegations are absurd, as Ms. Zaheer has been entirely absent from the company's management for years.

17.     As a result of this conspiracy by the defendants, the emergency status conference requested by NBK resulted in the dismissal of the bankruptcy case.

18.     What's interesting is that, if Ms. Zaheer was sincerely the manager of Naissance Galleria, LLC, she would not have worked to have the bankruptcy case dismissed.

19.     Such actions, if they had been taken by a legitimate manager for Naissance Galleria, LLC, would be a breach of fiduciary duty to the company, *unless there was a back room deal NBK*.

20.     Now that NBK has re-posted the 2425 Building for foreclosure, Plaintiff will suffer irreparable harm as a result of the defendants' actions.

**IV.**
**FACTUAL BACKGROUND**

21.     In 2018, NBK loaned certain funds to Plaintiff.  NBK has continually interfered with the Plaintiff's ability to lease the 2425 Building to produce revenue and Plaintiff's ability to sell the 2425 Building to pay NBK off.  Every time NBK has so interfered, it has then blamed the Plaintiff for its inability supposedly to meet some of the loan terms.

Page **5** of **29**

22.     For example, in January 2021, Plaintiff Ali Choudhri, who is vilified by NBK in various pleadings, had serious parties interested in acquiring interests in the building more than enough to clear NBK's debt.  A letter dated January 15, 2021, from SIBS International, and two purchase contracts would have paid off not only NBK, but left the Plaintiff with a great deal of value.  **NBK, rather than facilitate this sale, issued a formal notice of default to the Plaintiff and its intent to accelerate the loan on June 29, 2021**, while the SIBS International deal was in progress, killing that deal.

23.     **The same was true with regard to NBK's interference with the Plaintiff's attempt to lease space in the building to provide revenue so it could operate and make loan payments.**  By August 2021, this situation had become untenable due to NBK's refusal to approve new tenants and new leases, prompting the Plaintiff, on August 13, 2021, to send NBK a detailed letter regarding lease-up and renewal prospects for discussions, none of which, it seemed NBK would approve.

- **Healthcare Service Organization**

  - •Size: 130,000+ RSF – large client requirement in their preliminary planning stages:  •Industry: Healthcare Service Organization •Type of use: Administration Offices •Direct/Sublease •Commencement date: Q3/2023 •Term:5-10 yrs.  They are specifically VERY interested in amenities available, for example: deli, gym, day care, conference center (# of seats), training center (# of seats).

- **Invesco**

  - We met with the team twice and are actively pursuing them for 2425.  They are interested in a 157-month lease term for 208,830 SF of Net Rental Area.

- **Financial Services Firm**

  - Office •AREA: West Houston (610 West, Hwy 290, Beltway 8) •SPACE: Open Concept •SIZE: Approximately 20,000 – 25,000 rsf •PARKING: 5/1000 ratio •OCCUPANCY: Late 2Q22/Early3Q22 •TERM: 36-60 months with

renewal options •This tenant is currently at 24 Greenway on their top floor and have been looking at other A buildings.

- **Beyond Finance**

  - We are discussing a 68-month lease term for +/- 40,000 rentable SF.

- **Banco Affirme**

  - We submitted a 64-month lease term for 4,545 SF of Net Rental Area.

- **Walls Bank (existing tenant)**

  - Renew 3,054 SF of rental space for 60-month term starting January 1, 2022.

- **Others (working directly with ownership)**

  - ResMed ([https://www.resmed.com/en-us/](https://www.resmed.com/en-us/)), interested in the entire building, working directly with Dr. Peter Farrell, Founder and Chairman

  - Healthstore Holdings ([https://www.healthstore.com/](https://www.healthstore.com/)), interested in a 15-year term with 80,000 SF in phase 1 and 75,000 SF in 12 months as phase 2.

  - Immunicom ([https://immunicom.com/](https://immunicom.com/)), interested in at least two full floors, moving HQ from San Diego, CA

24.     Below is an August 16, 2021 email from counsel for the Plaintiff to NBK

forwarding multiple leases for approval that **NBK had failed to approve or even respond to.**

Page **7** of **29**



25. This lack of approval, or finding obstacles to approve, was not new. In September 2019, Related Group had reached out to lease the parking garage located at the 2425 Building to be used for overflow, for parking up to 110 spaces. **NBK's authorized representative Michael Carter would not approve this lease** (note "nbkny" email address below– *i.e.* National Bank of Kuwait, New York Branch), which would have generated a great deal of revenue for the Plaintiff.

> **From:** Michael Carter <Michael.Carter@nbkny.com>
> **Date:** Monday, 23 September 2019 at 13:22
> **To:** Azeemeh Zaheer <azeemeh@naissancecapital.co.uk>, Lisa Walker <Lisa.Walker@nbkny.com>
> **Subject:** RE: LOI
>
> My primary concern is that the tenant determines when the commencement date is, presumably because they have zoning and building department approvals to complete as well as financing to arrange, which is understandable, however there does not appear to be an outside expiration date for the Commencement date. It appears they could tie up these space permanently without having to pay rent. I think you should have an outside date for Commencement.

26.     The situation became so untenable that in September 2021, Plaintiff initiated a lawsuit against NBK.

27.     In good faith, even during the pendency of this litigation, the Plaintiff was still trying to get tenants into the building and get NBK's approval to do so, so it would not claim additional breaches of loan agreements.  **On July 2, 2022, the Plaintiff sent NBK five leases for approval, which NBK did not approve.**

28.     *The parties litigated for eleven (11) months until August 22, 2022, when they entered into a Confidential Settlement Agreement.*  **NBK has prevented Plaintiff's successful performance under any and all agreements it has with NBK, including the Confidential Settlement Agreement.**

29.     The Confidential Settlement Agreement permitted a timeframe in which Plaintiff could sell the 2425 Building, or seek refinancing, and Plaintiff was successful in obtaining a buyer for the building.  Upon closing this transaction, Plaintiff would have retained a forty-five (45%) ownership interest in the 2425 Building. However, **NBK again took actions which interfered with the continuation and closing of that transaction, including issuing a notice of foreclosure**

**on March 29, 2023 in breach of the Confidential Settlement Agreement, which Plaintiff believes was done intentionally to prevent the sale.**  The sale would have cleared the NBK debt as it stood at that time and left great value for the Plaintiff.  Plaintiff believes that NBK recognized that greater value and wanted to take it for itself by foreclosure in a "loan to own" gambit.

30.    There are tremendous factual inaccuracies that NBK represents to state and federal courts and they continue into these proceedings.  For example, in its Motion to Dismiss the Plaintiff's Bankruptcy, while it is absolutely true that temporary restraining orders were filed to attempt to prevent a foreclosure by NBK and its takeover of the 2425 Building, NBK fails to note that such requests were also **granted by this Court** based upon showings that **NBK had not allowed the Plaintiff to lease up the building to generate revenue, and had killed at least two transactions that Plaintiff was working on that would have cleared NBK and left value for the Plaintiff.**

31.    Additionally, NBK posted for foreclosure in 2023 early, and against an extended grace period that this Court had given Plaintiff, which silenced the bidding process and interest in the 2425 Building completely.  No one wants to buy a building posted for foreclosure.  **Plaintiff believes that NBK knew this and did it on purpose to prevent the Plaintiff from successfully selling the property and paying off the loan, so NBK could foreclose and take the 2425 Building for itself so it can open a Houston location.**

32.    After NBK's disclosures of the situation created by the Confidential Settlement and the wrongful posting for foreclosure during an extension of that agreement, potential buyers of the property who would otherwise become good prospects to negotiate a sale with Plaintiff, became potential purchasers of the NBK Note and began negotiating with NBK.  NBK interfered with

these potential purchases and with these business relationships.  At least the following were interfered with in this fashion:

        a)    Globix Investment,

        b)    Ironwood Commercial Realty,

        c)    Shah Firm, LLC, and

        d)    Jeb Brown Law.

**B.**    **Azeemeh Zaheer Decides She Wants the Building.**

33.    On June 26, 2023, Zaheer, filed a lawsuit in the name of Naissance Galleria, LLC ("*Naissance*"), despite having assigned control over such entity several years prior., in the 157th Judicial District Court in Harris County, Texas referenced by case number 2023-39006 against Brad Parker ("*Parker*") as an initial step in Zaheer's pursuit of a hostile takeover of the 2425 Building.

34.    On July 5, 2023, Zaheer, again acting in the name of Naissance, filed a second lawsuit in the 129th Judicial District Court in Harris County, Texas referenced by case number 2023-41091 against Parker and NBK, to further her hostile takeover attempt of the 2425 Building. Zaheer sought injunctive relief, but that request for an emergency temporary restraining order was denied.

35.    On or about July 5, 2023, Plaintiff commenced a Chapter 11 bankruptcy proceeding in the Southern District of Texas, referenced by case number 23-60036.  NBK sought to dismiss the bankruptcy proceeding, but after a full day evidentiary hearing its motion to dismiss was denied on September 26, 2023.  The Chapter 11 Plan could have been approved and would have substantially reduced the value of NBK's secured debt. So, after its motion to dismiss was denied,

000464

NBK changed tactics and decided to invite Ms. Zaheer and her counsel into the bankruptcy case to cause confusion and disruption. NBK decided it could not allow its debt to be restructured under the bankruptcy code, just as it had decided it could not allow the prior sales of the building that had been lined up by Plaintiff.

**C.    Azeemeh Zaheer is a False Representative of Naissance.**

36.    Azeemeh Zaheer at one time had a business and personal relationship with Ali Choudhri, both of which appeared to have ended mutually for a time. Azeemeh Zaheer sought injunctive relief in the 80th Judicial District Court for Harris County against Naissance Galleria, LLC, which was a mezzanine lender to an LLC ("***LLC***") two steps up in the chain.

37.    Azeemeh Zaheer had signed, as the authorized representative of the Managing Member of Naissance Galleria, LLC an Assignment of the management rights of that LLC to Ali Choudhri. In response, Mr. Choudhri stepped into Naissance's shoes, covered its expenses, and did a miraculous job of negotiating the aforementioned settlement with NBK after the Assignment. Azeemeh Zaheer made this assignment for a number of reasons, but most of them stemmed from her ineffective management of the building and her fear of exposure to NBK and certain individuals affiliated with NBK because of her poor performance.

38.    After Mr. Choudhri received the Assignment and had negotiated the successful settlement with NBK and the building looked as if it might succeed (a period of years), Azeemeh Zaheer decided she wanted to misappropriate the value that Mr. Choudhri had just preserved and to an extent had just created. First, she claimed the Assignment was invalid and sought and received a Temporary Injunction, on September 21, 2023, from the 80th Judicial District Court in Harris County. This Temporary Injunction basically only created a stalemate with respect to the management of Naissance Galleria, LLC to preserve the status quo until a trial in January. Mr.

Page **12** of **29**

000465

Choudhri is still the manager of Naissance Galleria, LLC, not Azeemeh Zaheer, although she did have some approval rights under the injunction. Mr. Choudhri, as the manager of Naissance Galleria LLC and is only required to obtain approval from Zaheer for his actions. Zaheer DOES NOT have any control of the entity. Moreover, this was confirmed at a hearing on November 13, 2023 before Judge Manor in the 80th Judicial District Court.

**D.    Azeemeh Decides to Conspire with NBK So It Could Foreclose On the Building.**

39.    After the September 21, 2023 entry of the Temporary Injunction, some ironic, if not strange, events start taking place with respect to Ms. Zaheer and the Plaintiff. First, it is against Azeemeh Zaheer and Naissance's financial interests if NBK forecloses.

40.    Second, on information and belief, Zaheer caused a copy of the Temporary Injunction Entered on September 21, 2023 by the 80th Judicial District Court in Harris County to be sent to counsel for NBK, who used it to interfere with the Plaintiff's ability to reorganize under the bankruptcy code and confirm a chapter 11 plan.

41.    Third, Zaheer's directed her counsel to appear without any forewarning at the October 12, 2023 status conference, in the Bankruptcy Court about the plan, claiming Azeemeh Zaheer now is the manager of Naissance Galleria, LLC and they have been hired by her to represent Naissance Galleria, LLC, all by virtue of the Temporary Injunction.

```
 6        MR. DRINNON:  Okay.  I represent Mr. Abdullatif in
 7   other cases but not this one.  I tend to get hired because I
 8   have sued Mr. Choudhri successfully in numerous
 9   jurisdictions and cases . . . .
```

Page **13** of 29

### E.     Zaheer Changes Sides to Make a Deal with the NBK

42.     Progressively, Azeemeh Zaheer's behavior becomes more inexplicable as she: (1) takes the position that the Temporary Injunction put her in charge of Naissance (it did not);[1] (2) that Naissance Galleria, LLC could or had already become the owner of the Debtor building (2425 Galleria Owner, LLC, Plaintiff herein) and as the new owner, they did not wish to pursue claims asserted in the bankruptcy case against NBK by Plaintiff and Naissance for breaching the settlement agreement  and would want to take the bankruptcy in another direction.

43.     This created an environment of confusion for the Bankruptcy Court, which was by Defendants' design, and it was a concerted effort by the Defendants to have the bankruptcy case dismissed, allowing NBK to foreclose.  Defendant NBK would not be impeded by the bankruptcy and Zaheer could tell Mr. Choudhri: "I will not go along with your reorganization plan unless you pay me millions of dollars" while making a deal with NBK to block the Plan of Reorganization in the event no payment was received from Mr. Choudhri.

44.     The Defendants are working in concert, to achieve the same end.  Specifically, the Defendants have devised, and intended to devise, a scheme or artifice to seize the 2425 Building by any means necessary.  Defendants will stop at nothing to see the Plaintiff lose possession of the 2425 Building, and upon information and belief, the driving force behind their efforts is Osama Abdullatif ("*Abdullatif*").

---

[1] At a hearing had in the issuing court (the 80th Judicial District Court) on Monday, November 13, 2023, the Court confirmed her Temporary Injunction Order had not turned control of Naissance over to Zaheer and Zaheer had no authority to authorize attorneys to make the filing and take the action they had on behalf of Naissance Galleria, LLC in the Bankruptcy.

45.     Defendants' scheme has involved false representations of material information, including but not limited to misrepresentations concerning the Plaintiff and the purpose and effects of the Temporary Injunction.

46.     On November 29, 2023, Azeemeh appeared, through counsel, at an emergency hearing where Naissance Galleria, LLC's Application for Temporary Restraining Order was being heard before the Harris County District Court Ancillary Judge.  Naissance Galleria, LLC sought an emergency temporary restraining order, to enjoin NBK from proceeding with the foreclosure sale scheduled for December 5, 2023, in an effort to protect its interests in the 2425 Building. However, Azeemeh, through counsel, argued against entry of the temporary restraining order, and worked alongside NBK to ensure its denial, leaving the 2425 Building subject to foreclosure. Azeemeh's stance is bizarre, considering Azeemeh, improperly acting as manager for Naissance Galleria, LLC, sought an emergency temporary restraining order to stop NBK from foreclosing on the 2425 Building in July 2023[2].

**F.     False Representations by Zaheer's Agents are Successful in Getting Plaintiff's Bankruptcy Dismissed.**

47.     The Bankruptcy Court scheduled a Status Conference for the Plaintiff's Bankruptcy Case for November 1, 2023.  Azeemeh's agents, on October 31, 2023, only hours before the Status Conference, filed an Emergency Motion.  This Motion contained many misrepresentations, some of which follow:

> a)     Even though Zaheer had no right to or standing necessary to file anything on behalf of Naissance, and the Temporary Injunction gave Zaheer no such rights, statements were made in their Emergency Motion directly to the contrary, stating Azeemeh Zaheer was in, Choudhri was out.

---

[2] See Cause No. 2023-41091: Naissance Galleria LLC v. National Bank of Kuwait S.A.K.P., New York Branch, transcript from the July 5, 2023 Temporary Restraining Order hearing is attached.

000468

b)    The filing stated flatly at one point that the Assignment had been found to be forged – it had not.

c)    The filing stated that, because of the Temporary Injunction, Naissance was now controlled exclusively by Zaheer, who could make Naissance become the Owner of the Bankrupt.  (The issuing court on Monday, November 13, 2023, ruled from the bench it said no such thing.)

These misrepresentations had the desired effect, and the Bankruptcy Court dismissed the Bankruptcy, green-lighting NBK to foreclose.

## G.    Abdullatif is Choudhri's Competitor and Wants to Ruin Him.

48.    Choudhri has been in the real estate investment and management business for the last 20 years.  The regular course of Choudhri's business involves numerous aspects of real estate development.  These activities include real estate and business acquisitions and dispositions, seeking and obtaining financing, and developing and managing commercial and residential properties.  He regularly raises capital for these activities through the issuance of equity and/or debt.  It is also within his normal course of business to enter into transactions with borrowers, lenders, and investors to support the purchase, development, and operations of real estate properties.

49.    Choudhri at times conducts his real estate investment and management business through the use of special purpose entities, such as Plaintiff Galleria Owner 2425, LLC.  Choudhri runs a management company, Jetall ("***Jetall***"), to provide employees and management services to entities for purposes of operating real estate investments.

50.    Abdullatif has provided financing for numerous third-party claims against Choudhri, including interfering with Choudhri's final divorce proceedings in both Pakistan Supreme Court and Harris County District Court by soliciting Choudhri's ex-wife for her legal claims against Choudhri and/or his entities and to gain access to Choudhri's protected financial

disclosures. Abdullatif has filed several dozen Lis Pendens against Choudhri, and his properties, and has sponsored litigation against Choudhri in several dozen cases.

51.     Upon information and belief, Abdullatif is also financing the litigation expenses of Zaheer against Choudhri in the dispute over the building owned by Plaintiff. Abdullatif, Zaheer, and others have all agreed to the enterprise course of action aimed at destroying Choudhri's business, including taking possession of the 2425 Building.

52.     On more than one occasion, Abdullatif resorted to violence and threats against Choudhri and/or his family, friends, and associates. Mr. Choudhri had another real estate venture involving an entity called Dalio. Abdullatif was present at Dalio's foreclosure proceeding, where a friend accompanying him assaulted one of Choudhri's lawyers. On another occasion, Abdullatif and his associates used firearms to hold Choudhri, and his associates, hostage.

53.     Abdullatif also formed an association with others in his illegal efforts to destroy Choudhri's business. These individuals include but are not limited to Chris Wyatt, former paralegal of Jetall ("**Wyatt**").

54.     Wyatt was hired by Jetall in 2019. In the course of his employment, Wyatt oversaw legal and litigation matters for Jetall. He was provided confidential information concerning Jetall's and its client's real estate transactions, finances and debt leverage on properties, and litigation management strategies. As a Jetall representative, Wyatt was regularly involved in and provided access to privileged information and communications, including information subject to attorney-client and work product privileges. Wyatt signed a non-disclosure agreement at the beginning of his employment prohibiting him from disclosing confidential information and requiring him to return all files upon his termination.

55.    Wyatt's employment at Jetall ended in December 2020.  When he left Jetall, Wyatt stole corporate files including electronic communications and secretly recorded privileged phone communications between Choudhri and his attorneys.

56.    Jetall obtained a restraining order in January 2021 enjoining Wyatt from disclosing or divulging confidential information obtained through his course of employment with Jetall.

57.    Abdullatif met with Wyatt before, during and after Wyatt's departure from Jetall. Abdullatif, directly and through his lawyers, received confidential and privileged information from Wyatt.   This information included but is not limited to illegal recordings of Choudhri's conversations with attorneys.

58.    Upon information and belief, Abdullatif and his lawyers were aware that Wyatt was a former employee of Jetall who was involved in confidential and privileged communications and that a restraining order was entered enjoining Wyatt from disclosing confidential information.

59.    Abdullatif and his agents have used the illegally obtained information and recordings as part of Abdullatif's scheme to destroy Choudhri's business.  Abdullatif retained Wayne Dolcefino ("***Dolcefino***") as a "consultant" to publish on the internet a series of hit pieces on Choudhri.  Dolcefino advertises that his services included "litigation support," and Abdullatif has utilized Dolcefino in the course of his numerous lawsuits asserted against Choudhri and his businesses.

60.    Information illegally obtained from Wyatt is included in many of Dolcefino's hit pieces.  Dolcefino continues to publish these hit pieces on the internet, including videos posted in May 2023.

61.    Abdullatif has made several false claims against his competitor, Choudhri, in many ways, two of the most egregious being:

Page **18** of 29

a)   Hiring Dolcefino to create video "hit pieces" about Choudhri, his business, his marital status, and inappropriate character based upon his actions during that marital status. This video contained "over the top" falsehoods, e.g. that he was still married and had been for years. It was commercial speech designed to designate a competitor (Choudhri) and give Abdullatif a competitive advantage, and was introduced into interstate commerce by release to major television (broadcast and cable) networks and by placing on the internet where it still resides today, making it available to the potential customers and lenders that are competed for; and

b)   Placing multiple improper Lis Pendens on the record title to properties owned by Choudhri or his business entities, which created a double negative effect on Choudhri's ability to conduct business by hampering his ability to find new lenders or renewing existing loans because the security for them was impaired and making it impossible to sell those properties to raise new capital on his own. These Lis Pendens were "over the top" misrepresentations because they were illegal and did not assert valid interests in the subject properties. The Lis Pendens were also introduced into interstate commerce because they were filed of record and were available "online" over the internet to any potential customer for commercial real estate in the Houston area.

## V.
## CAUSES OF ACTION

### COUNT 1:  BREACHES OF CONFIDENTIAL SETTLEMENT AGREEMENT

62.   Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

63.   Plaintiff and NBK reached a valid and enforceable agreement expressly set forth in the Confidential Settlement Agreement.  Pursuant to the Confidential Settlement Agreement, NBK agreed to keep the contents and terms of the parties' agreement completely confidential.  Plaintiff dismissed its very good claims in the Lawsuit against NBK in reliance upon NBK's promise to uphold the confidentiality obligations set forth in the Confidential Settlement Agreement.

64.   NBK breached the Confidential Settlement Agreement by disclosing its contents and terms to third parties in violation of the agreement's express confidentiality provisions.  These

Page **19** of **29**

disclosures prevented Plaintiff from closing on the sale of the 2425 Building and chilled the market for other buyers for Plaintiff's property.  The same is true for NBK's wrongful, early filing of a notice of foreclosure on the 2425 Building, also in violation of the Confidential Settlement Agreement.

65.    Plaintiff hereby sues NBK for these breaches of the Confidential Settlement Agreement, including monetary damages for such breaches and  injunctive relief preventing NBK from foreclosing on the building because Civil Practices & Remedies Code Section 65.011 authorizes injunction relief when: 1) the applicant is entitled to a writ of injunction under the principles of equity and the laws of Texas relating to injunctions. Texas Civil Practices & Remedies Code Section 65.011(3); See Butnaru v. Ford Motor Co., 84 S.W.3rd 198, 210 (Tex. 20002); and 2) when irreparable injury to real or personal is threatened, irrespective of any remedy of law. Tex. Civ. Practice & Remedies Code Section 65.011(5).

66.    Plaintiff requests injunctive relief as allowed pursuant to *CytoGenix, Inc. v. Waldroff*, 213 S.W.3d 479, 487 (Tex.App.—Houston, [1st Dist.] 2006, pet. denied), and *L Series, L.L.C. v. Holt*, 571 S.W.3d 864, 876 (Tex.App.—Fort Worth 2019, pet. denied) due to Defendant's breach.

### COUNT 2:  TORTIOUS INTERFERENCE WITH CONTRACT

67.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

68.    As alleged, NBK tortiously interfered with the SIBS International contract and the Caldwell Soames Inc. contract, causing damages to the Plaintiff in the net amounts of the contracts which, but for NBK's interference, would have been paid to the Plaintiff.

Page **20** of 29

69.     Zaheer has tortiously interfered with Plaintiff's contract with NBK, and abused process by interfering in Plaintiff's bankruptcy proceeding.

**COUNT 3:  TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS**

70.     Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

71.     After NBK's disclosures of the situation created by the confidential settlement and the wrongful posting for foreclosure during a judicial extension of the grace period contained in that agreement, potential buyers of the property who would otherwise have become good prospects to negotiate a sale with Plaintiff, became instead potential purchasers from NBK of the NBK note and began contacting and negotiating or attempting to negotiate with NBK instead of the Plaintiff. NBK interfered with these potential purchasers and with these potential business relationships.  At least the following were interfered with in this fashion:

        a)     Globix Investment,
        b)     Ironwood Commercial Realty,
        c)     Shah Firm, LLC, and
        d)     Jeb Brown Law.

72.     Zaheer have interfered with the Plaintiff's relationship with NBK and/or entered into a relationship with Zaheer and their antics caused the dismissal of Plaintiff's Chapter 11 bankruptcy proceeding, which was otherwise proceeding to a cram-down restructuring under Chapter 11 of the bankruptcy code

73.     This interference by the Defendants damaged Plaintiff in amounts to be determined after discovery, but which exceed the minimum jurisdictional limits of this Honorable Court.

## COUNT 4:  COMMON LAW FRAUD/LENDER LIABILITY

74.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

75.    NBK never had any intention of living up to the Confidential Settlement Agreement.  The Plaintiff was winning the lawsuit against NBK, so NBK induced the Plaintiff into dismissing its lawsuit and entering into the Confidential Settlement Agreement which NBK had no intention of living up to.  This fraud works an estoppel against NBK (see Count 6, "ESTOPPEL").  Plaintiff hereby sues NBK for fraud and fraudulent inducement and alleges it constitutes the basis for an action for Lender Liability.

76.    NBK knew at the time it entered into the Confidential Settlement Agreement it would deflect and tortiously interfere with the Plaintiff's attempts to sell the 2425 Building so NBK would be able to foreclose on the building and take all of the value instead of just the value of the amounts otherwise owed at the time.  Plaintiff accordingly sues NBK for its fraud, fraud in the inducement, lender liability, and subsequent interference with the settlement agreement. Plaintiff seeks benefit of the bargain damages for the fraud related to the enforceable contract. Plaintiff requests injunctive relief as allowed pursuant to *CytoGenix, Inc. v. Waldroff*, 213 S.W.3d 479, 487 (Tex.App.—Houston, [1st Dist.] 2006, pet. denied), and *L Series, L.L.C. v. Holt*, 571 S.W.3d 864, 876 (Tex.App.—Fort Worth 2019, pet. denied) due to Defendant's breach.

## COUNT 5:  FRAUDULENT TRANSFER

77.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

78.    The funds paid by the Plaintiff to NBK:

a)      $801,509.42 paid Plaintiff to NBK on August 27, 2022;

b)      $80,000 paid by Plaintiff to NBK on April 18, 2023; and

c)      $80,000 paid by Plaintiff to NBK on May 10, 2023

were fraudulently induced by NBK and were payments for which the Plaintiff received nothing in return and constitute fraudulent conveyances in violation of U.S.C. § 544, 548, and 550 and TEX. BUS. & COMM. CODE §§ 24.001, *et seq.*, for which the Plaintiff hereby sues NBK to recover all such amounts. In addition, the Loan Agreement between NBK and Plaintiff set aside reserve funds to cover certain events of default related to the anchor tenant. Due to COVID-19, this provision of the Loan Agreement activated, and Plaintiff's loan payments were being drawn down from the reserve funds. However, NBK intentionally depleted Plaintiff's reserve funds, and transferred Plaintiff's funds to itself prior to the time when they were actually due. Plaintiff requests an injunction pursuant to Sec. 24.008.

## COUNT 6:  ESTOPPEL

79.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

80.    NBK is estopped from claiming Plaintiff owes any more than the amount stated and agreed to in the Confidential Settlement Agreement because of its fraud and fraudulent inducement alleged previously.

## COUNT 7:  BUSINESS DISPARAGEMENT

81.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

82.    The posting of the 2425 Building during any negotiation periods and/or the extended grace period when actual buyers were moving toward concluding a deal and when other

potential buyers were expressing interest in the 2425 Building, constituted business disparagement against the Plaintiff for which Plaintiff hereby sues NBK.

83.     The efforts of Zaheer to make false accusations and representations about the Plaintiff's ownership interests, management, and decision-making abilities constituted business disparagement against the Plaintiff for which the Plaintiff hereby sues Zaheer.

84.     The business disparagement by the Defendants damaged Plaintiff in amounts to be determined after discovery, but which exceed the minimum jurisdictional limits of this Honorable Court.

## COUNT 8:  BREACH OF GOOD FAITH AND FAIR DEALING

85.     Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

86.     Every contract has a duty of good faith and fair dealing engrafted upon it, especially in a lender/borrower relationship, and even more so when the lender is based in the State of New York as NBK is.

87.     NBK breached its duty of good faith and fair dealing by:

a)      Inducing Plaintiff to dismiss their State Court lawsuit;

b)      Inducing Plaintiff to enter into the Confidential Settlement Agreement;

c)      Tortiously interfering with Plaintiff's performance under the Confidential Settlement Agreement;

d)      Tortiously interfering with third-party contracts;

e)      Not approving tenant leases or contracts for sale; and

f)      deflecting buyers so Plaintiff could not sell the 2425 Building.

88.    Plaintiff hereby sues NBK for breach of duty of good faith and fair dealing.  The damages are for the value of the amounts that would have been recovered in the state court litigation and/or the value of the deals lost for leases and/or sales of the 2425 Building.

## COUNT 9:  <u>UNJUST ENRICHMENT</u>

89.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

90.    If NBK is allowed to foreclose on the 2425 Building it will make an unconscionable profit and succeed in its "loan to own" gambit.  The amount of its unjust enrichment for which Plaintiff hereby sues NBK is the difference between what NBK would have been owed (but for its breaches of the Confidential Settlement Agreement) under the Confidential Settlement Agreement and the true value of the building, for which Plaintiff hereby sue NBK.

## COUNT 10:  <u>CONSPIRACY</u>

91.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

92.    Defendants agreed to work in concert with each other in order to interfere with Plaintiff's bankruptcy case, and to have it dismissed by making fraudulently claiming Azeemeh had control over Naissance Galleria, LLC.

93.    Defendants acted with the intent to harm plaintiff by disrupting its bankruptcy proceedings and ultimately obtaining a sua-sponte dismissal of such proceeding based upon their allegations

94.    To accomplish the object of their agreement Defendants intentionally or negligently mischaracterized the effect of the state court temporary injunction, in order to confuse and disrupt Plaintiff's bankruptcy case, which resulted in dismissal.

000478

95.    The agreement to engage in this conduct proximately caused injury to plaintiff. Plaintiff's sole asset and its ability to reorganize its affairs under Chapter 11 of the bankruptcy code, has now been posted for foreclosure on December 5th, 2023, instead of being protected through its reorganization proceedings. A foreclosure will irreparably harm Plaintiff.

### COUNT 11:    FEDERAL MISREPRESENTATION OF SERVICES AND UNFAIR COMPETITION UNDER THE LANHAM ACT

96.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

97.    Section 43 of the Lanhan Act provides civil relief to any person damaged by the acts of another with connection to "any goods or services," who uses any "false designation of origin, false, or misleading description of fact, or false or misleading representation of fact" that either is either "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person," or "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 41 U.S.C. § 1125(a)(1).

98.    To establish a prima facie claim under § 43 of the Lanham Act of 1946, a plaintiff must establish  that: (1) the defendant made a "false or misleading statement of fact," (2) the statement "either deceived or had the capacity to deceive a substantial segment of potential consumers," (3) the deception was "material, in that it is likely to influence the consumer's purchasing decision," (4) the goods, services, or commercial activities must be "in interstate commerce," and finally, (5) "as a result of the statement at issue," there was injury to the plaintiff

or the plaintiff "is likely to be injured." *IQ Prod. Co. v. Pennzoil Prod. Co.*, 305 F.3d 368, 375 (5th Cir. 2002).

99.    NBK and the Plaintiff entered into a settlement agreement in the spring of 2023.  The settlement agreement was confidential. Thereafter, NBK made misleading statements about the confidential settlement agreement that deceived others, the actions were material, the actions were in interstate commerce and resulted in injury to the Plaintiff.  Since the settlement agreement was and may still be confidential, further information about the actions could be argued to be a breach of the confidentiality provisions.

100.    Further, NBK made misleading statements on the potential leases in the building owned by the Plaintiff.  The Plaintiff had numerous potential leases, NBK refused to approve the leases, the actions of NBK were misleading, the actions were deceptive as to both the Plaintiff and the potential leases, the actions were material in influencing the potential tenants in future relations with the Plaintiff, many of the larger proposed tenants were or are national companies in interstate commerce and the actions caused injury to the Plaintiff.

101.    Further, the Plaintiff and principally its owner purchase liens on properties and to purchase properties oftentimes at foreclosure sales, but other times as purchasers from willing sellers. Many of these properties are worth millions of dollars.  Buying properties worth millions of dollars is a very capital-intensive business. Consequently, Choudhri must maintain good reputations to assure that lenders will lend him money and buyers will enter into contracts to purchase their properties since the primary sources of capital necessary to keep this business functioning are capital from lenders and proceeds from the sales of their existing properties.

102.    The capital utilized in the leases and businesses comes from and flows through interstate commerce and at times through international commerce, and the purchasers or some of

their members are oftentimes citizens of states other than Texas or countries other than the United States of America.

103.    NBK has engaged in false advertising in violation of Section 43(a) of the Lanham Act as described above and possibly in other ways.

104.    These acts and others were in violation of 15 USC § 1125(a), Section 43a of the Lanham Act.

## COUNT 12:  **ATTORNEYS' FEES**

105.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

106.    Plaintiff hereby sues Defendants for its reasonable and necessary attorneys' fees under breach of a written contract under Civil Practice and Remedies Code §38.001, under the fee shifting agreement of the contract, and under any statutory or common law right to recover same.

## VI. **JURY DEMAND**

107.    Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## VII. **PRAYER**

108.    For the reasons set forth above, Plaintiff asks that the Court enter a judgment relief in the following manners:

    a)    Actual damages including economic injuries & consequential damages;

    b)    Attorney's fees;

    c)    Exemplary damages;

    d)    Prejudgment and post judgment interest;

    e)    Court costs; and

Page **28** of **29**

f)    All other relief to which Plaintiff is entitled under both law and equity.

Respectfully submitted,

The Pope Law Firm
6161 Savoy Drive, Suite 1125
Houston, Texas 77036
Ph: 713-449-4481
Fx: 281-657-9693
jamesp@thepopelawfirm.com

By: /s/ James Q. Pope
    James Q. Pope
    TBN: 24048738
    Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on December 17, 2023, a copy of the foregoing was served on interested parties by electronic service using the court's electronic noticing system.

By: /s/ James Q. Pope
    James Q. Pope

Page **29** of **29**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

James Pope on behalf of James Pope
Bar No. 24048738
jamesp@thepopelawfirm.com
Envelope ID: 82647538
Filing Code Description: Amended Filing
Filing Description: Plaintiff Sixth Amended Petition
Status as of 12/18/2023 9:54 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jerry CAlexander | | alexanderj@passmanjones.com | 12/17/2023 7:53:14 PM | SENT |
| Ruth NVera | | verar@passmanjones.com | 12/17/2023 7:53:14 PM | SENT |
| Sheryl Chandler | | chandlers@passmanjones.com | 12/17/2023 7:53:14 PM | SENT |
| James Pope | | jamesp@thepopelawfirm.com | 12/17/2023 7:53:14 PM | SENT |
| James Quantrele Pope | 24048738 | ecf@thepopelawfirm.com | 12/17/2023 7:53:14 PM | SENT |
| Rodney Lee Drinnon | 24047841 | rdrinnon@mccathernlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Robin Harrison | | rharrison@hicks-thomas.com | 12/17/2023 7:53:14 PM | SENT |
| Charles Conrad | | charles.conrad@pillsburylaw.com | 12/17/2023 7:53:14 PM | SENT |
| Nancy Jones | | nancy.jones@pillsburylaw.com | 12/17/2023 7:53:14 PM | SENT |
| Simone Nunez | | snunez@mccathernlaw.com | 12/17/2023 7:53:14 PM | SENT |
| David Clark | | dclark@mccathernlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Danielle Chester | | dchester@mccathernlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Haseeb Dada | | hdada@mccathernlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Averyll  Mauch | | amauch@Mccathernlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Gage Fender | | gage@clouthierlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Jennifer LMacGeorge | | jmac@jlm-law.com | 12/17/2023 7:53:14 PM | SENT |
| Jackie Marlowe | | jmarlowe@hicks-thomas.com | 12/17/2023 7:53:14 PM | SENT |
| Jetall Legal | | legal@jetallcompanies.com | 12/17/2023 7:53:14 PM | SENT |
| MacGeorge Law Firm Admin | | service@jlm-law.com | 12/17/2023 7:53:14 PM | SENT |
| Clouthier Law | | info@clouthierlaw.com | 12/17/2023 7:53:14 PM | SENT |
| Ryan Steinbrunner | | ryan.steinbrunner@pillsburylaw.com | 12/17/2023 7:53:14 PM | SENT |
| Elizabeth Klingensmith | | liz.klingensmith@pillsburylaw.com | 12/17/2023 7:53:14 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

James Pope on behalf of James Pope
Bar No. 24048738
jamesp@thepopelawfirm.com
Envelope ID: 82647538
Filing Code Description: Amended Filing
Filing Description: Plaintiff Sixth Amended Petition
Status as of 12/18/2023 9:54 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Elizabeth Klingensmith | | liz.klingensmith@pillsburylaw.com | 12/17/2023 7:53:14 PM | SENT |
| Angela McGinnis | | angela.mcginnis@pillsburylaw.com | 12/17/2023 7:53:14 PM | SENT |
| Ali Choudhri | | ali@jetallcompanies.com | 12/17/2023 7:53:14 PM | SENT |

Associated Case Party: Ali Choudhri

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ali Choudhri | | legal@jetallcompanies.com | 12/17/2023 7:53:14 PM | SENT |

EXHIBIT 3

# EXHIBIT

# B

Unofficial Copy Office of Marilyn Burgess District Clerk

## DECLARATION OF QUANELL X

I, Quanell X Farrakhan, am a person over the age of eighteen (18) years and am competent to give this declaration. I have personal knowledge of the facts set forth in this declaration, and such facts are true and correct.

In October 2020, I met with Osama Abdullatif. During that meeting, Mr. Abdullatif told me he had text messages from Chris Wyatt. Mr Abdullatif said he felt like Mr. Wyatt was trying to extort him. I understood Mr. Wyatt to be a former employee of Ali Choudhri. Mr. Abdullatiff told me that he Mr. Wyatt wanted to sell Mr. Choudhri's business records/files and property.

Mr. Abdullatif said he had in his phone text messages from Mr. Wyatt where Mr. Wyatt asked Mr. Abdullatif to pay $200,000 in exchange for assisting and selling information and property to Mr. Abdullatif. Mr. Abdullatif told me he wanted to pay Mr. Wyatt for information and business records/files of Mr. Choudhri.

During this meeting Mr. Abdullatif showed me his phone and told me about a series of text messages from Chris Wyatt. The messages identified specific documents Mr. Wyatt was able to steal from his employer, Jetall companies, prior to his resignation. Wyatt's messages also touted his personal knowledge of Jetall's business operations and its President Ali Choudhri. Wyatt apparently believed his stolen documents and information were extremely valuable. The series of text messages culminated with a request by Wyatt for $200,000.00 in exchange for his cooperation, information and the stolen property. Based on the text messages Mr. Abdullatif told me and related discussions, Mr. Wyatt asked Mr. Abdullatif to pay $200,000 in exchange for assisting Mr. Abdullatif and providing him with documents and information belonging to Ali Choudhri. Mr. Wyatt asked Mr. Abdullatif to pay $200,000 in exchange for assisting Mr. Abdullatif and providing him with documents and information belonging to Ali Choudhri.

My date of birth is _12-7-70_, and my address is _10061 Rebel Rd_. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas, on the _29_ day of December, 2020.

Quanell X Farrakhan

ALEJANDRA PEREZ
Notary Public, State of Texas
Comm. Expires 06-28-2023
Notary ID 129933928

1

EXHIBIT 4

000488

# EXHIBIT 14

### THIRD DECLARATION OF QUANELL X

I, Quanell X Farrakhan, am a person over the age of eighteen (18) years and am competent to give this declaration. I have personal knowledge of the facts set forth in this declaration, and such facts are true and correct.

On approximately January 20, 2021, I received the text attached as Exhibit A hereto from Wayne Dolcefino.

In regards to my prior Declarations and discussions of meetings with Osama Abdullatif, Abdullatif informed me in one of the meetings that Chris Wyatt had told him that Ali Choudhri had hired me to kill Abdullatif. Since this was obviously false, I spoke with officers from the Houston Police Department concerning these allegations and they confirmed to me that they had dismissed Wyatt's false accusations against me and Choudhri as a hoax.

My date of birth is December 7, 1970, and my address is 10061 Rebel Road, Houston, TX 77016.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, Texas, on the 25TH day of January, 2021.

Quanell X Farrakhan

1

000489



**11:19 AM**    55% 🔋

‹ 55

+1 (713) 389-0810 ›

that brother you can intimidate with this foolishness

Delivered

The evidence.  Go to war

Yesterday 6:22 PM

We will be reporting the falsities in your affidavit to the da. You disappoint me

https://youtu.be/LhRO1mxeWh8

  iMessage 

EXHIBIT 5

# In the Matter Of:

TEXAS REIT LLC

24-10120-smr

# OMAR KHAWAJA

*September 11, 2024*

1        IN THE UNITED STATES BANKRUPTCY COURT

2        FOR THE WESTERN DISTRICT OF TEXAS

3                AUSTIN DIVISION

4

5  In re:                    Chapter 11

6  TEXAS REIT, LLC              Case No.

7  Debtor                    24-10120-smr

8

9

10

11            REMOTE DEPOSITION OF

12               OMAR KHAWAJA

13

14

15

16          September 11, 2024
              10:15 a.m.
17

18

19        5051 Westheimer, Suite 1200
              Houston, Texas
20

21

22

23

24

25      Cheryl Madriaga, Shorthand Reporter

1               APPEARANCES OF COUNSEL:

2

On behalf of Debtor, Texas Reit, LLC:

3

4    STEPHEN W. SATHER, ESQ.
    BARRON & NEWBURGER, P.C.
   7320 N. Mopac Expy, Suite 400

5    Austin, TX 78731
   (512) 476-9103

6    ssather@bn-lawyers.com

7

On behalf of Deponent, Omar Khawaja:

8

9    MICHAEL BALLASES, ESQ.
    HOOVER SLOVACEK, LLP
   5051 Westheimer, Suite 1200

10   Houston, Texas 77056
   (713) 977-8686

11   ballases@hooverslovacek.com

12

On behalf of Dalio Holdings I and II, LLC:

13

14   LORI A. HOOD, ESQ.
   SHACKELFORD, MCKINLEY & NORTON, LLP
   717 Texas Avenue, 27th Floor

15   Houston, TX 77002
   (832) 669-6081

16   lhood@shackelford.law

17

Also Present:

18

19   Dwayne Mason, Esq., Greenberg Traurig, LLP -
   prospective counsel for Dalio Holdings I and II, LLC

20   Ali Chouhdri, pro se - in his individual capacity

21   Gene McCubbin - assistant to Lori Hood

22   Tammy Luu - assistant to Ali Choudhri

23   Osama Abdullatif - noticed deponent

24   John Quinlan - noticed deponent

25

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
3

1             INDEX TO EXAMINATION

2  EXAMINATION                       PAGE

3  Examination by Mr. Sather       6
  Examination by Ms. Hood        47
4  Examination by Ms. Hood        72
  Examination by Mr. Choudhri   126
5  Reporter's Certificate       229

6

7            INDEX OF EXHIBITS

8  DEBTOR'S      DESCRIPTION         PAGE

9

  Exhibit 1    Proof of Claim         9
10

  Exhibit 2    Supplemental Notice of Lis    35
11           Pendens for 8052 Westheimer

12  Exhibit 3    Supplemental Notice of Lis    37
          Pendens for 8098 Westheimer
13

  Exhibit 4    Adversary Complaint - George Lee   38
14

  Exhibit 5    Debtor's Objection to Claim     44
15

  Exhibit 6    Motion for Leave to Withdraw    45
16           Claim Number 9

17

18

19

20

21

22

23

24

25

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    4

1             P R O C E E D I N G S

2             THE REPORTER:  We are on the record.  The date

3    is September 11th, 2024.  This begins the deposition

4    of Omar Khawaja.

5             My name is Cheryl Madriaga, representing

6    Esquire Deposition Solutions.

7             Will counsel please state their name on the

8    record and whom they represent?

9             MR. SATHER:  Stephen Sather --

10            MR. BALLASES:  Michael Ballases --

11            MR. SATHER:  -- attorney for --

12            MR. BALLASES:  -- (unintelligible) Khawaja --

13            THE REPORTER:  Sorry --

14            MR. BALLASES:  -- John Quinlan, and Osama

15   Abdullatif.

16            THE REPORTER:  Okay.  Sorry.  I just had two

17   people speaking at once.  Could I start with one

18   counsel, please?

19            MR. BALLASES:  Sure.  Michael Ballases,

20   counsel of record for the deponent, Omar Khawaja, also

21   John Quinlan, also Osama Abdullatif.

22            THE REPORTER:  Thank you.

23            MR. SATHER:  Stephen Sather --

24            MR. BALLASES:  You're welcome.

25            MR. SATHER:  -- for Texas REIT, LLC, the

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                        5

1    debtor in this case.

2          MS. HOOD:  Lori Hood of Dalio Holdings, a

3    creditor in the case.

4          MR. CHOUDHRI:  Ali Choudhri, a creditor in the

5    case.

6          THE REPORTER:  Okay.  Is there anything else,

7    or are we ready to have me swear in the witness?

8          MR. BALLASES:  Now, there are other people on

9    the call.  They need to make an appearance.

10         MR. MASON:  This is Dwayne Mason, prospective

11   counsel for Dalio with Greenberg Traurig.

12         MR. MCCUBBIN:  Gene McCubbin, assistant to

13   Lori Hood.

14         MR. BALLASES:  Okay.  I'm going to object --

15   this is Michael Ballases.  I'm going to object to Lori

16   Hood, her assistant, Ali Choudhri, and Dwayne Mason

17   being present on the call.  They're not -- they don't

18   represent Texas REIT.  They're not parties, they don't

19   have standing, and they cannot participate.  And this

20   is not a creditors' meeting.  So I want that to be on

21   the record.

22         MR. SATHER:  All right.  Your objection is

23   noted.  Let's proceed.

24         THE REPORTER:  Okay.  And just before we go on

25   the record, I just ask that we please do our best not

OMAR KHAWAJA

September 11, 2024

TEXAS REIT LLC

6

1　to speak over one another.

2　　　　Mr. Khawaja, please keep your voice nice and

3　loud, allow counsel to finish his completely before

4　you begin your answer, and all answers must be verbal.

5　Thank you.

6　　　　MR. CHOUDHRI:  Just confirming, Madam Court

7　Reporter, we are on the record; right?

8　　　　THE REPORTER:  Yes, we are.

9　　　　MR. SATHER:  All right.

10　　　　MR. CHOUDHRI:  Okay.

11　　　　MR. SATHER:  If you would swear in the

12　witness, please.

13　　　　　　OMAR KHAWAJA,

14　having been first duly sworn, was examined and

15　testified as follows:

16　　　　　　EXAMINATION

17　　　　MR. BALLASES:  Real quick before we get

18　started -- this is Michael Ballases -- I assume we

19　have an agreement to take this deposition by the

20　Federal Rules of Civil Procedure and also the Court's

21　limiting instruction.

22　　　　MR. SATHER:  Yes.

23　　　　MR. BALLASES:  Okay.

24　BY MR. SATHER:

25　　　Q.  All right.  Mr. Khawaja, have you ever given a

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                         7

1   deposition before?

2       A.  I don't think so, no.

3       Q.  All right.  But are you familiar with the

4   process for taking a deposition, sir?

5       A.  Yes.  Yes, I am.

6       Q.  And do you understand that your testimony

7   today is under oath?

8       A.  Yes, I do.

9       Q.  And is there anyone present in the room with

10  you where you are giving your testimony?

11      A.  Yes, my attorney, Michael Ballases, and the

12  other two parties, Osama Abdullatif and John Quinlan.

13      Q.  All right.  And, Mr. Khawaja, do you

14  understand that you cannot confer with any of the

15  parties in the room with respect to your answers?

16      A.  Yes, I do.

17      Q.  Tell me what you do for a living.

18      A.  I'm an attorney.

19      Q.  And are you familiar with a company called

20  Texas REIT, LLC?

21      A.  Yes, I am.

22      Q.  And how are you familiar with Texas REIT, LLC?

23      A.  So an entity that Ali Choudhri owns.

24      Q.  Okay.

25      A.  Or controls.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    8

1      Q.  And have you ever entered into a business

2   transaction with Texas REIT, LLC?

3      A.  No, I have not.

4      Q.  Do you claim to be an owner of Texas REIT,

5   LLC?

6      A.  No, I don't.

7      Q.  Have you ever filed a notice of lis pendens on

8   behalf of any party against Texas REIT, LLC?

9      A.  I may have, yes.

10     Q.  Okay.  And are you familiar with what a notice

11  of lis pendens is?

12     A.  Yes.

13     Q.  Are you familiar with Ali Choudhri, who is

14  present here today?

15     A.  Yes.

16     Q.  And how are you familiar with Mr. Choudhri?

17     A.  I have litigation against him.  He's defrauded

18  me.  He's defrauded people I know.  I represent people

19  against him.  And, you know, we're sitting here in

20  this case today, so I know him because I am a party in

21  this case.

22     Q.  All right.  Are you familiar with Jetall

23  Companies?

24     A.  Yes.

25     Q.  And how are you familiar with Jetall

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    9

1   Companies?

2       A.  It's an entity that Ali Choudhri controls or

3   owns, and I have judgments against them.

4           MR. SATHER:  All right.  I'm going to share my

5   screen and show Exhibit 1.

6           (Debtor's Exhibit No. 1 was marked for

7   identification.)

8       Q.  (BY MR. SATHER)  I have previously provided

9   this document to the court reporter and your counsel.

10          And so can you see Exhibit Number 1 on the

11  screen, sir?

12      A.  Yes, I do.

13          THE WITNESS:  Do you have a physical copy too,

14  Michael?

15      Q.  (BY MR. SATHER)  All right.  Now, are you

16  familiar -- are you aware that this is a proof of

17  claim filed with the United States Bankruptcy Court?

18      A.  Yes, I am.

19      Q.  And are you one of the claimants listed on

20  this proof of claim?

21      A.  I am.

22      Q.  And as I read the proof of claim, there are

23  three individuals who are listed as the current

24  creditor:  John Quinlan, Omar Khawaja, and Osama

25  Abdullatif.  What is the relationship between the

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    10

1  three individuals with respect to the proof of claim?

2      A.  They're just judgment orders.

3      Q.  Okay.  But do each of you assert the claim

4  jointly and severally, or do each of you have

5  different pieces of the claim?

6      A.  You know, jointly and severally.

7      Q.  All right.  Now, do you have an agreement

8  between the three of you as to how any monies received

9  on the claim will be divided?

10     A.  Not particularly.  I mean, you know, we don't

11 have a written agreement, from my understanding.

12     Q.  Okay.  Now, if I could go --

13     MR. BALLASES:  (Unintelligible) Ballases.  I'm

14 going to object.  You're violating -- you're being

15 harassing and oppressive and that you're violating the

16 Court's limiting instruction.

17         I'm going to give you a little bit of leeway

18 to get into all this just because it's background, but

19 the purpose of this deposition is for you to ascertain

20 why my clients filed the proof of claim and why they

21 now want to withdraw it.  And so I'll give you some

22 leeway, but I'm just letting you know.

23     MR. SATHER:  All right.  I disagree with that

24 contention.  I've listened to Judge Robinson's ruling.

25 I think it's broader.  But I'm going to continue on,

1    and if we run into a problem, we may have to take that

2    up with the Court.  But let me move on with my

3    questions.

4        Q.  (BY MR. SATHER)  Mr. Khawaja, did you sign the

5    proof of claim?

6        A.  I don't recall signing it.  I may have.  I

7    don't know.

8        Q.  Okay.  Did you authorize filing the proof of

9    claim?

10       A.  Yes, I did.

11       Q.  Did you read the proof of claim before it was

12   filed?

13       A.  Yes.

14       Q.  What steps did you take to ensure that the

15   proof of claim was accurate?

16       A.  I read it.

17       Q.  All right.  Now, I'm going to go down to Box 7

18   on the claim, and that has a dollar amount.  Do you

19   see that?

20       A.  Yes.

21       Q.  And do you know how that number was

22   calculated?

23       A.  I don't recall.

24       Q.  Going to page 8 of 54, there is a summary of

25   damages.  Does that refresh your recollection as to

OMAR KHAWAJA                                                    September 11, 2024
TEXAS REIT LLC                                                                  12

1   how the proof of claim numbers were calculated?

2        A.  Can you enlarge it just a little bit so I can

3   look at it carefully?

4        Q.  Sure I can.  It does depend on my ability to

5   work this.  Does that help?

6        A.  Yeah, that -- that helps.  Thank you.

7        Q.  And so do you know where -- and let me scroll

8   up here.

9        A.  Sure.

10       Q.  Do you know where these numbers came from?

11       A.  This appears to be numbers that my counsel

12   provided.

13       Q.  And for the record, who is your counsel who

14   provided the numbers?

15       A.  Michael Ballases with Hoover Slovacek.

16       Q.  And have you taken any steps personally to

17   verify that these amounts are correct?

18       A.  I mean, I looked at the judgments before we

19   filed them.

20       Q.  Anything else?

21       A.  That's it.

22       Q.  Now I'm going to go to Box 9 and -- now, on

23   this page, it asks:  Is any -- all or any part of the

24   claim secured?  And it's not checked, but I'd like to

25   go to a subsequent page.  It may be a prior page.

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
13

1    Excuse me.

2         Okay.  Here we go.  Looking at Box 9, do you

3    see where the box of, Is the claim secured, checked

4    "Yes."  Do you see that, sir?

5         A.  I do see that.

6         Q.  What is the basis for the claim being secured

7    according to the proof of claim?

8         A.  I mean, I'd have to ask my attorney.

9         Q.  Okay.  But it says -- and I believe this is

10   probably a typo, but it says "les pendens."  You think

11   that's a reference to filing of a notice of lis

12   pendens?

13        A.  It could be.

14        Q.  And is it your contention that filing a notice

15   of lis pendens creates an interest in property?

16        A.  It doesn't create -- it doesn't create an

17   interest in property.

18        Q.  All right.  What do you believe that it does?

19        A.  It secures a potential claim against property.

20        Q.  Okay.  Now, it's my understanding that the

21   proof of claim is based upon three separate judgments.

22   Is that your understanding?

23        A.  I think that's accurate.

24        Q.  Now, would you agree with me that none of

25   these judgments were taken against Texas REIT, LLC,

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                14

1  the debtor in this case?

2      A.  I believe that's correct.

3      Q.  Now, I'm going to go down and look at the

4  different judgments, and I'm going to ask you some

5  questions about them.  And actually I'm just going to

6  start with the summary here.

7          Number 1 is -- Judgment 1 is called the "Davy

8  and Heil Judgment."  Do you see that?

9      A.  I do.

10      Q.  And this appears to be -- actually, I am going

11  to go to the judgment.  I apologize.  This appears to

12  be a judgment in a case from the Court of Appeal

13  styled Jetall Companies, Inc., Appellant, versus

14  Richard Heil, Todd Oakum, and Renee Davy, formerly

15  known as Renee Davy, formally known as Renee Oakum.

16          Do you see that?

17      A.  I do.

18      Q.  Now, you were not a party to this judgment,

19  were you, sir?

20      A.  I was not.

21      Q.  And what is your connection to the judgment

22  that would give you the authority to submit a proof of

23  claim in this case?

24      A.  The judgment was assigned to me.

25      Q.  Okay.  And is that -- was that a written

OMAR KHAWAJA                          September 11, 2024
TEXAS REIT LLC                                        15

1  assignment of judgment?

2     A.  Yes.

3     Q.  And I will represent to you that the

4  assignment of judgment is not part of the proof of

5  claim.  Do you know why that assignment was not

6  included?

7     A.  I don't know why.

8     Q.  And if we were to look at the assignment of

9  the judgment, would the assignee be just Omar Khawaja,

10  or would it be someone else?

11     A.  I believe my assignment would have my name on

12  it.  I'm not sure about the other assignments.

13     Q.  Okay.  So for this particular judgment, it was

14  assigned to you, Omar Khawaja?

15     A.  I don't have it in front of me.  It's possible

16  that Mr. Abdullatif and Mr. Quinlan's name are on the

17  assignment.

18     Q.  All right.  How much did you pay to have the

19  judgment assigned to you?

20     A.  I don't recall.

21     Q.  And did you pay anything to acquire the

22  judgment?

23     A.  Yes, I did.

24     Q.  Now, do you agree with me that this judgment

25  is against Jetall Companies and not Texas REIT?

1          MR. BALLASES:  Objection.  Form.

2      A.  This particular judgment is against Jetall;

3  that is correct.

4      Q.  (BY MR. SATHER)  All right.  And so do you

5  contend that Texas REIT, LLC, is liable for a judgment

6  against Jetall Companies, Inc.?

7      A.  Yes, I do.

8      Q.  And why do you contend that, sir?

9      A.  Because all of the entities that Mr. Choudhri

10  either controls or is involved in are essentially

11  shell companies for his own personal finances, so

12  any --

13      Q.  (Unintelligible)

14      A.  Any company are -- I'm sorry.  Would you like

15  me to continue, or --

16      Q.  Yes, please.

17      A.  -- do you want to --

18      Q.  I did not mean to cut you off.

19      A.  Sorry.  I was saying any entity that

20  Mr. Choudhri controls or owns is treated as if it is

21  his own personal asset with no respect for the

22  corporate form and, I believe, is responsible for --

23  one entity is responsible for the other entity's

24  conduct.

25      Q.  Now I'd like to scroll down to the second

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                   17

1  judgment.  And this document says it's a judgment from

2  the 14th Court of Appeals in Jetall Companies, Inc.

3  Versus Hoover Slovacek, LLP.  Are you familiar with

4  this judgment?

5      A.  Yes, I am.

6      Q.  Is Hoover Slovacek the law firm that is

7  representing you today in connection with this

8  deposition?

9      A.  Yes, it is.

10        MR. BALLASES:  Objection.  Form.

11      Q.  (BY MR. SATHER)  You can answer.

12      A.  Yes.

13      Q.  What is your connection to -- your connection,

14  if any, to this judgment?

15      A.  I believe I acquired it.

16      Q.  Did you acquire it by way of a written

17  assignment?

18      A.  Yes.

19      Q.  And did you pay any consideration to Hoover

20  Slovacek to acquire their judgment?

21      A.  Yes.

22      Q.  And how much did you pay them to acquire this

23  judgment?

24      A.  I don't recall how much I paid.

25      Q.  And is it a regular part of your business to

1    purchase judgments?

2        A.  Yes, it is.

3        Q.  Now, I may have asked this already, in which

4    case I apologize, but do you have a written assignment

5    of judgment?

6        A.  Yes -- yes, I believe there is one.  I don't

7    have it in front of me.

8        Q.  Is there a reason that assignment was not

9    included with the proof of claim?

10       A.  I don't know.

11       Q.  And do you know whether the assignment would

12   have been in favor of you, John Quinlan, Osama

13   Abdullatif, or some combination of the three of you?

14       A.  I believe all three of us.  It was assigned to

15   all three of us on the same instrument.

16       Q.  Now, do you agree with me that this judgment

17   is against Jetall Companies and not Texas REIT, LLC?

18       A.  Yes.

19       Q.  And why do you contend that Texas REIT, LLC,

20   is liable for a judgment against Jetall Companies?

21       A.  Because Texas REIT, LLC, is an alter ego of

22   Jetall Companies, Inc.

23       Q.  Now I'm going to go to the third judgment.

24   And this is a judgment in a case -- well, first of

25   all, do you see the judgment that I have up on the

1    screen?

2        A.  I do.

3        Q.  And that appears to be a judgment in a case,

4    Osama Abdullatif, individually, and Abdullatif &

5    Company, LLC, versus Ali Choudhri and Houston Real

6    Estate Properties, LLC; is that correct?

7        A.  That's correct.

8        Q.  And do you have an interest in this judgment,

9    or is this just Mr. Abdullatif's judgment?

10       A.  This particular judgment is Mr. Abdullatif's

11   judgment.

12       Q.  All right.  So do you have any interest in

13   this judgment whatsoever?

14       A.  No, I do not.

15           MR. BALLASES:  Objection.  Form.

16       Q.  (BY MR. SATHER)  All right.  Do you assert an

17   interest in the judgment in Cause Number 2013-41273?

18       A.  No.

19           MR. BALLASES:  Objection.  Form.

20       Q.  (BY MR. SATHER)  Now, of the three judgments

21   we went through, you assert an interest in the first

22   two, but not the third; is that correct?

23           MR. BALLASES:  Objection.  Form.

24       A.  That's correct.

25       Q.  (BY MR. SATHER)  Now, continuing down in the

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                        20

1   claim, there is a copy of an adversary proceeding that

2   was filed in the United States Bankruptcy Court for

3   the Southern District of Texas.  Are you familiar with

4   this adversary proceeding?

5       A.  Vaguely.

6       Q.  Okay.  And I see that you are named as one of

7   the movants in the adversary proceeding.  Do you see

8   that?

9       A.  Yes, I do.

10      Q.  Did you authorize the adversary proceeding to

11  be filed listing you as one of the participants?

12      A.  Yes, I did.

13      Q.  Did you read it before it was signed?

14      A.  Yes, I did.

15      Q.  Now, so what is your understanding of the role

16  that this adver -- or that this original complaint

17  plays with respect to the proof of claim that was

18  filed on your behalf?

19      A.  I mean, I'm not a bankruptcy attorney.  We're

20  doing whatever we need to do to try to collect our

21  judgment.

22      Q.  So you're an attorney; right?

23      A.  Yes.

24      Q.  And you -- when you represent clients, you

25  file pleadings on their behalf; correct?

1      A.  That's correct.

2      Q.  And -- but your clients need to understand

3  what you're filing for them, don't they?  Isn't that

4  part of the rules regarding filing lawsuits?

5      A.  Yes.

6      Q.  What steps did you take to familiarize

7  yourself with the allegations in this adversary

8  proceeding?

9      A.  I reviewed the judgments, and I reviewed the

10  complaint.

11      Q.  And after reviewing them, did you conclude

12  that the allegations were true and correct?

13      A.  Yes, I did.

14      Q.  Now I'm going to read you a statement in

15  paragraph 1 of the adversary proceeding, which says:

16          This lawsuit shall prove that Jetall

17          Companies, Inc., Arabella PH 3201, LLC,

18          9201 Memorial Drive, LLC, 2727 Kirby 26L,

19          LLC, Texas REIT, LLC, Dalio Holdings I,

20          LLC, Dalio Holdings II, LLC, Houston Real

21          Estate Properties, LLC, Shahnaz Choudhri,

22          Ali Choudhri, Shepherd-Huldy

23          Development I, LLC, Shepherd-Huldy

24          Development II, LLC, and Galleria Loop

25          Note Holder, LLC, (collectively the

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
22

1        Choudhri defendants) are alter egos of

2        each other and intentionally acting in a

3        manner to defraud creditors and evade

4        legal obligations through a series of

5        fraudulent transfers.  The evidence will

6        demonstrate that Ali Choudhri is the

7        puppeteer controlling his web of business

8        entities, which hold his various

9        properties and other assets.  This web

10        includes Houston Real Estate Properties,

11        LLC, and Jetall Companies, Inc., as well

12        as the other named defendants.

13   Did I read that correctly?

14      A.  Yes, you did.

15      Q.  Do you have an understanding of what it means

16   to say that one person or company is the alter ego of

17   another person or company?

18      A.  Yes.

19      Q.  And what is your understanding?

20      A.  That one entity pays the debts or obligations

21   of another.  They commingle funds, commingle assets.

22   One principal is taking actions on behalf of any of

23   the various alter egos at any given time with no

24   respect for the corporate form.  Yeah, that's my --

25   that's my understanding.

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
23

1    Q.  All right.  Now, is it your contention that

2    each of the 13 persons and companies named as

3    defendants is the alter ego of every other one of the

4    persons and companies named?

5    A.  That's what --

6        MR. BALLASES:  Objection.  Form.

7    A.  Yes.

8    Q.  (BY MR. SATHER)  So are you contending that

9    Texas REIT is the alter ego of Jetall Companies?

10        MR. BALLASES:  Objection.  Form.

11    A.  That's what it says.  Yes.

12    Q.  (BY MR. SATHER)  And are you alleging that

13    Texas REIT is the alter ego of Arabella PH 3201, LLC?

14    A.  Yes.

15        MR. BALLASES:  Objection.  Form.

16    Q.  (BY MR. SATHER)  Are you alleging that Texas

17    REIT is the alter ego of Dalio I Holdings (sic), LLC?

18        MR. BALLASES:  Objection.  Form.

19    A.  Yes.

20    Q.  (BY MR. SATHER)  And would your answers be the

21    same if I went through all of the rest of the names of

22    the defendants in this case?

23    A.  Yes, because Ali Choudhri controls all of

24    them.

25    Q.  All right.  And so are you alleging that Ali

1  Choudhri and Shahnaz Choudhri are alter egos of each

2  other?

3      A.  Yes.

4        MR. BALLASES:  Objection.  Form.

5      Q.  (BY MR. SATHER)  So are you -- it's your

6  contention that any company or entity in which Ali

7  Choudhri has an interest is an alter ego of Ali

8  Choudhri?

9        MR. BALLASES:  Objection.  Form.

10      A.  I don't know if there's any.  I mean, are

11  there entities that I don't know about?  I don't know.

12      Q.  (BY MR. SATHER)  Were you aware that there was

13  an amended complaint filed that names 17 defendants?

14      A.  I believe --

15        MR. BALLASES:  Objection.  Form.

16      A.  I believe so.

17      Q.  (BY MR. SATHER)  And is it your contention

18  that each of the 17 defendants is the alter ego of

19  each of the other 17 defendants?

20      A.  If that's what the petition says, yes, that's

21  my contention.

22      Q.  The complaint alleges that each of the claimed

23  alter egos were, quote (Reading:)  ...intentionally

24  acting in a manner to defraud creditors and evade

25  legal obligations through a series of fraudulent

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    25

1  transfers.

2       Did I read that right?

3    A.  Yes, you did.

4    Q.  So are you claiming that every one of these 13

5  or 17 persons and companies listed made fraudulent

6  transfers to each and every other one of the persons

7  and companies listed?

8    A.  Yes.

9    Q.  So, for example, are you claiming that Shahnaz

10  Choudhri made fraudulent transfers to 2727 Kirby 26L,

11  LLC?

12   A.  I don't know about that.

13   Q.  As we sit here today, do you know of any

14  fraudulent transfers that any of these defendants made

15  to Texas REIT, LLC, the debtor in this case?

16   A.  I don't.

17   Q.  And so with respect to that particular

18  allegation about making fraudulent transfers, you're

19  not aware of any involving the debtor in this case;

20  correct?

21   A.  I'm not aware of any sitting as -- as I'm

22  sitting here right now.  But any specific one?  No.

23   Q.  And what would you need to do --

24       THE WITNESS:  Oh, Mr. Sather, I'm sorry.  I

25  need to just take a quick restroom break if you don't

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    26

1    mind.

2            MR. SATHER:  All right --

3            MR. CHOUDHRI:  No.  No.  No.  Hold on.  Let's

4    finish this line of questioning.  Please ask your

5    question --

6            MR. SATHER:  Mr. Choudhri -- Mr. Choudhri,

7    it's my questions.  I decide whether we're going to

8    take a bathroom break or not.

9            I don't have a problem with taking a break,

10   but do not discuss your testimony with your attorney

11   while we're off the record.

12           THE WITNESS:  Not a problem.

13           MR. SATHER:  All right.  And so five minutes?

14           THE WITNESS:  Five minutes should be good.

15           MR. SATHER:  All right.  Madam Reporter, we

16   will be off the record for five minutes.

17           THE REPORTER:  Off the record.

18           (A recess was taken.)

19           THE REPORTER:  All right.  We are back on the

20   record.

21      Q.  (BY MR. SATHER)  And, Mr. Khawaja, I want to

22   follow up on something I asked you earlier.  When I

23   asked you how you knew Ali Choudhri, you said that he

24   defrauded you.  Can you tell me what transaction that

25   he defrauded you with regard to?

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    27

1        MR. BALLASES:  Objection.  Form.

2     A.  It was an apartment complex that my family

3  owned.

4     Q.  (BY MR. SATHER)  And was it you personally, or

5  was it your family?

6        MR. BALLASES:  I'm going to instruct the

7  witness not to answer.  He's here to answer the basis

8  for his proof of claim and why he wants to withdraw

9  it.  That's not a part of his claim.  It's not alleged

10  in any of the documents, and therefore, it's outside

11  the scope of the judge's limiting instruction.

12     Q.  (BY MR. SATHER)  Is this prior transaction --

13  have anything to do with this case?

14     A.  I'm sorry.  Can you repeat that question?

15     Q.  Yes.  Does the prior transaction where you say

16  Mr. Choudhri defrauded you or your family -- does that

17  have anything to do with the proof of claim against

18  Texas REIT?

19     A.  No.

20     Q.  Now, earlier I asked you about whether your

21  business involved purchasing judgments, and I also --

22  you also testified that you're an attorney.  Are those

23  separate businesses that you're involved in?

24     A.  No.

25     Q.  And so do you purchase judgments through your

1   law firm?

2       A.  Yes.

3       Q.  And about how many judgments have you

4   purchased in, say, the last five years?

5           MR. BALLASES:  Objection.  Form.

6       A.  I don't know.  I'm not sure, to be honest with

7   you.

8       Q.  (BY MR. SATHER)  More than ten?

9       A.  No, probably not more than ten.

10      Q.  And --

11          MR. BALLASES:  Objection.  Form.

12      Q.  (BY MR. SATHER)  -- have you -- do you

13  purchase judgments against anyone other than entities

14  related to Ali Choudhri?

15          MR. BALLASES:  Objection.  Form.

16      A.  Not that I can recall.

17      Q.  (BY MR. SATHER)  All right.  So when we talk

18  about your purchase of judgments, that -- at least as

19  you recall today, those relate to your dealings with

20  Ali Choudhri.

21      A.  Yes.

22      Q.  And how would you describe your relationship

23  with Mr. Choudhri?

24          MR. BALLASES:  Objection.  Form.

25      A.  What do you -- what do you mean?

1    Q.  (BY MR. SATHER)  Is it cordial?  Unpleasant?

2  Adversarial?

3        MR. BALLASES:  Objection.  Form.

4    A.  He owes me money.  I mean, that's about it.

5    Q.  (BY MR. SATHER)  Going back to the adversary

6  proceeding that's part of the proof of claim, I'm

7  going to go to paragraph 22.  And it's kind of a long

8  paragraph, so I'm just going to read you some

9  sentences towards the end where it says, quote

10  (Reading:)  Choudhri views HREP, Jetall, and himself,

11  as well as the other named defendants, as one and the

12  same and utilizes them in such a fashion.  In other

13  words, there is unity between Choudhri, HREP, Jetall,

14  and his other business entities such that the

15  separateness of the business entities has ceased, and

16  thus this Court should treat the Choudhri defendants

17  accordingly to protect plaintiffs/the creditors.  And

18  this is where the lawsuit begins.

19        So did I read that correctly?

20    A.  Yes.

21    Q.  And so what is the basis for your statement

22  that Mr. Choudhri views all of the Choudhri defendants

23  as one and the same?

24        MR. BALLASES:  Objection.  Form.

25    A.  It's in the petition, Counsel.  All of the

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                        30

1   bases that we have are listed out in very clear, you

2   know, language, just like you read.

3       Q.  (BY MR. SATHER)  Can you articulate what any

4   of those bases are?

5       A.  It's -- I mean --

6           MR. BALLASES:  Objection.  Form.

7       A.  -- do you want me to -- do you want me to

8   start reading the petition for you?  I'm happy to read

9   it for you, but it's in the petition.

10      Q.  (BY MR. SATHER)  I'm asking you -- I mean,

11  without reading the petition, do you know what the

12  basis for the allegations is?

13      A.  I mean the -- without reading the petition,

14  the purpose of the petition was to articulate the

15  basis of the petition.  So it's in the petition

16  itself.  I'm happy to read through the petition for

17  you if you'd like me to, but in -- in plain language,

18  he treats every entity that he controls or owns as a

19  personal piggy bank, just like the petition states.

20  And that's the basis of the alter ego claim that we're

21  making.

22      Q.  All right.  And so your allegation is also

23  that he views his mother as one and the same with

24  himself?

25          MR. BALLASES:  Objection.  Form.

1     A.  Yes.

2     Q.  (BY MR. SATHER)  Now, you obviously don't

3   contend that they're the same person; right?  You --

4   they are different human beings.

5         MR. BALLASES:  Objection.  Form.

6         (Crosstalk)

7     A.  Sorry.  Is that a -- was that -- do you really

8   want me to answer that question?  I'm not sure.

9     Q.  (BY MR. SATHER)  Yes, I do.  I wouldn't have

10   asked it if I --

11    A.  You mean like Norman Bates, that kind of thing

12   or -- is that what -- I'm sorry.  It's just a

13   stupid --

14    Q.  (BY MR. SATHER)  I just want you to

15   acknowledge that these are two different human beings,

16   sir.

17    A.  Yes, sir.  Yes, they're two different human

18   beings.

19    Q.  And so is it your contention that there's no

20   separateness between, say, Houston Real Estate

21   Properties, LLC, and Texas REIT, LLC?

22        MR. BALLASES:  Objection.  Form.

23    A.  Again, I'm gonna -- I'm gonna refer you back,

24   Mr. Sather, to the petition.  That's what the petition

25   states.

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                        32

1     Q.  (BY MR. SATHER)  All right.  And you contend

2   that -- and you stand by the allegations in the

3   petition.

4     A.  Yes, sir.  I stand by each and every

5   allegation in the petition.

6         MR. BALLASES:  Objection.  Form.

7     Q.  (BY MR. SATHER)  And so is everything that you

8   know about this allegation of alter ego contained in

9   the petition?

10     A.  I mean, we don't -- I don't believe we

11   finished discovering the process, sir, so we're -- I'm

12   sure we're gonna get to learn a lot more about the

13   alter-ego basis on which Mr. Choudhri operates and the

14   other defendants.

15     Q.  And so did the petition set forth all of the

16   bases that you knew about at the time it was filed?

17     A.  In a good faith manner, yes.

18     Q.  All right.  What does that mean, "in a good

19   faith manner"?

20         MR. BALLASES:  Objection.  Form.

21     A.  To the best of our ability, right, on some --

22   on some evidence that we've been able to muster.

23     Q.  (BY MR. SATHER)  Did you intentionally omit

24   any bases for making an allegation of alter ego?

25     A.  No.

1          MR. BALLASES:  No, I instruct the client not

2    to answer, simply because you're invading attorney

3    work product, legal privileges.  What we decided to

4    put in or not in our petition is subject to work

5    product and privilege.  Don't invade our privilege,

6    please.

7       Q.  (BY MR. SATHER)  All right.  Do you know of

8    any evidence that you decided not to include in the

9    petition?

10         MR. BALLASES:  Same assertion of privilege.

11      Q.  (BY MR. SATHER)  You can answer, sir.

12         MR. BALLASES:  It's work product and

13   privilege.  I'm instructing him not to answer.  It's

14   invading a legal privilege that he enjoys.

15         THE REPORTER:  And I'm sorry.  Counsel, if I

16   could just get you to just speak up a little bit as

17   well.  You're just sounding a little bit muffled.

18         MR. BALLASES:  Yes, ma'am.

19         THE REPORTER:  Thank you.

20      Q.  (BY MR. SATHER)  I'd like to go to

21   paragraph 23 where it says (Reading:)  Plaintiffs are

22   upstanding, honest, and respectable businessmen, real

23   estate developers, attorneys, and/or a combination of

24   all.

25         Which of those categories do you fall into,

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
34

1    sir?

2        A.  (Reading:)  Plaintiffs are upstanding, honest,

3    respectable businessmen, attorneys --

4            A combination.

5        Q.  Okay.  A combination of what?

6        A.  Of all.

7        Q.  Okay.  So you're a businessman, real estate

8    developer, and attorney?

9        A.  But I'm also upstanding, honest, and

10   respectable.

11       Q.  Okay.  Now, was it upstanding, honest, and

12   respectable for you to sponsor Mr. Choudhri's ex-wife

13   to claim to still be married to him and file notices

14   of lis pendens against all of his properties?

15           MR. BALLASES:  I'm going to instruct the

16   client not to answer.  You are violating the Court's

17   limiting instruction as to this deposition, and the

18   purpose of this deposition is to find the basis for

19   the filing of the proof of claim and why we are

20   willing to withdraw it now.  I'll let you go on and

21   get past that, but I'm going to start putting stops to

22   it if this is the kind of stuff we're going to have.

23       Q.  (BY MR. SATHER)  Okay.  But it's your

24   contention that you are, in fact, an upstanding,

25   honest, and respectable businessman, real estate

1  developer, and attorney, sir.

2      A.  Yes --

3          MR. BALLASES:  Objection.  Form.

4          MR. SATHER:  Now, I'm going to move on to a

5  different exhibit, Exhibit Number 2, assuming I can

6  bring it up on the screen.

7          (Debtor's Exhibit No. 2 was marked for

8  identification.)

9      Q.  (BY MR. SATHER)  Actually, one thing I didn't

10  ask you, Mr. Khawaja:  How old of a man are you?

11      A.  46.

12      Q.  And are you licensed to practice law in the

13  state of Texas?

14      A.  Yes, I am.

15      Q.  And when were you licensed?

16          MR. BALLASES:  Objection.  Form.

17      A.  2010.

18      Q.  (BY MR. SATHER)  I've brought up on the screen

19  what we've marked as Exhibit 2, which is titled

20  "Supplemental Notice of Lis Pendens."  Are you

21  familiar with this document?

22          MR. BALLASES:  Mr. Sather, we don't have

23  copies of that.  Could you please e-mail that to

24  myself and Steve Leyh and any other exhibits you'd

25  like to use?

1          MR. SATHER:  Sure.  Those should've been

2     provided to you in a ShareFile yesterday.

3          MR. BALLASES:  Could you resend them?

4          MR. SATHER:  I will -- yes, I will resend

5     those --

6          MR. BALLASES:  Please send them to Steve and

7     myself.

8          MR. SATHER:  My computer is lagging just a

9     little bit, so it'll take a second for them to load.

10    But I had tried to provide these to you ahead of time

11    so we could avoid this.

12          Okay.  And as you can see from the screen

13    share, I have sent the e-mail to you.

14          THE WITNESS:  Michael, I think he's addressing

15    you on the e-mail.

16          MR. BALLASES:  That's fine.

17    Q.  (BY MR. SATHER)  Now, what we've marked as

18    Exhibit Number 2 is a supplemental notice of lis

19    pendens.  And I'm going to scroll down to the end of

20    it, and do you see the real property description

21    there?

22    A.  I do, yes.

23    Q.  And are you aware that that is real property

24    owned by Texas REIT, LLC?

25    A.  Yes.

OMAR KHAWAJA
September 11, 2024
TEXAS REIT LLC
37

1      Q.  And are you familiar with this notice of

2   lis pendens?

3      A.  I believe I looked at it before it was filed,

4   yes.

5      Q.  And it looks like it's filed by

6   Mr. Abdullatif, and he is one of the parties to the

7   proof of claim; correct?

8      A.  Yes.

9         MR. BALLASES:  Objection.  Form.

10      Q.  (BY MR. SATHER)  And did you approve of the

11   filing of this notice?

12      A.  I must have if it was filed.

13      Q.  And what's your understanding of the purpose

14   of this notice?

15      A.  To make sure that we secure any proceeds that

16   could potentially come to Ali Choudhri or his entities

17   that he owes to us.

18      Q.  And do you know why it was filed?

19      A.  For that reason.

20         MR. SATHER:  I'm going to show you another lis

21   pendens which we have marked as Exhibit Number 3.

22         (Debtor's Exhibit No. 3 was marked for

23   identification.)

24      Q.  (BY MR. SATHER)  And are you familiar with

25   this document?

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
38

1     A.  Exhibit Number 3.  Sorry.  Yes.

2     Q.  And I see this was signed by Osama Abdullatif

3  as well.

4     A.  Yes.

5     Q.  And would your questions be the same -- or

6  your answers be the same with regard to this notice of

7  lis pendens as with the prior one?

8     A.  Yes.

9        MR. SATHER:  I'm going to switch gears now and

10  go to Exhibit Number 4, which is an adversary

11  complaint filed by George Lee against Texas REIT, LLC,

12  and Ali Choudhri -- or at Exhibit 4.  Excuse me.

13        (Debtor's Exhibit No. 4 was marked for

14  identification.)

15     Q.  (BY MR. SATHER)  Do you know George Lee?

16        MR. BALLASES:  I'm going to object to this

17  line of questioning and instruct the witness not to

18  answer as it exceeds the scope of the limited

19  deposition the judge granted you.  This has nothing to

20  do with our proof of claim or adversary proceeding.

21     Q.  (BY MR. SATHER)  Are you going to take your

22  counsel's advice?

23     A.  I am.

24     Q.  So let me just ask you by way of background.

25  Do you know George Lee?

1      MR. BALLASES:  Objection.  Form.  Same -- same

2  instruction.

3      Q.  (BY MR. SATHER)  Are you refusing --

4      MR. CHOUDHRI:  So (unintelligible) --

5      Q.  (BY MR. SATHER)  -- to answer that you know

6  George Lee?

7      MR. BALLASES:  Objection to form.  Same

8  objection; this has nothing to do with our claim, and

9  you're exceeding the scope of the limited deposition

10  the judge granted.

11      A.  I'm taking my counsel's advice.

12      MR. CHOUDHRI:  I just want to make sure the

13  record is clear.  Are you instructing the witness not

14  to answer?

15      MR. SATHER:  Mr. Choudhri, let me --

16      MR. BALLASES:  Mr. Choudhri, please be quiet.

17  You're not a party involved in this.  You have no

18  standing to be here.

19      MR. SATHER:  He actually does under the

20  Court's ruling.  But, Mr. Ballases --

21      MR. CHOUDHRI:  Wait a second.  Wait -- wait --

22  wait a second.  I want to get this on the record.

23      Mr. Ballases, I am here, and I have a standing

24  to object.  Okay?  And so --

25      MR. BALLASES:  (Unintelligible)

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                        40

1          MR. CHOUDHRI:  -- I have a standing to be

2   here.  So are you telling me on the record that you

3   are not going to cooperate and allow me to ask

4   questions on a deposition that I've cross-noticed?

5          MR. BALLASES:  That is correct.  You have no

6   party -- you're not a party in this proceeding.  You

7   have no standing.  We've also objected to your

8   cross-notice, so you better bet your bottom dollar.

9          MR. CHOUDHRI:  Okay.  Besides betting my

10  bottom dollar, Mr. Ballases, you understand that the

11  Honorable Judge Robinson made a ruling --

12         MR. BALLASES:  You're wasting your time --

13         MR. CHOUDHRI:  -- and said that --

14         MR. BALLASES:  -- (unintelligible) with the

15  judge's ruling.  Why don't you let your counsel ask

16  questions.

17         MR. CHOUDHRI:  No, no.  I'm here representing

18  myself pro se as a creditor.  I have filed a proof of

19  claim.  I'm a creditor.  I have standing.

20         Are you saying on the record that you are

21  going to instruct your client not to answer any of my

22  questions?  I just want to get this on the record so

23  it's clear.  Are you instructing your client not to

24  answer any questions, and is your client going to take

25  your advice?

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    41

1          MR. BALLASES:  Yeah, so the way this
2    proceeding words, there's a court reporter who writes
3    down everything we say.  I've been clear in my speech
4    and what I say in my objections.  If you're confused,
5    you can ask the court reporter to read it back, or you
6    can just take better notes.  Be quiet, and let your
7    counsel ask questions.
8          MR. CHOUDHRI:  So just so the record is
9    crystal clear, Mr. Ballases, you are instructing your
10   client, Omar Khawaja, who is a deponent today, to not
11   answer any questions that I'm gonna have, and you're
12   also obstructing my ability to object or make any
13   objections in this deposition.  Is that all correct?
14   I just want to make sure the record is very crystal
15   clear.
16         MR. BALLASES:  Let Mr. Sather ask his
17   questions.  Please be quiet.
18         MR. CHOUDHRI:  Sir, I just want to clarify,
19   because I have a right to be here and object, and you
20   are --
21         MR. BALLASES:  Let --
22         MR. CHOUDHRI:  -- telling me to be quiet.
23         MR. BALLASES:  -- (unintelligible) questions.
24   So let your counsel ask questions.  You're wasting
25   everybody's time.

1       MR. CHOUDHRI:  Okay.  Just so the record is

2   clear, you are refusing to allow me to participate and

3   object and ask questions in this deposition that I've

4   cross-noticed; is that correct?  So we're clear, is

5   that correct or not?

6       MR. BALLASES:  You are not a party.  You do

7   not --

8       THE REPORTER:  I'm --

9       MR. BALLASES:  Let me make it very clear for

10  you.  You are not a party to this dispute.  You are

11  not an attorney.  You lack standing.  This is not a

12  creditors' meeting.  We've objected to your

13  cross-notice.  Is that clear enough for you, buddy?

14      MR. CHOUDHRI:  Mr. Sather, please proceed.

15  We'll -- we'll deal with this on the record later and

16  deal with the Court.

17      And -- and as you know, Mr. Ballases, counsel

18  for Dalio is also on the line.  Are you also objecting

19  for them -- for Dalio's counsel to ask questions?  Is

20  that your --

21      MR. BALLASES:  Yeah.

22      MR. CHOUDHRI:  -- position?

23      MR. BALLASES:  Yeah.

24      MR. CHOUDHRI:  And you're gonna instruct your

25  client, Omar Khawaja, to not answer questions --

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
43

1      MR. BALLASES:  Mr. Choudhri, my point is you

2  like to play attorney, but you're not an attorney, and

3  you don't know the legal procedure or the rules or

4  regulations of court.  So please be quiet and let the

5  deposition proceed.  You're wasting everybody's time.

6      MR. CHOUDHRI:  Okay, Mr. Ballases.  You don't

7  have to be disrespectful.  I was -- you know, the

8  rules apply to all of us.  If I'm pro se or if -- or

9  if you're a lawyer, the rules apply equally.  And I

10  have to follow the rules, just like you have to follow

11  the rules.  And when a judge makes a ruling, it

12  applies, and it says what it says.  We all got to

13  honor it.  But you're refusing to honor the judge's

14  ruling.  I understand that.  You're refusing to honor

15  what --

16      MR. BALLASES:  (Unintelligible)

17      MR. CHOUDHRI:  -- Judge Robinson said on his

18  oral order.

19      THE REPORTER:  Sorry.  Just one person at a

20  time.

21      Mr. Ballases, I can hear you speaking in the

22  background, but I can't hear what you're saying while

23  Mr. Choudhri is speaking.

24      So just one person at a time if you'd like

25  this on the record, please.

1          MR. BALLASES:  Mr. Sather, please continue.

2      Q.  (BY MR. SATHER)  Mr. Khawaja, I have brought

3  back up Exhibit Number 1, the proof of claim.  When

4  you authorized the proof of claim to be filed, did you

5  understand that it was being filed under penalty of

6  perjury?

7      A.  Yes.

8      Q.  And as a lawyer, do you know what penalty of

9  perjury means?

10      A.  Yes.

11          MR. BALLASES:  Objection.  Form.

12      Q.  (BY MR. SATHER)  Now, what was your purpose in

13  filing the proof of claim?

14      A.  The purpose in filing the proof of claim?  I

15  mean, it's to collect monies that are owed to us.

16      Q.  Any other purpose?

17      A.  No, that's it.

18      Q.  Now, I'm going to show you Exhibit Number 5,

19  and I'm going to try to make it bigger.

20          (Debtor's Exhibit No. 5 was marked for

21  identification.)

22      Q.  (BY MR. SATHER)  Were you aware that Texas

23  REIT, LLC, filed an objection to the proof of claim?

24      A.  Yes.

25      Q.  And were you aware that you have not filed a

1   response to this objection to proof of claim?

2      A.  No.

3      Q.  And do you see that this was filed with

4   negative notice language?

5      A.  I'm not sure what that means, sir.

6      Q.  Okay.  Fair question.

7          Next, I'd like to show you what we've marked

8   as Exhibit Number 6, which is --

9      A.  Yes.

10      Q.  -- a motion for leave to withdraw Claim

11   Number 9.

12          (Debtor's Exhibit No. 6 was marked for

13   identification.)

14      Q.  (BY MR. SATHER)  Do you see that?

15      A.  Yes, sir, I do.

16      Q.  And what is your understanding of the reason

17   why you filed a -- well, let me ask you this:  Did you

18   authorize the motion for leave to withdraw Claim

19   Number 9?

20      A.  I did.

21      Q.  And why did you authorize the claim to be

22   withdrawn?

23      A.  It appears there's no money in Texas REIT,

24   LLC.

25      Q.  Any other reason?

1       A.  No, sir.  That's it.

2       Q.  And do you understand that the consequence of

3   withdrawing the claim means that you're not able to

4   assert a claim to any of the property in the Texas

5   REIT bankruptcy estate?

6           MR. BALLASES:  Objection.  Form.  You're going

7   beyond the scope of the limited purpose of this

8   deposition.

9           MR. SATHER:  I don't believe so.

10      Q.  (BY MR. SATHER)  Are you aware that Texas REIT

11  has objected to withdrawal of the proof of claim

12  unless it is withdrawn with prejudice?

13      A.  I wasn't aware of that, no.

14      Q.  All right.  Do you know what "with prejudice"

15  means?

16      A.  Yes, I do.

17      Q.  And you understand that if the claim is

18  withdrawn with prejudice, you can never make these

19  allegations against Texas REIT again.

20      A.  Yes, I understand that.

21          MR. SATHER:  All right.  At this point I will

22  pass the witness.  I know there are other counsel

23  present who wish to ask questions, and so I'm not

24  concluding the deposition.  I'm giving the other

25  parties present an opportunity to ask their questions.

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
47

1  BY MS. HOOD:

2      Q.  Mr. Khawaja, my name is Lori Hood, and I

3  represent Dalio Holdings.  Nice to meet you.

4          MR. BALLASES:  Ms. Hood --

5      A.  Nice to meet you.

6          MR. BALLASES:  -- I'm going to go ahead and

7  just object.  I'm not going to let you ask questions.

8  You're not a party to this dispute, and you lack

9  standing to be here.  This isn't a creditors' meeting,

10  and so -- and of course, your notice was just filed

11  this morning, which we're going to object to.  So I'm

12  not going to let you ask questions.

13          MS. HOOD:  All right.  Mr. Ballases, my notice

14  was this morning because you failed to give notice to

15  all the creditors that this was taking place.

16          In my understanding -- and my client is a

17  creditor.  In my understanding of the judge's ruling,

18  it allows for creditors to be in attendance at this

19  deposition and to ask questions of your clients as to

20  the basis and motivation of their filing the proof of

21  claim.  We can argue all day long about whether you

22  agree with that or not.  If you don't allow me to take

23  questions -- ask questions today, then we're going to

24  have a do-over because we're going to go back to the

25  Court and seek a motion to compel your client's

1  attendance at a deposition where I will ask my

2  questions.

3　　　　　MR. BALLASES:  So that's not the Court's

4  order.  The Court's order was to allow Mr. Sather to

5  take questions -- or to ask questions to determine the

6  basis to -- as to why we filed the proof of claim and

7  why it has been requested to be withdrawn.

8　　　　　It is not for creditors to ask questions.  The

9  creditors -- this isn't a creditors' meeting, and so

10  I'm not going to let you ask -- I mean, you can ask

11  him, but I'm going to instruct him not to answer

12  because I think you're violating the Court's ruling,

13  and I'm going to abide by the Court's ruling.

14　　　　　MS. HOOD:  So you're -- no matter what

15  question I ask him, you're going to tell him not to

16  answer me?

17　　　　　MR. BALLASES:  Yes, ma'am.

18　　　　　MS. HOOD:  Okay.  And that's --

19　　　　　MR. BALLASES:  You're violating the Court's

20  ruling, and I want to abide by it.

21　　　　　MS. HOOD:  All right.  So you want to abide by

22  the Court's ruling, and we have a difference of

23  opinion as to the impact and the breadth of the

24  Court's ruling.

25　　　　　I'm going to tell you I'm going to file a

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
49

1   motion to compel your client's attendance at a

2   deposition where I'm going to be allowed to ask

3   questions.  And when I do so, I'm going to ask for

4   compensation of my attorney's fees.  Do you understand

5   that?

6        MR. BALLASES:  I understand.

7        MS. HOOD:  All right.  And just to be clear on

8   the record, Madam Court Reporter, Mr. Ballases is

9   stating to me on the record that he's going to

10  instruct his client not to answer any of my questions

11  that I have prepared for today, all relating to the

12  filing of the proof of claim and the motivation for

13  filing the proof of claim and the motivation for

14  withdrawing the proof of claim, all of which go into

15  the merits of the judge's order.

16        And I'm objecting to Mr. Ballases' refusal to

17  allow me to take questions -- or ask questions of his

18  client and putting him on notice that I am going to

19  seek my attorney's fees as compensation for me having

20  to do a do-over with his client.

21        MR. BALLASES:  For the record -- so again,

22  this is Michael Ballases -- I believe Ms. Hood is

23  misinterpreting the judge's ruling.  She's not a party

24  to this -- her client is not a party to this dispute.

25  They lack standing.  This is not a creditors' meeting.

OMAR KHAWAJA                                                 September 11, 2024
TEXAS REIT LLC                                                              50

1   The basis of this deposition was for a limited purpose

2   to allow the debtor to inquire as to why we filed the

3   proof of claim and why we now want to withdraw it.  We

4   are abiding by the judge's ruling, and we will not

5   deviate from it.

6        MS. HOOD:  Mr. Ballases, please don't put

7   words in my mouth.  And just because, you know, we're

8   here taking a deposition doesn't mean you always have

9   to get the last word in.  We are in a disagreement

10  about your statements.  You're not going to allow --

11  you're going to instruct your client not to answer my

12  questions.  There's not much I can do about it if he's

13  going to sit here and not answer my questions.

14        I will go back to the Court and ask for him to

15  reappear and answer my questions related to the

16  subject of this deposition of which I represent a

17  creditor, and we are entitled to ask questions.

18        Your client's proof of claim has unnecessarily

19  complicated the underlying chapter proceeding and

20  gummed up a lot of other issues with regard to the

21  debtor's property, and even today they haven't

22  withdrawn their -- or released their lis pendens.  So

23  there's a lot to talk to him about with regard to the

24  filing of the proof of claim, the motivation, and

25  everything else.  And I've read the judge's

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                           51

1   instructions on this issue, and I believe I'm

2   completely within my rights to ask these questions.

3          And you really don't have to answer, because I

4   don't need you to answer.  We're in a disagreement,

5   and I'm going to file the motion to compel.  So I

6   do --

7          MR. BALLASES:  (Unintelligible)

8          MS. HOOD:  I do not -- I do not pass the

9   witness.  I reserve my rights.

10         MR. CHOUDHRI:  And --

11         MR. BALLASES:  Thank you for telling me --

12         MR. CHOUDHRI:  -- I would like to make the

13  record -- I would also like to make the record very

14  clear.

15         So the record is clear, Mr. Khawaja, are you

16  taking your attorney's -- are you following your

17  attorney's instructions, and are you going to refuse

18  to answer any questions asked by Lori Hood or by my --

19  or any questions that I may ask you?

20         MR. BALLASES:  So no question's on the table,

21  Mr. Choudhri, so I think you're confused --

22         MR. CHOUDHRI:  Mr. Ballases -- Mr. Ballases,

23  please --

24         (Crosstalk)

25         THE REPORTER:  Sorry.  Just --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                 52

1          MR. CHOUDHRI:  Hang on a second.  I just

2    want --

3          THE REPORTER:  Sorry.  One at a time, please.

4    Thank you.

5          MR. CHOUDHRI:  I just want to make sure that,

6    Mr. Ballases, your client can affirm that he's taking

7    your instructions, and he's not going to answer any

8    questions, so we don't have to sit here and ask

9    questions if your instructions are going to be for him

10   to not answer any of my questions that I've properly

11   cross-noticed this deposition on pursuant to the

12   Court's order.  I just want to make sure the record is

13   clear that your client's not answering any questions

14   that I may ask.

15         MR. BALLASES:  For the record, the record is

16   clear.  I made the same objection that I made to

17   Ms. Hood as to you.  You are not a party.  You do not

18   have standing.  You're not an attorney.  This isn't a

19   creditors' meeting.  We are here to answer --

20         MR. CHOUDHRI:  Okay --

21         MR. BALLASES:  -- the debtor's questions about

22   the proof of claim --

23         MR. CHOUDHRI:  I'm --

24         MR. BALLASES:  -- and that's it.

25         MR. CHOUDHRI:  Okay.  We have the audio of the

1   order, oral ruling of Judge Robinson.  I would like to

2   play that at this point for the record.  So, please,

3   if we can play that for the record --

4          MR. BALLASES:  That's not --

5          (Crosstalk)

6          THE REPORTER:  I'm --

7          MR. CHOUDHRI:  Tammy or Gene, can y'all play

8   that?

9          THE REPORTER:  I'm sorry.  Sorry.  I have two

10  people speaking at once.  I can hear Mr. Ballases, and

11  I can hear Mr. Choudhri.  Could I please just get one

12  speaker on the record at a time.

13         MR. CHOUDHRI:  So I was speaking --

14         MR. BALLASES:  That's not --

15         MR. CHOUDHRI:  -- and --

16         (Crosstalk)

17         THE REPORTER:  Sorry.

18         MR. CHOUDHRI:  So the quote from the ruling

19  is -- and I'm quoting the judge (Reading:)  I'm going

20  to grant the motion as to the date and time of the

21  examinations, and my order is going to be very simple.

22  It's going to say that.  It's also going to further

23  order that the debtor and any creditor -- any other

24  creditor, for that matter, that cross-noticed this

25  deposition is permitted to take a deposition --

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
54

1          -- participate.  So I just want to be clear,

2  Mr. Ballases.  I want to give you one more chance so

3  we can conclude --

4          MR. BALLASES:  It's not unclear --

5          MR. CHOUDHRI:  -- and complete the deposition.

6          (Crosstalk)

7          MR. CHOUDHRI:  Can I finish?

8          MR. BALLASES:  You're being --

9          MR. CHOUDHRI:  Mr. --

10          MR. BALLASES:  You're being investigated

11  (unintelligible).  You're being investigated by the

12  Department of Justice.  You've been found by courts to

13  file lawsuits for improper purposes and harassment.

14  You're founded by courts and juries to have committed

15  fraud and libel, and you were just, on Monday, held by

16  Judge Norman to be a forger and a liar.  So anything

17  you say, I don't believe --

18          MS. HOOD:  How about if I -- how about if I

19  say it?

20          (Crosstalk)

21          THE REPORTER:  Sorry.  I'm sorry.  No --

22  sorry.  Sorry.  I need one person speaking at a time.

23  The record is not clear when I have multiple speakers.

24  Thank you.

25          MR. CHOUDHRI:  So let me just respond,

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    55

1   Mr. Ballases.  First of all, you are supporting

2   perjury.  Okay?  Mr. Ballases, your client has

3   solicited --

4          MR. BALLASES:  (Unintelligible)

5          MR. CHOUDHRI:  -- solicited people -- so,

6   please, all of this is all supported and solicited by

7   your client, and we'll get to the bottom of it --

8          MR. BALLASES:  (Unintelligible)

9          MR. CHOUDHRI:  -- which is why your client

10  doesn't want to answer questions.  I understand that.

11         THE WITNESS:  You'll be a great jailhouse

12  lawyer.

13         MR. CHOUDHRI:  This is proper --

14         THE REPORTER:  I'm sorry --

15         MR. BALLASES:  Can we start the next --

16         MR. CHOUDHRI:  Sorry?

17         MR. BALLASES:  -- deposition?  Can we start --

18         MR. CHOUDHRI:  Hold on.

19         MR. BALLASES:  -- the next deposition --

20         THE WITNESS:  You're going to be a great

21  lawyer --

22         MR. BALLASES:  -- if Mr. Sather doesn't have

23  any more questions?

24         THE WITNESS:  You'll be a great lawyer in

25  jail, man.

1       MR. CHOUDHRI:  Okay.  So -- so that's your

2    goal --

3       MR. BALLASES:  (Unintelligible)

4       MR. CHOUDHRI:  -- going around telling

5    people --

6       THE REPORTER:  I'm sorry --

7       MR. BALLASES:  -- let's jump to the next

8    witness --

9       MR. CHOUDHRI:  Please --

10       THE REPORTER:  I'm sorry.  Sorry.  Sorry.  I

11    am not getting Mr. Ballases' words on the record.

12       Mr. Ballases, if you have something to say, I

13    need just one speaker at a time.  I'm not getting

14    anything you're saying at this point.

15       MR. BALLASES:  Okay.  What I'm saying is --

16       MR. CHOUDHRI:  Please, Mr. Ballases, go ahead.

17       MR. BALLASES:  -- (unintelligible) remains the

18    same.  And if Mr. Sather has more questions, we're

19    happy to answer them.  If he doesn't, then let's go to

20    the next witness.

21       MR. CHOUDHRI:  No, no.  We're -- we're not --

22    we're not playing any games here.  Please play the

23    audio from the Court's ruling.  Let's do that right

24    now --

25       MR. BALLASES:  Okay (unintelligible) --

1          MR. CHOUDHRI:  -- so the record is crystal

2    clear.

3          THE WITNESS:  This is getting ridiculous.

4          MR. BALLASES:  I'm going to end the deposition

5    if Mr. Sather doesn't have any more questions, and we

6    can jump to --

7          MR. CHOUDHRI:  You can't end the deposition --

8          (Crosstalk)

9          MR. CHOUDHRI:  Unless all parties agree to go

10   off the record, we stay on the record.  That's the

11   rule, Mr. Ballases.  The rule applies to everyone.

12         Please play --

13         MR. BALLASES:  (Unintelligible)

14         MR. CHOUDHRI:  -- the audio --

15         (Crosstalk)

16         MR. CHOUDHRI:  Please play the audio --

17         MR. BALLASES:  I'm going to shut it down if

18   you don't take control of your client in the

19   deposition.  Your choice, Mr. Sather.

20         MR. CHOUDHRI:  I'm here as a creditor.  We're

21   going to play the audio --

22         MR. BALLASES:  (Unintelligible) Okay.

23         MR. CHOUDHRI:  Mr. --

24         MR. BALLASES:  We're going to -- we're all

25   ready to go forward with the next witness.  We're

OMAR KHAWAJA                                     September 11, 2024
TEXAS REIT LLC                                                    58

1    here, and we're ready to go forward.

2          Mr. Sather, if you have more questions, let me

3    know, and he will stay and answer them.

4          MR. SATHER:  I am adjourning the deposition --

5          MR. CHOUDHRI:  I have the floor.  I have the

6    floor.  I'm a creditor.  I've cross-noticed this

7    deposition.  Please play --

8          MR. BALLASES:  (Unintelligible)

9          MR. CHOUDHRI:  -- the oral ruling from the

10   Court right now.  Go ahead.

11         MR. BALLASES:  Mr. Sather --

12         (Crosstalk)

13         (Audio file played.)

14         THE REPORTER:  I'm sorry.  Sorry.  I -- I'm

15   sorry.  Mr. McCubbin, I cannot hear anybody when I

16   have multiple speakers at once.  I don't know if you

17   want this on the record, but it's going in as

18   crosstalk because it's not coming through clearly.

19         MR. CHOUDHRI:  Yes, Madam Court Reporter.

20         MR. BALLASES:  Mr. Sather --

21         MR. CHOUDHRI:  I have the floor.

22         MR. BALLASES:  -- (unintelligible) the

23   questioning --

24         MR. CHOUDHRI:  Please stop interrupting,

25   Mr. Ballases.

1        MR. BALLASES:  -- (unintelligible) not going

2   to the next witness.

3        MR. CHOUDHRI:  I am -- I am making the record.

4   Mr. Ballases, please let me speak, and please don't

5   interrupt me.  Okay?  Please --

6        MR. BALLASES:  Okay --

7        MR. CHOUDHRI:  -- play the audio ruling of

8   Judge Robinson --

9        MR. BALLASES:  We're going to --

10       MR. CHOUDHRI:  -- so it's clear on the record.

11  Go ahead.

12       (Audio file played.)

13       MR. CHOUDHRI:  No, we're -- we're --

14       (Audio file continues playing.)

15       MR. MCCUBBIN:  He just said any other

16  creditor (unintelligible) --

17       THE REPORTER:  I'm sorry, Mr. McCubbin.  You

18  just cut out for a second.

19       MR. MCCUBBIN:  He just said --

20       MR. CHOUDHRI:  Go and play that,

21  Mr. McCubbin --

22       MR. MCCUBBIN:  -- any other creditor --

23       MR. CHOUDHRI:  -- just so the record is clear.

24  Please go ahead --

25       MR. MCCUBBIN:  The judge just stated any other

1   creditor.  I can replay it.

2        MR. CHOUDHRI:  Please replay it for the record

3   so the record is crystal clear, and it's the judge --

4        So, Madam Court Reporter, so the record is

5   clear, we are about to begin playing the oral ruling

6   of Judge Robinson.

7        THE REPORTER:  Okay.  So are you wanting me to

8   transcribe --

9        MR. CHOUDHRI:  Yes.

10       THE REPORTER:  -- this audio into the record?

11       MR. CHOUDHRI:  Yes.  Yes, Madam Court

12   Reporter.  He's about -- we're about to play the

13   judge's ruling -- oral ruling on the record so that

14   way we can have a simple and clean completion of this

15   deposition and end this shenanigan and argument with

16   Mr. Ballases.

17       Please, Mr. -- please, sir, please proceed

18   with the record -- the audio ruling of Judge Robinson.

19   Go ahead.

20       (Audio file played.)

21       THE REPORTER:  I'm sorry.  Sorry --

22       (Audio file continues playing.)

23       THE REPORTER:  Sorry.  The audio is not clear.

24   The audio is not crystal clear.  I hear Mr. Sather

25   responding on the audio, and it's not clear.

1    Typically in a transcript, we do not

2   transcribe audio played.

3        MR. BALLASES:  And I'm going to object --

4        MR. CHOUDHRI:  Time out.

5        MR. BALLASES:  I'm objecting --

6        MR. CHOUDHRI:  We're going to e-mail you --

7   Court Reporter, we're going to e-mail you this audio

8   right now, and he's going to adjust the volume and

9   play it again.

10       Go ahead.  Play it again, please.

11       And, Court Reporter, let us know if you're

12  getting a clear --

13       MR. BALLASES:  Mr. Sather --

14       MR. CHOUDHRI:  -- read on it.  Okay?

15       MR. BALLASES:  -- take control of the depo.

16  This is a waste of time.  It's a waste of the client's

17  time --

18       MR. CHOUDHRI:  Mr. Ballases, please -- please

19  stop talking.

20       MR. BALLASES:  -- (unintelligible) control of

21  the deposition --

22       MR. CHOUDHRI:  I have the floor --

23       MR. SATHER:  You don't have it yet,

24  Mr. Choudhri.

25       (Crosstalk)

MR. BALLASES: Let's just jump to the next witness. I'm not allowing the questions to be asked. So it's not going to change. We're just wasting time --

MR. CHOUDHRI: We're playing the oral ruling of Judge Robinson. Please, Mr. Ballases, be quiet so we can play the ruling of Judge --

MR. BALLASES: (Unintelligible)

MR. CHOUDHRI: -- Judge Robinson's ruling.

MR. BALLASES: (Unintelligible) we're not going to play -- we're not -- that's not how depositions work, Mr. Choudhri. I'm sorry you like to play an attorney --

MR. CHOUDHRI: Well, please --

MR. BALLASES: -- but that's not how this works. So either I'm going to --

MR. CHOUDHRI: No. No, no. Please stop.

MR. BALLASES: Again, I'm going to get off -- if you'd like to have another -- if you'd like to ask questions of my other clients, I'm happy to do that, and you're happy to ask questions, Mr. Sather. But these shenanigans are not --

MR. CHOUDHRI: If your --

MR. BALLASES: -- going to happen.

MR. CHOUDHRI: -- responses, Mr. Ballases, is

1    gonna -- the shenanigans are yours, Mr. Ballases.  If

2    your responses are gonna be the same and you're not

3    going to allow cross-notice creditors who are here,

4    want to ask questions, then let's clarify this right

5    now so we can complete the deposition properly,

6    Mr. Ballases.  Please don't obstruct the discovery

7    right now.

8         Go ahead and play the oral ruling of Judge

9    Robinson.

10        MR. BALLASES:  I'm going to object --

11        (Audio file played.)

12        THE REPORTER:  I'm sorry.  I'm sorry.  I

13   cannot hear when Mr. Ballases is speaking --

14        MR. CHOUDHRI:  Mr. Ballases --

15        THE REPORTER:  I need one person --

16        MR. CHOUDHRI:  Mr. Ballases --

17        THE REPORTER:  -- at a time.

18        MR. CHOUDHRI:  -- intentionally --

19   Mr. Ballases intentionally interferes, interrupts when

20   we play the ruling of Judge Robinson that is gonna

21   clarify this issue that cross-notice creditors are not

22   allowed to participate and ask questions.

23        So please play the ruling of Judge Robinson.

24        And, Mr. Ballases, please refrain and be

25   quiet, because the court reporter cannot take

1    different people talking at the same time.

2          So please play the audio of Judge Robinson.

3          THE REPORTER:  Sorry --

4          MR. CHOUDHRI:  Go ahead.

5          THE REPORTER:  Sorry.  One second, please,

6    before you play it.

7          Mr. Sather, this is your deposition

8    transcript.  Normally if I can't hear, I can't

9    transcribe what's being said.  It would need to be

10   transcribed separately, because I'm not transcribing

11   this on the record right now if I cannot hear it

12   clearly.

13         MR. SATHER:  All right.  If you're unable to

14   hear it clearly, I suggest that we move on.  The judge

15   said what he said.  I do have one more question for --

16         MR. CHOUDHRI:  Hold on, Mr. Sather.  Just one

17   second, please, before we conclude anything here.  I

18   do want to take a break before we do conclude

19   anything, but I want to play this, and I think he can

20   do it a little bit louder.

21         Let's try if you can hear it again.  Ms. Court

22   Reporter, let's try one more time.

23         MR. BALLASES:  (Unintelligible)

24         MR. CHOUDHRI:  Go ahead.  Play the recording.

25         THE REPORTER:  I'm sorry.  Mr. Ballases --

1    MR. BALLASES:  The court reporter is saying

2  (unintelligible).

3    THE REPORTER:  I'm sorry.  Mr. Ballases, could

4  you please repeat that?

5    MR. BALLASES:  Sure.  I just was telling

6  Mr. Choudhri that you have instructed him you cannot

7  take it down in this manner, and so I'm just trying to

8  tell him that he's wasting more time.

9    Mr. Sather --

10    MR. CHOUDHRI:  Mr. Ballases, that's not what

11  she said.

12    MR. BALLASES:  -- if you want to go --

13    MR. CHOUDHRI:  Mr. Ballases, we're going to

14  try for her to hear it.  Okay?

15    MR. BALLASES:  Okay.  Call us when you're

16  ready --

17    MR. CHOUDHRI:  So she's being very cooperative

18  and polite.

19    Please, Mr. Ballases, be quiet.

20    Go ahead, Mr. -- sir.  Please play the -- play

21  the audio for the judge's ruling.

22    (Audio file played.)

23    MR. MCCUBBIN:  He said, And any other

24  creditor.

25    MR. CHOUDHRI:  Can you please --

1          MR. SATHER:  Madam Reporter --

2          MR. CHOUDHRI:  Please play the -- please play

3    the whole recording.

4          MR. MCCUBBIN:  The recording is starting --

5          MR. SATHER:  Okay.  Stop.  Stop.

6          Madam Reporter, were you able to get the last

7    excerpt?

8          MR. BALLASES:  Ms. Court Reporter, you told us

9    you couldn't take anything down in that manner.  It'd

10   have to be transcribed by the person who noticed the

11   deposition, Mr. Sather.  I assume you're going to

12   stick by what you stated earlier.

13         THE REPORTER:  Okay.  It's not crystal clear.

14   And because it's being played, I'm not sure where the

15   audio and where it is stopping.

16         MR. CHOUDHRI:  Well, let's take a five-,

17   ten-minute break.  Let's e-mail it to you, Madam Court

18   Reporter, and so we can be efficient, and that way we

19   don't have to interrupt the deposition and come back a

20   different day and go seek court intervention.  We can

21   save the Court's time and not bother the Court.

22         But if Mr. Ballases insists that we have to

23   bother the Court, then we'll seek emergency relief

24   from the Court.  But why don't we go ahead and e-mail

25   you right now.

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                        67

1          And let's not allow anybody to bully anybody

2     here.  So, Mr. Ballases, please don't put words in her

3     mouth.

4          So let's go ahead and take -- because at this

5     point, this is -- I've cross-noticed the depo, and I

6     want the record to be clear.  If Mr. Ballases is going

7     to continue to not allow questions despite the order

8     by the judge being shown and heard for him -- so the

9     record is clear.  But we'll go ahead and take a --

10    let's go and take a ten-minute break.

11         Madam Court Reporter, we're going to e-mail

12    you the audio oral ruling of Judge Robinson so we can

13    have a smooth deposition and complete discovery, and

14    no one can obstruct this process.  Okay?  So can you

15    provide your e-mail address, Madam Court Reporter,

16    just so I have it?

17         MR. BALLASES:  Mr. Sather, are we moving on to

18    the next witness?

19         MR. SATHER:  Yeah, I don't think this is

20    productive.  Mr. Ballases has indicated that he is not

21    going to allow you to ask questions regardless of what

22    the Court ruled, and so it is my intent at this time

23    to adjourn the deposition subject to any future

24    rulings from Judge Robinson.  If Judge Robinson

25    allows --

1        MR. CHOUDHRI:  Well --

2        MR. SATHER:  -- the other parties to ask

3   questions, I may have -- I reserve the right to ask

4   follow-up questions.

5        MR. CHOUDHRI:  So -- so I --

6        MR. BALLASES:  Would you like to ask --

7        MR. CHOUDHRI:  No, no.  Hold --

8        MR. BALLASES:  Would you like to proceed --

9        (Crosstalk)

10       THE REPORTER:  I'm sorry.  I can't --

11       MR. BALLASES:  -- with Osama Abdullatif or

12   John Quinlan next?

13       THE REPORTER:  Mr. Ballases -- sorry --

14       MR. CHOUDHRI:  Hang on a second.

15       THE REPORTER:  -- Mr. Ballases --

16       MR. CHOUDHRI:  I have --

17       THE REPORTER:  -- could you --

18       MR. CHOUDHRI:  -- contacted the Court.  I'll

19   be e-mailing the Court right now.  We are not

20   suspending this deposition.  I want to go ahead and

21   pause the deposition.  We are going to contact the

22   Court.  Okay?

23       Madam Court Reporter, would you give us your

24   e-mail address, please?

25       THE REPORTER:  And I just want to note,

1   Mr. Ballases, I did not get anything you just said as

2   you were speaking at the same time as Mr. Choudhri.

3   So do you have anything to put on the record?

4          MR. BALLASES:  Myself, me?

5          THE REPORTER:  Yes.  I did not get what you

6   were saying while -- after what Mr. Sather said.

7          MR. BALLASES:  Sure.  I just asked Mr. Sather

8   if we're ready to move to the next witness.  I think

9   he indicated he was before Mr. Choudhri interrupted.

10   And so that's all I'm asking.

11          MR. CHOUDHRI:  So --

12          MR. BALLASES:  Do we want to move to the next

13   witness, Steve?

14          MR. CHOUDHRI:  So this part is -- at this

15   moment, I'd like to e-mail the court reporter the

16   judge's oral ruling, and let's take a 15-minute break.

17   And I've already reached out to the Court.  The Court

18   has asked for us to e-mail the Court for relief so we

19   can complete the deposition and not waste the Court's

20   time or disrupt the deposition and have to come back a

21   different day.  Everybody's schedules are -- are very

22   important.

23          Mr. Ballases, in the event we are able to

24   resume or reschedule the deposition, can you provide

25   us dates?

1      MR. BALLASES:  Steve, can we move on?  Can you

2  control your client to any degree?  I mean --

3      MR. SATHER:  Mr. Choudhri --

4      MR. CHOUDHRI:  I'm not his client.

5      MR. SATHER:  -- is not my client in his

6  individual capacity, and therefore --

7      MR. BALLASES:  I understand he's a principal

8  of Texas REIT, the debtor.

9      MR. SATHER:  He's also asserting his right to

10 appear as a pro se creditor and that I do not have any

11 control over that capacity.  If he wishes to contact

12 the Court, that is his business.

13     MR. BALLASES:  I understand that, but you've

14 noticed the deposition.  Do we want to proceed with

15 the next witness?  I've got my --

16     MR. CHOUDHRI:  And we --

17     MR. BALLASES:  -- clients here.  We've

18 rearranged our schedules for you.  Do you want to take

19 the deposition or not?  It's up to you, Steve.

20     MR. SATHER:  I want to proceed --

21     MR. CHOUDHRI:  We are resuming.  We are

22 pausing the deposition, and we're going to have a

23 conversation, and we'll come back in 15 minutes on the

24 record.

25     But in the meantime, Court Reporter, can I

1  have your e-mail address so we can e-mail you the

2  audio ruling of the judge?  And I think that'll solve

3  any issues and resolve the -- the objection or

4  position that Mr. Ballases is taking that the judge

5  said something the judge didn't say, so it's clear.

6  If I can get your e-mail address, we can e-mail you

7  the audio right now, and we can resume.

8        Let's -- let's resume the deposition at noon.

9  It's 11:40 right now.

10        THE REPORTER:  Okay.  May I go off the record,

11  please?  If we're pausing?

12        MR. CHOUDHRI:  Please.

13        MR. SATHER:  Yes, you may.  Yes.

14        MR. BALLASES:  Yes, you can go off the record.

15        THE REPORTER:  Okay.  So I am off the record.

16        (Discussion held off the record.)

17        (A recess was taken.)

18        THE REPORTER:  Back on the record.

19        MR. BALLASES:  So this is Michael Ballases,

20  counsel for John Quinlan, Omar Khawaja, and Osama

21  Abdullatif.  There is no written order, but I did

22  listen to the recording, and it appears he did say

23  "creditors."  And so I was mistaken, and so I will

24  allow creditors to ask questions, however, in the

25  limited capacity that he stated in the oral hearing.

1    So we can go forth with Mr. Khawaja.

2          Ms. Hood, if you want to ask questions, go for

3    it.

4          MS. HOOD:  Thanks.  Okay.  Steve, I may use

5    your exhibits, so if you can have those by the --

6          MR. SATHER:  I'm happy to --

7          MS. HOOD:  -- by the ready for me, I

8    appreciate it.

9          MR. SATHER:  -- put them up on the screen if

10   you need them.

11          MS. HOOD:  Thank you.

12   BY MS. HOOD:

13      Q.  Mr. Khawaja, my name is Lori Hood.  We've

14   never met before; correct?

15      A.  That's correct.

16      Q.  And I understand that you are an attorney

17   licensed in the state of Texas; correct?

18      A.  That's also correct.

19          MR. BALLASES:  Objection.  Form.

20      Q.  (BY MS. HOOD)  And do you practice law?

21      A.  Yes, ma'am.

22          MR. BALLASES:  Objection.  Form.

23      Q.  (BY MS. HOOD)  And do you have -- where do you

24   practice law?

25          MR. BALLASES:  Objection --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                  73

1        A.  At my own law firm.

2        Q.  (BY MS. HOOD)  And what is the name of that

3   law firm?

4        A.  The Law Offices of -- and my name.

5        Q.  And where is that?  Where are your offices

6   located?

7            MR. BALLASES:  Objection.  Form.

8        A.  On Richmond and Sage.

9            MS. HOOD:  If you'll -- thanks, Steve.  Can

10   you scroll down, Steve?

11            MR. SATHER:  Certainly.

12        Q.  (BY MS. HOOD)  In the proof -- if I understand

13   your testimony correctly, you stated that your proof

14   of claim is based upon some judgments that you had

15   assigned to you by virtue of purchasing those

16   judgments from third parties; is that correct?

17            MR. BALLASES:  Objection.  Form.

18        A.  Yes.

19            MS. HOOD:  Mr. Ballases, what is the basis of

20   your objection?

21            MR. BALLASES:  Asked and answered.  We've gone

22   through all this.

23            MS. HOOD:  And I understand that,

24   Mr. Ballases, but you were objecting quite frequently

25   to Mr. Sather's questions, and I just want to make

OMAR KHAWAJA                                  September 11, 2024
TEXAS REIT LLC                                             74

1   sure that the record is clear with regard to what your

2   objection is. I didn't know what your objection was

3   during his questioning, and so I'm just trying to make

4   sure that if the question needs to be rephrased or has

5   come out at a different angle, that the question is

6   clear to your client and that we're not going to deal

7   with objections in the transcript later on. Is that

8   fair?

9       MR. BALLASES: I'm going to make my objections

10   according to the rules. You can respond how you think

11   appropriate pursuant to the rules.

12       MS. HOOD: Okay. I appreciate that.

13       Oops. What's that? No, take that down.

14       MR. SATHER: Sorry.

15   Q. (BY MS. HOOD) All right. So -- okay. So

16   this proof of claim is your individual proof of claim;

17   is that correct?

18   A. My individual proof of claim? It looks like

19   my name is on there as well as Mr. Quinlan's and

20   Mr. Abdullatif's.

21   Q. Right. But this isn't a proof of claim you

22   filed on behalf of your law office; correct?

23   A. Oh, yeah. Yeah, that's filed on my behalf,

24   correct. Mm-hmm.

25   Q. And if I understand your testimony, the value

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    75

1  of the property that is included in Section 9 consists

2  of the total of the three judgments that form the

3  basis of your proof of claim; correct?

4      A.  That's right.

5      Q.  And you've used these three judgments as the

6  basis for filing an adversary action in the Southern

7  District but also attached the adversary action to

8  your proof of claim; is that correct?

9      A.  That sounds correct.

10     Q.  Okay.  So if I can drill down, we've got --

11  the basis for your proof of claim was, one, three

12  judgments and, two, an adversary action; is that

13  correct?

14     A.  That sounds correct.

15     Q.  All right.  And the basis of the adversary

16  action were the three judgments; is that correct?

17         MR. BALLASES:  Objection.  Form.

18     A.  Sorry.  Can you repeat the question?

19     Q.  (BY MS. HOOD)  Yeah.  The basis of your

20  adversary action is the three judgments that you claim

21  you're unable to collect; is that correct?

22     A.  That's correct.

23         MR. BALLASES:  I'm going to object to form.

24         MS. HOOD:  And what is the basis of your

25  objection?

1        MR. BALLASES:  I think it's vague and

2   ambiguous and misstates the evidence.  I mean, the

3   petition or the complaint speaks for itself.

4        MS. HOOD:  So last time I checked, documents

5   don't talk.  So let me correct my question just to

6   make it clear.

7      Q.  (BY MS. HOOD)  Mr. Khawaja, in your adversary

8   action which is attached to your proof of claim, you

9   reference three judgments; is that correct?

10     A.  Yes.

11     Q.  And you testified earlier, when Mr. Sather was

12  asking you questions, that the reason you brought the

13  adversary action was your inability to collect on

14  those judgments and that somehow all of these related

15  entities are alter egos of Mr. Choudhri; correct?

16     A.  Yes.

17     Q.  Okay.  Let me drill down on the judgments.

18        You state that you're an assignee of two of

19  these judgments; is that correct?

20     A.  That's correct.

21        MR. BALLASES:  Objection.  Form.

22        MS. HOOD:  All right.  What is the basis of

23  your objection?

24        MR. BALLASES:  Asked and answered.  This has

25  been already discussed and answered clearly by

1   Mr. Sather.

2        MS. HOOD:  Okay.  I disagree --

3        MR. BALLASES:  You're just rehashing --

4        MS. HOOD:  -- but -- okay.  Let me finish.

5    Q.  (BY MS. HOOD)  You have --

6        MS. HOOD:  Steve, can you go to the basis of

7   the damages that were attached?  And thank you for

8   being my paralegal.  I appreciate it.

9    Q.  (BY MS. HOOD)  All right.  So Judgment

10  Number 1, you have an assigned interest in; correct?

11   A.  Yes.

12       MR. BALLASES:  Objection.  Form.

13   Q.  (BY MS. HOOD)  Before you purchased your

14  assignment, did you do any due diligence on the

15  underlying pleadings in the case?

16       MR. BALLASES:  Objection.  Form.

17   A.  Yes.

18   Q.  (BY MS. HOOD)  And because you did underlying

19  due diligence in the case, you understand that nowhere

20  in that case is there any allegation of fraudulent

21  transfer; correct?

22   A.  In which case?

23   Q.  Judgment Number 1, Davy versus Heil.

24   A.  I mean, I didn't get into the facts of that

25  case.  There's a final judgment, I purchased it, and

1   it was assigned to me.  Why do I care what happened in

2   that case?

3       Q.  Okay.  Well, I just asked you if you looked at

4   the underlying pleadings in the case, and you said

5   yes.  So now your testimony is that you did not look

6   at the underlying pleadings.

7       A.  I mean, I skimmed through them.

8       Q.  And as you were skimming through them, did you

9   understand that there was no cause of action for

10  fraudulent transfers?

11      A.  I don't recall.

12      Q.  Have you read the judgment?

13      A.  Yes, I have.

14      Q.  And did you read it before you purchased it?

15      A.  Yes, I did.

16      Q.  And do you understand that nowhere in that

17  judgment is there a finding of fraudulent transfers?

18      A.  Okay.  If you say so.

19      Q.  Well, no, I'm asking you if you've read it and

20  if you understand that.

21          MR. BALLASES:  Objection.  Form.

22      A.  I mean, if there isn't, I'm gonna take your

23  word for it and say there isn't.

24      Q.  (BY MS. HOOD)  Okay.  Well, take my word for

25  it.  There isn't.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                  79

1          Did you purchase this judgment at a discount?

2          MR. BALLASES:  Objection.  Form.

3      A.  I don't recall.

4          MS. HOOD:  What's the basis for your

5   objection?

6          MR. BALLASES:  Lacking relevance.  The purpose

7   of the deposition is to understand why the proof of

8   claim was filed and why it is now being withdrawn.

9          MS. HOOD:  All right.  Well, I think --

10         (Crosstalk)

11         MR. BALLASES:  (Unintelligible) an underlying

12  matter in the Southern District.

13         MS. HOOD:  All right.  I disagree with your

14  analysis, but we can argue that another day.

15     Q.  (BY MS. HOOD)  So you don't recall how much

16  you purchased the judgment for.

17     A.  Correct.

18     Q.  And you are one of three assignees of this

19  judgment; correct?

20     A.  That's correct.

21         MR. BALLASES:  Objection.  Form.

22     Q.  (BY MS. HOOD)  Before you purchased the

23  judgment, did you have an agreement with the other two

24  claimants, Mr. Quinlan and Mr. Abdullatif, as to why

25  you were purchasing the judgment?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                      80

1        MR. BALLASES:  Objection.  Form.

2     A.  Did I have an agreement as to why we were

3  purchasing the judgment?  I mean, the purpose of

4  purchasing the judgment is to collect on a judgment,

5  so that was the agreement.

6     Q.  (BY MS. HOOD)  So you sat down with the other

7  two gentlemen, and the three of you decided to

8  purchase this judgment together.

9     A.  I don't recall if we sat down together

10  anywhere and had that -- a sit-down discussion about

11  what was gonna happen.  I think maybe that did.

12     Q.  Maybe it did, or maybe it didn't?

13     A.  Yeah.  Maybe it was a phone call; maybe it was

14  a sit-down meeting.

15     Q.  When did you --

16        MR. BALLASES:  And just for the record --

17     Q.  (BY MS. HOOD)  Can you tell us when the

18  judgment --

19        MR. BALLASES:  Just so that I have --

20        THE REPORTER:  I'm sorry.  I'm sorry.

21        MS. HOOD:  Sorry.

22        THE REPORTER:  I hear somebody else speaking.

23        MR. BALLASES:  Sure.  I just -- I wanted to

24  caution Ms. Hood.

25        You're getting real close to attorney-client

1    privilege and/or work product legal privilege.  So I

2    don't think you're there yet, but you're close, so I

3    just wanted to warn you to keep that in mind.

4        Q.  (BY MS. HOOD)  Sure.  And, Mr. Khawaja, please

5    understand that I don't want to know what you talked

6    about with your lawyers, okay, ever, or what your

7    lawyers have discussed with you regarding their

8    strategy.  Okay?  So if you feel like you have to

9    reveal that kind of information in response to my

10   question, I don't want to know that stuff.  Okay?

11           And certainly you understand as a lawyer that

12   you have the right to discuss this kind of response

13   with your lawyer prior to answering; right?

14       A.  Yes.

15       Q.  Can you tell us when you -- when you purchased

16   the judgment?

17       A.  Sometime before this proof of claim was filed.

18   I don't recall exactly when, no.

19       Q.  Do you recall the year?

20       A.  I think it was --

21           MR. BALLASES:  Objection.  Form.

22       A.  I think it was 2023.

23       Q.  (BY MS. HOOD)  And how did it come about that

24   this judgment came across your desk to be purchased?

25           MR. BALLASES:  Objection.  Form.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    82

1      Q.  (BY MS. HOOD)  You can answer.

2      A.  I mean, that's -- that's privileged

3  information that I'm not gonna discuss.

4         MR. BALLASES:  I'll go ahead and assert the

5  attorney work product, attorney-client privilege.  I'm

6  going to instruct him not to answer.

7      Q.  (BY MS. HOOD)  How do you typically learn of

8  judgments that are available for you to purchase?

9      A.  I would say typically it is something that's

10  brought to my attention by a third party.

11     Q.  And which third party brought this particular

12  judgment to your attention?

13        MR. BALLASES:  Objection.  Form.  Assertion of

14  attorney-client and work product legal privileges.

15  Instruct client not to answer.

16     Q.  (BY MS. HOOD)  Did Mr. Abdullatif bring this

17  judgment to your attention?

18        MR. BALLASES:  Same assertion of privilege,

19  same instruction to the client not to answer.  It

20  violates attorney-client and attorney work product.

21     Q.  (BY MS. HOOD)  Mr. Khawaja, do you have any

22  sort of agreement with Mr. Abdullatif or Mr. Quinlan

23  regarding a joint prosecution of this proof of claim?

24     A.  We do.

25     Q.  And is that in writing?

OMAR KHAWAJA                                     September 11, 2024
TEXAS REIT LLC                                                        83

1        MR. BALLASES:  Also joint litigation

2    privilege, I'll assert.

3       Q.  (BY MS. HOOD)  Okay.

4       A.  I'm not gonna answer.

5       Q.  Is your -- is your agreement in writing?

6        MR. BALLASES:  Instruct client not to answer.

7    He doesn't need to give work product, attorney-client,

8    or joint litigation privilege information away.

9       Q.  (BY MS. HOOD)  Back to my question.

10   Mr. Khawaja, do you have an agreement in writing with

11   Mr. Abdullatif and Mr. Quinlan with regard to pursuing

12   this proof of claim?

13       MR. BALLASES:  I'm going object again to the

14   question and assert the legal privileges of

15   attorney-client, work product, also joint litigation

16   privilege and instruct the client not to answer.

17      Q.  (BY MS. HOOD)  Mr. Khawaja, are you adhering

18   to your -- to your counsel's instruction?

19      A.  I am.

20      Q.  And refusing to answer my question?

21      A.  On advice of counsel, yes.

22      Q.  With regard to this particular Davy-Heil

23   judgment, do you know Mr. Heil?

24      A.  I don't.

25      Q.  Do you know Mr. Oakum?

1    A.  I don't.

2    Q.  Do you know Renee Davy?

3    A.  Not personally.

4    Q.  Not personally?  How else would you know her?

5    A.  I've seen videos of her online.

6    Q.  Doing what?

7    A.  Stating that Mr. Choudhri's a fraud and a

8  thief and shouldn't be trusted.

9    Q.  Have you ever spoken to her?

10    A.  I have not.

11    Q.  When you purchased this judgment, who did you

12  pay?

13        MR. BALLASES:  Objection.  Form.

14        I'm going to also -- it's harassing and

15  oppressive.  I'm also going to assert the

16  attorney-client, attorney work product, and joint

17  litigation privilege and instruct the client not to

18  answer.

19    Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

20  follow your attorney's instruction and not answer my

21  question?

22    A.  I am.

23    Q.  When you guys purchased your assignment of

24  this judgment, the Davy-Heil judgment, did you each

25  provide separate payment, or did it come from one

source?
MR. BALLASES: I'm going to assert the same objection and the same assertions of legal privilege and instruct the client not to answer, as I did to the question before.
Q. (BY MS. HOOD) Mr. Khawaja, are you going to follow your counsel's instruction and refuse to answer my question?
A. I am.
Q. Mr. Khawaja, when you purchased your interest in this judgment, did you purchase it via wire transfer or a check? Cash? How did you purchase it?
MR. BALLASES: I'm going to assert the same legal objections and the same assertions of legal privilege and instruct client not to answer, as I did with the previous question.
Q. (BY MS. HOOD) Mr. Khawaja, are you going to adhere to your client's (sic) instruction and refuse to answer my question?
A. My counsel's. Yes, I am.
Q. Mr. Khawaja, do you know a gentleman by the name of Wayne Dolcefino?
A. I've seen him online.
Q. And was it one of Mr. Dolcefino's videos in which Ms. Davy appeared?

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    86

1      A.  I think so, yes.

2          MR. BALLASES:  Objection.  Form.

3      Q.  (BY MS. HOOD)  Have you ever met

4  Mr. Dolcefino?

5      A.  I've met him, yes.

6          MR. BALLASES:  Objection --

7      Q.  (BY MS. HOOD)  In connection with any of your

8  cases related to Mr. Choudhri?

9      A.  No.

10         MR. BALLASES:  Objection.  Form.

11     Q.  (BY MS. HOOD)  With regard to this Judgment

12  Number 1 that was assigned to you, how much of -- how

13  much do you own of this judgment?

14         THE WITNESS:  I think that goes to the

15  privilege again.

16         MR. BALLASES:  I'm going to object to the

17  question as being oppressive and harassing and assert

18  the attorney-client, attorney work product, and joint

19  litigation privilege and instruct him not to answer.

20     Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

21  adhere to your lawyer's instruction not to answer my

22  question?

23     A.  I am.

24     Q.  As you sit here today, you're not going to

25  tell me how much of this $501,513.85 judgment that you

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                              87

1  own.

2       MR. BALLASES:  Objection.  Form.

3    A.  On advice of counsel, I will not answer that

4  question.

5    Q.  (BY MS. HOOD)  And you testified that you

6  purchased this judgment sometime last year; correct?

7       MR. BALLASES:  Objection.  Form.

8    A.  I believe so, yes.

9    Q.  (BY MS. HOOD)  Okay.  And what have you done

10  to try and collect this judgment?

11    A.  Well, we filed --

12       MR. BALLASES:  Objection.  Form.

13    A.  -- in Bankruptcy Court or, I guess, in our

14  proof of claims.  And I think -- I think that's it at

15  this stage.

16    Q.  (BY MS. HOOD)  Have you filed any

17  post-judgment discovery in the underlying lawsuit in

18  the 152nd?

19    A.  I don't -- I don't -- I'm not aware of that.

20    Q.  Have you hired a lawyer to pursue

21  post-judgment discovery or collection of this

22  judgment?

23    A.  The only lawyer I've hired is Mr. Ballases.

24    Q.  And you're certainly not aware of Mr. Ballases

25  doing anything to try to collect this judgment outside

1   of the bankruptcy action; correct?

2          MR. BALLASES:  Objection.  Form.

3      Q.  (BY MS. HOOD)  You can answer.

4      A.  I'm not aware.

5      Q.  As an attorney in the state of Texas,

6   certainly you're aware of the fact that, as a judgment

7   creditor, you have the right to pursue post-judgment

8   collection efforts within the confines of the Court

9   that issued the judgment; correct?

10     A.  Sure.

11     Q.  And you've chosen not to avail yourselves of

12  those opportunities; correct?

13         MR. BALLASES:  I'm going to go ahead and

14  object to the question as misleading, also oppressive

15  and harassing, and assert attorney-client, attorney

16  work product, and joint litigation privilege.

17         What we do for collection, you do not get to

18  ask about to aid Mr. Choudhri and Jetall and his

19  companies to hide assets any further.  So we're not

20  going to answer that.

21         MS. HOOD:  All right.  I object to any

22  commentary about me helping anybody do anything.  All

23  right?  I'm here representing a creditor, and I'm

24  trying to determine the basis for the filing of this

25  proof of claim.  And part of that issue is any attempt

1    by the judgment creditor to collect the judgment

2    outside of filing a proof of claim in a bankruptcy

3    action, that has nothing to do with the underlying

4    judgment.

5        Q.  (BY MS. HOOD)  Mr. Khawaja, do you personally

6    know of any action taken in the public forum by you to

7    collect this judgment outside of this bankruptcy

8    action?

9        A.  I'm not aware of any.

10            MR. BALLASES:  I'm further going to instruct

11    you:  Don't answer any more questions regarding what

12    we've done to collect because that gets into attorney

13    work product, also attorney-client, and joint

14    litigation privilege.

15            THE WITNESS:  I understand.

16            MS. HOOD:  And certainly, Mr. Ballases, I

17    appreciate the nuances and everything else.  And

18    again, I don't want to know anything about your

19    strategy or anything else.  That's why I asked for

20    public record, because I can't find anything in the

21    public record that shows any attempt to try to collect

22    this judgment.  And so I'm just trying to clarify and

23    get commentary and testimony from your client

24    confirming that.

25            MR. BALLASES:  I appreciate that, but we don't

1    need to get into anything that could aid your client

2    or the principal who owns your client to hide assets

3    any further.

4         MS. HOOD:  I'm going to object to the sidebar

5    commentary there.

6       Q.  (BY MS. HOOD)  The judgment that you bought,

7    the judgment debtor is Jetall Companies, Inc.;

8    correct?

9       A.  Correct.

10       Q.  Certainly that judgment does not include my

11    client as a judgment debtor; correct?

12       A.  Yeah, it's not -- does not include?  Correct.

13       Q.  It certainly doesn't include Mrs. Choudhri as

14    a judgment debtor; correct?

15       A.  It does not include them as a judgment debtor,

16    correct.

17       Q.  It doesn't include Texas REIT as a judgment

18    debtor either; right?

19       A.  Correct.

20       Q.  On Judgment Number 2, I think you testified

21    that you don't own any part of that judgment; correct?

22       A.  Judgment Number 2, I believe I do own part of

23    it.

24       Q.  The Abdullatif judgment?

25       A.  Okay.  No, I do not.  Sorry.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    91

1      Q.  Okay.  Are you aware of the fact that that

2  judgment has been bonded around?

3      A.  I'm not aware of --

4         MR. BALLASES:  Objection.  Form.

5      A.  I'm not aware of that.

6      Q.  (BY MS. HOOD)  And when you filed the proof of

7  claim that included Judgment Number 2, did you do any

8  due diligence on that judgment in order to satisfy

9  yourself that that judgment was not bonded around?

10        MR. BALLASES:  Objection.  Form.

11     A.  I -- minimally, not -- minimally.

12     Q.  (BY MS. HOOD)  What do you mean "minimally"?

13     A.  Meaning it was a final judgment, and that's

14  how I -- that was what I understood it to be.

15     Q.  Certainly as a lawyer in the state of Texas,

16  you understand that when a judgment is superceded,

17  that that stays any collection activities; correct?

18        MR. BALLASES:  I'm going to object to the

19  question as misleading and harassing and oppressive.

20     Q.  (BY MS. HOOD)  You can answer --

21     A.  I'm not aware of that --

22     Q.  You're not aware of that?

23     A.  I'm not aware of that being -- I'm not aware

24  of the judgment being superceded.

25     Q.  And did you take any independent actions to

1  determine whether or not this judgment, which is on

2  appeal, had been superceded?

3     A.  No.

4     Q.  Judgment Number 3, this HSLLP judgment.

5     A.  Yes.

6     Q.  All right.  That judgment, when did you

7  purchase that judgment?

8     A.  I think 2023, if I recall correctly.

9     Q.  And how did you become aware that that

10  judgment was available to purchase?

11        MR. BALLASES:  Objection.  Form.  Harassing

12  and oppressive.  I'm also going to assert

13  attorney-client, attorney work product, and joint

14  litigation privilege and instruct the client not to

15  answer.

16     Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

17  adhere to your client's -- excuse me -- to your

18  lawyer's instructions?

19     A.  I am.

20     Q.  And if I understand your testimony, you are

21  one of three owners also of this judgment; is that

22  correct?

23        MR. BALLASES:  Objection.  Form.

24     A.  That's correct.

25     Q.  (BY MS. HOOD)  And can you tell me how you

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    93

1   paid for the purchase of this judgment?

2        MR. BALLASES:  I'm going to object to the

3   question again as harassing and oppressive, assert the

4   attorney-client legal privilege, the work product

5   legal privilege, and the joint litigation legal

6   privilege and instruct the client not to answer.

7     Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

8   adhere to your lawyer's instruction?

9     A.  Yes.

10     Q.  Mr. Khawaja, can you tell me whether you paid

11   for -- excuse me.  Strike that.

12        Can you tell me who you paid when you

13   purchased this assignment of this judgment?

14        MR. BALLASES:  I'm going to assert the same

15   objection I just levied to the prior question as well

16   as the same assertion of legal privileges to the prior

17   question and instruct the client not to answer, just

18   like the prior question.

19     Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

20   adhere to your lawyer's instruction and not answer my

21   question as to who you paid for the purchase of this

22   judgment?

23     A.  I am.

24     Q.  I see that this judgment -- the judgment

25   creditor is Hoover Slovacek; correct?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    94

1     A.  That appears correct.

2     Q.  And that's the same law firm that is

3   representing you here today; correct?

4     A.  That's correct.

5        MR. BALLASES:  Objection.  Form.

6     Q.  (BY MS. HOOD)  Do you have any joint defense

7   agreements with Hoover Slovacek?

8        MR. BALLASES:  Objection.  Form.  I think --

9   well, objection.  Form.

10     A.  I'm not aware.

11     Q.  (BY MS. HOOD)  Do you have any prosecution

12   agreements with Hoover Slovacek?

13        MR. BALLASES:  Objection.  Form.

14     A.  I'm not aware of any.

15     Q.  (BY MS. HOOD)  At the time that you purchased

16   this judgment, were you represented by Hoover

17   Slovacek?

18        MR. BALLASES:  Objection.  Form.

19     A.  At the time I purchased the judgment, I was

20   represented by nobody.

21     Q.  (BY MS. HOOD)  So you were representing

22   yourself?

23     A.  Correct.

24     Q.  Who drafted the assignments?

25        MR. BALLASES:  Objection.  Form.

1    A.  I think that's a privileged answer.

2        MR. BALLASES:  Also assert the same legal

3    privileges we asserted in the previous questions,

4    which would be attorney-client, attorney work product,

5    and joint litigation and instruct the client not to

6    answer.

7    Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

8    adhere to your lawyer's instructions and not answer my

9    question?

10    A.  Yes.

11    Q.  When you purchased the assignment of this

12    judgment and the other two also purchased their

13    portion of the judgment, was it all done at one time?

14        MR. BALLASES:  Objection.  Form.

15        I'm also going to assert the same legal

16    privileges and instruct the client not to answer, as I

17    did with the previous question.

18    Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

19    adhere to your client's instruction and not answer my

20    question as to the timing of the purchase of the

21    assignment by the three of you?

22    A.  Yes.

23    Q.  Did you purchase the assignment of this

24    judgment from Mr. Abdullatif?

25        MR. BALLASES:  Objection.  Form.  Same

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                      96

1   objections, same assertions of legal privilege, same

2   instruction not to answer based on those legal

3   privileges as the question before.

4       Q.  (BY MS. HOOD)  Are you going to follow your

5   lawyer's instruction and not answer my question as to

6   who you purchased the assignment from?

7       A.  Yes.

8       Q.  When you purchased the assignment and you were

9   representing yourself, what lawyers did you deal with

10  for the other purchasers?

11          MR. BALLASES:  Objection.  Form.  I'm also

12  going to assert the same attorney work product and

13  attorney -- joint litigation legal privilege and

14  instruct the client not to answer.

15      Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

16  adhere to your lawyer's instructions and not answer my

17  questions?

18      A.  Yes.

19      Q.  Okay.  When you purchased your assignment, was

20  Mr. Abdullatif represented by counsel?

21          MR. BALLASES:  Objection.  Form.

22          Asserting the same legal privileges as the

23  previous question and instructing client not to answer

24  as I did with the previous question.

25      Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

1  adhere to your client's instruction -- or to your

2  lawyer's instruction and not answer my question as to

3  whether or not Mr. Abdullatif had a lawyer at the time

4  of the purchase?

5      A.  Yes.

6      Q.  At the time you purchased your assignment of

7  this judgment, was Mr. Quinlan represented by counsel?

8          MR. BALLASES:  Objection.  Form.

9          I'm also going to assert the same legal

10  privileges as I did before and instruct the client not

11  to answer.

12     Q.  (BY MS. HOOD)  Mr. Khawaja, are you adhering

13  to your counsel's instructions and not answering my

14  question as to whether or not Mr. Quinlan was

15  represented by counsel at the time of the assignment

16  of the judgment?

17     A.  Yes.

18     Q.  Does your assignment include just your

19  signature, or is it an assignment that includes the

20  other purchasers' signatures?

21         MR. BALLASES:  I'm going to object to the

22  question -- object to the form of the question.

23  Excuse me.

24     A.  I don't -- I don't recall.

25     Q.  (BY MS. HOOD)  Do you have a physical copy, or

1   do you have the original of this assignment?

2       A.  I believe I do somewhere, not with me today.

3   I'm sure it was provided to me.

4       Q.  The copy or the original?

5       A.  The copy.

6       Q.  Do you know who holds the original of the

7   assignment?

8       A.  I don't.

9       Q.  Because you don't know who holds the original

10  of the assignment, you can't tell us whether or not

11  the assignment has been paid; correct?

12          MR. BALLASES:  Objection.  Form.

13          I'm going to assert the attorney-client and

14  attorney work product and attorney joint -- or excuse

15  me -- joint litigation privilege and instruct the

16  client not to answer.

17      A.  I'm going to follow advice of counsel.

18      Q.  (BY MS. HOOD)  And as you sit here today, you

19  can't tell us who holds the original of this

20  assignment.

21      A.  I can't.

22          MR. BALLASES:  Objection.  Form.

23      Q.  (BY MS. HOOD)  You can't?

24      A.  I cannot.

25          MR. BALLASES:  Objection.  Form.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    99

1     Q.  (BY MS. HOOD)  Can you tell me why you didn't

2  include a copy of the assignment with your proof of

3  claim?

4        MR. BALLASES:  Objection.  Form.

5        Just -- and I'm -- and I apologize because I

6  know I'm not supposed to talk right now, but it's

7  attached to the actual complaint in the Southern

8  District, so you can pull it up.  It's public record.

9        MR. CHOUDHRI:  Mr. Ballases, please stop

10  coaching the witness.

11        MR. BALLASES:  Be quiet.

12        MR. CHOUDHRI:  I'm sorry.  Mr. Khawaja, did

13  you say something?

14        MS. HOOD:  Okay --

15        MR. BALLASES:  No, I told you to be quiet.

16  This is Mr. Ballases.

17        MS. HOOD:  Okay.  This is my time.  Okay?  You

18  guys can bicker and do your little boy thing when I'm

19  not talking.

20     Q.  (BY MS. HOOD)  So if I understand correctly,

21  this adversary action, which is based upon two

22  judgments that you claim to have an assignment in, was

23  originally filed in the Southern District of Texas; is

24  that correct?

25     A.  That's correct.

OMAR KHAWAJA                                              September 11, 2024
TEXAS REIT LLC                                                          100

1      Q.  And then you took that adversary and used it

2  as -- as an exhibit to your proof of claim that you

3  then filed in this action; correct?

4      A.  That's correct.

5      Q.  And if I understand your testimony, along with

6  this adversary action, you filed lis pendens against

7  the debtor's property in this action; correct?

8      A.  That's correct.

9      Q.  And if I remember the lis pendens, you did not

10  sign that lis pendens; correct?

11      A.  Correct.

12      Q.  Did Mr. Abdullatif have your permission to

13  sign that lis pendens that was filed against the

14  debtor's property in this action?

15      A.  Yes.

16      Q.  And when did you give him permission to file

17  that lis pendens?

18      A.  I'm not sure.  I'm assuming sometime before it

19  was filed.

20      Q.  Was it done prior to the time that you brought

21  the adversary action in the Southern District of

22  Texas?

23      A.  I don't know.

24          MS. HOOD:  Steve, my trustee paralegal, can

25  you bring up the first lis pendens, the supplemental

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                      101

1   lis pendens, which I think is Exhibit -- yeah --

2   Exhibit 2, yeah.  Can you go down to the signature

3   page?

4        MR. SATHER:  Yes.

5      Q.  (BY MS. HOOD)  All right.  So Exhibit 2 is the

6   supplemental lis pendens that you authorized

7   Mr. Abdullatif to file against the debtor's property

8   in this action; correct?

9      A.  That's correct.

10     Q.  All right.  And the date of that says

11  August 22nd, 2023.  Do you agree with me?

12     A.  Yes.

13     Q.  Okay.  And would it be fair to say that you

14  gave Mr. Abdullatif your authority to sign on your

15  behalf somewhere around August 22nd, 2023?

16     A.  It could've been before that, but it sounds

17  correct.

18     Q.  Did you have a conversation with

19  Mr. Abdullatif about the filing of the lis pendens?

20        MR. BALLASES:  I'm going to object to the

21  question.  I'm also going to assert the

22  attorney-client, attorney work product, and joint

23  litigation privilege and instruct the client not to

24  answer.

25     A.  On advice of counsel, I'm not answering any

1  questions regarding my conversations with

2  Mr. Abdullatif or Mr. Quinlan.

3      Q.  (BY MS. HOOD)  Did you prov -- the authority

4  that you provided to Mr. Abdullatif for you -- for him

5  to sign on your behalf this lis pendens, was that

6  given verbally or in writing?

7          MR. BALLASES:  Objection.  Form.

8          Same assertion of legal privilege, same

9  instruction not to answer.

10     Q.  (BY MS. HOOD)  Mr. Khawaja, are you going to

11  adhere to your client's (sic) instructions and not

12  answer my question about how you gave permission to

13  Mr. Abdullatif --

14     A.  Yes, I am.

15         MS. HOOD:  Steve, can you bring up the --

16  Exhibit Number 3?

17     Q.  (BY MS. HOOD)  Exhibit Number 3 is the second

18  supplemental lis pendens that was filed also on the

19  debtor's property, and it looks to me that that also

20  is dated August 22nd, 2023.  Is that accurate?

21     A.  That looks accurate.

22     Q.  All right.  And is it fair to say that you

23  again gave Mr. Abdullatif permission or authorized him

24  to sign on your behalf somewhere around August 22nd of

25  2023?

1       A.  Or prior to that, yes.

2       Q.  Certainly you didn't give him permission to

3    file it before you actually were an owner in the

4    judgment; correct?

5       A.  That's correct.

6       Q.  And again, just to summarize your testimony,

7    you think you recall purchasing your assignment in

8    this judgment sometime in 2023; correct?

9       A.  That's correct.

10       Q.  So we've got somewhere between January and

11    August 22nd that you purchased your interest in this

12    judgment; correct?

13       A.  That sounds right.

14       MR. BALLASES:  Ms. Hood, I don't mean to

15    derail your testimony, but if you look at the

16    complaint itself, it says when he obtained the

17    assignment.  It's February 17th, 2023.  You can read

18    it for yourself.  It's Exhibit 1.

19       MS. HOOD:  So I appreciate that, Mr. Ballases.

20    I'm trying to get your client's testimony on these

21    issues, not what's in a document that you wrote.  I

22    want his testimony, but I appreciate it.  He said he

23    couldn't recall, and that's fine with me.

24       Q.  (BY MS. HOOD)  On this judgment that you

25    purchased from Hoover Slovacek, prior -- prior --

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
104

1    sorry; my mouth is not working -- prior to your

2    purchase of the assignment, did you review the

3    underlying pleadings related to the lawsuit?

4        A.  Not really.

5        Q.  Can you be more specific than "not really"?

6    Is that you didn't look at them at all, or you kind of

7    looked at them?

8        A.  I may have briefly skimmed through them.

9        Q.  And by skimming through them, were you aware

10   that there were no causes of action for fraudulent

11   transfer, et cetera, against Jetall?

12       A.  No, I wasn't, but I'll take your word for it

13   that there were not.

14       Q.  And would you agree with me that the judgment

15   debtor in Judgment Number 3 is Jetall Companies, Inc.?

16       A.  Yes.

17       Q.  And the judgment debtor is not Arabella PH

18   3201; correct?

19       A.  No, they're an alter ego of Jetall Companies.

20           MS. HOOD:  Objection.  Non-responsive.

21       Q.  (BY MS. HOOD)  Arabella PH 3201 is not a

22   judgment debtor; correct?

23           MR. BALLASES:  Objection.  Form.

24       A.  That's correct.

25       Q.  (BY MS. HOOD)  9201 Memorial Drive is not a

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                105

1    judgment creditor; correct?

2        A.  Correct.

3            MR. BALLASES:  Objection.  Form.

4        Q.  (BY MS. HOOD)  2727 Kirby 26L, LLC, is not a

5    judgment debtor; correct?

6            MR. BALLASES:  Objection.  Form.

7        A.  Correct.

8        Q.  (BY MS. HOOD)  Texas REIT, LLC, is not a

9    judgment debtor; correct?

10       A.  Correct.

11           MR. BALLASES:  Objection.  Form.

12       Q.  (BY MS. HOOD)  Dalio Holdings I is not a

13   judgment debtor; correct?

14       A.  Correct.

15           MR. BALLASES:  Objection.  Form.

16       Q.  (BY MS. HOOD)  Dalio Holdings II is not a

17   judgment debtor; correct?

18       A.  Correct.

19           MR. BALLASES:  Objection.  Form.

20       Q.  (BY MS. HOOD)  Houston Real Estate Properties,

21   LLC, is not a judgment debtor; correct?

22       A.  (Unintelligible)

23           MR. BALLASES:  Objection.  Form.

24           THE REPORTER:  Sorry.  Was that "correct"?

25       Q.  (BY MS. HOOD)  What was your -- yeah, I didn't

1  hear your --

2      A.  That's correct.

3      Q.  -- answer either.  Yeah.

4      A.  Correct.  Correct.

5         MR. BALLASES:  And I object to the form.

6      Q.  (BY MS. HOOD)  Shahnaz Choudhri is not a

7  judgment debtor; correct?

8      A.  Correct.

9         MR. BALLASES:  Objection.  Form.

10     Q.  (BY MS. HOOD)  Ali Choudhri is not a judgment

11 debtor; correct?

12     A.  Correct.

13        MR. BALLASES:  Objection.  Form.

14     Q.  (BY MS. HOOD)  Shepherd-Huldy Development I is

15 not a judgment debtor; correct?

16     A.  Correct.

17        MR. BALLASES:  Objection.  Form.

18     Q.  (BY MS. HOOD)  Shepherd-Huldy Development II

19 is not a judgment debtor; correct?

20     A.  Correct.

21        MR. BALLASES:  Objection.  Form.

22     Q.  (BY MS. HOOD)  Galleria Loop Note Holder, LLC,

23 is not a judgment debtor; correct?

24     A.  Correct.

25        MR. BALLASES:  Objection.  Form.

1    Q.  (BY MS. HOOD)  What due diligence did you do,

2  if any, before you alleged in this adversary action,

3  which forms the basis of your proof of claim, that my

4  client, Dalio Holdings, LLC, is the alter ego of

5  Houston Real Estate Properties?

6    A.  What due diligence did I do personally?

7    Q.  Yeah.

8    A.  I mean, I think it's stated pretty clearly in

9  the petition what evidence we have.  There's a whole

10  court history of fraudulent transfers, commingling of

11  assets; you know, fraudulent, unethical conduct that

12  we have available as public record as to Mr. Choudhri

13  and, by extension, your client's conduct.  And that's

14  the due diligence I did to make these claims.

15    Q.  Okay.  So you based your due diligence off

16  your allegation that this is all public record.

17    A.  That's correct.

18      MR. BALLASES:  Objection.  Form.

19    Q.  (BY MS. HOOD)  What public records did you

20  look at?

21    A.  Well, if you -- everything that's stated in

22  the petition.  If you look at Lawsuit 2013-41273,

23  Harris County District Court, he was found to have

24  committed fraud, filed a fraudulent lien, and there

25  was no promissory note, and that was an entity that he

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                            108

1    controlled, HREP.  If you look at -- on February 16th,

2    2017, in Case Number 2017-1 --

3        Q.  Let's go -- let's go back to the first one.

4    You --

5            MR. BALLASES:  I'm going to --

6        Q.  (BY MS. HOOD)  -- said that there was a --

7            THE REPORTER:  I'm sorry.

8        Q.  (BY MS. HOOD)  You claim to have a finding --

9            (Crosstalk)

10       Q.  (BY MS. HOOD)  You claim there's a finding of

11   fraud --

12           MR. BALLASES:  Ms. Hood --

13           THE REPORTER:  Sorry --

14           MR. BALLASES:  -- can you let my client answer

15   the question, please?

16           MS. HOOD:  I -- it's my question-and-answer,

17   and if I want to cut him off, I can.

18           MR. BALLASES:  Okay.  So you want to --

19           MS. HOOD:  I want to -- I want to drill down

20   on the first one.  Well, he's referencing a pleading

21   that I'm assuming that you wrote, so I just want to

22   find out what he knows personally about some of this

23   stuff.

24           MR. BALLASES:  Objection (unintelligible).

25       Q.  (BY MS. HOOD)  So you reference a lawsuit --

OMAR KHAWAJA                                           September 11, 2024
TEXAS REIT LLC                                                        109

1    hang on.  Let me find it.

2         Is that the lawsuit involving HREP?

3    A.  Yes.

4    Q.  Okay.  And were you involved in that lawsuit?

5    A.  I was not.

6    Q.  So everything you know about that lawsuit, you

7    read as a matter of public record.

8    A.  That's correct.

9    Q.  Was there a finding of fraudulent transfers in

10   that case?

11        MR. BALLASES:  Objection.  Form.

12   A.  Other fraud, but I don't know if fraudulent

13   transfer was part of that.

14   Q.  (BY MS. HOOD)  I didn't see it.

15        MR. BALLASES:  Objection.  Sidebar.

16   Q.  (BY MS. HOOD)  All right.  That's the first

17   lawsuit that you said you looked at for public record

18   in order to determine that my client is somehow the

19   alter ego of all these other things; correct?

20   A.  That's correct.

21   Q.  Okay.  What other -- what other public records

22   did you review?

23   A.  There's also these videos by a guy named Wayne

24   Dolcefino I saw.

25   Q.  So you looked at videos.

1    A.  Yes.

2    Q.  Anything else you reviewed?

3    A.  I think just generally people in the community

4  know that your client commits fraud.  He's known as a

5  fraudster.

6    Q.  Who are these --

7    A.  So many people have approached me.

8    Q.  Okay.  Who are these people?

9    A.  Yeah, I can't -- many people that he's

10  defrauded over the years.

11    Q.  Name one.

12    A.  Well, Judge Norman is one.  I don't know if

13  you know him.  He's in the Southern District.

14    Q.  Okay.  Who else?

15    A.  Let's see.  Who else in the community have

16  called him a fraudster?

17        Judge Landrum, Judge Michael Landrum in the

18  Harris County District Court, 164th District Court.

19  He considers your client a fraud.

20    Q.  And is that in relation to the HREP case?

21    A.  I just think generally.

22    Q.  Okay.  So Judge Landrum has spoken to you

23  about Mr. Choudhri being a fraudster?

24    A.  It's in a final judgment.  I can read that for

25  you if you'd like.

OMAR KHAWAJA                                                September 11, 2024
TEXAS REIT LLC                                                              111

1    Q.  No, I'm asking --

2    A.  Do you want me to read it to you?

3    Q.  No, no, no.  I'm asking you.  You said people

4  have told you; many people have told you.  So I'm

5  asking who --

6    A.  Yes.

7    Q.  -- who's had a conversation with you about

8  Mr. Choudhri being a fraudster?  And you've said Judge

9  Norman, and I'm assuming you didn't --

10   A.  Yes.

11   Q.  -- talk personally with Judge Norman.  That's

12  out of an opinion; right?

13   A.  Yes.

14   Q.  Okay.  The same as --

15   A.  Members of the community --

16   Q.  Okay.  So who --

17   A.  I'm sorry --

18      THE REPORTER:  Sorry.  One at a time, please.

19  Thank you.

20   Q.  (BY MS. HOOD)  What community?

21      MR. BALLASES:  Objection.  Form.

22   A.  The real estate community, the Pakistani

23  community, basically anyone Mr. Choudhri has come in

24  contact with and done business with, people from those

25  communities.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                   112

1        Q.  (BY MS. HOOD)  Okay.  So we've got the real

2    estate community.  We've got the Pakistani community.

3        A.  His family members.  His own family members

4    have said the same.

5        Q.  Family members.

6            All right.  So who in the real estate

7    community have you had a specific conversation with

8    that have informed you that he's -- that he -- that my

9    client fraudulently -- my client, Dalio, is -- has

10   been the recipient or the instigator of fraudulent

11   transfers such that they're the alter ego of

12   Mr. Choudhri?

13       A.  Harold Polk.

14       Q.  Who?

15       A.  So just a -- Harold Polk.

16       Q.  And who is Mr. Polk?

17       A.  Somebody that your client knows that he ripped

18   off, I guess.

19       Q.  Well, how do you know him?

20       A.  He came to me and told me that your client

21   ripped him off.

22       Q.  Okay.  He came to you just out of the blue?

23       A.  Yeah.  I mean, you know, I don't know why he

24   came to me, but yeah, he did.

25       Q.  When did you have this --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    113

1      A.  He probably saw the --

2      Q.  When did you have this conversation with

3  Mr. Polk?

4      A.  Years ago.

5         MR. BALLASES:  Objection.  Form.

6      A.  I can't remember.

7      Q.  (BY MS. HOOD)  Years ago?  Okay.

8      A.  Yes.

9      Q.  Okay.  Who else?

10         MR. BALLASES:  Objection.  Form.

11      A.  I don't -- I can't recall.  I mean, a lot of

12  people.  A lot of people.

13         MR. BALLASES:  I'm going to object to the

14  question as exceeding the scope of the judge's

15  limiting order.

16         Can we please just stick to the basis for the

17  proof of claim and why we are willing to withdraw it?

18         MS. HOOD:  Objection.  Sidebar.

19         I've asked him, what due diligence did he do

20  in order to craft together the adversary proceeding,

21  which was attached to the proof of claim as evidence

22  supporting his proof of claim.  And I've got, so far,

23  two public lawsuits and some people in the community

24  that have spoken to him, one of whose name is Harold

25  Polk.  And he can't remember anybody else's name

1  because there's just so many over so many years.

2      Q.  (BY MS. HOOD)  Is that correct?

3          MR. BALLASES:  No, he's identified several

4  people.

5          I'm going to object to sidebar.

6          If you want to engage in discovery in the

7  Southern District, we can do that, but right now we're

8  just trying to understand why we filed the proof of

9  claim and why we're willing to withdraw it.

10          MS. HOOD:  Yeah, I understand.

11          And I object to your sidebar.

12      Q.  (BY MS. HOOD)  Mr. Khawaja, certainly your

13  lawyer and Mr. Abdullatif had your permission to file

14  this proof of claim; correct?

15          MR. BALLASES:  Objection.  Form.

16      A.  Yes.

17      Q.  (BY MS. HOOD)  And you understand the proof of

18  claim was filed under penalty of perjury.

19      A.  Yes.

20          MR. BALLASES:  Objection.  Form.

21      Q.  (BY MS. HOOD)  And you understand that the

22  amount in the proof of claim is based upon these three

23  judgments; correct?

24      A.  Yes.

25      Q.  And we've run through the three judgments, and

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    115

1   one of which you don't even have an interest in;

2   correct?

3      A.  Yes, that's correct.

4      Q.  And you don't know anything about the

5   substance of that judgment; correct?

6      A.  That's (unintelligible).

7         MR. BALLASES:  Objection.  Form.

8         MS. HOOD:  Excuse me.  What was the answer?

9      A.  That was correct.

10     Q.  (BY MS. HOOD)  Do you own an assigned interest

11  in any other judgment related to any of these entities

12  that you claim are alter egos of Mr. Choudhri?

13     A.  I don't think so.

14        MR. BALLASES:  I object to the form of the

15  question.

16     Q.  (BY MS. HOOD)  Is it your habit to -- strike

17  that.

18        If one of these judgments became available to

19  purchase, would you buy it?

20        MR. BALLASES:  Objection.  Form.

21     A.  I don't know.  I don't know how much money

22  your client has.  It just depends.  Collectibility

23  matters, so...

24     Q.  (BY MS. HOOD)  Collectibility matters?

25     A.  Yes.

1    Q.  Did collectibility matter to you when you

2    purchased the assignment of the judgments that form

3    the basis of your proof of claim?

4    A.  Yes.

5        MR. BALLASES:  Objection.  Form.

6    Q.  (BY MS. HOOD)  Did you do any due diligence

7    prior to filing your proof of claim in this lawsuit as

8    to the debtor's ability to pay these judgments?

9    A.  Yes.

10        MR. BALLASES:  Objection.  Form.

11    Q.  (BY MS. HOOD)  What due diligence did you do?

12    A.  Reviewed public documents, spoke to people,

13    watched videos of Wayne Dolcefino online.

14    Q.  Okay.  So the public documents that you

15    reviewed prior to filing your proof of claim in this

16    lawsuit --

17    A.  Yes.

18    Q.  -- that -- let me finish -- that supported

19    your proof of claim regarding collectibility were

20    public records and the --

21    A.  Yes.

22    Q.  -- Dolcefino videos.

23    A.  That's correct.

24        MR. BALLASES:  Objection.  Form.

25    Q.  (BY MS. HOOD)  When did you learn that your

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
117

1  proof of claim was uncollectible?

2      MR. BALLASES:  Objection.  Form.

3      A.  I think the Texas REIT judge in that case said

4  that there wasn't enough money in the Texas REIT

5  matter to pay us.

6      Q.  (BY MS. HOOD)  When you filed your proof of

7  claim, how much money was in Texas REIT?

8      MR. BALLASES:  Objection.  Form.

9      A.  I'm not sure.  No idea.

10     Q.  (BY MS. HOOD)  If I understand correctly,

11  bankrupt debtors have to file documents that outline

12  their assets; correct?

13     A.  Yes.

14     MR. BALLASES:  Objection.  Form.

15     Q.  (BY MS. HOOD)  Did you look at any of those

16  filings by the debtor?

17     A.  I believe I did, but a lot of what your client

18  files is fraudulent, so -- or the debtor in this case.

19  So it's hard to trust those documents.

20     MS. HOOD:  Objection.  Non-responsive.

21     Q.  (BY MS. HOOD)  Did you look at any of the

22  documents filed by the debtor, the accounting

23  documents, prior to filing your proof of claim?

24     MR. BALLASES:  Objection.  Form.

25     A.  Yes.

OMAR KHAWAJA                                     September 11, 2024
TEXAS REIT LLC                                                   118

1      Q.  (BY MS. HOOD)  Which documents did you look

2  at?

3      A.  I'm sure I reviewed the schedules.  I don't --

4  I can't recall specifically what I looked at.

5          MR. BALLASES:  I'm going to go ahead on this

6  line of questioning and instruct him not to answer

7  because it gets into attorney work product.

8          MS. HOOD:  I'm just asking what he looked at.

9  I don't want to know what you looked at or what you

10  talked to him about.

11         MR. BALLASES:  I understand.

12         MR. CHOUDHRI:  I'm gonna object.

13         Mr. Ballases, you continue to coach the

14  witness, so I'm gonna object.  Please stop coaching

15  the witness.

16         MR. BALLASES:  What's your legal basis, sir,

17  for your objection?

18         MR. CHOUDHRI:  Mr. Ballases, because you're

19  making sidebar, coaching the witness.  Keep your

20  objections limited.  Don't coach the witness.  You've

21  been doing it throughout the whole depo, and you're

22  also objecting on a frivolous basis.  But regardless,

23  please stop coaching the witness.

24         MR. BALLASES:  Okay.  So what's your formal

25  objection for the record?

1      MR. CHOUDHRI:  For the record, you're

2   improperly coaching the witness.  Refrain your

3   objections --

4      MR. BALLASES:  Okay.

5      MR. CHOUDHRI:  -- to just objections.

6      MR. BALLASES:  I want to make sure.  Okay.  I

7   just want to make sure your formal objection was on

8   the record.

9      THE WITNESS:  He's just buying time for his

10  lawyer to make up questions.

11     MS. HOOD:  What?  Mr. --

12     MR. CHOUDHRI:  Mr. Khawaja, what did you say?

13     MS. HOOD:  Yeah.  Excuse me, Mr. Choudhri.

14  This is my time.

15     Q.  (BY MS. HOOD)  First of all, there's no

16  requirement that I pepper you incessantly directly.

17  I'm going through my notes.  I don't need time to come

18  up with questions for you.

19     I'd actually like it if you would answer my

20  questions, but you've chosen not to do that.  So I'm

21  going through my notes to see if I can actually ask

22  some questions that you would be kind enough to answer

23  relating to your proof of claim and why you filed it.

24  So when you --

25     MR. BALLASES:  (Unintelligible) and what

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    120

1   you're doing, okay, or your sidebar.  And we are

2   answering questions.  I'm sorry you don't like them.

3        MS. HOOD:  You're not answering them.  You're

4   objecting.

5     Q.  (BY MS. HOOD)  At the time that you filed your

6   proof of claim, you had satisfied yourself that you'd

7   be able to collect your judgments through this debtor.

8     A.  Yes.

9        MR. BALLASES:  Objection.  Form.

10     Q.  (BY MS. HOOD)  Do you understand that in order

11  to collect your judgments through this debtor, you

12  would have to win on your adversary claim regarding

13  the alter egos?

14     A.  Yes.

15     Q.  And if I read your adversary complaint, it's

16  your assertion that Mr. Choudhri keeps his entities

17  devoid of assets in order to keep creditors from

18  collecting their judgments.  Is that a fair statement?

19     A.  I mean, I think that's one of many tactics

20  that he uses, but yes.

21     Q.  And certainly you have these judgments at your

22  ready; correct?

23        MR. BALLASES:  Objection.  Form.

24     A.  Yeah.  I'm sorry.  I didn't -- I didn't quite

25  understand the question.

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    121

1       Q.  (BY MS. HOOD)  Yeah, bad question.

2           You have these judgments that you own that you

3   could go out and try to collect absent filing

4   documents in Bankruptcy Court; correct?

5       A.  I guess.

6       Q.  And you've not chosen to pursue any

7   post-judgment collection of these judgments in Texas

8   State Court; correct?

9           MR. BALLASES:  Objection.  Form.

10          I'm going to instruct the client not to

11  answer.

12          You're invading attorney-client, work

13  privilege -- attorney-client, and you're also getting

14  into joint litigation privilege.  We're not going to

15  help Mr. Choudhri hide more assets.

16      A.  On advice of counsel, I will not answer that

17  question.

18      Q.  (BY MS. HOOD)  It's not -- okay.  The question

19  is this.  Okay?  Based upon public records, I find no

20  activity by you to collect these judgments in Texas

21  State Courts; is that an accurate statement?

22      A.  Yes.

23          MR. BALLASES:  I object to the form.

24      Q.  (BY MS. HOOD)  And rather than pursue

25  opportunities in State Court, you and your co-owners

1  have chosen to pursue unrelated third parties in

2  Bankruptcy Court; correct?

3      MR. BALLASES:  Objection.  Form.

4    A.  No, that's not correct.  "Unrelated"?  What do

5  you mean "unrelated"?  What is that supposed to mean?

6    Q.  (BY MS. HOOD)  Texas (sic) Real Estate

7  Properties, LLC, is not a judgment debtor; correct?

8  You've already admitted this.

9    A.  Does that mean -- you said "unrelated."

10 That's not -- they're very related.

11    Q.  In your mind, but they don't -- they're not a

12 party to the judgment; correct?

13      MR. BALLASES:  Objection.  Sidebar.

14    A.  In reality and on public record.

15    Q.  (BY MS. HOOD)  The debtor in this case is not

16 a judgment debtor; correct?

17    A.  Asked and answered.

18    Q.  Okay.  Now you're objecting to your own

19 questions?  Are you a lawyer or a witness?

20    A.  I am a lawyer, but I mean --

21    Q.  Okay.  Answer my question.

22    A.  -- just answering --

23    Q.  Answer my question.

24    A.  No, I'm not gonna answer that question.

25    Q.  This debtor is not a judgment debtor to you;

1   correct?

2        THE WITNESS:  Do you want me to answer?

3        MR. BALLASES:  Objection.  Form.

4        You can answer.

5    A.  No.

6    Q.  (BY MS. HOOD)  And yet you chose to pursue

7   this debtor to try to collect your judgments that are

8   in the name of others; correct?

9    A.  This -- yes.  This debtor is an alter ego of

10  all the other debtor -- all the other defendants in

11  this case.

12   Q.  Tell me where there's a finding by a court of

13  law that this debtor is the alter ego of one of the

14  two entities in which you hold an assigned interest.

15   A.  We will prove it in this case.

16   Q.  Okay.  That's not my question.  Tell me where

17  I can find as a matter of law that Ali Choudhri and

18  Houston Real Estate Properties, LLC, are one and the

19  same.

20       MR. BALLASES:  Objection.  Form.

21   A.  We don't have that.

22   Q.  (BY MS. HOOD)  Tell me where I can find as a

23  matter of public record that Jetall is one and the

24  same with this debtor.

25       MR. BALLASES:  Objection --

1      A.  Based on his testimony in multiple cases.

2          MR. BALLASES:  Objection.  Form.

3      Q.  (BY MS. HOOD)  Tell me where I can find as a

4  matter of public record a finding by a trier of fact

5  that Jetall Companies is one and the same as this

6  debtor.

7          MR. BALLASES:  Objection.  Form.

8      A.  I don't -- I'm not sure if we'll find that.

9      Q.  (BY MS. HOOD)  There isn't one, is there?

10         MR. BALLASES:  Objection.  Form.

11     A.  We have multiple public record documents

12  indicating that Ali Choudhri is one and the same as

13  all of his entities.

14     Q.  (BY MS. HOOD)  And there's not a finding by a

15  trier of fact that this debtor is one and the same

16  with Jetall Companies, is there?

17     A.  Only admissions by your client.  That's it.

18         MR. BALLASES:  Objection.  Form.

19     Q.  (BY MS. HOOD)  There's no finding by a trier

20  of fact that this debtor is one and the same as Jetall

21  Companies; correct?

22         MR. BALLASES:  Objection.  Form.

23         (Phone ringing.)

24     A.  (Unintelligible)

25         THE REPORTER:  I'm sorry.  I'm sorry.  I

1  did -- sorry.  I did not hear your answer.  Could you

2  please restate your answer?

3      A.  I said -- I said, Correct, not by a trier of

4  fact, but by admissions through your client.

5          MS. HOOD:  Objection.  After "correct" --

6  objection.  Non-responsive after "correct."

7          Mr. Khawaja, I fully expect to go back to the

8  Court and try to get him to compel you to answer some

9  of my questions that I think were improperly objected

10 to, and so I can go through that with your lawyer

11 through motion practice.  I appreciate your time

12 today.  Based upon whether or not the other lawyers

13 and Mr. Choudhri have questions, I may or may not get

14 another pass at you, and I appreciate your time.

15         THE WITNESS:  Thank you.

16         MS. HOOD:  I'm going to pass the witness to

17 the next creditor in line, and I reserve my right to

18 come back and ask questions -- follow-up questions if

19 I deem necessary.

20         THE REPORTER:  Sorry.  Just before we go to

21 Mr. Choudhri, would it be possible to just take two

22 minutes to go to the bathroom?

23         MS. HOOD:  Oh, absolutely.  You're in charge.

24 You're the one doing the hard work.

25         THE REPORTER:  Thank you.  Just two minutes.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                126

1  Thanks.

2       MR. CHOUDHRI:  Absolutely, Cheryl.  Take your

3  time.

4       THE REPORTER:  Thank you.

5       (A recess was taken.)

6  BY MR. CHOUDHRI:

7     Q.  Mr. Khawaja, good afternoon.  How are you?

8     A.  I'm good, man.  Just -- let's get to your

9  questions.  I don't -- we don't have time for

10 formalities.  Thank you.

11    Q.  Mr. Khawaja, you're not looking at -- first of

12 all, who is present with you in the room there?

13      MR. BALLASES:  We've already answered that.

14      Objection.  Form.

15      We're also having trouble hearing you, so you

16 might want to turn up your volume --

17    A.  Yeah, you need to turn your speaker up.

18    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, can you hear

19 me now?

20    A.  Better, but you still need to speak up a

21 little bit.

22    Q.  So can you identify who's in the room there

23 with you, Mr. Khawaja?

24      MR. BALLASES:  Objection.  Form.

25    A.  Mr. Quinlan is here; my attorney, Michael

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                      127

1   Ballases.

2       Q.  Is Osama Abdullatif in the room with you?

3       A.  He has --

4          MR. BALLASES:  Objection.  Form.

5       A.  He's not in the room, like, at this minute.

6       Q.  (BY MR. CHOUDHRI)  But throughout this

7   deposition, you've had Osama Abdullatif and John

8   Quinlan sitting in the room with you, present;

9   correct?

10      A.  Yes.

11         MR. BALLASES:  Objection.  Form.

12         We've already answered that and said that.

13  Quit wasting everybody's time.

14         MR. CHOUDHRI:  Mr. Ballases, I would ask you

15  to please calm down and allow me to ask my questions.

16         MR. BALLASES:  Objection.  Sidebar.

17      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you had -- as

18  we started this deposition, you had said that I had

19  defrauded you?

20      A.  Ali, I'm sorry.  You're really going to have

21  to turn up your sound because I can't hear you and

22  neither can the people in the room.

23         MR. CHOUDHRI:  Is everybody -- can everybody

24  hear me okay?

25         Cheryl, can you hear me?

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                              128

1        THE REPORTER:  I can hear you.

2        MR. CHOUDHRI:  Okay.  Maybe it's only

3   Mr. Khawaja who can't hear me, then.

4        THE WITNESS:  Osama, can you hear him?

5        MR. BALLASES:  It's difficult to hear you.

6        MR. ABDULLATIF:  No, I can't hear him without

7   hearing aid.

8     A.  Mr. Quinlan can't hear you and neither can

9   Osama, and they need to hear you.

10    Q.  (BY MR. CHOUDHRI)  Well, the court reporter

11  can hear me.  If they want me to come closer, they

12  can.  I would actually object to them even being there

13  and handing you notes, but we'll try to --

14       MR. BALLASES:  Objection.  Sidebar.

15       MR. CHOUDHRI:  -- get on with the deposition.

16       MR. BALLASES:  (Unintelligible)

17       MR. CHOUDHRI:  The court reporter could hear

18  me just fine.

19       THE WITNESS:  Okay.

20    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, how do you

21  know John Quinlan?

22       MR. BALLASES:  Objection.  Form.

23    A.  I'm not gonna answer that question.

24    Q.  (BY MR. CHOUDHRI)  You're not gonna answer the

25  question of how you know John Quinlan?

1    A.  I -- I met him in the real estate community.

2    Q.  When did you meet Mr. Quinlan?

3        MR. BALLASES:  Objection.

4        Ali, can you show yourself?  If you're going

5    to be asking questions, you need to show yourself.

6        THE WITNESS:  Yes.

7        MR. BALLASES:  Thank you.

8        MR. CHOUDHRI:  Okay.  Can you all see me now?

9    Is that okay?

10       MR. BALLASES:  Yes.

11    Q.  (BY MR. CHOUDHRI)  Okay.  Mr. Khawaja, you

12   were present earlier during the deposition when you

13   were being asked questions.  Did you happen to listen

14   to Judge Robinson's oral ruling?

15       MR. BALLASES:  Objection.  Form.

16    A.  I don't know what that has to do with

17   anything.

18    Q.  (BY MR. CHOUDHRI)  The deposition that we're

19   here on, Mr. Khawaja, is --

20    A.  Yes.

21    Q.  -- subject to a court order.  Do you

22   understand that?

23       MR. BALLASES:  Objection.  Form.

24       This has nothing to do with the proof of

25   claim.  Move on.

1      A.  Please get to the proof of claim,

2  Mr. Choudhri.

3      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, this is my

4  deposition.  I get to ask you questions, and you can

5  answer them.  This is my opportunity.

6          MR. CHOUDHRI:  And so, again, Court Reporter,

7  would you please repeat the question?

8          THE REPORTER:  The question is (Reading:)  The

9  deposition that we're here on, Mr. Khawaja, is subject

10  to a court order.  Do you understand that?

11     A.  I didn't -- I have not seen a court order.

12     Q.  (BY MR. CHOUDHRI)  Are you aware, earlier

13  today, that an oral ruling on an audio from the Court

14  was sent to your attorney, Michael Ballases?

15     A.  It -- it may have been.

16         MR. BALLASES:  Objection.  Form.

17     Q.  (BY MR. CHOUDHRI)  And are you aware, whether

18  written or oral, we are here pursuant to a court

19  order?  Are you aware of that?

20         MR. BALLASES:  Objection.  Form.

21     A.  Might -- that might be the case.

22     Q.  (BY MR. CHOUDHRI)  But you're not aware that

23  we're here pursuant to a court order.

24         MR. BALLASES:  Objection.  Form.

25     A.  It could possibly be the case.

1    Q.  (BY MR. CHOUDHRI)  But you don't know?

2    A.  I don't know.

3    Q.  And I've asked you earlier as how you know

4  Mr. Quinlan, and your answer was you're not going to

5  answer that; is that correct?

6        MR. BALLASES:  Objection.  Form.

7    A.  I think I told you after -- after that that I

8  met him in the real estate community.

9    Q.  (BY MR. CHOUDHRI)  And when did you meet him?

10       MR. BALLASES:  Objection.  Form.

11       Are you going to ask every question two or

12  three times?  Ask good questions.

13       MR. CHOUDHRI:  Mr. --

14   A.  I can't remember.

15       MR. CHOUDHRI:  Mr. Ballases -- Mr. Ballases,

16  for the record, I would ask you to please stop

17  interfering and obstructing the deposition.

18       MR. BALLASES:  Objection.  Sidebar.

19       So I would just request that you comply with

20  the judge's instruction to tailor the questions

21  narrowly to the reasons why the proof of claim was

22  filed and why it was withdrawn and not ask why he

23  knows people and who he knows people and not ask

24  things three times.

25   Q.  (BY MR. CHOUDHRI)  Is John Quinlan a

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    132

1    co-claimant on the proof of claim?

2        A.  I believe so.

3            MR. BALLASES:  Objection.  Form.

4        Q.  (BY MR. CHOUDHRI)  Is Osama Abdullatif a

5    co-claimant on the proof of claim?

6            MR. BALLASES:  Objection.  Form.

7        A.  I believe so, yes.

8        Q.  (BY MR. CHOUDHRI)  When did you meet Osama

9    Abdullatif?

10           MR. BALLASES:  Objection.  Form.

11       A.  Maybe 2010.  2009 or '10, something like that.

12   I'm not sure.  Around the time you deprived me of my

13   property, I think.

14       Q.  Which property is that, Mr. Khawaja?

15       A.  The Avondale property.

16           MR. BALLASES:  Objection.  Form.

17       Q.  (BY MR. CHOUDHRI)  Can you tell us a little

18   bit about that, because you've mentioned it several

19   times in this deposition, and so I'd like you to tell

20   us a little more about the Avondale property.

21       A.  No --

22           MR. BALLASES:  Objection.  Form.

23           I'm going to instruct him not to answer

24   because you're violating the judge's instruction as to

25   this limited deposition.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                133

1        Please stick to the proof of claim and the

2   reason why it's being withdrawn.

3        MR. CHOUDHRI:  Mr. Ballases, he's opening the

4   door.  He's answering my questions.  I have a right to

5   ask him questions.  Okay?

6        MR. BALLASES:  Yeah, so you're not a lawyer.

7   You don't know what you're talking about.

8        MR. CHOUDHRI:  Mr. Ballases, please be

9   respectful, sir.  I know it's difficult, but please be

10  respectful.

11     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja --

12        MR. BALLASES:  I am.

13     Q.  (BY MR. CHOUDHRI)  -- are you going to answer

14  my --

15        MR. BALLASES:  I'm respecting my client --

16     Q.  (BY MR. CHOUDHRI)  -- questions --

17        MR. CHOUDHRI:  Mr. Ballases, please stop

18  disrupting the deposition.

19     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you said you

20  met Mr. Osama Abdullatif when I deprived you of your

21  property.  Is that -- did I hear that correct?

22        MR. BALLASES:  Objection.  Form.

23     A.  Yes.

24        MR. BALLASES:  I'm going to instruct you not

25  to answer.

1          We're not going to talk about this.

2          THE WITNESS:  Okay.  Sorry.

3          MR. BALLASES:  It has nothing to do with the

4    proof of claim.  It has nothing to do for the reason

5    for filing it.  It has nothing --

6      A.  Ali, we can grab a cup of coffee afterwards.

7    You can ask me all about that.  Let's please stick to

8    the purpose of this.  Okay?

9          MR. CHOUDHRI:  Let's have some decorum,

10   gentlemen.  This is a formal deposition.  I'm asking

11   the questions.  Mr. Khawaja just said yes, so why the

12   proof of claim was filed is very relevant.  And

13   Mr. Khawaja just answered that, so I have an

14   opportunity to explore that.

15          Mr. Ballases, you have a law license.  You

16   have to follow the creed that you've been licensed by,

17   so please don't frivolously object and coach the

18   witness.  Okay?  I --

19          MR. BALLASES:  Objection.  Sidebar.

20          MR. CHOUDHRI:  -- would like -- if everybody

21   wants, I'm happy to play the audio of the judge's oral

22   ruling so Mr. Khawaja is aware -- and so are you,

23   Mr. Ballases -- and we don't have to waste more time

24   like we did this morning about what the scope of the

25   deposition is about.  Would you like me to do that,

1   Mr. Ballases, so you can stop --

2          MR. BALLASES:  Objection.  Sidebar --

3          MR. CHOUDHRI:  -- interfering --

4          MR. BALLASES:  The only reason you're asking

5   questions is because I heard it.  So why don't you be

6   quiet and focus on asking questions if it's relevant

7   to the judge's scope.  Thank you.

8          MR. CHOUDHRI:  Madam Court Reporter, do you

9   have a -- do you have an ability to play at a certain

10  point of the audio?  Is that something you're able to

11  do for us?

12         THE REPORTER:  I am actually not authorized to

13  be playing audio or sharing exhibits during the

14  deposition.

15         MR. CHOUDHRI:  Okay.  Well, maybe we can then

16  play the audio at 23 minutes and 14 seconds, and then

17  we'll play it at 28 minutes and 12 seconds.

18     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you -- you

19  have indicated that you have not heard the oral

20  ruling, why we're here, by Judge Robinson; is that

21  correct?

22     A.  Let's assume for purposes of this question I

23  have.  What would you like me to answer?

24     Q.  Well, I just want to clarify because you keep

25  not answering, and Mr. Ballases keeps interfering and

1  interrupting, so I want to go ahead and get the

2  judge's ruling on the record, so --

3      A.  Just ask me the questions that you want the

4  answers to.  I'm happy to answer the questions.

5      Q.  Were you present or on the phone when the

6  hearing took place with Judge Robinson?

7      A.  I was not.

8          MR. BALLASES:  Objection.  Form.

9          MR. CHOUDHRI:  Let's go ahead and play at

10  23 minutes and 14 seconds.

11          Gene, can you play that right now?

12          MR. BALLASES:  So just for the record, we --

13  as I've told your counsel, we have to cut if off at

14  4:30.  If this is how you want to use your time, by

15  all means.  It's your dime.

16          MR. CHOUDHRI:  Mr. Ballases, you've been

17  interfering with the depo all day, and we're going to

18  do this by the rules and what the rules -- the federal

19  rules are and the timing.  So if you want to walk out

20  of a depo, that's really your choice --

21          MR. BALLASES:  (Unintelligible)

22          MR. CHOUDHRI:  -- and you'll suffer the

23  consequences.

24          THE REPORTER:  Okay.  So just before we play

25  the audio, as I let everybody know in the e-mail, I

1   cannot transcribe anything I cannot clearly hear.  If

2   you would like a separate transcription of this audio,

3   then you can contact our office.

4        MR. CHOUDHRI:  No -- no problem, Cheryl.

5   We'll do the best we can.

6        THE REPORTER:  Okay.  Thank you.

7        MR. CHOUDHRI:  And I'm sure you will too.  And

8   if it works, great.

9        THE REPORTER:  Thank you.

10       MR. CHOUDHRI:  So while we're getting ready to

11  do that -- go ahead, Gene.  Are you ready?

12       MR. MCCUBBIN:  Yeah.  You said 23:14.

13       MR. CHOUDHRI:  Correct, at 23 minutes and

14  14 seconds.  Let's start there.

15       MR. MCCUBBIN:  Yeah, this is, I think, 23:10.

16  Here we go.

17       (Audio file played.)

18       MR. MCCUBBIN:  There you go.

19       MR. CHOUDHRI:  Would you go to 23 minutes and

20  18 -- 28 minutes and 12 seconds, please?

21       MR. MCCUBBIN:  Yeah, give me a second.

22       MR. CHOUDHRI:  28 minutes and 12 seconds.

23  Let's get that on the record.  Go ahead.

24       MR. MCCUBBIN:  Okay.

25       (Audio file played.)

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                138

1          MR. MCCUBBIN:  There you go.

2      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, were you able

3   to hear the judge, Robinson?

4      A.  Yes.

5      Q.  Does that help you understand a little more

6   about what we're here about?

7      A.  What's your question?

8      Q.  Did you --

9          MR. BALLASES:  Objection (unintelligible) --

10     Q.  (BY MR. CHOUDHRI)  -- hear him say motivations

11  of filing the proof of claim?  Do you understand what

12  that means, motivations of filing the proof --

13     A.  Yes.

14     Q.  -- of claim?  Okay.

15     A.  Yes.

16     Q.  So again, I want to go back to some of my

17  questions, Mr. Khawaja.  You said that I defrauded you

18  of your property.

19     A.  Yes.

20     Q.  So can you explain how I defrauded you of your

21  property?  I want to understand the motivations here.

22     A.  I think we got a trial --

23         MR. BALLASES:  Objection.  Form.

24     A.  -- on that case coming up in a month.  Let's

25  wait till trial.  Let's wait till we get to trial on

1  that.

2      Q.  (BY MR. CHOUDHRI)  Well, Mr. Khawaja, you

3  filed this proof of claim in the Texas REIT bankruptcy

4  case; correct?

5      A.  Yes.

6          MR. BALLASES:  Objection.  Form.

7      Q.  (BY MR. CHOUDHRI)  And so your motivation,

8  when I asked you earlier -- and we can go back and

9  have the court reporter reread some of your answers

10  earlier in the deposition.  I've taken notes as well.

11  I just want to make sure the record is good and clear;

12  there's no confusion.

13          MR. BALLASES:  Objection.  Form.

14          Objection.  Sidebar.

15      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, I just want to

16  understand today; you're under no medication.  Right?

17      A.  Yes.

18          MR. BALLASES:  Objection.  Form.

19      Q.  (BY MR. CHOUDHRI)  And you're here and able to

20  answer truthfully under oath?

21      A.  Yes.

22          MR. BALLASES:  Objection.  Form.

23      A.  Yes.

24      Q.  (BY MR. CHOUDHRI)  And you understand you're

25  under oath as if you were in a courtroom; correct?

000631

1          MR. BALLASES:  Objection.  Form.

2     A.  Like I'm in front of a jury, yes.

3     Q.  (BY MR. CHOUDHRI)  Or a judge.

4     A.  Or a judge.

5     Q.  Okay.  So, Mr. Khawaja, can you tell us about

6  when you say, You defrauded me of my property, and you

7  said Avondale.  Did I hear that correctly?

8          MR. BALLASES:  Objection --

9     A.  Mr. Choudhri, here's the thing --

10         MR. BALLASES:  Objection.  Form.

11         I'm going to instruct my client not to answer

12  because it exceeds the scope of the deposition as to

13  what -- the judge's order.

14         Plus, as I understand it, based on what was

15  just said --

16         THE WITNESS:  There's a trial coming.

17         MR. BALLASES:  -- he got a trial coming up,

18  and I'm not going to let you ask him -- get a second

19  deposition of him in a wholly separate matter that's

20  irrelevant to our proof of claim.  Move along, please,

21  sir.

22         MR. CHOUDHRI:  Mr. Ballases, you have been

23  disrupting this deposition the entire time.  You

24  refused to let me answer -- ask questions, Ms. Lori

25  Hood.  We had to send you the audio.  You misstated

1   what the judge said.  You continue to disrupt the

2   deposition.  We're allowed -- I played the audio

3   ruling.  The judge says the motivation of filing the

4   proof of claim, and he says, Because you defrauded me

5   of my property, Avondale.  So I have a right to get

6   into that.

7          When he answers a question, Mr. Ballases, I

8   have a right to explore that because that's his

9   answer.  He opened the door.  Throughout this depo, he

10  opened the door, Mr. Ballases, so I am entitled to ask

11  those questions.  And if you're going to continue --

12         MR. BALLASES:  (Unintelligible)

13         MR. CHOUDHRI:  -- to instruct him wrongfully

14  to not answer that, then just instruct him, but stop

15  doing what you're doing and making talking objections.

16  Either object or instruct him not to answer, and we'll

17  keep moving on.  But keep your objections limited to

18  what's correct and not frivolous --

19         MR. BALLASES:  What's your legal objection,

20  sir -- what's your legal objection, sir, because I

21  didn't hear it.

22         MR. CHOUDHRI:  You continue to do sidebars

23  throughout the deposition and disrupt and frustrate

24  the deposition.  We're trying to have a smooth

25  deposition; you continue to have sidebars.  So please

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                142

1   refrain from that, Mr. Ballases.

2      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, when you

3   said --

4         MR. BALLASES:  Objection.  Sidebar.

5      Q.  (BY MR. CHOUDHRI)  -- you -- Mr. Khawaja, what

6   is the Avondale property?

7         MR. BALLASES:  Objection.  Form.

8         This has nothing do to with the proof of claim

9   or the withdrawal --

10        (Crosstalk)

11     A.  We're getting ready to stop this depo -- you

12  need to get to your questions.  We're not talking

13  about cases that are going to trial.  You know better

14  than that.  I'm not doing it.  So get to the questions

15  you have about this proof of claim.  I'm happy to

16  answer those, or we're done.

17     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, are you going

18  to comply with the Court's order on this --

19     A.  Yes.

20     Q.  -- now getting into motivations for filing the

21  claim?  And when asked, you said, Because you

22  defrauded me of my property.

23     A.  No, I didn't.  That's not true.  You asked

24  me --

25     Q.  That's not --

1    A.  -- when did I meet Osama -- you asked me when

2  did I meet Osama Abdullatif, and I said, Around the

3  time you defrauded me of my property.

4    Q.  And when I -- when you said "my property,"

5  you're defining your property as Avondale; is that

6  correct?

7      MR. BALLASES:  Objection.  Form.

8    A.  Yeah, I'm not going to -- again, we're getting

9  ready to shut the depo down, so it's up to you.

10    Q.  (BY MR. CHOUDHRI)  So you're refusing to

11  answer these questions; correct?

12    A.  I'm refusing to answer questions that are

13  outside the scope of what you're permitted to ask,

14  correct.

15      MR. BALLASES:  Objection.  Form.

16    A.  You're not an attorney.

17    Q.  (BY MR. CHOUDHRI)  So because I'm not an

18  attorney, I can't ask you questions per the Court's

19  ruling --

20    A.  Outside --

21    Q.  -- is your objection?

22    A.  -- of the scope -- outside of the scope,

23  you're not.  That's correct.

24    Q.  So are you saying motivations for filing the

25  claim and you opening the door is outside the scope?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    144

1    A.  Yes.

2    Q.  Okay.

3        MR. BALLASES:  Objection.  Form.

4    Q.  (BY MR. CHOUDHRI)  And you're gonna refuse --

5    you're gonna refuse to answer any of those questions;

6    correct?

7        MR. BALLASES:  Objection.  Form.

8    A.  You've only asked me one that I'm not gonna

9    talk about because there's a trial coming up.  I think

10   the judge will understand that.  Your -- if your --

11   any of the attorneys that you're paying that are here

12   with you would care to speak up, they'll tell you,

13   Mr. Choudhri, you can't ask those questions.  So you

14   should ask them too.

15       MR. BALLASES:  I object to the form of the

16   question.

17   Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, did you -- you

18   mentioned Wayne Dolcefino; correct?

19   A.  Yes.

20       MR. BALLASES:  Objection.  Form.

21   Q.  (BY MR. CHOUDHRI)  And, Mr. Khawaja, is

22   somebody in the room coaching you?  Because you keep

23   looking at somebody else and talking and -- who's in

24   front of you right now that you keep looking at and

25   talking --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                  145

1      A.  I don't need to be coached to answer your

2    silly questions, no.

3          MR. BALLASES:  Objection.  Sidebar.

4      A.  I can answer them with my eyes closed.  Do you

5    want me to do that?

6      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you can answer

7    them however you want.  I just want you to answer them

8    truthfully --

9      A.  Yes.

10     Q.  -- and honestly.

11     A.  Yes.

12     Q.  When did you meet Mr. Ballases?

13         MR. BALLASES:  Objection.  Form.

14     A.  I don't know, to be hon -- but, you know, you

15   understand he's my attorney, and this is all --

16   anything I discussed with him, ever, including when I

17   met him or where I met him, is protected by

18   attorney-client privilege.  You can't ask me those

19   questions.

20     Q.  (BY MR. CHOUDHRI)  So are you going to refuse

21   to answer my question on when you met Mr. Ballases?

22     A.  Yes, I am.

23     Q.  Mr. Khawaja, are you aware -- let's --

24         MR. CHOUDHRI:  Steve, are you there?  Would

25   you pull up that proof of claim, Steve?

1          MR. SATHER:  Just give me just a moment.  I

2    need to turn my sharing back on.

3          MR. CHOUDHRI:  No problem.

4          THE REPORTER:  And just while he's doing that,

5    Mr. Khawaja, could you spell Avondale for me, please?

6          THE WITNESS:  A-V-O-N-D-A-L-E.

7          THE REPORTER:  Thank you.

8          MR. SATHER:  Okay.  I'm there.

9          MR. CHOUDHRI:  Would you go down, Mr. Sather?

10   Just scroll down a little bit, please.  Keep going.

11   Go to paragraph 9.  Stop right there.

12       Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, what does

13   Number 9 say on the proof of claim?

14       A.  9 --

15          MR. CHOUDHRI:  Time out.  Time out.  Before we

16   go there, Mr. Sather, would you scroll up just for a

17   second a little bit?  Stop right there.

18       Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, what does that

19   captioning say?  It starts at "24-10120."  Would you

20   read that, please, into the record?

21       A.  24-1010 (sic), and this is at Number 4?  Oops.

22   Sorry.  One second here.

23          MR. BALLASES:  Steve, would you mind -- this

24   is Michael Ballases.  Will you make it bigger?  I

25   can't read it on the screen.  Please.

OMAR KHAWAJA                  September 11, 2024
TEXAS REIT LLC                          147

1     Q. (BY MR. CHOUDHRI) Mr. Khawaja, my question is

2   to you.

3       MR. BALLASES: Thank you.

4       MR. CHOUDHRI: Stop, please.

5     Q. (BY MR. CHOUDHRI) What does it say? Claim

6   Number -- what exactly does that say? Would you read

7   that -- that entire header --

8     A. (Reading:) Read the --

9     Q. -- into the record?

10     A. (Reading:) Read the instructions before

11   filling out this form. This form is for making a --

12     Q. No --

13     A. (Reading:) -- claim for payment in a

14   bankruptcy case --

15     Q. No.

16     A. Which one?

17     Q. No, Mr. Khawaja. No, Mr. Khawaja. Look on

18   top where it says -- where it has a case number,

19   starts off with a case number. And then --

20     A. Yes.

21     Q. -- that's what -- would you read what's

22   highlighted, Mr. Khawaja, into the record?

23     A. Yeah, twenty -- okay. (Reading:)

24   24-10120-smr, Claim Number 9-1, filed 06/04/24, Main

25   Document page 1 of 3.

OMAR KHAWAJA                                   September 11, 2024
TEXAS REIT LLC                                                148

1    Q.  Yes.  Is that what you authorized to be filed?

2    A.  Yes.

3        MR. BALLASES:  Objection.  Form.

4        MR. CHOUDHRI:  Scroll down, Mr. Sather.

5   Scroll down, Mr. Sather.  Okay.  Stop right there.

6    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, what does it

7   say on paragraph 9?

8    A.  (Reading:)  Is all or part of the claim

9   secured?  Yes.  The claim is secured by a lien on

10  property.

11       Is that what you're referring to?

12   Q.  Yes.

13       MR. CHOUDHRI:  Stop right there.

14   Q.  (BY MR. CHOUDHRI)  So it's your contention

15  that your claim is secured by a lien on the property;

16  is that correct?

17   A.  I believe so, if that's what we filed.

18   Q.  Okay.  And you understand -- at least what

19  you're representing here is that a lis pendens is a

20  lien on property; correct?

21   A.  I'm assuming that's what we're referring to,

22  yes.

23   Q.  Okay.  Mr. Khawaja, you're familiar with the

24  property Texas REIT that --

25   A.  Yes.

1    Q.  Let me strike that.  Let me strike that.  It's

2  a bad question.  Let me clear the record here.  Okay?

3        Mr. Khawaja, you're aware that debtor, Texas

4  REIT, LLC, is in the Western District of the

5  Bankruptcy Court.

6        MR. BALLASES:  Objection.  Form.

7    A.  I guess.  I mean, that's -- if that's where

8  you chose to file it.  I'm not sure.

9    Q.  (BY MR. CHOUDHRI)  You understand --

10    A.  The property's located here in Houston, Harris

11  County.

12    Q.  So my question, Mr. Khawaja, is that you are

13  aware that Texas REIT is the debtor that's in

14  bankruptcy in the Western District.

15    A.  Yes.

16    Q.  And Texas REIT owns a property.  Are you

17  familiar with the property that Texas REIT owns?

18    A.  Yes.

19    Q.  What do you know about the property that Texas

20  REIT owns?

21        MR. BALLASES:  Objection.  Form.

22    A.  That you have defrauded your partners out of

23  money in that property, that it's -- Walgreens left.

24  It's falling apart; a lot of homeless, a lot of crack

25  addicts in the area now.  It's not maintained

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                    150

1   properly.  It's part of this case, that there's a

2   judgment against you on it, and it's basically -- and

3   it's in Houston, yeah.  It's in Houston, Texas, too.

4        Q.  Anything else that you want to add to it?

5        A.  No, that's it.

6        Q.  When did you become familiar with this

7   property?

8        A.  I think in the course of just monitoring

9   litigation against you.

10        Q.  And remind me what kind of lawyer you are,

11   Mr. Khawaja.

12            MR. BALLASES:  Objection.  Form.

13        A.  I do plaintiff's work.

14        Q.  (BY MR. CHOUDHRI)  Is that personal injury

15   mainly, what your --

16        A.  Yes.

17        Q.  -- focus is?

18        A.  Yes, correct.

19        Q.  Personal injury attorney?

20        A.  Yes, correct.

21            MR. BALLASES:  Objection.  Form.

22        Q.  (BY MR. CHOUDHRI)  And, Mr. Khawaja, so you

23   became familiar with this property through the course

24   of litigation, you said?

25        A.  Yes, just monitoring litigation.

1    Q.  When did you first become familiar with this

2    property?

3    A.  I couldn't say --

4        MR. BALLASES:  Objection.  Form.

5    A.  I couldn't say when.

6    Q.  (BY MR. CHOUDHRI)  Were you involved in any

7    way, shape, or form of filing any lis pendenses (sic)

8    on this property?

9    A.  No.

10       MR. BALLASES:  Objection.  Form.

11    Q.  (BY MR. CHOUDHRI)  You've never been involved

12    of filing any lis pendenses on this property?

13    A.  You mean --

14       MR. BALLASES:  Objection.  Form.

15    A.  You mean other than the one that's in this --

16    or is part of the bankruptcy case?

17    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, my question is

18    very simple.  Are you or have you ever been involved

19    in filing, directly or indirectly, lis pendenses

20    against the property that the debtor owns?

21    A.  Not to my -- not to my understanding, no.

22       MR. BALLASES:  Objection.  Form.

23    A.  I'm not sure what that has to do with the

24    scope of this deposition either, by the way.

25    Q.  (BY MR. CHOUDHRI)  Do you know what a

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    152

1  bankruptcy stay is, Mr. Khawaja?  Do you know what an

2  automatic --

3      A.  Yes.

4      Q.  -- stay is?

5      A.  Yes.

6          THE REPORTER:  I'm sorry.  Do you know what

7  a --

8          MR. BALLASES:  Objection.  Form.

9          THE REPORTER:  -- what is?  I'm sorry.  Mr. --

10         MR. CHOUDHRI:  An automatic -- an automatic

11 stay.

12         THE REPORTER:  Okay.  Thank you.

13     A.  You have more experience than I do on that,

14 but I do know what it is, yes.

15     Q.  (BY MR. CHOUDHRI)  Have you violated any

16 automatic stays?

17         MR. BALLASES:  Objection.  Form.

18     A.  No, absolutely not.

19     Q.  (BY MR. CHOUDHRI)  Do you believe filing --

20 okay.  Who is Hira Azhar?

21         MR. BALLASES:  Objection.  Form.  And instruct

22 the client not to answer --

23         THE WITNESS:  (Unintelligible)

24         MR. BALLASES:  -- because it has nothing to

25 do --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    153

1      A.  It's not --

2          MR. BALLASES:  -- with our proof of claim or

3    the withdrawal of it, and it exceeds the judge's

4    limitations on this depo.  So I'm going to object to

5    the question as harassing and oppressive and instruct

6    the client not to answer.

7          THE WITNESS:  Thank you.

8      Q.  (BY MR. CHOUDHRI)  Did you participate with

9    Hira Azhar of filing a lis pendens against the subject

10   property?

11         MR. BALLASES:  Same objection, same assertions

12   of privilege, same assertions of -- same objections

13   and same instruction not to answer.

14     Q.  (BY MR. CHOUDHRI)  You can answer,

15   Mr. Khawaja.  What's your answer?

16     A.  I will not answer on advice of counsel.

17     Q.  Are you aware of any lis pendenses filed by

18   Hira Azhar against the debtor's property?

19         MR. BALLASES:  Objection.  Same objections,

20   same assertions of privilege, same instruction not to

21   answer.  This has nothing to do with the proof of

22   claim in this matter or the reason for withdrawal.

23     A.  I'm not going to answer.

24     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, has it been

25   your motivation to prevent me or any of my entities

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    154

1  from transacting business?

2       MR. BALLASES:  Objection.  Form.

3    A.  No.

4    Q.  (BY MR. CHOUDHRI)  Is it your -- is it your

5  habit to contact people that me or my entities are

6  doing business with and tell them not to do business

7  with me?

8    A.  Never --

9       MR. BALLASES:  Objection.  Form.

10    A.  Never done that.

11       MR. BALLASES:  Can we please ask questions

12  about the purpose for the deposition today, the reason

13  for the filing of the proof of claim and the reason

14  for the withdrawal, sir?

15       MR. CHOUDHRI:  Mr. Ballases, stop wasting

16  time.  Keep it to objections.

17    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, do you -- what

18  is your phone number?

19       MR. BALLASES:  Object -- don't answer that.

20  Objection --

21    Q.  (BY MR. CHOUDHRI)  Your cell --

22    A.  You know my number.  You've called me.

23       MR. BALLASES:  Objection.  Stop.  Stop.

24       I'm going to instruct you not to answer.  Your

25  cell phone is not relevant to this proceeding today.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    155

1  You don't need to give it on the record.

2       It's oppressive -- objection of oppressive and

3  harassing.

4    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, are you not

5  gonna answer the question about what your cell phone

6  is on the record today --

7    A.  Correct.

8    Q.  You refuse to answer --

9    A.  Yeah, on advice of counsel --

10       THE REPORTER:  I'm sorry --

11    A.  On advice of counsel --

12       THE REPORTER:  Just --

13    A.  On advice of counsel --

14       THE REPORTER:  -- one person --

15       THE WITNESS:  Sorry.

16       THE REPORTER:  -- at a time, please.  Thank

17  you.

18       THE WITNESS:  On answering the question that

19  Mr. Choudhri just asked, on advice of counsel, I will

20  not answer that question.

21    Q.  (BY MR. CHOUDHRI)  Isn't it true that you've

22  been involved with over 50 lis pendenses relating to

23  Texas REIT or any other entity that I have ownership

24  or control of?

25    A.  No --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    156

1          MR. BALLASES:  Objection.  Form.

2     A.  -- not true.

3     Q.  (BY MR. CHOUDHRI)  You have not participated

4   in any slander of title or fraudulent liens or

5   lis pendenses on any properties that Texas REIT or I

6   own or control.

7          MR. BALLASES:  Objection.  Form.

8     A.  Correct.

9     Q.  (BY MR. CHOUDHRI)  You've not participated or

10  been involved with any filing of any lis pendenses

11  relating to the debtor's property.

12    A.  That's correct.

13         MR. BALLASES:  Objection.  Form.

14         Are you referring to -- aside from the lis

15  pendens filed --

16         MR. CHOUDHRI:  Sir -- no, Mr. Ballases.  Stop.

17  Stop.  Stop coaching the witness.

18         I'm going to object to you, your sidebar.

19         You're continually coaching the witness.

20  Please stop.

21    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, do you use --

22         MR. BALLASES:  (Unintelligible)

23    Q.  (BY MR. CHOUDHRI)  -- text messaging as a form

24  of communication --

25         (Crosstalk)

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                      157

1          THE REPORTER:  Sorry.  I'm sorry.  I'm getting

2    two speakers again.

3          MR. BALLASES:  Sure.  I just -- I'm just

4    trying to help Mr. Choudhri answer questions --

5          MR. CHOUDHRI:  No, please don't help.

6          MR. BALLASES:  -- on our --

7          MR. CHOUDHRI:  Please don't help me.  I don't

8    need your help, Mr. Ballases.  Please stop talking.

9    Object and limit your objections.  Stop talking.

10        Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, do you use

11   text messaging as a form of communication?

12         MR. BALLASES:  Objection.  Form.

13        A.  Occasionally, sure.  I think we all do.

14        Q.  (BY MR. CHOUDHRI)  Have you texted Wayne

15   Dolcefino?

16        A.  No.

17         MR. BALLASES:  Objection.  Form.

18        Q.  (BY MR. CHOUDHRI)  Have you received any text

19   messages from Wayne Dolcefino?

20        A.  No.

21         MR. BALLASES:  Objection.  Form.

22        Q.  (BY MR. CHOUDHRI)  What's your answer,

23   Mr. Khawaja?

24        A.  No.

25         MR. BALLASES:  Objection.  Form.

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                      158

1      Q.  (BY MR. CHOUDHRI)  Have you ever paid Wayne

2   Dolcefino directly or indirectly, in any way?

3          MR. BALLASES:  Objection.  Form.

4      A.  (Unintelligible) no.

5          MR. BALLASES:  I'm going to -- your answer is

6   what?

7          THE WITNESS:  My answer is no.

8          MR. BALLASES:  The answer is no, but I'm going

9   to instruct him not to answer any more questions that

10   have nothing to do with the scope and purpose of this

11   deposition pursuant to the judge's instruction.

12          MR. CHOUDHRI:  Stop frivolously objecting,

13   Mr. Ballases.  He said he learned based on Wayne

14   Dolcefino's videos, so I definitely have an

15   opportunity to get into the line of questions that I

16   need to get into, and you're going to continue to

17   object and instruct him not to answer.  Is that what

18   you're going to say on the record?

19          MR. BALLASES:  Objection.  Sidebar.

20      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, just so the

21   record is clear, you have not ever, in any way, shape,

22   or form, paid Wayne Dolcefino any amount of money or

23   consideration?

24      A.  I'm not answering that question.

25          MR. BALLASES:  Objection.  Form.

1        I'm going to instruct the client --

2        MR. CHOUDHRI:  I --

3        MR. BALLASES:  -- not to answer because it is

4   oppressive and harassing and has nothing to do with

5   the limited scope of the deposition, and he's already

6   answered it.

7        Move along.

8    Q.  (BY MR. CHOUDHRI)  Are you not going to answer

9   any questions relating to Wayne Dolcefino?

10       A.  That means, yes, I'm not going to answer any

11   questions relating to Wayne Dolcefino.  He has nothing

12   to do with this case at all.

13       Q.  Well, can I ask you why?  When Ms. Hood was

14   asking you, you mentioned that you -- you mentioned

15   Wayne Dolcefino and how you --

16       A.  He --

17       MR. BALLASES:  Objection.  Form.

18       (Crosstalk)

19       THE REPORTER:  I'm sorry.  One at a time,

20   please.

21       THE WITNESS:  I'm sorry.  Go ahead.

22       MR. BALLASES:  Objection.  Form, for the

23   record.

24       A.  Well, can I answer?  You asked very -- she

25   asked me very specifically where did I learn about the

1  potential for the claims that -- the basis of the

2  claims that we filed against you in this case, and I

3  answered, Through multiple sources, including Wayne

4  Dolcefino.  That's a factual answer.

5      Q.  (BY MR. CHOUDHRI)  And have you paid Wayne

6  Dolcefino any amount of money --

7          MR. BALLASES:  Objection.  Form.

8      Q.  (BY MR. CHOUDHRI)  -- or consideration,

9  directly or indirectly --

10         (Crosstalk)

11         MR. BALLASES:  -- (unintelligible) not to

12  answer your question.

13         MR. CHOUDHRI:  Mr. Ballases --

14         THE REPORTER:  I'm --

15         MR. CHOUDHRI:  Mr. Ballases, would you please

16  let the court reporter take her turn -- please take

17  turns.  When I'm asking the question, wait till my

18  question is over before you need to --

19         MR. BALLASES:  So you've asked -- you've asked

20  this question three times, and he's answered it three

21  times.  And all three times, I've told him -- I've

22  objected and told him not to answer.  So you don't

23  need to ask it a fourth time.

24         It's on the record clear.  I know you're not

25  an attorney, and you're not familiar with this, but

1   it's on the record and it's clear, I promise.  Move

2   along.

3       Q.  (BY MR. CHOUDHRI)  So the record is clear,

4   when I've asked you, Have you been -- have you paid

5   Wayne Dolcefino any amount of money, directly or

6   indirectly, or any consideration, your answer is:  I'm

7   not going to answer that question.  Is that -- is that

8   clear --

9           MR. BALLASES:  Objection --

10      Q.  (BY MR. CHOUDHRI)  -- for the record?

11          MR. BALLASES:  Objection.  Form.  I've --

12      A.  I'm not going to answer that question.

13          MR. BALLASES:  -- objected --

14      A.  I've already asked it -- answered.

15          MR. BALLASES:  -- to the form.  It's

16  oppressive and harassing.  The client's already

17  answered it.  I'm instructing him not to answer

18  because it's exceeding the scope of the deposition,

19  and it's oppressive and harassing, and it's asked and

20  answered.

21          Did you hear me, Mr. Choudhri?

22          MR. CHOUDHRI:  Mr. Ballases, throughout today,

23  you have been frustrating this deposition.

24          MR. BALLASES:  Objection.  Sidebar.

25          MR. CHOUDHRI:  You have been disrupting -- so

1   please refrain from your -- your sidebar and your

2   objections.  Limit to your objections as form.

3      Q.  (BY MR. CHOUDHRI)  So, Mr. Khawaja --

4         MR. BALLASES:  Objection.  Sidebar.

5      Q.  (BY MR. CHOUDHRI)  -- have you paid --

6   Mr. Khawaja, have you paid -- no, let me back up.

7         Mr. Khawaja, who is Wayne Dolcefino?  What

8   does he do?

9         MR. BALLASES:  Objection --

10     A.  I'm not going to answer these questions.

11        MR. BALLASES:  Objection.  Form.

12     A.  I'm sorry.  You've got to move on to the

13  claim -- claim questions, Ali, or we're gonna end

14  this.

15     Q.  (BY MR. CHOUDHRI)  So, Mr. Khawaja, are you

16  going to tell me that you're not going to describe --

17     A.  Yes.

18     Q.  -- who Wayne --

19     A.  I'm not going to.

20     Q.  -- Dolcefino is, and you're not --

21     A.  Correct.

22        MR. BALLASES:  Objection.  Form.

23        I'm going to instruct him not to answer

24  because your questions are oppressive and harassing,

25  and they exceed the scope of the limited deposition.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                  163

1          I'm instructing him not to answer.  I'm doing

2    it, Mr. Ballases.

3        Q.  (BY MR. CHOUDHRI)  Are you taking his

4    instructions and not answering any questions as it

5    relates to Wayne Dolcefino, Mr. Khawaja?

6        A.  Yes, sir.  Yes.  I'm not.  I will follow

7    advice of counsel.

8        Q.  Who is Chris Wyatt, Mr. Khawaja?

9        A.  Again, that has nothing to do with this case.

10         Q.  So Chris Wyatt has nothing to do with this

11   case.  So -- I want the record clear.

12        A.  I -- Chris Wyatt is a witness, and he is a --

13   he was your former chief financial officer, and that's

14   how I know him -- or chief operating officer.

15         Q.  Has he ever given you documents from the

16   Jetall server?

17        A.  From the Jetall server?  I don't -- I don't

18   know that.  I don't know the answer to that question.

19        Q.  Has Mr. Wyatt --

20        A.  I don't know what the Jetall server is.

21        Q.  Has Mr. Wyatt ever given you any documents?

22        A.  No.

23        Q.  Mr. Chris Wyatt has never given you any

24   documents; that's a true statement?

25        A.  I cannot discuss anything pertaining to Chris

1   Wyatt because of attorney-client privilege, so we're

2   not talking about Chris Wyatt.

3      Q.  What is the privilege, Mr. Khawaja, with you

4   and Chris Wyatt?

5      A.  Attorney-client privilege.

6      Q.  Is Chris Wyatt an attorney?

7      A.  No, no.  I'm the attorney; he's the client.

8   He sought counsel from me, which I provided,

9   pertaining to this case, and I will not discuss

10  anything further regarding him.

11     Q.  Pertaining to this case, the case we're here

12  for today.

13     A.  No, pertaining to other matters involving you

14  and him.

15     Q.  So Chris Wyatt is your client; is that

16  correct?

17     A.  Yes.

18        MR. BALLASES:  Objection --

19     Q.  (BY MR. CHOUDHRI)  And Hira Azhar is your

20  client; correct?

21     A.  Yes.

22     Q.  And Azeemah Zaheer is your client; correct?

23     A.  Yes.

24        MR. BALLASES:  Objection.  Form.

25     Q.  (BY MR. CHOUDHRI)  And Osama -- and Osama

1   Abdullatif is your client; correct?

2        A.  Yes.

3            MR. BALLASES:  Objection.  Form.

4        Q.  (BY MR. CHOUDHRI)  Is David Tang your client?

5        A.  No.

6            MR. BALLASES:  Objection.  Form.

7        A.  He's just a friend.

8        Q.  (BY MR. CHOUDHRI)  Is Rodney Drinnon your

9   client?

10           MR. BALLASES:  Objection.  Form.

11       A.  No.

12       Q.  (BY MR. CHOUDHRI)  Is Harold Polk --

13       A.  He's an attorney.

14       Q.  -- your client?  Is Harold Polk your client?

15           MR. BALLASES:  Objection.  Form.

16       A.  No, he's not.

17       Q.  (BY MR. CHOUDHRI)  Harold Polk is not your

18  client.

19       A.  Correct.

20           MR. BALLASES:  Objection.  Form.

21       Q.  (BY MR. CHOUDHRI)  How did you meet Chris

22  Wyatt?

23           MR. BALLASES:  Objection.  Form.

24       A.  Yeah, I can't talk about that.  I'm sorry.

25       Q.  (BY MR. CHOUDHRI)  Why can't you talk about

1    how you met Chris Wyatt?

2        A.  That's protected.

3        Q.  By what?

4        A.  Attorney-client privilege.

5        Q.  Are you refusing to answer when you met Chris

6    Wyatt?

7        A.  Yes.

8        Q.  When did the attorney-client privilege start

9    with Chris Wyatt?

10           MR. BALLASES:  Objection.  Form.

11       A.  Since I met him.

12       Q.  (BY MR. CHOUDHRI)  And when did you meet him?

13           MR. BALLASES:  Objection.  Form.

14       A.  Sometime after he left your employment.

15       Q.  (BY MR. CHOUDHRI)  You never met him while he

16   was employed as a paralegal for me?

17       A.  No.

18           MR. BALLASES:  Objection.  Form.

19       Q.  (BY MR. CHOUDHRI)  You never saw him come to

20   court in the divorce case when you were representing

21   the -- Hira Azhar?

22           MR. BALLASES:  Objection.  Form.

23       A.  No, I didn't, actually, to be honest with you.

24   No.

25       Q.  (BY MR. CHOUDHRI)  And you're not aware that

OMAR KHAWAJA                                          September 11, 2024
TEXAS REIT LLC                                                      167

1   Chris Wyatt worked on the case that Jetall has against

2   Khawaja?

3      A.  No --

4         MR. BALLASES:  Objection.  Form.

5      A.  -- I'm not aware of that.

6      Q.  (BY MR. CHOUDHRI)  You're not aware of that --

7      A.  If he --

8      Q.  -- is that correct?

9      A.  Correct.  If he did, he never discussed it

10  with me.

11     Q.  So you're not aware that Chris Wyatt did legal

12  work for me while he was employed for me.

13        MR. BALLASES:  Objection.  Form.

14     A.  No.

15     Q.  (BY MR. CHOUDHRI)  Isn't it true that Jetall

16  Companies has a judgment against Khawaja?

17        MR. BALLASES:  Objection.  Form.

18     A.  "Against Khawaja," what does that mean?

19     Q.  (BY MR. CHOUDHRI)  Against Khawaja Partners.

20     A.  Possibly.

21        MR. BALLASES:  Objection.  Form.

22     Q.  (BY MR. CHOUDHRI)  And that judgment has not

23  been appealed and not been superceded.

24     A.  Yes.

25     Q.  Is that one --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    168

1          MR. BALLASES:  Objection.  Form.

2      Q.  (BY MR. CHOUDHRI)  -- of your motivations,

3   Mr. Khawaja?

4          MR. BALLASES:  Objection.  Form.

5      A.  No.

6      Q.  (BY MR. CHOUDHRI)  So Jetall owns an asset --

7   Jetall Companies owns an asset, and that's a judgment

8   against Khawaja Partners; correct?

9          MR. BALLASES:  Objection.  Form.

10     A.  I don't know if Jetall owns an asset or --

11  Jetall doesn't seem to be doing too well right now.

12     Q.  (BY MR. CHOUDHRI)  And how do you know that?

13         MR. BALLASES:  Objection.  Form.

14     A.  I mean, there was a great article about you

15  the other day in The Real Deal.  I don't know if you

16  saw that.

17     Q.  (BY MR. CHOUDHRI)  Have you spoken to The Real

18  Deal?

19     A.  I haven't --

20         MR. BALLASES:  Objection.  Form.

21     A.  -- but I read that article.

22         THE REPORTER:  Sorry --

23     A.  It's not a good look.

24     Q.  (BY MR. CHOUDHRI)  You haven't spoken --

25         THE REPORTER:  Sorry.  Sorry.  Just one at a

1    time, please.  Thank you.

2        A.  I haven't, no.

3        Q.  (BY MR. CHOUDHRI)  Has anybody on your behalf,

4    indirectly or directly, spoken to The Real Deal?

5            MR. BALLASES:  Objection.  Form.

6        A.  No, but a lot of people sent me that article,

7    like real estate -- people in real estate, legal.  A

8    lot of people sent it to me.

9        Q.  (BY MR. CHOUDHRI)  And Chris Wyatt testified

10   at the that hearing; correct?

11           MR. BALLASES:  Objection.  Form.

12       A.  I don't --

13           MR. BALLASES:  What hearing are you talking

14   about, sir?  I mean, come on.

15           MR. CHOUDHRI:  Mr. Ballases --

16       A.  You're all over the place.

17           MR. CHOUDHRI:  -- can you --

18       Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, The Real Deal

19   quotes an order and mentions Chris Wyatt.

20           MR. BALLASES:  Objection.  Form.

21       A.  Okay.  Anything else you want to share with me

22   about the article?  I mean, that's fine.

23       Q.  (BY MR. CHOUDHRI)  And so have you paid Chris

24   Wyatt any money?

25       A.  No.

1        MR. BALLASES:  Objection.  Form.

2        Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you had

3    mentioned that you're in the business of buying

4    judgments.  Do you recall that line of testimony

5    earlier?

6        A.  Yes.

7        Q.  And you've bought less than ten judgments; is

8    that correct?

9        A.  I think so.

10        Q.  And your answers earlier were -- and I just

11    want to make sure the record is clear --

12        MR. BALLASES:  Objection.  Sidebar.

13        Q.  (BY MR. CHOUDHRI)  -- that the only --

14    Mr. Khawaja, are you done looking at your phone?

15        A.  Yes.  Sorry.  Go ahead.

16        MR. CHOUDHRI:  Just for the record, throughout

17    the deposition, Mr. Khawaja has been continuing to

18    look at his phone and make communications with other

19    people in the room and has constantly looked at his

20    phone throughout the entire duration of this

21    deposition.

22        Q.  (BY MR. CHOUDHRI)  So, Mr. Khawaja, I just ask

23    you to please refrain from looking at your phone.

24    Okay?

25        MR. BALLASES:  Objection.  Sidebar.

1          Don't instruct my client anything, and you are

2    incorrect with your assertions.

3          MR. CHOUDHRI:  Mr. Ballases, please stop

4    talking.

5      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, can you please

6    stop looking at your phone?

7          MR. BALLASES:  Objection.  Sidebar.

8      A.  I've got a sick relative in the hospital right

9    now.  That's what I'm worried about, so...

10     Q.  (BY MR. CHOUDHRI)  Well, I'm sorry about your

11   relative.  I hope they get better.

12         Mr. Khawaja, which judgments -- strike that.

13         Mr. Khawaja, it's your contention that any

14   entity that I -- at least if I heard your testimony

15   correctly earlier, that any entity that Ali Choudhri

16   has ownership or control in is an alter ego.  Is that

17   your contention --

18     A.  Of Ali --

19     Q.  -- Mr. Khawaja?

20     A.  Yes, it is.

21         MR. BALLASES:  Objection.  Form.

22     Q.  (BY MR. CHOUDHRI)  So any entity that Ali

23   Choudhri has any ownership or control of is an alter

24   ego of Ali Choudhri; correct?

25     A.  I believe that -- I believe that to be the

1   case, yes.

2        MR. BALLASES:  Objection.  Form.

3      Q.  (BY MR. CHOUDHRI)  Okay.  Mr. Khawaja, which

4   judgments have you acquired?

5        MR. BALLASES:  Objection.  Form.

6      A.  You mean other than yours?  Other than the

7   Jetall judgments?

8      Q.  (BY MR. CHOUDHRI)  Again, Mr. Khawaja --

9      A.  Are you there?

10     Q.  -- I believe your answers earlier were that

11  you have not acquired any judgments other than

12  judgments relating to Jetall or Ali Choudhri.

13     A.  I think that's --

14     Q.  Is that true?

15     A.  -- correct.  That's true.

16        MR. BALLASES:  Objection.  Form.

17     Q.  (BY MR. CHOUDHRI)  So what I want to do is I

18  want to go down, because your contention is Texas REIT

19  is an alter ego of Ali Choudhri; correct?

20     A.  Yes.

21        MR. BALLASES:  Objection.  Form.

22     Q.  (BY MR. CHOUDHRI)  So basically what you're

23  saying is any obligations of Ali Choudhri or any of

24  Ali Choudhri's entities are the obligations of Texas

25  REIT; is that correct?

1   A.  Yes.  That's correct, yes.

2   Q.  So it's just basically one big pot.

3   A.  That's the way you've treated them, yes.

4   Q.  And that's your contention, and that's the --

5   A.  I believe the evidence will show that.  Yes.

6   Q.  And outside what's in your pleading, you don't

7   have any other evidence that --

8       MR. BALLASES:  Objection.  Form.

9   A.  Well, we've got to do discovery -- we have to

10  do discovery, sir, which you're obstructing, but yes.

11  Q.  (BY MR. CHOUDHRI)  Okay.  So the record is

12  clear, outside your pleading, there's no other

13  evidence other than the discovery you're yet to do.

14      MR. BALLASES:  Objection.  Form.

15  Q.  (BY MR. CHOUDHRI)  Is that correct?

16  A.  We're in the -- we're in the middle of

17  discovery.

18      MR. BALLASES:  Objection.  Form.

19  Q.  (BY MR. CHOUDHRI)  Is that correct?

20      MR. BALLASES:  Objection.  Form.

21  A.  Outside the pleading?  The pleading contains a

22  lot of evidence.  I don't know if you've seen the

23  attachments or not, but there's a lot.  There's a lot

24  more that will have to be done.

25  Q.  (BY MR. CHOUDHRI)  And so you're refusing to

1    answer any questions relating to Chris Wyatt; correct?

2        A.  Yes.

3            MR. BALLASES:  Objection.  Form.

4        A.  That's -- that encompasses attorney-client

5    privilege.  Correct.

6        Q.  (BY MR. CHOUDHRI)  So anything I would ask you

7    today about Chris Wyatt, you would refuse to answer.

8        A.  That's correct.

9            MR. BALLASES:  Objection.  Form.

10       Q.  (BY MR. CHOUDHRI)  Who drafted the affidavit

11   that was attached to the petition that's attached to

12   this proof of claim that Chris Wyatt signed?

13           MR. BALLASES:  Objection.  Form.

14       A.  I have no idea.

15       Q.  (BY MR. CHOUDHRI)  You don't know --

16       A.  It wasn't me.

17       Q.  -- who drafted -- it wasn't you.  Was it

18   Mr. Ballases?

19           MR. BALLASES:  Objection.  Form.

20           Instructing not to answer.  It violates

21   attorney work product, attorney-client privilege.

22       A.  I'm not answering on advice of counsel.

23       Q.  (BY MR. CHOUDHRI)  Does Mr. Ballases or Hoover

24   Slovacek represent Chris Wyatt?

25       A.  I don't think so.

1    Q.  Does Ashish Mahendru represent Chris Wyatt?

2        MR. BALLASES:  Objection.  Form.

3    A.  I don't know.  I mean, ask Ashish.

4    Q.  (BY MR. CHOUDHRI)  Did you refer Chris Wyatt

5    to Ashish Mahendru?

6        MR. BALLASES:  Objection.  Form.

7    A.  I mean, again, I just told you I'm not

8    answering any questions about Chris Wyatt.

9    Q.  (BY MR. CHOUDHRI)  So can you explain to me

10   why the adversary where you claim alter ego and

11   fraudulent transfer has an attachment of Chris Wyatt

12   as a declaration?

13   A.  I mean, he had some evidence that you are an

14   alter ego, that you have alter egos that operate under

15   you, so he provided it.  It's evidence.

16   Q.  Do you hold any -- do you hold any contingency

17   claims or rights of any adverse parties to Ali

18   Choudhri or any of his related entities?

19       MR. BALLASES:  Objection.  Form.

20   A.  Do I hold any -- I mean, if I did, it's

21   attorney-client privilege, so I'm not answering that.

22   Q.  (BY MR. CHOUDHRI)  So any contingency claims

23   you hold against --

24   A.  Right.

25   Q.  -- Texas REIT or any other entity --

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                      176

1    A.  Yes.

2    Q.  -- or party relating to Ali Choudhri is --

3   you're not going to answer because it's

4   attorney-client privilege?

5    A.  Yes.

6       MR. BALLASES:  Objection.  Form.

7    A.  And outside the scope of what you're allowed

8   to ask me about.

9    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, do you have

10   surveillance on me or any of my entities or companies?

11      MR. BALLASES:  Objection.  Form.

12      I'm going to instruct you not to answer.  It's

13   harassing and oppressive.  It has nothing to do with

14   the limited scope of this deposition.

15   A.  I'm not answering that.

16   Q.  (BY MR. CHOUDHRI)  Do you have any agreement

17   with George Lee?

18      MR. BALLASES:  Objection.  Form.

19   A.  I don't.

20      MR. BALLASES:  It's not relevant to the

21   limited scope of this deposition; therefore, I'm going

22   to instruct him not to answer.

23   A.  I should be asking you that question.  It's

24   gonna come up in trial.

25   Q.  (BY MR. CHOUDHRI)  Do you have any text

1    messages between you and George Lee?

2        MR. BALLASES:  Object --

3    A.  No --

4        MR. BALLASES:  Objection.  Form.

5    A.  -- I'm not gonna talk about that.

6        MR. BALLASES:  And I'm going to instruct

7    him not to --

8    A.  It has nothing to do with this.

9        MR. BALLASES:  I'm going to instruct you not

10   to answer.  It violates the scope of this deposition

11   that the judge indicated.  It's harassing and

12   oppressive.  This isn't a free-for-all discovery.

13       THE WITNESS:  Yeah.

14       MR. BALLASES:  It's just about why the proof

15   of claim was filed or why it's being withdrawn.

16   Q.  (BY MR. CHOUDHRI)  So is it your contention

17   that you have information you've received from Chris

18   Wyatt that has to do with the basis of your claim?

19       MR. BALLASES:  Objection.  Form.

20   A.  I mean, he provided an affidavit in this case,

21   so...

22   Q.  (BY MR. CHOUDHRI)  So again, when did he

23   become your client, and when did you establish that

24   attorney-client privilege?

25       MR. BALLASES:  Objection.  Form.

1      A.  I'm not sure when.

2      Q.  (BY MR. CHOUDHRI)  Do you have text messages

3   between you and Chris Wyatt?

4          MR. BALLASES:  Objection.  Form.

5      A.  I mean, if I did, I wouldn't disclose them to

6   you, and nor would a court compel me to.  It's

7   attorney-client privilege.

8      Q.  (BY MR. CHOUDHRI)  Well, here's the thing,

9   Mr. Khawaja.  Here's the thing.  There's something

10  called a privilege log, right?  I'm entitled to know

11  if you have communications.  I'm not asking you --

12          MR. BALLASES:  Objection.  Sidebar.

13      Q.  (BY MR. CHOUDHRI)  -- about the content of

14  your communications.

15          MR. CHOUDHRI:  Mr. Ballases, please stop

16  interrupting.

17      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, I'm not asking

18  you about the contents of your --

19          MR. BALLASES:  (Unintelligible)

20      Q.  (BY MR. CHOUDHRI)  Let me finish my question

21  before you answer.  Okay?

22          I'm asking you not about -- so we're very

23  clear, I'm not eliciting or asking you for privileged

24  information.  I'm asking you if there are

25  communications, not the contents.  Do you have --

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                              179

1     A.  Even if it existed --

2     Q.  -- communications with Chris -- can I finish?

3         Do you have communications with Chris Wyatt,

4  yes or no?

5         MR. BALLASES:  Objection.  Form.

6     A.  Even if it existed, I would not disclose that

7  to you, nor would I be compelled to, nor is it a part

8  of this case.

9     Q.  (BY MR. CHOUDHRI)  So why are you adding the

10  declaration of Chris Wyatt as a part of this case?

11        MR. BALLASES:  Objection.  Form.

12     A.  It's evidence.

13     Q.  (BY MR. CHOUDHRI)  Well, do you understand

14  what a sword --

15     A.  It's evidence of the alter (unintelligible).

16     Q.  -- and shield is?

17        THE REPORTER:  I'm sorry --

18     Q.  (BY MR. CHOUDHRI)  It's evidence of the alter

19  ego?

20        I'm sorry.  Finish your question -- your

21  answer, Mr. Khawaja.  It's --

22     A.  It's evidence --

23     Q.  -- evidence of what?

24     A.  -- of the alter ego.  It's evidence of the

25  alter ego.

1    Q.  So Chris Wyatt has evidence of the alter ego.

2  That's your answer?

3    A.  Yes.

4    Q.  And you're refusing to answer any questions

5  about Chris Wyatt.

6    A.  I'm not gonna talk about any attorney-client

7  privileged communications.  Correct.

8    Q.  So do you have any communications with Chris

9  Wyatt, yes or no?

10    MR. BALLASES:  Objection.  Form.

11    A.  I'm not gonna talk about it.

12    MR. BALLASES:  Objection.  Form.

13    MR. CHOUDHRI:  Mr. Ballases, being emphatic on

14  your objection doesn't change the objection.

15    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja --

16    MR. BALLASES:  Objection.  Sidebar.

17    Q.  (BY MR. CHOUDHRI)  -- are you refusing to --

18  are you refusing to answer the mere fact that

19  communications exist between you and Chris Wyatt?

20    MR. BALLASES:  Objection.  Form.

21    A.  I'm telling you that if they do exist -- I'm

22  not confirming that they do or don't, but they would

23  be privileged.  That's it.  And this is not the

24  case --

25    Q.  (BY MR. CHOUDHRI)  So how did --

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                      181

1      A.  This is not the case that you're going to get

2    any of that information.

3      Q.  Now, you'll agree with me that Chris Wyatt --

4    that in your petition in adversary that you've

5    attached to this proof of claim, you've attached a

6    declaration of Chris Wyatt, true or false?

7      A.  True.

8      Q.  And you're refusing to provide me any

9    communications or the fact that any communications

10   even exist between you and Chris Wyatt, true?

11          MR. BALLASES:  Objection.  Form.

12     A.  True.

13     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, would you

14   please stop looking at your phone?

15     A.  I'm not looking at my phone.  I'm looking at

16   the petition that you just asked me about, the

17   adversary.

18          MR. BALLASES:  Objection.  Sidebar.

19          Don't instruct my client again.

20     A.  This is the adversary petition I'm reading.

21     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, what

22   contingency claims, if any, do you hold, indirectly or

23   directly, against me or any of my entities?

24          MR. BALLASES:  Objection.  Form.

25     A.  Outside the scope of this discussion.  I'm not

1  answering.

2     Q.  (BY MR. CHOUDHRI)  So, Mr. Khawaja, it's your

3  contention that Texas REIT is an alter ego of every

4  one of those entities that I have interest in;

5  correct?  That's your contention.

6        MR. BALLASES:  Objection.  Form.

7     Q.  (BY MR. CHOUDHRI)  You're refusing to answer

8  what claims -- so is your statement or answer here,

9  under oath, that you're refusing to answer what

10  motivations and rights or claims or contingencies you

11  have against Texas REIT?  Now, when I --

12        MR. BALLASES:  Objection.  Form.

13     Q.  (BY MR. CHOUDHRI)  -- say "Texas REIT," that

14  applies to any and all entities that I have ownership

15  in, directly or indirectly; correct?

16     A.  Yes, based on alter ego.  Yeah, I'm not gonna

17  give you any -- whether I have any contingency-related

18  litigation against you on that.  If I do, you'll find

19  out about it at some point.

20     Q.  So you're refusing to disclose any claims you

21  have against the debtor.

22        MR. BALLASES:  Objection.  Form.

23     A.  Any claims I have against the debtor?  I don't

24  have any claims against the debtor other than the ones

25  I presented in this case.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                  183

1      Q.  (BY MR. CHOUDHRI)  So when you have

2   contingencies or claims against me, under your theory,

3   those would be claims against the debtor as well.

4          MR. BALLASES:  Objection.  Form.

5      A.  I don't know about that.

6      Q.  (BY MR. CHOUDHRI)  Do you use WhatsApp?

7      A.  Yes.

8          MR. BALLASES:  Objection.  Form.

9      Q.  (BY MR. CHOUDHRI)  Have you communicated --

10      A.  We're in some group -- we're in some groups

11   together on WhatsApp, I think.  Yes.

12      Q.  Mr. Khawaja, did you come to me for a job?

13          MR. BALLASES:  Objection.  Form.

14      A.  A job?  I'm not talking about that, no.

15      Q.  (BY MR. CHOUDHRI)  You never came to me for a

16   job.

17      A.  No.  Look, that's outside the scope of this

18   conversation.

19          MR. CHOUDHRI:  Mr. Osama Abdullatif needs to

20   stop talking in the background and coaching the

21   witness.

22          MR. BALLASES:  Objection.  Sidebar.

23          MR. CHOUDHRI:  Mr. Ballases, please stop.

24   Control Mr. Osama --

25          MR. BALLASES:  Objection.  Sidebar.

1          MR. CHOUDHRI:  -- (unintelligible) your

2     witnesses.

3          Q.  (BY MR. CHOUDHRI)  Mr. Khawaja --

4          MR. BALLASES:  Objection.  Sidebar.

5          Q.  (BY MR. CHOUDHRI)  -- would you mind sharing

6     the camera around your office there?

7          A.  We're not gonna do that.

8          Q.  You're not gonna do that?  Okay.  You're

9     refusing to do that.

10          MR. BALLASES:  Objection.  Sidebar.

11          Objection.  Form.

12          Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, did you ever

13     seek employment from Jetall Companies?

14          MR. BALLASES:  Objection.  Form.

15          I'm going to instruct the client not to

16     answer.  It's harassing and oppressive.  It exceeds

17     the limited scope of this deposition per the judge's

18     instructions.

19          Stop wasting time, sir.

20          Q.  (BY MR. CHOUDHRI)  You can answer,

21     Mr. Khawaja.

22          A.  On advice of counsel, I'm not gonna answer

23     that question.  Sorry.

24          Q.  Are you upset at Jetall Companies in any way,

25     shape, or form?

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    185

1        A.  No.

2        Q.  Are you upset at Ali Choudhri in any shape,

3    way, or form?

4        A.  I mean, I want the money that I'm owed.  Just

5    pay me the money that you owe.  This will -- this will

6    go away.  It's nothing personal.

7        Q.  And how much money would it take to make this

8    go away?

9        MR. BALLASES:  Objection.  Form.

10       We're not -- I'm going to instruct my client

11   not to answer.  It has nothing do with the limited

12   scope of this deposition and exceeds what the judge's

13   orders were.

14       Q.  (BY MR. CHOUDHRI)  Are you going to answer the

15   question, Mr. Khawaja?

16       A.  I'm gonna follow the advice of counsel and not

17   answer.

18       Q.  So you say this is about money; Just pay me

19   the money you owe me, and I'll go away.  But you won't

20   tell me what that amount is.  Is that your answer?

21       MR. BALLASES:  Objection.  Form.

22       A.  Yeah, we're not --

23       MR. CHOUDHRI:  Is Osama Abdullatif --

24       A.  -- in a settlement --

25       Q.  (BY MR. CHOUDHRI)  No, this is not a

1   settlement.  I'm asking you -- again, this is not

2   settlement discussion.  This is a deposition under

3   oath on the record.

4           I'm asking you a follow-up to your answer that

5   this is not personal; it's about money.  That's all

6   you want.  You want money, and you'll go away.  That's

7   what you said.  Did I hear -- did I hear your

8   answer --

9           MR. BALLASES:  Objection --

10    Q.  (BY MR. CHOUDHRI)  -- incorrectly, or do we

11  need the court reporter to repeat your answer?

12          MR. BALLASES:  Objection.  Form.

13          Objection.  Sidebar.

14    Q.  (BY MR. CHOUDHRI)  Are you answering the

15  question --

16    A.  You need to move along, sir.  I'm not going to

17  answer that question.

18          MR. CHOUDHRI:  Ms. Court Reporter, would you

19  read back his statement or his answer earlier:  This

20  is not personal; it's just money; if you pay me the

21  money you owe me, I'll go away.

22          Would you read that back into the record so

23  it's clear?  There's been a lot of objections, and

24  I've been distracted.

25          THE REPORTER:  I'll need a minute to go

1    through and find that answer.

2         MR. CHOUDHRI:  Take your time.  No problem.

3         Mr. Khawaja is not on the screen any longer,

4    for the record.

5         MR. BALLASES:  Yeah, he is.

6         MR. CHOUDHRI:  Mr. --

7         THE REPORTER:  Sorry.  Just off the record.  I

8    just need to go off the record because I can't type

9    and look for the testimony at the same time.

10        MR. CHOUDHRI:  So why don't we take a five --

11        THE WITNESS:  Can you see me?

12        MR. CHOUDHRI:  I'll tell you what.  Why don't

13   we do this, Ms. Court Reporter.  It looks like we've

14   been going for a little bit here.  So it's 2:42.  Why

15   don't we come back in 15 minutes at 3:00.

16        MR. BALLASES:  No, we'll take a five-minute

17   break.

18        THE WITNESS:  We'll take a five-minute break,

19   and that's it.  We're done.

20        MR. CHOUDHRI:  Again, Mr. Khawaja, this is my

21   deposition.  I get to ask questions.  And with all due

22   respect, you really don't dictate the -- but if you

23   need to take a break, I'm happy to let you take a

24   break --

25        THE WITNESS:  I'll take a five-minute break,

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                      188

1  and that's it.

2      No?  Okay.  No, we don't need a break.  Thank

3  you.

4      MR. CHOUDHRI:  So, Court Reporter, while

5  you're looking for the answer, let's go and take a

6  five-minute break.  We'll come back in five minutes.

7  We're off the record.

8      (A recess was taken.)

9      THE REPORTER:  So we are back on the record.

10  And I just please ask everybody, in order to keep the

11  record clear, please, one speaker at a time.

12      And, Mr. Khawaja, if your counsel does have an

13  objection, just please allow him to make the objection

14  and then answer afterwards, just so I don't have both

15  of you speaking.  Thank you.

16      THE WITNESS:  All right.  Thank you.

17      MR. BALLASES:  So just for the record,

18  Ms. Court Reporter, we've looked at the live schedule

19  that was filed by the debtor under declaration of

20  penalty and was signed by Mr. Ali Choudhri, and it

21  does not list Mr. Choudhri as a debtor anywhere on

22  here, and therefore -- or excuse me -- as a creditor

23  anywhere on here.  And so, therefore, him not being a

24  creditor based upon his own sworn document, he has no

25  legal basis to continue to ask questions here today.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    189

1          So I'd like to have -- if Ms. Hood or

2    Mr. Sather have any more questions, I'd like to finish

3    it up.  Mr. Khawaja does have to go because he has a

4    relative who is probably passing away relatively soon

5    in the hospital.  We can then move on --

6          MR. CHOUDHRI:  So --

7          MR. BALLASES:  -- with the next deponents.

8          MS. HOOD:  So --

9          MR. CHOUDHRI:  So, Mr. Ballases --

10   Mr. Ballases, this is my deposition.  If you want --

11   if there is a life/death situation, I'm not -- I'm

12   happy to work with you and Mr. Khawaja on schedules.

13   I have no problem doing that.  Family's important.  So

14   if we need to reset this deposition to tomorrow or

15   another day, I'm happy to accommodate that.

16         But what I don't want to do is have you

17   control the deposition and who can ask questions and

18   who can't, because I'm in the middle of my questioning

19   of Mr. Ballases (sic).  So --

20         MR. BALLASES:  Okay.  So --

21         MR. CHOUDHRI:  -- let's continue on with the

22   questions.

23      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, are you ready

24   to answer more questions?

25         THE WITNESS:  What do you think, Michael?

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    190

1         MR. BALLASES:  It's up to you.  If you've got

2    to go to the hospital, then --

3      A.  Okay.  I can go for a little bit longer.

4         MR. CHOUDHRI:  Okay.  Madam Court Reporter,

5    would you please read the answer back while we took a

6    break?

7         THE REPORTER:  Okay.  One second.  Okay.  So

8    the question and answer was (Reading:)  Question:  Are

9    you upset at Ali Choudhri in any way, shape, or form?

10        Answer:  I mean, I want the money that I'm

11   owed.  Just pay me the money that you owe.  This will

12   go away.  It's nothing personal.

13     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, did she read

14   your answer correctly and accurately?

15     A.  Yes.

16     Q.  And so to follow up on that answer, what is

17   the amount of the money that you claim you're owed?

18     A.  Well, there's a certain amount of -- there's a

19   certain amount that's claimed in the judgment that

20   probably has gone up since we filed it.  And, you

21   know, you can go through that.  Your attorney can

22   discuss that with my attorney if you want to make an

23   offer.  Someone will --

24     Q.  I'm not asking about a settlement,

25   Mr. Khawaja.  I'm just asking about how much money

1  you're owed, because I can go to the oral ruling

2  that -- from Judge Robinson about how you came up with

3  the number, how you calculated it, and what that

4  number is.  And that's what we're here today to ask

5  you questions about on your proof of claim.

6          So you said, Owe me -- pay me the money you

7  owe, so my question is --

8     A.  Right.

9     Q.  -- what are you claiming you're owed?

10    A.  Do you have a copy of the adversary?

11    Q.  Go ahead, Mr. Khawaja.  What is the amount of

12  money you're owed?  That's my question.  Do you know?

13    A.  Yeah, it's somewhere north of $500,000.  Give

14  me one second here.

15          The total amount is $4,847,894.68.

16    Q.  I'm sorry.  Would you repeat that again?  The

17  total amount that you're owed is what?

18    A.  $4,847,894.68.

19    Q.  Sorry.  There's somebody talking in the

20  background.  I think Osama's helping you and talking,

21  so --

22          MR. BALLASES:  Objection.  Sidebar.

23    Q.  (BY MR. CHOUDHRI)  So what is the total amount

24  that you need to be paid so you can go away?

25          MR. BALLASES:  Objection.  Form.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    192

1      A.  $4,847,894.68.

2      Q.  (BY MR. CHOUDHRI)  Okay.  Thank you for your

3   answer, Mr. Khawaja.

4          And you stand behind that number as being

5   truthful, accurate with all lawful offsets?

6      A.  I mean, I don't -- I don't know what that

7   means, but yeah, it's truthful, for sure.

8      Q.  Okay.

9      A.  There are no offsets.

10      Q.  There are no offsets?

11      A.  No.

12      Q.  Is that what you said?

13          Okay.  So there are no offsets; is that

14   correct?

15      A.  That's correct.

16      Q.  Okay.  Mr. Khawaja, is that the basis of -- so

17   let me just kind of set the table for a second.

18          So we said this earlier, and I just want to

19   make sure that I don't have to go through a list of,

20   you know, all these entities and all these other

21   parties.

22          So when we talk about Texas REIT, when you

23   answer the question that -- against Texas REIT, your

24   position is that any entity that I have ownership,

25   directly in or indirectly, is an alter ego of Texas

OMAR KHAWAJA                                         September 11, 2024
TEXAS REIT LLC                                                      193

1   REIT; correct?

2        MR. BALLASES:  Objection.  Form.

3     A.  Alter ego of Ali Choudhri.  Yes.

4     Q.  (BY MR. CHOUDHRI)  Okay.  So --

5     A.  And Jetall Companies.

6     Q.  -- that's the basis?

7        THE REPORTER:  I'm sorry?

8     Q.  (BY MR. CHOUDHRI)  And Jetall.  So when the --

9        THE REPORTER:  And who?  Sorry.

10       THE WITNESS:  Sorry.  Of Ali Choudhri and

11  Jetall Companies.

12       THE REPORTER:  Thank you.

13    Q.  (BY MR. CHOUDHRI)  And so that is the basis of

14  several lis pendenses that have been filed; is that

15  correct?

16    A.  I don't know about several.  There's one

17  that's filed in this case.

18    Q.  Well, if you contend that any and all

19  liabilities and assets of Texas REIT's are alter egos

20  of Ali Choudhri, you have -- in this adversary that is

21  the basis of your proof of claim -- back up.

22       This proof -- the adversary is the basis of

23  your proof of claim; correct?

24    A.  Yes.

25    Q.  So in that adversary, you have filed many lis

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    194

1    pendenses on various properties, true or false?

2        A.  Yes.

3        Q.  And what real property interest do you contend

4    that you own in any of these properties?

5        A.  We're a judgment creditor.  So if you own it,

6    we own it.

7        Q.  So it's your contention that -- again, I just

8    want to get the whole scope here.  It's your

9    contention that, based on the fact that you're a

10   judgment creditor, you have real property interest in

11   all these various properties, true or false?

12       A.  Yes.

13       Q.  Is that true?

14       A.  True.

15       Q.  Outside of that, do you have any other real

16   property interest that you contend you own in any of

17   these properties?

18       A.  No.

19       Q.  And do you know where I live?

20          MR. BALLASES:  Objection.  Form.

21       A.  I think you live in 9201 Arabella.

22       Q.  (BY MR. CHOUDHRI)  9201 Arabella?

23          MR. BALLASES:  Objection.  Form.

24       A.  Let me see here.  Ninety -- sorry -- 9201.

25   You live at Arabella PH, whatever property Arabella PH

1   3201, LLC, owns.  At the Arabella, I think, unless you

2   moved.

3       Q.  (BY MR. CHOUDHRI)  And you have knowledge that

4   I've lived there for how long?

5           MR. BALLASES:  Objection.  Form.

6       A.  I mean, I guess at least a few years.  Maybe

7   two.

8       Q.  (BY MR. CHOUDHRI)  And are you aware that --

9       A.  You sold your house and then -- I think so.  I

10  mean, look, I -- I'm not sure, to be honest with you.

11  I think you live there.  I can find out if you want me

12  to.

13      Q.  So you said I sold my house?

14          MR. BALLASES:  Ali, can -- Mr. Choudhri, can

15  you put yourself on the screen again so we know it's

16  you asking questions?

17      Q.  (BY MR. CHOUDHRI)  So you said --

18          MR. BALLASES:  Thank you.

19      Q.  (BY MR. CHOUDHRI)  -- I sold my house,

20  Mr. Khawaja, that you know I sold my house?

21      A.  Yeah.

22          MR. BALLASES:  Objection.  Form.

23      A.  You sold the River Oaks house; right?

24      Q.  (BY MR. CHOUDHRI)  I'm asking you,

25  Mr. Khawaja.  You said I sold my house.  What do you

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                196

1   mean by that?

2       A.  Yes.  I think you sold your River --

3          MR. BALLASES:  Objection.  Form.

4       A.  I think you sold the River Oaks house, and

5   then you moved.

6       Q.  (BY MR. CHOUDHRI)  And how do you know that?

7          MR. BALLASES:  Objection.  Form.

8       A.  I think -- I mean, that's just -- that's the

9   rumors.

10      Q.  (BY MR. CHOUDHRI)  And who told you that?

11         MR. BALLASES:  Objection.  Form.

12      A.  I think it was in The Real Deal.

13      Q.  (BY MR. CHOUDHRI)  Is that where you -- are

14  you saying that's where you know about it?

15      A.  Possibly.

16         MR. BALLASES:  Objection.  Form.

17      A.  I don't know, to be honest with you.

18      Q.  (BY MR. CHOUDHRI)  Do you know who Kevin

19  Powers is?

20         MR. BALLASES:  Objection.  Form.

21      A.  He's an attorney.  Yes.

22      Q.  (BY MR. CHOUDHRI)  Have you communicated with

23  Kevin Powers?

24         MR. BALLASES:  Objection.  Form.

25      A.  I think he called me once or twice, but no

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                  197

1  real communication with him.

2      Q.  (BY MR. CHOUDHRI)  Have you ever texted him or

3  received texts from him?

4          MR. BALLASES:  Objection.  Form.

5      A.  Not that I recall.  I don't think so.

6      Q.  (BY MR. CHOUDHRI)  Do you know who WCW is?

7          MR. BALLASES:  Objection.  Form.

8      A.  Some entity that you owe money, I think.

9      Q.  (BY MR. CHOUDHRI)  Do you know who Steven Wu

10  is?

11      A.  Another guy that you --

12          MR. BALLASES:  Objection.  Form.

13      A.  -- that you owe money to.

14      Q.  (BY MR. CHOUDHRI)  And your contention is I

15  owe money to Steven Wu?

16      A.  You owe money --

17          MR. BALLASES:  Objection.  Form.

18      A.  -- to a lot of people, including me, but yes.

19      Q.  (BY MR. CHOUDHRI)  And what do you know about

20  what I owe to Steven Wu?

21          MR. BALLASES:  Objection.  Form.

22      A.  That you defrauded him, and they have --

23  they're seeking to recover the money that you owe them

24  and --

25      Q.  (BY MR. CHOUDHRI)  And how much money is

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                198

1   that --

2      A.  -- defrauded them in the Texas REIT --

3          THE REPORTER:  I'm sorry --

4      Q.  (BY MR. CHOUDHRI)  I defrauded in the Texas

5   REIT case, you said?

6      A.  Yes.  I think some Texas REIT case.  I'm not

7   sure which one, but it's millions of dollars.

8      Q.  And so is it Steven Wu that you contend that I

9   defrauded?

10     A.  Yes.

11         MR. BALLASES:  Objection.  Form.

12     Q.  (BY MR. CHOUDHRI)  And Steven Wu is owed money

13  by Texas REIT is your contention?

14         MR. BALLASES:  Objection.  Form.

15     A.  Yes, and there's probably many other creditors

16  out there I'm not aware of.

17     Q.  (BY MR. CHOUDHRI)  Which creditors are you

18  aware of?

19         MR. BALLASES:  Objection.  Form.

20     A.  Only the ones that I would know.  I mean, I'm

21  one of them.  So, I mean, whoever's listed in these

22  schedules, I guess.

23     Q.  (BY MR. CHOUDHRI)  Have you contacted TIG

24  Romspen?  Do you know who Romspen is?

25     A.  No.

1          MR. BALLASES:  Objection.  Form.

2      A.  I know who they are, but I have not -- I read

3    about them in The Real Deal, but I've not contacted

4    them.

5      Q.  (BY MR. CHOUDHRI)  Do you know who Mansoor

6    Chaudhry is?

7      A.  Yes.

8      Q.  Do you have an attorney-client privilege with

9    him?

10      A.  No, I don't.

11          MR. BALLASES:  Objection.  Form.

12      Q.  (BY MR. CHOUDHRI)  Have you ever texted him or

13    received texts from him?

14      A.  No.

15          MR. BALLASES:  Objection.  Form.

16      A.  I mean, yes, he's texted me.  Yes, he has.

17      Q.  (BY MR. CHOUDHRI)  So when did you meet

18    Mansoor Chaudhry?

19      A.  Maybe two years --

20          MR. BALLASES:  Objection.  Form.

21      Q.  (BY MR. CHOUDHRI)  Under what circumstance?

22          MR. BALLASES:  Objection.  Form.

23      A.  He's a -- he has a title company, and I've

24    done some title work with him.

25      Q.  (BY MR. CHOUDHRI)  So you do some title work

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                       200

1  with him?

2      A.  Yes.

3          MR. BALLASES:  Objection.  Form.

4      Q.  (BY MR. CHOUDHRI)  What is the name of his

5  title company?

6          MR. BALLASES:  Objection.  Form.

7      A.  I think it's called Transact Title.

8      Q.  (BY MR. CHOUDHRI)  And is Transact Title a

9  tenant at 1001 West Loop?

10         MR. BALLASES:  Objection.  Form.

11     A.  Yes.

12     Q.  (BY MR. CHOUDHRI)  And have you filed a lis

13 pendens against 1001 West Loop?

14         MR. BALLASES:  Objection.  Form.

15     A.  If it's an alter ego of yours -- no, I don't

16 think so.  Maybe not.

17     Q.  (BY MR. CHOUDHRI)  You're looking at Osama to

18 answer the questions.  Do you understand this

19 deposition is me asking you, not Osama answering the

20 questions?  You understand that; right?

21         MR. BALLASES:  Objection.  Sidebar.

22         Don't pretend like you know what's happening

23 over here.

24         Objection.  Sidebar.

25     A.  I'm not looking at anybody.  But I don't know.

OMAR KHAWAJA                                      September 11, 2024
TEXAS REIT LLC                                                    201

1  Do you want me to file a lis pendens on 1001 West

2  Loop?

3      Q.  (BY MR. CHOUDHRI)  As we sit here today, are

4  you telling me that you have not caused any lis

5  pendens to be filed on 1001?

6      A.  No.  I don't know.  I don't think so.

7      Q.  Do you contend 1001, the property, 1001, or

8  the entity that owns 1001, is an alter ego of Ali

9  Choudhri or Texas REIT?

10     A.  Yes.  Yes, it is.

11     Q.  Do you contend --

12     A.  Even if it's not listed by -- even if it's not

13  here, it is -- anything that you control or own is an

14  alter ego, because that's how you operate.

15     Q.  Okay.  Do you know who BridgeCo is,

16  Mr. Khawaja?

17     A.  Yes.

18        MR. BALLASES:  Objection.  Form.

19     Q.  (BY MR. CHOUDHRI)  Have you spoken to anybody

20  at BridgeCo?

21     A.  No.

22        MR. BALLASES:  Objection.  Form.

23     Q.  (BY MR. CHOUDHRI)  But you've sued BridgeCo;

24  correct?

25     A.  Yes.

1     MR. BALLASES:  Objection.  Form.

2   Q.  (BY MR. CHOUDHRI)  And are you aware that

3   BridgeCo made six loans?

4   A.  Yeah.

5     MR. BALLASES:  Objection.  Form.

6   Q.  (BY MR. CHOUDHRI)  Do you know which

7   properties BridgeCo made loans on?

8   A.  There were --

9     MR. BALLASES:  Objection.  Form.

10   A.  -- some properties in Austin and some

11   properties in Houston, but I don't know -- I couldn't

12   tell you it's this one or that one.

13   Q.  (BY MR. CHOUDHRI)  And you contend those

14   properties are alter egos of Ali Choudhri or Texas

15   REIT.

16     MR. BALLASES:  Objection.  Form.

17   A.  I mean, they would be.  If you own them, they

18   would be.  But I don't know if we're making that claim

19   in this case anymore.

20   Q.  (BY MR. CHOUDHRI)  Have you sued Cypress

21   BridgeCo and Magnolia BridgeCo in this case?

22   A.  I think we did.  And I'm not sure if we still

23   have maintained those claims.  But I know they

24   foreclosed on their interest.

25   Q.  So you're aware that BridgeCo foreclosed on

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    203

1   the properties that you filed lis pendenses on.

2       A.  Yes.

3       Q.  And you realize that a lis pendens frustrates

4   and interferes with the sale of a property.

5           Please don't look at Osama for an answer.  I

6   know you really want to.

7           MR. BALLASES:  Objection --

8           MR. CHOUDHRI:  But, Mr. Abdullatif, would you

9   please stop helping Mr. Khawaja?

10          MR. BALLASES:  Objection.  Sidebar.

11          You don't know what you're talking about.

12          (Crosstalk)

13          MR. CHOUDHRI:  Madam Court Reporter, did you

14  get -- did --

15          (Crosstalk)

16          THE REPORTER:  Sorry.  What is your question,

17  Mr. Choudhri?

18          MR. CHOUDHRI:  What did Osama say?  I couldn't

19  hear him.

20          THE REPORTER:  I couldn't hear him either.  If

21  I can't hear him, I can't transcribe him.  And he's

22  not on the record.  Like, he's not --

23      A.  Let's please continue with the deposition.

24          MR. CHOUDHRI:  Mr. Osama Abdullatif, I can

25  hear you in the background calling me a liar.  That's

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                         204

1    unprofessional.

2            MR. BALLASES:  Objection.  Sidebar.

3            Ask your question, or I'll --

4        A.  Or we're gonna cut this -- or we're gonna shut

5    this thing down.

6        Q.  (BY MR. CHOUDHRI)  So, Mr. Khawaja, you're

7    aware -- let me back up.

8            You're in the real estate business as well;

9    right?

10           MR. BALLASES:  Objection.  Form.

11       A.  Not really.  A little bit.

12       Q.  (BY MR. CHOUDHRI)  Do you own real estate

13   outside of your home?

14       A.  Yes.

15       Q.  Which real estate?

16           MR. BALLASES:  Objection.  Form.

17       A.  I'm not gonna get -- I'm not gonna get into

18   that.

19       Q.  (BY MR. CHOUDHRI)  Are you refusing to answer

20   the question about what real estate you own --

21       A.  Yes, I'm --

22       Q.  -- outside of your house?

23       A.  I am -- I am refusing to answer that.

24           MR. BALLASES:  I'm instructing him not to

25   answer because it's outside the scope of the limited

1  deposition that the judge ordered.

2      Q.  (BY MR. CHOUDHRI)  So, Mr. Khawaja, we've

3  already established many, many, many times it's your

4  contention that any entity I own or control is an

5  alter ego of Texas REIT; correct?

6      A.  Yes.

7          MR. BALLASES:  Objection.  Form.

8      Q.  (BY MR. CHOUDHRI)  And so you're also aware,

9  Mr. Khawaja, that when you file a lis pendens on a

10  piece of property, you have to meet certain elements

11  to have a lis pendens on a piece of property.  Are you

12  aware of that?

13      A.  Yes.

14      Q.  And do you know what those elements are?

15          MR. BALLASES:  Objection.  Form.

16      A.  I don't.

17      Q.  (BY MR. CHOUDHRI)  You're unaware what the

18  elements are to file a lis pendens against real

19  property.

20      A.  I'm not sure.

21          MR. BALLASES:  Objection.  Form.

22      Q.  (BY MR. CHOUDHRI)  You're unaware, or you're

23  aware?

24      A.  I'm not aware.

25          MR. BALLASES:  Objection.  Form.

1          MR. CHOUDHRI:  Mr. Ballases, it doesn't change

2    by you yelling on the objection, so --

3          MR. BALLASES:  Objection.  Sidebar.

4       Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, how many

5    lawsuits have you been involved in where you have

6    instructed, sponsored litigation against Texas REIT or

7    any other entity that I own or control?

8          MR. BALLASES:  Objection.  Form.

9       A.  I don't know.  I don't -- I don't think many

10   at all.  Not as many as I could.  That's for sure.

11      Q.  (BY MR. CHOUDHRI)  And so you have filed a lis

12   pendens against a property at 2232 Swift Boulevard.

13   Are you aware of that?

14      A.  Yes.  Yes.

15      Q.  And you contend 2232 Swift Boulevard -- that

16   property and any interest in that property is an alter

17   ego of Texas REIT?

18      A.  Or Ali Choudhri.

19         MR. BALLASES:  Objection.  Form.

20      A.  Or Ali Choudhri.

21      Q.  (BY MR. CHOUDHRI)  Texas REIT or Ali --

22      A.  Or Jetall.

23      Q.  -- Choudhri; correct?

24      A.  Or Jetall.

25      Q.  Sorry?

1    A. Or Jetall Companies, Inc.

2    Q. Okay. So basically any and all entities that

3 I have any ownership in -- directly, indirectly --

4 it's an alter ego, and that's what you believe.

5    A. I believe the evidence will show that, yes.

6       MR. BALLASES: Objection. Form.

7    Q. (BY MR. CHOUDHRI) But as we sit here today,

8 you don't have any evidence --

9    A. No, we have plenty --

10       MR. BALLASES: Objection. Form.

11    A. We've been talking about it all day.

12       MR. BALLASES: Objection. Form.

13    Q. (BY MR. CHOUDHRI) So outside of whatever we

14 talked about today, you don't have any other evidence.

15       MR. BALLASES: Objection. Form.

16    A. Not until we get into the discovery, which

17 you're obstructing, but yes.

18    Q. (BY MR. CHOUDHRI) So this is your opportunity

19 to tell --

20    A. You'll find out more after you and, I think,

21 your mom's deposition coming up.

22    Q. Oh, okay. So you've sued my mom; correct?

23    A. Yes. Don't try to get out of that deposition

24 either. I'm gonna have a court reporter, translator,

25 everything. So don't try to get out of that.

OMAR KHAWAJA                                        September 11, 2024
TEXAS REIT LLC                                                      208

1      Q.  Mr. Khawaja, have you -- let me pull this up.

2   Hold on.

3          Have you contacted anybody related to QB Loop

4   Property?

5          MR. BALLASES:  Objection.  Form.

6      A.  No.

7      Q.  (BY MR. CHOUDHRI)  Have you contacted --

8      A.  What's going on with that?

9          THE WITNESS:  Sorry.  Sorry.

10      A.  I have not.

11      Q.  (BY MR. CHOUDHRI)  Have you contacted -- would

12   you dispute if third parties made statements that you

13   contacted them and told them not to do business with

14   me?

15          MR. BALLASES:  Objection.  Form.

16      A.  I would dispute that, yeah.  I mean, tell

17   them -- who said that I said that?

18          MR. BALLASES:  Objection.  Form.

19      Q.  (BY MR. CHOUDHRI)  Have you ever contacted

20   anybody who I do business with, or any of my related

21   entities, and told them not to do business with me?

22          MR. BALLASES:  Objection.  Form.

23      A.  I mean, that's outside the scope of what we're

24   talking about, but no, unless I was specifically

25   asked.

OMAR KHAWAJA                                         September 11, 2024
TEXAS REIT LLC                                                      209

1      Q.  (BY MR. CHOUDHRI)  Have you contacted Anwar

2   Qadeer (phonetic) in relation to --

3      A.  No.

4         MR. BALLASES:  Objection.  Form.

5      A.  No.  Are you trying to sue Anwar now?  No.

6      Q.  (BY MR. CHOUDHRI)  Have you contacted Qasim --

7   Abdul Qasim (phonetic)?

8         MR. BALLASES:  Objection --

9      A.  Abdul Qasim?

10      Q.  (BY MR. CHOUDHRI)  Abdul Qasim.

11         THE REPORTER:  Sorry.  One at a time, please.

12      A.  I never contacted -- no, he's a friend of --

13         THE REPORTER:  Sorry.  One at a time, please.

14         Mr. Khawaja, could you please repeat your

15   answer?

16      A.  I have not.

17         MR. BALLASES:  Objection.  Form.

18         Please stick to the limited purpose of this

19   deposition.

20      Q.  (BY MR. CHOUDHRI)  And --

21      A.  Don't get those guys in trouble.

22      Q.  -- Mr. Khawaja, are you -- are you -- are you

23   done laughing?

24      A.  Yes.  Yes.

25      Q.  Thank you.  You understand this is a serious

1  situation we're here, right?  This is a deposition.

2  It's not a joke --

3     A.  Oh, very much.

4        MR. BALLASES:  Objection.  Sidebar.

5     A.  Very much.  Very much so.

6     Q.  (BY MR. CHOUDHRI)  And, Mr. Khawaja, you're

7  taking this serious; correct?

8     A.  Oh, yeah, absolutely.

9        MR. BALLASES:  Objection.  Sidebar.

10     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, can you tell

11  me why -- you know, why you believe that the BridgeCo

12  entities are an alter ego of Texas REIT?

13        MR. BALLASES:  Objection.  Sidebar.

14        No, excuse me.  I'm gonna go ahead, and I'm

15  gonna actually object to this exceeding the scope of

16  the deposition that the judge ordered and instruct him

17  not to answer.

18     A.  I'm gonna take the advice of counsel.

19     Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you're not

20  going to answer the question, I understand; is that

21  correct?

22     A.  Yes.

23     Q.  Mr. Khawaja, are you aware that when a lis

24  pendens is filed on a property, a property -- the

25  title is clouded, and it interferes with the ability

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                211

1   for the property to be sold or refinanced?

2      A.  I mean --

3         MR. BALLASES:  Objection.  Form.

4      A.  -- you filed many of those, so you're pretty

5   aware of what it does, so yes.

6      Q.  (BY MR. CHOUDHRI)  And besides whatever we've

7   covered today, you don't have any other -- are you --

8      A.  Plans?

9      Q.  -- familiar with the -- sorry?

10     A.  Other plans?  I don't know.  I'm just trying

11  to guess what you were gonna say.

12     Q.  I'm sorry, Mr. Khawaja.  What was your

13  statement?

14     A.  I said -- you said, You don't have any other,

15  and then you just trailed off.  So I said, What,

16  plans?

17     Q.  What -- so I think I've asked this earlier,

18  and you've refused to answer.  I just want to make

19  sure the record is clear.  You're refusing to answer

20  any contingency claims or any claims you own or hold,

21  indirectly or directly, against me or any of my

22  entities.  You're refusing to answer any of those

23  questions.

24     A.  Yes --

25         MR. BALLASES:  Objection --

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    212

1      A.  -- that's correct.

2          MR. BALLASES:  Objection.  Form.

3      Q.  (BY MR. CHOUDHRI)  And you're aware that

4   2727 Kirby was foreclosed on.

5          MR. BALLASES:  Objection.  Form.

6      A.  That's what I understand.

7      Q.  (BY MR. CHOUDHRI)  And you're aware that

8   that's one of the properties you filed a lis pendens

9   on.

10         MR. BALLASES:  Objection.  Form.

11     A.  Sure.  You owe a lot of money on it.

12     Q.  (BY MR. CHOUDHRI)  Is there money owed to you

13  on 2727 Kirby?

14     A.  I mean, it's an alter --

15         MR. BALLASES:  Objection.  Form.

16     A.  -- ego of Jetall Companies, so yeah, we

17  should've gotten something out of it.

18     Q.  (BY MR. CHOUDHRI)  Is that why you filed a

19  lis pendens, so you could get something out of it?

20         MR. BALLASES:  Objection.  Form.

21     A.  To prevent you from committing fraudulent

22  transfers and defrauding people like you do.

23     Q.  (BY MR. CHOUDHRI)  And so let's elaborate.

24  How do I defraud people?

25         MR. BALLASES:  Objection.  Form.

1   A.  I mean -- I mean, come on.

2   Q.  (BY MR. CHOUDHRI)  I just want to --

3       (Crosstalk)

4   A.  You really want me to answer that question?

5   Q.  (BY MR. CHOUDHRI)  Absolutely.  Go ahead.

6       MR. BALLASES:  Objection.  Sidebar.

7       It's not the opportunity to ask an improper

8   question.

9       THE WITNESS:  No.

10      MR. BALLASES:  It is your opportunity to ask

11  about why a proof of claim was filed and why it was

12  withdrawn.  You are mistaken, and you're exceeding the

13  Court's order.  Please stick to the Court's limited

14  deposition order.

15      Q.  (BY MR. CHOUDHRI)  Are you going to refuse to

16  answer the question, Mr. Khawaja?

17  A.  Yes.

18      MR. BALLASES:  Objection.  Form.

19      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, you're aware

20  that following the filing of lis pendenses on various

21  properties, those properties were foreclosed after you

22  filed those lis pendenses, true or false?

23      MR. BALLASES:  Objection.  Form.

24  A.  After -- I mean, what does that mean, after I

25  filed those lis pendenses?  You lost those properties

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    214

1  because you refused to pay on them, like you've done

2  on so many properties throughout your entire life.

3         So, you know, you excel at losing properties.

4  That's what happened.  That's what happened to

5  2425 West Loop.  Don't try to put that on me unless

6  you want more lawsuits.  We're happy to oblige.

7     Q.  (BY MR. CHOUDHRI)  Do you --

8     A.  Yes.

9        MR. BALLASES:  Objection.  Sidebar.

10    A.  No, I'm not done.  I'm just getting started.

11    Q.  (BY MR. CHOUDHRI)  So continue on.  I'm

12  listening.

13       MR. BALLASES:  There's no question on the

14  table.

15    Q.  (BY MR. CHOUDHRI)  You're just getting

16  started?

17       THE REPORTER:  I'm sorry --

18    Q.  (BY MR. CHOUDHRI)  What do you mean by "just

19  getting started" --

20       THE REPORTER:  I'm sorry.  Mr. Ballases, what

21  was your objection or your comment?

22       MR. BALLASES:  Objection.  Form.

23       There was no question on the table.

24    Q.  (BY MR. CHOUDHRI)  Go ahead, Mr. Khawaja.  If

25  you want to talk, you can talk.  You said you're just

1    getting started --

2            MR. BALLASES:  Objection.  Sidebar.

3        A.  Stick --

4        Q.  (BY MR. CHOUDHRI)  Do you want to --

5        A.  Stick to the questions, please.  Stick to the

6    questions.

7        Q.  You're answering -- you're answering the

8    questions, so I'm allowing you to finish your answers.

9    And you said --

10           MR. BALLASES:  Objection.  Sidebar.

11       Q.  (BY MR. CHOUDHRI)  -- you're just getting

12   started.  What do you mean by, "I'm just getting

13   started"?  That was your answer.

14       A.  Yes.  We have --

15       Q.  (Unintelligible)

16       A.  We have a lot of -- we have discovery to

17   complete in this case.

18       Q.  And so what do you mean, "I'm just getting

19   started"?  Elaborate on that --

20           MR. BALLASES:  Objection.  Form.

21       A.  Yeah, we need -- we have to complete

22   discovery.

23       Q.  (BY MR. CHOUDHRI)  And what evidence or

24   information do you have that my mom is an alter ego of

25   Texas REIT?

1          MR. BALLASES:  Objection.  Form.

2       A.  Have you reviewed the -- have you reviewed our

3   evidence in this case?  Have you looked at what we've

4   been able to uncover, or no?  I hope your attorneys

5   are sharing it with you.  There's a lot.

6       Q.  (BY MR. CHOUDHRI)  So what evidence do you

7   have that Shahnaz Choudhri is an alter ego --

8       A.  Yes.

9       Q.  -- of Texas REIT?

10       A.  There's money flowing through bank accounts.

11   There's checks that she's written to entities that you

12   control.  There's personal payments going out to her

13   from entities that you control.  I mean, there's a

14   lot.  There's a lot.  We're gonna get into all of

15   that.

16       Q.  And so the evidence is all within your

17   pleadings.  Is that --

18       A.  Not all of it.

19          MR. BALLASES:  Objection.  Form.

20       A.  Not all of it.  There's just something --

21   there's discovery.  There's subpoenas.  There's --

22   there's things.  There's a deposition coming up that

23   you're aware of that you're gonna try to get out of.

24   We're not gonna let you.

25       Q.  (BY MR. CHOUDHRI)  Have you made statements to

1  third parties that Judge Norman is gonna do whatever

2  you ask him to do because you have him on payroll?

3        MR. BALLASES:  Objection.  Form.

4        And objection.  Sidebar.

5     A.  Man, come on.  Don't do stuff like that.

6  That's gonna get you --

7     Q.  (BY MR. CHOUDHRI)  Have you made a

8  statement to anybody --

9     A.  -- in a lot of trouble.

10       THE REPORTER:  I'm sorry.

11    Q.  (BY MR. CHOUDHRI)  Have you made --

12       THE REPORTER:  One person at a time, please.

13    A.  That's -- that's gonna get you into a lot of

14  trouble with the FBI.  I wouldn't do that.  That's a

15  mistake on your part.

16    Q.  (BY MR. CHOUDHRI)  Have you ever made any

17  statements like that?  Have you ever made any

18  statements --

19    A.  No.

20    Q.  -- like that?

21       MR. BALLASES:  Objection.  Form.

22    A.  That's very dangerous of you to say that.  I'm

23  just warning you.  It's very dangerous.

24       MR. CHOUDHRI:  Mr. Ballases --

25    Q.  (BY MR. CHOUDHRI)  Mr. Khawaja --

1      THE WITNESS:  Make sure you get a copy of this

2  transcript, please --

3      Q.  (BY MR. CHOUDHRI)  -- you've never made --

4      THE WITNESS:  -- and provide that.

5      Q.  (BY MR. CHOUDHRI)  You --

6      THE REPORTER:  Sorry --  okay.

7      A.  I would stop if I were you.  I would stop

8  right now if I were you.

9      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, please.  I'm

10  asking the questions.  Okay?

11      A.  Yeah, you are.

12      Q.  Have you met with Anthony Gill or Kenneth

13  Shaitelman?

14      MR. BALLASES:  Objection.  Form.

15      A.  I'm not gonna --

16      (Crosstalk)

17      MR. BALLASES:  I'm going to instruct you not

18  to answer.  That has nothing to do with the proof of

19  claim that was filed or the reason that we've offered

20  to withdraw it, and therefore, I'm instructing not to

21  answer.  It exceeds the scope of the judge's order.

22      So I object to the form of the question.

23      A.  I'm not answering.

24      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja, were you

25  present on September 6, 2023, when Chris Wyatt, your

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024
219

1    client, testified on the stand in Judge Manor's court?

2        MR. BALLASES:  Objection --

3    A.  No.

4        MR. BALLASES:  Objection.  Form.

5    A.  I wasn't.

6    Q.  (BY MR. CHOUDHRI)  Were you present around

7    September 2023 in front of Judge Manor regarding a

8    case styled Naissance versus Zaheer?

9        MR. BALLASES:  Objection.  Form.

10       A.  I don't even know if I was or not, but that's

11   outside the scope of this purpose of this deposition,

12   so move on.

13       Q.  (BY MR. CHOUDHRI)  Are you aware that Chris

14   Wyatt, your client, testified that he has given you

15   my -- Jetall Companies' hard drive?

16       MR. BALLASES:  Objection.  Form.

17       A.  Not -- not in the -- within the scope of this

18   conversation -- I mean this deposition.  But if he

19   testified to that, I'd have to look back and see.

20   Maybe he did.

21       Q.  (BY MR. CHOUDHRI)  Is Chris Wyatt truthful?

22       MR. BALLASES:  Objection.  Form.

23   A.  You hired him.  What do you think?

24   Q.  (BY MR. CHOUDHRI)  Have you hired --

25       THE WITNESS:  Look, I'm done, Michael.  This

OMAR KHAWAJA
TEXAS REIT LLC

September 11, 2024

220

1   is it.  This is getting into things --

2          MR. BALLASES:  Okay.

3          THE WITNESS:  -- that are unrelated.  So we

4   can --

5          MR. BALLASES:  And you've got to go see your

6   family --

7          THE WITNESS:  I have to go see my family --

8          MR. BALLASES:  Then we'll take it up with a

9   judge.

10          THE WITNESS:  Thank you.

11          (Crosstalk)

12      Q.  (BY MR. CHOUDHRI)  Are you going to walk out

13   of this deposition?

14          THE REPORTER:  I'm sorry --

15      A.  Yes.

16      Q.  (BY MR. CHOUDHRI)  No --

17          THE REPORTER:  Sorry.  One at a -- sorry.  One

18   at a time, please.  Thank you.

19          MR. CHOUDHRI:  I am not done with my --

20          THE WITNESS:  I have a medical --

21          MR. CHOUDHRI:  -- questions.

22          THE WITNESS:  -- emergency.

23      Q.  (BY MR. CHOUDHRI)  If you have a medical

24   emergency, we can agree to a rescheduling.  Your

25   medical emergency, Mr. Khawaja, is you have a family

1    member in the hospital; correct?

2       A.  Yes, I do.

3          MR. BALLASES:  You don't need to answer any

4    more questions.

5          He has to get out of here.  You took up enough

6    time --

7          THE WITNESS:  We'll take it up with a judge.

8       Q.  (BY MR. CHOUDHRI)  Mr. Khawaja --

9          MR. BALLASES:  Do you want a five-minute

10   break, or do you want to start?

11      Q.  (BY MR. CHOUDHRI)  Mr. Khawaja --

12         MR. BALLASES:  You go.  I got it.

13      Q.  (BY MR. CHOUDHRI)  -- the deposition is still

14   going.  Are you going to get up and walk out?

15         MR. CHOUDHRI:  Madam Court Reporter --

16         MR. BALLASES:  Yes, he's got to --

17         MR. CHOUDHRI:  -- would you --

18         MS. HOOD:  Okay.  If I can weigh in here, I

19   had some follow-up questions for him; very few, but I

20   do have follow-up questions.

21         MR. BALLASES:  How much time?  Like, how much

22   would you estimate, Ms. Hood?

23         MS. HOOD:  Ten minutes.

24         MR. BALLASES:  It's up to you.  If you've got

25   to get out of here --

1        MR. CHOUDHRI:  But I'm not done --

2        MS. HOOD:  But it's -- I need -- Mr. Choudhri

3    hasn't passed the witness.  But I did want to go on

4    the record that I do have a few more questions for

5    him.

6        MR. BALLASES:  Okay.  Well --

7        THE WITNESS:  We'll take it up if we need to

8    with a judge.

9        MR. BALLASES:  Okay.  Then unless we're going

10   to go directly to your ten minutes, then he's got to

11   get to the hospital.

12       MR. CHOUDHRI:  Mr. Ballases, if he's got to go

13   to the hospital, is there a mutually agreeable time

14   before he leaves that we can agree to maybe --

15       MR. BALLASES:  No.

16       MR. CHOUDHRI:  -- pick this up?

17       MR. BALLASES:  No.

18       MR. CHOUDHRI:  Are you not agreeing to resume

19   the deposition at a convenient time after his

20   emergency for his visitor -- for his family member in

21   the hospital?

22       MR. BALLASES:  I'm not right now.  You've had

23   plenty of time to ask questions.  You've asked

24   questions that had nothing to do with the limited

25   scope of the deposition.  I let you ask them.  I

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    223

1    probably shouldn't have.  And so you used your time as

2    you saw fit.

3          Do you all want to take a two-minute break or

4    five-minute break before we start the next one, or no?

5          MR. CHOUDHRI:  Mr. Ballases, I am -- this is

6    still my deposition that I'm asking questions on.  I

7    want the record to be clear.  Have you instructed your

8    witness to leave?  Have you instructed the witness to

9    leave --

10         MR. BALLASES:  He's gone.  Yes, he is gone.

11   He is gone.  I've instructed him to leave because he

12   has a family member who is dying.  I don't know how

13   much clearer I can make that.  Stop repeating

14   yourself.

15         MR. CHOUDHRI:  Well, Mr. Ballases --

16         MR. BALLASES:  So you can either --

17         MR. CHOUDHRI:  -- as you know -- can I finish

18   talking, please, before you keep --

19         MR. BALLASES:  No --

20         MR. CHOUDHRI:  -- cutting me off?

21         MR. BALLASES:  -- you can't.  You waste

22   everybody's time.

23         So we can start with the next deposition.

24         It's clear that --

25         MR. CHOUDHRI:  Mr. Ballases --

1        MR. BALLASES:  -- he's left, and it's clear

2    you want to ask questions.

3        So we can start with the next deposition now

4    or in two minutes.  Please make your decision.

5        Stephen, if you want to make it because you're

6    the lead, that's fine.

7        MS. HOOD:  Can I just say on the record that I

8    would like to finish my questioning of the deponent

9    when he has the next available opportunity that's

10   convenient for everybody so I can ask my four

11   questions.

12       MR. BALLASES:  And I would -- that's fine.

13   You can take it up with the Court.  He was on record

14   for five hours.  Take away maybe the 30 minutes where

15   we argued about the judge's oral order.  Four and a

16   half hours, that's plenty of time for this deposition

17   to go forward and for y'all to complete it.

18       We have two more people here, and I have till

19   4:30.  I'd like to get started to go as fast as

20   possible, but it's y'all's call.

21       MS. HOOD:  Okay.  Well, I'll just --

22       MR. CHOUDHRI:  Mr. Ballases, the time is --

23   the time is 3:30 p.m.  Is that --

24       Or, Court Reporter, would you just confirm

25   what time we have right now?

1        MR. BALLASES:  No one needs to confirm the

2   time.  Do you want to get started with the next one or

3   not?  I mean, stop wasting everybody's time?

4        MS. HOOD:  I just want to -- for my part of

5   this, I wasn't -- I didn't adjourn the deposition with

6   regard to this deponent for my questioning.  I was

7   waiting for it to come back, to cycle around with me

8   again.  I have a few more questions for him, and I

9   want to finish those.

10        And I understand he's left, and I understand

11   the basis for it, and I wish all Godspeed to his

12   family member.  And I don't want to get involved in

13   any sort of issue about whether someone needs to

14   leave, doesn't need to leave, that sort of thing,

15   right?  I just -- and if we have to go back to the

16   judge for my four questions, I'm happy to do it.

17        I just want that on the record for me.  What

18   the other lawyer does and what Mr. Choudhri does --

19        MR. BALLASES:  (Unintelligible)

20        MS. HOOD:  -- I'm not in control of that.

21        MR. BALLASES:  I understand.  You've made

22   it -- you've put it on the record twice.  That's fine.

23   I understand, and I'll stipulate that you do have more

24   questions.

25        Do we want to go to the next witness now?

OMAR KHAWAJA                                September 11, 2024
TEXAS REIT LLC                                              226

1          MR. CHOUDHRI:  Mr. Ballases, would you at

2    least provide, subject to your client's availability,

3    times you're available to resume the deposition of

4    Omar Khawaja?

5          MR. BALLASES:  No.  No, I will not.  I've said

6    that twice now.

7          MR. CHOUDHRI:  Are you not --

8          MR. BALLASES:  Do we want to move to the next

9    deposition?

10          MR. CHOUDHRI:  Are you going to refuse to make

11    him available --

12          MR. BALLASES:  Stop wasting time.  I'm not

13    going to provide it unless we have an order from a

14    judge.  Do you understand?  Stop wasting time.  We've

15    got a limited amount --

16          MR. CHOUDHRI:  Well, I just want to --

17          MR. BALLASES:  -- of time --

18          MR. CHOUDHRI:  -- get this on the --

19          (Crosstalk)

20          MR. BALLASES:  -- basis to take a deposition.

21          Do we want to move to the next person or not?

22    Please tell me.

23          MR. CHOUDHRI:  Before --

24          MR. BALLASES:  I would say, Stephen, it's your

25    job to say it.

1        MR. SATHER:  Yeah, I'm prepared --

2        MR. CHOUDHRI:  Mr. --

3        MR. SATHER:  -- to move to the next --

4        MR. CHOUDHRI:  Mr. Ballases --

5        MR. SATHER:  -- witness --

6        MR. BALLASES:  All right.  Let's go.

7        MR. SATHER:  Who do you have --

8        MR. CHOUDHRI:  Mr. Ballases --

9        MR. SATHER:  -- up next?

10        THE REPORTER:  I'm sorry --

11        MR. BALLASES:  Osama.

12        THE REPORTER:  Okay.

13        MR. CHOUDHRI:  Mr. Ballases --

14        MR. BALLASES:  Osama's ready to go.

15        MR. CHOUDHRI:  Time out.  I just want to get

16   this on the record very clearly, Mr. Ballases.

17        MR. BALLASES:  Oh, Jesus.

18        MR. CHOUDHRI:  I just want to make it --

19        MR. BALLASES:  It's on the record clearly.

20   Stop wasting time.

21        MR. CHOUDHRI:  You are not willing to

22   cooperate to resume the deposition of Omar Khawaja

23   absent a court order.  Is that your position?

24        MR. BALLASES:  I've stated my position.  Let's

25   move forward.

OMAR KHAWAJA                                    September 11, 2024
TEXAS REIT LLC                                                    228

1          Let's take a two-minute break, and then

2   Osama's going to be in this chair.

3          THE REPORTER:  Okay.  So I am going off the

4   record.

5          (End of proceedings at 3:31 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 6

**THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

_____ )
                                 )
In re:                           )          Chapter 11
                                 )
GALLERIA 2425 OWNER, LLC,        )          Case No. 23-34815
                                 )
                      Debtor.    )
_____ )

_____

**ORDER GRANTNG MOTION TO COMPLY WITH THE GATEKEEPING
PROVISIONS OF THE CONFIRMED CHAPTER 11 PLAN**

_____

BEFORE THE COURT is the Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan.

The Court hereby GRANTS the motion.

IT IS THEREFORE HEREBY ORDERED that the claims raised by Ali Choudhri and Naissance Galleria, LLC against the Bank can proceed in the following cases:

> _Naissance Galleria, LLC v. Zaheer, et al_., Cause No. 2023-43755, pending in the 80th District Court of Harris County, Texas;
>
> _Galleria 2425, LLC, Naissance Galleria, LLC and Choudhri v. NBK_, Adversary Case No. 23-06009, pending in this Court; and
>
> _Choudhri v. NBK and Zaheer_, Adversary Case No. 23-03263, pending in this Court.

Dated:                    _____

                          UNITED STATES BANKRUPTCY COURT

EXHIBIT 7

**IN RE GALLERIA 2425 OWNER, LLC, CASE NO. 23-34815**
**SERVICE LIST (a/o July 2, 2024)**

**Debtor:**
Galleria 2425 Owner, LLC
1001 West Loop South Ste 700
Houston, TX 77027

**Debtor's Counsel:**
Reese W. Baker
Baker & Associates
950 Echo Lane Ste 300
Houston, TX 77024

James Q. Pope
The Pope Law Firm
616 Savoy Drive Ste 1125
Houston, TX 77036

**U.S. Trustee:**
Office of United States Trustee
Attn: Jana Smith Whitworth
515 Rusk Street Suite 3516
Houston, TX 77002

**Chapter 11 Trustee:**
Christopher R. Murray
602 Sawyer Street Ste 400
Houston, TX 77007

**Chapter 11 Trustee's Counsel:**
R. J. Shannon
Shannon & Lee LLP
2100 Travis Street Ste 1525
Houston, TX 77002

**Governmental Entities:**
Harris County Tax Assessor
P O Box 4622
Houston, TX 77210

Harris County, et al.
P O Box 2928
Houston, TX 77252-2928

**Twenty Largest Creditors:**
Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070

Cirro Electric
P O Box 60004
Dallas, TX 75266

City of Houston
P O Box 1560
Houston, TX 77251-1560

City of Houston Water Department
P O Box 1560
Houston, TX 77251-1560

Datawatch Systems
Suite 200
4520 East West Highway
Bethesda, MD 20814

Firetron
10101A Stafford Centre Dr.
Stafford, TX 77477

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062

Gulfstream Legal Group
1300 Texas Street
Houston, TX 77002
(*Returned to Sender / Unable to Forward*)

Gulfstream Legal Group
720 N Post Oak Rd Ste 355
Houston, TX 77024

Hayward PLLC
10501 N Central Expy Ste 106
Dallas, TX 75231-2203

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362

Houston Community College System
c/o Tara Grundemeier
Linebarger, Groggan, Blair & Sampson
P O Box 3064
Houston, TX 77253-3064

Houston Independent School District
P O Box 4668
Houston, TX 77210
(*Returned to Sender / Unable to Forward*)

Lexitas
P O Box 734298 Dept 2012
Dallas, TX 75373

Nationwide Security
2425 W Loop South Ste 300
Houston, TX 77027
(*Returned to Sender / Unable to Forward*)

Nichamoff Law Firm
2444 Times Blvd Ste 270
Houston, TX 77005

T&R Mechanical
21710 White Oak Drive
Conroe, TX 77306-8848
(*Returned to Sender / Unable to Forward*)

TKE
3100 Interstate North Cir SE 500
Atlanta, GA 30339

Zindler Cleaning Service Co.
2450 Fondren Ste 113
Houston, TX 77063

**Other Creditors / Interest Holders:**
2425 WL, LLC
60 West 2nd Street
Freeport, NY 11746

ADT
P O Box 382109
Pittsburgh, PA 15251

Ali Choudhri
1001 West Loop South 700
Houston, TX 77027

Ash Automated Control Systems, LLC
P O Box 1113
Fulshear, TX 77441

CFI Mechanical, Inc.
6109 Brittmoore Rd
Houston, TX 77041

CNA Insurance Company
P O Box 74007619
Chicago, IL 60674

Comcast
P O Box 60533
City of Industry, CA 91716

Environmental Coalition Inc.
P O Box 1568
Stafford, TX 77497

Ferguson Facilities Supplies
P O Box 200184
San Antonio, TX 78220

Jetall Companies Inc.
2425 West Loop South Ste 1100
Houston, TX 77027-4210

Kings 111 Emergency Communications
751 Canyon Drive Suite 100
Coppell, TX 75019

Logix Fiber Networks
P O Box 734120
Dallas, TX 75373

2

Mueller Water Treatment
1500 Sherwood Forest Dr
Houston, TX 77043

Smart Office Solutions
6623 Theall Road
Houston, TX 77066-1213
(*Returned to Sender / Unable to Forward*)

Waste Management
P O Box 660345
Dallas, TX 75266

Metwall Design Solutions LLC
10931 Day Road
Houston, TX 77043-4901

US Retailers LLC d/b/a Cirro Energy
Attn: Bankruptcy Department
P O Box 3606
Houston, TX 77253-3606

Naissance Galleria, LLC
c/o Law Office of Nima Taherian
701 N Post Oak Rd Ste 216
Houston, TX 77024

H.N.B. Construction, LLC
c/o Malcolm D. Dishongh
P O Box 2347
Humble, TX 77347-2347

CC2 TX, LLC
14800 Landmark Blvd Ste 400
Dallas, TX 75254

MacGeorge Law Firm
2921 E 17th St Bldg D Ste 6
Austin, TX 78702
(*Returned to Sender / Unable to Forward*)

MacGeorge Law Firm
701 Tillery Street Ste 12
Austin, TX 78702

**Executory Contract Counterparties:**

2425 West Loop LLC dba Metwall Design
Solutions LLC
2425 West Loop South Ste 800
Houston, TX 77027-4214
(*Returned to Sender / Unable to Forward*)

2425 WL, LLC
13498 Pond Springs Rd
Austin, TX 78729-442
(*Returned to Sender / Unable to Forward*)

2425 WL, LLC
700 Lavaca Street Ste 1401
Austin, TX 78701
(*Returned to Sender / Unable to Forward*)

Bankable Equities
2425 West Loop South Ste 600
Houston, TX 77027-4203

Boho Lounge
2425 West Loop South Ste 100
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

CNA Insurance Company
P O Box 74007619
Chicago, IL 60674

Eyebrows 4UTX LLC
2425 West Loop South Ste 340b
Houston, TX 77027-4205

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062

G3 Global Services LLC
2425 West Loop South Ste 310
Houston, TX 77027-4208

Galloworks
2425 West Loop South Ste 400
Houston, TX 77027-4205

3

Jetall Companies Inc.
2425 West Loop South Ste 1100
Houston, TX 77027-4210

Kudrath Enterprises PLLC
2425 West Loop South Ste 350
Houston, TX 77027-4208

Nationwide Investigations & Security Inc.
2425 West Loop South Ste 300
Houston, TX 77027-4207
(*Returned to Sender / Unable to Forward*)

Shah Sloan LLC
2425 West Loop South Ste 501, 503 and 523
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

SIBS International Inc.
2425 West Loop South Ste 900
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

SIBS International Inc.
2425 West Loop South Ste 350
Houston, TX 77027
(*Returned to Sender / Unable to Forward*)

SprintCom Inc.
2425 West Loop South, Rooftop
Houston, TX 77027-4205
(*Returned to Sender / Unable to Forward*)

St. Christopher Holdings GP LLC
2425 West Loop South Ste 700
Houston, TX 77027-4205

UL Therapy
2425 West Loop South Ste 315
Houston, TX 77027-4211
(*Returned to Sender / Unable to Forward*)

Uptown Cosmetic and Implant Dentistry
2425 West Loop South Ste 333
Houston, TX 77027-4211

**Parties Requesting Notice:**
Jeannie Lee Andressen
Tara Grundemeier
Linebarger Goggan Blair & Sampson LLP
P O Box 3064
Houston, TX 77253-3064
*Counsel for City of Houston, Houston
Community College System, and Houston
ISD*

Rodney Lee Drinnon
McCathern Houston
2000 West Loop South Ste 1850
Houston, TX 77027
*Counsel for Rodney Drinnon*

Susan Fuertes
Harris County Attorney's Office
P O Box 2928
Houston, TX 77252-2928
*Counsel for Harris County, Attn: Property
Tax Division*

James Robert MacNaughton
Porter & Powers PLLC
5900 Memorial Drive Ste 305
Houston, TX 77027
*Counsel for 2425 West Loop, LLC*
(*Returned to Sender / Unable to Forward*)

James Robert MacNaughton
Porter & Powers PLLC
1776 Yorktown St Ste 300
Houston, TX 77056
*Counsel for 2425 West Loop, LLC*
(*Returned to Sender / Unable to Forward*)

James Robert MacNaughton
Porter Firm, PLLC
2221 S. Voss Road, Suite 200
Houston, TX 77057
*Counsel for 2425 West Loop, LLC*

4

Stephen Wayne Sather
Mark E. Smith
Barron Newburger, P.C.
7320 N Mopac Expy Ste 400
Austin, TX 78731
*Counsel for 2425 WL, LLC*

Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road Ste 850
Dallas, TX 75251
*Counsel for CC2 TX, LLC*

Broocks Wilson
Kean Miller LLP
711 Louisiana Suite 1800
Houston, TX 77002
*Counsel for Sonder USA Inc.*

Ali Choudhri
2425 West Loop South 11th Floor
Houston, TX 77027

David Tang
6711 Stella Link #343
West University Place, TX 77005
*Counsel for Azeemeh Zaheer*

Omar Khawaja
5177 Richmond Ave Ste 1065
Houston, TX 77056
*Counsel for Azeemeh Zaheer*

4868-8377-7229.v1
000728

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

November 05, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-34815** |
| **GALLERIA 2425 OWNER, LLC,** | § | |
| | § | |
| Debtor. | § | |
| | § | **CHAPTER 11** |

### ORDER RESETTING HEARING

Hearing is reset on the Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan (ECF No. 810) at 9:00 a.m. on December 3, 2024, in Courtroom 403, United States Courthouse, 515 Rusk St., Houston, Texas. The response deadline is 5:00 p.m. on November 22, 2024. Requested relief that is unopposed by written response prior to the response deadline may be ruled on without the necessity of a hearing. The Court may grant or deny any relief sought in any motion/application or objection without hearing based on responsive pleadings. The movant shall serve a copy of this order on all affected parties within 24 hours and file a certificate of service; **or** file and serve a hearing notice within 24 hours, which must include the response deadline.

**Parties should reference the Court's website for in person hearing requirements and connection instructions for virtual appearances.**[1]

**SO ORDERED**.

SIGNED 11/05/2024

Jeffrey Norman
United States Bankruptcy Judge

---

[1] https://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-jeffrey-p-norman

1 / 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-34815 (JPN) |
| GALLERIA 2425 OWNER, LLC | § | |
| | § | Chapter 11 |
| Debtor. | § | |

**NBK'S RESPONSE TO ALI CHOUDHRI'S MOTION TO COMPLY WITH THE**
**GATEKEEPING PROVISIONS OF THE CONFIRMED CHAPTER 11 PLAN**
[Relates to Docket No. 810]

TO THE HONORABLE JEFFREY P. NORMAN,
UNITED STATES BANKRUPTCY JUDGE:

National Bank of Kuwait, S.A.K.P., New York Branch ("NBK"), files this response (the

"Response") to Ali Choudhri's *Motion to Comply with the Gatekeeping Provisions of the*

*Confirmed Chapter 11 Plan* [Docket No. 810] ("Choudhri's Motion")[1] and represents follows:

**PRELIMINARY STATEMENT**

1.      The Court has provided Mr. Choudhri with every opportunity to participate in this

case and be heard. When attorneys for companies he owns were unwilling to make arguments to

the Court or pursue various lines of questioning with witnesses, the Court permitted Mr. Choudhri

to examine witnesses and make arguments, which were ultimately found to be nonsense.[2]

2.      Now, after three plus years of litigation involving two bankruptcy cases and several

state court lawsuits and bankruptcy adversary proceedings that have not gone his way,

Mr. Choudhri, rather than simply comply with the unstayed provisions of the confirmed Plan,

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in National Bank of Kuwait, S.A.K.P, New York Branch's Emergency Motion to Enforce the Gate-Keeping Provisions of the Confirmed Chapter 11 Plan [Docket No. 758] ("NBK's Motion").

[2] "This Court having spent considerable time attempting to evaluate the actions and testimony of Ali Choudhri in this case both as a witness and as a pro se litigant. The Court, based on this analysis, holds that Choudhri must at times believe what he is telling the Court. Unfortunately, what he has told the Court, often in broad terms, is not supported by rational facts or any documentary evidence. It additionally often is totally untrue." [Docket No. 565 at 17-18] (the "Memorandum Opinion").

seeks to challenge its gatekeeping provisions, so that he can continue to harass NBK, arguing that the Supreme Court "significantly constrained" this Court's gatekeeping powers. That argument fails for two reasons. First, *Purdue Pharma* did nothing to alter existing Fifth Circuit law,[3] so nothing in *Purdue Pharma* requires this Court to reconsider the propriety of the Plan's gatekeeping provisions.

3.    Second, Mr. Choudhri is barred from challenging the Plan's gatekeeping provisions. Although a company owned by Mr. Choudhri challenged and appealed the Plan's gatekeeping provisions, Mr. Choudhri did not.[4] As explained below, fourteen years ago the Supreme Court foreclosed an after-the-fact attack on a confirmed plan by a party that never objected or appealed, even if the challenged provisions contravene the Bankruptcy Code. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010).[5]

4.    Because there is neither a basis to challenge the Plan's gatekeeping provisions nor can Mr. Choudhri pursue a challenge given his failure to object to those provisions in the first place, the next step for the Court would be to determine whether Mr. Choudhri has colorable claims against NBK. But, as Mr. Choudhri himself acknowledges,[6] the Court has already made that determination. Nevertheless, Mr. Choudhri asks the Court to *reconsider* because "the Plaintiffs were not permitted to present, and the Court was not permitted to hear, a full airing of the evidence

---

[3]    Non-consensual third-party releases have long been prohibited in the Fifth Circuit. *See, e.g., Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760 (5th Cir. 1995) (overturing an injunction that effectively discharged a non-debtor).

[4]    The only party to appeal the Confirmation Order was 2425 WL, LLC ("2425 WL") [Docket No. 603].

[5]    Any effort by Mr. Choudhri to even suggest that 2425 WL's appeal should be treated like he appealed, or he should get some benefit here from that appeal should be rejected out of hand. Mr. Choudhri is currently opposing efforts to hold him and various of his entities *alter egos* of each other in other litigation pending before this Court, arguing each are distinct. *See John Quinlan, et al. v. Jetall Companies, Inc., et al.,* Adversary No. 23-03141 (Bankr. S.D. Tex.). He cannot have it both ways.

[6]    *See* Choudhri's Motion at ¶ 33.

to support the Plaintiffs' claims,"[7] as though the Court must conduct a full trial before it can determine whether a claim is colorable.

5.     Then, instead of describing the unheard evidence and explaining how it would affect the Court's ruling, Mr. Choudhri points to (a) testimony the Court already heard and did not believe, and (b) the pleadings in the Pending Actions, without identifying a single factual allegation that the Court has not heard or that would (or even might) persuade the Court to reverse its determination that Mr. Choudhri's claims are "dubious," "of limited value," "primarily nuisance litigation," "not viable," and "implausible."[8] That is because there are none.

6.     Additionally, Mr. Choudhri invokes the wrong legal standard for determining whether his claims against NBK are colorable and asks the Court to accept his allegations as true.[9] This matter does not concern the fraudulent joinder rule, and the appropriate test is not "more lenient" than the analysis applicable to a FED. R. CIV. P. 12(b)(6) motion. As explained below, the Gatekeeper Colorability Test from *Highland Capital* is broader and requires an additional level of review. The test permits a court to take into consideration its knowledge of the bankruptcy case and the parties and any additional evidence and places the burden on Mr. Choudhri to make a *prima facie* showing that his proposed claims are (a) not without foundation, (b) not without merit, and (c) not being pursued for any improper purpose such as harassment.

7.     The Court ordered Mr. Choudhri to show why the claims asserted in the Pending Actions are colorable.[10] He has failed to do so. It is time for Mr. Choudhri's vexatious litigation against NBK to end, and he should be sanctioned.

---

[7]   *Id.*

[8]   Memorandum Opinion at 16-17.

[9]   *See* Choudhri's Motion ¶ 24.

[10]   *See* Docket No. 779 at 2. The Court also ordered Naissance Galleria to show cause, but it has not. Accordingly, pursuant to the Court's prior order, its claims against NBK must be dismissed. *Id.*

4869-6753-5861.v7
000732

## **BACKGROUND**

8.     This Court previously entered a Memorandum Opinion in which the Court determined that claims asserted by the Debtor and its principal Mr. Choudhri against NBK "are not viable" based on evidence presented during the confirmation hearing, "especially the documentary evidence."[11] The Court found the disputes raised by the Debtor, primarily through Mr. Choudhri, to be "dubious and of limited value that includes primarily nuisance litigation to avoid foreclosure of the subject real estate."[12] The Court also noted "two distinct facts (1) that the Debtor via his principal has never been able to pay the original note, or his Confidential Settlement Payment or his extended Confidential Settlement Payment which was a sizable discount on the original amount of the Note; [and] (2) the record in this case does not support his sizable but *implausible claims*."[13] In rendering its opinion, the Court stated "Choudhri must at times believe what he is telling the Court. Unfortunately, what he has told the Court, often in broad terms, is not supported by rational facts or any documentary evidence. It additionally often is totally untrue."[14]

9.     During the confirmation hearing, the chapter 11 trustee testified that in the course of his duties he investigated the Debtor's claims against NBK.[15] He testified that (a) the releases in favor of NBK in the Confidential Settlement Agreement ("CSA") were likely enforceable;[16] (b) the Debtor and Mr. Choudhri failed to provide any documentary evidence to support its claims

---

[11] Memorandum Opinion at 16.

[12] *Id.*

[13] *Id*. at 17 (emphasis added).

[14] *Id*. at 17-18.

[15] *See* June 19, 2024 confirmation hearing transcript, attached as **Exhibit A**, at 122:4-9.

[16] *See id.* at 127:9-15.

4869-6753-5861.v7
000733

for events following the execution of the CSA;[17] and (c) any factual support for those claims was "weak to non-existent."[18]

10.     The claims evaluated by the Trustee and the Court during the confirmation hearing included a litany of claims and alleged facts duplicated in multiple lawsuits by Mr. Choudhri, whether in his own name or via various of his entities including the Debtor, Naissance Galleria, LLC ("Naissance"), or 2425 WL.[19] For ease of reference, attached as **Exhibit B**, is a chart of the pending claims asserted by the Debtor, Naissance, and Mr. Choudhri.

11.     Specifically, the Court noted in its Memorandum Opinion that the claims asserted by the Debtor, Naissance, and Mr. Choudhri against NBK in Adversary No. 23-03263 ("*Choudhri Intervention Action*"),[20] commenced under this bankruptcy case, are the same as those asserted in Adversary No. 23-06009 ("*Galleria I Adversary*"), commenced under the Debtor's prior bankruptcy case – namely "breach of the [CSA], tortious interference with contract, tortious interference with business relations, fraud and fraudulent inducement/lender liability, fraudulent conveyance, estoppel, breach of good faith and fair dealing, and unjust enrichment."[21] The claims in the *Choudhri Intervention Action* also include causes of action for conspiracy and federal misrepresentation of services and unfair competition under the Lanham Act.[22] The *Choudhri*

---

[17] *See id*. at 129:22-130:8.

[18] *See id*. at 130:9-13.

[19] *See* Memorandum Opinion at 2. These claims included a number of causes of action previously nonsuited with prejudice by Debtor as to NBK in Cause No. 2021-63370, *Galleria 2425 Owner, LLC v. NBK, et al.* pending in the District Court of Harris County, Texas, 281st Judicial District, including claims for breach of the loan agreement in allegedly failing to approve leases or sale of the property, common law fraud in allegedly fraudulently inducing Debtor to enter the loan agreements, tortious interference with prospective relations and existing contracts including tenant leases, breach of fiduciary duty, and general good faith duty in allegedly failing to approve tenant leases. *Plaintiffs' Second Amended Petition* attached as **Exhibit C**; *Order on Plaintiffs' Notice of Nonsuit as to Defendant National Bank of Kuwait, S.A.K.P.* attached as **Exhibit D**.

[20] The Court referenced Adversary No. 23-34815 in its Memorandum Opinion. However, the removed case is Adversary No. 23-03263.

[21] *See* Memorandum Opinion at 2-3.

[22] *See id.* at 3.

5

*Intervention Action* includes his *Second Amended Petition in Intervention* in which Choudhri asserts claims for fraud, promissory estoppel, and equitable estoppel.[23] Although Mr. Choudhri offers scant facts to support his claims in his *Second Amended Petition*, they appear to arise from the CSA to the extent asserted against NBK. The Court dismissed with prejudice the Debtor's causes of action against NBK in the *Choudhri Intervention Action.*[24]

12.    Naissance also filed Cause No. 2023-43755, *Naissance Galleria, LLC v. Azeemeh Zaheer*, Cause No. 2023-43755, in the 80th Judicial District Court of Harris County, Texas, ("*Naissance I*") and in that action filed *Plaintiff's Second Amended Petition & Emergency Application for Temporary Restraining Order against NBK*.[25] Naissance asserts the same claims against NBK as those asserted in the *Choudhri Intervention Action* including breach of the CSA, tortious interference with contract, tortious interference with business relations, fraud and fraudulent inducement, business disparagement, and unjust enrichment. In support of the petition in *Naissance I*, Mr. Choudhri declared under penalty of perjury that the facts and events set forth in *Plaintiff's Second Amended Petition & Emergency Application for Temporary Restraining Order* against NBK were within his personal knowledge and true and correct.[26] As noted in footnote 10, although it was ordered to show cause why its claims can be pursued consistent with the Plan's gatekeeping provisions, Naissance did not do so. Its claim against NBK, therefore, must be dismissed. *See* Docket No. 779 at 2 ("The failure to timely file a Show Cause Motion by a plaintiff shall be deemed to be an admission by that plaintiff that its Pending Action is an estate

---

[23] Adversary No. 23-03263, Docket No. 1-2 at 907.

[24] Adversary No. 23-03263, Docket No. 26.

[25] Attached as **Exhibit E**.

[26] *Id.* at 29.

6

claim, or is not a colorable, non-estate claim, and the appropriate Pending Action shall be permanently stayed, removed if necessary to this Court, and dismissed with prejudice.").

## ARGUMENT & AUTHORITIES

### A.    Mr. Choudhri Is Prohibited from Collaterally Attacking Confirmed Plan Provisions That He Did Not Object to or Appeal

13.    "The Supreme Court has held that a confirmed plan may bind parties in interest even if a plan provision contravenes the Bankruptcy Code." *In re Sanchez Energy Corp.*, 631 B.R. 847, 857 (Bankr. S.D. Tex. 2021).

> In *United Student Aid Funds, Inc. v. Espinosa*, a bankruptcy court confirmed a chapter 13 plan which improperly discharged a portion of the debtor's student loan debt. 559 U.S. 260, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010). Like Occidental, the creditor received notice of the plan, but did not object to or appeal confirmation. Although the bankruptcy court confirmed the plan in error, the Supreme Court found that the confirmation order was "enforceable and binding on [the creditor] because [the creditor] had notice of the error and failed to object or timely appeal." *Id.* at 275, 130 S.Ct. 1367.
>
> . . .
>
> "An Order confirming a plan of reorganization is entitled to res judicata effect." *In re Wildwood Prop. Owners Ass'n*, 2017 WL 3189874, at *7 (Bankr. S.D. Tex. July 25, 2017) (citing *Stoll v. Gottlieb*, 305 U.S. 165, 170-71, 59 S.Ct. 134, 83 L.Ed. 104 (1938)). "Federal courts have consistently applied res judicata principles to bar a party from asserting a legal position after failing, without reason, to object to the relevant proposed plan of reorganization or to appeal the confirmation order." *Id.*

*Id.* 857-59.

14.    "*Espinosa* makes clear that parties and the Court must adhere to the terms of a confirmed plan. This is so even if the Court committed a legal error by confirming the plan." *In re Sanchez*, 631 B.R. at 857. Even if the scope of the gatekeeping provisions in the confirmed Plan runs afoul of any requirement imposed by the Fifth Circuit's *Highland Capital* opinion (which

they do not),[27] there can be no question that the Court must apply them here as set forth in the confirmed Plan.

15.    Additionally, implicit in Choudhri's Motion is an argument that, but for the gatekeeping provisions, the Court would not have jurisdiction over the Pending Actions. But that implicit argument is wrong.

16.    There can be no question that this Court has related-to jurisdiction over the Pending Actions. As this Court has held:

> The Supreme Court has noted "related to" bankruptcy proceedings include "(1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate." *Arnold v. Garlock*, 278 F.3d 426, 434 (5th Cir.2001) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.5, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995)). The Fifth Circuit has stated that a matter is related to a case under title 11 if "the outcome of that proceeding could *conceivably* have any effect on the estate being administered in bankruptcy." *Wood*, 825 F.2d at 93 (citing *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984)). Even when there is a possibility a suit may ultimately have no effect on the estate, this possibility is not enough to conclude there would be no *conceivable* effect. *Id.* "Certainty or even likelihood of such an effect is not a requirement." *Arnold*, 278 F.3d at 434 (citing *In re Canion*, 196 F.3d 579, 588 (5th Cir.1999)).

*In re Mugica*, 362 B.R. 782, 788 (Bankr. S.D. Tex. 2007) (emphasis added).

17.    The Fifth Circuit has also held that related-to jurisdiction may extend to non-debtors' state-law disputes after the plan is confirmed. *Feld v. Zale Corp. (In re Zale)*, 62 F.3d 746, 757-59 (5th Cir. 1995).

18.    With respect to the "lender liability" claims cited throughout Choudhri's Motion, the Debtor was the borrower, and the estate released all of its claims against NBK under the Plan.

---

[27] *Matter of Highland Cap. Mgmt., L.P.*, 48 F.4th 419 (5th Cir. 2022), *cert. denied sub nom. Highland Cap. Mgmt., L.P. v. Nex-Point Advisors, L.P.*, 144 S. Ct. 2714 (2024), *and cert. denied sub nom. NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.*, 144 S. Ct. 2715 (2024).

4869-6753-5861.v7
000737

Nearly identical claims were asserted by Naissance in *Naissance I*, and the *Galleria I Adversary* and *Choudhri Intervention Action* each of which are already pending in this Court.

19.    Under these circumstances, there is no doubt that post-confirmation related-to jurisdiction exists.

20.    Furthermore, post-confirmation core jurisdiction also exists, and the evaluation by this Court of the various claims asserted by Mr. Choudhri necessarily means comparing the identical nature of those claims to the released estate claims. Mr. Choudhri has not established that the claims he asserts are his direct claims against NBK, and not just repackaged estate claims that have been released or dismissed altogether. If they are just repackaged estate claims, it is well within this Court's core jurisdiction to prohibit their prosecution in aid of confirmation of the Plan and in the exercise of its inherent power to enforce its own order confirming the Plan and approving the releases of estate claims against NBK.[28]

**B.    The Appropriate Standard Is the *Highland Capital* Gatekeeper Colorability Test**

21.    In *Highland Capital*, United States Bankruptcy Judge Jernigan undertook the most comprehensive analysis of the proper standard to apply when determining the "colorability" of a claim in the context of gatekeeping provisions in a chapter 11 plan.

> The court concludes that the appropriate standard to be applied in making its "colorability" determination in ***this*** bankruptcy case, in the exercise of its gatekeeping function pursuant to the two Gatekeeper Orders and the Gatekeeper Provision in ***this*** Plan, is a broader standard than the "plausibility" standard applied to Rule 12(b)(6) motions to dismiss. It is, rather, a standard that involves ***an additional level of review***—one that places on the proposed plaintiff a burden of making a prima facie case that its proposed claims are ***not without foundation***, are ***not without merit***, and are ***not being pursued for any improper purpose such as harassment***. Additionally, this court may, and should, take into consideration its ***knowledge*** of the ***bankruptcy proceedings*** and ***the parties*** and any additional evidence presented at the hearing on the Motion for Leave. For ease of reference,

---

[28] *See Defendant National Bank of Kuwait, S.A.K.P., New York Branch's Objection to Emergency Motion to Remand of Ali Choudhri* [Adversary No. 03120, Docket No. 9].

the court will refer to this standard of "colorability" as the "Gatekeeper Colorability Test." The court considers this test as a sort of hybrid of what the *Barton* doctrine contemplates and what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place.

*In re Highland Cap. Mgmt., L.P.*, No. 19-34054-SGJ-11, 2023 WL 5523949, at *41 (Bankr. N.D. Tex. Aug. 25, 2023) (emphasis in original). Judge Jernigan emphasized "***this*** bankruptcy case" and "***this*** Plan" because "[i]n determining what appropriate legal standard applies here in the 'colorability' analysis, the context in which the Gatekeeper Provision of the Plan was approved seems very relevant." *Id.* at *38.

22.    To the extent that the FED. R. CIV. P. 12(b)(6) plausibility standard is applicable, a court is not just permitted, but is required, to rely upon its judicial experience and common sense in its application.

The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Factual allegations that are merely consistent with a defendant's liability, stop short of the line between possibility and plausibility of entitlement to relief, and thus are inadequate. Accordingly, the requisite facial plausibility exists when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Determining whether a complaint states a plausible claim for relief is a context-specific task that ***requires*** the reviewing court to draw on its ***judicial experience*** and ***common sense***.

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quotations and citations omitted) (emphasis added).

23.    Thus, it is entirely appropriate for the Court to view Mr. Choudhri's claims through the lens of its knowledge of the bankruptcy proceedings and the parties, including the time "spent over two days June 17 and 19, 2024, hearing specific evidence regarding the disputes between the Debtor, its principal and the NBK,"[29] and any party's credibility deficit resulting therefrom.

---

[29] Memorandum Opinion at 16.

### C.    Mr. Choudhri's Claims Do Not Satisfy Any of the Requirements Under the Gatekeeper Colorability Test

24.    As stated in NBK's Motion, the Pending Actions assert the same basic facts and claims that this Court found lacked foundation and merit. The lender liability claims in the Pending Actions hinge upon an alleged breach by NBK of the CSA. These claims and NBK's alleged breach of the CSA were explored on several occasions in this case, including in the motion to prohibit credit bidding,[30] at the hearing on NBK's motion to convert, and – most thoroughly – at the confirmation hearing.

25.    The CSA was a key evidentiary document evaluated by the Court at the confirmation hearing, including the following provisions whereby Mr. Choudhri waived claims against NBK.

> (a) Acknowledgement of the Indebtedness. As of the Effective Date, Choudhri, Galleria and Naissance acknowledge and agree that NBK is owed $60,212,816.90 under the Loan Documents, **without defenses, setoffs, claims, counterclaims or deductions of any nature whatsoever, all of which are hereby expressly waived**;

> (b) Acknowledgment of Existing Defaults. Galleria, Choudhri and Naissance further acknowledges and agrees that: (i) an Event of Default exists under the Loan Documents, (ii) any cure period with respect thereto has expired, (iii) all principal, interest, fees, costs and other charges due under the Loan Documents are fully accelerated and immediately due and owing to NBK **without defenses, setoffs, claims or counterclaims or deductions of any nature whatsoever all of which are hereby expressly waived**, . . . .

Memorandum Opinion at 5 (emphasis in original).

26.    A cursory review of the Pending Actions makes clear that they allege claims based on conduct that allegedly occurred before the CSA was executed. These claims have been expressly released by Mr. Choudhri, and he presents no credible argument or fact that would support vitiating Mr. Choudhri's release.

---

[30] Docket No. 353.

27.    Furthermore, to the extent that Mr. Choudhri contends that there was a post-execution breach of the CSA that should void the releases, or that gives rise to new post-execution claims for breach, the Court found no evidence NBK breached the CSA, after evaluating the documentary evidence and Mr. Choudhri's own allegations.

> The Debtor's principal strongly feels that he is a victim of unusual circumstance, COVID and mostly the actions of NBK. He strongly complains that the actions of NBK have caused him to default, face foreclosure and that it should pay for its actions [whatever they may be]. However, this totally ignores two distinct facts (1) that the Debtor via his principal has never been able to pay the original note, or his Confidential Settlement Payment or his extended Confidential Settlement Payment which was a sizable discount on the original amount of the Note; (2) the record in this case does not support his sizable but implausible claims. The Court notes two specific allegations. ***First, the allegation that NBK faces a large lender liability claim based on the CSA and second, that NBK breached that agreement first and therefore the Debtor's breach of the CSA by not paying over $26 million dollars was somehow acceptable. The Court invites the parties to examine the record to find any evidence that either of these facts are true.*** Yes, the Debtor had lawyers testify that the Debtor had claims but they never explained how or why these claims arose, just that they existed. Additionally, the Court notes that the Chapter 11 Trustee interviewed these attorneys and discounted their claims. Their testimony was incomplete and not believable given the lack of documentary evidence. Just because a lawyer tells this Court or any Court that its client or potential client has a great claim for damages does not make it so or the presentation of evidence in hearings would become superfluous.

Memorandum Opinion at 17 (footnotes omitted) (emphasis added).

28.    Because the Court found that NBK did not breach the CSA, Mr. Choudhri's express waiver of claims against NBK under the CSA remains in effect, and there is no claim for a post-CSA breach. The claims asserted, therefore, are neither colorable nor viable.

29.    Moreover, Choudhri's Motion altogether fails to introduce any new documentary evidence supporting the argument that the Court has not heard "a full airing of the evidence" before concluding that Mr. Choudhri's claims lack merit. Mr. Choudhri's evidence has been presented and found wanting. For example:

- Exhibit 3 to Choudhri's Motion is attached to support the allegation Osama Abdullatif "arranged to have hard drives seized from Choudhri's companies." This allegation was

raised in the *Motion to Disqualify Rodney Drinnon as Counsel* [Adversary. No. 23-03259, Docket No. 10].

- Exhibit 4 to Choudhri's Motion is attached to support the allegation that Abdullatif "arranged for Choudhri to be accused of a murder-for-hire plot to kill Abdullatif himself, which authorities dismissed as 'a hoax.'" This allegation was raised in 2425 WL, LLC's *Motion for Reconsideration and Relief from Judgment* [Docket No. 740] concerning the disallowance of Proof of Claim No. 7, which the Court denied [Docket No. 743]

- Exhibit 5 to Choudhri's Motion is attached to support the allegation that Abdullatif's attorney "admits to representing Abdullatif and Zaheer in furtherance of Abdullatif's avowed goal of seizing all of Choudhri's business interests through litigation—under their theory: 'If [Ali] own[s] it, we own it.'" This allegation was also raised in the *Motion for Reconsideration and Relief from Judgment.*

30.    Leaving aside that none of these allegations involve alleged conduct by NBK, there simply is nothing in Choudhri's Motion that the Court has not already considered in assessing the foundation and merit of the claims at issue. Furthermore, the Court has had ample opportunity to assess Mr. Choudhri's purpose for pursuing these claims and likewise found them to be improper. Therefore, although the Gatekeeper Colorability Test requires that all three prongs – foundation, merit, and purpose – be satisfied, Mr. Choudhri's claims fail to satisfy a single component of the test.

## **CONCLUSION**

For the foregoing reasons, NBK respectfully requests that this Court deny Choudhri's Motion, enforce the Plan's gatekeeping provisions by requiring the Pending Actions to be dismissed, and sanction Mr. Choudhri for his continued pursuit, without any new evidence, of claims this Court has already found to be meritless.

13

DATED: November 20, 2024            **PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Charles C. Conrad*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

- *and* -

Andrew M. Troop (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

***Counsel for National Bank of Kuwait, S.A.K.P., New York Branch***

## CERTIFICATE OF SERVICE

I hereby certify that, on November 20, 2024, a true and correct copy of the forgoing Objection was served via the Court's CM/ECF system on all counsel of record who are deemed to have consented to electronic service.

*/s/ Charles C. Conrad*
Charles C. Conrad

4869-6753-5861.v7
000743

# EXHIBIT A

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                          HOUSTON DIVISION

 3    In re                        )  CASE NO: 23-34815 (JPN)
                                   )
 4    GALLERIA 2425 Owner, LLC,    )  Houston, Texas
                                   )
 5            Debtor.              )  Wednesday, June 19, 2024
                                   )
 6                                 )  9:00 a.m. to 4:54 p.m.
      ------------------------------)

 7

 8                              TRIAL

 9          BEFORE THE HONORABLE JEFFREY P. NORMAN
                UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12    For Debtor:              REESE W. BAKER, ESQ.
                               Baker & Associates
13                             950 Echo Lane, Suite 300
                               Houston, TX 77024
14
      For 2425 WL, LLC:        H. GRAY BURKS, IV, ESQ.
15                             BurksBaker, PLLC
                               950 Echo Lane, Suite 300
16                             Houston, TX 77024

17                             STEPHEN SATHER, ESQ.
                               Barron & Newburger, P.C.
18                             7320 North Mopac Expressway
                               Suite 400
19                             Austin, TX 78731

20    For Ali Choudhri,        ALI CHOUDHRI
      pro se:                  2425 West Loop South, 11th Floor
21                             Houston, TX 77027

22    For the Trustee:         R.J. SHANNON, ESQ.
                               Shannon & Lee LLP
23                             2100 Travis Street, Suite 1525
                               Houston, TX 77002

24

25    For National Bank of     ANDREW M. TROOP, ESQ.
```

```
 1   Kuwait, S.A.K.P., New      PATRICK E. FITZMAURICE, ESQ.
     York Branch:               Pillsbury Winthrop Shaw Pittman
 2                              31 West 52nd Street
                                New York, NY 10019-6131
 3                              CHARLES C. CONRAD, ESQ.
                                Pillsbury Winthrop Shaw Pittman
 4                              Two Houston Center
                                909 Fannin, Suite 2000
 5                              Houston, TX 77010-1028

 6   Court Reporter:            TRACEY CONRAD

 7   Transcribed by:            Veritext Legal Solutions
                                330 Old Country Road, Suite 300
 8                              Mineola, NY 11501
                                Tel: 800-727-6396
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   Transcript produced by transcription service.
```

```
 1                              INDEX

 2   TRIAL WITNESSES       DIRECT    CROSS    REDIRECT    RECROSS

 3   MICHAEL CARTER          34       67        104        108

 4   CHRISTOPHER MURRAY     111      145        179        182

 5   ALLEN HOLLIMAN         185      187

 6   ALI CHOUDHRI           195      231        233

 7

 8   TRIAL EXHIBITS                                      RECEIVED

 9   Exhibit 508-7                                          45

10   Exhibit 501-01                                         59

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          HOUSTON, TEXAS; WEDNESDAY, JUNE 19, 2024; 9:00 a.m.

 2                           (Call to Order)

 3          CLERK:  All rise.

 4          THE COURT:  Please be seated.  So we are on the

 5   record for Wednesday, June 19th, 2024.  It's 9:00 a.m.

 6   There is one matter set on the docket.

 7          I apologize for the air conditioning situation.

 8   We are working diligently to correct it, but sometimes I

 9   can't control what goes on at the courthouse, and this is

10   one of those situations.  All right.

11          23-34815, Galleria 2425 Owner, LLC.  Let me take

12   appearances first please and we'll just go around the room.

13   Go ahead.

14          MR. TROOP:  I'm standing up here, Your Honor.

15   Good morning, Your Honor.  Andrew Troop from Pillsbury

16   Winthrop Shaw Pittman on behalf of National Bank of Kuwait.

17   I am here today with my colleagues, Charles Conrad, Thomas

18   Morris, and Kwame Akuffo.  We have some people on the line

19   as well.

20          As a quick aside, Your Honor, thank you.  I meant

21   to thank you on Monday.  But we actually had summer

22   associates observing the hearing on Monday and taking up

23   your bandwidth.  And we appreciate that.

24          Our corporate representative and a witness,

25   Michael Carter, is also here today, Your Honor.
```

```
 1                THE COURT:  All right.  Thank you.  All right.
 2   The objecting parties.
 3                MR. BAKER:  Reese Baker on behalf of the Debtor.
 4                THE COURT:  Thank you, Mr. Baker.
 5                MR. BURKS:  Good morning.  It's Gray Burks, B-U-R-
 6   K-S, on behalf of 2425 WL.  Good morning.
 7                THE COURT:  Thank you.  Good morning.
 8                MR. SATHER:  Stephen Sather, also appearing on
 9   behalf of 2425 WL, LLC, Your Honor.
10                THE COURT:  Thank you so much.
11                MR. SHANNON:  Your Honor, just for the record
12   since we're here, RJ Shannon on behalf of the Chapter 7
13   Trustee, Christopher Murray.
14                THE COURT:  Mr. Shannon, does the Trustee intend
15   to take a position relative to plan confirmation?
16                MR. SHANNON:  The trustee supports confirmation,
17   although we did not file anything in support.  But we do
18   support the confirmation, Your Honor.
19                THE COURT:  You want to be involved in the witness
20   process at all?
21                MR. SHANNON:  Not unless it's the trustee being
22   questioned, Your Honor.
23                THE COURT:  Okay, that's fine.  All right.  Thank
24   you.
25                All right, Mr. Troop, I think your client is the
```

1    plan proponent.  So you have the burden.  So I'll let you

2    make an opening statement if you want to make one.

3           MR. TROOP:  Sure, Your Honor.  First I would like

4    to -- I do have a short opening statement where I suggest to

5    you how I think the day should go, talk about where we are

6    on a few things.

7           First, Your Honor, let's just sort of lay the land

8    in terms of what's in play today.  Right?  There were

9    several objections filed, mostly taxing authorities --

10          THE COURT:  Which both were withdrawn.

11          MR. TROOP:  They've been withdrawn.

12          THE COURT:  There are two pending objections right

13   now I'm aware of though.

14          MR. TROOP:  Exactly.  That's it.  Just two

15   pending.  You speak much faster than I do, Your Honor.  So

16   maybe Mr. Burks (indiscernible).

17          Your Honor, yesterday we spent some time with Mr.

18   Burks about some things at the hearing.  So let me tell you

19   what we have been able to agree to and what we haven't been

20   able to agree to.

21          We have agreed that between us there should only

22   be three witnesses today.

23          THE COURT:  Okay.

24          MR. TROOP:  Michael Carter, the trustee, Chris

25   Murray, and Mr. Choudhri.

1          We also agreed to the admission of all the

2     exhibits on our respective exhibits lists save two.

3          THE COURT:  So let's go ahead and do that now so

4     that it's on the record and we can just basically deal with

5     it.

6          So there's an exhibit list from 531.  Is that the

7     one you were making reference to?

8          MR. FITZMAURICE:  Your Honor, the bank's exhibit

9     list at 501.

10          THE COURT:  501.  We're going way, way back, huh?

11     Okay, so 501.  Any of the exhibit at 501 are exhibits that

12     we are not admitting?

13          MR. FITZMAURICE:  Yes.  We understand that 2425

14     objects to Exhibit 23, which is Mr. Carter's declaration,

15     and Exhibit 18, which we call on the list evidence of the

16     bank's ability to make its required plan payments.  But

17     that's the annual report.

18          THE COURT:  All right.  And so let's do one thing

19     at a time.  So as to 501, Mr. Burks, do you have any

20     objection to any of the exhibits save and except 23 and 18

21     which we'll deal with in due course?

22          MR. BURKS:  Only half of 2425 WL -- and I'm

23     looking at 501 Exhibits 1 through...

24          THE COURT:  501 actually only goes to 22 is what

25     I'm seeing.

1          MR. BURKS:  I have through 26.

2          MR. FITZSIMMONS:  So I think,  Your Honor, on the

3     list there are some that are to be filed.  And they were

4     filed in the future.  So they may actually have different

5     ECF references when they actually hit the docket.

6          THE COURT:  Okay.  So let me just make sure the

7     record is clear.  So I'm looking at the docket right now.

8     And I'll just show it to you.  It makes it easier.  Okay?

9          501 starts at Exhibit 1 and then goes through 21.

10    But 21 references Exhibit 22.

11         MR. FITZSIMMONS:  So I think for these, Your

12    Honor, as I understand the agreement it's all of these save

13    for, except for number 18.

14         MR. BURKS:  So at this point then from the

15    exhibits that Your Honor has called, to make the record

16    straight, Exhibits 1 through 17 --

17         THE COURT:  And again the problem with that, Mr.

18    Burks, is Exhibit 1 through 17 doesn't work electronically.

19    It's got to be by ECF number.  So that's the reason I'm

20    going ECF 501-1, dash two, dash three.  They don't

21    apparently match, which is part of the problem.  Yeah.

22    Maybe whoever is on the record.

23         MR. BURKS:  And what am I stipulating to?  Do I

24    have to look at each on the docket?

25         THE COURT:  Well, I haven't looked at 501.  I

1    don't know.  I mean -- but so you get to Exhibit --

2              MR. BURKS:  May I have a moment?  I see what

3    you're doing.  May I have a moment?

4              THE COURT:  Yeah.  Uh-huh.

5              MR. BURKS:  Mr. Troop will help me.

6              THE COURT:  And if you want to look -- I can pull

7    them up and show you what they are if you want to know.

8              MR. BURKS:  The way I understand it works is for

9    501 for the ECF numbers, Exhibit 1 is 501.1.

10             THE COURT:  That's correct.

11             MR. BURKS:  Exhibit 2 is --

12             THE COURT:  So the docket is going to reflect that

13   I admit exhibits by ECF number.  ECF 501-1, 501-2, 501-3.

14   The exhibit numbers mean nothing to me.

15             MR. TROOP:  Right.  So for your --

16             MR. BURKS:  I'm with you.

17             MR. TROOP:  Okay.

18             MR. BURKS:  May I see, Your Honor, will you click

19   on 501-18?

20             THE COURT:  Sure.

21             MR. BURKS:  And maybe scroll down?

22             THE COURT:  It's going to come.  It just takes a

23   minute to download.

24             MR. BURKS:  All right.

25             THE COURT:  That is 501-18.

1          MR. BURKS:  Can you scroll up?

2          THE COURT:  That's the top of the document.  If

3     you want to look at the top, it says 501-18.

4          MR. BURKS:  So what I stipulated to was 501-19.

5     May I see 17?

6          THE COURT:  Sure.  Hold on for one second.  Did

7     you say 17?

8          MR. BURKS:  Yes, please.

9          THE COURT:  Seventeen looks like it's marked

10    Exhibit 18.

11         MR. TROOP:  Your Honor, I can help clear this up.

12    Okay?

13         MR. BURKS:  Because I don't know...

14         MR. TROOP:  There is a disconnect in terms of

15    between this exhibit list and what actually got filed.  The

16    document that Mr. Burks wants to object to is the document

17    that is entitled Evidence of Feasibility, Your Honor.  And

18    we'll look for that exact ECF number for you and bring it up

19    and make it clear on the record that Mr. Burks has not

20    agreed to the admission of that exhibit.

21         THE COURT:  So let's just do this.  I'll

22    conditionally admit everything in 501 except whatever comes

23    up that we're not going to stipulate to.  Okay?

24         And Mr. Burks is grimacing, and I understand his

25    grimace.

1        MR. BURKS:  I don't know what I've just stipulated

2   to.  So I'm looking at a list that's apparently on the right

3   list.

4        THE COURT:  Well, I think it's the right list.  I

5   think it's just the way it's been filed.  And the problem is

6   how we're going to refer to it on the record.  So why don't

7   we --

8        MR. BURKS:  All right.  Let's try this.

9        THE COURT:  Okay.

10        MR. BURKS:  We can stipulate to everything except

11   in the exhibit entitled Evidence of NBK's Ability to Make

12   its Required Plan Payments and an exhibit called Carter's

13   Declaration.

14        With that said --

15        THE COURT:  Hold on.

16        MR. BURKS:  I know.  With that said, may I reserve

17   the right when I see an exhibit that I --

18        THE COURT:  To object to it.

19        MR. BURKS:  I didn't know that I was stipulating

20   to that I object to, that I may object to it.  Because this

21   is a little awkward because I don't know what I'm -- I don't

22   know what I'm stipulating to.

23        THE COURT:  That's fine.

24        MR. TROOP:  We're fine with that, Your Honor.  I

25   think conceptually we all understand that (indiscernible)

1    been reserved.

2         THE COURT:  All right.  Mr. Sather, do you have

3    something you want to say?

4         MR. SATHER:  I was just going to say that those

5    two documents were filed as one document at 514-2 as an

6    attachment to the bank's brief.

7         THE COURT:  Okay.  All right.  So the record is

8    clear, I am going to admit Exhibits 501-1 to 501-22 with the

9    exception of anything that references the evidence of NBK's

10   ability to make plan payments and then the Carter

11   Declaration plus Mr. Burks reserves the right to object to

12   any other document that basically comes up during testimony.

13        MR. BURKS:  Because 1 through 22 may include --

14   I'm looking at --

15        THE COURT:  I understand.  And I reserve your

16   right to object to it.  Okay?  So those are now done.

17        Is there other exhibits that Mr. Burks has that

18   we're going to stipulate to admissibility?

19        MR. TROOP:  Your Honor, we will stipulate to the

20   admissibility of all of the documents.  With respect to some

21   of them, Your Honor, that were filed yesterday, we

22   understand that they were intended to be used to address

23   some question as to whether or not the sale was going to

24   include furniture (indiscernible) equipment that it is

25   alleged that the trustee doesn't own.  And I believe that we

1    agreed yesterday that the asset purchase agreement is

2    intended only to purchase that which the Trustee can

3    transfer to us.  If the Trustee can't transfer to us --

4          THE COURT:  Which is the rule of law anyway.

5          MR. TROOP:  Exactly.

6          THE COURT:  So --

7          MR. TROOP:  No skin off our nose, Your Honor.  I'm

8    not -- I'm just saying I think --

9          THE COURT:  Mr. Burks, do you have exhibits that

10    you want me to put into evidence right now given the

11    stipulation?

12          MR. BURKS:  Yes, Your Honor.  I don't know the ECF

13    numbers.

14          MR. SATHER:  We've been using 499, which was

15    Reese's set.  And it would be 1 through 93.  Before we get

16    into all the supplemental ones.

17          MR. BURKS:  Yes, Your Honor.  At this point I

18    offer into evidence 2425 WL's Exhibits 499-1, 499-2, 499-3,

19    499-5, 499-6, 499-7, 499-8, 499-9, 499-10, 499-12, 499-34,

20    546 -- may see the Docket 541 -- 546.  So I understand what

21    you're doing.  And I just want to make sure that I'm

22    referring to the correct ECF numbers, Your Honor.

23          THE COURT:  It's the exhibit list you filed

24    yesterday.

25          MR. BURKS:  So what I called Exhibit 96, is that

1    546-1?

2            THE COURT:  I don't know without looking.  Bear

3    with me for one second.

4            MR. BURKS:  And, Mr. Troop, you're following along

5    with me so I can make sure our stipulation is accurate?

6            MR. TROOP:  We are keeping up.

7            MR. BURKS:  Thank you.

8            THE COURT:  That's it right there?

9            MR. BURKS:  Yes.  That is -- and that's 546-1?

10           THE COURT:  Mm-hmm.

11           MR. BURKS:  All right.  So offer into evidence

12   546-1, 546-2, 546-3, 546-4, 546-5, and 546-6.  May I see 6

13   on the screen just so I know that I've got this right?

14   That's what I offer at this time, Judge.

15           THE COURT:  All right.  Then I will admit based on

16   the lack of objection by Mr. Troop 499-1 through 10, 499-12,

17   499-34, 546-1, 546-2, 546-3, 546-4, 546-5, and 546-6.

18           MR. BURKS:  Reserve the right to of course call --

19   offer any rebuttal exhibits, Judge.

20           THE COURT:  That's fine.

21           MR. BURKS:  Thank you.

22           THE COURT:  Mr. Troop, back to you.

23           MR. TROOP:  Mr. Baker.  I'm sorry.

24           MR. BAKER:  On behalf of the Debtor, we would like

25   to also have the same exhibits that 2425 WL is offering.

```
 1            THE COURT:  They are admitted on the record and

 2   you can use them for whatever purpose you would like, Mr.

 3   Baker.

 4            MR. BAKER:  Thank you.

 5            THE COURT:  Thank you.

 6            MAN 1:  Your Honor, there are a number of people

 7   on GoToMeeting who I don't believe had an opportunity to

 8   announce their appearance, including the U.S. Trustee.

 9            THE COURT:  The only person that I'm currently

10   seeing is Mr. Choudhri, and I am taking notice of his

11   position.  So we're good to go.  Thank you.  Ms. Whitworth,

12   do you want to make an appearance?

13            MR. CHOUDHRI:  Your Honor?

14            THE COURT:  Mr. Choudhri, hold on for one second.

15   Ms. Whitworth, do you want to make an appearance?

16            MS. WHITWORTH:  Yes.  Good morning, Judge.  Jana

17   Whitworth on behalf of the United States Trustee.  Thank

18   you.

19            THE COURT:  All right.  Thank you.

20            MR. TROOP:  Thank you.

21            THE COURT:  Mr. Choudhuri, I note your appearance

22   for the record.  Do you have something else you want to say?

23            MR. CHOUDHRI:  Yes, Your Honor.  I would like to

24   make (indiscernible) and I would like to --

25            THE COURT:  Excuse me, sir.  I didn't -- go ahead.
```

1          MR. CHOUDHRI:  Yes, Your Honor.  I would like to

2    make an appearance and I would like to announce my

3    appearance and I would like to make an oral motion right

4    now, Your Honor, for continuance.  I have felt very, very

5    ill yesterday.  I'm not in good condition.  And I would

6    refer to ECF number document 442-1, which I presented for a

7    continuance that I believe was denied, Your Honor.  But

8    since then I have felt very, very ill yesterday and I am not

9    in good condition.  And so I don't want to be forced to go

10   forward.  So I would ask for a very short continuance, Your

11   Honor.  So I would like to make an oral motion of that due

12   to my stroke that I am -- that I suffered from.

13          And then second, the doctor on the 6th and 7th of

14   June and I was advised by the cardiologist that I should not

15   take on any stress or work until July 7th.  I've been in the

16   hospital fighting for my health, I'm fighting for my

17   finances.  So I would urge for -- an oral motion here for an

18   emergency continuance of this hearing.  That's my first oral

19   motion, Your Honor.

20          THE COURT:  All right.  Mr. Choudhri, let me rule

21   on your oral motion.  And let me be clear for the record.

22          The first problem you have, Mr. Choudhri, is the

23   fact that we have at this point in time one, two, three,

24   four, five, six, seven, eight, nine lawyers in the courtroom

25   who are all billing at very, very high rates.  And for you

1    to come in at the last minute and ask for a continuance I

2    think is unfortunately too little too late.

3          I also will state for the record, Mr. Choudhri,

4    that you are a little bit like the boy who cries wolf.

5    Okay?  I've seen an emergency motion to continue this

6    hearing based on a stroke.  Two days later you appeared at a

7    hearing.  You appeared at a nine-hour hearing the other day

8    where you appeared to do just fine where counsel got up and

9    said that you were suffering so badly that you couldn't even

10   participate and you participated a great deal.  Okay?

11         I hold all those things against you, Mr. Choudhri.

12   I am going to deny your motion.  Thank you.

13         Do you have another motion you want to make?

14         MR. CHOUDHRI:  I do, Your Honor.  I would like to

15   make a motion because when the motion for continuance was

16   made by 2425 WL, as I walked in the courtroom, I was asking

17   to make a motion for a continuance.  Your Honor would not

18   hear it --

19         THE COURT:  I am denying any sort of request for a

20   continuance at this point in time, Mr. Choudhri.  If that's

21   what you intend to argue or make a motion for, I'm not going

22   to hear it.  Do you have some other motion you want to make?

23         MR. CHOUDHRI:  I do, Your Honor.  I would make a

24   motion based on the fact that after that motion for

25   continuance was filed, Your Honor went outside the record to

1    investigate the motion.  And I believe Your Honor is biased

2    against me and investigating the case outside of the record

3    that was before you.  You had made some comments, Your

4    Honor, that you had spoken to maybe --

5              THE COURT:  I did speak to Judge Isgur about your

6    appearance in front of him.  That's correct.  I don't

7    consider that to be improper our outside the record or

8    create any sort of problem for me hearing your case.

9              MR. CHOUDHRI:  Right, well --

10             THE COURT:  And so I will acknowledge on the

11   record, I did do that.

12             MR. CHOUDHRI:  So my mental abilities are limited

13   --

14             THE COURT:  Mr. Choudhri, I'm going to cut you

15   off.  I've ruled on your motion.  We're done.  All right?

16   You may participate in this hearing.  I'm willing to let you

17   participate.  I'm willing to let you make whatever arguments

18   you want to make.  I'm not continuing this hearing.  Mr.

19   Troop, back to you.

20             MR. CHOUDHRI:  Your Honor --

21             MR. TROOP:  Thank you.

22             MR. CHOUDHRI:  -- are you denying the motion --

23             THE COURT:  Mr. Choudhri, no.  I already denied it

24   on the record, Mr. Choudhri, for all the reasons I just

25   said.  Okay?  Thank you.  Thank you.

1          MR. CHOUDHRI:  The motion for -- excuse me, Your

2     Honor.

3          THE COURT:  It's denied.  Thank you.

4          Mr. Troop?

5          MR. TROOP:  Thank you, Your Honor.  Why don't we

6     stay on some procedural housekeeping matters.

7          THE COURT:  Sure.

8          MR. TROOP:  This morning, Your Honor, there was a

9     witness list and exhibit list filed by Jetall, which is an

10    affiliate of Mr. Choudhri.  They have not objected.  They

11    don't have an objection on file.  And as far as I can tell -

12    - I mean, I don't know whether they have a lawyer on the

13    phone or not, but there are entities, Your Honor.  That

14    strikes me as late, inappropriate ambush and the like.  And

15    I would move that that witness list and exhibit list be

16    stricken.

17         THE COURT:  And is that -- I'm not seeing that on

18    the record.  Is it just -- I mean...

19         MR. TROOP:  Try 548, Your Honor.  ECF 548.

20         THE COURT:  Okay.  Bear with me for one second.

21    So let me just be clear.  I came in the courtroom at 8:00

22    and set up my computer system.  All right?  It loads the

23    docket at that point in time.  So the record is clear, this

24    is what the docket reflects.  It reflects only the 547,

25    which means it was filed after 8:00 this morning.  All

1    right?

2              MR. TROOP:  Yes, Your Honor.

3              THE COURT:  I'm going to refresh now and look at

4    it.

5              There is an exhibit witness list followed by

6    Jetall Companies on -- after 8:00 this morning at 548.  I'm

7    going to find that it's untimely, that it's late, that the

8    objection deadline for objections to confirmation have

9    passed and that Jetall Companies Inc. can't participate in

10   the confirmation hearing.  And so the record is clear, the

11   Court spent a great deal of time preparing for this hearing.

12   There were at the time of my review after the objection

13   deadline four objections to confirmation.  286, which is the

14   City of Houston objection that has been withdrawn; an

15   objection by CC2 which was filed late, which I was going to

16   disallow but was also withdrawn; an objection by the debtor

17   at ECF 409 and an objection by 2425 WL LLC at 401.  Those

18   are the two objections I plan to hear.  All right?  Thank

19   you.

20             MR. TROOP:  In that regard, Your Honor, just again

21   to make the record clear, 2425 WL filed a supplemental

22   objection on Friday, on 5/26.  We have filed a response to

23   that saying it's both untimely, the three new objections

24   that were raised, the reasons given, which were we

25   identified them after the deadline, we identified clearly

1   how there's nothing in there that wasn't known by the

2   original deadline --

3            THE COURT:  Hold on one second.  Let me mute

4   everybody on the line.  Just mute everybody.  Thank you so

5   much.

6            MR. TROOP:  I'm sorry, Your Honor.

7            THE COURT:  I'll come back to the parties online.

8   Go ahead.

9            MR. TROOP:  And, Your Honor, we identified that it

10  was all -- everything they needed to know they knew by the

11  time the original June 3rd objection.  They will argue on

12  one of them with regard to voting that the summary of votes

13  wasn't filed until June 7th -- on Friday the 10th as I

14  recall.  But it was perfectly clear that the NBK votes were

15  being voted in favor of the plan.  There was no reason to

16  wait ten days, to the Friday before the original hearing

17  that was scheduled to file at the end of the day

18  supplemental objections on things that were at least well

19  known for ten days.  That's just unfair, Your Honor.  It is

20  additional ambush.

21           But I can address the merits as well of that

22  particular one when you'd like.  But effectively I think --

23           THE COURT:  So let me just make this ruling on the

24  record.  The deadline for filing objections to the plan was

25  June 3rd, 2024.  All right?  If it truly is a supplemental

1    response that simply basically amplifies what's previously

2    been filed, I am more than happy to hear it.  To the extent

3    that it raises new objections, I'm not going to hear it.

4    It's not timely.  Thank you.

5         MR. TROOP:  And again, Your Honor, I misspoke.

6    That supplemental objection was filed on Sunday, the day

7    before the hearing and not the Friday before the hearing.

8    The record will show what it shows, Your Honor.

9         THE COURT:  It shows what it shows.  But again

10   what's important is the reason the Court sets deadlines is

11   because it then enforces those deadlines.  Thank you.

12        MR. TROOP:  Thank you, Your Honor.  So with that,

13   Your Honor, the way I think I would like -- I propose we

14   proceed today --

15        THE COURT:  Go ahead.

16        MR. TROOP:  -- is that I'm going to give a very

17   high-level overview of what we're here for today and what I

18   at least see as the significant issues for you to decide.  I

19   would yield to the objecting parties and ask them to do the

20   same at the high level.  (indiscernible) witnesses at the

21   end.  Mr. Akuffo, our colleague, will go through the

22   confirmation requirements and discuss how they've been

23   satisfied to sort of wrap it up.  Then I will probably

24   address any other issues that have been raised during the

25   course of the day.  Although I guess we have to go last as

1    the moving party.  So right before we talk, they get to talk

2    about what they think about confirmation.  Sorry about that,

3    Your Honor.

4              THE COURT:  All right.

5              MR. TROOP:  Sorry about that.

6              Your Honor, at a very high level we are here today

7    on the confirmation of the liquidating proposed by NBK

8    today.  There is -- there is no other alternative available

9    and all of the confirmation requirements have been

10   satisfied.

11             Your Honor, you have made perfectly clear that the

12   issue that appears to be foremost in the Court's mind and

13   the parties' minds based upon what's been filed so far today

14   is whether this plan has been proposed in good faith.

15             And in that regard, Your Honor, I think there's

16   really no dispute about the background here that led to this

17   case.  A loan that wasn't paid, an effort to foreclose.

18   Multiple, multiple pieces of litigation in state court, a

19   Chapter 11 filing on the eve of a foreclosure, a dismissal

20   by Judge Lopez, a refiling again on the eve of the

21   foreclosure, a motion by NBK to convert the case because it

22   was very clear that this case, this asset required an

23   independent fiduciary to manage its going-forward basis.

24             At that hearing, you decided not to appoint -- not

25   to convert the case, but rather to appoint a Chapter 11

1    Trustee.  Mr. Murray became the independent fiduciary.  We

2    were the secured creditor.  We are the secured creditor, the

3    largest secured creditor.  Exclusivity terminated and we

4    needed a plan -- and this is in the colloquial sense -- to

5    move this case forward to conclusion.  And the viable way to

6    do that was to propose a plan of reorganization since we

7    were in Chapter 11.  We have the right to do so, and we did.

8    And it is a fair plan, Your Honor.  It was proposed in good

9    faith.  You'll hear testimony that as the fiduciary for the

10   estate, we negotiated with Mr. Murray about the plan.  The

11   plan terms were changed to accommodate some, not all of its

12   requests, like you would expect in any negotiation.  And

13   then we move forward in a transparent and open manner.

14         We have proposed a plan in good faith that, yes,

15   provides NBK with releases of estate claims and we have

16   proposed a plan of reorganization which enforces that

17   release both through injunctions and a gatekeeping

18   provision.  But the gatekeeping provision, Your Honor, is

19   not at all implicated by Highland Capital in the decision by

20   the Fifth Circuit where the issue was whether or not

21   gatekeeping could be used in that case to protect someone

22   who was arguably not on the narrow list but nonetheless was

23   sort of a quasi-fiduciary in a third-party release kind of

24   way.  All claims, any claims related to the Debtor or the

25   estate were typically post-petition exculpation claims.

1    Emphasize that, Your Honor.  The issue in Highland was

2    exculpation.

3         The plan has been modified to make it clear that

4    the only party receiving exculpation is the Chapter 11

5    trustee.  I don't think there can be any dispute that the

6    Chapter 11 Trustee is a fiduciary covered by (indiscernible)

7    entitled to be exculpated and protected both by injunctions

8    and by gatekeeping.

9         So the only question is whether on the facts of

10    this case, which are not dissimilar in some ways to

11    Highland, having a non-debtor who is very litigious and

12    arguably trying to pursue estate claims cabined in some way

13    in terms of this conduct or the company's conduct.  Similar

14    there, but dissimilar because the gatekeeping function as it

15    relates to NBK is only with respect to released claims.

16    Released claims against NBK are only estate claims.

17         And the alternative, Your Honor, is that every

18    time NBK would get sued, they would remove the case to this

19    Court and seek to enforce the injunction.  And here the

20    process is that parties around the table, around the video,

21    around anywhere, have to come here and say to you I am

22    pursuing something that's not an estate claim, not

23    frivolous, and I get to pursue it.  And we can argue in

24    front of you, and you decide.  But at the end of the day

25    it's only estate claims.

1          And in that regard, Your Honor, doesn't impact

2    the good faith nature of the plan, doesn't impact anything

3    else.

4          And back on good faith, Your Honor, the issue is

5    whether the plan was proposed in good faith.  The focus on

6    that is predominantly on conduct during the Chapter 11 and

7    in connection with preparing the plan and proposing the

8    plan.  It's not the things that you heard on Monday.  It's

9    not the things that you heard about prepetition conduct.

10          Embedded in here is a settlement of those claims.

11   And the Trustee testified on Monday and we expect he will

12   testify again today that in his independent reasonable

13   judgement, that's a good settlement for the estate.  But I

14   note, Your Honor, and I hope we are careful today, subject

15   to your rulings of course, that we don't retread a

16   tremendous amount of ground that was addressed on Monday.

17   They are two different motions.  I understand there were

18   objections sustained that pushed certain issues to here.

19   Those issues should absolutely be addressed here.

20          But the fundamental question, which you ruled on,

21   the Court holds that there must be some sufficient dispute

22   between the parties.  And all the parties are here, Your

23   Honor.  There's no one here who wasn't there who didn't have

24   a full opportunity that it can find cause for disallowing or

25   limiting credit bidding.  Here it does not find any such

1    cause and denies the motion in its entirety.

2           But you went on, Your Honor, and you also found

3    the movants, and especially (indiscernible) go to great

4    lengths to pass blame for their nonpayment to NBK.  The

5    settlement payment.  In effect, that he or others could not

6    pay due to the actions of NBK.  You found that on a review

7    of the documentary evidence, and you could take judicial

8    notice of all the documentary evidence in this case, does

9    not believe -- does not believe these allegations.  Does not

10   believe these allegations.  There's no credible claim there

11   to waste our time on today.

12          And so, Your Honor, you may hear us object.  A lot

13   of it moves into that.  And we hope now that you will --

14   just a preview in terms of what our thinking on that would

15   be.

16          Those seem to us to be the big issues.  There

17   can't be an issue about feasibility, there can't be an issue

18   about classification -- that is that there are classes.

19   There are so many things in that list that there cannot be

20   issues about, Your Honor.  So I hope that we focus today on

21   the ones that are important and legitimately

22   (indiscernible).

23          THE COURT:  All right.  Let me hear from the

24   debtor first.  Mr. Baker?

25          MR. BAKER:  Your Honor, we would request that you

1  allow 2425 and Mr. Burks to go forward first at this point

2  in time.  We are generally filing along with what he is

3  doing at this point in time.

4        THE COURT:  I'm happy to do that if you want to

5  waive your opening argument.  If not, I want to hear it.

6        MR. BAKER:  I'll waive my opening argument.

7        THE COURT:  Thank you.  Mr. Burks?

8        MR. BURKS:  That was interesting.  To borrow from

9  a line from a movie, almost everything that that man said I

10  disagree with.  And here's why.

11       We don't have the burden of proof of confirmation.

12  The proponent, NBK, does.  There are 16 elements that

13  they're going to have to prove up in 1129.  Maybe this plan

14  conceptually could have been confirmed.  Technically, it's

15  flawed.  So flawed that it can't possibly meet the 16

16  elements of 1129.  We talk about what the scope of the

17  objections are.  I think the objection of 2425 WL is pretty

18  clear.  The objection of the Debtor is pretty clear on some

19  of the technical faults.

20       The first thing that counsel for NBK said was this

21  is the only option before the Court as far as the Chapter 11

22  plan.  Well, first of all, that was NBK's choice as to what

23  was in the plan or not in the plan.  It's an aggressive plan

24  with respect to classification, it's an aggressive plan with

25  respect to releases, and it's an aggressive plan in that he

1    only ballot accepting the plan is by the plan proponent.

2    And we'll get to that in a minute when we talk about

3    1129(a)(10).

4         I don't have the burden to prove that there is one

5    accepting class; NBK does.  And the proponent is the only

6    one who accepted it.  And so we have the gatekeeping issue

7    of do you even have one accepting class within the

8    definition of 1129(a)(10).  The answer is a resounding no.

9         Surprisingly no.  Don't know why we don't, but we

10   don't.  Maybe if the balloting had been -- the solicitation

11   had been different, I'm not saying you can't get an

12   accepting class other than the proponent.  But as we stand

13   here today right now -- or more accurately as of 8:00 a.m.

14   today -- we don't have an accepting class for two reasons.

15   Here's why.

16        The proof of claim on file by NBK has been

17   objected to.  It has not been allowed.  It has not been

18   estimated.  No motion on notice and hearing has been filed.

19   Judge Rodriguez in In re Bressler said that's fatal to

20   confirmation as we stand here right now.  Can it be fixed

21   later?  I don't know.  I don't know why they didn't file the

22   motion to estimate the claim.  But we don't have a creditor

23   with an allowed for voting purposes claim on file.  That

24   wasn't my choice.  There's a lot of counsel in this room

25   that know how to practice bankruptcy law.  I can't

1    substitute for them.  And I can't relieve them of the burden

2    of proof of showing that there's one allowed correct.  But

3    there's something else that's happening here.  Of course we

4    research whether or not the proponent of the plan can be the

5    one -- could be if it has an allowed claim or an allowable

6    or an estimated claim -- of course we'll research whether

7    they could be.  And the answer in all the six cases we found

8    is they could be.  But here we have a problem.  We have NBK

9    who has a note, has a proof of claim.  And in that proof of

10   claim, they can do really whatever they want with the debt.

11   They can reduce it, they can eliminate some of it, they can

12   do anything they want with their lien.  And as the proponent

13   of the plan, they've chosen to do just that.  They've

14   changed their rights.  They've exercised their rights under

15   the note and said here's how we are going to be treated.

16   That's not an impaired claim.  They've exercised their note

17   rights and set forth in this plan how they will accept and

18   agree to be paid.  They've exercised their note rights.

19          Is it a novel argument?  Yes.  But is it a

20   gatekeeping argument that they have the burden of proof to

21   overcome?  Yes.  And here's why it's important.  They didn't

22   get any other votes for the plan.  That's why it's

23   important.  I don't know if they tried.  I don't know why

24   they didn't.  But you're sitting here right now with a plan

25   that can't satisfy 1129(a)(10).  We wish it could maybe.

```
 1            Let's go back to the first thing he told you; it's
 2   the only option you have.  Not true.  There's nothing that
 3   prevents you from converting this case to Chapter 7.  And
 4   that would take care of a lot of the issues here.  When we
 5   get to the issues of what's the value of the claims being
 6   released, when we get to the issues, the technical issues of
 7   the plan, all will go away.  No one is ever going to be able
 8   to prove that in between the time of today and the time this
 9   case may be converted that the value of the property is
10   going to go down.  It's not going to be able to be put into
11   evidence.
12            Can another party file a plan?  Can NBK file an
13   amended plan?  My point today is if what you had as of 8:00
14   a.m. today is technically not (indiscernible).  There's more
15   to this.  You bet it's an aggressive release.  And it's not
16   just a release...
17            THE COURT:  Go ahead.
18            MR. BURKS:  It's not a release of just -- or an
19   exculpation of just the trustee.  On Page 8 of the plan,
20   Paragraph 78, it says released parties means, A, the Chapter
21   11 Trustee.  But it doesn't stop there.  B, NBK.  C, the
22   liquidation trustee.  D, each related party of each entity
23   in Clause A through D.  Former and current equity holders
24   and their affiliates and related parties are not released
25   parties.  In other words, Mr. Choudhri or anybody else.
```

```
 1            So I didn't write the definition of released

 2    parties.  And I'm not going to mince words on the Fifth

 3    Circuit caselaw on exculpation versus gatekeeping versus

 4    released parties because a creditor has never been -- a

 5    creditor who is not participating in the reorganization of a

 6    debtor has never been gatekept.  I don't know if that's a

 7    word or a phrase.  Maybe it is now.  Can you be gatekeep or

 8    gatekept if you have absolutely nothing to do with the

 9    reorganization?  No.

10            Maybe the Purdue Pharma case might change that

11    under certain circumstances.  The facts of that case are so

12    different than the facts of this case that there's no way

13    that that's going to be precedent here.

14            What's happened is, Judge, the exculpation or

15    release or gatekeeping provision is a technical bar to

16    confirmation.  Can this plan go forward and be confirmed

17    without it?  Sure it can.  If the proponent chooses to.  But

18    what they want you to do is not only to confirm a plan, but

19    to adjudicate today, right now here, three sets of claims

20    where with all respect certainly we didn't put on evidence,

21    we weren't trying those cases two days ago.  Couldn't have

22    if we tried.  You wouldn't have let us because you ruled

23    properly on the evidence as to what the issue was before us

24    two days ago.

25            But today they want you to rule on the merits of
```

1    all pending litigation against NBK.  And if they disagree

2    with my point, then simply put in the confirmation order

3    that any limited liability claim against NBK and any pending

4    adversary proceedings removed or otherwise against NBK are

5    not included in any injunctions, releases, or exculpations.

6    If they're not, they're not.  We can just say it.  And we

7    may be over very quickly here.  If their intent is not to

8    have this broad, overreaching release, make it clear.  If

9    their intent is to get a plan confirmed by the

10   classification issues by including classifying claims the

11   way Mr. Sather says are technically flawed, one vote, one

12   party, then we've got a problem.  We have a technical

13   problem.  I didn't write 1129, but they have to follow 1129.

14   And they didn't do it here.  Thank you.

15           THE COURT:  Thank you.  All right, Mr. Troop, back

16   to you.  I'll hear your first witness.

17           MR. TROOP:  I was just going to say I don't think

18   you expect me to respond, Your Honor.

19           THE COURT:  No, I don't.  I just expect you to

20   call a witness.

21           MR. TROOP:  So we'll call the witness and I'll

22   turn this over to Mr. Fitzmaurice, Your Honor.

23           THE COURT:  Thank you.

24           Mr. Carter, do you want to come forward, please?

25   Again, if you'll stand at the microphone.  I know we just

1    did this the other day.  I'll swear you in and then you can

2    be seated.  And I apologize to you for the lack of air

3    conditioning.

4            Please raise your right hand to be sworn.  Do you

5    swear or affirm to tell the truth, the whole truth, and

6    nothing but the truth, so help you God?

7            MR. CARTER:  Yes, I do.

8            THE COURT:  All right.  Please be seated.  Sir,

9    you know, the drill.  Please speak into the microphone.

10           Mr. Fitzmaurice, I'll turn on the podium if you

11   want to present from there.

12           MR. BURKS:  Excuse me, Judge?

13           THE COURT:  Yes.

14           MR. BURKS:  Mr. Choudhri had his hand raise.  I

15   don't know if he's muted or not or --

16           THE COURT:  He is muted.  And I don't know why he

17   would be trying to speak at this point in time.

18           MR. BURKS:  Yes, Your Honor.  I just wanted to

19   make sure you saw it.

20           THE COURT:  I saw it, yeah.

21           MR. BURKS:  Yes, Your Honor.

22           THE COURT:  Thank you.

23               DIRECT EXAMINATION OF MICHAEL CARTER

24   BY MR. FITZMAURICE:

25   Q    Good morning, Mr. Carter.  Mr. Carter, are you

1    currently employed at National Bank of Kuwait?

2    A    Yes.

3    Q    When did you join the bank?

4    A    At the end of May of 2018.

5    Q    Was that after the bank's loan to the Debtor was made?

6    A    Yes.

7    Q    I'm not trying to be obnoxious with this question, but

8    is this your first job out of college?  Is your job at the

9    bank your first job since you graduated from college?

10   A    No.

11   Q    Have you worked in banking for most of your career?

12   A    Yes.

13   Q    About how long have you worked in banking?

14   A    Since 1988.

15   Q    During the course of your career in banking, have you

16   focused on any particular industry?

17   A    Real estate.

18   Q    And has that focus on real estate continued during your

19   time at the National Bank of Kuwait?

20   A    Yes.

21   Q    Are you generally familiar with the bank's loan to the

22   Debtor?

23   A    Yes.

24   Q    And how are you familiar with the bank's loan to the

25   Debtor?

1   A     I am the RM for the loan, Relationship Manager.

2   Q     Thank you.  When did you assume that role as

3   Relationship Manager?

4   A     Around the end of 2018.

5   Q     So from the time that you assumed that role as

6   relationship manager up until today, have you maintained

7   that role during that entire period?

8   A     Yes.

9   Q     And during that period of time is there anybody else at

10  the bank who serves as relationship manager?

11  A     Not as relationship manager, no.

12  Q     Can you generally describe for the Court what your

13  responsibilities are as relationship manager for the loan to

14  the debtor?

15  A     To do annual reviews on the status of the loan and

16  provide those to the credit committees, monitor the interest

17  payments and other conforming covenants that are in the loan

18  agreement.

19  Q     You mentioned credit committee.  Do you sit on the

20  credit committee?

21  A     No.

22  Q     In your capacity as a relationship manager, do you make

23  recommendations to the credit committee?

24  A     Yes.

25  Q     Do you prepare reports that are submitted to the credit

1   committee?

2   A    Yes.

3   Q    As far as you are aware, since the time that you became

4   the relationship manager for the loan to the Debtor, have

5   there been any reports concerning the loan submitted to the

6   correct committee that you weren't involved in preparing?

7          MR. BURKS:  Objection.  There is no way that he

8   can know what he hasn't done.  Calls for hearsay.  Calls for

9   speculation.  He doesn't know -- he is not a member of the

10  credit committee.  He doesn't know what the credit committee

11  has received, Your Honor.

12         THE COURT:  I'll sustain the objection and let you

13  rephrase it and see if you can get it in another way.  Thank

14  you.

15  BY MR. FITZMAURICE:

16  Q    In the course of your duties as relationship manager

17  for the bank, when a credit committee makes a decision

18  relating to the loan, are you generally informed of that

19  decision?

20  A    Yes.

21  Q    Has there ever been a decision that you've been

22  informed of where you were not involved previously in

23  preparing some kind of submission to the credit committee?

24  A    No.

25  Q    So has there ever been a decision by the credit

1    committee that you were informed of that you were surprised

2    about or you had no idea that was happening?

3    A      No.

4    Q      Have you issued any reports to the credit committee

5    concerning this bankruptcy case?

6    A      Yes.

7    Q      Have you made any recommendations to the credit

8    committee concerning this bankruptcy case?

9              MR. BURKS:  Objection.  Best evidence rule.  If

10   the recommendations or if the reports are oral, hearsay.  If

11   they are written, I would like to see them in evidence,

12   please.

13             THE COURT:  If they are oral, I don't think they

14   are hearsay.  If they are written, then I think there is

15   best evidence.  I'll sustain the objection on that

16   particular part.  But I'll let him flesh it out.  He hasn't

17   said whether they were written or not.

18             MR. BURKS:  Yes, Judge.

19             THE COURT:  Thank you.

20   BY MR. FITZMAURICE:

21   Q      Have you had any discussions with the credit committee

22   concerning this bankruptcy case?

23   A      It has been mentioned in credit reviews.  We do monthly

24   credit reviews for troubled loans.

25   Q      Is the loan to the Debtor classified as a troubled

1    loan?

2    A    Yes.

3            MR. BURKS:  Objection.  At this point he is

4    getting into an area of questioning where he needs a credit

5    committee member who has got personal knowledge of the

6    reports that he's talking about right now, Judge.

7            THE COURT:  I'll overrule that objection.  Go

8    ahead.

9    BY MR. FITZMAURICE:

10   Q    I think you answered the question, but there was a

11   pending objection so --

12           THE COURT:  It doesn't make a difference.  I heard

13   it.  I overruled the objection.  Go ahead.

14   BY MR. FITZMAURICE:

15   Q    Is the bank's loan to the Debtor in default?

16   A    Yes.

17   Q    Was the filing of the bankruptcy case an event of

18   default?

19   A    Yes.

20   Q    Are you aware of any other defaults under the loan

21   agreement?

22   A    Yes.

23   Q    Can you describe any of them for me?

24   A    Principally failure to pay interest.

25   Q    Let me ask you about that.  Did the loan documents call

1    for the payment of principal and interest during the term of

2    the loan?

3              MR. BURKS:  Objection.  I don't have enough

4    foundation to know what this gentleman had analyzed in terms

5    of the loan documents or this account history.  We are

6    assuming he has looked at the loan documents and the account

7    history, but he hasn't told us he has.  Objection,

8    foundation.

9              THE COURT:  I will sustain the objection as to

10   foundation.  Let's lay a better foundation for the record,

11   please.  Thank you.

12   BY MR. FITZMAURICE:

13   Q    Mr. Carter, are you familiar with the loan documents

14   for the loan -- are you familiar with the loan documents

15   relating to the bank's loan to the Debtor?

16   A    Yes.

17   Q    Have you reviewed those loan documents?

18   A    Yes.

19   Q    Have you reviewed them during the course of your

20   employment as the relationship manager for the bank's loan

21   to the Debtor?

22   A    Yes.

23   Q    Are you generally familiar with the terms of those loan

24   documents?

25   A    Yes.

1    Q    Do you know when the loan was made?

2    A    It was mid-May 2018.

3    Q    Do you know what the original term of the loan is?

4    A    So five years.

5    Q    So if my math is right, mid-May 2018 plus five years is

6    May of 2023.  Does that sound right to you?

7    A    Yes.

8    Q    Do you have an understanding of as to whether or not by

9    its terms the loan matured in May of 2023?

10   A    Yes.

11   Q    And did it in fact mature in May of 2023?

12   A    Yes.

13   Q    Do you know whether the loan documents call for the

14   payment of principal and interest during the term of the

15   loan?

16   A    It was an interest-only loan.

17   Q    And how was principal to be repaid under the loan

18   documents?

19   A    The loan amount was $51,675,000.

20   Q    And when was that due under the loan documents?

21   A    Mid-May 2023.

22   Q    So the full principal balance was due at maturity.  Is

23   that right?

24   A    Yes.

25   Q    And how frequently was the Debtor required to make the

1    interest-only payments?

2    A     Monthly.

3    Q     Did the Debtor make all those required payments?

4    A     No.  They stopped in mid-2020.  And then there was an

5    interest reserve that had been established at closing, for a

6    years' worth of interest.  So that was tapped for the

7    following year until mid-2021.

8    Q     And at some point was the interest reserve exhausted?

9    A     Yes, mid-2021.

10   Q     Do you know if the loan agreement generally required

11   the Debtor to pay real estate taxes when they were due?

12   A     Yes.

13   Q     And it in fact required those taxes to be paid?

14   A     Yes.

15   Q     And in an event of default during the loan agreement

16   were those taxes not to be paid?

17   A     Yes.

18   Q     Are you aware of whether the Debtor in fact paid real

19   estate taxes?

20   A     It did not make the 2019 tax payment and made no

21   further tax payments since then.  But it did borrow the

22   money from a lender to pay those taxes.

23   Q     Just to make sure that I understand, did the Debtor pay

24   real estate taxes due for the year 2019?

25   A     No.

1    Q    Do you know whether a lien was recorded against the pt

2    relating to those taxes that were not paid?

3    A    Yes.

4    Q    Is the filing of that lien an event of default under

5    the loan agreement?

6    A    Yes.

7    Q    Were real estate taxes paid for the year 2020?

8    A    Not by the borrower.

9    Q    Was ultimately a lien recorded against the property for

10    the tax year 2020 as a result of the failure to pay the tax

11    -- I mean -- let me start over again.

12        As a result of the debtor's failure to pay real estate

13    taxes in 2020, was a lien filed against the property?

14    A    Yes.

15    Q    Do you know if the Debtor paid real estate taxes for

16    the year 2021?

17    A    Similarly they borrowed the money from a tax lender and

18    assigned the county tax lien to that lender.

19    Q    And did the Debtor pay real estate taxes for the year

20    2022?

21    A    Same situation.

22    Q    2023?

23    A    Same.

24    Q    And each one of those failure to pay, are they separate

25    events of default under the loan agreement?

1    A    Yes.

2    Q    After the bank exhausted the funds in the interest

3    reserve, did it do anything to attempt to enforce its

4    rights?

5    A    Filed for foreclosure.

6    Q    Was it successful in completing that foreclosure?

7    A    No.

8    Q    Why not?

9    A    The borrower filed for a TRO, temporary restraining

10   order.

11   Q    Did the bank ultimately attempt to resolve these

12   disputes with the borrower?

13   A    We entered into a settlement agreement with the

14   borrower.

15   Q    And are you generally familiar with that settlement

16   agreement?

17   A    Yes.

18   Q    I'm going to show you what's -- what was filed at ECF

19   508-7.  I think this document is -- was entered into

20   evidence on Monday and we neglected to include it in our

21   discussions earlier this morning, so we'll look at it now.

22        MR. BURKS:  Well, excuse me.  For the record, it's

23   been entered into evidence today.  I don't -- we're not

24   going back -- the record on Monday I assume does not apply

25   to the record here, Judge.  It's been admitted into evidence

1  today.

2       MR. FITZMAURICE:  And I'm not disputing -- my only

3  point was if I had remembered, I would have asked you to

4  stipulate to this this morning when we talked about

5  stipulations for today.  And I didn't.  So that's why I'm

6  showing it to him now.

7       MR. BURKS:  I thought I stipulated to the

8  admission of this.  And if I haven't --

9       MR. FITZMAURICE:  I'm happy to take that

10 stipulation now.

11      MR. BURKS:  Stipulate into evidence admission for

12 the document what is at ECF 508-7?

13      MR. FITZMAURICE:  Yes, that's right.

14      MR. BURKS:  Stipulated that it's admissible,

15 Judge, for whatever it says.

16      THE COURT:  I'll admit 508-7 on stipulation.

17 Thank you.

18       (Exhibit 508-7 admitted into evidence)

19 BY MR. FITZMAURICE:

20 Q   Is this document, 508-7, is this the settlement

21 agreement that the bank entered into with the Debtor and Mr.

22 Choudhri and (indiscernible) Galleria LLC?

23 A   Yes, I believe so.

24 Q   Okay.  Who is (indiscernible) Galleria LLC?

25 A   That was the mezzanine lender.

1          MR. FITZMAURICE:  Your Honor, my (indiscernible)

2    have disappeared and I'm going to ask if my colleague could

3    open up the document.  I am not sure why it's not

4    projecting.

5          THE COURT:  It's the way the PDF is trying to

6    write.  But I can move it over here if you want to move it

7    to that table.  (indiscernible) plug in.

8    BY MR. FITZMAURICE:

9    Q    While we're doing that, let me ask you an unrelated

10   question while we get those organized.  You know what?  Mr.

11   Akuffo is faster than I am.

12         MR. FITZMAURICE:  Kwame, you can go to Section

13   3.1A, please.

14         THE COURT:  Go ahead.

15   BY MR. FITZMAURICE:

16   Q    Mr. Carer, I'm showing you Section 3.1A of the

17   settlement agreement.  Do you see that in front of you?

18   A    Yes.

19   Q    And do you see that in the settlement agreement that as

20   of the effective date of the settlement agreement, the

21   borrower acknowledges the debt that was owed to NBK?

22   A    Yes.

23   Q    And it acknowledged that that was owed without the

24   setoff claim, counterclaim, or deduction of any nature

25   whatsoever?

```
 1   A    Yes.

 2   Q    And all of those things I just asked you about, all of

 3   those were expressly weighed by the settlement agreement.

 4   Is that right?

 5   A    Yes.

 6   Q    Okay.  Can you scroll down just a bit?  Thank you.

 7        And in the settlement agreement you see that in Section

 8   3.1B the Debtor and Mr. Choudhri and the mezzanine lender

 9   acknowledged existing events of default under the loan

10   documents?

11   A    Yes.

12   Q    And that all of those events of default existed, again,

13   without defendant's setoff -- you can read the language for

14   yourself.

15   A    Mm-hmm.

16   Q    Is that right?

17   A    Yes.

18   Q    Okay.

19        MR. BURKS:  Your Honor, at this point I object to

20   the testimony of this witness.  To the extent that he's

21   reading from what the terms of the settlement terms are.

22   That's best evidence rule.  It says what it says.

23        To the extent that he's testifying as to the legal

24   effect or the current legal status of this settlement

25   agreement, he is not the qualified witness for that.  There
```

 1    is a litigation on file.  He can certainly say what they

 2    intend.  He can certainly say what it says.  But if he's

 3    giving legal conclusions as to what the current status of

 4    these settlement terms are and the effect of the settlement

 5    agreement as we stand here today, this is a non-qualified

 6    witness.  And I object --

 7            THE COURT:  I think all of your objections, Mr.

 8    Burks, go to weight, which I am very, very aware of.  And

 9    we've covered this more than once.  So I'm going to overrule

10    your objection.  Thank you.

11    BY MR. FITZMAURICE:

12    Q    In the settlement agreement, did the bank agree to

13    compromise the amount of the debt that was owed?

14    A    Yes.

15    Q    And did it agree to accept a discounted amount in

16    exchange for release of the loan (indiscernible)?

17    A    Yes.

18    Q    What was that?

19    A    $27 million.

20    Q    And was the Debtor and Mr. Choudhri's other parties,

21    were they given a period of time within which to make that

22    payment?

23    A    210 days.

24    Q    Okay.  Did they?  Did they make that payment?

25    A    No, they did not.

1   Q    Do you know what the settlement provides happens if the

2   payment is not made?

3   A    It allows for the filing of foreclosure.

4   Q    After the Debtor and Mr. Choudhri's other entities

5   failed to make the payment, did the bank -- what did the

6   bank do?

7   A    We filed for foreclosure again.

8   Q    And was that foreclosure successful?

9   A    No.

10  Q    Why not?

11  A    The court allowed extension of the payment for 90 days

12  provided the borrower paid $80,000 each month toward the

13  payment.

14  Q    Did the borrower make those payments?

15  A    Only two of the three payments were made.

16  Q    Did the bank proceed with its foreclosure at the end of

17  that 90-day period?

18  A    It filed again, yes.

19  Q    And was that foreclosure successful?

20  A    No.

21  Q    Why not?

22  A    The borrower filed bankruptcy.

23  Q    Do you know what happened in that bankruptcy case?

24  A    It was eventually dismissed.

25  Q    And after the dismissal of that bankruptcy case, did

1  the bank seek to exercise its rights under the loan

2  documents?

3  A    Yes.

4  Q    Was it successful?

5  A    No.  There was a second bankruptcy filed.

6  Q    Was that this one?

7  A    Yes.

8  Q    Have you ever heard of an entity called 2425 WL, LLC?

9  A    Yes.

10  Q    How have you heard about it?

11  A    They filed a subordinate mortgage claim about -- it was

12  three years after the loan originally closed.

13          MR. BURKS:  Objection.  Subordinate mortgage claim

14  is a legal conclusion, Judge.  I would ask that you strike

15  that sentence.

16          THE COURT:  I'll overrule that objection.  Go

17  ahead.

18  BY MR. FITZMAURICE:

19  Q    Is 2425 WL's mortgage, the filing of that mortgage, is

20  that an event of default under the loan documents?

21  A    Yes.

22  Q    Has the bank proposed a plan in this case?

23  A    Yes.

24  Q    Can you tell me generally what the plan provides for?

25  A    It provides for payment of outstanding real estate

1    claims.  It also includes payment of administrative fees and

2    partial payment of trade creditors.

3    Q    Dop you know what the plan provides for with respect to

4    the Debtor's building?

5    A    Yes.  There's a credit bid allowed in the plan.  And a

6    deficiency is also one of the categories in the plan.

7    Q    Do you know if there's going to be a sale of the

8    Debtor's building?

9    A    Well, there's an auction.  That's the process by which

10   either credit bid or third party bids take place.

11   Q    Do you know when that auction is scheduled to take

12   place?

13   A    Friday.

14   Q    Has the bank made a bid in connection with that

15   auction?

16   A    Yes.

17   Q    And what's the amount of that bid?

18   A    $18,600,000.

19   Q    Do you know if there are any other bids?

20   A    My understanding is there was another bid.

21   Q    Do you know what the amount of that other bid is?

22   A    I believe it's --

23        MR. BURKS:  Objection.  This is hearsay, Judge.

24        THE WITNESS:  $20 million --

25        THE COURT:  Bear with me.

```
 1              MR. BURKS:  There's no basis for him knowing what

 2     the bids are.

 3              THE COURT:  I'll sustain the objection.  The

 4     trustee can testify as to what the bids are.  Go ahead.

 5     BY MR. FITZMAURICE:

 6     Q    Does the plan provide for the bank being paid

 7     everything it is owed?

 8     A    No.

 9              MR. BURKS:  Objection, legal conclusion.  That is

10     a legal conclusion, what is it owed.

11              THE COURT:  I'll overrule that objection.  Thank

12     you.

13     BY MR. FITZMAURICE:

14     Q    If there was a third party who purchases the property

15     at auction, do you know what the plan provides as to who

16     gets paid for that money?

17     A    Payments go first to the real estate tax liens.  And

18     there is also portions that go to the administrative fees.

19     And there is a portion that goes to the liquidation trust

20     for the trustee.  The balance then goes to our note.

21     Q    You mentioned the real estate taxes.  Do you know

22     whether the plan pays those in full?

23     A    Yes.  Whatever is legally owed.

24     Q    And you said something about administrative expenses.

25     Do you know whether the plan pays those in full?
```

```
 1    A    Yes.

 2    Q    And does it?

 3    A    Yes.

 4    Q    Is it your understanding that the plan does not --

 5    withdrawn.  Does the plan pay anything to general unsecured

 6    creditors?

 7    A    Well, the plan pays some to trade plans.  You know,

 8    contractors who provided work on the building at the 70

 9    percent.

10    Q    Does it pay those creditors cash?

11    A    Yes.

12    Q    Are there other unsecured creditors who --

13    A    There's another group of third-party creditors that are

14    in the class along with our deficiency -- 90 percent of our

15    deficiency claim (indiscernible).

16    Q    And so does that class of creditors receive anything

17    under the plan?

18    A    Well, they would get pro rata share of any recoveries

19    that the trustee gets that goes into the liquidation trust.

20    Q    You mentioned the word class in the context of the

21    plan.  Do you know what that is?  Do you know what that

22    means?

23    A    Well, yes.  There are eight classes of creditors to the

24    borrower.  And they are each identified and each have

25    different rights, different recoveries under the plan.
```

1   Q    Does the plan attempt to group creditors together in

2   those classes?

3   A    Yes.

4   Q    Do you know as the plan proponent how the bank chose

5   which creditors go in which class?

6   A    Based on their legal status and claim status.

7   Q    Are there some creditors who don't get a recovery under

8   the plan?

9   A    Yes.

10  Q    And who are those?

11  A    Those tend to be subordinate claims by related parties

12  to the borrower.

13  Q    Do you know if the borrower's equity holders receive

14  anything under the plan?

15  A    They don't.

16  Q    Why not?

17  A    There's insufficient value in the property to pay the

18  primary secured claim of our loan.

19  Q    We talked before about 2425 WL.  Do you recall that?

20  A    Yes.

21  Q    Do you know whether the plan treats 2425 WL as having a

22  secured claim or an unsecured claim?

23  A    Well, unsecured because there's insufficient funds to

24  cover the first mortgage, which is our mortgage.

25  Q    Do you know what the plan provides for if the bank is

1    the successful bidder at the auction?  And let me withdraw

2    that question and I'll ask a different one.

3          In terms of payments to creditors, do you know what the

4    plan provides for if the bank is the successful bidder at

5    the auction?

6    A    The bank will pay cash to the real estate tax claims,

7    the administrative costs, and that portion to the trade

8    creditors as well as a contribution to the liquidation

9    trust.

10   Q    And do you know approximately the amount of the cash

11   that's required to make all of those payments?

12   A    It's approximately $3.7 million.

13   Q    And has the bank committed to make those payments?

14   A    Yes.

15   Q    And if it turns out those required payments are a

16   little higher, has the bank committed to make those higher

17   payments?

18   A    Yes.

19   Q    Does the bank have the financial ability to make those

20   payments?

21   A    Yes.

22   Q    Well, let's assume that the bank is not the successful

23   bidder at the auction.  Do you know in that instance what

24   the plan provides by way of payments to creditors?

25   A    The payments are similar.  They get deducted from the

1    amount of the winning bid.

2    Q    And what happens to the bank's claim in that instance?

3    A    Well, after those other amounts are paid, the remainder

4    goes to cover the bank's claim.

5    Q    And similarly if those expenses are a little higher

6    than anticipated, the bank understands it's going to take --

7    it's going to receive a little bit less.  Is that right?

8    A    Yes.

9    Q    And the bank has accepted that?

10   A    Yes.

11   Q    That's what the plan provides?

12   A    Yes.

13   Q    Do you know whether the plan that's on file with the

14   court is the first draft of the plan that was prepared for

15   the bank?

16           MR. BURKS:  Objection, foundation.

17           THE COURT:  I'll overrule the objection.  Go

18   ahead.

19   BY MR. FITZMAURICE:

20   A    There was negotiations between the trustee and NBK's

21   lawyers on the features of the plan.

22           MR. BURKS:  Objection.  Question called for

23   hearsay.  Answer is hearsay.  This is the wrong witness for

24   this, Judge.

25           THE COURT:  I'll overrule the objection.  Thank

1    you.

2              MAN 1:  Your Honor, may I (indiscernible)?

3              THE COURT:  Sure.  I just need to change the

4    connection over here.  Hold on for one second.  There you

5    go.

6    BY MR. FITZMAURICE:

7    Q    It's difficult to see on the top of the page given

8    several layers of blue text, but I'm showing you the

9    document that's at ECF 501-01 titled Chapter 11 Plan of

10   Liquidation of the Debtor by National Bank of Kuwait

11   S.A.K.P. New York Branch.

12             MR. BURKS:  Judge, for clarification and as part

13   of what I didn't understand on the stipulations, is this the

14   plan that's being proposed?  Is this the final form of plan

15   that we are here on today?

16             MR. FITZMAURICE:  Yes, it is.

17             MR. BURKS:  Thank you, Judge.

18             THE COURT:  Thank you.

19             MR. FITZMAURICE:  So again, Your Honor, I'm having

20   --

21             THE COURT:  (indiscernible).  Do you want me to go

22   back over to the --

23             MR. FITZMAURICE:  I do, please.  So 501-1.

24             MR. BAKER:  And, Your Honor, it doesn't seem like

25   that's projecting on GoToMeeting.

1             THE COURT:  It's not.  And I'm aware of that.

2             MR. FITZMAURICE:  Your Honor, I see it here, but I

3     don't -- just for...

4             THE COURT:  I'm seeing it on my screen here, which

5     means it should be projecting there.  But for some reason --

6             MR. FITZMAURICE:  I see it on the tables, I just

7     don't see it on these back here.

8             THE COURT:  I'm not sure why it's doing that.

9             MR. FITZMAURICE:  May I just ask the witness?  Do

10    you see the document?

11            THE WITNESS:  Yes.

12            THE COURT:  It's on.  For some reason it's not

13    working.  We'll see if we can fix it.  Go ahead.

14    BY MR. FITZMAURICE:

15    Q    Is that your signature?

16    A    Yes.

17    Q    And did you sign the plan of liquidation that the bank

18    is proposing?

19    A    Yes.

20    Q    And is this in fact a copy of that plan?

21    A    Yes.

22            MR. FITZMAURICE:  Your Honor, I think we've done

23    this.  But nevertheless, move to formally admit into

24    evidence ECF 501-01, a copy of the plan of liquidation for

25    the Debtor submitted by National Bank of Kuwait.

```
 1              THE COURT:  All right.  Any objection to the

 2     admission of 501-01, Mr. Burks?

 3              MR. BURKS:  I'm sorry, Judge.  What?

 4              THE COURT:  Do you have any objection to 501-01?

 5              MR. BURKS:  Yes, no objection.

 6              THE COURT:  It's admitted.  Thank you.

 7              (Exhibit 501-01 admitted into evidence)

 8              MR. TROOP:  Excuse me, Your Honor.  And I

 9     apologize for interfering.  But on a procedural matter, our

10     witnesses is our corporate rep, gets to be in here as a

11     trustee.  He gets to be in here.  I didn't ask are there any

12     witnesses in the courtroom for 2425?

13              We invoke the rule, Your Honor.

14              THE COURT:  All right.  So at this point in time

15     the rule has been invoked.  So you just need to go outside,

16     sir.  Maybe Ms. Conrad will give you a place to sit.

17              There are a number of people on the line.  I think

18     the only person who you've told me -- I mean, you've told me

19     there are going to be three witnesses.  And I don't think

20     that person is on the list that we talked about.  All right.

21     So you may be excused, sir.  We'll give you a place to sit.

22              Mr. Choudhri is on the phone.  I'm assuming you

23     have no objection to him listening?

24              MR. TROOP:  Your Honor, I don't.

25              THE COURT:  Okay.
```

1          MR. TROOP:  I do not assert an objection.  I

2     believe he is a corporate rep.

3          THE COURT:  How are you?  Good to see you.  Yeah,

4     tell him to bring him up.  He can come up.

5          Mr. Choudhri is waiting to be in the courtroom so

6     I'm going to bring him up.  All right, that's fine.

7          MR. TROOP:  And I would suspect they would say he

8     is the corporate rep for both of them.

9          MR. BURKS:  He is the corporate representative of

10    my client.  He is the corporate representative of the

11    debtor.

12         THE COURT:  That's fine.

13         MR. TROOP:  And I don't think I can invoke the

14    rule with respect to him, Your Honor.

15         THE COURT:  All right.  Then, Ms. Conrad, do you

16    want to go open a room?  Or you want to get the testimony

17    going and then you can do it?

18         CLERK:  Give me one second.

19         MR. BURKS:  And, Judge, do we need -- do you want

20    for the record to name this witness as being excluded?

21         THE COURT:  We'll do it when you call him as a

22    rebuttal witness.  Thank you.

23         MR. BURKS:  Yes, Judge.

24         THE COURT:  Thank you.  All right.

25         MR. BURKS:  Excuse me, Judge.  Is now an okay time

```
 1    for me to take a restroom break?  I am struggling with a

 2    stomach issue.

 3              THE COURT:  I typically break every two hours.  I

 4    was planning a break at 11:00.  But, Mr. Burks, if you need

 5    to go to the bathroom, I don't want to stop you from doing

 6    that.

 7              MR. BURKS:  That's not the way I would have put it

 8    on the record, but thank you for putting it that way.

 9              THE COURT:  That's basically what you said.  All

10    right, but we'll stand down.  We'll stand down for ten

11    minutes.  This will be our 11:00 break.  Thank you.

12              CLERK:  All rise.

13              (Recess)

14              CLERK:  All rise.

15              THE COURT:  Please be seated.

16              MR. FITZMAURICE:  Your Honor, can Mr. Burks take

17    one other thing to the witness stand?

18              THE COURT:  Mr. Carter?  Sure.  No problem.

19              MR. FITZMAURICE:  And Mr. Burks can do whatever he

20    wants.

21              MR. BURKS:  You're calling me?

22              MR. FITZMAURICE:  No, no.

23              THE COURT:  I did exactly the same thing, so my

24    water's here as well.

25              CLERK:  It's okay.
```

```
 1              THE COURT:  Again.  All right, Mr. Carter.  I'll
 2    remind you that you're still under oath.  Go ahead, sir.
 3              MR. FITZMAURICE:  Thank you, Your Honor.
 4              BY MR. FITZMAURICE:
 5    Q    Mr. Carter, what kind of building is the property owned
 6    by the debtor?
 7    A    It's an office building.
 8    Q    Thank you.  Are you aware of whether the building has
 9    tenants?
10    A    I'm not aware of the actual situation.
11    Q    Well, whether or not the building has any tenants, do
12    you know what the plan does with respect to any leases those
13    tenants have?
14    A    It vacates all the leases so we can then review after
15    and decide whether or not we want them, and any third-party
16    bidder can decide which ones they would like to retain.
17    Q    You testified earlier concerning litigation that was
18    brought by the debtor.  Do you know if the plan does
19    anything with respect to that litigation?
20    A    Litigation by the?
21    Q    By the debtor.
22    A    The debtor is released.
23    Q    Do you know whether the -- under the plan the bank
24    receives a release of claims by the estate?
25    A    Yes.  It does.
```

1    Q    And if the bank did not receive that release, would it

2    fund the amounts it's paying under the plan?

3    A    No.

4    Q    Can you remind me again what the banks -- what

5    approximate amount the bank is owed as of the filing of the

6    bankruptcy case?

7    A    I believe it's around 61 or 2 million.

8    Q    And in connection with the auction, the bank made a

9    bid.  The bank made a credit bid.  Is that correct?

10   A    Yes.

11   Q    And what was the amount of that credit bid?

12   A    18 million 6.

13   Q    And if the property sold to the bank at that credit bid

14   in a foreclosure, would there be any money that was left for

15   unsecured creditors?

16   A    No.

17   Q    But the bank is paying unsecured creditors something

18   under the plan, right?

19   A    Yes.

20   Q    In your view, is the bank making those payments

21   essentially in exchange for the release and getting of

22   estate claims?

23   A    No, we're making those payments because we think it's

24   fair to those parties.

25   Q    Is the bank asking for the estate to pay any legal fees

1    the bank has incurred in connection with the bankruptcy

2    case?

3    A    No.

4    Q    Is the bank asking the estate to pay any expenses the

5    bank has incurred in connection with the bankruptcy case?

6    A    No.

7    Q    I want to go back to the settlement agreement for a

8    moment, 508-7.

9            THE COURT:  Do you have a copy of the exhibit?

10           MR. FITZMAURICE:  It's on the screen.

11           THE COURT:  Let me try something.  I'm going to --

12    I'm just going to see if I can get the screens to come back

13    so it's on the big ones.  I'm sorry.  I'm not able to do

14    that.  Go ahead.

15           BY MR. FITZMAURICE:

16    Q    Under the settlement agreement, in general terms, the

17    bank agreed to accept less than it was owed.  Is that right?

18    A    Yes.

19    Q    And does the settlement agreement provide what happens

20    concerning the amount owed to the bank by the debtor if the

21    debtor fails to perform under the settlement agreement?

22    A    Could you ask that again?

23    Q    I'll try to ask it better.  Do you know if the

24    settlement agreement says what happens to the amount owed to

25    the bank if the Choudhri parties fail to make the payment

1    required under the settlement agreement?

2    A    They acknowledge the original full amount due.

3    Q    And in that instance, is -- do you know if the

4    settlement agreement allows the bank to exercise all of its

5    rights under the loan documents?

6    A    Yes.

7    Q    And to collect the full amount that's owed?

8    A    Yes.

9         MR. FITZMAURICE:  Excuse me one moment, Your

10    Honor.

11        THE COURT:  All right.  Go ahead.

12        MR. FITZMAURICE:  Your Honor, I think we've

13    addressed this issue, but just for clarity, I move for

14    admission of document at ECF 508-7, which is the settlement

15    agreement.  I think we've done it, but I just want to...

16        MR. BURKS:  So for clarification, I --

17        THE COURT:  It was admitted.  I admitted it back

18    originally.

19        MR. BURKS:  Is it that?  Is it 508-7 or do we have

20    now two copies of it?

21        MR. FITZMAURICE:  No, it's -- 508-7 is the -- is

22    what I had showed him earlier and that was the version that

23    we referenced earlier.  So it's the same one.

24        THE COURT:  It's on the record.  It's been

25    admitted.  I'm pulling it up to make sure it is 508-7.

1    Thank you.

2    BY MR. FITZMAURICE:

3    Q    Mr. Carter, do you know whether the bank voted in

4    connection with the plan?

5    A    Yes.

6    Q    Did the bank vote in favor or against?

7    A    In favor.

8    Q    Do you know how many claims the bank had?

9    A    I'm not sure I understand the question.

10   Q    Does the bank have one claim in this case or more than

11   one?

12   A    Oh, you mean in terms of the categories.  Yes, it has

13   three.

14   Q    However many claims it had that are entitled to vote,

15   did it vote all of those claims the same way?

16   A    No, I believe just two of the three are voting.

17   Q    So two of the three claims are voting claims?

18   A    Yes.

19   Q    And were those two claims voted in favor or against?

20   A    In favor.

21            MR. FITZMAURICE:  Your Honor, I know that we just

22   came back.  May I have a short time to confer?

23            THE COURT:  Yeah.  Take your time.

24            MR. FITZMAURICE:  Thank you.

25            MR. TROOP:  We're going to step away from the mic,

1    aren't we?

2            THE COURT:  That's probably a wise idea.

3            MR. FITZMAURICE:  Your Honor, I'm happy to report

4    this is one instance where a short break hopefully saves

5    some time.  Pass the witness.

6            THE COURT:  All right.  Mr. Baker, you made the

7    first appearance, but I realize you may not want to go

8    first.

9            MR. BAKER:  I'd like Mr. Burks to go first.

10           THE COURT:  Then I'll call on Mr. Burks for cross.

11           MR. BURKS:  Thank you, Judge.

12           THE COURT:  Mr. Burks, are you going to project?

13   Where are you going to project from?

14           MR. BURKS:  I'm going to project from Mr. Baker.

15           THE COURT:  All right.  Then I'll go to the right

16   table.  Mr. Burks -- Baker can connect at his leisure.

17           MR. BAKER:  Fixed it.

18           MR. BURKS:  He did it.

19           MR. BAKER:  I'm multi-talented, Mr. Burks.

20           MR. BURKS:  Who am I to disagree, Your Honor?

21               CROSS-EXAMINATION OF MICHAEL CARTER

22   BY MR. BURKS:

23   Q    Hi, Mr. Carter.  How are you, sir?

24   A    Good.  How are you?

25   Q    I'm doing all right, thanks.  Feeling a little better,

1    thanks.  All right.  So let's go over the provisions of the

2    plan, and let's start with what you gave your testimony on,

3    the note in the -- the note.  And you testified what exactly

4    your opinion was as to the terms of the note, correct?  Did

5    the settlement agreement modify the terms of that original

6    note?

7            MR. FITZMAURICE:  Objection, Your Honor.  Calls

8    for a legal conclusion.

9            MR. BURKS:  This door is really wide open at this

10   point.

11           THE COURT:  I'll give you a little bit of leeway.

12   I think the agreement speaks for itself, Mr. Burks.  What he

13   thinks may or may not have any relevance to me, but if you

14   want to ask the questions and put it on the record, I'm more

15   than happy to do that.

16           MR. BURKS:  Thank you, Judge.  I made the same

17   objections, frankly.

18   BY MR. BURKS:

19   Q    In your opinion, did the settlement agreement modify

20   the original terms of the note?

21           MR. FITZMAURICE:  So objection, Your Honor.

22   Question calls for speculation and the witness' opinion.  He

23   is not here as an opinion witness, as an expert.  He's here

24   to offer factual testimony.

25           MR. BURKS:  He gets to answer that.

```
 1              THE COURT:  I'll let him answer that question.

 2   Thank you.  Go ahead.

 3   BY MR. BURKS:

 4   A    Could you say that again?

 5              THE COURT:  Let me be clear.  Mr. Burks may be

 6   asking you questions that you do not know, and if you do not

 7   know --

 8              THE WITNESS:  Mm hm.

 9              THE COURT:  -- the correct responses, you don't

10   know, okay?  But if you do know or you have an opinion, I'd

11   like to hear it.  Go ahead.

12              MR. BURKS:  Thank you, Judge.

13   BY MR. BURKS:

14   Q    You testified as to the terms of the note and whether

15   or not the note was in default and whether or not the

16   borrower had performed.  Do you remember that testimony?

17   A    Yes.

18   Q    All right.  Was your -- and you testified that there

19   was a settlement agreement, correct?

20   A    Yes.

21   Q    You testified that you understood and you were familiar

22   with the terms of that settlement agreement, correct?

23   A    Yes.

24   Q    All right.  Did the settlement agreement modify or

25   change any terms of the original note?
```

1    A    Well, because it's a settlement, it made some changes

2    to the amount that was due.

3    Q    Did it cure all the defaults up to and effective as of

4    August 22, 2022?

5         MR. FITZMAURICE:  Objection, Your Honor.  Calls

6    for a legal conclusion.  And also, the document and its

7    terms speak for themselves.

8         MR. BURKS:  Let's see what he knows, Your Honor.

9    You gave him an awful lot of leeway on direct.  I'm

10   certainly within the scope of direct here.

11        THE COURT:  I'll let -- again, and I'll say it

12   again for the record, the document says that it says, Mr.

13   Burks, but I don't have any objection to you asking that

14   question.

15        MR. BURKS:  I'm eventually going to -- the only --

16        THE COURT:  The question.  You don't need to tell

17   me what you're going to do.  I'm happy to hear the

18   testimony.  Go ahead.

19        MR. BURKS:  You've ruled.  Thank you, Judge.

20   BY MR. BURKS:

21   Q    Do you need the question again, sir?

22   A    Could you ask it again?

23   Q    Sure.  By the terms of the confidential settlement

24   agreement, did all the defaults leading up to the settlement

25   agreement date of August 22, 2022, were those cured?  Were

1    those brought current by the settlement agreement?

2    A    Yes.  The borrower properly behaved under the

3    settlement agreement and those claims were waived.

4    Q    All right.  So let's go to what the settlement

5    agreement required.  The first requirement was a payment of

6    --

7              MR. BURKS:  Scroll down, please.

8    BY MR. BURKS:

9    Q    -- $800,000.  And I -- I'm telling you that so we can

10   get to the agreement, sir.

11             MR. BAKER:  Where is it?

12             MR. BURKS:  Until you see (indiscernible).  Keep

13   going down.

14    BY MR. BURKS:

15   Q    So the settlement payment of $801 -- 509 --

16   $801,509.42, was that received by NBK?

17             MR. FITZMAURICE:  So objection, Your Honor, to the

18   extent that counsel described that as the settlement payment

19   and mischaracterizes the evidence.

20             MR. BURKS:  Actually, I said "was the payment of"

21   in terms of the settlement payment.  We all see what the

22   settlement payments are.  I'm asking was the 801,509.42

23   received.  That's a simple question.

24    BY MR. BURKS:

25   A    Yes.

```
 1   Q     The Judge has to rule on the objection.  One moment.

 2             THE COURT:  What?  Was there an objection?  I

 3   didn't hear it.

 4             MR. BURKS:  Okay.

 5   BY MR. BURKS:

 6   Q     So the 801,509.42 was received by the bank, correct?

 7   A     Yes.

 8   Q     All right.  The settlement payments also include...

 9             MR. BURKS:  (indiscernible).  Wherever.  Go back

10   up.  Go ahead and put the three payments of $80,000.

11             THE COURT:  I think that's part of the state court

12   litigation.

13             MR. BURKS:  Okay.  Freeze there.

14   BY MR. BURKS:

15   Q     Were any other payments due to the bank under this

16   settlement agreement?

17   A     There was a total settlement of 27 million.

18   Q     And when was that due?

19   A     That was due within 210 days.

20   Q     Did the bank receive 27 million with the

21   (indiscernible) balance due within 210 days?

22   A     No.

23   Q     So what did the bank do?  Did the bank extend the time

24   or make any sort of agreement?

25   A     We proceeded to file for foreclosure.
```

1   Q    Did you make an agreement to extend the time to receive

2   the money?

3   A    The borrower made a request to the court to extend it.

4   And there was an agreement to extend it for 90 days with a

5   payment of $80,000 a month.

6   Q    Mm hm.

7   A    Of which only two of the three months were paid.

8   Q    So was the first month paid?

9   A    Yes.

10  Q    Was the second month paid?

11  A    Yes.

12  Q    Was the third month paid?

13  A    No.

14  Q    At what point did the bank take the position that the

15  borrower was in default on the settlement agreement?  On

16  what date or what time?

17  A    When they failed to make the third payment.

18  Q    And what date was that?

19  A    I don't remember specifically.

20  Q    All right.  Are you aware that there was a lawsuit

21  filed?  The lawsuit's been admitted into evidence, not for

22  voracity of the claims, but for the fact that the lawsuit

23  exists and the claims exist.  Are you aware of that lawsuit?

24  A    No.

25  Q    So you're not aware that NBK is a defendant in a

1    lawsuit regarding the enforceability and terms of this

2    settlement agreement.

3            MR. FITZMAURICE:  So objection, Your Honor.  Lacks

4    foundation.  And if there's a lawsuit, we can look at it.

5            THE COURT:  Yeah, I'll sustain the objection.

6            MR. BURKS:  Well, I'm asking him if he's aware.

7    An objection's sustained.  I'll reask it.

8    BY MR. BURKS:

9    Q    When you stated that the debtor or the borrower was in

10   default of the settlement agreement, were you under the --

11   were you making the assumption that the bank had not first

12   been in breach of the settlement agreement?

13   A    Yes.

14   Q    If I told you, and it's purely hypothetical, but if I

15   told you as a hypothetical in your experience as a banker,

16   in your experience as -- dealing with loans that if there

17   was an agreement that the bank breached first, would you

18   take the position that the borrower was still in default of

19   that agreement?

20           MR. FITZMAURICE:  Objection, Your Honor.  Calls

21   for speculation.

22           THE COURT:  I'll sustain the objection.

23   BY MR. BURKS:

24   Q    The tax liens that the bank claims are going to be paid

25   to the bank by -- in terms of the plan.  Is that correct?

1          MR. FITZMAURICE:  Objection, Your Honor.  The plan

2     speaks for itself.

3          THE COURT:  I'll sustain the objection as to what

4     the plan says.  And it's in evidence.  If you want to show

5     him and have him read it you can.

6          MR. BURKS:  Yes, Your Honor.

7     BY MR. BURKS:

8     Q    Does the settlement agreement affect the rights of the

9     borrower or NBK with respect to the tax liens?

10          MR. FITZMAURICE:  Objection, Your Honor.  Calls

11     for a legal conclusion.

12          MR. BURKS:  Your Honor -- response, Your Honor.

13     This door is so wide open regarding what he understands the

14     effects of the settlement agreement --

15          MR. FITZMAURICE:  If he doesn't know, he doesn't

16     know.

17          THE COURT:  Here's my problem.  I struggle for the

18     relevance of what he thinks because what he thinks really

19     isn't that important to me.  It's what I think and how I

20     rule.  It's in evidence.  If you want to make an argument

21     that it does some particular thing for the debtor, that's

22     fine.  But I don't really care what he thinks.  How's it

23     relevant?

24          MR. BURKS:  He's declaring the loan in default and

25     he's testifying as to the validity of the claim, Judge.

1          THE COURT:  And so your point is what?  You're

2    going to cross-examine him on that issue?

3          MR. BURKS:  And I want -- I think it goes to

4    weight in the documents.

5          THE COURT:  Okay.  Thank you.

6    BY MR. BURKS:

7    Q    I want to talk about classification, which is something

8    you talked about.  Do you remember talking to your attorney

9    about classification of claims?  Sort of the grouping.  You

10   described it, I believe, as the grouping of the claims.

11   A    Yes.

12   Q    You said that 2425 WL filed a second lien on the

13   property.  Is that correct?

14   A    Yes.

15   Q    You stated that WL is getting zero under the plan.  Is

16   that correct?

17   A    Yes.

18   Q    And why is WL getting zero under the plan?

19   A    They have a subordinated claim and mine is insufficient

20   to cover the first claim.

21   Q    Why is the plan -- if that is true if -- after the

22   auction if that is true, why does the plan not provide for a

23   general unsecured claim on WL's second -- 2425 WL's second

24   lien?  Why does it not provide for that as an unsecured

25   claim?

1    A    They are a Category 6.

2    Q    So it's because of the way they were classified.  Let

3    me ask it differently.

4    A    Okay.

5    Q    Is the unsecured portion of 2425 WL's claim in the same

6    class as the under-secured or unsecured portion of NBK's

7    lien?

8    A    No.

9    Q    But NBK's lien is mixed with some other unsecured

10   creditors, isn't it?

11   A    It's mixed with some third-party claimants.

12   Q    Okay.  Let's assume under your math, you told your

13   attorney that the value -- you believe the value is

14   somewhere around 60 -- or excuse me, you said today that the

15   amount due on the note was about 60, 61.  Correct me if I'm

16   mischaracterizing.  Is that what you said?

17   A    Say that again?  That the...

18   Q    What is the current amount due on the first lien note

19   of NBK?

20   A    It's a little over 60 million.

21   Q    All right.  Let's say -- and you said that the credit

22   bid was for 18 what?

23   A    Six.

24   Q    All right.  So let's say you have a 41,000 --

25   $41,400,000 unsecured claim, okay?

1    A    Yes.

2    Q    That's mixed in with -- in the plan, that's classified

3    and mixed in with unsecured -- of an unsecured claim in the

4    total amount of what?

5    A    I don't know the total amount of those other unsecured

6    claims.

7    Q    Small, deminimis compared to NBK's claim?

8    A    Yes, they are small.

9    Q    What would happen if you took the $26 million unsecured

10   claim that you believe that exists of WL on its second lien

11   and mixed it in with NBK's lien?  What would happen?

12        MR. FITZMAURICE:  Objection, Your Honor.  Vague as

13   to what would happen.  Also relevance if -- to the current

14   plan and whether it would be the confirmation standards,

15   whether there was some other set of facts that doesn't

16   exist.

17        THE COURT:  I think the question is vague.  Tell

18   me how it affects me confirming this plan or not.

19        MR. BURKS:  Classification -- unfair

20   discrimination classification, Judge.

21        THE COURT:  I think you can ask that question a

22   different way rather than the way you're asking it.  So

23   rephrase your question please.

24   BY MR. BURKS:

25   Q    Would a $26 million claim classified in the same group

1    as NBK's probable approximately $43 million claim, would

2    that dilute substantially the distribution on that unsecured

3    claim?

4            MR. FITZMAURICE:  Objection.  Vague as to

5    "dilute".  Vague as to "that claim".

6            THE COURT:  I'll overrule the objection.  You can

7    answer the question.

8    BY MR. BURKS:

9    A    Well, all of the -- all of that junior subordinate

10   claim is subordinate to NBK's claim.

11   Q    So your position is, is that the unsecured claim

12   portion of the junior lien is subordinate to the unsecured

13   portion of the first lien.  Is that what you're saying?

14   A    Yes.

15   Q    All right.  Let's talk about leases for a minute.  What

16   happens to the current tenants' leases?  You said they were

17   being rejected, correct?

18   A    Yes.

19   Q    And where -- how much are the rejection lease claims

20   being paid?

21   A    They don't get a payment.

22           MR. FITZMAURICE:  Objection, Your Honor.  The plan

23   speaks for itself as to the treatment that the creditors

24   receive.

25           MR. BURKS:  I can't tell.

 1          THE COURT:  If he knows he can testify to it.  If

 2    he doesn't know, he'll tell you he doesn't know.

 3    BY MR. BURKS:

 4    A    The tenants don't get a payment.

 5    Q    They don't get one dime, do they?

 6    A    No.

 7    Q    All right.  Trade creditors, are those trade creditors,

 8    do they hold liens on the property?

 9    A    They are various contractors who were doing work on the

10    property that haven't been paid by the borrower.

11    Q    My question is for purposes of this plan.  Do they hold

12    liens?

13    A    I don't know.

14    Q    And they're getting paid .70 cents on the dollar,

15    correct?

16    A    Yes.

17    Q    And how much are general unsecured creditors being

18    paid?

19    A    The general unsecured ones get the pro rata share of

20    all the claims in that category.

21    Q    And is the approximately $40 million claim of NBK in

22    that same class?

23    A    Yeah, it's 90 percent of it.

24    Q    So the general unsecured claims are mixed in with NBK's

25    claim, correct?

```
 1              MR. FITZMAURICE:  Objection, Your Honor.
 2   Mischaracterizes the plan.
 3              MR. BURKS:  Oh, I doubt it.  It's a --
 4              THE COURT:  Well, let's show him the plan then.
 5              MR. BURKS:  All right.  Let's have the plan.
 6   Paragraph 12.  Page 12, Paragraph G, please.
 7   BY MR. BURKS:
 8   Q    Sir, you recognize this as the plan you've testified
 9   you're familiar with?  Or do you need the first page of it?
10   A    Yes.
11   Q    That is the plan that you're testifying about that
12   you're familiar with?
13   A    Yes.
14   Q    To you, what does -- on Page 12, what does Paragraph G
15   Classified B of the general unsecured claims -- what does it
16   mean when it says, "Pro rata distribution of general
17   unsecured claims, provided, however, NBK should be deemed to
18   have another general unsecured claim equal to 90 percent of
19   its deficiency"?  What does that mean to you?
20   A    Pro rata means that whatever is recovered through the
21   liquidation trust, it would then be divided up based on the
22   size of the claim.  But NBK's claim is reduced to 90 percent
23   of its unpaid claim at that point.
24   Q    So the other general unsecured claims are mixed in with
25   that 90 percent.
```

```
1    A    Yes.

2    Q    All right.

3    A    They're at 100 percent.

4              MR. TROOP:  Objection, Your Honor.  That

5    mischaracterizes the plan.  The plan doesn't say general

6    unsecured claims.  It says --

7              MR. CHOUDHRI:  Objection.  One --

8              MR. TROOP:  It says other.  Other general

9    unsecured claims.  And there's only so much misleading that

10   counsel ought to be able to do through his testimony because

11   the plan's pretty clear.  5(a) is trade creditors, trade

12   general unsecured creditors.

13             MR. CHOUDHRI:  Objection.

14             MR. TROOP:  There's a definition of other general

15   unsecured creditors, and then there's Class 6.

16             THE COURT:  Okay.  And so let's be clear to

17   everyone.  I can read the plan.  I could take what this

18   witness says in light of what the plan says, and it goes

19   greatly to weight, okay?  So Mr. Burks' questions, I don't

20   see any problems with them.  You may have some disagreement

21   with the form of the question, but I take that answer in

22   context of the plan that I'm going to review, and it doesn't

23   bother me in the least.  Mr. Choudhri, you may sit down.

24   You don't get to object.  Go ahead.

25   BY MR. BURKS:
```

```
 1   Q    Paragraph B, treatment of classes of claims in

 2   interest, Paragraph B(g), the second -- just to be clear,

 3   the second lien claim of WL to the extent there's no value

 4   to that lien, it is excluded from B(g), correct?

 5               MR. FITZMAURICE:  Objection, Your Honor.  Is

 6   counsel asking about Classified B in Subsection G of this

 7   section?

 8               MR. BURKS:  Yes.

 9               THE COURT:  You can answer the question, sir.

10               THE WITNESS:  Okay.

11   BY MR. BURKS:

12   A    Could you repeat that question?

13   Q    The (indiscernible) -- the second lien claim of WL is

14   excluded from Page 12, Paragraph B(g).

15               MR. FITZMAURICE:  Objection, Your Honor.  There is

16   no Paragraph B(g).  Misleading.

17               MR. BURKS:  Well, (indiscernible) claims is

18   Capital B and then little (g) is Class B5.  I'm looking at

19   it.  The witness is looking at it.  We're all looking at it.

20               THE COURT:  Go ahead.  Ask the question and answer

21   it.  I mean, I'm looking at the same thing and I'm taking it

22   in light of what the plan says.  And I -- Mr. Burks, I

23   wonder why -- the questions you're asking seem to be

24   undisputed facts, okay?  I mean, I'm aware of what the plan

25   says.  I'm aware of the claim classification.  I'm really
```

1    worried about disputed facts.  This appears not to be a

2    disputed fact as to what's in the claims and how they're

3    being paid.

4         MR. BURKS:  I'll answer the question, Judge.  This

5    witness said that this is a fair, equitable, and permittable

6    plan.

7         THE COURT:  Well, why don't you ask him questions

8    about whether it's fair and equitable rather than how claims

9    are classified?  Because I can tell how claims are

10   classified.  It's in the plan, okay?  If you have an

11   argument to make, you have evidence that relates to fair and

12   equitable, how the claims are classified perhaps, but I know

13   how they're classified.  Go ahead.

14        MR. BURKS:  All right.  I'm going to ask him one

15   more question about classification and then I'll move on.

16   May I, Judge?

17        THE COURT:  Yeah, you can.

18        MR. BURKS:  Thank you.  Turn to trade creditor.

19   (indiscernible).

20        MR. BAKER:  In the (indiscernible)?

21        MR. BURKS:  Mm hm.  Go backwards.

22        MR. BAKER:  Wait.  Do you want me to go back to

23   definitions?

24        MR. BURKS:  No, I want you to go -- I'd like you

25   to go, Mr. Baker, to trade creditors.

```
 1                    MR. BAKER:  Which section?

 2                    MR. BURKS:  It's what I'm looking for, treatment

 3       of trade creditors.

 4                    MR. BAKER:  I'm almost there.

 5                    MR. BURKS:  (indiscernible).  I'm looking for it.

 6       Scroll up and look for it (indiscernible).  It's on the same

 7       page.

 8       BY MR. BURKS:

 9       Q     The plan provides, as the judge has said -- and we can

10       all read it, the plan provides for trade creditors to

11       receive 70 percent of their allowed claims, correct?

12       A     Yes.

13       Q     Under any test, do you believe that the creditors, the

14       other general unsecured claimants in Subclass G will receive

15       70 percent of their allowed claims?

16                    MR. FITZMAURICE:  Objection, Your Honor.

17       Mischaracterizes the document.  There is no Subclass G.

18       It's the --

19                    MR. BURKS:  Paragraphs -- Paragraph G, Class 5B of

20       the general unsecured claims.

21       BY MR. BURKS:

22       Q     Do you believe that there is any way that they will

23       receive .70 cents on the dollar?

24                    MR. FITZMAURICE:  Objection, Your Honor.  Calls --

25       the question is misleading.  Counsel is making the legal
```

```
 1    argument about whether that's required in order for the plan
 2    to be fair and equitable.
 3              THE COURT:  I think he's asking a question that I
 4    already know the answer, but I'll ask you to answer the
 5    question, sir.  And then I may ask the questions which I
 6    think you should be asking because I don't think you're
 7    getting there.  But go ahead.  Answer the question.
 8    BY MR. BURKS:
 9    A    It's unlikely.
10    Q    All right.
11              MR. BURKS:  Am I deferring to you now or --
12              THE COURT:  You are.
13              MR. BURKS:  -- am I proceeding?
14              THE COURT:  So if we look at the plan, Mr. Carter,
15    there are two general unsecured classifications, Class A and
16    Class 5B.  And what I'd like to know is the rationale of why
17    those claims are split into two separate classes of claims.
18    If you know, tell me what the rationale is.
19              THE WITNESS:  The general rationale is that the 5A
20    category was third-party contractors that were doing work on
21    the building and didn't get paid by the borrower at the time
22    of the bankruptcy filing.  While the 5B is entities that
23    were doing work for the borrower but not the building.
24              THE COURT:  Okay.  So you're basically --
25              THE WITNESS:  Essentially most of them were law
```

```
 1   firms that were doing claim work on behalf of the borrower.
 2            THE COURT:  All right.  So your rationale is --
 3            THE WITNESS:  It goes in a different category.
 4            THE COURT:  And in your mind, that separate
 5   classification is fair and equitable.
 6            THE WITNESS:  Yes.
 7            THE COURT:  Okay.  Let me ask about Class 7, which
 8   is the subordinated claims.  They're not getting paid
 9   anything.  What's the rationale for not paying the
10   subordinated claims anything?
11            THE WITNESS:  Well, Class 6, 7, and 8 are all
12   related entities to the borrower.
13            THE COURT:  So in effect, you're saying their
14   insider claims, they shouldn't be paid.
15            THE WITNESS:  Not that they shouldn't be paid, but
16   there are insufficient funds or value in the property to pay
17   them.
18            THE COURT:  Okay.  Go ahead, Mr. Burks.
19            MR. BURKS:  Thank you, Judge.  I forget sometimes
20   you were a debtors' attorney.
21            BY MR. BURKS:
22   Q    Sir, you stated that there would be -- you stated that
23   the bank anticipates paying $3.7 million cash into the plan,
24   correct?
25   A    Yes.
```

1    Q    And you stated that you were -- if you did not receive

2    the release, if NBK did not receive the release in the plan

3    -- that's provided in the plan, did I understand you

4    correctly to say that you would not pay the -- the bank

5    would not pay the $3.7 million?

6    A    Some of that 3.7 is administrative fees that would need

7    to be paid anyway.  But some parts of it are for trade

8    creditors, etcetera, that would be voluntary.

9    Q    Well, I don't think I asked the question clearly.  If

10   the --

11   A    Yeah.

12   Q    If the judge rules that he cannot grant a release in

13   this plan -- and I'm not saying he will or won't, but if the

14   judge rules he can't grant NBK the release that's in the

15   plan, will NBK pay the $3.7 million if the plan's otherwise

16   confirmed?

17            MR. FITZMAURICE:  Objection, Your Honor.  Calls

18   for speculation.

19            THE COURT:  I'll sustain that objection.

20   BY MR. BURKS:

21   Q    In the plan, is the $3.7 million payment tied to the

22   release?

23            MR. FITZMAURICE:  Objection, Your Honor.  The plan

24   speaks for itself.

25            MR. BURKS:  No, he --

```
 1                THE COURT:  I'll sustain the objection.

 2                MR. BURKS:  All right.

 3      BY MR. BURKS:

 4      Q    Have you or -- have you made a determination what is

 5      the value against NBK of all the litigation that's pending

 6      that you're aware of?  Have you made a valuation of that?

 7                MR. FITZMAURICE:  Objection.  The witness

 8      personally?

 9                MR. BURKS:  That's where I'm going as my initial

10      question, yes.

11                MR. FITZMAURICE:  So then I'll object to the

12      extent the witness -- the question would ask the witness to

13      reveal the contents of the attorney-client communications.

14      I instruct the witness not to do so.

15                THE COURT:  I'll sustain the objection.  I think

16      that question's better directed to the trustee anyway.

17      BY MR. BURKS:

18      Q    Has NBK's loan committee -- did they approve the

19      payment of 3.7?  Did they approve the payment of $3.7

20      million through the plan if it's confirmed?

21      A    Yes.

22      Q    Did they do so on the expectation of the full release

23      from litigation?

24      A    Yes.

25      Q    In doing so, did they assign a value to the litigation
```

1    that they're being released from?

2            MR. FITZMAURICE:  Objection, Your Honor.  Calls

3    for speculation and again (indiscernible).

4            THE COURT:  I'll sustain the objection.

5    BY MR. BURKS:

6    Q    Is this plan being confirmed or proposed with the bank

7    assigning no valuation to the litigation (indiscernible)?

8            MR. FITZMAURICE:  Objection, Your Honor.  It's the

9    version of the same question that we've been at here a

10   little while.

11           THE COURT:  And I sustained the objection for the

12   first time, and I'll sustain it again.  Thank you.

13           MR. BURKS:  Yes, Your Honor.  So your ruling is

14   that I don't get to know what the value -- the bank's value

15   of the litigation is?

16           THE COURT:  I just said I think that question is

17   better asked of the trustee.  He's probably in a much better

18   position to make an evaluation of what it's worth and not

19   worth.

20           MR. BURKS:  Yes, Your Honor.  I understand.  I'm

21   going to ask the Court to take judicial notice that in the

22   case the proponent in this plan and the trustee is not.

23           THE COURT:  That's fine.

24           MR. BURKS:  Thank you, Judge.

25           THE COURT:  Thank you.

```
 1              MR. BURKS:  May I have a moment with my notes,

 2   Judge?

 3              THE COURT:  Certainly.

 4              MR. BURKS:  Thank you.  Thank you, Your Honor.

 5              MAN 1:  May I borrow a tissue from the court?

 6              THE COURT:  Yeah, sure.

 7              MAN 1:  And (indiscernible) I will not return it.

 8              MR. BURKS:  Mr. Baker, will you turn to Page 11 of

 9   the plan, please?  May I proceed?

10              MR. FITZMAURICE:  Oh, yes.  Thank you, yes.

11   BY MR. BURKS:

12   Q    Mr. Carter, will you look on Page 11 of the plan?

13   There's a summary of classification.  I want to know what

14   other secured claims in Class 1 are.  Who are they, please?

15   A    Class 1 is the outstanding tax claims.

16   Q    Are you aware of proof of claim at ECF Docket 496-1

17   filed by Arin-Air Inc.?

18   A    No.

19   Q    Never heard of it?

20   A    No.

21   Q    Okay.  Do you know whether or not the claim of Arin-Air

22   Inc. is being paid in the plan?

23   A    I don't know what that claim is.

24   Q    Okay.  Let's put it up on the screen and see.  Docket

25   ECF 496-1.
```

```
 1              MR. BURKS:  Mr. Baker, will you slowly scroll

 2   down?

 3   BY MR. BURKS:

 4   Q    And Mr. Carter, I'm doing this so -- I'm trying to see

 5   if you can identify this claim.  It purports to be from

 6   Arin-Air Inc. and it purports to have a mechanic

 7   (indiscernible) on it.

 8              MR. BURKS:  All the way down (indiscernible).

 9   BY MR. BURKS:

10   Q    Have you seen this proof of claim, Mr. Carter, before?

11   A    I don't recall this one.

12   Q    It purports to be, certainly on its face --

13              MR. BURKS:  Go to Page 1, please.

14   BY MR. BURKS:

15   Q    -- a secured claim.  Isn't that the definition of Class

16   1, other secured claims?

17              MR. FITZMAURICE:  Objection, Your Honor.  The plan

18   speaks for itself in how it defines numbers of the classes.

19              THE COURT:  I'll sustain the objection.  Thank

20   you.

21   BY MR. BURKS:

22   Q    Do you know what class Arin-Air Inc. is included in?

23   A    Given that it appears to be a construction company,

24   it's like in the 5A group.  If it's there.  I don't know

25   that one particularly.
```

1    Q    And which group is that?

2    A    That's the one that gets 70 percent.

3    Q    The date of the lien purports to be 8/11/2023.  Do you

4    recall the date of the second lien filed by 2425 WL?

5              MR. FITZMAURICE:  So objection, Your Honor.  Calls

6    for a legal conclusion as to whether or not the -- if there

7    is a lien that is actually valid and perfected as of that

8    date.

9              THE COURT:  Ask the question again, Mr. Burks.

10   BY MR. BURKS:

11   Q    We see that Arin-Air Inc.'s lien affidavit by order or

12   not was filed on 8/11/2023.  Do you recall when the lien of

13   2425 WL, valid or not, do you recall when that was filed?

14             MR. FITZMAURICE:  So objection, Your Honor.  Lacks

15   foundation as to the date of the filing.  I don't know if

16   the witness knows what any of the markings on this document

17   mean.

18             MR. BURKS:  I asked him when it was filed.

19             THE COURT:  I'll overrule the objection.  You can

20   answer the question.  If you recall.

21             THE WITNESS:  I don't recall it --

22             THE COURT:  If you don't recall --

23             THE WITNESS:  -- when it was filed.

24   BY MR. BURKS:

25   Q    All right, sir.  Well, I have a question about that,

1    and I'm going to pull up the proof of claim, which has been

2    previously admitted into evidence so you can take a look at

3    it.  (indiscernible) one moment, sir.  I understand that you

4    don't remember all the claims.

5              MR. BURKS:  Is this you (indiscernible)?  Let's do

6    some work on it.

7              MR. BAKER:  FR claim?

8              MR. BURKS:  Of the (indiscernible).

9              MR. BAKER:  Yeah.  I would have to look there.

10             MR. BURKS:  (indiscernible).

11             MR. BAKER:  He's there.  Go up.  Keep going up.

12             MR. BURKS:  And on a slightly lighter note, I do

13   miss the days of paper a little bit.

14             MR. BAKER:  12.  No, I'm sorry.  (indiscernible).

15   Here it is.

16             MR. BURKS:  Yeah, there it is.  7.  Go down to the

17   middle of the page.

18   BY MR. BURKS:

19   Q    So the date of the lien affidavit of Arin-Air was

20   8/11/23 irrespective of this enforceability.  And the --

21             MR. TROOP:  Object -- I'm sorry, Your Honor.

22             MR. BURKS:  Can I ask the question?

23             MR. TROOP:  Well, no, because it's about what

24   you're talking about.  It's not admissible.

25             MR. SATHER:  Your Honor, this --

```
 1              THE COURT:  Whoa, whoa, whoa.  One at a time.  One

 2    at a time.  I'll let you go, Mr. Sather, but let him talk

 3    first.  Don't interrupt him.  Thank you.  Go ahead.

 4              MR. TROOP:  Your Honor, I do not believe that the

 5    Arin-Air proof of claim has been admitted into evidence.  If

 6    it's not been admitted into evidence, you're entitled to

 7    take judicial notice of the fact that it is on the claims

 8    register, but you can't take anything about it as being true

 9    for a fact that's been asserted.  There's no foundation for

10    that.  And therefore to the extent that this line of

11    questioning is trying to elicit something between the truth

12    of a document that is not admitted for the truth, it can't

13    be admitted for the truth of it and another document.  But

14    the line of questioning should be prohibited, Your Honor.

15              THE COURT:  Mr. Burks, I'll let you respond to

16    that.  Go ahead.  And I'll let Mr. Sather respond as well.

17              MR. BURKS:  So you can do -- I'm asking the Court

18    to take judicial notice of Docket Number 496-1, which is the

19    proof of -- excuse me.

20              THE COURT:  I'll take judicial notice of the

21    claims register in 2334815 Galleria 2425 (indiscernible).

22              MR. BURKS:  And all I'm asking is the Court to

23    take judicial notice that the claim includes (indiscernible)

24    with the date.  Whether it's valid or not is for you to

25    decide when you write your opinion on this (indiscernible).
```

1          THE COURT:  Okay.  So what's your question to this

2    witness then?

3          MR. BURKS:  My question is comparing the date of

4    lien on (indiscernible) for Arin-Air from 8/11/2023, whether

5    valid or not, is it before or after the trust date, whether

6    valid or not, in 2425 WL from Proof of Claim 7.

7          THE COURT:  Mr. Burks, that has so much

8    speculation in it, it's not even that funny.  So I'm not

9    going to allow that question.  But I can look at the claims

10   here to strike and compare dates.  Thank you.

11         MR. BURKS:  All right.  I ask -- hold on, please.

12   Your Honor, I ask the Court to take judicial notice of Claim

13   7-1 --

14         THE COURT:  I've already taken judicial notice of

15   the entire claims register, Mr. Burks.

16         MR. BURKS:  I ask the Court to take judicial

17   notice that the date of trust purports to be recorded on

18   8/11/2021.

19         THE COURT:  Scrolling down, that's an official

20   copy, right?

21         MR. BURKS:  Yes, Your Honor.

22         THE COURT:  It's unofficial.

23         MR. BURKS:  On the proof of claim it purports to

24   be recorded on 8/11/2021.

25         THE COURT:  What claim is that, Mr. Burks?

1          MR. BURKS:  This is Claim 7, the claim on 2425 WL.

2    Go to the first page where it says the date on it.

3          THE COURT:  Bear with me for one second.  I'm

4    looking at it.  I'm pulling it off ECF.

5          MR. BURKS:  Let me see it (indiscernible).  You're

6    going to put it on the screen, Judge?

7          THE COURT:  Yeah, I'm going to look at it.  But I

8    can put it on the screen.  It's already on the screen.

9          MR. BURKS:  Mm hm.  All right.  Keep going.  Stop.

10          THE COURT:  You want me to take judicial notice of

11    the fact that it was recorded on 5/11/2021?  Is that what

12    you're asking?

13          MR. BURKS:  That the proof of claim purports to

14    claim that it was recorded on 5/11/2021.

15          THE COURT:  The recording information seems to

16    indicate that it was filed on 5/11/2021.  That's at the top

17    of Page 5 of 18.  I'll take judicial notice that.

18          MR. BURKS:  Thank you, Your Honor.  May I ask the

19    Court to take judicial notice of Docket Number 496-1, the

20    proof of claim of Arin-Air Inc.?

21          THE COURT:  I've already taken judicial notice of

22    the entire claims register, Mr. Burks.  I don't need to.

23          MR. BURKS:  Will you take judicial notice that the

24    lien affidavit purports to be recorded on 8/11/2023?

25          THE COURT:  I'll take judicial notice of the

1    recording stamp dated 8/11/2023, Claim 17-1 on Page 4 of 9.

2         MR. BURKS:  Yes, Your Honor.  Thank you.

3    BY MR. BURKS:

4    Q    Mr. Carter, on that class of trade creditors, they are

5    getting paid 70 percent of their allowed claims.  Are you

6    aware of any of those claims that have recorded mechanic's

7    and (indiscernible) liens?

8    A    No.

9         MR. BURKS:  Your Honor, I may be complete with my

10   cross of this witness.  May I -- Mr. Ali Choudhri did ask

11   for me to speak to him.  May I take --

12        THE COURT:  That's fine.

13        MR. BURKS:  -- 60 seconds or more?  How much time

14   may I have?  90 seconds?

15        THE COURT:  I'll give you as much time as you

16   need, Mr. Burks.  I don't want to cut anyone off from asking

17   questions as long as they're relevant.  So go ahead.

18        MR. BURKS:  Thank you, Judge.  I'd rather handle

19   it this way.

20   BY MR. BURKS:

21   Q    Go back to the very beginning of the plan.  You talked

22   a little with your client -- with your attorney, sorry.  You

23   talked with your attorney about the negotiation and proposal

24   of the plan.  Did NBK negotiate the terms of this plan with

25   the Chapter 11 trustee?

1    A    No.

2    Q    Did NBK provide the terms of the plan to the Chapter 11

3    trustee?

4    A    Our lawyers did the initial draft.

5    Q    Okay.  Do you know -- for purposes of this hearing, do

6    you know if the Chapter 11 trustee asked for a cap on credit

7    bidding?

8    A    They did.

9    Q    Excuse me?

10    A    They did.

11    Q    And was a cap on credit bidding provided in the plan?

12    A    We declined that request.

13    Q    All right.  Did the Chapter 11 trustee request more

14    funds be paid in for the release of claims?

15    A    That was a suggestion they made.

16    Q    Is -- and did you?  Did you agree to provide more than

17    the estimated 3.7 note?

18         MR. FITZMAURICE:  Objection, Your Honor.  The

19    question is misleading.  The first question was what was

20    initially requested, and now it's what is ultimately

21    provided.  And counsel is asking whether what was initially

22    requested -- there's a logical connection between the two,

23    and he hasn't established that they're in fact --

24         THE COURT:  Let's ask a little more detail, Mr.

25    Burks.

```
 1                MR. BURKS:  Fair enough.  I agree.  Sorry.
 2   BY MR. BURKS:
 3   Q    You're aware of the cash payments in the -- that are
 4   provided for -- required of the bank if they get a release
 5   and the plan's confirmed, correct?
 6   A    Yes.
 7   Q    And your estimation is that it was about -- it's going
 8   to be more or less $3.7 million.
 9   A    Yes.
10   Q    And the board's approved that.
11   A    Yes.
12   Q    Did the trustee ask for more than that amount of $3.7
13   million?
14   A    I'm not aware of any specific request of an amount.
15   Q    Did the trustee ask for more?  Not an amount, more than
16   $3.7 million.
17   A    Well, that's an estimate.  It could be more.
18   Q    Did the trustee ask for more than $3.7 million?
19                MR. FITZMAURICE:  Objection.  Asked and answered.
20                THE COURT:  And I'll sustain the objection.
21   BY MR. BURKS:
22   Q    Has NBK's board approved more than $3.7 million?
23                MR. FITZMAURICE:  Objection, Your Honor.
24   Mischaracterizes the witness' testimony.
25                THE COURT:  I'll sustain the objection.
```

1   BY MR. BURKS:

2   Q    Do you know --

3            MR. SATHER:  Your Honor, if I may, I believe the

4   two counsel from NBK are making objections.  I would request

5   that they be limited to a single counsel per witness.

6            THE COURT:  Mr. Fitzmaurice will make objections.

7   Go ahead.

8    BY MR. BURKS:

9    Q   Do you know how many negotiating sessions there were

10   between NBK's attorneys and the Chapter 11 trustee or the

11   Chapter 11 trustee's attorneys?  I'm not asking you for what

12   was said, but do you know how many negotiation sessions were

13   made?

14   A   No.

15           MR. FITZMAURICE:  Objection, Your Honor.  Lacks

16   foundation.

17           THE COURT:  He answered the question.  I don't

18   need to rule on the objection.  Go ahead.

19   BY MR. BURKS:

20   Q    You negotiate deals and workouts on loans, don't you?

21   A    Yes.

22   Q    Isn't it true that NBK in its negotiations constantly

23   told the Chapter 11 trustee if you want the cash, I got to

24   have credit bidding?

25           MR. FITZMAURICE:  Objection, Your Honor.  Lacks

1    foundation.

2            MR. BURKS:  He either knows or he doesn't.

3            THE COURT:  I'll overrule the objection.

4    BY MR. BURKS:

5    Q    If you want the cash, we've got to have credit bidding.

6    Was that a point that the bank made with the trustee?

7            MR. FITZMAURICE:  So objection, Your Honor, to the

8    extent that the question calls for the witness to reveal the

9    contents of attorney-client privileged communications for

10   which I instruct him not to do so.

11           MR. BURKS:  I asked him what the bank's position

12   was.  I was careful not to dance in between the bank and the

13   attorneys.

14           MR. FITZMAURICE:  Well, what he asked was what did

15   the bank's lawyers say to the trustee.

16           THE COURT:  I'll sustain the objection as to

17   privilege.  Thank you.

18   BY MR. BURKS:

19   Q    Did the bank -- not the bank's lawyers, did the bank

20   take the position that no credit bidding equals no $3.7

21   million in the plan?

22   A    We agree with that concept, yes.

23   Q    Isn't it true that the bank said no release of claims,

24   no release of liability, no $3.7 million?

25   A    We agreed with that concept, yes.

```
 1    Q     Is there any other plan on file right now for the
 2    Chapter 11 trustee to consider?
 3    A     Not that I know of.
 4    Q     So it's your plan or the highway, correct?
 5    A     From my understanding.
 6          MR. FITZMAURICE:  Objection, Your Honor.
 7    Argumentative.
 8          THE COURT:  That's argumentative, Mr. Burks.
 9          MR. BURKS:  Yes, Your Honor.  Only 30 seconds to
10    confer with counsel to make sure that --
11          THE COURT:  Go ahead.
12          MR. BURKS:  Your Honor, I'm checking my notes to
13    make sure that I've asked what I need to ask and then I'll
14    pass the witness.  Thank you, Your Honor.  Pass the witness.
15          THE COURT:  All right.  Mr. Baker?
16          MR. BAKER:  No additional questions, Your Honor.
17          THE COURT:  All right.  Thank you.  Mr.
18    Fitzmaurice?
19          MAN 1:  Your Honor?  May I ask a few, Your Honor?
20          THE COURT:  No, you may not.  Thank you.
21          MAN 1:  I thought I misunderstood maybe in the
22    beginning of the hearing you said that I would be able to
23    ask --
24          THE COURT:  You may sit down, sir.  Thank you.  Go
25    ahead.
```

```
 1              MR. FITZMAURICE:  Your Honor, briefly, before I

 2   begin, have we invoked the rule?  I just want to make sure I

 3   understand who the rest of the -- other than the marshals in

 4   the back, the -- I understand who the rest of the folks are

 5   in the courtroom who are sitting behind the bar.

 6              THE COURT:  I --

 7              MR. FITZMAURICE:  Mr. Steidley is counsel for

 8   2425.  I want to make sure he's here in that capacity, not

 9   as a witness given we've had lots of lawyers called as

10   witnesses.

11              THE COURT:  The rule's --

12              MR. FITZMAURICE:  And he was previously a witness.

13              THE COURT:  The rule's been invoked.  If they

14   violate the rule, it's on the people who are sitting at that

15   table right over there.  They know what the rule is.  And if

16   it's invoked and it's violated, then they don't get to

17   testify.  It's simple.  Thank you.

18              MR. FITZMAURICE:  Thank you, Your Honor.

19              REDIRECT EXAMINATION OF MICHAEL CARTER

20   BY MR. FITZMAURICE:

21   Q   Mr. Carter, do you know whether the Chapter 11 trustee

22   has filed an objection to 2425 WL's proof of claim?

23              MR. BURKS:  Excuse me, Your Honor.  I'm invoking

24   the rule on Mr. Steidley.  Somebody might call him.

25              THE COURT:  He's already been in the witness --
```

1    he's already been -- he's already heard testimony.  He can't

2    testify.

3              MR. BURKS:  All right.

4              THE COURT:    Thank you.

5    BY MR. FITZMAURICE:

6    Q    I'll repeat the question, Mr. Carter.  Do you know

7    whether the Chapter 11 trustee has filed an objection to the

8    2425 WL proof of claim?

9    A    Not that I know of.

10   Q    Okay.  Counsel was asking you questions about the

11   classification of claims in the plan.  Do you recall that?

12   A    Yes.

13   Q    And one of those questions was about Class 7

14   subordinated claims.  Do you recall that?

15   A    Yes.

16   Q    Just in general --

17   A    Oh.

18   Q    -- that he asked you questions about that topic.

19   That's all I'm asking for now.

20   A    Yes.

21   Q    Okay.  Do you know whether there are in fact any

22   creditors in Class 7?

23   A    Not that I know of.

24   Q    Okay.  Do you know whether the trustee has filed a

25   complaint seeking to equitably subordinate certain claims

1    that have been filed in this case by affiliates of Mr.

2    Choudhri?

3    A    Not that I know of.

4    Q    Okay.  There were some questions that were asked of you

5    about a proof of claim filed by Arin-Air.  Do you recall

6    those questions?

7    A    Yes.

8    Q    And do you recall that Mr. Burks was asking whether you

9    knew anything about whether that claim was in fact secured?

10   Do you recall those questions?

11   A    Yes.

12   Q    Okay.  Do you know whether that claim filed by Arin-

13   Air, if it's allowed, is senior in priority to the bank's

14   claim?

15   A    Not that I know of.

16   Q    Okay.  If it is senior in priority to the bank's claim,

17   do you know what happens to it under the plan?

18   A    I believe it goes into Category 2.

19   Q    And do you know what -- do you recall what the

20   treatment is to those claims?

21   A    It's 100 percent payment.

22   Q    Okay.  Do you know whether the period of time for the

23   estate to object to claims, whether that period of time has

24   passed?

25   A    I don't know that specific.

1    Q    Did you specifically, you, Mr. Carter, did you

2    negotiate any terms of the Chapter 11 plan of liquidation

3    with the Chapter 11 trustee?

4    A    No.

5    Q    Do you know whether any other bank employee negotiated

6    the terms of the plan on behalf of -- well, with the Chapter

7    11 trustee?

8    A    No.

9    Q    Do you know whether counsel for NBK negotiated the

10   terms of the Chapter 11 plan with the Chapter 11 trustee?

11   A    That's my understanding, yes.

12   Q    The bank has previously sought to foreclose its

13   mortgage against the property.  Is that correct?

14   A    Yes.

15   Q    And in the event of a foreclosure, do you have an

16   understanding as to what would happen to any lien that comes

17   after the banks?

18   A    They would be wiped out --

19   Q    Would they --

20   A    -- if the bank is not fully repaid.

21   Q    And if there are any parties who hold any unsecured

22   claims, would they receive any benefit in the event of a

23   foreclosure?

24   A    Not if the bank is not fully repaid.

25              MR. BURKS:  Objection.  Calls for speculation as

```
 1    to what would be brought in at a foreclosure.

 2              MR. FITZMAURICE:  The witness' answer I think

 3    resolves the question.  He said unless -- not if the bank

 4    wasn't fully repaid.

 5              THE COURT:  I'll overrule the objection.  Thank

 6    you.  Based on the response.

 7    BY MR. FITZMAURICE:

 8    Q    Thank you, Mr. Carter.

 9              MR. FITZMAURICE:  No further questions, Your

10    Honor.

11              THE COURT:  Mr. Burks?

12              MR. BURKS:  Yes, Your Honor.

13              RECROSS-EXAMINATION OF MICHAEL CARTER

14    BY MR. BURKS:

15    Q    Mr. Carter --

16              MR. BURKS:  Put the plan up please.  It's 23.

17    It's 194.

18    BY MR. BURKS:

19    Q    Bear with me, Mr. Carter.  I want to ask you a question

20    about the plan without being -- I believe we're on page --

21    the first page.  You're the representative of the bank,

22    correct?

23    A    Yes.

24    Q    A deposition was taken of an officer of the bank who

25    had knowledge of this case.  Within the scope of that
```

1    deposition -- and was that taken of you?

2    A    Yes.

3    Q    Are you --

4           MR. FITZMAURICE:  Your Honor, objection as beyond

5    the scope.  I think he's limited to what the redirect was.

6           THE COURT:  It is.  He is limited, but he's asked

7    about a deposition.  That could be impeachment.  I'll let

8    him go.  But if it's beyond the scope you can raise your

9    objection again.  Go ahead.

10          MR. BURKS:  I would never do that, Judge.

11          THE COURT:  I don't believe that for a minute, Mr.

12   Burks.

13          MR. BURKS:  I tried to keep a straight face.

14   BY MR. BURKS:

15   Q    Mr. Carter, you recognize this document, correct?

16   A    Yes.

17   Q    All right.  Who signed this?

18   A    Well, if you scroll down I could tell you.

19   Q    Thank you.

20   A    Yes, it's me.

21   Q    And the National Bank of Kuwait signed it through its

22   representative Michael Carter, correct?

23   A    Yes.

24          MR. BURKS:  Mr. Baker, scroll down.

25   BY MR. BURKS:

```
1    Q    Did the law firm sign it?  I don't see their signature.

2    Did the law firm sign it?

3            MR. FITZMAURICE:  Your Honor, we'll stipulate that

4    the bank signed and the law firms didn't.

5            THE COURT:  All right.  Thank you.  It's -- I'll

6    take the stipulation.  Thank you.

7    BY MR. BURKS:

8    Q    Is your statement that you had no knowledge of the

9    negotiation of the terms of this plan?

10           MR. FITZMAURICE:  Objection, Your Honor.

11   Mischaracterizes the witness' testimony.

12           MR. BURKS:  I asked him if it was.

13           THE COURT:  I think it mischaracterizes his prior

14   testimony.  Ask a different question.

15           MR. BURKS:  Yes, Your Honor.

16   BY MR. BURKS:

17   Q    Do you know the terms back and forth of the

18   negotiations of this plan that you signed?

19   A    Generally.  Generally, yes.

20           MR. BURKS:  Nothing further, Judge.

21           THE COURT:  All right.  Thank you.  Mr. Baker?

22           MR. BAKER:  Nothing further, Your Honor.

23           THE COURT:  All right.  Thank you.  Mr.

24   Fitzmaurice?

25           MR. FITZMAURICE:  Nothing further for Mr. Carter,
```

1    Your Honor.

2            THE COURT:  Thank you.  Mr. Carter, you're

3    excused.  You may step down.  Thank you.  All right.  Mr.

4    Fitzmaurice, next witness.

5            MR. FITZMAURICE:  Your Honor, National Bank of

6    Kuwait calls the Chapter 11 trustee Christopher Murray.

7            THE COURT:  All right.  Mr. Murray, come on

8    forward.  I'll swear you in.  Please raise your right hand

9    and be sworn.  Do you swear or affirm to tell the truth, the

10   whole truth, and nothing but the truth so help you God?

11           THE WITNESS:  I do.

12           THE COURT:  Thank you.  Have a seat.

13           DIRECT EXAMINATION OF CHRISTOPHER MURRAY

14   BY MR. FITZMAURICE:

15   Q    Good morning, Mr. Murray.

16   A    Good morning.

17   Q    Were you in the courtroom earlier this morning when the

18   Court took appearances?

19   A    I was.

20   Q    Did you hear Mr. Shannon tell the Court that the

21   Chapter 11 trustee supports confirmation of the bank's plan?

22   A    Yes, I did.

23   Q    Do you support confirmation of the bank's plan?

24   A    I do.

25   Q    Why?

1    A    It is -- if confirmed, will lead to a superior outcome

2    for unsecured creditors and other parties in interest than

3    the alternative.

4    Q    Is there presently an alternative?

5    A    No.

6    Q    Was there previously an alternative?

7    A    There were other plans filed but ultimately withdrawn.

8    Q    In your role as Chapter 11 trustee, did you evaluate

9    the benefit to the estate from -- at the time when there

10   were in fact competing plans?

11   A    Yes.

12   Q    And did you make a determination as to which of the

13   competing plans was superior from the estate's purposes?

14   A    Yes.

15   Q    I should say from the estate's perspective.

16   A    Yes.

17   Q    Okay.  What was that determination?

18   A    I determined that the NBK plan was more likely to be

19   confirmed and therefore in the creditor's best interest.

20   And in that sense, superior to the competing plans.

21   Q    What factors did you consider in determining whether or

22   not you thought -- that you thought the bank's plan was more

23   likely to be confirmed than the plan proposed by the debtor?

24   A    I considered feasibility in terms of ability to fund.

25   That was critical.  I considered what -- whether there'd be

1    enough money for admins.  I considered permission to use

2    cash collateral, which was essential to keep the business in

3    an 11.  I considered what recovery to unsecured creditors

4    might be.  I considered how causes of action would be

5    preserved or not.  And I considered my assessment of

6    confirmability of the plan.  There might be other things,

7    but those are what come to mind right now.

8    Q    And after consideration of all of those factors, you

9    made the determination that the bank's plan was superior to

10   the debtor's plan.  Is that right?

11   A    Well, yeah.  I'd say that I think it was superior to

12   not having a plan.

13   Q    Did you make a determination as to whether you thought

14   the debtor's plan was confirmable?

15   A    I did.

16   Q    Did you make a determination as to whether you thought

17   the debtor's plan was feasible?

18   A    Yes.

19   Q    What was that determination?

20   A    I didn't believe it was feasible.

21   Q    Why did you believe the debtor's plan was not feasible?

22   A    Lack of funding primarily, but also the de facto veto

23   that the bank would have absent adequate assurance payments

24   and adequate protection, which I didn't see the feasibility

25   of.

1              MR. FITZMAURICE:  Your Honor, may I project?

2              THE COURT:  Sure.

3              MAN 1:  (indiscernible)?

4              MR. FITZMAURICE:  Please.  Thank you.

5              MAN 1:  Thank you.

6    BY MR. FITZMAURICE:

7    Q    Mr. Murray, I'm showing you Document ECF 302.  Do you

8    recognize this to be the third amended plan that was

9    proposed by the debtor jointly with 2425 WL?

10   A    Yeah, that's what it says.

11   Q    Do you recall whether the funding source was for the

12   payments that the debtor was required to make under this

13   plan?

14   A    I don't.  I don't remember.

15             MAN 1:  I think you're having your Adobe problem

16   again.

17             MR. FITZMAURICE:  Oh, I am.  That's unfortunate.

18   Here I was, Your Honor.  I thought I was organized.  I had

19   all my documents open.  All my -- for my witnesses ready to

20   go.  I apologize.

21             THE COURT:  There are reasons why we hate Adobe,

22   and this is one of them.

23             MR. FITZMAURICE:  So Your Honor, I'm going to ask

24   my colleague to open the document at ECF 302, which is the

25   debtor's third amended plan.  I will unplug.  And I'm going

1    to ask you, Mr. Akuffo, to scroll down to the end.  Yep.  Up

2    a little bit to the first page of the term sheet.

3    BY MR. FITZMAURICE:

4    A    Okay.  I see that.

5    Q    Do you recall reviewing this summary of key terms of

6    and conditions for debtor-in-possession term loan facility?

7    A    Yes.  Yes.

8    Q    Do you know whether this was, in fact, the source of

9    funding for the payments the debtor was required to make

10   under its third amended plan?

11   A    Yes, I think that's what they were proposing to fund

12   their plan with.  Yes.  Yeah.

13   Q    Did you make an assessment as to whether or not funding

14   would in fact be available?

15   A    Yes.

16   Q    And what was that assessment?

17   A    I doubted it would be.

18   Q    And what were the factors that led to that conclusion?

19   A    Well, the history of the debtor generally being unable

20   to secure funding even for its settlement agreement, the

21   inability to fund its first bankruptcy case, its inability

22   to show a commitment to funding at any point during the

23   case.  Those things generally, but also a proposed DIP

24   lender term sheet is not a loan.

25   Q    Do you know whether this term sheet contemplated a loan

1   that would prime the bank's lien?

2          MR. FITZMAURICE:  I'll ask you, Mr. Akuffo, to

3   scroll --

4   BY MR. FITZMAURICE:

5   A    I don't remember this one specifically.  I remember

6   thinking --

7          MR. FITZMAURICE:  Go up a little bit.

8   BY MR. FITZMAURICE:

9   A    Yeah.

10         MR. BURKS:  Your Honor, I object to any further

11  answer.  The document speaks for itself and he has answered

12  that he doesn't remember.

13         MR. FITZMAURICE:  Your Honor, I'm allowed to use

14  essentially anything to try to refresh the witness'

15  recollection, which is what I'm trying to do.

16         THE COURT:  That's fine.  I'll overrule the

17  objection.

18  BY MR. FITZMAURICE:

19  Q    Mr. Murray, I'd ask you to look at the sort of middle

20  portion of your screen.  Does that refresh your recollection

21  as to whether or not --

22  A    I see now it's a priming DIP.

23  Q    Okay.  Did you make an assessment as to whether you

24  thought a priming DIP would be available to the debtor in

25  this case?

1    A    I did.

2    Q    And what was that assessment?

3    A    That they would not be able to meet the requirements to

4    prime.

5    Q    Do you know whether the debtor sought to support its

6    payment obligations in connection with its fourth amended

7    plan with this same term sheet?

8    A    I don't remember.

9         MR. FITZMAURICE:  So I'm going to ask my colleague

10   to pull up Document Number ECF 366.  Sorry, 366.

11        MAN 1:  365.

12        MR. FITZMAURICE:  366 is what I'm looking for.  Go

13   to the first page, please.

14        MAN 1:  (indiscernible).

15        MR. FITZMAURICE:  I don't.  Thank you.

16   BY MR. FITZMAURICE:

17   Q    Mr. Murray, I'm showing you the document at ECF 366.

18   Do you recognize this to be the disclosure statement the

19   debtor filed in connection with its fourth amended joint

20   plan with 2425 WL?

21   A    Yes, I do.

22        MR. FITZMAURICE:  So I'll ask my colleague to move

23   to Page 47 of 129.

24        MR. BURKS:  Is this the fourth amended

25   (indiscernible)?  What's --

1    BY MR. FITZMAURICE:

2    Q    Do you see there, Mr. Murray, the same summary key

3    terms of the conditions for debtor-in-possession term loan

4    facility?

5    A    Yes, it looks like the one we just looked at.

6    Q    All right.  And does this refresh your recollection as

7    to whether the same contemplated financing from Legalist was

8    used by the debtor to support the payments for

9    (indiscernible) it made under its fourth amended plan?

10   A    I mean, not this specifically, but I recall that the

11   funding source in those plans was the same.  Or would've

12   been the same had they had the funding.

13   Q    Thank you.

14        MR. FITZMAURICE:  And Mr. Akuffo, if we could go

15   to ECF Number 377 please.

16   BY MR. FITZMAURICE:

17   Q    Mr. Murray, do you recognize this to be the debtor's

18   fifth amended plan?

19   A    Yes.

20   Q    And this was the last plan the debtor had on file?

21   A    Yes.

22   Q    And this is the plan that was ultimately withdrawn?

23   A    That's my understanding, yes.

24        MR. FITZMAURICE:  I don't have the page number.

25   Can you scroll down for me?

```
 1              MAN 1:  Yeah, he's looking for the term sheet.
 2              MR. FITZMAURICE:  Thank you.
 3    BY MR. FITZMAURICE:
 4    Q    Mr. Murray, do you see again in the same May 3, 2024
 5    summary of key terms under the conditions for debtor-in-
 6    possession term loan facility?
 7    A    Yeah.  It looks like the same term sheet, yes.
 8    Q    So is it your understanding that the debtor was again
 9    contemplating using the same facility in support of the
10    payments under the fifth amended plan?
11    A    Yeah, it was the Legalist funding.  Yes.
12    Q    Are you aware of whether Legalist ever approved its
13    funding?
14    A    No, I'm not.
15    Q    Do you know of -- has anyone told you that Legalist did
16    not in fact approve funding for the plan?
17              MR. BURKS:  Calls for hearsay.  Has anyone told
18    you?
19              THE COURT:  I'll sustain the objection.
20    BY MR. FITZMAURICE:
21    Q    Do you know whether or not Legalist ever in fact
22    approved funding contemplated by the debtor's plan?
23              MR. BURKS:  Objection.  Calls for hearsay.  He
24    already stated that he's not aware.
25              MR. FITZMAURICE:  But the last question was
```

1    whether somebody told him.  This is whether he's aware.

2              MR. BURKS:  Two questions ago was, was he aware.

3              THE COURT:  I'll overrule the objection.  He can

4    answer the question.  Thank you.  If you're aware.

5    BY MR. FITZMAURICE:

6    A    I know we had asked for information to confirm that --

7    whether there was funding.  I never saw any kind of

8    confirmation.  So...

9              MR. FITZMAURICE:  I'm going to ask my colleague to

10   pull up a document at ECF 527-3.

11   BY MR. FITZMAURICE:

12   Q    Mr. Murray, you've got in front of you a document

13   that's ECF 527-3, a June 13, 2024 email.  That purports to

14   be an email from someone named Brian Rice to me.  Do you see

15   that?

16   A    I see it.

17   Q    Reading this email, does that refresh your recollection

18   as to whether or not Legalist ever approved the finance --

19   the contemplated financing for the debtor?

20             MR. BURKS:  Objection.  The rules of evidence do

21   not allow that witness' recollection to be refreshed by a

22   hearsay document.

23             MR. FITZMAURICE:  In fact, they specifically do,

24   Your Honor.  I'm allowed to show him anything.

25             THE COURT:  I'll overrule the objection.

```
1    BY MR. FITZMAURICE:

2    A    I mean, it doesn't refresh my recollection.  I don't

3    think I've seen this email.

4    Q    Okay.  Thank you.

5         MR. FITZMAURICE:  You can take that one down.

6    Thank you.  Actually, sorry.  Just one more.  ECF Number

7    474.

8    BY MR. FITZMAURICE:

9    Q    Mr. Murray, showing you what's -- the document that's

10   been docketed at ECF Number 474.

11        MR. FITZMAURICE:  Just scroll up to the top so we

12   can see that please.  Thank you.

13   BY MR. FITZMAURICE:

14   A    I recognize this.

15   Q    And is this the debtor's withdrawal of its fifth

16   amended plan?

17   A    Yeah, right before a show-cause hearing on the plan,

18   yes.

19   Q    Do you know what that show-cause hearing was intended

20   to address?

21   A    I recall that the court ordered the disclosure of

22   documents evidencing availability of funding.  Something

23   like that.  And I remember waiting for that day.  Then it

24   came and went and there was no proof of funding that was

25   ever filed.
```

 1              MR. FITZMAURICE:  Okay.  You can take this one

 2    down.  Thank you.

 3    BY MR. FITZMAURICE:

 4    Q    Mr. Murray, are you aware of whether or not the debtor

 5    has asserted claims against the National Bank of Kuwait?

 6    A    Yes.

 7    Q    In the course of your duties in this case as the

 8    Chapter 11 trustee, have you investigated those claims?

 9    A    Yes.

10              MR. FITZMAURICE:  I'm just going to grab a

11    document from the table if that's okay.

12              THE COURT:  That's fine.  Feel free.

13              MR. FITZMAURICE:  Always at the bottom of the

14    pile.

15    BY MR. FITZMAURICE:

16    Q    So Mr. Murray, I'd like to discuss with you the things

17    that you did to investigate the debtor's claims against the

18    bank.  Did you discuss the nature of those claims with the

19    debtor's counsel?

20    A    Yes.

21    Q    Now the debtor has more than one counsel.  Is there --

22    can you let us know who you spoke to?

23    A    At different points I spoke to Mr. Baker, I spoke to

24    Mr. Choudhri personally, spoke to Ms. Hayward, spoke with

25    Mr. Alexander.  At some point I think we spoke, but Mr.

1    Sather.  I don't think I discussed it ever with Mr. Burks.

2    Might have discussed it with Ms. Brown, but I don't remember

3    that.  But there were lots of discussions with the debtor

4    and its representatives about the claims.

5    Q    Do you have in your mind a rough estimate of the time

6    that was spent by you having conversations with the debtor

7    and/or its representatives relating to the claims asserted

8    against the bank?

9          MR. BURKS:  Objection, Your Honor.  Ambiguous.  I

10   need to know is he talking about his time personally or his

11   counsel's time combined with his or his counsel's time.

12         THE COURT:  I understood the question to be his

13   time, so I'll take it such.  Mr. Murray, go ahead.

14   BY MR. FITZMAURICE:

15   A    Personally probably a dozen hours.

16   Q    Are you aware of whether or not your counsel had any

17   separate conversations with any of those folks that you were

18   not involved in?

19   A    I believe they had lots of conversations, yes.

20   Q    And do you know approximately how much time your

21   counsel spent talking to those folks about the debtor's

22   claims against the bank?

23   A    I don't know.

24   Q    Rough order of approximation more or less than -- of

25   the time that you spent?  If you know.

```
 1              MR. BURKS:  Objection.  Asked and answered I don't

 2    know.

 3              THE COURT:  I'll sustain the objection.  Thank

 4    you, Mr. Burks.

 5    BY MR. FITZMAURICE:

 6    Q    Did you discuss the claims with Mr. Choudhri?

 7    A    Yes.

 8    Q    On one occasion, more than one occasion?

 9    A    At least three in person and there were other

10    communications too.  I don't know how many.

11    Q    Did you review any pleadings filed by the debtor

12    against the National Bank of Kuwait?

13    A    Yes.

14    Q    Did you review any pleadings relating to claims filed

15    by Mr. Choudhri against the National Bank of Kuwait?

16    A    Yes, I think so.

17    Q    Did you review any pleadings relating to any claims

18    filed by 2425 WL against the National Bank of Kuwait?

19    A    Yes.

20    Q    Mr. Murray, do you know who James Pope is?

21    A    I don't know him personally.  I think he entered an

22    appearance as debtor's counsel.

23    Q    Did you talk to him at all about the claims against the

24    bank?

25    A    He might've been on one of the early phone calls, but I
```

1    don't remember specifically.

2    Q    There was an attorney who testified here on Monday

3    named Jim Wetwiska.  Do you recall that?

4    A    Yes.  Yes.

5    Q    Did you speak with Mr. Wetwiska about the claim against

6    the bank?

7    A    I did, yes.

8    Q    There was another attorney who testified here on Monday

9    named Jerry Alexander.  Do you recall that?

10   A    Yes.

11   Q    And did you speak with Mr. Alexander about the claims

12   against the bank?

13   A    Yes.

14   Q    Did you speak with anyone -- so again, in the context

15   of your investigation into the claims against the bank, did

16   you speak with anyone that's not affiliated with the debtor?

17   A    Yes.

18   Q    Can you recall anyone that you spoke with who wasn't

19   affiliated with the debtor?

20   A    Well, I spoke with your team.  I know my counsel

21   interviewed Mr. Cauldwell.  I and my counsel spoke with a

22   woman named Azeemeh Zaheer and her counsel.  And that's who

23   I can recall right now.

24   Q    Without revealing anything that you discussed with the

25   contents of any communications, the specific contents of any

1  communications you had with your attorneys, did you in

2  general discuss counsel's meeting with Mr. Cauldwell with

3  counsel?

4  A    Yes.

5  Q    And I apologize.  I don't recall whether you said you

6  attended the meeting with Ms. Zaheer or not.

7  A    I was at most of the meeting with Ms. Zaheer.  Then I

8  had to leave.

9  Q    Okay.  Again, without revealing the contents of any

10  communications with counsel, did you discuss with them the

11  portions of the meeting that you missed?

12  A    Yes.

13  Q    Whether formally or informally, did you request

14  document production from the debtor?

15  A    Yes, we did.

16  Q    And were any documents provided?

17  A    I don't think they ever produced anything in the formal

18  discovery.

19  Q    But informally did the debtor provide you with any

20  information?  Withdrawn.  Informally, did the debtor provide

21  you with any documents?

22  A    Yes.

23  Q    Do you recall what those were?

24  A    I recall there was a letter and an email I think from

25  Mr. Alexander.  There might've been a letter or email from

1    Mr. Wetwiska.  At some point there was a PowerPoint

2    presentation I think.  I think that was about the claims

3    against the bank that we paged through at Mr. Choudhri's

4    desk early on.  There might've been some other papers, but

5    that's all I remember was informally produced.

6    Q    And that description of the discovery, is that the same

7    if I ask you about Mr. Choudhri and the debtor and 2425 WL?

8    A    Yes.  I don't the WL entity provided anything apart

9    from what Mr. Choudhri provided.

10   Q    In connection with assessing the estate's claims

11   against the bank, did you review the settlement agreement?

12   A    Yes.

13   Q    In connection with assessing the estate's claims

14   against the bank, did you form a view as to the

15   enforceability of the settlement agreement?

16   A    Yes.

17   Q    And what was that view?

18        MR. BURKS:  Objection.  This is a multi-layered

19   question based on his entire investigation.  The --

20   everything that is attorney-client privilege with respect to

21   NBK, unless the trustee has waived it, is privileged.  WL --

22   these are settlement negotiations regarding the description

23   of the settlement agreement, parties' views of them.  2425

24   WL does not waive the settlement privilege.

25        MR. FITZMAURICE:  So I'm not asking about any of

```
 1    that.  I'm asking about the confidential settlement

 2    agreement that was entered into between the debtor Mr.

 3    Choudhri, and Naissance Galleria on the one hand and the

 4    National Bank of Kuwait on the other hand.  The agreement

 5    that is in evidence, that's the agreement that I'm talking

 6    about.  And 2425 is not a party to that.  So I'm not sure

 7    what the basis of the objection is.

 8                 THE COURT:  Go ahead.  Make your objection again.

 9                 MR. BAKER:  Your Honor, the debtor does not waive

10    -- agree to waive the privilege.  I'm going to object.

11                 MR. FITZMAURICE:  Mr. Baker has no right to assert

12    the debtor's privilege.  There's a Chapter 11 trustee in

13    this case.

14                 THE COURT:  Mr. Baker, you can't assert any

15    privilege to the debtor.  That's clear.  You can't.  Okay?

16    So Mr. Burks, tell me your objection one more time.

17                 MR. BURKS:  Yes, Your Honor.  The -- NBK's

18    attorney has gotten the trustee to state a wide variety of

19    things in conversations and documents that he's looked at.

20    And then based on his analysis of everything, he's being

21    asked to form a legal conclusion as to the validity of the

22    settlement agreement based on all the conversations, almost

23    of which are privileged settlement communications, Judge.

24                 THE COURT:  I disagree.  I really do.  You can

25    answer the question.  I'll overrule the objection.
```

```
 1              MR. BURKS:  Based only his view of the settlement
 2    agreement?
 3              THE COURT:  I overruled the objection, Mr. Burks.
 4    You don't get to reargue the objection.  Please sit down.
 5    Thank you.  Go ahead.  You can answer the question.
 6    BY MR. FITZMAURICE:
 7    Q    Do you recall the question?
 8    A    I think it was what my -- ask again.
 9    Q    Yes.  After -- as a result of the investigation that
10    you performed in connection with reviewing the estate's
11    claims against the bank, did you form a view as to the
12    enforceability of the settlement agreement?
13    A    Yes.
14    Q    And what was that view?
15    A    That it was likely enforceable.
16    Q    In conducting your investigation, were you looking for
17    factual support for the concept that the settlement
18    agreement could be rescinded?
19    A    Yes.
20    Q    Did you find any?
21    A    No.
22    Q    Are you aware that Mr. Choudhri and the debtor assert
23    claims against the bank that relate to events that occurred
24    after August 22nd of 2022?
25    A    Yes.
```

1    Q    And I'll just represent to you that's the date of the

2    settlement agreement.  We can look at it, but the document's

3    in evidence.  Did they provide you any factual support for

4    those claims?

5    A    They told me what their allegations were, yes.

6    Q    Did they provide you with any documentary evidence in

7    support of those claims?

8    A    No.

9    Q    Did you form a view as to the factual support for those

10    claims?

11    A    Yes.

12    Q    What was that?

13    A    That it was weak to non-existent.

14    Q    In connection with your investigation into the estate's

15    claims against the National Bank of Kuwait, did you form a

16    view as to the voracity of Mr. Choudhri?

17    A    Yes.

18    Q    What was that?

19    A    I did not think I could rely on the voracity of things

20    Mr. Choudhri told me.

21    Q    Have you read the plan that NBK has filed in this case?

22    A    Yes.

23    Q    Do you understand that the plan reflects a compromise

24    or settlement of estate claims against the bank?

25    A    Yes.

1    Q    Do you think that settlement should be approved?

2    A    Yes.

3    Q    Do you think that settlement is in the best interest of

4    the estate?

5    A    Yes, absolutely.

6    Q    Do you think that the funding the bank is providing

7    under the plan provides more benefit to the estate than

8    pursuing those claims?

9    A    Yes.

10    Q    Have you -- during the course of your investigation,

11    did you form an opinion as to the value of the estate's

12    claims against the bank?

13    A    Yes.

14    Q    Did you form a view as to whether that value was more

15    or less than the value the bank is providing under the plan?

16    A    Yes.

17    Q    Is it more or less?

18    A    I'd say much less.

19    Q    Mr. Murray, does the plan incorporate an auction of the

20    property?

21    A    Yes.

22    Q    Is that auction going forward?

23    A    Yes.

24    Q    Does that mean that there's more than one qualified

25    bidder?

1    A    Yes.

2    Q    The bank is a qualified bidder?

3    A    Yes, by definition.

4    Q    Pursuant to the stalking horse agreement?

5    A    Yes, and I think bid procedures motion to -- for order,

6    yeah.

7    Q    So I'm going to ask you questions about the auction.

8    To the extent that there is confidential information that

9    you feel you can't reveal, then please just tell me that.

10    But other than the bank, how many qualified bidders are

11    there?

12    A    There is one other bidder.

13    Q    And who is that?

14    A    It is -- I always say it wrong.  I think it's QB Loop

15    or QB Investments Loop.  It's an entity that's represented

16    by Simon Mayer.

17    Q    How much is their bid?

18    A    Their bid is $21 million.

19    Q    The property is -- was being marketed by Hilco.  Is

20    that correct?

21    A    I should say their qualifying bid is $21 million.  We

22    have not had the auction.

23    Q    And the property is being marketed by Hilco.  Is that

24    correct?

25    A    Yes.

1    Q    You were here the other day and there was a lot of

2    questions and testimony concerning the Hilco marketing

3    process.  Do you recall that?

4    A    Yes.

5    Q    And there were questions and testimony concerning the

6    Hilco brochure.  You recall that?

7    A    I do.

8    Q    And there was reference in the Hilco brochure to a

9    minimum overbid amount?

10    A    Yes.

11    Q    What is the minimum overbid amount?

12    A    It was 19,750,000 I think.  It starts with a 19.

13    Q    And I apologize for the stupidity of this question, but

14    21 million is more than 19,750,000, correct?

15    A    Yes, it is.

16    Q    Okay.  Do you know whether Mr. Choudhri has any

17    connection to QB Loop?

18    A    I do.

19    Q    And does he?

20    A    Yes.

21    Q    And what is that?

22    A    Mr. Mayer told me that Mr. Choudhri's mother is one of

23    the participants in the investor group that that group

24    represents.  Also, Mr. Anwar Qadeer, who I think organized

25    that group, had told me -- I sense an objection coming.

```
 1              MR. BURKS:  Yeah, I'm --

 2              MR. FITZMAURICE:  Hasn't come yet though.

 3              MR. BURKS:  Objection.  No personal knowledge.

 4    Complete hearsay.  He has no personal knowledge of what the

 5    -- what, if any, connection there is between Mr. Choudhri

 6    and Q whatever.  And it's your role, frankly.

 7              MR. FITZMAURICE:  I'd like to respond to that

 8    objection.

 9              THE COURT:  Which one?

10              MR. FITZMAURICE:  The objection that it lacks

11    personal knowledge.

12              MR. BURKS:  Hearsay and relevance.

13              THE COURT:  I think it's relevant.  I certainly

14    think it's relevant.  I'll overrule that objection.  Whether

15    it's hearsay or not is a different issue.

16              MR. FITZMAURICE:  I'll ask a different question,

17    Your Honor.

18              THE COURT:  Thank you.

19    BY MR. FITZMAURICE:

20    Q    Did anyone tell you that Mr. Choudhri has a connection

21    to QB Loop?

22              MR. BURKS:  Hearsay.

23     BY MR. FITZMAURICE:

24    A    Yes, he did.

25    Q    Mr. Choudrhi did.
```

1    A    Yes.

2              MR. FITZMAURICE:  Statement by a party opponent,

3    Your Honor.

4              THE COURT:  All right.  I'll overrule the

5    objection.

6              MR. BURKS:  All right.

7    BY MR. FITZMAURICE:

8    Q    What did he tell you?

9    A    During our lunch break on Monday --

10             MR. BURKS:  Objection, hearsay.

11             MR. FITZMAURICE:  It's --

12             THE COURT:  Again, it's -- I'll overrule the

13   objection.  Go ahead.

14   BY MR. FITZMAURICE:

15   A    During our lunch break on Monday, he -- I forgot

16   exactly what he said, but I said, "Why didn't you make a

17   bid."  And he said, "I did.  QB Loop is me."

18   Q    Mr. Murray, when the bank filed its proposed plan of

19   liquidation on the docket, was that the first time you had

20   seen it?

21   A    I'm sorry.  Repeat the question.

22   Q    Sure.  When the bank filed the proposed plan of

23   liquidation of the debtor on the docket, was that the first

24   time you had seen all that?

25   A    No.

1    Q     So you had seen it prior to that.

2    A     Yes.

3    Q     Do you know whether bank's counsel provided your

4    counsel with direct copies of the plan?

5    A     Yes.

6    Q     Do you know whether the respective counsel, yours on

7    the one hand, the bank's on the other, discussed proposed

8    revisions to the plan?

9    A     Yes.

10   Q     Do you know whether your counsel made suggested

11   revisions to the plan?

12   A     Yes.

13   Q     Do you know whether the plan that's on file reflects at

14   least some of the suggestions that you or your counsel made?

15   A     Not as many as I could like, but yes.  At least some.

16   Q     Do you know if the original draft plan that you or your

17   counsel received from the bank provided for a recovery from

18   Choudhri's or the debtor's former counsel?

19   A     I think initially --

20         MR. BURKS:  Go ahead.

21   BY MR. FITZMAURICE:

22   A     One of the drafts had debtor's former counsel not

23   considered a trade creditor and I think maybe classified as

24   an insider or otherwise subordinate to the trade class, but

25   I don't remember exactly.

1    Q    Did you or your counsel ask the bank to classify those

2    creditors in a manner that they would receive some value

3    under the plan?

4    A    Yes.

5    Q    Does the plan so classify those creditors?

6    A    Yeah.  I thought that exclusion of debtor's prior

7    counsel from trade -- I didn't see how that was fair to that

8    creditor group that they provided services for the debtor.

9    And their side ultimately acquiesced and included them in

10    the trade clause.

11    Q    Do you know whether the debtor's former counsel are in

12    the Class 5A trade class or if they are in another class?

13    A    I don't.  I don't remember.

14            MR. FITZMAURICE:  Let's -- can we open the --

15    let's look at the plan.

16            MAN 1:  It's the only number.  Sorry.

17            MR. FITZMAURICE:  You need to plug in I think.

18    That's what I got.  It's all right.  Yeah, and just a little

19    bit so we can see 5A.

20    BY MR. FITZMAURICE:

21    Q    So looking at the descriptions here, Mr. Murray, on

22    Page 12 of the bank's plan, does this refresh your

23    recollection as to where the debtor's former counsel are

24    classified?

25    A    No, I think I need the definition of trade general

1    unsecured.

2            MR. FITZMAURICE:  Can we scroll up, please, to

3    definition of trade general unsecured?

4            MR. BURKS:  Objection to the answer to that

5    question.  The witness has demonstrated that he does not

6    know, and then the document speaks for itself under the Best

7    Evidence Rule.

8            THE COURT:  I'll overrule that objection.

9    BY MR. FITZMAURICE:

10   Q    So Mr. Murray --

11   A    I think you need to --

12   Q    -- looking the definition of trade unsecured creditors

13   -- excuse me, looking at the definition of trade unsecured

14   claims --

15           MR. FITZMAURICE:  Keep going down so that the

16   chart shows.

17   BY MR. FITZMAURICE:

18   A    I don't see her firm on here.  Can I see the --

19   Q    Was it other general unsecured?

20           MR. FITZMAURICE:  Can we see the definition of

21   general unsecured claims?

22   BY MR. FITZMAURICE:

23   A    Yeah, it must be that unless her firm is still listed

24   on the insider claims that are subordinated.  Do you have

25   that definition?  The --

1    Q    What's that?

2    A    -- subordinated claims.  Yeah.  This -- yeah, I was

3    misremembering.  It was originally subordinated and then it

4    wasn't I think was how we resolved that.

5    Q    Okay.  So do you know whether debtor's former counsel

6    is -- receives value under the plan?

7    A    Yes.

8    Q    And that's as a result of a request that you made to

9    the bank?

10   A    Yes, that's right.

11   Q    In your work as the Chapter 11 trustee in this case,

12   have you made an assessment of any claims that have been

13   filed against the estate?

14   A    Yes.

15   Q    Did you make an assessment of the claim that was filed

16   by 2425 WL?

17   A    Yes.

18   Q    You objected to that claim.

19   A    I did.

20   Q    What's the basis of that objection?

21   A    I've got to look at the objection.  I don't remember.

22   I'm pretty sure it was subordination.

23        MAN 1:  Page 402?

24        MR. FITZMAURICE:  Yeah, I'm not sure I've looked

25   at that since we found it.

```
1    BY MR. FITZMAURICE:

2    A    If you could just scroll down --

3              MR. FITZMAURICE:  Mr. Akuffo, I'll just ask you to

4    scroll through --

5    BY MR. FITZMAURICE:

6    A    -- and I can try to read it.

7              MR. FITZMAURICE:  -- slowly please.

8    BY MR. FITZMAURICE:

9    A    Try to remember exactly what the basis (indiscernible).

10             MR. FITZMAURICE:  So let's stop there.

11   BY MR. FITZMAURICE:

12   A    Oh, right.  Okay.

13   Q    So Mr. Murray, does reading the document here at ECF

14   402 refresh your recollection as to the basis of the

15   objection that you filed to the 2425 WL claim?

16   A    Yeah.  I think we take the position that the asserted

17   debt and its perfection and its security interest are not

18   valid for enforcement.

19   Q    Does the trustee take the position that there is in

20   fact no debt owed by the estate to 2425 WL?

21   A    Yes.  Yeah.  I think it was a fake debt.

22   Q    I'm sorry.  It was a fake debt?

23   A    Fake debt.

24   Q    Thank you.  Have you objected to any other claims --

25   A    Yes.
```

1    Q    -- so far?  Do you recall any other claims that you

2    objected to?

3    A    I think we -- that are filed.

4    Q    That are -- and I'm only asking about the claim

5    objections that have been filed as of the day, the 19th of –

6    –

7    A    Yeah.  I think -- of what we filed, I think we objected

8    to Mr. Choudhri's personal claim by Jetall Capital, and then

9    we filed an adversary against Jetall Companies.  Which I

10   think also had filed a claim and the objection is in the

11   adversary.

12   Q    And do you recall what the basis of the adversary

13   proceeding against Jetall Companies is?

14   A    There's a few.  There's preferences, fraudulent

15   transfers, breach of fiduciary duty I'm pretty sure.

16   Q    Does the adversary seek equitable subordination?

17   A    Yes, I think so.  To the extent there was a secured

18   claim by Jetall Companies.

19   Q    Mr. Murray, do you know whether the plan of disclosure

20   statement filed -- withdrawn.  Do you know whether the

21   voting procedures in connection with the (indiscernible)

22   plan of liquidation of the debtor called for balance to be

23   delivered to you or your counsel?

24   A    I know I got a solicitation package.  I don't know

25   where I was on the procedures there though.

1    Q    Do you know whether ballots were in fact delivered to

2    you?  Whether completed ballots were delivered to you.

3    A    Oh, yes.  I thought you were talking about the

4    solicitation.  No, the completed ballots, yes.

5    Q    Yes, apologize for my -- for the bad question.

6    A    Well, not to me.  I think Mr. Shannon received those.

7    Or at least he collected them.  I might've been copied on

8    the email.

9         MR. FITZMAURICE:  So I'm going to ask Mr. Akuffo

10   to pull up a document at ECF 428.

11   BY MR. FITZMAURICE:

12   Q    Did your counsel file this ballot summary?

13   A    Yes.

14        MR. FITZMAURICE:  Can you scroll down please?  Go

15   back to the -- yep, right there.

16   BY MR. FITZMAURICE:

17   Q    Does this reflect -- accurately reflect the votes, the

18   ballots( that were received -- let me start again.  I

19   apologize.  Does this accurately reflect the ballots that

20   were received by your counsel?

21   A    Yes.

22        MR. FITZMAURICE:  Your Honor, I'd ask the Court to

23   accept into evidence the document at ECF Number 428.

24        THE COURT:  All right.  I'll take the ballot

25   summary into evidence at 428.  Thank you.

1          MR. FITZMAURICE:  Your Honor, might I take a

2    moment and see --

3          THE COURT:  Sure.  Feel free.

4          MR. FITZMAURICE:  Thank you.

5          MR. BURKS:  Your Honor, may I be excused?  Just --

6    I have --

7          THE COURT:  Sure.  I plan on breaking in just a

8    minute.

9          MR. FITZMAURICE:  Your Honor, if it helps speed up

10   the break, I have no further questions for Mr. Murray at

11   this time.

12         THE COURT:  All right.  Mr. Murray, why don't you

13   step down?  Now would be a good time to break.  Now here's

14   my only concern.  I have someone checking on it as it is.  I

15   don't know whether you want to break for lunch or not.  The

16   problem is I can't guarantee that we can everyone rescreened

17   to come back into the courthouse.  They're checking on that

18   now.  Assuming that they can, and if you can go back out and

19   then get rescreened coming back in, you guys want to break

20   for lunch?

21         MR. SHANNON:  I think it makes sense.

22         MR. FITZMAURICE:  If we can, Your Honor, then yes.

23   Otherwise I think we'll plow through.

24         CLERK:  He's going downstairs to check.

25         THE COURT:  Okay.  So we'll check.  In a just

 1    minute we'll have Mr. Baker come back.  As long as you can

 2    rescreened I'm willing to give you a break.  At least you

 3    guys can go across the street and get in air conditioning.

 4    That would be a huge benefit I'm sure.  I don't have that

 5    ability unfortunately.  So let's see.  And what I'll do is

 6    I'll switch when we come back.  I'll come back out and I'll

 7    tell you what we're going to do relative to breaking.  I

 8    want to give you a lunch break.  I may be limited in what I

 9    can do based on screening, okay?  So I'll step down for a

10    few minutes.

11              MR. FITZMAURICE:  Thank you, Your Honor.

12              MR. BURKS:  Thank you, Your Honor.

13              CLERK:  All rise.

14              (Recess)

15              CLERK:  All rise.

16              THE COURT:  Mr. Burks, I think that you are up.

17              MR. BURKS:  I think I'm up and I'm feeling very

18    much better than I was before break.  Thank you, Judge.

19              THE COURT:  You're welcome.

20              MR. BURKS:  May I gather my notes and then take

21    the podium?

22              MR. BAKER:  Mr. Burks, I'm disappointed you don't

23    have a second Astros tie.

24              MR. BURKS:  I was thinking of you this morning and

25    I almost … I have a close family member who works for the

```
 1    Astros and I have plenty of ties.  I'm looking for my work
 2    copy of the plan and I'll be right at the podium, Judge.
 3    Got it.
 4              THE COURT:  Mr. Burks, you want to project, you
 5    ever project from a particular placed podium?
 6              MR. BURKS:  From the podium, Mr. Baker?
 7              THE COURT:  Mr. Baker has to help.
 8              MR. BURKS:  Should I wait for Mr. Troop, Your
 9    Honor?
10              THE COURT:  I think that Mr. Fitzmaurice is more
11    than capable of handing the matter, so go ahead.
12              MR. BURKS:  All right, Judge.  Thank you, Your
13    Honor.
14              CROSS EXAMINATION OF CHRISTOPHER MURRAY
15    BY MR. BURKS:
16    Q    Hi, how are you?  Still all right?
17    A    Yes.  Glad you're feeling better too.
18    Q    Thank you very much.  Let's go back a little bit.
19    Starting with, I'm going to go last to first
20    (indiscernible).  There's an auction coming up.  It's on
21    Friday, correct?
22    A    Yes.
23    Q    How many qualified bids are there?
24    A    There are two.
25    Q    Who are they?
```

```
 1    A    It's QB Loop Investments, I think that's their full

 2    name, and the bank.

 3    Q    All right.  QB Loop, there was a statement you said

 4    that Mr. Saunders said that is him, that is he, whatever

 5    your statement was.  Do you remember that?

 6    A    Yes.

 7    Q    Have you done any investigation as to who owns Q --

 8    what is QB Loop?

 9              MR. FITZMAURICE:  Objection, compound?

10              THE COURT:  One question at a time.

11    BY MR. BURKS:

12    Q    Who owns QB Loop?

13    A    I don't remember who all owns it.  It's a group of

14    investors.

15    Q    So, next question is, what is QB Loop?

16    A    I think it's a group that was put together for the

17    purpose of bidding on the building.

18    Q    So, but you don't know that.  That's your surmise?

19    A    No, that's what they told me, I mean in sum and

20    substance.  I did have conversations with, first with Anwar

21    Qadeer, who is an attorney who said he represented that

22    group.  I'd also spoken with Leonard Simon at one point, who

23    said he spoke on behalf of that group.  And most recently,

24    Simon Mayer has been representing that group and I've spoken

25    to him about it.
```

1    Q    But Mr. Ali is not an owner in this investment group?

2    A    I don't know.

3    Q    If you know whether or not Mr. (indiscernible) is an

4    investor in that group?

5    A    I don't think he is directly an investor.  I think Mr.

6    Mayer told me that he was not directly an investor, but that

7    his mom was.

8    Q    That his who was?

9    A    His mother.

10   Q    His mother.  Did (indiscernible) comply with all the

11   requirements so far with (indiscernible) instructions?

12   A    I think so, yeah.

13   Q    And can they put down earnest money?

14   A    They did.

15   Q    How much?

16   A    There's $2.1 million in escrow.

17   Q    All right.  So, irrespective of who they know or don't

18   know, or who's involved in the group, they're a qualified

19   bidder.  Cash?

20   A    Oh, absolutely.

21   Q    The auction was supposed to take place, I believe,

22   initially, subject to (indiscernible) yesterday at one

23   o'clock.  Is that correct?

24   A    I think that's the earliest it could have happened.

25   Q    And why did it not happen yesterday?

1    A    I wanted more time to evaluate this.

2    Q    And --

3    A    Well, I had -- that's not the full answer.  The other

4    answer is I lost the entire day Monday doing the hearing.

5    So, the time I would have spent on that was spent doing

6    that.

7    Q    (indiscernible)

8    A    Yes.

9    Q    So, are you taking anymore bids?

10   A    Not at the present time, no.

11   Q    Do you intend to take more bids at the (indiscernible)?

12   A    I don't know.

13   Q    When is the auction going to be held, where you sit

14   now, what time and day?

15   A    I've scheduled it for Friday at one o'clock, local

16   time, Central.

17   Q    And where is that taking place?

18   A    We're going to do it virtually.

19   Q    And who, who can sign in or link in to watch the

20   bidding process?

21   A    I don't think I've determined that yet, probably just

22   the parties who are qualified.

23   Q    All right.  So, for example, can Mr. Choudhri be muted

24   and watch?

25   A    I suppose anybody could watch the auction.  I don't

1   have a problem with that.  I, I don't want any interference

2   with the auction.

3   Q    Exactly.  So, you can, if you do it remotely, you can

4   have a situation where no one can see Mr. Choudhri, no one

5   can hear Mr. Choudhri, right?

6   A    I suspect we could do that.  I know Hilco is going to

7   handle the electronic logistics, so I don't know exactly

8   what system they use.  But I imagine that's possible, and if

9   so, I wouldn't mind anyone watching.

10   Q    Thank you.  I think Mr. Choudhri would like to watch

11   it.

12   A    Yeah, I would have no problem with that.

13   Q    I, personally, would rather watch the Astros game than

14   that but … (indiscernible) still going backwards.  You made

15   decisions regarding the validity of the Choudhri claims,

16   correct?

17   A    Are you talking about his proof of claims?

18   Q    No, I'm talking proof of claims right now, yes.

19   A    Okay, yes.

20   Q    And you objected to it.

21   A    Yes, I objected to -- yes.

22   Q    And you made decisions regarding three sets, or three

23   pieces of litigation also, correct?

24   A    I think so.

25   Q    Right.  And of those three pieces of litigation, is it

1    fair to say, or isn't it true, that you're basically

2    releasing them to MPK for 3.7 million or less?

3    A    Releasing the Choudhri claims or -- I misunderstand.

4    Q    So, there are three pieces of litigation.  It's the two

5    lawsuits that have been admitted into evidence, and it's the

6    (indiscernible) claim, that (indiscernible) --

7    A    Okay, you're saying the claims against the family?

8    Q    Yes.

9    A    Right, okay.

10    Q    And you're releasing those to the extent you can,

11    correct?

12    A    If the plan is confirmed, they're released as part of

13    the plan, yes.

14    Q    Right.  And what is the consideration that the estate

15    receives for those releases of those three actions?

16    A    I consider it to be everything the estate gets from the

17    plan.  So, that's the funding that comes in that will cover

18    the admin expenses, the carveout, essentially, that funds

19    the trade creditors and the money that's for the general

20    unsecureds.  And also, there's some seed funding for the

21    litigation trust.  That's the … most of it, yeah.

22    Q    And Mr. Carter has testified that he thought that was

23    about 3.7 million.  Is that your understanding?

24    A    I think he said that's his estimate of how much cash

25    the bank would have to put in if their credit bid of 18.6

1    prevailed.  That's what I understood him to stay.

2    Q    And is that your understanding?

3    A    Yeah.  I mean, I don't know exactly what the total

4    admins will be, so it's just an estimate, but that sounds

5    about right.

6    Q    So, it's fair to say the bank gets the right to credit

7    bid for 18.6, they've got a full release of everything

8    that's out there, and (indiscernible) 3.7.

9    A    Not everything.  They get a release of the claims the

10   estate has; other parties might have claims.

11   Q    Unless the release in the plan is written the way I

12   read it, right?  I'm reading it as a full release.  Are you?

13          MR. FITZMAURICE:  Objection, Your Honor.  The plan

14   speaks for itself.  Your Honor will interpret its breadth

15   and scope and terms.

16          THE COURT:  I'll sustain the objection.  Thank

17   you.

18   BY MR. BURKS:

19   Q    You said you spoke to Jerry Alexander, correct?

20   A    Yes.

21   Q    And what did you speak to him about?

22   A    We spoke to him about the lender liability claims.

23   Q    Did he tell you what his damages model was on that

24   lender liability claim?

25   A    I … numbers, I don't remember that, no.

1    Q    All right.  So, you don't know what he was assessing

2    the value of his action?

3    A    I mean, I know he thought it was potentially very

4    valuable, big number, but I don't remember a number.

5    Q    Thirty-five million?  Does that sound familiar?

6    A    It doesn't, but it could be.

7    Q    All right.  And have you ever tried a lender liability

8    claim yourself?

9    A    As an attorney?

10   Q    Yes.

11   A    No, no I …

12   Q    Are you --?

13   A    I've objected to bank claims before, but I've not …

14   lender liability, no.

15   Q    Fair enough.  Are you aware that … let's say it

16   differently.  Isn't it true that Jerry Alexander has a

17   reputation for being an accomplished lender liability claims

18   attorney?

19   A    Honestly, I had not heard of him before this case.

20   Q    So, you don't know what his reputation is?

21   A    That's right, I don't.

22   Q    You now know.

23   A    I've been told that people hold him in high regard and

24   that he's succeeded in one lender liability case.  That's

25   pretty much the extent of it.

```
1    Q    All right.  But that was after the plan was filed.

2    A    I don't know when I came to know that, but that was

3    certainly after I met him and tried to find out who he was.

4    I don't remember chronologically, whether that was before or

5    after the plan.

6    Q    Did you speak with Jeff Steidley, an attorney?

7    A    I don't think so.

8    Q    All right.  Are you aware that Jeff Steidley is the

9    attorney who has filed a State Court lawsuit that's been

10   removed and subject to remand, regarding the enforceability

11   and the settlement agreement?

12   A    That sounds right, but I don't really remember one way

13   or the other.

14   Q    Have you spoken to -- you haven't spoken to him?

15   A    I don't think so.

16   Q    All right.

17   A    Personally, I don't remember talking to him.

18   Q    Do you know what his theories are on the lawsuit

19   regarding enforceability and regarding damages on the

20   settlement?  Do you know what his theories are?

21   A    I'm not sure I understand them very well.

22   Q    You don't understand them?

23   A    No.

24   Q    Okay.  James Wetwiska, have you spoken to him?

25   A    Wetwiska?
```

1    Q    Is that how you pronounce his name?

2    A    That's how you pronounce his name, Wetwiska.

3    Q    Mr. Wetwiska, have you spoken to him?

4    A    Yes.

5    Q    And what did you speak to him about?

6    A    Same thing.  Oh, no, I didn't speak to him about the

7    theories of why the settlement agreement wouldn't be valid.

8    I talked to him about the bank's conduct that might underlie

9    claims.

10   Q    And is there another claim that's currently on file

11   against National Bank of Kuwait that the … is, in fact, on

12   file, that you considered?

13   A    I'm not sure what you're referring to.

14   Q    All right.  Let me be less vague on that, because that

15   was pretty vague.  Are you aware that Mr. (indiscernible)

16   filed an adversary proceeding, pending in this Court, for

17   the equitable subordination of MPK's lien to the purported

18   second lien of 2425 WL?

19   A    Yes, I remember.  Yes.

20   Q    All right.  Well, that was the other action I was

21   talking about.  Are you familiar with that action?

22   A    As I sit here today, not in detail, no.

23   Q    So, if I asked you what was the basis of that

24   complaint, for that … for the claim of subordination, could

25   you tell me?

1    A    Yeah, I can tell you my recollection generally.

2    Q    Yes.

3    A    It was that the bank behaved badly and their lien

4    deserves to be subordinated because of that.

5    Q    You stated that you concluded, and you objected to the

6    claim of 2425 WL, of which that cause of action is

7    predicated, obviously.  You objected to it, correct?

8    A    Yes.

9    Q    And you objected to it, as I understand, because, isn't

10    it true that you think the lien is fictitious?

11    A    I think (indiscernible) was fictitious?

12    Q    And therefore the liens are fictitious.

13    A    Yeah.

14    Q    Right now, is that lien on file?

15    A    I don't remember.

16    Q    Has it been voided?

17    A    I don't know.  I don't remember.

18    Q    Okay.  And what was your basis for determining that the

19    lien was voidable and/or the (indiscernible) debt was

20    fictitious?  What did you base that on?

21    A    It was based on some irregularities in the documents

22    that appeared that the debt instruments were created after

23    the debt would have existed, and it contradicted some other

24    documents in the case, is my recollection.

25    Q    And was the lien reported and is it still reported?

1    A    I don't know.  I don't remember that.

2    Q    All right.  You spoke with Mr. Ali Choudhri, correct?

3    A    Yes.

4    Q    And I think you testified that you find him to be, in

5    all ways, not credible.  Is that correct?

6    A    I didn't say that.

7    Q    How do you find him to be?  Do you find him to be

8    credible?

9    A    I was asked about the veracity of what he says, and I

10    says, I said I do not think I can rely on the veracity of

11    the things he says.  I don't know if he's lying all the

12    time, none of the time.  But I have doubts when he says

13    things, that they are true.

14    Q    I understand.  Did you receive an email, personally, or

15    from your counsel, where Mr. (indiscernible) or Mr. Choudhri

16    figured -- and I'll let you answer yes or no; I'm using the

17    word tendered on purpose -- when Mr. Choudhri tendered

18    $700,000 cashier's check to buy claims from you against MPK?

19            MR. FITZMAURICE:  Objection to the use of the term

20    tender.  It calls for a legal conclusion as to whether that

21    standard has been satisfied.

22            THE COURT:  I'll let it be used in the generic

23    sense of tender.  Go ahead, answer the question.

24    BY MR. BURKS:

25    A    I saw an email that had, as an image attached to it,

1    what looked like a cashier's check for $700,000.

2    Q    All right.  And what did you do with that tender --

3    that letter -- I'll re-ask.  What did you do with the email

4    that had -- well, tell me what the email was.  It was a copy

5    of, it was a copy of a cashier's check for how much?

6    A    It was $700,000 was the amount on that image of a

7    check.

8    Q    And what else came to you with the image of the check?

9    A    I think it was a proposal from Mr. Choudhri, or one of

10   the entities, I don't remember, but to buy the claims of the

11   estate against the bank.

12   Q    For how much?

13   A    It was an offer for $700,000.

14   Q    Right.  Did you respond?

15   A    I don't know if I responded definitely to it yet.  I

16   mean, I haven't accepted that.

17   Q    Have you rejected it?

18   A    I don't know if I have.  I don't, actually don't think

19   I have yet.

20   Q    Do you believe that it's a valid tender of money?

21   A    I don't know.

22   Q    If it was, would you be inclined to accept it?

23          MR. FITZMAURICE:  Objection, calls for

24   speculation.

25          THE COURT:  I'll sustain the objection,

1    speculation.

2            MR. BURKS:  All right.  May I approach, please?

3            THE COURT:  No.  I mean, you want to tell me why -

4    - typically, we don't approach the witness.

5            MR. BURKS:  I have the original check and I'm

6    asking if (indiscernible) the original cashier's check --

7            THE COURT:  There's the ELMO right there, you can

8    show it to me.  Thank you.  It's right there.

9    BY MR. BURKS:

10   Q    Sir, do you see on the screen what's in the projector,

11   ELMO projector?

12   A    Yes, and that's the image that was in the email.  I

13   think the email image was black and white, but that looks

14   like what I saw.

15   Q    All right.  So, the document that I put down here, can

16   we agree, that kind of looks like an official cashier's

17   check, payable to you.

18           MR. FITZMAURICE:  Objection.  Objection to the use

19   of the term cashier's check.  I think that lacks foundation.

20           THE COURT:  I'll sustain the objection.  It looks

21   like a check, obviously.  You can ask the next question.

22   BY MR. BURKS:

23   Q    Does this appear to be an original official check

24   written on, written by Metro City Bank?

25   A    Yeah.  It looks like a check and that's what it says.

1    Q    Who is the payee?

2    A    Me.

3    Q    Yeah.  For how much?

4    A    It's $700,000.

5    Q    Purpose, it reads -- can you read the purpose?

6    A    It says, "Purchase of estate claims against MPK."

7    Q    You now -- dated June 14th, 2024, correct?

8    A    I see that.

9    Q    Now, do you believe now that Mr. Choudhri seriously

10   intends to pay you, would like to pay you $700,000 for the

11   purchase of the claims against MPK?

12         MR. FITZMAURICE:  Objection, Your Honor, lacks

13   foundation as to Mr. Choudhri's intent.  His name appears

14   nowhere on this image.

15         MR. BURKS:  I actually asked him does he now

16   believe.

17         THE COURT:  Excuse me, Mr. Burks.  Ask the

18   question again.

19   BY MR. BURKS:

20   Q    You stated (indiscernible), apparently I need more

21   predicate, Judge.  You stated that this appears to be the

22   document from which, the image you received, with that email

23   offer.

24   A    Yes.

25   Q    All right.  Based on seeing this official check, right

1    now in Court, are you, do you now believe that Mr. Choudhri

2    is serious about paying you $700,000 cash to buy the claims

3    of MPK?

4            MR. FITZMAURICE:  Objection, Your Honor, lacks

5    foundation as to official check and Mr. Choudhri.  I mean, I

6    see the words on there, but I think counsel is using that

7    for a different purpose.  And also, as to Mr. Choudhri,

8    whose name does not appear anywhere on the image.

9            MR. BURKS:  Response.

10           THE COURT:  Go ahead.

11           MR. BURKS:  So, Mr. Murray just testified that

12   this is the, appears to be the document from which the image

13   included in this settlement offer from Mr. Choudhri, and

14   he's testified to that; it was from Mr. Choudhri or one of

15   his entities.  And this is the image that was included with

16   it.

17           THE COURT:  I'll just note for the record, I'll

18   let him answer the question, and I'll just note for the

19   record that the remitter is not Mr. Choudhri but BPH

20   Acquisition, LLC, whoever that happens to be.  All right?

21   Go ahead.

22   BY MR. BURKS:

23   Q    Do you now believe that Mr. Choudhri is serious about

24   paying you $700,000 for the claims against MPK?

25   A    I believe he's serious about wanting the claims.  I

1    have no idea if this check is real or not.  I have no reason

2    to think it's not, but until I deposit it and it appears in

3    my account, I … I don't know how to answer the question

4    other than that.

5    Q    Sure, fair enough.  Is it your understanding that

6    confirmation of the plan today would preclude you from

7    accepting an offer of $700,000 to buy those claims?

8    A    Yes.

9    Q    Okay.

10           MR. BURKS:  Your Honor, may I take this off of the

11    ELMO?

12           THE COURT:  Yeah sure.  It's off.  I turned it

13    off.  Don't lose it.

14    BY MR. BURKS:

15    Q    Going back to your causative action, did Mr. Wetwiska

16    tell you, or give you a damages model for the action, which

17    is model for the action that he'd like to bring in terms of

18    enforcing the suit, which is about the settlement agreement?

19    A    I don't --

20           MR. FITZMAURICE:  Objection.  I think that lacks

21    foundation.

22           THE COURT:  I'll let you answer the question, go

23    ahead.

24    BY MR. BURKS:

25    A    I don't remember getting a damage model from Mr.

1    Wetwiska.

2    Q    All right.  Do you have a general idea what he thinks

3    of the claim after your conversation with him?

4    A    No, no different from my recollection of what Mr.

5    Alexander said.  Big damages, but I don't remember a number.

6    Q    There he speaks in terms of huge damages, correct?  All

7    right.  And let the record reflect that the witness nodded.

8    A    In the affirmative.

9    Q    Have you read the lawsuit, which is at ECF -- actually,

10    if you've read it.  I don't want to ask you to testify

11    (indiscernible) at this point.  Have you read the lawsuit

12    which is at ECF … or maybe I lost it (indiscernible) … ECF

13    502-6.  Is the second amended (indiscernible) petition, and

14    it's the one that (indiscernible) talked to you about.  It's

15    the one that Jeff Steidley talked to you about, correct?

16    A    I don't remember talking to Mr. Steidley.  I'm pretty

17    sure I reviewed that pleading though.

18    Q    All right.  Are you aware that that complaint has two

19    very distinct causes of action within it?

20    A    I really don't remember the pleading.

21    Q    All right, fair enough.

22    A    I remember it exists, I don't remember it.

23    Q    Are you aware, or do you know, that that pleading

24    involves two tax liens?

25    A    That sounds, I think that sounds right.

1    Q    All right.  Are you aware that the Plaintiffs' position

2    is, is that if the settlement agreement failed, that the tax

3    liens would be returned to Ali Choudhri?

4    A    Yeah, my … yes.

5    Q    All right.  Doesn't the claim, though, provide for the

6    tax liens to be satisfied through the plan, and paid off?

7    A    Yes.

8    Q    If the tax liens are owned by Mr. Ali Choudhri, why

9    isn't he entitled to the value of those tax liens?

10                MR. FITZMAURICE:  Objection, Your Honor, calls for

11    speculation.  Also, calls for a legal conclusion as to the

12    results of that lawsuit.

13                THE COURT:  I'll sustain the objection.

14    BY MR. BURKS:

15    Q    Does the lawsuit sue MPK for the value of those two tax

16    liens?

17    A    I don't remember the prayer in the lawsuit.

18    Q    All right.  But it's of record.  (indiscernible) can

19    just read it.  What's the amount owed on those two tax

20    liens?

21    A    Well, I'm a little confused because there's lots of tax

22    liens (indiscernible).

23    Q    There are two tax liens that are being paid through the

24    plan.

25                MR. FITZMAURICE:  Objection, Your Honor,

1    mischaracterizes the plan.

2              THE COURT:  I'll sustain the objection.

3    BY MR. BURKS:

4    Q    The two tax liens that are the subject of the

5    litigation, the complaint at ECF 502-6, what are the amounts

6    of those two loans?

7    A    I don't remember.

8    Q    Would it surprise you if their face value of $4 million

9    combined?

10   A    Sure.

11   Q    Okay.  Let me move along.  When you were negotiating

12   with the bank, in the manner that you testified, did you

13   have any other option than what the bank was offering and

14   agreeing to?

15   A    It depends on what point in time you're talking about.

16   Q    The point in time in which the plan that's filed today,

17   that we're considering, was filed.

18   A    At that time, I recall somebody on the Debtor's side

19   was also either talking about or had filed another plan.

20   So, there was that.  I understand there was an exclusivity,

21   so there might have been other plans.  I mean, early on I

22   didn't know.

23   Q    Were there?

24   A    Other than the five or six filed by the Debtor's side,

25   no.

1    Q    Right.  And you talked about -- and it's a big document

2    (indiscernible).  And you said, hey, I want a cap on credit

3    (indiscernible), correct?

4    A    I know, I know I wanted one, and I know we talked about

5    that with the bank and asked if they would do that.

6    Q    Did you have any bargaining power to get that

7    accomplished?

8    A    Yeah, some.

9    Q    So, why wasn't it accomplished?  Why wasn't there a

10   cap?  You wanted it.

11   A    I wanted all general unsecureds to get paid in full.  I

12   didn't get that either.

13   Q    Did you agree that … did you want more money for the

14   release?

15   A    I wanted as much money as I could get.  At different

16   times I asked for more.

17   Q    And what was your bargaining power, or leverage, to get

18   you (indiscernible)?

19   A    Well, a couple of things.  I mean, I have the claims

20   against MPK, that if, for nothing else, has some nuisance

21   value to the bank; no bank wanted a release, so they have to

22   give you something for that.

23   Q    Nuisance value?

24   A    Yeah.

25   Q    Nuisance value?

1    A    I said if nothing else.  I think they're worth more

2    than nuisance value.  I don't think they're worthless

3    claims.  I don't think they're worth as much as you think

4    they're worth, or (indiscernible).

5    Q    Did Mr. Alexander offer to try the case over on

6    (indiscernible)?  Did he tell you he'd do it?

7    A    He asked me to hire him, yes.

8    Q    And what were the terms of his proposed engagement?

9    A    He said he would do it on, I think, full contingency, I

10   think a third.  But I don't … I think it was a third.

11   Q    What about Mr. Steidley or Wetwiska?  Do you know what

12   their terms of employment or engagement are?

13   A    I don't remember anything about Steidley.  I'm pretty

14   sure Wetwiska said he was uninterested in representing the

15   estate.

16   Q    All right.  Did Steidley, so you don't recall Steidley

17   offering to represent the estate and do it for a full

18   continency, no money down?

19   A    I don't remember one way or the other.

20   Q    Okay.  Now, the (indiscernible) subordination agreement

21   case, there is a pending motion in front of Your Honor, Jeff

22   Norman, I guess His Honor, Judge Norman, and that's filed by

23   Mr. Steve Sather.

24   A    That's the claim you were talking about earlier?

25   Q    Right.

1    A    Okay.

2    Q    And that's filed by my co-counsel for 2425 WL, correct?

3    A    Yes.

4    Q    And there's a motion pending to allow the Creditor,

5    2425 WL, to bring this, correct?

6    A    I don't know the current status of the motions

7    (indiscernible).

8    Q    Did you file the suit?

9    A    Mr. Sather's suit?

10   Q    Yes.

11   A    No, I --

12   Q    Did you file the cause of action?

13   A    No.

14   Q    All right, so you didn't file equitable subordination

15   cause of action.

16   A    Wait --

17   Q    Did you file a complaint for equitable subordination?

18   A    Which lien, against who?  There's a lot of liens in

19   this case and there's a lot of claims that they should be

20   subordinated.

21   Q    Did you file a complaint for equitable subordination of

22   the MPK lien, subordinate to 2425 WL?

23   A    Did I file a claim to subordinate the bank's lien?  No,

24   I don't think so.

25   Q    But there's, my co-counsel for 2425 WL did, correct?

1   A    Right.

2   Q    And do you oppose him bringing that lawsuit?

3   A    No.

4   Q    Will he be able to bring it if this plan is confirmed?

5   A    I don't know.

6   Q    It's your claim you're releasing, correct?

7   A    If it's my claim and I'm releasing it, he can't bring

8   it.  I think he has a theory that he has some sort of

9   independent standing or independent claim, and I don't

10  really care about it in our creditor dispute that is, you

11  know, (indiscernible).

12  Q    Right.  Fair enough.  What's the value of that

13  subordination claim in your bid?

14           MR. FITZMAURICE:  Objection, foundation.

15           THE COURT:  I'll sustain it if it's foundation.

16  If you want to lay a foundation, please do.

17  BY MR. BURKS:

18  Q    In approving this claim, and say that you approve this

19  claim, that you formed a damages model or an effect, a model

20  of the effect of this suit, against MPK, what's the value of

21  that suit?

22  A    I didn't approve of them.  I said, as I sit here today

23  I supported it as the only plan that's available.  So, you

24  want to know if I … an advantage model of the subordination

25  claim?

1    Q    Or an effect model, yes, sir.

2    A    I considered the effect but …

3    Q    (indiscernible) wins MPK is subordinate to 2425 WL

4    (indiscernible), right?

5         MR. FITZMAURICE:  Objection, calls for

6    speculation.

7         THE COURT:  I'll sustain the objection.

8    BY MR. BURKS:

9    Q    Are you aware that the requested relief in the

10   complaint is to put the 2425 WL lien ahead of the MPK lien?

11   Are you aware of that?

12   A    Not specifically, no, but it sounds like the goal of

13   the subordination claim.

14   Q    And did you consider that in determining whether to

15   sell all your claims for $3.7 million?

16        MR. FITZMAURICE:  Objection, you know,

17   mischaracterizes the witness's testimony --

18        MR. BURKS:  I actually asked him what he

19   considered.

20        THE COURT:  I'll sustain their objection.  I think

21   it does misclassify the testimony.  Ask another question.

22   BY MR. BURKS:

23   Q    Is the … so, how does the subordination suit filed by

24   Mr. Sather, impact your decision to accept $3.7 million?

25        MR. FITZMAURICE:  Objection, lacks foundation.

```
1              THE COURT:  I'll overrule the objection.

2    BY MR. BURKS:

3    A    I don't know.

4    Q    Fair enough.  How many breach of contract cases have

5    you personally tried?

6              MR. FITZMAURICE:  Objection, relevance, Your

7    Honor.  It's a confirmation of the bank's plan.

8              MR. BURKS:  He's making a business decision and

9    I'm trying to understand the foundation for the basis of

10   that decision.  His business decision is to support the plan

11   and his business decision was to agree --

12             THE COURT:  He's already testified as to why his

13   business decision supports the plan.  If you want to attack

14   that testimony, you can.  But I think that that's not a

15   proper question and I'll sustain the objection.

16   BY MR. BURKS:

17   Q    You've read the second amended (indiscernible)

18   petition; it's the one on the lawsuit involving the tax

19   liens, and also the validity of the settlement agreement.

20   You've read that, correct?

21   A    Yeah, I'm sure at some point I've read it, I just

22   wanted (indiscernible).

23   Q    Sure.  And you testified as to the investigation and

24   inquiry you made regarding that, right?

25   A    Yes.
```

```
 1    Q    Have you ever tried a case like that?

 2               MR. FITZMAURICE:  Same objection, Your Honor.

 3               THE COURT:  I'll sustain the objection.  Thank

 4    you.

 5               MR. BURKS:  May I have a moment to make sure that

 6    I've asked all the questions I intended to ask?

 7               THE COURT:  Certainly, Mr. Burks.

 8    BY MR. BURKS:

 9    Q    On the plan, you've been very forthright as to what's

10    happening, I believe, on Friday, and I appreciate it,

11    especially if you can have it muted, where people can

12    actually, like Mr. Ali Choudhri, can watch the bidding

13    process.  You've talked about the bidding, the auction

14    that's going to occur on Friday, correct?

15    A    Yes.

16    Q    If the cash bid is higher than the highest credit bid,

17    are you going to take the cash bid or the credit bid?

18               MR. FITZMAURICE:  Objection, Your Honor, calls for

19    speculation about some event that theoretically might happen

20    in the future.

21               THE COURT:  I'll overrule the objection.  Go

22    ahead.

23    BY MR. BURKS:

24    A    Probably, but there's other things that might happen,

25    so I can't say for sure, but generally speaking, yes, I'll
```

1    take the higher bid.

2    Q    Any bid you accept, of course, is tradition

3    (indiscernible).  They've only paid you $2 million.  So, if

4    another bid is the highest bid, they'd still have to pay the

5    balance and lose it, right?

6    A    Oh, yeah.

7    Q    Sure.

8    A    They'd (indiscernible) close.

9    Q    If the credit bid is not successful, what is your

10   understanding regarding the bank's right to releases?  Do

11   they still get the release?

12   A    If the plan is confirmed, yes.  The releases come from

13   the plan, is my understanding.

14   Q    Right.  If their credit bid is unsuccessful, then they

15   still owe you $3.7 million.

16        MR. FITZMAURICE:  Objection, Your Honor.  The plan

17   speaks for itself, and "Owe you $3.7 million,"

18   mischaracterizes the nature of the plan.

19        THE COURT:  I think it does.  Ask the question a

20   different way, perhaps.

21        MR. BURKS:  Yeah, all right.

22   BY MR. BURKS:

23   Q    If the credit bid is not successful, does MPK still owe

24   you (indiscernible) liquidating trust $3.7 million?

25   A    Sort of.  And my --

1  Q    Go ahead, because I don't know the answer to this.

2  A    There is money from the sale of the bank's collateral

3  that some cash bidder will pay at closing.  And that money

4  will, under the plan, go first to the tax liens, then to the

5  admins.  And that's money that, in a sense, is the proceeds

6  of the bank's collateral, so they are kind of paying it.

7  That's why I say sort.  Do they have to come out of pocket?

8  There might be some strange scenario where that happens,

9  because I think they're backstopping the admins under the

10  plan, whether there's a credit bid or not.  But that seems

11  really unlikely, because their credit bid is high enough

12  that the cash bid would recover those expenses.  That's how

13  I understand the bid.

14  Q    (indiscernible) isn't it true that you made a decision

15  not to market test the value of those three lawsuits that

16  I've been talking about in (indiscernible)?  (indiscernible)

17  for sale (indiscernible).

18  A    I have not pursued an auction of the causes of action.

19  Q    Why not?

20  A    Because the value I get from trading those for a

21  release as part of the plan, in my view, is a much better

22  and more solid outcome for the estate and its creditors.

23  Q    But not (indiscernible) is right, correct?

24        MR. FITZMAURICE:  Objection, Your Honor, lacks

25  foundation.

```
 1              THE COURT:  I'll sustain the objection.  Thank

 2    you.

 3    BY MR. BURKS:

 4    Q    If the damage models that you've testified to that you

 5    understand being huge -- and I did that so I can get back to

 6    it -- it's a huge … if the damage models are right though,

 7    wouldn't the amount you covered be considerably higher than

 8    $3.7 million?

 9              MR. FITZMAURICE:  So, Your Honor, lacks foundation

10    as to damage models, also mischaracterizes the witness's

11    testimony and is otherwise misleading.

12              THE COURT:  Let's say what he did say.  He said he

13    hadn't seen any damage models.  So, for you to ask him about

14    damage models he hasn't seen, he didn't testify the way your

15    question, basically, is formulated.  So, I'll sustain he

16    objection.  If you ask in a different way you can.  I know

17    what he testified to, but he testified that he hadn't seen

18    any damage models; they weren't shared with him.

19              MR. BURKS:  Thank you, Judge.

20    BY MR. BURKS:

21    Q    You investigated the causes of action, correct?

22    A    Yes.

23    Q    You got to release them -- on the one hand, here we go,

24    I'm holding my left hand out -- on the one hand, you're

25    going to release them for $3.7 million, right?
```

1   A    Right.  I continue to disagree with the way you're

2   describing this but --

3   Q    How would you describe it?

4   A    Under the plan, I'm releasing the claims.  What I get

5   under the plan, is what I get under the plan.  Somebody said

6   it, and likely to be 3.7 million; in a credit bid scenario

7   it could be a different number, that's why -- but when you

8   say 3.7, I understand you to mean what the estate gets out

9   of this plan.  And yes, I'm releasing the claims under the

10  plan.

11  Q    In a credit bid scenario, will you actually get $3.7

12  million cash, or will you get considerably less?

13         MR. FITZMAURICE:  Objection, Your Honor.  The plan

14  speaks for itself.

15         THE COURT:  I'll sustain the objection, it speaks

16  for itself.  We're don't have to argue what the plan says,

17  because the plan is -- it says what it says, Mr. Burks, and

18  I can read.

19  BY MR. BURKS:

20  Q    Whatever the plan says here, the alternative would be,

21  though, to either try and market those causes of action

22  independently, correct.  Would that be an alternative?

23  A    I suppose that's possible, sure.

24  Q    And what would you expect to get from that?

25  A    Less.

1    Q    Why?

2    A    Because I don't think the claims are worth much to

3    anyone other than the party, because they're worth a lot,

4    and that party made an offer.  That's why the claim was in

5    an amount that was less than what I believe the estate gets

6    out of the claim.

7    Q    But there's another alternative sir, is there not?

8    Don't release them and let these attorneys, who are offering

9    to do it on a full contingency, try the case.  Isn't that an

10    alternative?

11    A    It is something else that could happen, yes.

12    Q    What is the truest way to determine the validity of a

13    piece of litigation?  Is it to try it?

14    A    If the only thing you care about is rolling the dice

15    and seeing if you hit snake eyes, that's a thing you can do.

16    That's not what I'm doing here.  I'm trying to make

17    decisions that are in the best interests of the estate.

18    Q    If you don't sell it for $3.7 million, those three

19    actions, have you formed an opinion, if you went forward

20    with them, have you formed an opinion as to how much MPK

21    would offer to settle?

22          MR. FITZMAURICE:  Objection, Your Honor,

23    mischaracterizes the witness's testimony of the plan.

24          THE COURT:  I'll sustain he objection.

25    BY MR. BURKS:

1    Q    Can you form a valid business decision without

2    determining what you could get in settling if you brought

3    the claims yourself?

4              MR. FITZMAURICE:  Objection, Your Honor,

5    mischaracterizes the witness's testimony.  He's testified

6    that he did, in fact do that.

7              THE COURT:  I'll sustain he objection.

8    BY MR. BURKS:

9    Q    So, based on the objections of MPK's counsel, the only

10   thing that we have for your consideration, is that true, is

11   releasing the claims to MPK for $3.7 million?  I mean,

12   that's it.

13             MR. FITZMAURICE:  Objection, Your Honor, as to the

14   predicate of the question, that it somehow benefits the

15   estate and entirety gestalt of objections by MPK's

16   (indiscernible).

17             MR. BURKS:  I'm going to ask him what his opinion

18   is, because it's his judgment that he's testified about.

19             THE COURT:  I think he's testified as to what his

20   judgment was and how he got there.  I think the question

21   mischaracterizes his prior testimony.  So, if you want to

22   ask another question, Mr. Burks, you can, but I've listened

23   to all of his testimony.  I'm listening to your questions.

24   I think your questions are not a true indication of what he

25   previously testified to.  And I can read from my notes back

1  to you what I think he said, because they're right here, but

2  I don't think that's my job, okay.

3          MR. BURKS:  It's not your job and (indiscernible).

4          THE COURT:  So, ask a question within the law.

5  Thank you.

6          MR. BURKS:  I've asked all the questions in that

7  area, Judge.  Thank you.

8          THE COURT:  Thank you.

9  BY MR. BURKS:

10  Q    So, the final question is, just so I understand, your

11  business judgment is that there is no need to market test

12  the sale or the litigation of these claims, because $3.7 is

13  the most you think you can get.

14          MR. FITZMAURICE:  Objection, Your Honor,

15  mischaracterizes the witness's testimony.

16          THE COURT:  It does mischaracterize the testimony.

17  Ask another question.  He never testified to that.

18          MR. BURKS:  (indiscernible) no further questions,

19  Your Honor.

20          THE COURT:  Thank you.  Mr. Baker?

21          MR. BAKER:  No questions.

22          THE COURT:  Mr. Shannon, I'll come to you, just

23  because you said you might want to participate.

24          MR. SHANNON:  No questions, Your Honor.

25          THE COURT:  All right, thank you, Mr. Fitzmaurice.

1          MR. FITZMAURICE:  Thank you, Your Honor.

2          REDIRECT EXAMINATION OF CHRISTOPHER MURRAY

3     BY MR. FITZMAURICE:

4     Q    Mr. Murray you were asked questions about the equitable

5     subordination claim filed by 2425 WL against the bank.  Do

6     you recall that?

7     A    Yes.

8     Q    Do you recall that the bank filed a motion to dismiss

9     the complaint in that case?

10    A    I don't.  But that sounds right, but I don't really

11    remember what the status of that litigation is.

12    Q    Similarly, do you not recall whether or not that motion

13    to dismiss was granted?

14    A    I just don't remember, no.

15    Q    Do you know whether 2425 WL has filed a motion, has

16    filed an application with the Court seeking to assert estate

17    claims?

18    A    Yes.

19    Q    And you oppose that application, correct?

20    A    Yes, I do oppose it.

21         MR. FITZMAURICE:  Your Honor, I'm going to give it

22    another shot.

23         THE COURT:  Sure, go ahead, you're connected.

24         MR. FITZMAURICE:  Thank you.

25    BY MR. FITZMAURICE:

1   Q    So, Mr. Murray is showing me the document at ECF 534.

2   A    Yes.

3   Q    That's the objection you filed to the 2425 WL

4   application to pursue estate claims?

5   A    Yeah, I recognize that.

6   Q    Mr. Burks was asking you questions about a $700,000 --

7   let's just call it a check for purposes of these questions -

8   - do you recall those questions?

9   A    Yes.

10  Q    Do you know the amount of the tax liens that have been

11  filed in this case?

12  A    The ones filed, the ones by the taxing authorities, not

13  the ones that were purchased or traded later, yes.

14  Q    Do you know about the approximate amount of those?

15  A    It's over two million.  I don't know exactly.

16  Q    So, that's more than 700,000.

17  A    Yes.

18  Q    And does the indicated plan call for those tax liens to

19  be paid in full?

20  A    Yes.

21  Q    Is there also a tax lien against the property that's

22  currently held by … and we'll call it Caz Creek or

23  (indiscernible)?

24  A    Yes.

25  Q    Do you know the approximate amount of that tax lien?

1    A    I don't.  It's more than 700,000, to be sure, but I

2    don't remember.

3    Q    And do you know if that tax lien is paid off in full

4    under the bank's plan?

5    A    Yes, it is.

6    Q    The bank's plan also pays off administrative expenses

7    in full, correct?

8    A    Yes.

9    Q    It makes a cash payment to a certain amount of secured

10   creditors.  Is that right?

11   A    Yes, to cash creditors.

12   Q    And it funds a liquidation trust?

13   A    Yeah, that was the second (indiscernible).

14   Q    As compared to $700,000, do you have a sense of the

15   magnitude, as a comparison, of the payments the bank is

16   making under the plan?

17   A    Yes.

18   Q    Is it about five times as much?

19   A    Well, it's 3.7 or more versus 700, so, yeah a little

20   more than five times, at least.

21   Q    Counsel was asking you whether you spoke to an attorney

22   named Jeff Steidley.  Do you recall those questions?

23   A    I do.

24   Q    Did Mr. Choudhri or anyone on any side ask you to talk

25   to Mr. Steidley?

1    A    I just don't remember.  I don't remember that name and

2    those discussions.

3    Q    In connection with the determinations that you've made

4    in this case, without telling me the contents of it, have

5    you sought legal advice?

6    A    Yes.

7    Q    And does the legal advice that you've received from

8    your counsel form part of the basis for the conclusions that

9    you've reached?

10   A    Yes, very much.

11             MR. FITZMAURICE:  Nothing further.  Thank you.

12             THE COURT:  Mr. Burks?

13             RE-CROSS EXAMINATION OF CHRISTOPHER MURRAY BY

14   BY MR. BURKS:

15   Q    Just to be clear, the tax liens that he was talking

16   about, the various liens he was talking about, if the

17   property is sold, whether it's sold to a cash bidder or to a

18   stalking horse, credit bearer, or another credit bearer,

19   they still don't get paid, or do they?

20             MR. FITZMAURICE:  Objection, Your Honor, calls for

21   speculation as to the results of, for example, negotiation

22   that the bidder might, a successful bidder might have with

23   the taxing authority.

24             THE COURT:  I'll overrule the objection.

25   BY MR. BURKS:

```
 1   A     Yeah, I think the tax liens have to get paid at a
 2   closing on the building regardless of whether it's sold a
 3   cash buyer or be accredited.
 4              MR. BURKS:  Nothing further, Your Honor.
 5              THE COURT:  Thank you.  Mr. Baker?
 6              MR. BAKER:  No questions.
 7              THE COURT:  Mr. Shannon?
 8              MR. SHANNON:  No questions, Your Honor.
 9              THE COURT:  Mr. Fitzmaurice?
10              MR. FITZMAURICE:  Nothing further, Your Honor.
11   Thank you.
12              THE COURT:  Thank you, Mr. Murray.  Thank you for
13   your patience.  You may step down.
14              MR. MURRAY:  Thank you, sir.
15              THE COURT:  Thank you.  Mr. Fitzmaurice.
16              MR. FITZMAURICE:  Thank you, you know, the bank
17   rests.
18              THE COURT:  All right, thank you.  Mr. Baker, do
19   you have witnesses?
20              MR. BAKER:  I defer to Mr. Burks.
21              THE COURT:  Mr. Burks, do you have a witness?
22              MR. BURKS:  Your Honor, at this time … Judge, at
23   this time, 2425 WL calls Mr. Holliman.
24              THE COURT:  Is he the gentleman that's in the
25   waiting room?
```

1          MR. BURKS:  Yes.

2          THE COURT:  All right (indiscernible).  He's a

3     rebuttal witness, I assume?

4          MR. BURKS:  Excuse me?

5          THE COURT:  He's a rebuttal witness, I assume?

6          MR. BURKS:  I'm putting on my case in chief.

7          THE COURT:  How come I was told that I only had

8     three witnesses and now I've got someone else?

9          MR. BURKS:  He's a rebuttal witness for my case in

10    chief.  I'm sorry.

11         MR. FITZMAURICE:  Your Honor, may we inquire,

12    rebuttal as to what?

13         MR. BURKS:  So, it's been represented that the

14    plan was noticed out and this is a creditor who received no

15    notice and no (indiscernible) to vote on.

16         THE COURT:  Okay, fine.  Sir, if you'll come to

17    the podium.  (indiscernible) I will swear you in.  Please

18    raise your right hand to be sworn.  Do you swear or affirm

19    to tell the truth, the whole truth and nothing but the

20    truth, so help you God.

21         MR. HOLLIMAN 1:  Yes.

22         THE COURT:  All right.  Please be seated sir,

23    right here.  Make sure you speak into the microphone.  Mr.

24    Baker you may proceed at your leisure.

25         MR. BURKS:  Mr. Burks.

```
 1              THE COURT:  Mr. Burks, sorry.

 2              DIRECT EXAMINATION OF ALLEN HOLLIMON

 3    BY MR. BURKS:

 4    Q    Hi, thanks for waiting.  I bet that was a lot of fun.

 5    A    Yes, sir.

 6    Q    What is your name, sir?

 7    A    My name is Allen Holliman.

 8    Q    And what do you do, sir?

 9    A    I am the owner of the(indiscernible) company that 2425

10    (indiscernible).

11              THE COURT:  I didn't catch it, sir, so please say

12    that answer again.  You are what?

13              THE WITNESS:  I am the owner and CEO of Nationwide

14    Security, which is (indiscernible) 2425 (indiscernible),

15    suite 300.

16              THE COURT:  Thank you.

17    BY MR. BURKS:

18    Q    Do you have any knowledge of a company called Galleria

19    2425 Owner?

20    A    Yes, I do.

21    Q    And what knowledge do you have?  How do you know this

22    company?  How do you know the company Galleria 2425 Owner?

23    A    I provide security services for the building.

24    Q    And do you have a contract with someone to do that?

25    A    Yes, we do.
```

1    Q    With whom?

2    A    With the Galleria 24.

3    Q    With Galleria 2425 Owner?

4    A    Correct.

5    Q    Did you file a proof of claim in this case?

6    A    We have not, as of yet.

7    Q    All right.  Are you owned, in your mind, are you owed

8    money by the estate?  By the creditor?

9    A    Absolutely.

10   Q    Did you receive a plan ballot voting … let me look …

11   did you receive a notice regarding voting on the plan?

12   A    Yes, from Galleria.

13   Q    From Galleria.  And did you receive notice from anybody

14   else?

15   A    I have not.

16   Q    Did you submit a ballot?

17   A    No, I have not.

18   Q    When did you receive the ballot from Galleria?

19   A    Early May.

20   Q    Early May?

21   A    Early May, if I recall correct.

22   Q    Did you receive anything in the mail from MPK or the

23   chapter 11 trustee regarding this plan?

24   A    Not that I recall.

25            MR. BURKS:  Pass the witness, Your Honor.

```
1              THE COURT:  Bear with me for one second.

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Give me the full name of your company

4    again, sir.

5              THE WITNESS:  Nationwide Investigations and

6    Security Inc.

7              THE COURT:  So, Nationwide Security 2425 West Loop

8    South 300, Houston, Texas 77027.

9              THE WITNESS:  That's correct.

10             THE COURT:  That's your mailing address.

11             THE WITNESS:  Correct.

12             THE COURT:  Go ahead.

13             MR. TROOP:  Thank you, Your Honor.

14                 CROSS EXAMINATION OF ALLEN HOLLIMAN

15   BY MR. TROOP:

16   Q    Mr. Holliman, good afternoon.

17   A    Good afternoon.

18   Q    Mr. Holliman, I'm not sure I understood what you said.

19   You said you received a package in early May, with regard to

20   (indiscernible).  Correct?

21   A    If I can recall, yes.

22   Q    Early May.  And you said that that package that you

23   received was from the Debtor, Galleria Owner 2425, not from

24   National Bank of Kuwait?

25   A    Yeah, I haven't heard from the Bank of Kuwait.
```

1          MR. TROOP:  Your Honor, I'm going to bring up on

2    the screen, through Mr. (indiscernible).

3          THE COURT:  Thank you (indiscernible).

4          MR. TROOP:  Your Honor, this is the -- go to the

5    top, please, of the document …

6          MAN 1:  Sir, this is ECF 501 (indiscernible).

7          MR. TROOP:  ECF 501-15, Your Honor.

8          THE COURT:  All right.

9    BY MR. TROOP:

10   Q    Mr. Holliman, you said the name of your company is

11   National Security?

12   A    No, Nationwide.

13   Q    Nationwide Security.

14   A    Investigation.

15   Q    Thank you.

16         MR. TROOP: Could you scroll down to the attachment

17   with the addresses?

18   BY MR. TROOP:

19   Q    Do you see this highlighted in blue, sir?

20   A    Yes, I do.

21   Q    Is that your address, 2425 West Loop, Suite 300?

22   A    That's my address.

23   Q    Houston, Texas 77007.

24   A    Correct.

25   Q    And you said you received a package at the beginning of

1    May.  Correct?

2    A    From my recollection.

3         MR. TROOP: Can you go to the top of the document,

4    please?  Could you scroll down just a little bit.

5    BY MR. TROOP:

6    Q    Do you see that it was National Bank of Kuwait,

7    paragraph three, that mailed the solicitation package in

8    early May?  There, right there, number three?

9    A    Three …

10   Q    On May 6th.

11   A    On May 6th, (indiscernible) National Bank, okay, yes, I

12   see that.

13        THE COURT:  (indiscernible) down a little bit.

14        MR. TROOP:  I'm sorry.  Could you please bring up

15   the plan, 2425 in the Debtor's certificate of services

16   (indiscernible)?

17        THE COURT:  Who's doing it?

18   BY MR. TROOP:

19   Q    You said you received it in early June, right?  That's

20   what you said?

21   A    I said early May, from my recollection.

22   Q    Actually, that's not what you said, sir.  Early May,

23   that's right, that's correct, that was our plan.  I

24   apologize.  Did you receive a second package in early June?

25   A    I don't recall.

1    Q    You don't recall.  Do you see that this would have been

2    service made by the Debtor, Galleria 2425 Owner LLC, and the

3    other plan proponent, 2425 WL LLC?  The plan you said you

4    got.  You said you go the Debtor's plan, right?

5    A    I got the Debtor's plan.  Okay.

6    Q    You see, this was mailed on May 30th, correct.

7    A    Correct.

8    Q    Like a month after you said you got the package, which

9    would have been consistent with when MPK sent you a package.

10   Correct?

11   A    (indiscernible) MPK, I recall the Debtor's package but

12   I don't recall (indiscernible).

13   Q    And can that be because you looked at the name of the

14   case and it said Galleria 2425 Owner at the top?

15   A    That's what it says.

16   Q    Do you have the package that you received with you?

17   A    I don't have it with me, no.

18   Q    But if you received a package in early May, did it have

19   a ballot in it?

20   A    I don't recall.

21   Q    Could you tell me who asked you to come here to be a

22   witness today?

23   A    The attorneys from Choudhri (indiscernible).

24   Q    And they asked you.  Did Mr. Choudhri talk to you about

25   whether you received a package before you talked to the

1    attorneys?

2    A    No.

3    Q    No.  How did they get your name?

4    A    They should have a name.  I operate the security in

5    that building.

6    Q    But how did they think to call you about whether you

7    got this or not?

8    A    I couldn't answer that question.

9         MR. TROOP:  Okay.  What else?  I don't think

10   anything else, Your Honor.  No further questions for this

11   witness.

12        THE COURT:  All right, (indiscernible).  Sir, when

13   did you become aware of this bankruptcy filing the first

14   time?

15        THE WITNESS:  I can't recall that.  It's been

16   going on for a while, so probably, I think maybe a year ago

17   (indiscernible) paperwork had come through.  But that's all

18   that my office (indiscernible), from my attorney.

19        THE COURT:  Thank you.  Mr. Burks?

20        MR. BURKS:  Nothing further, Judge.

21        THE COURT:  All right, thank you, sir.  You may

22   step down.  Mr. Burks, next witness.

23        MR. BURKS:  He's not here yet.  Let me see, my

24   witness list because I'm constantly losing the damn thing.

25   Put this up on the screen, please, 12.

1          Your Honor, rather than call Mr. Choudhri at this

2     time, what I think I would like to do, is put some

3     documents, court filed documents, that have been admitted

4     into evidence.

5          THE COURT:  I can let you do that in argument if

6     it's already in the record.  But what I'd like to do is I'd

7     like to conclude testimony.  So, if you want to rest that's

8     fine.  But this is the time to call witnesses, live

9     testimony.  That's what I would like for you to do.  I'm

10    surprised we're not hearing from Mr. Choudhri.  I really

11    wanted to hear from him.  But if you don't want to call him,

12    that's fine.

13         MR. BURKS:  Well, I want to call him, but he's

14    ill.  I don't know where he is.  He's on the screen, he's …

15    I know that he is ill.  Excuse me.  I know that he has told

16    me he is very ill.

17         THE COURT:  He is on the phone.

18         MR. BURKS:  All right.

19         THE COURT:  And if he'll show up on video, I'm

20    happy to have you examine him.  If he doesn't want to show

21    up or doesn't want to testify, that's fine too.  You can

22    rest.  And I'm happy to give you a few minutes, if you would

23    like, to try and contact him to get him by video.

24         MR. BURKS:  You've read my mind.  May I do so?

25         THE COURT:  Yes.  So, let's do this:  It is 2:42.

1     I'll come back at 2:50.  That gives you eight minutes to try

2     and get (indiscernible).

3                 MR. BURKS:  Thank you.

4                 THE COURT:  All right, thank you.

5                 CLERK:  All rise.

6                 (Recess)

7                 THE COURT:  All right, Mr. Burks, what's the

8     status?

9                 MR. BURKS:  Your Honor, 2425 WL calls Mr. Ali

10    Choudhri.

11                THE COURT:  He is not online or on the phone.  He

12    was when I left the bench.  He's left.  You should hear a

13    ding if he calls in.

14                MR. BURKS:  Is he on the headphones?

15                THE COURT:  No.

16                MR. BURKS:  I will wait for him to come on for as

17    long as --

18                THE COURT:  No, I'll wait a few more minutes, and

19    then he's not going to testify.

20                MR. BURKS:  Yes, Your Honor.  Was that something

21    (indiscernible), Judge?

22                THE COURT:  Excuse me?

23                MR. BURKS:  Was there --

24                THE COURT:  Oh, there's a phone call.  There he

25    is.  He's been unmuted.  He needs to show up now by video.

```
1              MR. CHOUDHRI:  Hello?

2              THE COURT:  Mr. Choudhri, I can hear you.  Can you

3    hear me?

4              MR. CHOUDHRI:  Judge Norman?

5              THE COURT:  Yes.

6              MR. CHOUDHRI:  Yes, I can hear you.

7              THE COURT:  Okay, I need you to appear by video,

8    and I'll swear you in, sir, and you can testify.

9              MR. CHOUDHRI:  Okay, I'm having a problem with my

10   video.  Can you give me just a minute?

11             THE COURT:  I'll give you a few more minutes.

12   I've already given you a few minutes, but I'll give you a

13   few more.

14             MR. BURKS:  Let me see.  Do we have

15   (indiscernible) deposition?

16             MR. BAKER:  Yeah.

17             MR. BURKS:  Which one is it?

18             MR. BAKER:  It's 49922 or 23.

19             MR. BURKS:  Yeah, all right, okay.

20             MR. CHOUDHRI:  Thanks for your patience.

21             THE COURT:  Just so the parties are aware, if you

22   want to share documents with Mr. Choudhri, which I'm

23   assuming that you are going to do, that will have to occur

24   through GoTo Meeting.  So just be aware of that fact.

25             MR. BURKS:  Where's our exhibit list?
```

```
1              MR. BAKER:  (indiscernible).

2              MR. BURKS:  Yeah, it's all the same.

3              THE COURT:  All right, Mr. Choudhri, can you hear

4    me?  Mr. Choudhri, can you hear me?

5              MR. CHOUDHRI:  Yes.

6              THE COURT:  All right, I'm going to ask you to

7    raise your right hand, sir, and be sworn.  Do you swear or

8    affirm to tell the truth, the whole truth, and nothing but

9    the truth, so help you God?

10             MR. CHOUDHRI:  Yes.

11             THE COURT:  All right, go ahead, Mr. Burks.

12                  DIRECT EXAMINATION OF ALI CHOUDHRI

13   BY MR. BURKS:

14   Q    Sir, will you please state your -- state and spell your

15   name for the record?

16   A    Ali Choudhri.

17   Q    And how do you spell your last name, sir?

18   A    C-H-O-U-D-H-R-I.

19   Q    Are you the -- what is your position in 2425 WL?

20   A    Equity.

21   Q    What is your position in Galleria 2425 Owner?

22   A    Equity.

23   Q    All right, I'm going to start with some housekeeping

24   matters, Mr. Choudhri.  I'm going to put up ECF Docket

25   Number 502-34.  And I'd like you to tell me when you can see
```

1    it, because I'm not sure what technological (indiscernible).

2    There's no 502-34, Hilco sale brochure.

3    A    I'm sorry?

4         MR. FITZMAURICE:  One moment, sir.

5         MR. BURKS:  One moment, sir.  We're putting up an

6    exhibit for you to look at.  So the Exhibit 30 -- 499-34 is

7    somewhere.

8         MR. FITZMAURICE:  Your Honor, I apologize.  Before

9    we begin the questioning of Mr. Choudhri, looking at it on

10   the screen, it's not clear to me that that's a real

11   background or --

12        THE COURT:  It's a virtual background.  Mr.

13   Choudhri, will you turn off your virtual background?  You

14   have to project your GoTo Meeting, Mr. Choudhri.  Anything

15   you do internally, we can see in the courtroom, he can't

16   see.  You've got to be connected to GoTo meeting.  You've

17   got to share through GoTo Meeting.  Because you can project

18   it all over the courtroom, but he's not going to see it.  So

19   Mr. Choudhri, in case you didn't understand my instructions,

20   any sort of virtual background blurring needs to be turned

21   off.  Thank you.

22        THE WITNESS:  Can you see this?

23        THE COURT:  I can see you, yeah.  That's fine, but

24   you can't --

25        THE WITNESS:  Okay, (indiscernible).

```
 1              THE COURT:  -- no virtual backgrounds.

 2              THE WITNESS:  Yes, sir.

 3              MR. BURKS:  And Mr. Choudhri, we're waiting for

 4    ECF 499-34, the Hilco sale brochure, to come up, and then

 5    we're going to go to 499-12 in one moment, sir.

 6              MR. BAKER:  Your Honor, I apologize.  I'm

 7    connected and I'm clicking on it.  It says "Can't share your

 8    screen.  We apologize, but we're experiencing difficulties

 9    with the video contents and are unable to share your

10    screen."  I've never had that happen before.

11              THE COURT:  Yeah, it sometimes -- and that's the

12    reason why we -- okay, let's see if I could make it work.

13              MR. BAKER:  You want me to try --

14              THE WITNESS:  I can't see with these.

15              THE COURT:  Mr. Choudhri, we'll be with you in a

16    second.

17              THE WITNESS:  Okay, sorry.

18              THE COURT:  I get the same error message, Mr.

19    Burks.  We can't share documents.

20              MR. BURKS:  So we can see it, but he won't.  Is

21    that correct?

22              THE COURT:  That's correct.

23              MR. BURKS:  Oh.

24              THE COURT:  Yeah, there we go.  All right, so I'll

25    try and pull up documents for you.  What do you want to pull
```

1    up?

2           MR. BURKS:  Thank you, Your Honor.  I apologize.

3    I mean, I don't know what I can do about it, but I do

4    apologize.  Docket 499-34, Your Honor, ECF 499-34 and 36.

5           Mr. Choudhri, hang on there.  We're about to,

6    apparently, about to get this done.

7           Mr. Choudhri, the document, ECF 499-34, is on the

8    screen.  Is it big enough for you to see it?

9           And Judge, I don't know if you can click and open

10   it bigger.  I just don't know how it works.

11          THE COURT:  All I can do is this.

12          THE WITNESS:  Yeah, yeah, I see it.

13          THE COURT:  Mr. Choudhri, you can drag on your

14   screen and basically make us very small and your exhibits

15   very, very large.

16          THE WITNESS:  Okay, yes, sir.  I can.  Thank you,

17   Your Honor.

18          MR. BURKS:  Let me know when you've got it to

19   where you can read the document, Mr. Choudhri.

20          THE WITNESS:  I can't scroll down, but I can zoom

21   in and out.  I'm not able to scroll down.

22          THE COURT:  You can't scroll?  All you can do is

23   make it bigger or smaller?

24          THE WITNESS:  Yes, I see it.

25   BY MR. BURKS:

1    Q    Mr. Choudhri, obviously, you're aware --

2    A    (indiscernible).

3    Q    -- of the proceedings going on in the bankruptcy case

4    of Galleria 2425 Owner.  Is that correct?

5    A    Huh?  Say that again.

6    Q    Are you aware that there's an auction taking place this

7    Friday regarding the --

8    A    Yeah.  (indiscernible).

9    Q    -- building in this bankruptcy case?  And do you know

10   who marketed the property for auction?

11   A    Yes.

12   Q    Who?

13   A    Hilco.

14   Q    Look at what has been put on the screen as Docket

15   Number 499-34.  It purports to be the Hilco Real Estate

16   sales document.

17   A    Yes, I see this.

18   Q    All right, do you know whether or not Hilco is

19   marketing the building or the building with all the --

20   A    Can you speak up?

21   Q    Sure, can you hear me now?

22   A    Just if you can speak up a little, please.

23           THE COURT:  I don't think he can get any louder,

24   Mr. Choudhri.  You need to get off your speaker phone.  Hold

25   your phone up to your ear.  Go.

1              THE WITNESS:  Hello?

2              MR. BURKS:  Can you hear me now?

3              THE WITNESS:  Better.  Yeah, much better.

4              MR. BURKS:  All right, thank you.  And the judge

5    has let you put the phone up to your face, so you're in good

6    shape, sir.

7              THE WITNESS:  Thank you, Your Honor.  Thank you,

8    Judge.

9    BY MR. BURKS:

10   Q    Looking at the exhibit up on the screen, have you seen

11   that whole document before?

12             THE COURT:  Do you want me to scroll through it?

13             MR. BURKS:  Please, so we can see.

14             THE WITNESS:  Yep, please.  I have -- that's the

15   one with an extra zero.  I think it's got an extra zero on

16   the 18.6 million.  That's the one.  I've seen it.  Yeah,

17   I've seen this.

18   BY MR. BURKS:

19   Q    Do you know whether this brochure is auctioning or

20   offering for auction the building or the building and the

21   furniture?

22             MR. FITZMAURICE:  Your Honor, objection.  The

23   Trustee can only sell the things the estate owns.  That's

24   what's going to be sold pursuant to the auction and approved

25   or not by Your Honor at the sale hearing.

```
 1              MR. BURKS:  That's not what I asked.

 2              THE COURT:  Well, I'll let you respond to the

 3    objection.  The objection basically is the Trustee can only

 4    sell, and you and I know that he can only sell whatever

 5    ownership interest he has.

 6              MR. BURKS:  Right.

 7              THE COURT:  So what's --

 8              MR. BURKS:  Well, what I want to make sure is, I'm

 9    going to establish what he has an ownership interest in or

10    not, through Mr. Choudhri.

11              THE COURT:  Well, I -- why is that important to

12    plan confirmation?

13              MR. BURKS:  Because the plan is offering the --

14    whatever Hilco is advertising, and Hilco is advertising the

15    building and the furniture.  I want to put on testimony that

16    the furniture is not the estate.  It's just Mr. Choudhri's

17    or one of his enemy's.

18              THE COURT:  I'll sustain the objection.  Thank

19    you.

20              THE WITNESS:  I (indiscernible) --

21              THE COURT:  Mr. Choudhri, there's no question for

22    you, so you don't get to talk.  Thank you.

23              MR. BURKS:  There's no question.  There's no

24    question.

25              Put on 499 as well.
```

1          THE COURT:  Are you asking me?  Because he can't

2   do it.

3          MR. BURKS:  I am asking you.  I apologize.  And he

4   just gave me that look like "Don't ask me.  Ask him."

5          THE COURT:  We're going to do it a different way.

6   It'll make things a little quicker.

7          MR. BURKS:  I'm used to the tap screen, so I'm not

8   going to embarrass myself like I did the other day.  Judge

9   said "Mr. Burks, you just tap that screen and expect a

10  result?"

11         THE WITNESS:  I see the thing about

12  (indiscernible).

13         THE COURT:  Hold on, Mr. Choudhri.  We'll be with

14  you in just a second.

15         THE WITNESS:  Sorry.

16         MR. BAKER:  Back, 2425.  Yes, 2425.

17         MR. BURKS:  Is that what we want?

18         MR. BAKER:  Yeah.

19         THE COURT:  All right, this should be easier.

20  What is it that you want to look up, pick up, Mr. Burks?

21         MR. BURKS:  I appreciate what you're doing.  499 –

22  – well, Your Honor...

23         MR. FITZMAURICE:  So Your Honor, it appears that

24  the witness has materials in front of him that he's flipping

25  through or otherwise looking at, so we would object to that.

1          THE COURT:  All right, Mr. Choudhri, you may not

2    look at anything other than what's presented on the screen.

3    Let me ask you two questions.  Do you have any paperwork in

4    front of you?

5          You're muted, Mr. Choudhri.

6          THE WITNESS:  Your Honor, I have a 499 --

7          THE COURT:  I need you to set that all aside,

8    please.

9          THE WITNESS:  Okay.

10         THE COURT:  Okay?  Is there anyone else in the

11   room with you?

12         THE WITNESS:  No, Your Honor.

13         THE COURT:  Okay, so I don't want to see any

14   paperwork in front of you, besides you.  Move it all away

15   from you. Thank you.

16         I apologize.  When all my bandwidth is taken with

17   GoTo Meeting, everything else becomes super slow for me,

18   which is a reason we don't typically present exhibits for

19   parties.

20         MR. BURKS:  Makes sense.

21         THE COURT:  All right, 499-12, is that correct?

22         MR. BURKS:  Yes, Your Honor.

23         THE COURT:  That's 499-12.  I'm not sure that's

24   what you want.

25         MR. BURKS:  Let me see.

1           THE COURT:  Is it two pages?

2           MR. BURKS:  I think it is.

3           THE COURT:  Okay.

4           MR. BURKS:  I can't read it, though.

5           MR. FITZMAURICE:  No, second page.

6           MR. BURKS:  Second page?

7           MR. FITZMAURICE:  On the second page.

8           MR. BURKS:  Mr. Choudhri, move onto the second

9      page, please, on Page 2.

10          THE COURT:  What number do you want to go to that

11     I can make it bigger for him?

12          MR. BAKER:  Very top.

13          MR. BURKS:  It's very top --

14          THE WITNESS:  Yeah, I don't see this.

15          MR. BURKS:  Very top of the second page.

16     (indiscernible).

17          THE WITNESS:  Is this document (indiscernible)?

18     Yeah.

19     BY MR. BURKS:

20     Q    Does the Debtor own any office equipment or

21     furnishings?

22     A    No.

23          MR. BURKS:  All right, Your Honor, you can take

24     all these ones off, please.

25     BY MR. BURKS:

```
 1   Q     Mr. Choudhri, did you make an offer to buy the claims

 2   of the Chapter 11 Trustee against NBK?

 3   A     No.  Yes, on behalf of 2425 WL, LLC.

 4   Q     And what was the last amount of the offer you made to

 5   the Trustee?

 6              MR. FITZMAURICE:  Objection, Your Honor.

 7              THE WITNESS:  $700,000.

 8              THE COURT:  Hold on, one second.  What's the

 9   objection?

10              MR. FITZMAURICE:  There's lack of predicate, lack

11   of foundation as to the response of the -- of who the offer

12   was on behalf of.  We've seen an offer of fifty.  The first

13   offer on behalf of some other entity, not on -- nothing

14   related to any of the -- like Mr. Choudhri has testified to.

15              THE COURT:  I'll overrule the objection.  Go

16   ahead.  I mean, I've seen the check.  Everyone's seen the

17   check.  Go ahead.

18              THE WITNESS:  I'm (indiscernible) it was on behalf

19   of -- I made it on behalf of 2425 WL, LLC, Barron

20   Newburger's the law firm that Steve Sather's with.  And Mr.

21   Sather (indiscernible) while Mr. Sather (indiscernible) made

22   the last offer for $700,000.

23              MR. BURKS:  Thank you.

24              THE COURT:  Mr. Choudhri, I'm going to ask you to

25   do a couple of things.  I need to see your face when you're
```

1    testifying.  I don't have a problem with you doing it

2    remotely, but you need to be looking at the camera.  Get

3    your hand off your face.  Thank you so much.  Go ahead.

4    BY MR. BURKS:

5    Q    Have you received -- and is the phone -- have you

6    received a rejection or an acceptance in that offer?

7    A    Yes.

8    Q    And what was it?

9    A    Rejection.

10   Q    I have in my pocket a check.  It's a cashier's check, a

11   bank check.  It's called a bank check.  Those are good

12   funds.  Do you want me to return those to you now that

13   you've received the rejection?

14          MR. FITZMAURICE:  Objection, Your Honor.  Lacks

15   foundation.  Mischaracterizes the nature of the document we

16   looked at earlier.  There's no evidence as to whether the

17   purported check represents "good funds."

18          THE COURT:  I'll sustain the objection.

19          THE WITNESS:  So --

20          THE COURT:  You don't get to answer the question.

21   There's no question before you, Mr. Choudhri.  Thank you.

22          THE WITNESS:  All right.

23          MR. BURKS:  Is there a way for him to see...

24   BY MR. BURKS:

25   Q    So I'm holding what purports to be an original,

1    official check, written on the bank of Metro City Bank.

2    What can you tell me about that check?

3              MR. BURKS:  And is there a way that he can...

4              THE COURT:  No, unfortunately not.

5              THE WITNESS:  I'm familiar with this check.

6    BY MR. BURKS:

7    Q    Can you see it?

8    A    Yes, I'm familiar with this check.

9    Q    All right, what is it?

10   A    It's a cashier's check payable to Christopher Murray, a

11   trustee.  And in the memo, it's "purchase of claims

12   (indiscernible) against NBK," which is the latest -- or

13   offers made with proof of funds.  And then, Mr. Shannon

14   asked for proof of funds and provided them earlier, and then

15   he -- and then to eliminate any further issues to the bank

16   statement as holder that he had, which had $7 million in it.

17   And then he got a cashier's check payable to the trustee for

18   $700,000.  And Mr. Shannon said Mr. Murray rejects this

19   offer and he's going to (indiscernible) Chapter 7 trustee as

20   the Chapter 7 Trustee.  And the same reason that Mr. Shannon

21   said that Mr. Murray rejects this offer, we asked why.  He

22   said it was attorney/client privilege.

23             MR. FITZMAURICE:  Objection, Your Honor.  He went

24   very, very far beyond the question.  It also appears that

25   Mr. Choudhri's looking off camera and perhaps reading

1   something.  (indiscernible) --

2           THE COURT:  I don't think so, but I'm going to --

3   first of all, bear with me --

4           THE WITNESS:  I'm not reading anything, Your

5   Honor.

6           THE COURT:  -- Mr. Choudhri, bear with me.

7   There's a -- well, there's a question in front you.  You can

8   answer it.

9           So Mr. Burks, I want to make sure that I recall

10  that that check is dated June 14th, 2024.  Is that correct?

11          MR. BURKS:  June 14, 2024, written on Metro City

12  Bank.

13          THE COURT:  Okay, that's fine.  I'll strike the

14  part of his testimony that basically asked whatever you

15  asked him, because he went on for quite a while.

16          MR. BURKS:  Yes, Your Honor.

17          THE COURT:  Mr. Choudhri, I'm going to ask you to

18  listen to the question and answer it succinctly.  You don't

19  get to give narratives.  Thank you.

20          THE WITNESS:  Yes, Your Honor.

21  BY MR. BURKS:

22  Q    Mr. Choudhri, who is QB Loop?

23  A    QB Loop Property, LLC is a limited liability company

24  that a number of investors and its general partners

25  (indiscernible).

1    Q    Do you have any interest, ownership interest, in that

2    entity?

3    A    No.

4    Q    Do you have anything invested in the funds personally,

5    in that entity?

6    A    No, other than verify the (indiscernible) who used the

7    funds when I made the offer on behalf of myself to purchase

8    the note and lien, and they're the financier to advance the

9    funds to acquire the note and lien.  And (indiscernible) had

10    made offers to buy 2425.  They made offers (indiscernible) –

11    –

12             THE COURT:  Mr. Choudhri, let me cut you off.  I'm

13    going to strike anything after "no."  Okay?

14             Go ahead.  Ask the next question.

15             MR. BURKS:  Am I the only one who's having trouble

16    understanding enough?

17             THE COURT:  I don't think so.  Do want earphones?

18             MR. BURKS:  Do you understand him?

19             WOMAN 1:  He's muffled.

20             THE COURT:  He's muffled, but that's because he's

21    on a speaker phone.

22             MR. BURKS:  Mr. Choudhri, will you please get off

23    the speaker phone and hold the phone up?

24             THE WITNESS:  I'm sorry, I'm having a problem with

25    my phone.  I'm having a problem with my -- I'm having a

 1   problem with my phone.  I could come back to court if that's

 2   easier.

 3           MR. BURKS:  No, sir.  Were you here on the phone -

 4   - no.

 5   BY MR. BURKS:

 6   Q    Do you have an opinion as to whether -- are you aware

 7   that the cash -- final cash collateral order entered by this

 8   court is up on appeal?  Are you aware of that?

 9           MR. FITZMAURICE:  Objection, Your Honor.  Calls

10   for speculation.

11           THE WITNESS:  Can you repeat your question?

12           MR. BURKS:  I'm sorry, Mr. Choudhri, why don't --

13           THE COURT:  Foundation?

14           MR. BURKS:  Foundation?

15           THE COURT:  Yeah, is he aware --

16           MR. FITZMAURICE:  And also relevance to

17   confirmation, Your Honor.

18           MR. BURKS:  Well, it's been (indiscernible).

19           THE COURT:  Is the appeal part of the exhibits

20   have been admitted?

21           MR. BURKS:  Right, 546-98 and 99.

22           THE COURT:  All right, so what's the relevance?

23           MR. BURKS:  The relevance is, is that is he aware

24   that the cash collateral order is not final with respect to

25   anything that may have an impact on the plan?

```
1              MR. FITZMAURICE:  So Your Honor --
2              THE COURT:  I'll sustain the objection as to
3    relevance.  There's no said pending appeal, so at this point
4    in time, I'm not bound by anything the appeals court does.
5              MR. BURKS:  Right, that's not why it was being
6    offered.  I'm going to move along.
7              THE COURT:  Okay.
8    BY MR. BURKS:
9    Q    Mr. Choudhri, you've been here on the phone most of the
10   day today, correct?
11   A    Yes, I've been listening in.
12   Q    All right, are there any concerns that you have right
13   now about the confirmation process?
14             MR. FITZMAURICE:  Objection, Your Honor.
15   Relevance to any concerns that Mr. Choudhri has.  What
16   relevance do they have to confirmation?
17             THE COURT:  I'm more than happy to hear from Mr.
18   Choudhri about his concerns.  Okay?  But to allow him to
19   give a narrative about what his concerns are, Mr. Burks,
20   doesn't work for me.
21             MR. BURKS:  All right.
22             THE COURT:  Okay.  If you want to address specific
23   concerns, I told Mr. Choudhri that I would listen to
24   whatever sort of complaints he might have about the plan,
25   about the plan proponents, about fairness, and I'm more than
```

1  happy to hear that.  I don't want to hear him give a

2  narrative.  Okay?  And part of it is what happened on

3  Monday.  Okay?

4          MR. BURKS:  That's what I'm balancing.

5          THE COURT:  So ask your questions.  Be specific.

6  Get an answer to the questions, and I'm happy to hear it,

7  and I'm happy to give you as much time as that takes.

8          MR. BURKS:  Thank you.  Subject to Your Honor

9  cutting off any non-responsive answers.

10         THE COURT:  Well, we'll get to a point where I'll

11  ask you to sit down, so just be warned.

12         MR. BURKS:  All right.

13         THE COURT:  Okay?

14  BY MR. BURKS:

15  Q   Mr. Choudhri, do you believe that $3.7 million for the

16  causes of action that you believe the Debtor or 2425 WL or

17  you -- do you believe that that is a fair purchase price for

18  those three causes of action?

19         MR. FITZMAURICE:  So Your Honor, I think that

20  mischaracterizes -- objection, I think that mischaracterizes

21  the plan of what it does in its provisions.  I also think

22  that Mr. Choudhri's view is that issue is not relevant to

23  whether or not the plan is confirmed --

24         THE COURT:  I'm going to give, in fairness to Mr.

25  Choudhri, because I know that he already believes it, I

1    don't like him, and then I'm prejudiced against him.  I'm

2    going to give him a little bit of leeway.

3            So go ahead, answer the question, Mr. Choudhri.

4            THE WITNESS:  I believe it's absolutely unfair.

5    There's no -- it's -- I'll stop.  I'm going to keep going,

6    Your Honor.  I don't want to upset you any more than I have

7    already.

8            THE COURT:  No, Mr. Choudhri.  I want to know why

9    you think it's unfair.

10            THE WITNESS:  I'm telling you, Your Honor.  It's

11    unfair, because everything has been (indiscernible) in the

12    whole process.  There's been no transparency.  Mr. Murray

13    has ignored me, not responded.  I've made multiple offers to

14    buy the claims.  I've even drawn the litigation finance

15    funds for $2 million.  (indiscernible) or there's more than

16    the debt, and you take claims.

17            NBK wants desperately out of -- they want to buy a

18    (indiscernible), but they don't want to market test it.  It

19    should -- just like the property should be market tested,

20    the claims should be market tested.  I know people that are

21    willing to buy the claims.  I know -- I have investors.  The

22    claims are very, very valuable.  There's a lot the bank has

23    done, and what the bank has done is they they've given the

24    Trustee an unlimited admin amount, unlimited.

25            (indiscernible) admin claims, so I could take hold

1    of the offer then, but the response in writing from Mr.

2    Murray -- Mr. RJ was, "It's irrelevant.  We're not going to

3    tell you that it's unlimited."  The -- these plans are

4    originally, defenseless, completely defenseless, and you're

5    trading the biggest asset of the estate for one creditor,

6    which is not appropriate.  It's not fair.

7            The reason we're in bankruptcy is because of NBK.

8    NBK (indiscernible).  They didn't approve offers.  They

9    didn't respond to it.  The loan agreement says you're

10   supposed to provide SNDA.  The settlement agreement says

11   you're supposed to provide SNDA.  I worked hard day and

12   night.  It is completely unfair.

13           Mr. Murray got on the stand today and told Your

14   Honor that he so considered the offer (indiscernible)

15   rejected.  (indiscernible) rejected it.  I have emails of

16   them responding.  I have emails from Kyung Lee, who is Mr.

17   Murray's lawyer, saying "I don't care if Mr. Choudhri lives

18   or dies."  I had a stroke because of the stress because of

19   the stress here, Your Honor.  And it's so unreal that the

20   Bank of Kuwait, that the Trustee --

21           THE COURT:  Okay, I'm going to -- Mr. Choudhri,

22   I'm going to cut you off now and go back to Mr. Burks --

23           THE WITNESS:  I'm sorry, I'm sorry, I'm --

24           THE COURT:  No, that's fine.  I'm going to go back

25   to Mr. Burks.

1          THE WITNESS:  -- really sorry, Your Honor.

2          THE COURT:  No, I need you to stop.  Okay?  Just

3     listen and stop.

4          THE WITNESS:  I'm sorry.

5          THE COURT:  I'm going to go back to Mr. Burks and

6     let Mr. Burks ask you a follow-up question or questions

7     about what you just said.

8          Mr. Burks?

9          MR. BURKS:  Thank you, Your Honor, very much.  Mr.

10    Choudhri, please take a deep breath, sir.  Please, just take

11    a deep breath.  Sit up --

12          THE WITNESS:  I'm really sorry.  (indiscernible) -

13    -

14          MR. BURKS:  -- straight so we can see your face.

15    You don't have anything to apologize for.  You don't.  Now,

16    I'm going to ask the next question, all right?  All right.

17    BY MR. BURKS:

18    Q    Why do you think the causes of action should be market

19    tested instead of simply sold for the amount that the

20    Trustee thinks is a good price, whatever that price is?

21    A    Because --

22    Q    And limit your answer to why.  Why do you think that?

23    A    -- because it maximizes the value to everybody, not

24    just one Creditor, to all the Creditors, everybody.  Instead

25    of discriminating and just not a lot of due process to me or

1    my claim, if people got (indiscernible) not giving them due

2    process and discriminating against them in the plan,

3    allowing -- if a recovery can be made, let's say

4    (indiscernible) --

5    Q    Wait a minute, if a recovery can be made, if a recovery

6    can be made?

7    A    I'm sorry, my blood pressure is my low -- my systolic

8    is over 110.  And I'm sorry I'm not 100-percent myself.  So

9    please forgive me.  If a recovery can be made against the

10    Bank of Kuwait, whether it's a contingency (indiscernible)

11    like wasn't -- just like with Baker Botts and just like with

12    Jerry Alexander, the contingency was not a million at first,

13    and the cash could be used for the estate to stabilize or

14    maximize it.  In essence, sell the assets (indiscernible)

15    for more, but the biggest asset of the estate is the lawsuit

16    against the Bank of Kuwait.  It is the biggest asset.

17        I had many conversations with large law firms that had

18    evaluated these claims, and I believe the claims are very,

19    very valuable, not just for me, but they have -- they're an

20    asset of the estate, and they should be market tested and

21    auctioned, just like anything else.  It should be fair and

22    open, and people should be able to bid on those things and

23    value them.

24    Q    All right, I'm going to ask you the next question.

25    Thank you, sir.  That's very lucid.  I'm going to give you

1    about 30 seconds just to -- please, breathe.  I've seen what

2    happens when you get this excited right now.  Please, one

3    moment, 15 seconds.  All right?  Just relax, please.

4    A    Okay.

5    Q    All right.  Did you hear the testimony of Mr. Carter

6    this morning?

7    A    Yes.

8    Q    All right, when you -- did you sit in a deposition with

9    Mr. Carter?

10   A    Yes.

11        MR. BURKS:  All right, Mr. Baker, what is the ECF

12   of that deposition, please?  Do we have it?

13        THE WITNESS:  I believe it is on 499-22 if I'm --

14   if memory serves me correctly.

15        MR. BURKS:  Maybe it's 499-22.

16        THE WITNESS:  I think so.  (indiscernible) a lot

17   of these memorized.  I know Mr. Fitzmaurice may think I'm

18   looking at something, but I actually know it by heart.

19        MR. FITZMAURICE:  And we're going to have this

20   (indiscernible).

21        MR. BURKS:  I don't know why (indiscernible) so

22   Mr. (indiscernible) and Mr. Choudhri can --

23        THE COURT:  The only way is for me to try and pull

24   it up for you.

25        MR. BURKS:  Okay.  One moment, Mr. Choudhri.

1              THE WITNESS:  Yeah.

2              THE COURT:  Mr. Burks, it's --

3              MR. BURKS:  Mr. Choudhri, you just stated a moment

4    ago that you listened to the --

5              THE WITNESS:  (indiscernible).

6              MR. BURKS:  -- testimony of the gentleman this

7    morning.  You've also sat through the deposition.  I think

8    it was one document.

9    BY MR. BURKS:

10   Q    Did you ask a lot of questions at that deposition?

11   A    I did.

12   Q    All right.  Subject to, and let the other side object

13   before you start talking, do you believe that the testimony

14   today was inconsistent with what you heard?  And this is a

15   yes or no answer, inconsistent with what you heard at the

16   deposition about ten days ago?

17   A    Absolutely.  Absolutely.

18             MR. FITZMAURICE:  Your Honor, objection.

19             MR. BURKS:  All right, (indiscernible) objection.

20             THE COURT:  I think that's so general, I can't let

21   that in.

22             MR. BURKS:  Yes or no?

23             THE COURT:  He can't testify to that, no.

24             MR. BURKS:  All right.

25             THE COURT:  I'm giving -- willing to give him some

1    leeway.  I'm not willing to give him that much leeway.

2            MR. BURKS:  Yes, Your Honor.

3    BY MR. BURKS:

4    Q    So in the deposition, did, in your opinion, did Mr.

5    Carter seem to know anything about the Chapter 11 plan?

6            MR. FITZMAURICE:  Objection, Your Honor.

7    Relevance?  Mr. Carter?

8            THE COURT:  I'll sustain the objection as to

9    relevance.  I don't want to hear that.  I want to hear what

10   Mr. Choudhri thinks about the plan.  And I'll give you some

11   leeway for that to happen.  He's expressed that it's unfair,

12   that it doesn't evaluate claims properly, that it hasn't

13   been fair and open.  That's what I want to hear, Mr. Burks,

14   over their objections.  Okay?

15           MR. BURKS:  Understood.

16           THE COURT:  All right, now, if you have other

17   evidence that will survive their objections, I want to hear

18   that, too.

19           MR. BURKS:  Yes, Your Honor.

20           THE COURT:  Okay.

21   BY MR. BURKS:

22   Q    Mr. Choudhri, I want to turn to Exhibit 499-98.

23   A    Eight, it's very small.

24           THE COURT:  We're not there yet, Mr. Choudhry.

25   Bear with me.

1          THE WITNESS:  (indiscernible).  Okay.

2          THE COURT:  You said 499-88?

3          MR. BURKS:  No, I did, but I meant 546-98, one of

4  the exhibits amended this morning, Judge, 546.

5          THE COURT:  It doesn't go to 98.  It's got 1

6  through 6.

7          MR. BURKS:  One, two, three, four, five, six,

8  okay.

9          MR. FITZMAURICE:  Is that an order?

10          THE COURT:  That is the order granted, Trustee's

11  motions for an order.

12          MR. BURKS:  Okay, just so -- all right, Mr.

13  Choudhri, when you have a -- when you can view that, if you

14  wouldn't tell me what it is, please.

15          THE WITNESS:  Right, this is the (indiscernible)'s

16  order.

17  BY MR. BURKS:

18  Q    And is that the order we're authorizing you to buy the

19  claims against Sonder?

20  A    Yeah, an entity, yes.  Not me personally.

21  Q    All right.

22  A    I know there's confusion about it, so I just want to be

23  clear when we say that.  That's correct.  I think this is --

24  yes, short answer, yes.  All right.

25  Q    All right, and is it your understanding that the plan

1    was proposed and filed before you bought those claims or

2    your entity bought those claims?

3    A    Correct.

4    Q    And is it your understanding that the plan currently

5    provides that only the Trustee can pursue that claim, and

6    that no other creditor or party in interest can pursue that

7    claim?  Is that your understanding?

8         MR. FITZMAURICE:  Objection, Your Honor.  Mr.

9    Choudhri's understanding is not relevant to what --

10        THE WITNESS:  (indiscernible).

11        MR. FITZMAURICE:  -- the order actually provides.

12   We dealt with this on Monday.

13        THE COURT:  I'll sustain the objection.  What he

14   believes really doesn't make any difference to me as it

15   relates to this order and the plan, Mr. Burks.

16        MR. BURKS:  All right, I have to find it in the

17   plan.  One moment.  I think we've -- we all know about it.

18   Counsel and I discussed it.  We need to exclude the Sonder

19   claim from the plan, but one moment, and I'll find it,

20   Judge.

21   BY MR. BURKS:

22   Q    What is the entity that purchased the --

23        MR. TROOP:  Yeah, Your Honor, we'll stipulate that

24   the Sonder claim has been sold pursuant to a court order at

25   this point.  It is not property of the estate that's going

1    to be purchased by the APA or administered under the plan.

2            THE COURT:  I'll take that stipulation, Mr. Burks.

3    It's not really an issue for me, based on what I've read.

4            MR. BURKS:  As long as we -- it's in the plan

5    paragraph, on Page 16, Paragraph J, causes of action and

6    avoidance actions.  As long as any confirmation order, if

7    you decide to confirm the plan, if the stipulation is that

8    the confirmation will specifically exclude or reserve that

9    Sonder claim pursuant to your order, then I can move on,

10   Judge.

11           MR. FITZMAURICE:  Okay, Your Honor, we understand

12   that the draft confirmation order we've submitted transfers

13   claims that are owned by the estate into the liquidation

14   trust by definition.

15           THE COURT:  It's not a state claim anymore.

16           MR. BURKS:  Okay, I sure would like that to be as

17   clear as possible, Judge.

18           THE COURT:  All right, go ahead.

19           MR. TROOP:  Okay, Your Honor.  We'll stipulate to

20   it for (indiscernible).

21           THE COURT:  That's fine.

22           Go ahead.

23   BY MR. BURKS:

24   Q    Mr. Choudhri, do you understand what the plan would do

25   -- first of all, did 2425 WL file a proof of claim?  Let's

```
1    focus in.  This may be one of my last areas, sir.  Let's

2    focus in on the 2425 WL claim, okay?

3    A    Yes.

4           MR. BURKS:  All right, Mr. Baker, will you put the

5    proof of claim up?

6           (indiscernible).

7           MR. BAKER:  Claim 14.  I actually think 13 and 14

8    -- 13 is tax claims, 14 is the big claim.

9           MR. BURKS:  499-4, Your Honor, please.  That's 3,

10   499-3.  Wait, these claims were not --

11          MR. BAKER:  That's the amended objection.  Is that

12   what you want?

13          MR. BURKS:  Yes, 3, Proof of Claim 14.

14          MR. BAKER:  You want the proof of claim?

15          MR. BURKS:  Yeah.

16          THE COURT:  What do you want to see, Mr. Burks?

17          MR. BAKER:  The tax claim or the big claim?  Okay,

18   13 --

19          MR. FITZMAURICE:  You're looking for the 2425

20   proof of claim?  Proof of claim --

21          MR. BAKER:  Thirteen --

22          MR. BURKS:  The one with the lien on it.

23          MR. FITZMAURICE:  Proof of Claim Number 7 by your

24   client?

25          THE COURT:  Either your claim's registered or both
```

1    claim's registered.  I can get that with you.  Is that

2    easier?

3              MR. BAKER:  Here, look.

4              MR. BURKS:  The WL claim with the lien attached to

5    it, the one (indiscernible).

6              MR. SATHER:  Seven.

7              MR. BURKS:  Seven, so Proof of Claim Number 7.  Do

8    you have it?

9              (indiscernible).

10             MR. BURKS:  I feel so compromised.

11             THE COURT:  Well, this is just a horrible way to

12   try a case.  Okay, and that's the reason I enter the orders

13   that I enter and say that technological problems are your

14   problems.  They're not my problems.  And I'm trying to be

15   really, really nice, but my patience is about to wear real

16   thin.  Okay?  So what do you want to do --

17             MR. BURKS:  Understood.

18             THE COURT:  You would pull up what?

19             MR. BURKS:  Proof of Claim Number 7.

20             THE COURT:  Do you want me to pull up the claims

21   register and then look at the claim?

22             MR. BURKS:  Yes, please.

23             THE COURT:  Claim 7?

24             MR. BURKS:  Yes, please.  And thank you for

25   (indiscernible).

```
 1              MR. FITZMAURICE:  What page do you want to go to?

 2              MR. BURKS:  Mr. Choudhri, we're here, and then

 3    we'll just go to the deed of trust.

 4    BY MR. BURKS:

 5    Q    Mr. Choudhri, do you see this claim, proof of claim?

 6    Can you enlarge the screen so you can see it?

 7    A    Yes.

 8    Q    All right, the judge is scrolling down to the attached

 9    deed of trust.

10    A    Yes.

11    Q    It has been posited by one witness or more that that is

12    a fictitious lien that has no underlying basis.  How do you

13    respond to that?

14    A    Mona Dajani with Pillsbury approved this transaction

15    and the closing statement.  This transaction was initially

16    supposed to be a refi, and then the Bank of Kuwait wanted it

17    to be a sale because of the lis pendens sales by Osama

18    Abdullatif during litigation.  And this is reflected on the

19    closing statement from May 2020 -- May 2018.

20    (indiscernible) --

21    Q    How much money --

22              MR. FITZMAURICE:  Your Honor, Your Honor,

23    objection.  The witness is testifying, first of all, far

24    beyond the scope of the question, but also, the contents of

25    documents that we haven't seen and testifying -- I don't
```

1   want to represent -- testifying to the contents of documents

2   that are not in evidence and that need to be, if that's what

3   he's -- that's -- if he wants to testify about.

4           THE COURT:  I'm not going to let him testify about

5   dockets that are not before the Court that I haven't seen.

6           MR. BURKS:  Mr. Choudhri --

7           THE COURT:  He can answer your basic question as

8   to why he disagrees with Mr. Murray's claims.

9           MR. BURKS:  -- Mr. Choudhri, this is the last

10  area, I believe, I'm going to ask you questions on, so I

11  want -- the judge is going to scroll to show you what is

12  attached to the proof of claim.

13          THE COURT:  I'm there, but do you want to go

14  further down?  That's the deed of trust.

15          MR. BURKS:  Right.

16          THE COURT:  You want me to go further?

17          MR. BURKS:  Yes, please.  I want to see what's on

18  this thing.  All right, what's that?

19          THE COURT:  Property description.  Your list that

20  they sent -- he's -- because he can't see it, but I can show

21  it to you in a better way that you can tell me what you --

22          MR. BURKS:  There, thank you.

23          THE COURT:  He's not seeing this, though --

24          MR. BURKS:  That's okay, that's okay.

25          THE COURT:  So that's the end.

```
 1              MR. BURKS:  That's the property description I'm

 2    saying, so we have a proof of claim and note and a deed of

 3    trust, right?

 4              THE COURT:  Yes, proof of claim and the deed of

 5    trust is basically it.  It's all that's attached to it.  You

 6    tell me where you want me to go.  I'll move it back over.

 7    Then he can see it.

 8              MR. BURKS:  And is there anything above that?

 9              THE COURT:  Just the proof of claim.

10              MR. BURKS:  Okay, that.

11    BY MR. BURKS:

12    Q    Mr. Choudhri, the judge is about to show you, and this

13    is our last area, Mr. Choudhri, what happened in the

14    transaction that's reflected in the document directly in

15    front of you with the numbers on it?  Was that real money?

16    What happened?

17    A    2425 WL was the seller, the grantor of this property

18    that went to Gallery 2425 Owner, LLC in May 2018.  The --

19    there was zero cash that came from the (indiscernible)

20    Galleria 2425.  The funds went towards a seller carry of

21    $14,780,000.  That's reflected on the settlement statement

22    in the closing of the underlying transaction, on the close.

23    Q    So are you saying that before this transaction, the

24    Debtor did not own 100 percent of the building?  Is that

25    what you're saying?
```

```
 1   A    No, 2425 WL did.  2425 WL is the seller in -- as of May

 2   2018, and then the buyer is Galleria 2425 Owner

 3   (indiscernible).

 4   Q    Understood, and this is the claim, this is the note and

 5   deed of trust --

 6             MR. FITZMAURICE:  Objection, Your Honor.  Lack of

 7   foundation.  There is no note.

 8             THE COURT:  There is no note, yeah.  And he can't

 9   talk about the settlement statement, either.

10             MR. BURKS:  Okay.  Now I'm in the deed of trust,

11   please.

12   BY MR. BURKS:

13   Q    So don't refer -- the judge doesn't want you talking

14   about documents that aren't in evidence.  He's heard, the

15   judge has heard you, as to what the basis for that deed of

16   trust is.  Is there anything else you want to say about that

17   deed of trust, Mr. Choudhri?

18             MR. FITZMAURICE:  Yeah, objection, Your Honor.

19   Witness can't testify generically in the narrative just

20   about whatever it is he wants to talk about a given topic.

21             MR. BURKS:  On the deed of trust?

22             THE COURT:  Again, I'm going to give him a little

23   bit of leeway.  Go ahead.  Tell me, Mr. Choudhri.

24             THE WITNESS:  Yes, Your Honor.  It's what

25   (indiscernible) -- its own (indiscernible) file, and they're
```

1    underlining, and there's a one memo that they did

2    (indiscernible), and I believe it's one of the ECF numbers –

3    –

4            THE COURT:  And again, you can't testify as to

5    stuff that's not in front of me.

6            THE WITNESS:  (indiscernible).

7            THE COURT:  He asked a generic question, so ask --

8    answer it if you can, and if you can't, that's fine, too.

9            MR. BURKS:  And speak as distinctly as you can,

10   please, sir.

11           THE WITNESS:  I'm sorry, I apologize, Mr. Burks.

12   Can you repeat the question so I can get it right?

13           MR. BURKS:  Right, so there's a deed of trust.

14   I've heard what you said so far.  I'm satisfied, but I don't

15   count.

16   BY MR. BURKS:

17   Q    Is there anybody -- is there anything else you want to

18   say regarding a transaction, without referring to the

19   documents, that underlies the granting of this deed of trust

20   2425 WL?  I understand what you've already said.  Is there

21   anything else?

22   A    If I recall, it's like something like -- it's in one of

23   the ECF numbers that are filed like 4 or 2 or something.

24   (indiscernible) the objection.  It's a settlement statement

25   that the consideration (indiscernible) --

1           MR. FITZMAURICE:  Objection, Your Honor.  He's

2    doing exactly --

3           THE COURT:  You're doing exactly what I asked you

4    not to do.

5           MR. BURKS:  I know, I know.

6           THE COURT:  So I'm going to cut you off.  Ask the

7    next question.  I gave you leeway.

8           He blew it.

9           MR. BURKS:  No further questions, Judge.

10          THE COURT:  Thank you.

11          Mr. Fitzmaurice.  Okay, and I'll offer you the

12   same thing I offered Mr. Burks.  If you need me to put

13   something on the screen for you, I'm happy to do that.

14          MR. FITZMAURICE:  Thank you, Your Honor.  Well,

15   I've been challenged all day, so I was going to give it a

16   shot.  If I lock into GoTo Meeting --

17          THE COURT:  You should be able to share your

18   screen.

19          MR. FITZMAURICE:  And I can -- Mr. Choudhri will

20   be able to hear me through this microphone or do I need to

21   be on a phone?

22          THE COURT:  No.  No, no.  That's everything.  So

23   if you look -- just follow me on the screen --

24          THE WITNESS:  I can hear you very well.

25          THE COURT:  All right, there -- here it says

1    "share." You'll click on "share." It'll show "share

2    screen," and then you'll just hit that button, and you'll be

3    able to share.

4              There you go.

5              MR. FITZMAURICE: All right.

6              THE COURT: You're the wizard today of technology.

7              MR. FITZMAURICE: Well, all evidence to the

8    contrary this morning, Your Honor.

9              CROSS-EXAMINATION OF ALI CHOUDHRRI

10   BY MR. FITZMAURICE:

11   Q    Mr. Choudhri, I'm showing you a copy of the proof of

12   claim for Claim 7-1. Do you see that on the screen?

13   A    Yes.

14   Q    And this is a proof of claim that was filed by 2425 WL.

15   Is that right?

16   A    Yes.

17   Q    So I'm going to scroll through the -- it looks like 18

18   pages of this PDF. And my question at the end is, I'm going

19   to ask you if you've seen, in any of the documents that are

20   here attached to the proof of claim, a promissory note.

21   Okay?

22   A    No.

23   Q    I'll keep going. We'll go all the way to the end. And

24   I'll pause here for a second. Is that your signature?

25   A    Yes.

1    Q    At the time that -- at the time this proof of claim was

2    signed by you, were you the manager of 2425 WL?

3    A    Yes.

4    Q    I'll keep scrolling.  We'll look for the note.

5    A    I don't believe the note is there.

6    Q    So you think there's no note attached to the deed of

7    trust.  Is that right?

8    A    There's no note here on this proof of claim.

9    Q    Okay.  So let me ask you another question about the

10   deed of trust that's attached to the proof of claim.  And I

11   apologize.  I'm just going to scroll to the point that I'm

12   allowed to show you.  Okay, is that your signature here, Mr.

13   Choudhri, under grant -- ultimately under "grantor?"

14   A    Yes.

15   Q    Do you see here it says, the text on the document says

16   "this instrument was acknowledged before me this," blank,

17   "day of," blank, "2021?"  Do you see that?

18   A    Yes.

19   Q    And then it's signed?

20   A    Yes.

21   Q    Is that because this group -- this deed of trust was

22   executed in 2021?

23   A    Yes, that's why.

24         MR. FITZMAURICE:  Thank you, sir.  No further

25   questions.

```
 1                  THE COURT:  All right, thank you.

 2                  Mr. Burks?

 3                  RE-DIRECT EXAMINATION OF ALI CHOUDHRI

 4    BY MR. BURKS:

 5    Q    Mr. Choudhri, on that proof of claim, does the note

 6    exist?

 7    A    Yes.

 8    Q    Did you give a copy of it to Mr. Sather?

 9    A    Yes.

10    Q    Did you give a copy of it to Mr. Sather in time to file

11    the amended proof of claim?

12                  MR. FITZMAURICE:  Objection, Your Honor.  Lack of

13    foundation.  There is no amended proof of claim on file.

14                  THE COURT:  I'll sustain the objection.

15                  THE WITNESS:  (indiscernible) --

16    BY MR. BURKS:

17    Q    Have you provided Mr. Sather a copy of the note to put

18    forth as an exhibit in the proof of claim objection

19    proceeding?

20                  MR. FITZMAURICE:  Objection, Your Honor.  Lack of

21    foundation.

22                  THE COURT:  I'll overrule the objection.

23    BY MR. BURKS:

24    Q    Have you provided a copy of the note to Mr. Sather for

25    use in the objection of claim proceeding?
```

```
 1   A    Yes.  Yes.

 2              MR. BURKS:  Nothing further, Judge.

 3              THE COURT:  All right, Mr. Fitzmaurice?

 4              MR. FITZMAURICE:  Nothing, Your Honor.

 5              THE COURT:  All right, thank you.

 6              Mr. Burks, you have a witness.

 7              MR. BURKS:  Who's on the screen other than Mr. --

 8              THE COURT:  Mr. Choudhri.

 9              MR. BURKS:  And that's it?

10              THE COURT:  That's it.

11              MR. BURKS:  May I look in the hallway, please?

12              THE COURT:  No, I mean, I've been really, really

13   patient.  Do you rest?

14              MR. BURKS:  I rest --

15              THE COURT:  Mr. Baker, do you rest?

16              MR. BURKS:  -- Your Honor.

17              MR. BAKER:  Nothing further, Your Honor.

18              THE COURT:  Thank you.  All right, I think that

19   concludes at least the evidence, which allows me to give you

20   some time to argue.  Mr. Troop and Mr. Fitzmaurice, he's

21   going to argue for --

22              MR. FITZMAURICE:  Your Honor, Mr. Troop will, I

23   think, begin and Mr. Akuffo as well will present with

24   respect to the confirmation standards.

25              THE COURT:  Okay, that's fine.  I'd like to limit
```

1    argument.  I think I've heard what I need to hear, but I

2    want to give you time.  I'm going to limit each side to 15

3    minutes.  All right?

4            MR. BURKS:  Thank you.

5            THE COURT:  I'll give you five minutes to close.

6    All right?  Thank you.  So if you want to start now, you

7    may, or do you want a few minutes?

8            MR. BURKS:  Wait, did you say 15 or five?

9            THE COURT:  Fifteen.

10           MR. BURKS:  Is there any way that we can take a

11   very quick break that I need?  I --

12           THE COURT:  I'm fine breaking if you guys want to

13   break.

14           MR. BURKS:  I just have to run to the restroom,

15   frankly.

16           MR. TROOP:  I don't mind, Your Honor, but I

17   thought when we spoke this morning we decided that as the

18   moving party I would go last.

19           THE COURT:  Mm hm, well, you can do that, or you

20   can open and close if you want.  It's your choice.

21           MR. TROOP:  Oh, that's what you meant by open and

22   close, by 15 and five?

23           THE COURT:  Yeah.

24           MR. TROOP:  And it won't further (indiscernible).

25           THE COURT:  Okay, that's fine.  And let's do this,

1    it's 3:53.  I'll come back and four o'clock.  I'll let Mr.

2    Troop start, and then we'll go from there.  Thank you.

3              CLERK:  All rise.

4              (Recess)

5              CLERK:  All rise.

6              THE COURT:  All right.  We're back on the record

7    in 23-34815.  Mr. Troop, you may proceed.

8              MR. TROOP:  Thank you, Your Honor.  Again, Andrew

9    Troop from Pillsbury on behalf of National Bank of Kuwait.

10             Your Honor, we're going to try to stick to three

11   minutes and get Mr. Akuffo the first opportunity he's ever

12   had to present a confirmation order.

13             THE COURT:  That's fine.  I'd be happy to have him

14   present.

15             MR. TROOP:  Thank you.

16             THE COURT:  That said, it's always an exciting

17   time when you do it for the first time.  Go ahead.

18             MR. TROOP:  He's getting an interesting case as

19   well.

20             Your Honor, when we started this morning, I talked

21   to you primarily about two things, the two things of focus.

22   The first thing that I talked about is that I thought that

23   there was an objection that was going -- that was being

24   raised with regard to good faith.  And I don't think there's

25   been any evidence presented with respect to a lack of good

1    faith, and -- to the contrary -- only evidence that supports

2    a finding of good faith.

3         A plan was proposed in good faith.  It was not

4    proposed in any means prohibited by law.  It was

5    transparent.  It was negotiated with the Chapter 11 trustee.

6    It was sent out to both -- it was sent out to both properly.

7    The only witness with regard to notice, I believe it was

8    clearly shown that he actually received our plan, not

9    theirs.  Your Honor, nothing against him.  It's just -- Your

10   Honor, it's a matter of circumstance.

11        Your Honor, the plan is in good faith because it

12   seeks to maximize what would otherwise be a truly insolvent

13   state.  And yes, are there things that NBK gets in exchange

14   for that?  It's a release of estate claims.  It gets

15   protection against anyone breaking estate claims.  The

16   argument that their releases are broader than that, I

17   disagree with, but if there's concern about that, Your

18   Honor, we'll make it as crystal clear as you want it in the

19   confirmation order.

20        Your Honor, there are also other objections

21   raised, and I talked this morning about three that were made

22   untimely.  One of the ones that was made untimely had to do

23   with, indirectly, 1129(a)(10) and whether there is

24   (indiscernible) impaired class.

25        Mr. Burks, I think, tried to make two points

1    today.  He tried to say that NBK's claim was not impaired

2    because it accepts its treatment under the plan, but he'd be

3    -- that's just nonsensical Your Honor.  You'd remember

4    having an impaired accepting class.  You would never have an

5    impaired accepting class.  And the fact that (indiscernible)

6    doesn't change the fact that our legal rights are being

7    altered under the plan.  Our payment rights are being

8    altered under the plan.  (indiscernible) not we're impaired.

9         The second thing is there's no doubt that the

10   votes were cast, and cast affirmatively and cast timely.  So

11   the argument is that there was an objection pending, which

12   shouldn't involve the case here, I if can call it that, is

13   that there is a valid claim held by National Bank of Kuwait

14   or you would not have allowed it to credit it on Monday.

15        To move forward, Your Honor, a proof of claim is

16   prima facie evidence of the validity of the claim.  And yes,

17   an objection raises that question, but it has to raise

18   sufficient issues to rebut the prima facie validity of the

19   claim.  And again on Monday, you effectively found it does

20   not.  It does not.

21        A technical issue -- which it may be a technical

22   issue at best -- to not stand in the way of confirmation of

23   this plan.  But if you have any concern at the end, Your

24   Honor, Bankruptcy Rule 3018 allows you to estimate for

25   voting purposes the claims.  It is on notice in hearing, but

1    we all know the code says that notice in hearing -- it's

2    notice in hearing justified by the circumstances.  Here

3    there's no question that these parties, who are now more

4    than two full days of trial, that tried to raise disputes

5    about those claims.  And Your Honor, I think they did so

6    unsuccessfully.

7             So if there's any concern, I believe you can just

8    allow the claims for voting purposes in the form in which

9    they were presented for the votes.  And then if you confirm

10   the plan, the impact of the plan will be what it is with

11   respect to those claims.

12            I went way over my three minutes, Your Honor.  I

13   apologize.

14            THE COURT:  That's fine.

15            MR. TROOP:  Mr. Akuffo.

16            MR. AKUFFO:  Good afternoon, Your Honor.  Kwame

17   Akuffo from Pillsbury on behalf of the National Bank of

18   Kuwait.  (indiscernible) and secured lender to the debtor.

19            Mr. Troop already, you know, went through a couple

20   of plan confirmation requirements, and so I'm going to be

21   brief with my presentation and just focus on a couple of

22   issues that were discussed today, one being clarification,

23   the other being cram down with respect to whether or not

24   there's unfair discrimination against the rejected classes,

25   which include Class 6 and 8; and lastly the permissive

1    provisions that -- excuse me -- the permissive provisions

2    related to Section 1123(b).

3           So first with respect to classification, our

4    requirements, Your Honor, we believe that Section 1122's

5    classification requirements are met because our Goal 3 of

6    the plan designates a class of claims and interest under the

7    plan.

8           Briefly, I'm just going to take us through these

9    classes.  Again, Class 1 is other secured claims.  Class 2

10   is other priority claims.  Class 3 is the NBK tax claim.

11   Class 4 is NBK secure claim.  Class 5(a) and 5 -- Class 5(a)

12   is general -- trade general unsecured claims.  Class 5(b) is

13   other general unsecured claims.  Class 6 is insider claims.

14   Class 7 is subordinated claims, and Class 8 is interest of

15   the debtor.

16          We believe that the classifications in the plan is

17   rational, and they're valid, legal, and factual reasons that

18   justify classification.

19          With respect to Class 1, again, these classes hold

20   secured claims against the estate, and particularly they

21   cover secured real estate tax claims held by certain taxing

22   authorities and (indiscernible).

23          Class 2 claims consist of non-administrative

24   expense claims that I'll classify separately because they

25   are priority claims under Section 507 of the bankruptcy

1    code.

2         And Class 3 advocates the sole holder of that

3    claim and onto the plan.  NBK will receive -- will receive

4    value for its claim under Class 3 if it's not the winning

5    bidder of the property.  But to the extent that it is the

6    winning bidder of the property at the auction on Friday,

7    then it has agreed to waive its claim.

8         NBK is also the sole holder of our claim in Class

9    4, which is based on unsecured claim under the loan

10   documents that were -- under the loan documents between NBK

11   and the debtor.

12        Class 5, as you've heard throughout today,

13   consists of trade, unsecured claims arising from maintenance

14   and related work.  We particularly classed 5 as claims

15   separately because the trustee recommended that we do so,

16   and these claims are, again, based on secure claims that

17   were payable to trade to allow them to continue to provide

18   services to the estate's main assets, which are other

19   property.

20        With respect to Class 5(b), these are non-trade

21   unsecured claims, and they consist of the debtor's former

22   attorneys as well as NBK's deficiency claim based on its

23   loan to the debtor.

24        With respect to Class 6, which has been a hot-

25   button issue, they were separately classified because they

1    applied to the debtor's affiliates who are insiders,

2    particularly 2425WL and general.

3        Your Honor, it makes no sense to place these

4    entities into classes under the subclasses -- under the

5    subclasses, meaning Classes 5(a) and 5(b), because these

6    classes -- again, meaning 5(a) and 5(b) -- are going -- part

7    of their recovery are pro rata share interests and

8    litigation trust assets, and to the extent -- and they're

9    litigation targets.  And to the extent that recovery -- to

10   the extent that there are recoveries against these potential

11   litigation targets -- again, meaning Jetall and 2425WL -- it

12   makes no sense to recover money against them and then, you

13   know, have them actually receive recovery from -- under

14   those classes.

15       And so that's the basis because we separately

16   classified them.  And as you've heard all throughout today,

17   Your Honor, there are pending objections to these claims,

18   which are highly suspect.  And those objections are found at

19   ECF Number 402 and 404.

20       Moving on to Section 1129(d)'s cram down

21   requirements, we believe that there's no inferred

22   discrimination here against the rejecting classes,

23   particularly Classes 6 and 8, again for the same reasons

24   that we separately classified Class 6, there's no inferred

25   discrimination against them.

1          Again, these are -- this class covers -- this

2     class includes Jetall and 2425WL's claims.  And again,

3     placing these insiders in classes 5(b), for example, does

4     not make sense because to the extent that there are

5     recoveries against them through a litigation, they shouldn't

6     be able to share those recoveries for that reason.

7          And in terms of distribution to creditors in Class

8     5(a), it's not unfair to do so because, again, these Class

9     5(a) trade creditors are receiving value because they

10    provided critical services to the estate by helping maintain

11    its -- by helping to maintain the value of the property.

12         And the bottom line here is that NBK can decide

13    who gets to get paid under its plan, especially after the

14    debtor failed to pay the loan back to NBK a couple of years

15    ago.  That was the issue out of the loan documents, Your

16    Honor.

17         I'm sorry if I'm moving too fast.

18         THE COURT:  That's fine.  You still have four

19    minutes.  You're good to go.

20         MR. AKUFFO:  Okay.  With respect to fair and

21    equitable, again, simply the plan is not for -- the plan is

22    fair and equitable to holders of claims in Classes 6 and 8

23    because there's no value available to make distributions to

24    these creditors, and the plan does not provide for

25    recoveries for claims or interests junior to Classes 6.

```
 1          Lastly, the permissive requirements of Section
 2     1123(b) are met, particularly with respect to Section
 3     1123(b)(3)(a), it requires that a plan may settle an action
 4     that belongs to the estate.
 5          For the estate release, as you've heard today, the
 6     debtor commenced a loss against NBK in state court based on
 7     breach of a settlement agreement and has alleged tortious
 8     interference and lender liability claims agent NBK.  That
 9     state court lawsuit was removed -- excuse me.  That lawsuit
10     was removed from state court to this court, and after the
11     trustee was appointed in February, he was substituted as
12     Plaintiff in this lawsuit.
13          Today, Your Honor, you heard testimony from the
14     trustee that after you entered the cash collateral order
15     that allowed him to investigate claims and challenge the
16     amount in allowance of NBK's claims against the debtor under
17     their own documents, he conducted an exhaustive
18     investigation and assessment of claims against NBK.
19          For example, he spoke to Debtor's current and
20     former counsel.  He spoke to other parties, including Mr.
21     Caldwell, Ms. Azeemeh; and he requested documents from the
22     debtor.  And I believe he mentioned that they did not
23     produce certain documents.  And to the extent that they did
24     produce certain documents, they did not provide any factual
25     support to -- any factual support to support the lawsuit
```

1    that is pending against NBK.

2            And so after his exhaustive investigation of NBK

3    into its -- into the debtor's claims against the bank as

4    well as to determine whether or not NBK has a valid claim

5    under the loan documents, he determined that there was no

6    basis -- there was no -- excuse me -- he determined that

7    there was -- the claims asserted by the debtor lacked any

8    sufficient merit and that it was the best interest -- it was

9    not in the best interest of the estate to pursue claims

10   against the estate.

11           Now, even if the trustee had pursued litigation

12   against NBK, he would've had to rely on testimony from Mr.

13   Choudhri, and you've heard today that the trustee determined

14   that any testimony by Mr. Choudhri is not truthful.

15           And so in return for the estate release, NBK has

16   agreed to reduce its deficiency claim to 90 percent of -- 90

17   percent of that amount in Class 5(b).  It has also agreed to

18   pay administrative expenses -- expense claims in full, and

19   has also agreed to fund the liquidation trust for, I

20   believe, $150,000.

21           And lastly, based on the trustee's testimony

22   today, he determined it's reasonable business judgment that

23   the estate release is fair and equitable to the estate.  And

24   again, it's in the best interest of the estate.  And for

25   those reasons, Your Honor, we believe that the estate

1    release should be approved.

2          With respect to exculpation, we -- exculpation in

3    our goal 9.C of the plan should be approved.  Again, today

4    you heard that we received comments from the U.S. Trustee

5    regarding the breadth of the exculpatory party definition

6    under the plan that included NDK and related parties.  This

7    exculpation definition has been modified to apply to the

8    trustee and its related parties only, and that modification

9    is reflected in Paragraph 59 of the revised proposed order

10   filed at ECF Number 528.  So for that reason, Your Honor, we

11   believe that the exculpation under the plan should be

12   approved.

13         And lastly, the injunction and gatekeeper

14   provision, we believe that these injunction provisions

15   should be approved.

16         With respect to the gatekeeper provision, it

17   simply requires that any party with a colorable claim come

18   to this Court and confirm that that colorable claim --

19   excuse me.  Let me retract.

20         The gatekeeping provision basically is designed to

21   enforce the estate release that are being -- that is being -

22   - the estate release under the plan, and to the extent that

23   any party has a colorable claim, it requires that party to

24   come to this court to determine whether or not there's a

25   basis to go ahead and pursue that claim against a release

 1    party.  And to the extent that those claims, again, are

 2    released under the plan, there's no reason to do so.

 3            I also want to point out that the gatekeeper

 4    provision is not a third-party release.  The injunction and

 5    the gatekeeper provision is consistent with Fifth Circuit

 6    law.

 7            And so for the brief reasons that I've explained

 8    on the record, Your Honor, I believe that -- excuse me --

 9    NKB believes that the plan should be confirmed.

10            THE COURT:  All right.  Thank you, sir.

11            All right.  Mr. Burks?

12            MR. TROOP:  Your Honor, we were asked to advise

13    you that Ms. Whitworth, the U.S. Trustee, might want to

14    speak.

15            THE COURT:  She's on the phone, and she's unmuted,

16    and I'm sure she'll want to say something at the end, and

17    I'm going to give her the opportunity.  Thank you.

18            MR. TROOP:  Thank you.

19            THE COURT:  Mr. Burks, they did run over by a few

20    minutes.  If you run over by a few minutes, I'll give you

21    the same courtesy.

22            MR. BURKS:  How much time do I have, Your Honor?

23            THE COURT:  15 minutes plus a couple of minutes

24    grace.

25            MR. BURKS:  It's been a while since I heard an

1    accomplished bankruptcy attorney tell the Court that any

2    requirement for confirmation is just technical.  It's not

3    technical.  It's a requirement, 1129(a)(1) through (16) have

4    to be met.  Period.

5         I don't know why.  I assume that Counsel had a

6    reason for not estimating the claim.  I assume that they

7    read In re Bressler, which is the only opinion in this

8    district regarding whether or not -- not whether or not you

9    credit bid, not whether or not you have standing, but

10   whether your vote can be the sole accepting vote for

11   purposes of 1129(a)(10).

12        It's more than a technicality here.  In re

13   Bressler, which is written by Judge Rodriguez at 2021 Bankr.

14   LEXIS 64, says, "Here's what you have to do if you have a

15   claim -- proof of claim that is objected to."  You don't

16   have to try the proof of claim.  You don't get to try the

17   proof of claim.  It's an objected-to claim.  It's not a

18   deemed-allowed claim.

19        Why they didn't come to you already and ask you to

20   estimate it -- it's a strategy, I guess.  But to somehow

21   deem the fact that they're entitled to credit bid to somehow

22   mean that they are -- you know, one allowed claim for

23   purposes of 1129(a)(10), that's going to be new law, and

24   they're asking you to make new law.  It's not a

25   technicality.  It's a requirement under 1129(a).

1          THE COURT:  So let me understand your arguments

2     first.  Your argument is that because the claim was objected

3     to, they simply cannot go without me making some sort of

4     claims estimation?

5          MR. BURKS:  After notice in hearing, they need an

6     allowed -- they need an estimated claim in some amount after

7     notice in hearing.  They make the motion.  We get a fair

8     opportunity to object to that motion.  Yes, Your Honor.

9          THE COURT:  Okay.  Thank you.  Go ahead.

10          MR. BURKS:  Additionally, I was interested by

11     Counsel's opening argument where he said that somehow, the

12     fact that the proponent accepted the plan, somehow that

13     makes them unimpaired.  I never argued that.  That would be

14     an astonishing argument.

15          What I said was that if you only have one

16     "impaired claim," and it's not that the bank accepted it --

17     that's not what I'm talking about -- it's that they proposed

18     their own treatment under the note, which they're allowed to

19     do.  They can discount that note.  They can modify that

20     note.  They can propose anything they want, and it's under

21     the note that they're doing it.

22          So I'm not saying that there's a proponent who

23     accepted it.  I'm saying the only accepting class is the

24     proponent who's voluntarily pursued to the note, said,

25     "Here's how we're going to get paid to the note," and I'm

1    saying that is not impairment.  That's -- that is somebody

2    discounting the note just like anyone can -- the bank can

3    settle the note.  You know, the bank can waive foreclosure.

4    The bank can call off the auction.  They can do anything

5    they want under that note and deed of trust, and they've

6    done it.  That's not impairment.

7         Moving on to the next issues, I'm really

8    interested by Counsel's portrayal of the abandonment.  He

9    said, "Gee, they just haven't made any argument that it

10   wasn't proposed in good faith."

11        To the contrary.  The entire plan is based on bad

12   faith proposal, and here's why.  I don't know what the

13   counsel here in this room or the Court thought the purpose

14   of my questions to Mr. Carter and Chapter 11 trustee were

15   regarding the -- were regarding the negotiation of the plan

16   terms, but I'll tell you what it was.  We all read In re

17   Cajun Electric.  We know what the three prongs from 9019,

18   and we know what the Fifth Circuit said.  A balance to

19   leverage negotiation, a balanced negotiation is critical for

20   acceptance of any settlement.

21        This was a highly, highly leveraged negotiation

22   where the trustee, frankly, didn't have a chance.  He

23   bravely testified as to how he fought for things that he

24   wanted to, but the bottom line was he had once choice, and

25   one choice only for a plan.

1          You talk about an uneven playing field.  It

2     doesn't even come close.  He wanted different provisions for

3     the settlement and the payment amount.  He wanted different

4     provisions for the credit bid amount.  He even caved in, in

5     terms of not testing the true market value of these three

6     claims against the estate.  And we can all speculate whether

7     or not it was reasonable for him to do so.

8          In this highly leveraged and charged situation

9     that he was in, in negotiating the plan, reasonable or

10    unreasonable, no choice.  No choice.  And that is one of the

11    biggest arguments or problems that we have with this plan.

12         Look at the classifications.  Let's just

13    understand what the classification problems here are.  You

14    have a WL lien -- second lien.  Well, first -- here's the

15    first problem.  You have a lien from -- a second lien from

16    2425WL.  You have proof of claim with a deed of trust

17    attached.  It's filed.  Right now, you couldn't go to a

18    closing -- a title company right now and sell that first

19    lien if you tried because there's deed of trust on it.  What

20    would you do in state court?  You could only file a petition

21    for quiet title.  Then the party would -- Mr. Choudhri

22    would, on behalf of the entity, bring the note.  You'd have

23    a jury trial as to the validity of the claim and liquidity

24    of the lien, and whether or not you can quiet title.

25         In bankruptcy court, what do you do?  You file a

1    proof of claim.  It's deemed allowed until it's objected to.

2    Then you have a trial.  You get to try it.  You try whether

3    or not on all the evidence that's available, that's

4    admissible, relevant evidence.  You get to determine whether

5    or not that lien is valid, whether or not there's a debt

6    owed, and then ultimately whether or not there's cause to

7    subordinate it.  They want to pass all that.  They want to

8    cut through all that in this plan.  No way.

9            But it goes more.  It goes further than that,

10   Judge.  They don't want any unsecured claim allowed at all.

11   We not only void the lien.  Void the claim, and don't dare

12   put it in with a deficiency claim of the first lienholder

13   because that will then actually split the pool that's

14   available for the first lien deficiency.  That's unfair

15   discrimination at its quintessential basis.  At least,

16   that's my view of it.

17           Let's look at the trade creditors.  You have -- we

18   have the claim of (indiscernible) Inc.  It was at Document

19   Number 496-1.  We talked about the proof of claim.  It had a

20   lien attached to it.  We talked about that that lien was

21   filed after 2425WL's lien -- excuse me -- after the Bank of

22   Kuwait's lien but before -- excuse me -- after both the

23   first lien and WL's lien, yet the response of the trustee

24   was -- or Mr. Carter was, "Yeah.  That's going to be paid as

25   another security claim."

1          Now, wait a minute.  A claim filed after 2425L is

2     going to be paid before 2425L.  Hm.  All right.  And in

3     full.  What about those trade creditors?

4          See, the trade creditors are different than a

5     lienholder.  They're not being treated as a secure claim,

6     but they're getting 70 cents on the dollar.  Why's that

7     important to me representing 2425L?  Well, it's important to

8     me because my client's getting zero on their unsecured

9     claim, and trade creditors without liens are getting 70

10    percent.  Unfair classification.

11          Now, they can say, "Wait a minute.  We're giving

12    the insiders zero."  You can't go through due process of

13    claim allowance and claim trials and just say this lien is

14    invalid, and the claim underneath it is invalid.  There

15    isn't hope.  You'll hear it.  You'll hear the evidence and

16    decide.  But they're asking you to forgo all of that.  You

17    have a hearing on the subordination.  You have a hearing on

18    the removed case, whether or not to remand it.  There's

19    litigation to be done.

20          Is it doubtful in anybody's mind?  Not in my

21    client's and not in my client's attorney's.  Of course, the

22    bank will tell you it's frivolous.  Rule that way, but don't

23    cut off the litigation rights right here and now today.  But

24    they want you to, and they told you that that release is

25    pretty darn important for $3.7 million.

 1          Now, do we think -- do we know what the value of
 2   the causes of action are?  No.  Nobody does.  We have
 3   thoughts.  Trustee has an opinion, but he never tested that
 4   on the market, and the reason he didn't test it is because
 5   he can't because otherwise, he doesn't get the NBK to play
 6   ball.  That's bad faith.  Excuse me.  That's not proposing a
 7   plan in good faith.  That's restricting the trustee's time
 8   and the trustee's hands on what to do.
 9          Classification is fatal here.  Could it be fixed?
10   Yeah, probably.  Could you estimate a claim procedurally,
11   just file a motion, give a few days' notice, have a hearing
12   on estimation, and you fix these technicalities?  Maybe.
13   Probably some.  The classification though would look very
14   different.  You'd have the NBK claim paired other claims.
15   You'd have the trade creditor claims in the pool of other
16   unsecured creditors.  You'd have a different looking plan on
17   distribution, Judge.
18          These aren't technicalities.  Unfair
19   discrimination, fair and equitable as far as the liquidation
20   test.  You have no idea what the value of those claims are,
21   and frankly, neither do I, and if you confirm this plan,
22   you'll never find out.
23          I hope -- now, what do you do?  What do you --
24   what would you do here?  I mean, we have technical problems.
25   I'm not going to reread Mr. -- Steve's objection or the

1    debtor's objection, but what I know you're going to do is

2    you're going to go down -- you're going to take -- go in

3    Chambers, and you're going to go down 1 through 16 and look

4    at 29(a).  And if you can't check the 16 boxes, the code

5    says you can't conform.  If you can check the 16 boxes, you

6    can confirm.  As a matter of fact, you shall confirm if you

7    can check the boxes.

8            It's not that a plan isn't confirmable.  The

9    auction can go forward.  The trustee said that it's going to

10   look the same one way or the other on the auction, but the

11   releases shouldn't go forward.  No way.  I mean, I'm sorry.

12   That just violates Fifth Circuit law.  You can say it

13   doesn't, but just read the releases.  Gatekeeper?

14   Gatekeeper for a non-debtor or somebody who's not essential

15   to reorganize the debtor, never been done.  You'll be

16   creating new law against this circuit precedent.

17           These are not technical problems.  These are real.

18   Follow the law of the Fifth Circuit.  Follow the law in

19   (indiscernible).

20           Lastly, I want to thank you personally for hearing

21   all the evidence, including Mr. Choudhri's opinions.  Unlike

22   anyone else, I think they were critical in terms of there's

23   more than one side.  There's more than one story on these

24   causes of action.  But if you confirm today, we'll never

25   know what their actual value is.  That release is the

1   problem of this plan.  That classification is the problem in

2   that plan.  1129(a)(8) -- (10) is a problem with this plan.

3              Thank you, Judge.  I'm out of time.

4              THE COURT:  All right.  Thank you, Mr. Burks.

5              I'm going to turn now to Ms. Whitworth who

6   indicated she may have something to say.  I'll let her say

7   whatever she needs to say before I go back to Mr. Troop.

8              Ms. Whitworth?

9              MS. WHITWORTH:  Thank you, Judge.  Yes.  Thank

10  you, Judge.  Jana Whitworth on behalf of the United States

11  Trustee.

12             Your Honor, I just wanted to make a short

13  announcement on behalf of my client.  We did not file a

14  formal objection.  We did however submit a series of

15  requested revisions.  Those are reflected as counsel

16  (indiscernible) out in Paragraph 59 of the proposed orders

17  uploaded at 528 that correctly in the trustee's opinion

18  limits the definition of exculpated party to Chapter 11

19  trustee (indiscernible) professionals and people who were

20  working on his behalf.

21             There were a couple of other revisions in

22  Paragraph 59, 29 -- or excuse me -- 29 and 73 that relate to

23  post-effective date reporting by the liquidation trustee and

24  his responsibility for paying quarterly fees.

25             Other than that, Your Honor, the U.S. trustee does

1 not oppose entry of the -- a proposed confirmation order at

2 528.  Thank you, Your Honor.  I appreciate your time.

3     THE COURT:  I'm just going to look at something

4 really quick to make sure that I have that real quick.

5     MS. WHITWORTH:  I believe it was attached at the

6 exhibit to the --

7     THE COURT:  Yeah.  That's what I want to make

8 sure.  I saw the --

9     MS. WHITWORTH:  -- document.

10     THE COURT:  I'm sorry.  The bandwidth is taking a

11 minute to come up.  It must be pretty large.

12     MS. WHITWORTH:  It's 100 pages.

13     THE COURT:  Yeah.  So it's going to take a minute.

14 Okay.

15     MR. BURKS:  Your proposed order is 100 pages?

16     MS. WHITWORTH:  No.  It's the notice that attaches

17 --

18     THE COURT:  It's the plan, and everything's

19 attached to it.

20     MS. WHITWORTH:  Correct.

21     THE COURT:  It's 95 pages long.  Can you tell me

22 where -- what page your language starts on?  Oh, there it

23 is.  I found it.  Don't worry.  Okay.  All right.  Thank you

24 for the announcement.  I appreciate it.

25     MS. WHITWORTH:  Thank you, Judge.

1        THE COURT:  All right.  Mr. Baker, is there

2   something you want to say?

3        MR. BAKER:  Just a very short close, Your Honor.

4        THE COURT:  Okay.  You've silently made it till

5   the very end, but go ahead.

6        MR. BAKER:  I apologize.  I was somewhat surprised

7   because Mr. Troop got up here and said, "Well, you can

8   estimate the claims," but they've never filed a motion to

9   estimate the claims.  They're just showing up here today

10   saying, "Please estimate the claims," without ever filing a

11   motion.  That's --

12        THE COURT:  I have to tell you that I have found

13   at least a couple of cases from the early '90s that say I

14   don't need to.  So I think that potentially, there's a 1991

15   case that says -- so I'm not sure I agree with that

16   proposition, but I have looked at case -- I looked at some

17   on the break.  I'll have to do a little bit more digging on

18   it, but there is some Southern District caselaw from the

19   early '90s that says I can basically confirm the plan

20   without estimating the claims.

21        MR. BAKER:  Okay.

22        THE COURT:  Okay.  Go ahead.

23        MR. BAKER:  The other thing that I would point

24   out, under the plan, tax claims that NBK is claiming they

25   own would get paid to NBK.  Now, under the confidential --

1    and this hasn't been pointed out.  Confidential settlement

2    agreement, which is part of the record, goes through and

3    says, "Okay.  There's a liquidated damages provision if it

4    is breached."  What is it?  NBK, it's $800,000.  They're not

5    supposed to keep the tax claims.  Those are supposed to go

6    back to Mr. Choudhri.  So the plan doesn't comply with

7    what's in the confidential settlement agreement.

8              There is no payment based on the testimony to any

9    of the creditors with rejected leases.  It was asked --

10   there's nothing.  So what happens to the rejected leases

11   that are deemed rejected if NBK is the bidder, and the plan

12   provides that they all are rejected?  They just get tossed

13   out in the window.

14             It's interesting.  There are only three classes

15   that can vote: NBK on its secured claim, the general

16   unsecured creditors of which -- the way NBK has drafted it -

17   - they have 90 percent of it because they've excluded

18   2425WL, and the trade creditors.  That's it.  That's -- two

19   of the three classes are controlled by NBK.  Again, you go

20   back to what Mr. Burks's argument.  That seems to be a real

21   problem.  Was this proposed in good faith?

22             And I'm going to go back and just tie in a little

23   bit into what Mr. Burks was talking about as far as the

24   claims against NBK.

25             The other thing I found interesting is that Mr.

1    Murray did not get any damage models from either Mr.

2    Alexander or Mr. Wetwiska, specifically Mr. Alexander.  So I

3    didn't get any.  I don't know.  He never asked him for any.

4    He never got far enough into his investigation to determine

5    that.

6         At some point, if Mr. Alexander really is the

7    expert that he appears to b, the question should've been

8    asked by Mr. Murray to him, "What do you think we could

9    recover on this?"  He didn't make any effort to ask that

10   question.  Never probed.  Never even went into talking about

11   it.

12        And that's not an issue of Mr. Choudhri.  That's

13   an issue of a gentleman who was one of the two people

14   nominated to be president of the State Bar of Texas last

15   year who has the largest lender liability judgment in the

16   last 10 years who said this is a good claim, but he never

17   bothered to ask, "How much do you think you could recover on

18   it?"  That's surprising to me.

19        And Your Honor, I'll just conclude again with the

20   idea whether you estimate their claims or not, there is a

21   huge issue about what are the value of the claims against

22   NBK?  Thank you.

23        THE COURT:  All right.  Thank you.  All right.

24   Mr. Shannon, since the trustees had their -- the people

25   appointed the figure of the trustee, do you want to say

1    anything in response?  Then I'll go back to Mr. Troop, and

2    then I think we're done.

3           MR. SHANNON:  Your Honor, I'm just going to

4    reiterate that the trustee does support confirmation.  I

5    believe that the evidence both yesterday and today confirmed

6    that the trustee engaged in an investigation that was

7    serious, that was focused, and that was determined to make

8    an evaluation.  That's what he's done here.

9           As far as the particular -- you know, the

10   particular requirements of confirmation, I'm going to leave

11   that to NBK.  It's their plan.  But I do just want to say

12   that for the record.

13          THE COURT:  Thank you.

14          All right.  Mr. Troop.

15          MR. TROOP:  Thank you, Your Honor.  Your Honor, I

16   think that this case feels as though it has had a life that

17   has extended beyond its many months before you, and that is

18   particularly true with regard to NBK in this matter.

19          This Chapter 11 case is the result of -- and the

20   evidence clearly shows this -- repeated efforts by the

21   debtor and its principals to get this property for less and

22   less and less than what they promised they would pay back on

23   the loan.

24          And we're here, Your Honor, because Chapter 11 --

25   or had you converted the case at that point, Chapter 7 --

1   would've provided a pathway to an end.  And that's what this

2   plan does, and it does it fairly for this all the reasons

3   that we've discussed.

4          Your Honor, when you evaluate the issues that have

5   been raised, for example, about the NBK claim -- and the

6   claims against NBK.  And Your Honor, I thought about raising

7   my hand and saying it's huge, but it seemed a little too

8   theatric.

9          But what we know from a factual matter is that the

10  person who thinks they are the most valuable offered

11  $700,000 for them, not even two full business days before

12  the confirmation hearing was about to begin.  And the

13  trustee told you he evaluated that amount against what's

14  here for the benefit of creditors and the estate, and

15  concluded that this was a better deal.

16         Talk about it in 9019 terms, right.  It was within

17  the range of appropriate settlements, although the real

18  question is ultimately was it in the best interests of the

19  estate, and the trustee concluded that was true.  And if I

20  heard his testimony correctly, it's because he looked at the

21  facts that were alleged, and he was told, and he said,

22  "Ultimately, I find them -- some of them may be okay, but

23  overall -- not credible.  Not really strong claims."  Those

24  are factual claims.  You could create a damage model that

25  could say the claims are worth $1 billion.

```
 1              But that's not the question.  The question is
 2    whether the claims are likely to return something to the
 3    estate.  This plan does, and those claims have to be based
 4    on facts.  The trustee did his job to confirm whether he
 5    thought there were facts to do that.
 6              And, Your Honor, this case needs to come to a
 7    close.  And I don't want to be -- you've got our
 8    confirmation brief.  You'll see every element of 1129 laid
 9    out clearly there to the extent not addressed here.  But
10    there was this impassioned plea that somehow proof of claim
11    number seven that only has a deed of trust attached to it
12    should be given some more weight, and the fact that they
13    didn't attach a note to it, well, it shouldn't mean all that
14    much.
15              But just look at the chronology here.  That deed
16    of trust was allegedly executed in 2018.  Didn't get
17    notarized until 2021 and recorded later at a time when, you
18    know from the evidence before you, the debtor was in
19    default, and NBK was pursuing its rights.
20              And what you also know simply from looking at the
21    document was Mr. Choudhri gave a lien to himself.  Your
22    Honor, it would be perfectly appropriate for you to discount
23    any validity to that claim in addition to everything else
24    raised by the trustee in his objections in his complaints.
25              Your Honor, there's also no dispute there's no
```

1    value here beyond the first lien.  So anything that anyone

2    gets under this plan is in effect -- you know, gifting is

3    out of vogue, right?  But it's effectively a gift from the

4    secured creditor.  And the secured creditor's determination

5    about how it was going to take its value, not the estate's

6    value, its value -- and spread it out amongst creditors was

7    to say that trade creditors -- like 260,000 of them --

8    dollars' worth of them, Your Honor -- who may do work for

9    the building in the future, they should get the least amount

10   of hurt.

11          The next group of people who should get the least

12   amount of hurt but a completely contingent recovery because

13   it's completely contingent on litigation results should be

14   those third parties who weren't trade creditors who extended

15   credit to the debtor.

16          And then finally, you've got the people who caused

17   this problem who acted inappropriately.  Again, I'll go back

18   to proof of claim number seven.  Look at its timing.  Look

19   at the party giving himself a benefit to put himself into

20   the capital structure on a secured basis for an obligation I

21   note -- although the document -- I meant are not relying on

22   the document itself, the settlement statement.  But he

23   described -- Mr. Choudhri described has a credit from the

24   seller -- not a loan from the seller.  A credit.  A credit

25   against the purchase price.  Comes back three years later

1   and decides, "I'm going to but a lien on the property," and

2   you look at the loan documents, Your Honor, and there's no

3   permitted lien.  There's no permitted note.  There's no

4   permitted encumbrance for 2425WL.

5        So when the trustee described it as fake, I think

6   there is a strong amount of evidence to support that

7   description.  And so the question at the end of the day

8   becomes because the plan satisfies all the requirements of

9   1129, should there nonetheless be additional delay to allow

10  parties to further allow this property to deteriorate -- you

11  heard evidence about that on Monday -- to further hamstring

12  a transfer of the property on the hope and the prayer of

13  claims that the trustee evaluated independently, that the

14  party is trying to prove up -- at the very least created a

15  bona fide dispute -- and that you found really basically

16  lacked no merit -- lack of merit.  I'm sorry, Your Honor.

17  Double negative there.  Lack of merit.

18       On those conditions, Your Honor, not like other

19  judges -- I'm sorry -- similar to how other judges have

20  ruled in this district from time to time, enough is enough.

21  It is time to permit this process to end, the plan to be

22  confirmed.

23       And the last thing I will just underscore, again,

24  Your Honor.  If in fact Mr. Choudhri -- two things, Your

25  Honor.  Go back and look at the confidential settlement

1   agreement.  It does not say what Mr. Baker says.  It says

2   (indiscernible) liquidated damages.  It is a misreading at

3   best of that agreement.

4          But here, Your Honor, it is time to bring this

5   case to an end.  It is time for it -- it doesn't violate

6   (indiscernible).  It doesn't extend exculpation provision

7   protections and non-fiduciaries or (indiscernible) doesn't

8   even really talk about the gatekeeping function other than

9   to say in that case, it was a fair implementation tool for

10  the issue that was before the Court, whether the directors

11  of the liquidating trust were to get some protection.  But

12  here, it's a fairer limitation of a release of estate claims

13  and (indiscernible) estate claims.

14         Your Honor, I will just end with two other things.

15  The first is that notwithstanding some of the

16  contentiousness that you have seen in the courtroom over the

17  last few days, I really want to thank in particular Mr.

18  Burks for his time and his efforts over the last few days to

19  try to address those things that we could do consensually.

20         And then as he said, and we echo, I can't believe

21  it's a federal holiday, but we thank you all for your time

22  and effort here.  And obviously I hope it comes to a

23  particular conclusion, but I also thank you regardless of

24  the conclusion.  Thank you.

25         THE COURT:  Thank you.

```
 1              All right.  So I'll just make a couple of comments

 2     on the record.  First of all, the air conditioning does seem

 3     to be working after all this time at this point in time,

 4     which I'm very happy for.

 5              I want to address not really the merits of the

 6     case, but I want to make some comments to Mr. Choudhri.  For

 7     whatever reason, he believes that this process has been

 8     unfair, and I would disagree very, very highly; that he may

 9     not like the results, he may not like my determination of

10     the facts, but I think that he's been given every

11     opportunity to present his evidence and present his case,

12     and if he claims due process has not been met in this case,

13     I disagree with him very, very highly.

14              I also disagree very highly with him that we

15     haven't done what we need to do to evaluate claims in this

16     case.  The trustee's testimony is compelling as to his

17     evaluation of the claims.  It also lines up with my limited

18     evaluation of the claims based on what's before me in the

19     evidence that's before me.

20              A lot of lawyers tell me that their clients have

21     great claims.  When I have lawyers tell me they have great

22     claims and I don't hear any sort of evidence that tells me

23     why they have great claims, I start to wonder.  All right.

24              I think the process has been fair and open.  I

25     wish Mr. Choudhri the best of luck depending upon what I do.
```

1    But quite clearly, this is a case that is now over 18 months

2    old, and I agree that it is a case that needs to come to a

3    conclusion one way or the other.

4             I am hopeful, Mr. Murray, that I will get some

5    findings of fact and conclusions of law and an order either

6    confirming the plan or not to you by the time that you have

7    your auction.  That's the goal.  All right.

8             It's just been a really, really bad week.  I mean,

9    I will say that I'm not typically as busy as I've been this

10   week.  I have a huge panel tomorrow that's 61 pages.  I

11   contested confirmation hearings in the afternoon.  And I

12   have a Galveston docket on Friday.  So I will work as I can

13   and as I'm allowed to given what limited time I have, but I

14   promise you that I'll get something to you that you can look

15   at, agree with, disagree, and appeal as you feel necessary.

16            All right.  Thank you.  We're adjourned today.

17            CLERK:  All rise.

18            (Whereupon these proceedings were concluded at

19   4:54 PM)

20

21

22

23

24

25

```
 1                C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4    transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8    Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date  June 25, 2024
```

# **EXHIBIT B**

## <u>EXHIBIT B</u>

### *Summary of Causes of Action Asserted by Mr. Choudhri Against NBK*

| | **Previously Non-Suited Claims** | **Pending Action** *Galleria I Adversary* | **Pending Action** *Naissance I* | **Pending Action** *Choudhri Intervention* | **Claims Dismissed in ECF No. 25** |
|---|---|---|---|---|---|
| **Original Case Style** | *Galleria 2425 Owner, LLC v. NBK and Lee*, Cause No. 2021-63370 pending in the District Court of Harris County, Texas, 281st Judicial District | *In re Galleria 2425 Owner, LLC*; Galleria 2425, LLC, Naissance Galleria, LLC and Choudhri v. NBK, Case No. 23-06009 pending in the U.S. Bankruptcy Court for the S.D. Tex. Victoria Division | *Naissance Galleria, LLC v. Zaheer and NBK*, Cause No. 2023-43755 in the District County of Harris County, Texas, 80th Judicial District | *Galleria 2425 Owner, LLC v. NBK*, Cause No. 2023-22748 in the District County of Harris Court, 281st Judicial District | *Choudhri v. NBK*, Cause No. 2024-27168 in the 129th Judicial District Court, Harris County, Texas |
| **Case No./Adversary No.** | Cause No. 2021-63370 | Adversary No. 23-06009 | Cause No. 2023-43755 | Adversary No. 23-03263 | Adversary 24-03120 (Tax Liens) |
| **Date Filed** | 6/8/2022 | 9/19/2023 | 11/29/2023 | 12/18/2023 | 6/7/2024 |
| **Date Removed** | | | | 12/18/2023 | |
| **Plaintiffs** | Galleria 2425 Owner, LLC | Galleria 2425 Owner, LLC Naissance Galleria, LLC Choudhri | Naissance Galleria, LLC | Galleria 2425 Owner, LLC | Choudhri |
| **Live Pleading** | Plaintiff's Second Amended Petition | Galleria 2425 Owner, LLC, Naissance Galleria, LLC and Ali Choudhri's Original Complaint Against NBK | Plaintiff's Second Amended Petition & Emergency Application for TRO | Plaintiff's Sixth Amended Petition | Plaintiff's Third Amended Complaint |
| **ECF No.** | | ECF No. 1 | | ECF No. 1 at 917 | |
| **Causes of Action** | Breach of Contract & Violation of Foreclosure Law (notice of intent to accelerate) <br><br> Declaratory Judgment (notice of intent to accelerate) <br><br> Breach of Contract (lease approval and sale of property) <br><br> Common Law Fraud (induced into entering loan agreements, tenant improvement dollars for Sonder) <br><br> Tortious Interference with Prospective Relations and Existing Contracts (Sonder Leases and other leases) Quiet Title as to George Lee | Breach of CSA <br><br> Tortious Interference with Contract (SIBS and Caldwell Soames, Inc.) <br><br> Tortious Interference with Business Relations (Posting of Foreclosure Impacted Potential Buyers) <br><br> Fraud and Fraudulent Inducement/Lender Liability re: CSA <br><br> Fraudulent Conveyance (~$960k in payments to NBK) | Breach of CSA <br><br> Tortious Interference with Contract (SIBS and Caldwell Soames, Inc.) <br><br> Tortious Interference with Business Relations (Posting of Foreclosure Impacted Potential Buyers) <br><br> Fraud and Fraudulent Inducement re: CSA <br><br> Business Disparagement (Posting of Foreclosure Impacted Potential Buyers) | Breach of CSA <br><br> Tortious Interference with Contract (SIBS and Caldwell Soames, Inc.) <br><br> Tortious Interference with Business Relations (Posting of Foreclosure Impacted Potential Buyers) <br><br> Common Law Fraud/Lender Liability re: CSA <br><br> Fraudulent Transfer (~$960k in payments to NBK) <br><br> Estoppel (Estopped from claims indebtedness in excess of amount in CSA) | Conversion <br><br> Money Had and Received - Unjust Enrichment <br><br> Breach of CSA <br><br> Requesting declaratory relief |

| | Previously Non-Suited Claims | Pending Action *Galleria I Adversary* | Pending Action *Naissance I* | Pending Action *Choudhri Intervention* | Claims Dismissed in ECF No. 25 |
|---|---|---|---|---|---|
| | Promissory Estoppel (Sonder Leases)<br><br>Breach of Fiduciary Duty/General Good Faith Duty (lease approval and disclosure of confidential financial information)<br><br>Negligent Misrepresentation (Sonder Leases)<br><br>Slander of Title (wrongful foreclosure notice) | Estoppel (Estopped from claims indebtedness in excess of amount in CSA)<br><br>Business Disparagement (Posting of Foreclosure Impacted Potential Buyers)<br><br>Breach of Good Faith and Fair Dealing re: CSA, not approving leases, potential buyers)<br><br>Unjust Enrichment (re: NBK's foreclosure on building)<br><br>Attorneys' Fees | Unjust Enrichment (re: NBK's foreclosure on building)<br><br>Conspiracy re: Dismissal of Bankruptcy I<br><br>Attorneys' Fees | Business Disparagement (Posting of Foreclosure Impacted Potential Buyers)<br><br>Breach of Good Faith and Fair Dealing re: CSA, not approving leases, potential buyers)<br><br>Unjust Enrichment (re: NBK's foreclosure on building)<br><br>Conspiracy re: Dismissal of Bankruptcy I<br><br>Federal Misrepresentation of Services and Unfair Competition Under the Lanham Act<br><br>Attorneys' Fees | |
| Defendants | NBK<br>George Lee | NBK | NBK<br>Zaheer | NBK<br>Azeemeh Zaheer | NBK |
| Status/Disposition | Nonsuit with Prejudice (8/25/2022) | *Pending* | *Pending* | Dismissed by Order on Stipulation at ECF No. 26 | Dismissed [Case 24-03120, ECF No. 25]<br>Appeal Dismissed [Case 24-03120, ECF No. 34] |
| Verification | None | None | Choudhri Verification | Cause No. 2023-22748, Choudhri v. NBK in the District Court of Harris County, Texas, 281st Judicial District | |
| Original Case Style | Cause No. 2021-63370, *Choudhri v. NBK* in the District Court of Harris County, Texas, 281st Judicial District | | | Cause No. 2023-22748, Choudhri v. NBK in the District Court of Harris County, Texas, 281st Judicial District | |
| Case No./Adversary No. | | | | 23-03263 | |
| Date Filed | 7/18/2022 | | | 12/4/2023 | |
| Date Removed | | | | 12/18/2023 | |
| Intervenor | Choudhri | | | Choudhri | |
| Live Pleading/ECF No. | Ali Choudhri's Original Petition in Intervention | | | Ali Choudhri's Second Amended Petition in Intervention, ECF No. 1-2 at 907 | |
| Causes of Action | Fraudulent Inducement (transferred property to SPE in anticipation of bank loan) | | | Fraud (Zaheer rep to Cout in Cause No. 2023-41091 that she has authority to act on behalf of Naissance)<br>Promissory Estoppel (vague facts) | |

2

4892-4760-9835.v2
001016

| | Previously Non-Suited Claims | Pending Action *Galleria I Adversary* | Pending Action *Naissance I* | Pending Action *Choudhri Intervention* | Claims Dismissed in ECF No. 25 |
|---|---|---|---|---|---|
| | | | | Equitable Estoppel / Detrimental Reliance (CSA) | |
| **Defendants** | NBK | | | NBK<br>Azeemeh Zaheer | |
| **Status/Disposition** | Nonsuit w/o Prejudice (9/6/2022) | | | *Pending* | |
| **Verification** | None | | | Choudhri Verification ECF No. 1-2 at 912 | |

3

# **EXHIBIT C**

001018

6/8/2022 7:27 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 65268945
By: Jennifer Ochoa
Filed: 6/8/2022 7:27 PM

**Cause No. 2021-63370**

| | | |
|---|---|---|
| **GALLERIA 2425 OWNER, LLC**, | § | **IN THE DISTRICT COURT** |
| | § | |
| Plaintiff, | § | |
| | § | |
| Vs. | § | **OF HARRIS COUNTY, TEXAS** |
| | § | |
| **NATIONAL BANK OF KUWAIT, S.A.K.P.,** | § | |
| **A NEW YORK BRANCH** and **GEORGE M.** | § | |
| **LEE**, | § | |
| | § | |
| Defendants. | § | **281ST JUDICIAL DISTRICT** |

**PLAINTIFF'S SECOND AMENDED PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff **Galleria 2425 Owner, LLC** ("Galleria" or "Plaintiff") and files its

First Amended Petition against Defendants **National Bank of Kuwait, S.A.K.P., New York**

**Branch, a Banking Corporation Organized Under the Laws of Kuwait, Acting Through its**

**New York Branch** ("Kuwait" or "Defendant") and **George M. Lee** ("Lee") and, in support

thereof, respectfully show the Court as follows:

**A.  Discovery Control Plan**

1.      Plaintiff intends to conduct discovery under Level 3 of Texas Rule of Civil

Procedure 190.4.

**B.  Claim for Relief**

2.      Plaintiff seeks monetary relief over $1,000,000 and non-monetary relief. Tex. R.

Civ. P. 47(c)(4).  This case arises out of Kuwait's attempt to wrongfully foreclose on the subject

real property owned by Galleria and promises, representations and interference in connection

with the subject loan and Galleria's operations and leasing of the property.  Galleria hereby

asserts causes of action against Kuwait for breach of contract, wrongful foreclosure, declaratory

judgment, fraud, fraud in a real estate transaction, tortious interference, promissory estoppel, breach of fiduciary duty and general duty of good faith, negligent misrepresentation and slander of title. Galleria seeks a temporary injunction and economic, exemplary, and consequential damages, together with attorneys' fees and interest. Galleria further seeks judgment quieting title against Lee.

### C.  Parties

3.    Plaintiff Galleria, at all times relevant hereto, was and is a limited liability company doing business in Texas with an interest in real property located in Harris County, Texas that is the subject of this action.

4.    Defendant Kuwait has no registered agent in the state of Texas. This defendant has appeared and answered.

5.    Defendant Lee is an individual residing in Harris County who can be served at 5353 West Alabama, Suite 610, Houston, Texas 77056 or wherever he may be found.

### D.  Jurisdiction

6.    The Court has subject-matter jurisdiction over the lawsuit because the amount in controversy exceeds this Court's minimum jurisdictional requirements.

### E.  Venue

7.    Venue is proper in Harris County, Texas pursuant to Texas Civil Practice and Remedies Code §15.001 in that this action affects title to commercial real property and improvements situated entirely within Harris County, Texas located 2425 West Loop South, Houston, Texas 77027 (the "Property"). *See Exhibit "A," Cover Letter and Notice of Sale and Legal Descriptions attached thereto and incorporated herein by reference.*

## F. Facts

8.      Defendant's alleged interest in the Property derives from an alleged Note secured by an alleged Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing (the "Deed of Trust") dated on or about May 23, 2018, in favor of Defendant Kuwait. *See Exhibit E, Affidavit.*

9.      Stage Stores ("Stage") with approximately 13,000 employees overall and approximately 1,000 employees at its corporate headquarters in the Property was Plaintiff's longtime, primary tenant at the Property leasing hundreds of thousands of square feet over multiple floors. In May, 2020, Stage entered Chapter 11 bankruptcy. Since that time, Stage and its affiliates (Palais Royal, Bealls, Gordman's, etc.) ceased operations, vacated the Property, closed all retail stores in the chain, and laid off all its employees. It goes without saying that the loss of Stage as a tenant impacted the Property, and on account of the ongoing global pandemic, remote work, and market constrictions, it has been difficult for ALL commercial landlords to fill lease space. Plaintiff is actively marketing the Property for lease and showing the Property to prospective tenants. *See Exhibit E, Affidavit.*

10.     Stage Stores' demise and quick exit from the Property left Plaintiff with little options until Plaintiff could market and re-lease the Property. Kuwait failed to follow its obligations under Texas law and is, therefore, barred from foreclosing on the Property on October 5, 2021. *See Exhibit E, Affidavit.*

11.     Galleria disputes that Kuwait properly served it with Notice of Default and Intent to Accelerate, but to the extent that Kuwait served the June 29, 2021 **alleged** Notice of Default and Intent to Accelerate, it is fatally defective. Therein, Kuwait advised that "[i]f payment of all amounts that are then currently due and owing under the Note are not received by [Kuwait] by

3

[July 12, 2021], [Kuwait] **intends to** (1) accelerate the maturity of the indebtedness…" *See Exhibit B, Notice of Default and Intent to Accelerate* (emphasis added).

12.     Galleria disputes that Kuwait properly served it with Notice of Acceleration, but to the extent Kuwait served the July 14, 2021 Notice of Acceleration, the Notice of Acceleration is ineffective.  Any subsequent Notice of Sale is likewise ineffective.

13.     Despite Galleria's requests to Defendant Kuwait to postpone the foreclosure sale, Kuwait refused to postpone the foreclosure, and Kuwait informed Galleria that foreclosure would proceed on October 5, 2021. *See Exhibit E, Affidavit.* Galleria was successful in obtaining a Temporary Restraining Order to stop Kuwait's foreclosure.  Kuwait re-served another Notice of Default and Intent to Accelerate which was defective because Kuwait did not properly serve this Notice of Default and Intent to Accelerate.  Kuwait has since served yet another default and intends to foreclose on the Property.

14.     Defendant George M. Lee also claims an interest in the Property adverse to Plaintiff and adverse to Kuwait.  Lee loaned money to the former owner of the Property, and Lee had a lien on the Property to secure re-payment of loan.  Lee received funds sufficient to pay off his loan to the former owner, and Lee released his lien on the Property.  Lee, however, repudiated his Release of Lien and now unlawfully claims that his lien continues encumber the Property and that his security interest remains and superior to Kuwait's alleged lien on the Property.  Lee's alleged lien and/or interest is an unlawful cloud on title.

15.     Further, pursuant to the loan documents, Kuwait is obligated to present prospective tenants to Kuwait for approval.  Kuwait has no basis to withhold tenant approval, yet Kuwait, at every turn, has thwarted Galleria's efforts to lease the building and tortiously interfered with Landlord/Tenant relations.

4

16.     After Stage vacated, Galleria has worked diligently to lease the Property.  With the COVID-19 pandemic, leasing the Property has been a challenge, and Galleria continues to work to lease the Property.  Kuwait originally posted the Property for foreclosure, and the posting was ineffective because of the defective Notice of Intent to Accelerate.

17.     During this same time period, Kuwait had already advised Galleria that it wanted its loan paid in full, and in order to pay Kuwait, Galleria was in the middle of refinancing the Property to pay off Kuwait.  Galleria was also in the process of leasing the Property to new tenants. The wrongful foreclosure posting caused the new lender to reverse course and stop the refinance process.  It also caused the prospective tenant to back out of leasing the Premises.  New leases and refinancing the Property fell through as a direct result of the Kuwait's wrongful foreclosure posting.

18.     Further, because Kuwait had to approve leases and tenant improvement funds, there are multiple instances where Kuwait failed and refused to approve leases, and there was no basis for these actions.  Between the tenants and new lender backing out, and unreasonable failure to approve confirmed leases and failure to approve TI money, among other tortious interference, there is significant lender liability.  On account of Kuwait's wrongful posting of the Property for foreclosure, our client has been damaged.

19.     Further, the evidence will show that Kuwait tortiously interfered with Galleria's business relations, and it set in motion a domino effect.  The evidence will show that due to Kuwait's acts, which the evidence will show were not in good faith, has led to damages of approximately $80,000,000.  Kuwait created the inability to pay them off.  They caused to tenants to walk away.  If Kuwait had not wrongfully posted the property for foreclosure, Galleria would

have had a tenant that would have leased most of Premises, and the refinancing lender would have paid off Kuwait. Now, regardless of these wrongful, Kuwait wants to foreclose.

### G. Count I Against Kuwait – Breach of Contract & Violation of Texas Foreclosure Law

20.     Plaintiff adopts and incorporates herein by reference the foregoing paragraphs as though fully set forth herein.

21.     The applicable contracts in this instance are the alleged Note, Deed of Trust, and Loan Agreement (collectively, the "Loan Documents"). Plaintiff violated one or more of these alleged contracts and Texas law as further specified herein because Kuwait's alleged Notice of Intent to Accelerate is fatally defective. This defect renders the subsequent alleged Notice of Acceleration and Notice of Sale ineffective. The foreclosure cannot proceed.

22.     *Ogden v. Gibraltar Sav. Assoc.*, 640 S.W.2d 232, 233-234 (Tex. 1982) and *Sarasota, Inc. v. Ballew*, 2001 WL 194031, at * 3 (Tex. App.-Austin 2001, pet. denied) are directly on point and vitiate Defendant's ability to foreclose.

23.     In *Ogden*, the Texas Supreme Court considered whether a notice of intent to accelerate which stated that "failure to cure…*may* result in acceleration" was sufficient to put the plaintiff on notice of the defendant's intent to accelerate. 640 S.W.2d at 233 (emphasis added). The court held that, because it used the word 'may,' the notice was insufficiently clear as to whether acceleration *would* result. *Id.*

24.     The Texas court of appeals has since extended *Ogden* to hold that even language indicating that the defendant 'intends' to exercise its rights – though somewhat more positive than the notice in *Ogden* that the defendant 'may' exercise its rights – is too vague to constitute notice of intent to accelerate. *Sarasota, Inc. v. Ballew*, 2001 WL 194031, at * 3 (Tex. App.-Austin, pet. denied). In *Mastin v. Mastin*, 70 S.W.3d 148, 155 (Tex. App.-San Antonio 2001, no pet.) the San

Antonio Court of Appeals found that where a party did not give unequivocal notice of intent to accelerate, any attempted acceleration thereafter is ineffective.

25.    Kuwait's alleged Notice of Intent to Accelerate is defective on its face because it states that "[i]f payment of all amounts that are then currently due and owing under the Note are not received by Beneficiary by the time and date stated above, Beneficiary **intends to** (1) accelerate the maturity of the indebtedness…" *See Exhibit B (emphasis added).*  On account of Kuwait's fatally defective Notice of Intent to Accelerate, black letter Texas law vitiates Kuwait's ability to foreclose.  Kuwait's foreclosure cannot proceed.

26.    The alleged Loan Documents and Texas law require Kuwait to serve unequivocal Notice of Intent to Foreclose on Plaintiff.  Defendant Kuwait failed to do so which makes any attempt by Kuwait to foreclose unlawful.  Defendant Kuwait, therefore, breached the terms of its alleged contracts with Plaintiff and violated Texas foreclosure law.[1]  Plaintiff suffered and will continue to suffer damages if the Court does not restrain and enjoin Kuwait.

27.    Additionally and/or in the alternative, the subject loan documents are valid and enforceable agreements.  Galleria performed its obligations under the loan documents through September 2021, if not later.

---

[1] A borrower's obligation to make monthly payments is independent of a lender's obligations in the event of a default. *Williams v. Wells Fargo, Bank, N.A.*, 884 F.3d 239, 245 (5th Cir. 2018) ("If performance of the terms of a deed of trust governing the parties' rights and obligations in the event of default can always be excused by pointing to the debtor's default under the terms of the note, the notice terms have no meaning.").

　　　　Thus, because Plaintiffs' breach of contract claim is related to Defendants' alleged failures to uphold its *post*-default obligations under the Deed of Trust, Plaintiff's default does not preclude its breach of contract claim. *See Adams v. U.S. Bank, N.A.*, No. 3:17-cv-723-B-BN, 2018 WL 2164520, at * 4 (N.D. Tex. Apr. 18, 2018) (concluding a borrower who is in default is not precluded from asserting a breach of contract claim against a bank when the claim arises out of the bank's alleged failure to provide post-default notice); *Thomas v. Wells Fargo Bank, N.A.*, No. 4:17-CV-2070, 2018 WL 1898455, at *3 (S.D. Tex. Apr. 20, 2018) ("Plaintiffs' breach of contract claim is not foreclosed as a matter of law by their failure to satisfy their payment obligations under the Deed of Trust.").

28.     Kuwait was at all times obligated to perform its obligations under and enforce the loan documents in good faith. Kuwait breached that duty of good faith by withholding approval of leases, timely or otherwise, without reasonable basis.

29.     Additionally and/or in the alternative, under Article II of the subject May 23, 2018 Deed of Trust, the declaration of default, pursuit of the remedy of foreclosure and the recording of notices of foreclosure were only authorized in the event of uncured default and after acceleration.  Kuwait, through the substitute trustee, materially breached the loan documents by pursuing the remedy of foreclosure, without requisite filings, despite that lack of uncured default and acceleration.

30.     Kuwait's wrongful attempt to foreclose constitutes a material breach and/or wrongful repudiation of the loan agreement and/or breach of Kuwait's obligation of good faith.

31.     Such wrongful attempt to foreclose proximately caused economic damages and consequential damages to Galleria.  Specifically, Galleria has been unable to lease space at the Property or sell the Property on account of the pending foreclosure and real property foreclosure filings.  A sale of the Property for $85 million failed as a consequence of Kuwait's pursuit of wrongful default.  Space at the Property could not be leased because tenants do not wish to lease space from a Property under threat of foreclosure.  Rents from tenants in excess of $5 million have been lost as a consequence of the wrongful foreclosure, together with building investment value of over $100 million, as well as the $85 million sale of the building.

32.     **WHEREFORE**, Plaintiff requests that this Court (i) enjoin the foreclosure sale of Kuwait, its successors and/or assigns and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, and (ii) enter judgment in favor of Plaintiff and against Defendant for actual

8

damages in excess of $1,000,000 and consequential damages in excess of $100 million, (iii) award Plaintiff's attorney's fees and costs incurred herein, and (iv) award Plaintiff such other and further relief as this Court deems just and proper.

### H.    Count II Against Kuwait and Lee - Declaratory Judgment

33.    Plaintiff adopts and incorporates herein by reference all prior paragraphs of this Petition as though fully set forth herein.

34.    Additionally and/or in the alternative, Plaintiff seeks a declaratory judgment pursuant to Texas Civil Practice and Remedies Code §37.004 that: (i) Plaintiff's interest in the Property constitutes a legally-protectable interest; (ii) Defendant's alleged Notice of Intent to Foreclose is fatally defective; (iii) the alleged Notice of Acceleration is ineffective; (iv) the alleged Notice of Sale is ineffective; and (v) Lee has no legal or equitable interest in the Property superior to Plaintiff's interest.

35.    A real, subsisting, and justiciable controversy exists between the parties hereto concerning the Property and transfer of title.

36.    **WHEREFORE**, Plaintiff prays for judgment declaring, decreeing, and adjudging that (i) Kuwait, its successors and assigns and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, have no right, to foreclose on the Property based on the current posture of the requisite Notices, and (ii) they are barred, enjoined, and estopped from pursuing foreclosure without serving effective, requisite notices.

### I.  Count III Against Kuwait – Breach of Contract Against Kuwait

37.    Plaintiff adopts and incorporates herein by reference all prior paragraphs of this Petition as though fully set forth herein.

38.    Additionally and/or in the alternative, in order to prevail on its claim for breach of contract, Plaintiff must prove (i) the existence of a valid contract, (ii) performance or tendered performance by Plaintiff, (iii) breach of the contract by Defendant, and (iv) damages sustained as a result of the breach.[2]

39.    Kuwait unnecessarily and unreasonably withheld approval of prospective tenants and impeded Plaintiff's efforts to lease the Premises thereby breaching the terms of the mortgage agreements between Kuwait and Plaintiff.  Further, Galleria is entitled to reinstate the loan and avoid foreclosure, yet Kuwait refuses reinstatement and demands payment in full.  Regardless, Kuwait's loan is nowhere near maturity, and Galleria has an absolute right to reinstate the mortgage and avoid foreclosure.

40.    Additionally and/or in the alternative, the subject loan documents are valid and enforceable agreements.  Galleria performed its obligations under the loan documents through September 2021, if not later.  Paragraph 5.27 provides that Galleria was not to enter into any Material Lease without Kuwait's approval.

41.    Kuwait was obligated to perform its obligations under and enforce the loan documents in good faith. Kuwait breached that duty of good faith by withholding approval of leases, timely or otherwise, without reasonable basis. Additionally and/or in the alternative, Kuwait was obligated to exercise reasonable discretion in the approval or disapproval of leases. Kuwait's refusal to approve the leases in a timely manner constitutes a breach of contract dating back to February or March 2019 when Kuwait failed to approve, timely or otherwise, the Sonder leases exercising reasonable discretion.

---

[2] *Winchek v. American Express Travel Related Servs. Co.*, 232 S.W.3d 197, 202 (Tex. App.-Houston [1st Dist.] 2007, no pet.) (emphasis added).

42.    Kuwait's breach of the duty of good faith in the approval of leases constitutes a material breach and wrongful repudiation of the loan documents.  Such breach proximately caused economic damages and consequential damages to Galleria.  Specifically, Galleria has been unable to lease space at the Property or sell the Property on account of the described conduct.  A sale of the Property for $85 million failed as a consequence of Kuwait's conduct. Space at the Property could not be leased because of Kuwait's conduct.  Rents from tenants in excess of $5 million have been lost as a consequence of the conduct.

43.    **WHEREFORE**, Plaintiff requests this Court enter judgment for Plaintiff and against Defendant for actual damages in such amount as is fair and reasonable, for Plaintiff's attorney's fees and costs incurred herein, and for such other and further relief as this Court deems just and proper.

## J.  Count IV – Common Law Fraud Against Kuwait

44.    Plaintiff adopts and incorporates herein by reference all prior paragraphs of this Petition as though fully set forth herein.

45.    Additionally and/or in the alternative, Kuwait committed common law fraud because it made material misrepresentations upon which Galleria relied.  Kuwait induced Galleria to enter into the loan agreements with no intention of honoring same.  Kuwait intended for Galleria to rely on its misrepresentations, and Galleria relied on Kuwait's misrepresentations by entering into the loan agreements.

46.    Galleria suffered monetary damages, attorneys' fees and costs, and other sums within the jurisdictional limits of this Court.

47.    Additionally and/or in the alternative, between January and March 2019, Galleria advised Kuwait of 2 potential leases of the Property by Sonder USA Inc. ("Sonder"). Kuwait

11

orally approved the leases and orally promised to provide Galleria funds to cover tenant improvements and brokerage commissions for the leases. Knowing that Galleria could not enter into the Sonder leases without money tenant improvements and commissions, Kuwait followed up the oral promise of funds with conduct confirming the promise.

48.    Kuwait's representations were material because Galleria would not have entered into the Sonder leases without those representations of approvals and funding.  Kuwait's representations were false statements of fact: Kuwait intended to play semantic games regarding the approval of the leases and was not going to provide the promised funds. Alternatively, Kuwait's representations were false statements of opinion Kuwait knew Galleria would rely on because of Kuwait's knowledge of Galleria's situation.  Kuwait's conduct as described above by obtaining appraisals and conduct suggesting approval amounted to false representations to Galleria.

49.    To further evidence Kuwait's approval of the lease and promise of funding of commissions and improvements, Kuwait ordered an appraisal of the Property, specifically including the cash flow generated by the Sonder lease.

50.    However, Kuwait made those representations knowing they were false – Kuwait had no intent to provide the promised funding and Kuwait later took the position that the Sonder leases were not approved.  Or, Kuwait made the representations recklessly, as positive assertions, and without knowledge of their truth.

51.    Kuwait intended for Galleria to rely on the representations or had reason to expect Galleria to act in reliance on the representations.

52.     Based on such promises, Galleria executed the leases with Sonder in February and March 2019.  Upon execution of the leases, Galleria became obligated to pay the real estate brokers advising on the leases their commission.

53.     Justifiably relying on the promise of funds and lease approval, Galleria executed the leases and paid the commissions due the brokers.

54.     Galleria was forced to seek alternate funding because of Kuwait's refusal to honor its promises.  Kuwait's lien position meant that a loan to Galleria would be subordinate, and thus undesirable to lenders generally.

55.     Kuwait's notices of default made the subject of this petition cite Galleria's entering into the Sonder leases without permission as events of default.  Galleria would not have entered into the leases without Kuwait's representations that the leases were approved.

56.     Meanwhile, by March 2020, Sonder decided it did not want to honor the leases and claimed that it was no longer bound by the leases. The Sonder leases represented income to Galleria in excess of $45,525,000.  It is reasonably probable that but for Kuwait's conduct as described in this petition, Galleria would have received rents in excess of $45,525,000.

57.     Galleria's reliance on the promise of funds resulted in Galleria's loss of rents on account of the described funding delays.  Galleria's reliance on the described lease approvals and promise of funds resulted in delays that resulted in the loss of rents in excess of $45,525,000.

58.     **WHEREFORE**, Galleria requests this Court enter judgment in favor of Galleria and against Defendants for actual, consequential and punitive damages in an amount within the jurisdiction of this Court, for Galleria's attorney's fees and costs incurred herein, and for such other and further relief as this Court deems just and proper.

### K. Count V – Tortious Interference with Prospective Relations and Existing Contracts

59.     Plaintiff adopts and incorporates herein by reference all prior paragraphs of this Petition as though fully set forth herein.

60.     Additionally and/or in the alternative, Kuwait's illegitimate, unreasonable refusal to approve tenants tortiously interfered with Galleria's business relationships. Kuwait's calculated notices of default (and defective notices of intent to accelerate) and wrongful posting for foreclosure disrupted a refinance of the Property that would pay off Kuwait, and Kuwait intentionally frustrated Galleria's efforts to pay off Kuwait through refinancing. Wrongly posting the Property for foreclosure disrupted relations with sophisticated professionals who are aware of these kind of actions by Kuwait. Kuwait simply does not want Galleria to be successful and, in the meantime, wants to foreclose and is making every effort to impede these other contractual relations to prevent Galleria from increasing income and tenancy. Any time prospective tenants, investors, or lenders would appear to be interested, for example, Kuwait's actions caused these groups to lose interest.

61.     Tenants do not want to go into a building that is in the foreclosure process. But for the wrongful posting, Galleria would have been able to resolve the matter with Kuwait.

62.     Kuwait was aware of and tortiously interfered with the Sonder leases by refusing authority for same, as well as certain others, including but not limited to Resmed Corp., Beyond Finance, LLC, Banca Afirme SA Institucion de Banca Multiple Grupo Financiero and TX Invesco, LP.

63.     Kuwait's interference with Galleria's business relationships proximately caused injury to Galleria, including actual damages, loss of prospective tenants, and other business losses and ongoing carrying costs.

001032

### L.  Count VI Against Lee – Quiet Title Against George Lee

64.    Plaintiff adopts and incorporate herein by reference all prior paragraphs of this Petition as though fully set forth herein.

65.    Additionally and/or in the alternative, quiet title is brought in equity to remove the existence of a cloud on the title.  A suit to quiet title is equitable and allows any person claiming any title, estate, or interest in real property to institute an action against any person or persons having or claiming to have any title, estate, or interest in such property to have the court determine the estate, title, or interest of said parties, respectively, in such real estate, and to define and adjudge by its judgment or decree the title, estate and interest of the parties severally in and to such real estate. *See e.g., Vernon v. Perrien*, 390 S.W.3d 47, 61 (Tex. App.—El Paso 2012, pet. denied); *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 388 (Houston [1st Dist.] 2012, pet. denied); *Longoria v. Lasater*, 292 S.W.3d 156, 165 n.7 (Tex. App.—San Antonio 2009, pet. denied).

66.    Lee received all sums due and owing to him, and he released his lien.  Nevertheless, he repudiated the Release of Lien and claims the lien remains and that he has an equitable lien and/or interest.

67.    Lee possesses no right, title, or interest in and to the Property superior to that of Plaintiff because Lee received funds sufficient to pay off everything he was owed.  Same is adverse to Plaintiff's interest in the Property.  A justiciable controversy exists concerning title to the Property and the nature and extent of Lee's interest.  Plaintiff has no adequate remedy at law.

68.    **WHEREFORE**, Plaintiff prays for judgment (i) quieting title to the Property free and clear of any lien alleged held by Lee, (ii) finding that Lee has no interest in or to the Property and (iii) awarding such other and further relief as this Court deems just and necessary.

## M. Count VII Against Kuwait – Promissory Estoppel

69.     Plaintiff adopts and incorporate herein by reference all prior paragraphs of this Petition as though fully set forth herein.

70.     Additionally and/or in the alternative, between January and March 2019, Galleria advised Kuwait of 2 potential leases of the Property by Sonder. Kuwait orally approved the leases and orally promised to provide Galleria funds to cover tenant improvements and brokerage commissions for the leases. Knowing that Galleria could not enter into the Sonder leases without money tenant improvements and commissions, Kuwait followed up the oral promise of funds with conduct confirming the promise.

71.     Based on such promises, Galleria executed the leases with Sonder in February and March 2019.  Upon execution of the leases, Galleria became obligated to pay the real estate brokers advising on the leases their commission.

72.     To further evidence Kuwait's approval of the lease and promise of funding of commissions and improvements, Kuwait ordered an appraisal of the Property, specifically including the cash flow generated by the Sonder lease.

73.     Relying on the promise of funds and lease approval, Galleria executed the leases and paid the commissions due the brokers.  However, instead of providing the promised funding for commissions and tenant improvements in March 2019, Kuwait instead denied that the leases had been ever approved by Kuwait in the first place and refused to provide the promised funds to support the Sonder leases.  Such promised funds approximate $5.5 million.

74.     Galleria was forced to seek alternate funding because of Kuwait's refusal to honor its promise to fund the Sonder leases.  Kuwait's lien position meant that a loan to Galleria would be subordinate, and thus undesirable to lenders generally.

75. Kuwait's notices of default made the subject of this petition cite Galleria's entering into the Sonder leases without permission as events of default. Galleria would not have entered into the leases without Kuwait's representations that the leases were approved.

76. Meanwhile, by March 2020, Sonder decided it did not want to honor the leases and claimed that it was no longer bound by the leases. The Sonder leases represented income to Galleria in excess of $45,525,000. It is reasonably probable that but for Kuwait's conduct as described in this petition, Galleria would have received rents in excess of $45,525,000.

77. Galleria substantially and detrimentally relied on Kuwait's promised approval of the leases when Galleria entered into the Sonder leases and incurred brokerage commissions. Galleria's reliance on the promise of funds resulted in Galleria's loss of rents.

78. Galleria's reliance on Kuwait's promised lease approvals and funds was foreseeable. Galleria requested the funds and approvals, explained why they were necessary and were promised same. Kuwait knew that Galleria could not enter into the Sonder leases without Kuwait's approvals and the promised funds – Galleria made that clear in correspondence that such was necessary to get the lease.

79. Injustice can only be avoided by enforcing Kuwait's promises.

80. **WHEREFORE**, Galleria requests this Court enter judgment in favor of Galleria and against Defendants for actual damages and punitive damages within the jurisdictional limits of this Court, for Galleria's attorney's fees and costs incurred herein, and for such other and further relief as this Court deems just and proper.

### N. Count VIII – Claim for Breach of Fiduciary Duty / General Good Faith Duty

81. Plaintiff adopts and incorporate herein by reference all prior paragraphs of this Petition as though fully set forth herein.

82.    Additionally and/or in the alternative, Kuwait assumed the role of ultimate decision maker with respect to effectively all of Galleria's business operations, including what leases Galleria could or should enter into and the terms and provisions of such leases. Kuwait even commenced granular review of lease provisions for purposes of negotiation of their commercial negotiation.  During the course of Galleria's relationship, Kuwait exercised control over Galleria through the purported subject loan agreement, recommended business and ownership structures to Galleria, interjected itself into lease negotiations as described above, and maintained such a close relationship with Galleria, that Galleria was justified in relying on Kuwait to act in Galleria's best interests with respect to the Property and its commercial operation.  *O'Shea v. Coronado Transmission Co.*, 656 S.W.2d 5576 (Tex.App. – Corpus Christi 1983, writ ref'd n.r.e.).

83.    Kuwait abused this fiduciary or special relationship by obtaining information and taking action that Kuwait and using same against Galleria.  Kuwait disclosed Galleria's confidential financial information to third parties to further Kuwait's own business interests, to the detriment of Galleria.  Kuwait interfered with Galleria's leasing of the Property as described above.

84.    Kuwait abused its relationship with Galleria to induce alleged defaults under the loan agreements with the clear intent to engage in the subject wrongful foreclosure scheme to obtain a building worth over $100 million for the principal balance under the subject loan, resulting in a windfall to Kuwait and its business partners to the obvious detriment of Galleria, which stands to have all of its equity in the building lost as a result of Kuwait's foreclosure scheme.

001036

85.     On account of the loan agreements and assumption of roles and conduct by the Kuwait as consultant, lender and confidant, Kuwait (a) acquired influence and abused that influence as described, (b) took advantage of its relationship with Galleria, (c) knew or had reason to know of Galleria's trust and confidence that Kuwait would maintain the confidentiality of Galleria's confidential financial information, reasonably approve leases, provide promised funds for the Sonder leases, and (d) understood that a special trust, confidence or relationship existed between Kuwait and Galleria.  A special dependency was created and existed because of Kuwait's assumption of its role as business consultant, lender and confidant.  Kuwait thus assumed the fiduciary or common law good faith duties to Galleria.

86.     However, Kuwait breached these duties by withholding promised funds, disclosing Galleria's confidential information to Galleria's competitors in furtherance of Kuwait's business interests, and driving the loan, Galleria and Property into financial jeopardy, alleged defaults and wrongful foreclosure, all as scheme to obtain the Property through the described foreclosure scheme.

87.      As the result of Kuwait's breach of its fiduciary or good faith duties, Galleria is entitled to damages in excess of $100 million, including actual damages, interest, costs, and attorneys' fees.

**O.  Count VIII – Claim for Negligent Misrepresentation**

88.     Plaintiff adopts and incorporate herein by reference all prior paragraphs of this Petition as though fully set forth herein.

89.     Additionally and/or in the alternative, between January and March 2019, Kuwait advised Galleria to enter into the Sonder leases and represented that the leases were approved and that Kuwait would provide funds for tenant improvements and brokerage commissions.

90.     Kuwait made the representations in the course of its business as Galleria's lender. Kuwait made the representations in the course of a transaction in which it had a pecuniary interest.  Kuwait made the representation for the guidance of others.

91.     Kuwait's representation was a misstatement of fact or opinion, Kuwait would not provide the promised funds or approve the Sonder leases. Alternatively, Kuwait's misrepresentation was a failure to disclose information when Kuwait had a duty to do so, specifically Kuwait did not intend to release the promised funds and approve the Sonder leases.

92.     Kuwait did not use reasonable care in obtaining and communicating the information to Galleria.

93.     Galleria actually and justifiably relied on Kuwait's representations when Galleria entered into the Sonder leases and incurred brokerage commissions.  Galleria's reliance on the representations resulted in Galleria's loss of rents in excess of $45,525,000.

94.     Kuwait's misrepresentations proximately caused Galleria injury as described above.

95.     **WHEREFORE**, Galleria requests this Court enter judgment in favor of Galleria and against Defendants for actual damages in excess of $$45,525,000, for Galleria's attorney's fees and costs incurred herein, and for such other and further relief as this Court deems just and proper.

### P.  Count VIII Against Kuwait – Slander of Title

96.     Plaintiff adopts and incorporate herein by reference all prior paragraphs of this Petition as though fully set forth herein.

97.     Additionally and/or in the alternative, Galleria possessed the Property and sought to lease the Property at all material times.  On September 15, 2021, Kuwait filed its wrongful

notice of foreclosure with the Harris County Clerk seeking the foreclosure of its lien against the Property.

98.     In or around the time of the foreclosure notice GalloWorks was ready, willing and able to lease 4 floors of the Property at the rate of $75,000 per floor per month.

99.     Kuwait's foreclosure notice was false or wrongful for the reasons stated herein.

100.     Kuwait's foreclosure notice was recorded with the Harris County Clerk with legal malice.

101.     As a result of the recording of the foreclosure notice, GalloWorks at the time failed to enter into the lease of the 4 floors as a result of the noticed wrongful foreclosure.

102.     Accordingly, Kuwait's wrongful foreclosure notice caused injury to Galleria, which resulted in the loss of rents.

103.     **WHEREFORE**, Galleria requests this Court enter judgment in favor of Galleria and against Defendants for actual damages within the jurisdictional limits of this Court, for Galleria's attorney's fees and costs incurred herein, and for such other and further relief as this Court deems just and proper.

### Q.  Application for Temporary Restraining Order and Application for Temporary Injunction

104.     Plaintiff adopts and incorporates herein by reference all prior paragraphs of this Petition as though fully set forth herein.

105.     By Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer immediate and irreparable harm that cannot be adequately compensated by an award of damages, namely the loss of extremely valuable, unique, Harris County Real Estate.  Plaintiff is entitled to injunctive relief to force Kuwait, its successor and/or assigns, and any and all trustees and/or

substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, to refrain from continuing such unlawful conduct.

106.   Defendant already confirmed in writing that its unlawful conduct will continue and that Defendant will foreclose on the Property unless this Court immediately enjoins, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, from foreclosing. *See Exhibit D, Email from Kuwait's counsel confirming that foreclosure sale will proceed.*

107.   Plaintiff requests a Temporary Restraining Order to maintain the *status quo* pursuant to Texas Civil and Practice Remedies Code Section 65.011.  Unless Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, are immediately restrained, they will cause substantial and irreparable harm to Plaintiff, namely the potential, irreversible loss of the Property by virtue of a sale to a third party for a sizeable profit. Plaintiff ask the Court to maintain *status quo* and restrain Defendant Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them, including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, from foreclosing on the Property until such time as all claims and causes of action in this lawsuit are resolved.

108.   Unless Defendant Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, are enjoined, they will continue to take advantage of Plaintiff and potentially complete a foreclosure sale of the Property without lawful and proper

001040

notices which will greatly prejudice Plaintiff. Any attempt to take action against Plaintiff or that would prejudice Plaintiff in connection with this unique piece of Harris County real estate will cause Plaintiff to suffer imminent, irreparable harm for which no adequate remedy at law exists if Defendant Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them are not enjoined from these actions. The irreparable harm includes, but is not limited to, injury and a complete loss of Plaintiff's business and/or business reputation and/or business goodwill if the valuable real estate Plaintiff owns is lost to foreclosure.

109.    Black letter Texas law confirms that Plaintiff's Notice of Intent to Accelerate is fatally defective which renders the subsequent Notice of Acceleration and Notice of Sale ineffective. Furthermore, the Court cannot allow Kuwait to benefit from or foreclose after Kuwait's bad acts that prevented Plaintiff from refinancing and leasing the premises. Plaintiff is likely to succeed on the merits of this suit because Defendant has acted unilaterally, unlawfully, and without the proper authority to take any of these actions.

110.    The injunctive relief Plaintiff seeks will do no more than maintain *status quo*. Plaintiff asks the Court to set this application for temporary injunction for a hearing and, after hearing, issue a temporary injunction against Defendant Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, restraining Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them until a final trial on the merits or arbitration can be heard.

111.    Other than equitable relief, Plaintiff has no adequate remedy a law with respect to the actions Plaintiff seeks to enjoin. Without equitable relief, Plaintiffs would suffer irreparable

001041

injuries such as complete loss of its business and loss of reputation and/or business goodwill among tenants and prospective tenants, among others.

112.    In support of Plaintiff's Application for Temporary Restraining Order, Plaintiff and Plaintiff's representatives executed Affidavits confirming all facts set forth herein.

### R.  Attorney's Fees and Costs

113.    Plaintiff adopts and incorporates herein by reference all prior paragraphs of this Petition as though fully set forth herein.

114.    Plaintiff had to employ the services of an attorney to prosecute this lawsuit against Defendant.  Texas law and the Loan Documents allow Plaintiff to recover attorneys' fees and costs. For these reasons, Plaintiff seeks reimbursement of any and all reasonable and necessary attorneys' fees and costs it incurred in prosecution of this matter.

### S.  Conditions Precedent

115.    All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

### T.  Exemplary Damages

116.    Plaintiff adopts and incorporates herein by reference all prior paragraphs of this Petition as though fully set forth herein.

117.    Plaintiff's injury resulted from Kuwait's malice and actual fraud, which entitles Plaintiff to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a) as has been described above. As such, Plaintiff seeks exemplary damages from Kuwait in an amount within the jurisdictional limits of this court.

24

### U.  Respondeat Superior

118.    At the time of the incident made the basis of this suit, Defendants' agents, servants and employees were in fact their agents, servants and employees, and acting within the scope of their employment and authority as their agents, servants and employees.

### V.  Tex. R. Civ. P. 193.7 Notice

119.    This paragraph serves as continuing notice, pursuant to Tex. R. Civ. P. 193.7, that any and all documents produced in response to written discovery served by Plaintiff will be used against the producing party in any pretrial proceedings and/or trial.

### W. Jury Demand

120.    Plaintiff hereby requests a jury trial.

### X.  Prayer

**WHEREFORE, PREMISES CONSIDERED**, as a direct and proximate cause of Defendant's actions and the actions of its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, as outlined above, Plaintiff suffered and continues to suffer significant monetary damages including, without limitation, complete loss of the Property. Damages are within the minimum jurisdictional limits of this Court.  Plaintiff, therefore, prays that Defendant be cited to appear herein, that upon trial Defendant is held liable for (i) the causes of action Plaintiff pleads and (ii) Plaintiff's damages.  Specifically, Plaintiff prays for the following:

    i.      Actual economic damages;

    ii.     Exemplary damages;

    iii.    Declaratory relief as requested herein;

    iv.    Quiet title requested herein;

v. Reasonable and necessary attorneys' fees in an amount to be determined by the Court;

vi. Costs of Court;

vii. Temporary and permanent injunctive relief;

viii. Pre-judgment and post-judgment interest; and

ix. Any other damages or relief to which Plaintiff is justly entitled.

Respectfully submitted,

**NICHAMOFF LAW PC**

*/s/ Seth A. Nichamoff*

By: _____

Seth A. Nichamoff
State Bar No. 24027568
2444 Times Boulevard, Suite 270
Houston, Texas 77005
(713) 503-6706 Telephone
(713) 360-7497 Facsimile
seth@nichamofflaw.com

-and-

**THE ZWERNEMANN LAW FIRM**

Allen H. Zwernemann
State Bar No. 24034755
FID No. 2851120
800 Sawyer Street
Houston, Texas 77007
Tel: (281) 221-7168
Fax: (281) 783-4247
E-mail: az@azlf.com

-and-

001044

MacGeorge Law Firm, PLLC
2425 W Loop S, 11th Floor
Houston, TX 77027
P: (512)729-0261
jmac@jlm-law.com

Jennifer L MacGeorge
Attorney for Plaintiff
SBN: 24093627

**ATTORNEYS FOR PLAINTIFF**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on Wednesday, June 8, 2022, I served a copy of the foregoing instrument on the parties listed below by electronic service and that the electronic transmission was reported as complete. My e-mail address is <u>seth@nichamofflaw.com</u>.

Charles C. Conrad
charles.conrad@pillsburylaw.com
Ryan Steinbrunner
ryan.steinbrunner@pillsburylaw.com
Two Houston Center
909 Fannin, Suite 2000
Houston, Texas 77010-1018

*Attorneys for Defendant*

*/s/ Seth A. Nichamoff*

By: _____

Seth A. Nichamoff

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Seth Nichamoff
Bar No. 24027568
seth@nichamofflaw.com
Envelope ID: 65268945
Status as of 6/9/2022 8:07 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Seth Nichamoff | | seth@nichamofflaw.com | 6/8/2022 7:27:23 PM | SENT |
| Jason Carrington Norwood | 24027579 | jason@jcnorwood-law.com | 6/8/2022 7:27:23 PM | SENT |
| Elizabeth Klingensmith | 24046496 | Liz.Klingensmith@pillsburylaw.com | 6/8/2022 7:27:23 PM | SENT |
| Charles Conrad | | charles.conrad@pillsburylaw.com | 6/8/2022 7:27:23 PM | SENT |
| Nancy Jones | | nancy.jones@pillsburylaw.com | 6/8/2022 7:27:23 PM | SENT |
| Jorge Borunda | 24027205 | jorge@borundapc.com | 6/8/2022 7:27:23 PM | SENT |
| Ryan Steinbrunner | | ryan.steinbrunner@pillsburylaw.com | 6/8/2022 7:27:23 PM | SENT |
| Annarose Harding | | aharding@gallowaylawfirm.com | 6/8/2022 7:27:23 PM | SENT |
| Julie Moeller | | julie.moeller@pillsburylaw.com | 6/8/2022 7:27:23 PM | SENT |
| Cody Gartman | | cody.gartman@pillsburylaw.com | 6/8/2022 7:27:23 PM | SENT |
| Haley Sheppard | | hsheppard@gallowaylawfirm.com | 6/8/2022 7:27:23 PM | SENT |
| Branch Sheppard | | BSheppard@gallowaylawfirm.com | 6/8/2022 7:27:23 PM | SENT |
| Jennifer LMacGeorge | | jmac@jlm-law.com | 6/8/2022 7:27:23 PM | SENT |
| Nailah Jackson | | njackson@jlm-law.com | 6/8/2022 7:27:23 PM | SENT |
| Samantha Vasquez | | samantha.vasquez@pillsburylaw.com | 6/8/2022 7:27:23 PM | SENT |
| Yona Starosta | | yona.starosta@pillsburylaw.com | 6/8/2022 7:27:23 PM | SENT |
| Yolanda Rodriguez | | yolanda.rodriguez@pillsburylaw.com | 6/8/2022 7:27:23 PM | SENT |
| Jetall Legal | | legal@jetallcompanies.com | 6/8/2022 7:27:23 PM | SENT |
| Michael Clardy | | mclardy@jlm-law.com | 6/8/2022 7:27:23 PM | SENT |
| Allen Zwernemann | | AZ@AZLF.com | 6/8/2022 7:27:23 PM | SENT |

# **EXHIBIT D**

001047

8/25/2022 10:11:27 AM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 67648213
By: LUGO, BONNIE
Filed: 8/25/2022 10:11:27 AM

Cause No. 2021-63370

| | | |
|---|---|---|
| **GALLERIA 2425 OWNER, LLC,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **OF HARRIS COUNTY, TEXAS** |
| | § | |
| **NATIONAL BANK OF KUWAIT, S.A.K.P.,** | § | |
| **A NEW YORK BRANCH and GEORGE M.** | § | |
| **LEE,** | § | |
| | § | |
| **Defendants.** | § | **281ST JUDICIAL DISTRICT** |

## ORDER ON PLAINTIFF'S NOTICE OF NONSUIT
## AS TO DEFENDANT NATIONAL BANK OF KUWAIT, S.A.K.P.

The Court has considered Plaintiff Galleria 2425 Owner, LLC's ("Galleria") Notice of Nonsuit With Prejudice as to Defendant National Bank of Kuwait, S.A.K.P. ("NBK") only, and has decided to **GRANT** the Nonsuit in regard to claims asserted by Galleria against NBK.

It is therefore **ORDERED, ADJUDGED, and DECREED** that this dismissal with prejudice of all claims asserted by Galleria against only NBK is **GRANTED**. Each of Galleria and NBK is to bear their own costs and expenses.

This Order does not affect the claims asserted by Galleria against the remaining defendant in this action, George M. Lee.

Signed:
8/31/2022                    _Christ_____

Presiding Judge

4868-6339-7423

001048

# <u>EXHIBIT E</u>

001049

11/29/2023 9:17 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 82036951
By: Domonique Palmer
Filed: 11/29/2023 9:17 AM

## CAUSE NO. <u>2023-43755</u>

| | | |
|---|---|---|
| **NAISSANCE GALLERIA, LLC** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **AZEEMEH ZAHEER** | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | **80TH JUDICIAL DISTRICT** |

## <u>PLAINTIFF'S AMENDED PETITION & EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER AGAINST DEFENDANT NATIONAL BANK OF KUWAIT S.A.K.P.</u>

Naissance Galleria, LLC ("***Plaintiff***") files this Amended Petition and Emergency Application for Temporary Restraining Order against National Bank of Kuwait S.A.K.P., New York Branch (individually as "***NBK***", or collectively as "***Defendant***") and, in support, submit the following:

### I.
### <u>DISCOVERY PLAN</u>

1.      Discovery should be conducted pursuant to Level 2 of Rule 190.3 of the Texas Rules of Civil Procedure.

### II.
### <u>PARTIES</u>

2.      Naissance Galleria, LLC ("***Plaintiff***") is a limited liability company doing business in Texas and is mezzanine lender to Galleria 2425 JV, LLC ("JV"). The JV is the sole member of

Page | 1

001050

Galleria 2425 Owner, LLC (Owner"), which is the 100% owner of the building located at 2425 West Loop S., Houston, Texas 77027 ("*2425 Building*").

3.      Azeemeh Zaheer ("**Zaheer**"), is an individual who resides, and has appeared and is represented by counsel Rodney Drinnon, 2000 West Loop South, Suite 1850, Houston, Texas 77027 and David Tang, 6711 Stella Link, #343, West University Place, Texas 77005. **ZAHEER HAS APPEARED.**

4.      National Bank of Kuwait, S.A.K.P., New York Branch ("*NBK*") is a banking corporation organized under the laws of Kuwait, acting through its New York Branch.  This party may be served through its counsel, Charles Conrad, Two Houston Center, 909 Fannin, Suite 2000, Houston, Texas 77010-1018, and via email: charles.conrad@pillsburylaw.com. **CITATION IS REQUESTED**.

### III.
### INTRODUCTION

5.      Defendant Zaheer was previously the managing member of Naissance Galleria LLC, however on or about July 3, 2020, Defendant Zaheer assigned all control of Naissance Galleria, LLC to Ali Choudhri.  On or about July 3, 2020, Defendant Zaheer ceased having any "powers, rights, privileges, duties and discretion" as it pertains to Plaintiff Naissance Galleria LLC. Defendant Zaheer sent an email correspondence to Plaintiff's current managing member regarding her transfer of interest to Plaintiff's current managing member, which for all intents and purposes terminated and ratified the interest transfer by Defendant Zaheer for Naissance Galleria LLC.

001051

6.    Plaintiff Naissance Galleria LLC has been operating under the control of its current managing member since the execution of the assignment on July 3, 2020 and it is unconscionable to discover that Defendant Zaheer, three (3) years after executing the assignment is now suddenly asserting that she manages and has control over Naissance Galleria LLC.  Moreover, Defendant Zaheer retained counsel and initiated litigation against third parties on behalf of Naissance Galleria, LLC three (3) years after executing the assignment.  Most shockingly is that fact that, without any appearance or objection by Zaheer, the managing member of Naissance Galleria, Ali Choudhri, who has controlled Naissance Galleria LLC since around July 2020, has initiated lawsuits against Defendant Bank of Kuwait, and has entered into a sealed confidential settlement agreement on behalf of Naissance Galleria, LLC with Defendant Bank of Kuwait which is the subject of another litigation.

7.    A lawsuit was originally filed against NBK, a party who has been shown to be willing to engage in bad faith actions amounting to lender liability, because of its repeated attempts to make outside deals with third parties to specifically deprive the JV and Owner of their ownership interest, and Plaintiff of its collateral interest in the 2425 Building, in any way it can.

8.    Galleria 2425 Owner, LLC, filed bankruptcy to preserve the asset, which NBK vehemently opposed, and fought to have dismissed from the bankruptcy court. However, at the hearing on NBK's motion to dismiss, Galleria 2425 Owner, LLC was successful in defending against dismissal, and the bankruptcy case moved forward.

9.    Galleria 2425 Owner, LLC promptly proposed a plan in the bankruptcy court, which was characterized as a "really smart" plan that "check[ed] all the boxes" for plan confirmation, according to Judge Lopez.

001052

10.    Then, after Defendant NBK lost its motion to dismiss, true to its pattern of behavior, it continued to engage in more bad faith actions by conspiring with Azeemeh Zaheer, and perhaps other yet unknown parties, to create confusion that caused havoc and further disrupted the bankruptcy case.

11.    Notably, Judge Manor, in this matter, which is referenced in NBK's letter to Judge Lopez, did issue a Temporary Injunction, **which maintained the status quo of Choudhri's management and control of Naissance Galleria, LLC, but limited any actions that could be taken by Choudhri on behalf of Naissance Galleria, LLC to only those which are also approved by Zaheer, until a trial resolves the issue once and for all.**

12.    After the Temporary Injunction was in place establishing Choudhri's control of Naissance Galleria, LLC, Counsel David Tang and Rodney Drinnon acting for Azeemeh Zaheer, appeared in violation of this TRO and purported to act for Naissance Galleria, LLC. They appeared on behalf of Naissance Galleria, LLC, at two separate hearings in the bankruptcy court, on or about October 12th, 2023 and November 1st, 2023. Even more egregiously, these same parties, again acting in express violation of the Temporary Injunction, filed a motion to lift the stay in the bankruptcy court, which is entirely against the fiduciary interests of plaintiff, and they request for Judge Lopez to rule against the this Court and find that Zaheer had control of, and could act for Naissance Galleria, LLC.

13.    When the parties to the state court litigation returned to appear before this Court on November 13th, 2023, Judge Manor confirmed that her Temporary Injunction did not give Zaheer any right to act as the manager of Naissance Galleria, LLC, and confirmed that Choudhri was in control, subject to Zaheer's approval during the pendency of trial.

Page **4** of **29**

14. All of these actions, including the actions taken by Zaheer in direct violation of this Court's temporary injunction, gave rise to Judge Lopez's serious concerns about the ability to move forward with the bankruptcy case without resolution in the state court action. Judge Lopez stated in the November 1st, 2023 Status Conference the following:

"I don't have anything to qualify it in state court issues. I don't know. There's just a lot of confusing stuff, and my gut tells me that I need to dismiss this case and let you all go figure this out in State Court, because there's not enough here, and there's real concerns that I have…".

15. The fact that Zaheer, allegedly acting on behalf of Naissance filed these appearances and motions in violation of the Temporary Injunction not only makes these actions unlawful, but there could be no other purpose aside from attempting to cause the dismissal of the bankruptcy case brought by Galleria 2425 Owner, LLC, which is an action that, logically, would be counter to the company's fiduciary interests.

16. In its letter, NBK cleverly attempts to confuse the court by implying that Ms. Zaheer had control of Naissance Galleria, LLC because the order says that management decisions could not be made without her approval. This is exact same argument Zaheer made before being shut down by this Court itself, stating that its Temporary Injunction left Mr. Choudhri in control, subject to Zaheer's approval, in order to freeze all actions of the parties until trial, except that Mr. Choudhri's actions on behalf of Naissance Galleria, LLC in the instant suit have been expressly permitted.

17. Judge Weems in the 281st Civil District Court has handled cases related Galleria 2425 Owner, LLC for years, and is well aware that Ms. Zaheer has been entirely absent from any of these proceedings until on or about July 5th, 2023, when Mr. Tang appeared, allegedly for

Unofficial Copy Office of Marily Burgess District Clerk

Naissance Galleria, LLC, before that Court's ancillary docket, attempting to stop the foreclosure by NBK, at which hearing Judge Weems questioned the absence of Ms. Zaheer over the last several years, and denied the TRO, as it was not believable to Judge Weems that Zaheer had authority to act on behalf of Naissance Galleria, LLC.

18.      From July 3rd, 2020, the date of signing, until or July 5th, 2023, Defendant Zaheer did not make any claims of control over Naissance Galleria, LLC, did not attempt to object to or interfere with Mr. Choudhri's management of the company, and did not make allegations of forgery regarding the assignment of the company to Choudhri. These allegations are absurd, as Defendant Zaheer has been entirely absent from the company's management for years.

19.      **As a result of this conspiracy by the Defendant Bank of Kuwait and Defendant Zaheer falsely acting on behalf of Plaintiff Naissance Galleria LLC the emergency status conference requested by NBK resulted in the dismissal of the bankruptcy case.**

20.      **What's interesting is that, if Ms. Zaheer was authentically the manager of Naissance Galleria, LLC, and acting in the best interests of the company, she would not have worked tirelessly to have the bankruptcy case dismissed. The mezzanine debt, held by Naissance Galleria, LLC is junior to, or behind the NBK debt, the second lien debt, and the tax liens on the 2425 Building, and thus will be _entirely wiped out_ if NBK forecloses on the 2425 Building, given its present valuation. In addition, the agreement between the JV and Naissance Galleria, LLC is to treat equity and the mezzanine the same, and split the proceeds 50/50, so if the building is foreclosed, all of these parties walk away with nothing.**

21.      Such actions, if they had been taken by a legitimate manager for Naissance Galleria, LLC, would be a breach of fiduciary duty to the company, _unless there was a back room deal between Defendant Zaheer and Defendant Bank of Kuwait_ that provides Naissance Galleria, LLC

001055

with more compensation than it would have been provided under the proposed bankruptcy plan. Otherwise, dismissal of the bankruptcy leaves Naissance Galleria, LLC with _zero repayment_ on its mezzanine debt, where it would have received more than that through the proposed plan.

22.    Now that NBK has re-posted the 2425 Building for foreclosure, Plaintiff will suffer irreparable harm as a result of the defendants' actions.

## IV.
## FACTUAL BACKGROUND

23.    In 2018, Defendant NBK loaned certain funds to Galleria Owner 2425, LLC  and at the same time NBK has continually interfered with the Plaintiff's ability to lease the 2425 Building to produce revenue and Plaintiff's ability to sell the 2425 Building to pay NBK off.  Every time NBK has so interfered, it has then blamed the Plaintiff for its inability supposedly to meet some of the loan terms.  What is now occurring is a simply a continuation of the long term interference, because Defendant National Bank of Kuwait simply wants to own the building instead of being paid off.

24.    For example, in January 2021, Plaintiff Ali Choudhri, who is vilified by NBK in various pleadings, had the building at 2425 West Loop South, Houston, Texas, the main asset of the Plaintiff, had serious parties interested in building for a purchase price of $85 million, more than enough to clear NBK's debt.  A letter dated January 15, 2021 from SIBS International and two purchase contracts which would have paid off not only NBK, but left the Plaintiff with a great deal of value.  **NBK, rather than facilitate this sale, disclosed confidential information and sales issued a formal notice of default**, while the SIBS International deal was in progress, killing that deal.

001056

25.    **The same was true with regard to NBK's interference with efforts to lease space in the building to provide revenue so it could operate and make loan payments.**  By August 2021, this situation had become untenable due to NBK's refusal to approve new tenants and new leases, prompting the Plaintiff on August 13, 2021 to send NBK a detailed letter regarding lease-up and renewal prospects for discussions, none of which, it seemed NBK would approve.

- ◆ **Healthcare Service Organization**

  - ▪ •Size: 130,000+ RSF – large client requirement in their preliminary planning stages: •Industry: Healthcare Service Organization •Type of use: Administration Offices •Direct/Sublease •Commencement date: Q3/2023 •Term:5-10 yrs.  They are specifically VERY interested in amenities available, for example: deli, gym, day care, conference center (# of seats), training center (# of seats).

- ◆ **Invesco**

  - ▪ We met with the team twice and are actively pursuing them for 2425.  They are interested in a 157-month lease term for 208,830 SF of Net Rental Area.

- ◆ **Financial Services Firm**

  - ▪ Office •AREA: West Houston (610 West, Hwy 290, Beltway 8) •SPACE: Open Concept •SIZE: Approximately 20,000 – 25,000 rsf •PARKING: 5/1000 ratio •OCCUPANCY: Late 2Q22/Early3Q22 •TERM: 36-60 months with renewal options •This tenant is currently at 24 Greenway on their top floor and have been looking at other A buildings.

- ◆ **Beyond Finance**

  - ▪ We are discussing a 68-month lease term for +/- 40,000 rentable SF.

- ◆ **Banco Affirme**

  - ▪ We submitted a 64-month lease term for 4,545 SF of Net Rental Area.

- ◆ **Walls Bank (existing tenant)**

  - ▪ Renew 3,054 SF of rental space for 60-month term starting January 1, 2022.

- ◆ **Others (working directly with ownership)**

  - ▪ ResMed (https://www.resmed.com/en-us/), interested in the entire building, working directly with Dr. Peter Farrell, Founder and Chairman

Page **8** of **29**

- Healthstore Holdings (https://www.healthstore.com/), interested in a 15-year term with 80,000 SF in phase 1 and 75,000 SF in 12 months as phase 2.

- Immunicom (https://immunicom.com/), interested in at least two full floors, moving HQ from San Diego, CA

26.    Below is an August 16, 2021 email from counsel for the Plaintiff to NBK forwarding multiple leases for approval that **NBK had failed to approve or even respond to.**



This lack of approval, or finding obstacles to approve, was not new.  In September 2019, Related Group had reached out to lease the parking garage located at the 2425 Building to be used for

Page **9** of 29

overflow, for parking up to 110 spaces.  **NBK's authorized representative Michael Carter would not approve this lease** (note "nbkny" email address below– *i.e.* National Bank of Kuwait, New York Branch), which would have generated a great deal of revenue for the Plaintiff.

**From:** Michael Carter <Michael.Carter@nbkny.com>
**Date:** Monday, 23 September 2019 at 13:22
**To:** Azeemeh Zaheer <azeemeh@naissancecapital.co.uk>, Lisa Walker <Lisa.Walker@nbkny.com>
**Subject:** RE: LOI

My primary concern is that the tenant determines when the commencement date is, presumably because they have zoning and building department approvals to complete as well as financing to arrange, which is understandable, however there does not appear to be an outside expiration date for the Commencement date. It appears they could tie up the space permanently without having to pay rent. I think you should have an outside date for Commencement.

27.    The situation became so untenable that in September 2021, Galleria 2425 Owner, LLC  initiated a lawsuit against NBK.

28.    In good faith, even during the pendency of this litigation, the Galleria 2425 Owner, LLC was still trying to get tenants into the building and get NBK's approval to do so, so it would not claim additional breaches of loan agreements.  **On July 2, 2022,  Galleria 2425 Owner, LLC sent NBK five leases for approval, which NBK did not approve.**

29.    *Defendant Bank of Kuwait and Galleria Owner 2425 LLC litigated for eleven (11) months until August 22, 2022, when they entered into a Confidential Settlement Agreement.*  The entire Confidential Settlement Agreement will be submitted to the Court *in camera* at the appropriate time, and the Plaintiff – Naissance Galleria should be allowed to use it in this case since the breach of that Settlement Agreement by NBK is not only actionable, but was also devastating to Plaintiff.  Because NBK has a way of interpreting any action of the Plaintiff as one

Page **10** of 29

to breach or avoid some purported contractual obligation or other, when the reverse is entirely true, the Confidential Settlement Agreement has not been attached. **NBK has prevented Galleria 2425 Owner, LLC's successful performance under any and all agreements it has with NBK, including the Confidential Settlement Agreement.**

30.     The Confidential Settlement Agreement permitted a timeframe in which **Galleria 2425 Owner, LLC** could sell the 2425 Building, and **Galleria 2425 Owner, LLC** was successful in receiving a hard Letter of Intent dated January 17, 2023 to purchase the building from Caldwell Soames.  Again, while these negotiations were ongoing, **NBK took actions which interfered with the continuation and closing of that transaction, including issuing a notice of foreclosure on March 29, 2023 in breach of the Confidential Settlement Agreement, which Galleria 2425 Owner, LLC believes was done intentionally to prevent the sale.**  The sale would have cleared the Bank of Kuwait debt as it stood at that time and left great value for **Galleria 2425 Owner, LLC  and** Plaintiff.  Plaintiff believes that Bank of Kuwait recognized that greater value and wanted to take it for itself by foreclosure in a "loan to own" gambit.

31.     There are tremendous factual inaccuracies that NBK represents to state and federal courts and they continue into these proceedings.  For example, in its Motion to Dismiss the ~~Plaintiff's~~ Bankruptcy, while it is absolutely true that temporary restraining orders were filed to attempt to prevent a foreclosure by NBK and its takeover of the 2425 Building, they were also **granted by this Court**.  The **facts presented that NBK had not allowed the Galleria 2425 Owner, LLC to lease up the building to generate revenue, and had killed two transactions that Galleria 2425 Owner, LLC was working on that would have cleared NBK and left value for the Galleria 2425 Owner, LLC.**

001060

32.    Additionally, NBK posted for foreclosure in 2023 early, and against an extended grace period that this Court had given Galleria 2425 Owner, LLC, which silenced the bidding process and interest in the 2425 Building completely.  No one wants to buy a building posted for foreclosure.  **Plaintiff believes that NBK knew this and did it on purpose to prevent the Galleria 2425 Owner, LLC from successfully selling the property and paying off the loan, so NBK could foreclose and become the owner of the 2425 Building.**

33.    The absolute opposite is true.  Representatives of Defendant NBK have admitted in writing that the following substantial payments have been made to Defendant NBK well after March 6, 2021:

   a)    $801,509.42 paid by  Galleria 2425 Owner, LLC to Defendant NBK on August 27, 2022;

   b)    $80,000 paid by Galleria 2425 Owner, LLC to Defendant NBK on April 18, 2023;

   c)    $80,000 paid by Galleria 2425 Owner, LLC to Defendant NBK on May 10, 2023.

This is almost One Million Dollars ($1,000,000) that not only does NBK not give credit to  Galleria 2425 Owner, LLC for having made the payments, but again, it vilifies it, saying exactly the opposite that no payments (zero) have been made since March 6, 2021.

34.    After NBK's disclosures of the situation created by the Confidential Settlement and the wrongful posting for foreclosure during an extension of that agreement, potential buyers of the property who would otherwise become good prospects to negotiate a sale with **Galleria 2425 Owner, LLC**, became potential purchasers of the NBK Note and began negotiating with NBK. NBK interfered with these potential purchases and with these business relationships.  At least the following were interfered with in this fashion:

001061

a)      Globix Investment,

b)      Ironwood Commercial Realty,

c)      Shah Firm, LLC, and

d)      Jeb Brown Law.

**B.      Azeemeh Zaheer Decides She Wants the Building.**

35.     On June 26, 2023, Defendant Zaheer filed a lawsuit in the name of Naissance Galleria, LLC ("*Naissance*"), which she purported to control, in the 157th Judicial District Court in Harris County, Texas referenced by case number 2023-39006 against Brad Parker ("*Parker*") as an initial step in Zaheer pursuit of a hostile takeover of the 2425 Building.

36.     On July 5, 2023,  Defendant Zaheer and also in the name of Naissance, filed a second lawsuit in the 129th Judicial District Court in Harris County, Texas referenced by case number 2023-41091 against Parker and NBK at the request of Zaheer, to further the defendants' hostile takeover attempt of the 2425 Building.  Zaheer sought injunctive relief, but that request for an emergency temporary restraining order was denied.

37.     On or about July 5, 2023, Galleria 2425 Owner, LLC commenced a Chapter 11 bankruptcy proceeding in the Southern District of Texas, referenced by case number 23-60036. NBK sought to dismiss the bankruptcy proceeding, but its motion to dismiss was denied on September 26, 2023.  The Chapter 11 Plan should have been approved and would have substantially reduced the value of Bank of Kuwait's secured debt, which Bank of Kuwait decided it would not allow, just as it had decided not to allow the prior sales of the building that had been lined up by Galleria 2425 Owner, LLC.

001062

C.    **Azeemeh Zaheer is a False Representative of Naissance.**

38.    Azeemeh Zaheer at one time had a business relationship with Ali Choudhri, both of which appeared to have ended mutually for a time.  Azeemeh Zaheer filed an Application for Temporary Injunction in the 80th Judicial District Court for Harris County against Naissance Galleria, LLC, which was a mezzanine lender to an LLC ("*LLC*") two steps up in the building's ownership chain.

39.    Azeemeh Zaheer had signed, as the authorized representative of the Managing Member of Naissance Galleria, LLC an Assignment of the management rights of that LLC to Ali Choudhri.  In response, Mr. Choudhri stepped into Naissance's shoes, covered its expenses, and did a miraculous job of negotiating the aforementioned settlement with Bank of Kuwait after the Assignment.  Azeemeh Zaheer made this assignment for a number of reasons, but most of them stemmed from her ineffective management of the building and her fear of exposure to Bank of Kuwait and certain individuals affiliated with the Bank of Kuwait because of her poor performance.

40.    After Mr. Choudhri received the Assignment and had negotiated the successful settlement with Bank of Kuwait and the building looked as if it might succeed (a period of years), Azeemeh Zaheer decided she wanted to misappropriate the value that Mr. Choudhri had just preserved and to an extent had just created.  First, she claimed the Assignment was invalid and sought and received a Temporary Injunction on September 21, 2023 from the 80th Judicial District Court in Harris County.  This Temporary Injunction basically only created a stalemate with respect to the management of Naissance Galleria, LLC to preserve the status quo until a trial in January.  Mr. Choudhri is still the manager of Naissance Galleria, LLC, not Azeemeh Zaheer, although she did have some approval rights under the injunction.  Mr. Choudhri, as the manager of Naissance

001063

Galleria LLC, is only required to obtain approval from Zaheer for his actions. Zaheer DOES NOT have any control of the entity. Moreover, this was confirmed at a hearing on November 13, 2023 before Judge Manor in the 80th Judicial District Court.

**D.    Azeemeh Decides to Conspire with Bank of Kuwait So It Could Foreclose On the Building.**

41.    After the September 21, 2023 entry of the Temporary Injunction, some ironic, if not strange, events start taking place with respect to Ms. Zaheer and the Galleria 2425 Owner, LLC. First, it is against Azeemeh Zaheer and Naissance's financial interests if the Bank of Kuwait forecloses.

42.    Second, on information and belief, Zaheer caused a copy of the Temporary Injunction Entered on September 21, 2023 by the 80th Judicial District Court in Harris County to be sent to counsel for the Bank of Kuwait, who in turn immediately wrote a letter to Judge Lopez, the Bankruptcy Judge in charge of Galleria 2425 Owner, LLC's Bankruptcy, and the Judge who has approval authority over Galleria 2425 Owner, LLC's Plan. (Not exactly helpful in getting a Plan of Reorganization approved.)

43.    Third, Zaheer's attorneys (Mr. Tang and Mr. Drinnon) show up without any forewarning at the October 12, 2023 status conference in the Bankruptcy Court about the plan, claiming Azeemeh Zaheer now is the manager of Naissance Galleria, LLC and they have been hired by her to represent Naissance Galleria, LLC, all by virtue of the Temporary Injunction.

44.    They again made pleas to the court regarding Zaheer's desire to take over the 2425 Building, stating the Temporary Injunction gave them sole authority to represent Naissance, and Naissance did not want to sue the Bank of Kuwait for breach of the Settlement Agreement as it had already done under Mr. Choudhri's rightful management.

**E.**     **Zaheer Changes Sides to Make a Deal with the Bank of Kuwait and Extort Money from Mr. Choudhri.**

45.     Progressively, Azeemeh Zaheer's behavior becomes more inexplicable as she instructs her attorneys to: (1) take the position that the Temporary Injunction put her in charge of Naissance (it did not);[1] (2) that Naissance Galleria, LLC could or had already become the owner of Galleria 2425 Owner, LLC) and as the new owner, they might want to take the bankruptcy in another direction.

46.     **The only explanation for Zaheer's extraordinary behavior, which appears self-destructive, is Zaheer sees the opportunity to make a deal with the Bank of Kuwait or extort Mr. Choudhri, who will lose millions of dollars of equity in the building if a foreclosure takes place**.

47.     This created an environment of confusion for the Bankruptcy Court, which was by Defendants' design, and it was a concerted effort by the Defendants to have the bankruptcy case dismissed, allowing the Bank of Kuwait to foreclose.  Defendant NBK would not be impeded by the bankruptcy and Zaheer could tell Mr. Choudhri, "I will not go along with your reorganization plan unless you pay me millions of dollars" while making a deal with the Bank of Kuwait to block the Plan of Reorganization in the event no payment was received from Mr. Choudhri.

---

[1] At a hearing had in the issuing court (the 80th Judicial District Court) on Monday, November 13, 2023, the Court confirmed her Temporary Injunction Order had not turned control of Naissance over to Zaheer and Zaheer had no authority to authorize attorneys to make the filing and take the action they had on behalf of Naissance Galleria, LLC in the Bankruptcy.

001065

48.     The Defendants are working in concert, to achieve the same end.  Specifically, the Defendants have devised, and intended to devise, a scheme or artifice to seize the 2425 Building by any means necessary.  Defendants will stop at nothing to see the Plaintiff lose any interest it has in  the 2425 Building

49.     Defendants' scheme has involved false representations of material information, including but not limited to misrepresentations concerning the Plaintiff and the purpose and effects of the Temporary Injunction.

**F.     False Representations by Zaheer's Agents are Successful in Getting Galleria 2425 Owner LLC's Bankruptcy Dismissed.**

50.     The Bankruptcy Court scheduled a Status Conference for  Galleria 2425 Owner, LLC's Bankruptcy Case for November 1, 2023.  Azeemeh's agents, on October 31, 2023, only hours before the Status Conference, filed an Emergency Motion.  This Motion contained many misrepresentations, some of which follow:

a)     Even though Zaheer had no right to or standing necessary to file anything on behalf of  Naissance, and the Temporary Injunction gave Zaheer no such rights, statements were made in their Emergency Motion directly to the contrary, stating Azeemeh Zaheer was in, Choudhri was out.

b)     The filing stated flatly at one point that the Assignment had been found to be forged – it had not.

c)     The filing stated that, because of the Temporary Injunction, Naissance was now controlled exclusively by Zaheer, who could make Naissance become the Owner of the Bankrupt.  (The issuing court on Monday, November 13, 2023, ruled from the bench it said no such thing.)

These  misrepresentations  had  the  desired  effect,  and  the  Bankruptcy  Court  dismissed  the Bankruptcy, green-lighting the Bank of Kuwait to foreclose.

001066

**G.     Abdullatif is Choudhri's Competitor and Wants to Ruin Him.**

51.     Choudhri has been in the real estate investment and management business for the last 20 years.  The regular course of Choudhri's business involves numerous aspects of real estate development.   These activities include real estate and business acquisitions and dispositions, seeking and obtaining financing, and developing and managing commercial and residential properties.  He regularly raises capital for these activities through the issuance of equity and/or debt.  It is also within his normal course of business to enter into transactions with borrowers, lenders, and investors to support the purchase, development, and operations of real estate properties.

52.     Choudhri at times conducts his real estate investment and management business through the use of special purpose entities, such as Plaintiff Galleria Owner 2425, LLC.  Choudhri runs a management company, Jetall Companies, Inc. ("*Jetall*"), to provide employees and management services to entities for purposes of operating real estate investments.

53.     Abdullatif has provided financing for numerous third-party claims against Choudhri, including interfering with Choudhri's final divorce proceedings in both Pakistan Supreme Court and Harris County District Court by soliciting Choudhri's ex-wife for her legal claims against Choudhri and/or his entities and to gain access to Choudhri's protected financial disclosures.

54.     Upon information and belief, Abdullatif is also financing the litigation expenses of Zaheer against Choudhri in the dispute over the building owned by Plaintiff.  Zaheer has agreed to the enterprise course of action aimed at destroying Choudhri's business, and either taking possession of the 2425 Building or extorting money from him to agree to a plan of reorganization.

001067

55.    On more than one occasion, Abdullatif resorted to violence and threats against Choudhri and/or his family, friends, and associates.  Mr. Choudhri had another real estate venture involving an entity called Dalio.  Abdullatif was present at Dalio's foreclosure proceeding, where a friend accompanying him assaulted one of Choudhri's lawyers. On another occasion, Abdullatif and his associates used firearms to hold Choudhri and his associates hostage.

56.    Abdullatif also formed an association with others in his illegal efforts to destroy Choudhri's business.  These individuals include but are not limited to Chris Wyatt, former Chief Operating Officer of Jetall ("**Wyatt**").

57.    Wyatt was hired by Jetall in 2019.  In the course of his employment, Wyatt oversaw legal and litigation matters for Jetall.  He was provided confidential information concerning Jetall's and its client's real estate transactions, finances and debt leverage on properties, and litigation management strategies.  As a Jetall representative, Wyatt was regularly involved in and provided access to privileged information and communications, including information subject to attorney-client and work product privileges.  Wyatt signed a non-disclosure agreement at the beginning of his employment prohibiting him from disclosing confidential information and requiring him to return all files upon his termination.

58.    Wyatt's employment at Jetall ended in December 2020.  When he left Jetall, Wyatt stole corporate files including electronic communications and secretly recorded privileged phone communications between Choudhri and his attorneys.

59.    Jetall obtained a restraining order in January 2021 enjoining Wyatt from disclosing or divulging confidential information obtained through his course of employment with Jetall.

60.    Abdullatif met with Wyatt immediately following Wyatt's departure from Jetall. Abdullatif, directly and through his lawyers, received confidential and privileged information from

001068

Wyatt. This information included but is not limited to illegal recordings of Choudhri's conversations with attorneys.

61.    Upon information and belief, Abdullatif and his agents were aware that Wyatt was a former employee of Jetall who was involved in confidential and privileged communications and that a restraining order was entered enjoining Wyatt from disclosing confidential information.

62.    Abdullatif and his agents have used the illegally obtained information and recordings as part of Abdullatif's scheme to destroy Choudhri's business. Abdullatif retained Wayne Dolcefino ("***Dolcefino***") as a "consultant" to publish on the internet a series of hit pieces on Choudhri. Dolcefino advertises that his services included "litigation support," and Abdullatif has utilized Dolcefino in the course of his numerous lawsuits asserted against Choudhri and his businesses.

63.    Information illegally obtained from Wyatt is included in many of Dolcefino's hit pieces. Dolcefino continues to publish these hit pieces on the internet, including videos posted in May 2023.

64.    Abdullatif, with the assistance of Drinnon, now representing Azeemeh Zaheer, has made several false claims against his competitor, Choudhri, in many ways, two of the most egregious being:

a)    Hiring Dolcefino to create video "hit pieces" about Choudhri, his business, his marital status, and inappropriate character based upon his actions during that marital status. This video contained "over the top" falsehoods, e.g. that he was still married and had been for years. It was commercial speech designed to designate a competitor (Choudhri) and give Abdullatif a competitive advantage, and was introduced into interstate commerce by release to major television (broadcast and cable) networks and by placing on the internet where it still resides today, making it available to the potential customers and lenders that are competed for; and

001069

b)     Placing multiple improper Lis Pendens on the record title to properties owned by Choudhri or his business entities, which created a double negative effect on Choudhri's ability to conduct business by hampering his ability to find new lenders or renewing existing loans because the security for them was impaired and making it impossible to sell those properties to raise new capital on his own. These Lis Pendens were "over the top" misrepresentations because they were illegal and did not assert valid interests in the subject properties. The Lis Pendens were also introduced into interstate commerce because they were filed of record and were available "online" over the internet to any potential customer for commercial real estate in the Houston area.

**V.**

**CAUSES OF ACTION**

**COUNT 1: BREACHES OF CONFIDENTIAL SETTLEMENT AGREEMENT**

65.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

66.    Plaintiff and Defendant reached a valid and enforceable agreement expressly set forth in the Confidential Settlement Agreement. Pursuant to the Confidential Settlement Agreement, Defendant agreed to keep the contents and terms of the parties' agreement completely confidential.

67.    Defendant breached the Confidential Settlement Agreement by disclosing its contents and terms to third parties in violation of the agreement's express confidentiality provisions. These disclosures prevented the sale of the 2425 Building and chilled the market for other buyers.. The same is true for NBK's wrongful, early filing of a notice of foreclosure on the 2425 Building, also in violation of the Confidential Settlement Agreement.

001070

68.    Plaintiff hereby sues NBK for these breaches of the Confidential Settlement Agreement.  The damages for these breaches are the amounts of money that the Plaintiff would have made from the contemplated transaction

### COUNT 2:  TORTIOUS INTERFERENCE WITH CONTRACT

69.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

70.    As alleged, NBK tortiously interfered with the SIBS International contract and the Caldwell Soames Inc. contract, causing damages to the Plaintiff, but for NBK's interference, would have been paid to the Plaintiff.

71.    Zaheer, tortiously interfered with Plaintiff's contract with NBK, and with Plaintiff's bankruptcy proceeding.

### COUNT 3:  TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

72.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

73.    After NBK's disclosures of the situation created by the confidential settlement and the wrongful posting for foreclosure during a judicial extension of the grace period contained in that agreement, potential buyers of the property who would otherwise have become good prospects to negotiate a sale with Galleria 2425 Owner, LLC became instead potential purchasers from NBK of the NBK note and began contacting and negotiating or attempting to negotiate with NBK instead of Galleria 2425 Owner, LLC  NBK interfered with these potential purchasers and with these potential business relationships.  At least the following were interfered with in this fashion:

a)    Globix Investment,
b)    Ironwood Commercial Realty,
c)    Shah Firm, LLC, and

Page **22** of **29**

d)    Jeb Brown Law.

74.    Zaheer,  has interfered with the Plaintiff's relationship with NBK

75.    This interference by the Zaheer damaged Plaintiff in amounts to be determined after discovery

### COUNT 4:  FRAUD AND FRAUDULENT INDUCEMENT

76.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

77.    NBK never had any intention of living up to the Confidential Settlement Agreement.  The Galleria 2425 Owner, LLC was winning the lawsuit against NBK, so NBK induced the Plaintiff into entering into the Confidential Settlement Agreement which NBK had no intention of living up to.  This fraud works as an estoppel against NBK Plaintiff hereby sues NBK for fraud and fraudulent inducement

78.    NBK knew at the time it entered into the Confidential Settlement Agreement it would deflect and tortiously interfere with the Galleria 2425 Owner, LLC's attempts to sell the 2425 Building so NBK would be able to foreclose on the building and take all of the value instead of just the value of the amounts otherwise owed at the time.  The fraud, fraud in the inducement, and subsequent interference for all of which Plaintiff hereby sues NBK.

### COUNT 5:  BUSINESS DISPARAGEMENT

79.    Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

80.    The posting of the 2425 Building during any negotiation periods and/or the extended grace period when actual buyers were moving toward concluding a deal and when other

Page **23** of 29

potential buyers were expressing interest in the 2425 Building, constituted business disparagement against the Plaintiff for which Plaintiff hereby sues NBK.

81.     The efforts of Zaheer to make false accusations and representations about the Plaintiff's ownership interests, management, and decision making abilities constituted business disparagement against the Plaintiff for which the Plaintiff hereby sues Zaheer.

82.     The business disparagement by the Defendants damaged Plaintiff in amounts to be determined after discovery.

## COUNT 6:  UNJUST ENRICHMENT

83.     Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

84.     If NBK is allowed to foreclose on the 2425 Building it will make an unconscionable profit and succeed in its "loan to own" gambit. The amount of its unjust enrichment for which Plaintiff hereby sues NBK is the difference between what NBK would have been owed (but for its breaches of the Confidential Settlement Agreement) under the Confidential Settlement Agreement and the true value of the building, for which Plaintiff hereby sue NBK.

## COUNT 7:  CONSPIRACY

85.     Defendants Zaheer, in combination with NBK, agreed to work in concert with each other in order to interfere with Plaintiff's bankruptcy case, and to have it dismissed by making fraudulently claiming they had control over Naissance Galleria, LLC.

86.     Defendants Zaheer, and NBK acted with the intent to harm plaintiff.

87.     To accomplish the object of their agreement Zaheer, and NBK intentionally or negligently mischaracterized the effect of the state court temporary injunction, in order to confuse and disrupt Plaintiff's bankruptcy case, which resulted in dismissal.

001073

88.     The agreement to engage in this conduct proximately caused injury to plaintiff. Plaintiff's interests in Galleria 2425 Owner, LLC's sole asset, instead of being protected through a bankruptcy action, has now been posted for foreclosure on December 5th, 2023, which will irreparably harm Plaintiff.

### COUNT 8:  ATTORNEYS' FEES

89.     Plaintiff repeats and realleges the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

90.     Plaintiff hereby sue Defendants for its reasonable and necessary attorneys' fees under breach of contract and under any statutory or common law right to recover same.

### VI.
### APPLICATION FOR TEMPORARY INJUNCTION OR ORDER

91.     The Defendants have conspired with each other and others, or worked in parallel courses to get the bankruptcy of Plaintiff 2425 Galleria Owner, LLC dismissed so that Bank of Kuwait is not prohibited by the automatic stay from foreclosing.  If a foreclosure takes place, the equity of Plaintiff will be wiped out and Plaintiff will have no assets and no adequate remedy at law to return the retrieve the assets or its value.

92.     Temporary injunctive relief is necessary until such time as the merits of this case can be decided and the status quo is maintained pending resolution on the merits.

### APPLICATION FOR TEMPORARY RESTRAINING ORDER

93.     Plaintiff's application for a temporary restraining order is authorized by Tex. Civ. Prac. & Rem. Code §65.011(1) which allows applicants to the relief sought to restrain the Defendants from prejudicial acts; by Tex. Civ. Prac. & Rem. Code §65.011(3) which allows applicants to the relief sought under the principles of equity and laws of Texas related to

001074

injunctions; by Tex. Civ. Prac. & Rem. Code § 65.011(5) which allows applicants to the relief sought when irreparable injury to business, good will, reputation and personal property is threatened; and by Tex. Bus. Orgs. Code § 152.211(b), allowing partners in a partnership to obtain an injunction to enforce rights under the Texas Business Organizations Code.

94.    As set forth above, an emergency hearing on Plaintiff's Application for Temporary Restraining Order is necessary to conserve the Plaintiff's business status and maintain the status quo during the pendency of this lawsuit. Plaintiff would suffer material injury by the delay necessary to give notice. Any delay necessary for notice would lead to imminent and irreparable injury to property.

95.    It is probable that Plaintiff will recover from Defendants after a trial on the merits because the facts set forth are verified and sets forth the Defendants wrongful conduct; and actions including seeking the sale of the business by the Defendants are wrongful and must be stopped.

96.    If Plaintiff's application is not granted, harm is imminent because 1) Galleria 2425 Owner, LLC's  sole asset will be foreclosed as a result of Defendants harmful actions on December 5th, 2023; 2) Defendants will continue to conspire with each other in a manner that is counter to the true interests of Naissance Galleria, LLC; and 3) Defendants will continue to  violate the Temporary Injunction, as they have already done on at least three occasions, in order to interfere with Plaintiff's lawful attempts to preserve the 2425 Building. These harms are imminent and would cause irreparable injury with no other adequate legal remedy.

97.    The harm that will result if the temporary restraining order is not issued is irreparable because Plaintiff has an interest in a unique piece of real estate which it will be wiped out in the event of foreclosure. Texas Courts repeatedly rule that "every piece of **real estate** is innately  [**8] unique. *See, e.g., Greater Houston Bank v. Conte*, 641 S.W.2d 407, 410 (Tex.

001075

App.--Houston [14th [*58] Dist.] 1982, no writ) ("It is well established law that each and every piece of **real estate** is unique. Therefore, if appellants were allowed to foreclose appellees would be irreparably harmed, since **real estate** is so unique."); *El Paso Dev. Co. v. Berryman*, 729 S.W.2d 883, 888 (Tex. App.--Corpus Christi 1987, no writ) ("Every piece of **real estate** is unique, and if foreclosure were allowed before a full determination of the usury claim, appellee would be irreparably harmed."). *Kotz v. Imperial Capital Bank*, 319 S.W.3d 54, 57-58 (Tex. App.—San Antonio 2010, no pet.).

## VII.<u>JURY DEMAND</u>

98.    Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## VIII. <u>PRAYER</u>

99.    For the reasons set forth above, Plaintiff asks that the Court enter a Temporary Restraining Order, and after a hearing, a Temporary Injunction, enjoining the Defendants in the following manners:

a)     NBK is restrained from 1) Foreclosing on, posting, reposting, or otherwise selling at auction the 2425 Building; and 2) transferring any Note and/or lien it holds or may hold relating to the 2425 Building; or 3) or interfering with the Plaintiff's business in any manner, including by acting in concert with another party.

b)     Actual damages including economic injuries & consequential damages;

c)     Attorney's fees;

d)     Exemplary damages;

Page **27** of **29**

e)      Prejudgment and post judgment interest;

f)      Court costs; and

g)      All other relief to which Plaintiff is entitled under both law and equity.

100.    Plaintiff is willing to post bond.

Respectfully submitted,

**MATÍAS J. ADROGUÉ PLLC**

By: _____
Matías J. Adrogué
Texas State Bar No. 24012192
Leila M. El-Hakam
Texas State Bar No. 24007147
1629 West Alabama St.
Houston, Texas 77006
713-425-7270 *Telephone*
713-425-7271 *Facsimile*
service@mjalawyer.com
**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing has been served to all counsel of record by hand delivery, fax transmittal, Certified mail, return receipt requested, electronic mail, e-service, and/or U.S. Mail, on this the 29th day of November, 2023.

_____
Matías J. Adrogué

Page **28** of **29**

001077

JURAT

My name is Ali Choudhri, my date of birth is 01/24/1980. My office address is 1001 West Loop South, Suite 700, Houston, Texas 77027.  I declare under penalty of perjury that the facts and events set forth in the foregoing Amended Petition and Emergency Application for Temporary Restraining Order are within my personal knowledge and are true and correct.

Executed in Harris County, State of Texas, on November 29, 2023.

_____/s/Ali Choudhri_____
Ali Choudhri

Page **29** of **29**

001078

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Matias Adrogue
Bar No. 24012192
mja@mjalawyer.com
Envelope ID: 82036951
Filing Code Description: Amended Filing
Filing Description: Plaintiff's Amended Petition & Application for TRO
Status as of 11/29/2023 10:15 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jerry CAlexander | | alexanderj@passmanjones.com | 11/29/2023 9:17:40 AM | SENT |
| Ruth NVera | | verar@passmanjones.com | 11/29/2023 9:17:40 AM | SENT |
| Sheryl Chandler | | chandlers@passmanjones.com | 11/29/2023 9:17:40 AM | SENT |
| Jennifer LMacGeorge | | jmac@jlm-law.com | 11/29/2023 9:17:40 AM | SENT |
| Jetall Legal | | legal@jetallcompanies.com | 11/29/2023 9:17:40 AM | SENT |
| Omar Khwaja | | service@attorneyomar.com | 11/29/2023 9:17:40 AM | SENT |
| James Pope | | jamesp@thepopelawfirm.com | 11/29/2023 9:17:40 AM | SENT |
| Omar Khawaja | 24072181 | Omar@attorneyomar.com | 11/29/2023 9:17:40 AM | SENT |
| David Tang | 24014483 | dtangattorney@gmail.com | 11/29/2023 9:17:40 AM | SENT |
| MacGeorge Law Firm Admin | | service@jlm-law.com | 11/29/2023 9:17:40 AM | SENT |

Unofficial Copy Office of Marilyn Burgess District Clerk

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
November 25, 2024
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 23-34815 |
| GALLERIA 2425 OWNER, LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | CHAPTER 11 |

### ORDER DENYING MOTION (ECF 810)

Before the Court is the Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan filed by Ali Choudhri ("Choudhri") and the National Bank of Kuwait's ("NBK") Response to Ali Choudhri's Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan (ECF No. 824).  For the following reasons the motion is denied, with prejudice.

Choudhri by motion seeks to challenge or modify the "gatekeeping provisions" of the confirmed Chapter 11 Plan in this case so that he can continue to litigate with NBK.  The Court stresses that the effect of the confirmed plan was to end the vexatious litigation between entities controlled by Choudhri and NBK.  Choudhri continues to raise factual and legal issues which this Court has already considered and rejected.

The confirmed plan is under appeal but not by Choudhri only by a company he controls.  The Court doubts that Choudhri has standing to make the claims he makes by motion.  Irrespective of his lack of standing, he like all parties are bound by the terms of the confirmed plan.[1]  There was no stay pending appeal and the Court continues to stand on the record in this case.  If this Court has erred in any of its "gatekeeping provisions" then it welcomes an appropriate appellate review, which the Court assumes is ongoing.  However, it will not revisit factual and legal issues that it has already litigated. The Court cannot sufficiently stress that Choudhri continues to raise and argue the same basic facts and claims that this Court has found lacked foundation and merit.

Choudhri's claims the Court has not considered the factual and legal arguments he makes in his motion.  The Court strongly rejects any such claim. The Court has had ample opportunity to assess Mr. Choudhri's factual and legal arguments and has repeatedly rejected them.  Choudhri's purpose for pursuing these claims is improper and clearly vexatious.

---

[1] Section 1141(a) of the Bankruptcy Code explicitly states that a confirmed plan is binding on all parties.

The motion is all things denied, with prejudice.  The movant is warned that future ongoing litigation at the trial court level is subject to sanctions by this Court.

**SO ORDERED.**

SIGNED 11/25/2024

_____
Jeffrey Norman
United States Bankruptcy Judge

2 / 2

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

<table>
<tr><td>In re:</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Chapter 11</td></tr>
<tr><td>GALLERIA 2425 OWNER, LLC,</td><td>)</td><td>Case No. 23-34815</td></tr>
<tr><td>Debtor.</td><td>)</td><td></td></tr>
</table>

**NOTICE OF APPEAL**

Notice is hereby given that creditor and real party in interest Ali Choudhri files this appeal to the United States District Court for the Southern District of Texas from the following order:

    a. the "Order Denying Motion (ECF 810)" [Dkt. No. 833], attached as **Exhibit 1**;

Ali Choudhri is a creditor and real-party-in-interest in this bankruptcy case.

The other parties to the appeal and their attorneys include the following:

Galleria 2425 Owner, LLC

*Debtor*

Reese W Baker
Baker & Associates
950 Echo Lane
Suite 300
Houston, TX 77024
713-869-9200
Fax : 713-869-9100
courtdocs@bakerassociates.net

James Q. Pope
The Pope Law Firm
6161 Savoy Drive
Ste 1125
Houston, TX 77036
713-449-4481
ecf@thepopelawfirm.com

Jeffrey W Steidley
Steidley Law Firm
3000 Weslayan
Ste 200
Houston, TX 77027
713-523-9595
Jeff@texlaw.us

001083

| Christopher R Murray, | **Christopher R Murray** |
| | Jones Murray LLP |
| *Trustee* | 602 Sawyer St |
| | Ste 400 |
| | Houston, TX 77007 |
| | 832-529-1999 |
| | Fax : 832-529-3393 |
| | chris@jonesmurray.com |

**R. J. Shannon**
**Kyung Shik Lee**
Shannon & Lee LLP
2100 Travis Street, STE 1525
Houston, TX 77002
713-714-5770
rshannon@shannonleellp.com
klee@shannonleellp.com

| National Bank of Kuwait-New York Branch | Charles C. Conrad |
| | Ryan Steinbrunner |
| *Plan proponent* | 609 Main Street Suite 2000 |
| | Houston, TX 77002 |
| | Telephone: (713) 276-7600 |
| | Facsimile: (713) 276-7634 |
| | charles.conrad@pillsburylaw.com |
| | ryan.steinbrunner@pillsburylaw.com |

Andrew M. Troop
Patrick E. Fitzmaurice
 Kwame O. Akuffo
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com

3

Respectfully submitted,

*/s/ J. Carl Cecere*

J. Carl Cecere
State Bar No. 13268300
(admitted pro hac vice)
**Cecere PC**
6035 McCommas Blvd.
Dallas, TX 75206
Telephone: 469-600-9455

*Attorney for 2425 WL, LLC and*
*Ali Choudhri*

4

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 9th day of December, 2024, a true and correct copy of the foregoing was served on the following in accordance with the CM/ECF e-filing system, and upon all others who have consented to service in this case by registering to receive notices in this case through the CM/ECF e-filing system.

Christopher R Murray
Jones Murray LLP
602 Sawyer St
Ste 400
Houston, TX 77007
832-529-1999
Fax : 832-529-3393
chris@jonesmurray.com

Charles C. Conrad
Ryan Steinbrunner
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

R. J. Shannon
Shannon & Lee LLP
2100 Travis Street, STE 1525
Houston, TX 77002
713-714-5770
rshannon@shannonleellp.com

Andrew M. Troop
Patrick E. Fitzmaurice
Kwame O. Akuffo
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com

Kyung Shik Lee
Shannon and Lee LLP
2100 Travis St.
Ste 1525
Houston, TX 77002
713-301-4751
klee@shannonleellp.com

Reese W Baker
Baker & Associates
950 Echo Lane
Suite 300
Houston, TX 77024
713-869-9200
Fax : 713-869-9100
courtdocs@bakerassociates.net

James Q. Pope
The Pope Law Firm
6161 Savoy Drive
Ste 1125
Houston, TX 77036
713-449-4481
ecf@thepopelawfirm.com

Jeffrey W Steidley
Steidley Law Firm
3000 Weslayan
Ste 200
Houston, TX 77027
713-523-9595
Jeff@texlaw.us


*/s/ J. Carl Cecere*

**J. Carl Cecere**

EXHIBIT 1

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
November 25, 2024
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-34815** |
| **GALLERIA 2425 OWNER, LLC,** | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | **CHAPTER 11** |

<u>**ORDER DENYING MOTION (ECF 810)**</u>

Before the Court is the Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan filed by Ali Choudhri ("Choudhri") and the National Bank of Kuwait's ("NBK") Response to Ali Choudhri's Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan (ECF No. 824). For the following reasons the motion is denied, with prejudice.

Choudhri by motion seeks to challenge or modify the "gatekeeping provisions" of the confirmed Chapter 11 Plan in this case so that he can continue to litigate with NBK. The Court stresses that the effect of the confirmed plan was to end the vexatious litigation between entities controlled by Choudhri and NBK. Choudhri continues to raise factual and legal issues which this Court has already considered and rejected.

The confirmed plan is under appeal but not by Choudhri only by a company he controls. The Court doubts that Choudhri has standing to make the claims he makes by motion. Irrespective of his lack of standing, he like all parties are bound by the terms of the confirmed plan.[1] There was no stay pending appeal and the Court continues to stand on the record in this case. If this Court has erred in any of its "gatekeeping provisions" then it welcomes an appropriate appellate review, which the Court assumes is ongoing. However, it will not revisit factual and legal issues that it has already litigated. The Court cannot sufficiently stress that Choudhri continues to raise and argue the same basic facts and claims that this Court has found lacked foundation and merit.

Choudhri's claims the Court has not considered the factual and legal arguments he makes in his motion. The Court strongly rejects any such claim. The Court has had ample opportunity to assess Mr. Choudhri's factual and legal arguments and has repeatedly rejected them. Choudhri's purpose for pursuing these claims is improper and clearly vexatious.

---

[1] Section 1141(a) of the Bankruptcy Code explicitly states that a confirmed plan is binding on all parties.

001089

The motion is all things denied, with prejudice. The movant is warned that future ongoing litigation at the trial court level is subject to sanctions by this Court.

**SO ORDERED.**

      SIGNED 11/25/2024

Jeffrey Norman
United States Bankruptcy Judge

2 / 2