# THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| **In re:** | ) | |
| | ) | **Chapter 11** |
| **GALLERIA 2425 OWNER, LLC,** | ) | **Case No. 23-34815** |
| Debtor. | ) | |
| | ) | |
| **ALI CHOUDHRI,** | ) | |
| Appellant, | ) | |
| **v.** | ) | **Civil Action No. 4:24-cv-04836** |
| **NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,** | ) | |
| Appellee. | ) | |

_____

## APPELLANT'S BRIEF
_____

J. Carl Cecere
State Bar No. 13268300
(admitted pro hac vice)
**Cecere PC**
6035 McCommas Blvd.
Dallas, TX 75206
Telephone: 469-600-9455
ccecere@cecerepc.com

*Counsel for Appellant Ali Choudhri*

**TABLE OF CONTENTS**

Table of citations.................................................................................... iii

Jurisdictional statement........................................................................... vi

issues presented...................................................................................... vii

Statement of the case................................................................................2

Summary of the argument.......................................................................10

Argument.................................................................................................12

I.     The Bank cannot invoke the Plan's Gatekeeper provision to dismiss any of the claims against the Bank in the Challenged Litigation................ 12

     A.    Bankruptcy courts' gatekeeping powers can only be invoked to protect trustees and other court-appointees—not private parties serving in no official bankruptcy capacity like the Bank................. 12

     B.    Bankruptcy courts' gatekeeping powers have been significantly constrained by the Supreme Court's decision in *Purdue Pharma*. .................................................................................. 16

     C.    The Court exceeded its jurisdiction by dismissing the Challenged Litigation. ...................................................... 17

II.    The claims raised against the Bank satisfy the Plan's gatekeeping provision because they raise colorable lender-liability claims that the Plaintiffs have standing to pursue................................................ 19

Prayer………………..…………………………………………………...30

Certificate of service .............................................................................31

Certificate of compliance with type-volume limit...................................32

# TABLE OF CITATIONS

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................20

*Bailey Tool & Mfg. Co., et al. v. Republic Bus. Credit
  (In re Bailey Tool & Mfg. Co.)*,
  Adv. No. 16-03025-SGJ (Bankr. N.D. Tex. December 23, 2021)........................26

*Barton v. Barbour*,
  104 U.S. 126 (1881) ....................................................................... passim

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................20

*Casias v. Wal-Mart Stores, Inc.*,
  695 F.3d 428 (6th Cir. 2012)..........................................................................20

*Celotex Corp. v. Edwards*,
  514 U.S. 300 (U.S.1995) .................................................................................18

*Coyne v. Am. Tobacco Co.*,
  183 F.3d 488 (6th Cir. 1999)............................................................................21

*Dixon v. Brooks*,
  604 S.W.2d 330 (Tex. Ct. App. 1980) ..............................................................25

*Feld v. Zale Corp. (In re Zale Corp.)*,
  62 F.3d 746 (5th Cir. 1995)..............................................................................18

*Harrington v. Purdue Pharma L.P.*,
  144 S. Ct. 2071 (2024) ..................................................................... passim

*Highland Capital Mgmt. Fund Advisors, L.P. v.
  Highland Capital Mgmt., L.P.*,
  132 F.4th 353 (5th Cir. 2025)..........................................................................16

*In re Christensen*,
  598 B.R. 658 (Bankr. D. Utah 2019)................................................................14

*In re Circuit City Stores, Inc.*,
  557 B.R. 443 (Bankr. E.D. Va. 2016) ..............................................................13

*In re DMW Marine, LLC*,
   509 B.R. 497 (Bankr. E.D. Pa. 2014).......................................................................14

*In re Foster*,
   No. 22-10310, 2023 WL 20872 (5th Cir. Jan. 3, 2023) (per curiam) ..................14

I*n re Katrina Canal Breaches Litig*.,
   495 F.3d 191, 205 (5th Cir. 2007).........................................................................21

I*n re Ondova Ltd. Co*.,
   914 F.3d 990 (5th Cir. 2019)..................................................................................14

*Jones v. First Nat'l Bank of Anson*,
   846 S.W.2d 107 (Tex. Ct. App. 1992, no writ)............................................. 25, 28

*Lamar Sav. Ass'n v. White*,
   731 S.W.2d 715 (Tex. Ct. App. 1987) ...................................................................25

*Matter of Walker*,
   51 F.3d 562 (5th Cir. 1995).....................................................................................18

*NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P.*
   *(In re Highland Cap. Mgmt., L.P.)*,
   48 F.4th 419 (5th Cir. 2022)...................................................................... 13, 14, 15

*Overholt v. Purina Animal Nutrition LLC*, Case No. 1:14-CV-1216, 2015 WL
   1631855, at *2 (W.D. Mich. Apr. 13, 2015).........................................................20

*Phoenician Mediterranean Villa, LLC v. Swope (In re J & S Props., LLC)*,
   545 B.R. 91 (Bankr. W.D. Pa. 2015)......................................................................14

*Rey v. Acosta*,
   860 S.W.2d 654 (Tex. Ct. App. 1993) ...................................................................25

*State Nat'l Bank v. Farah Mfg. Co*.,
   678 S.W.2d 661 (Tex. Ct. App. 1984) ...................................................................25

*Tufts v. Hay*,
   977 F.3d 1204 (11th Cir. 2020).............................................................................19

*Villegas v. Schmidt*,
   788 F.3d 156 (5th Cir. 2015)..................................................................................13

*Williams v. National Mortg. Co.*,
  903 S.W.2d 398, 404 (Tex. Ct. App. 1995) .................................................. 25, 28

**Statutes**

11 U.S.C. § 541(a)) ...........................................................................................28

28 U.S.C. § 1334. ..............................................................................................18

**Rules**

Fed. R. Bankr. P. 8015(a)(5) ............................................................................31

Fed. R. Bankr. P. 8015(a)(7)(B)(i) ...................................................................31

**Other Authorities**

J. Macey, *Corporation Laws* (2020–4 Supp.) ..................................................28

COLLIER ON BANKRUPTCY (16th ed. 2023) ..................................................13

Metropolitan Corporate Counsel, *Liability Awaits the Unwary: Lenders and Leasing Decisions* (Dec. 13, 2004) .....................................................................25

## JURISDICTIONAL STATEMENT

This case arises from the Chapter 11 bankruptcy of Galleria 2425 Owner, L.L.C., which was filed on December 5, 2023. (ROA.000001.) The Bankruptcy Court had jurisdiction over the bankruptcy under 28 U.S.C. §§ 157(a)-(b), 1331, and 1334(a).

The Bankruptcy Court entered the order on appeal on November 25, 2024. (ROA.001080.) On December 9, 2024, Appellant timely appealed that order to this Court (ROA.001082), which has jurisdiction over the appeal under 28 U.S.C. § 158(a)(1).

## ISSUES PRESENTED

On November 25, 2024, the Bankruptcy Court denied the Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan filed by Ali Choudhri, and ordered that Choudhri refrain from future ongoing litigation against the National Bank of Kuwait, S.A.K.P., New York Division, in the following cases:

*Naissance Galleria, LLC v. Zaheer, et al.*, Cause No. 2023- 43755, pending in the 80th District Court of Harris County, Texas;

*Galleria 2425, LLC, Naissance Galleria, LLC and Choudhri v. NBK*, Adversary Case No. 23-06009, pending in this Court; and

*Choudhri v. NBK and Zaheer*, Adversary Case No. 23-03263, pending in this Court.

(ROA.001080.)

This order gives rise to the following issue:

I.      Did the Bankruptcy Court have legal, factual, or evidentiary grounds to force Choudhri and entities associated with him to refrain from pursuing the above-mentioned claims against the Bank of Kuwait?

**INTRODUCTION**

When the National Bank of Kuwait, S.A.K.B., New York Branch ("NBK" or the "Bank") proposed the Plan of liquidation that was ultimately confirmed in this case (the "Plan") (Bankr. Dkt. 566 [App. 1]), the Bank snuck several provisions into its proposed plan that exist solely for its own benefit. The Bank originally included itself among the "Exculpated Parties" that enjoy the Plan's exculpation provision, and among the "Released Parties" covered by the Plan's third-party release, even though the Bank is not a debtor in bankruptcy and has no connection to the Debtor, Galleria 2425 WL Owner, LLC or the bankruptcy estate other than as a lender and creditor. (*See* Plan arts. I(A)(39) & (78); *id.* IX(C) & (D).) The Bank also granted itself the benefit of the Plan's Gatekeeping provision, which requires parties to *any* litigation against the Bank related to this bankruptcy—pending in any court, anywhere—to receive approval from the Bankruptcy Court before that litigation can continue. And parties must obtain that approval according to a procedure and standards appearing nowhere in the Bankruptcy Code or the federal rules that requires them to demonstrate those claims are "colorable" before gatekeeping permission will be granted.

No legitimate bankruptcy purpose is furthered by extending this Gatekeeping provision to the Bank. And the litigation that the Bankruptcy Court extinguished under the Gatekeeping provision has no connection to, or effect on, the Debtor, the

1

estate, or the Plan's consummation. It instead relates to the Bank's improper actions that drove the Debtor into bankruptcy. Extending the protection of the Gatekeeping provision to the Bank serves no legitimate bankruptcy-related purpose. It is simply the Bank's reward for proposing the plan that the Bankruptcy Court ultimately confirmed—a plan that already richly rewarded the Bank with the right to credit bid on the valuable asset at the center of this bankruptcy at a foreclosure sale the Bank itself arranged. The Bankruptcy Court therefore erred in extending the provision to cover the Bank and in extinguishing the Challenged Litigation pursuant to that provision.

## STATEMENT OF THE CASE

This is a single asset real estate case in which the Debtor's sole asset is the property at 2425 West Loop South, Houston, Texas 77027, which was designed by the legendary architect I.M. Pei. (ROA.0001.) The transaction at the center of this bankruptcy—and at the center of 2425 WL's claim—began when Appellant Ali Choudhri, who controlled the Debtor, sought to refinance the loan on the Property, which was then owned by 2425 WL, LLC.

Choudhri faced an unfortunate obstacle in this effort: Lenders were reluctant to provide a refinancing loan because of a fictitious lien that had been placed on the Property by Choudhri's vindictive former partner: Osama Abdullatif. (ROA.000280.)

2

The Bank agreed to provide the money to refinance the debt through a sale of the Property to a newly created business entity—the Debtor Galleria 2425 Owner, LLC (also owned by Choudhri), which would not be burdened by Abdullatif's fictitious liens. The Bank provided a $52 million first-priority mortgage loan to the Debtor. And 2425 WL provided $14.7 million in junior secured seller-provided financing. (Bankr. Dkt. No. 565 at 4; ROA.000971.)

The relationship between the Debtor, Choudhri, and the Bank was initially successful. But over time, the Bank made it progressively more difficult for the Debtor to pay back the loan. For example, the Bank thwarted the Debtor's efforts on at least *five* different occasions to sell interests in the building that would have cleared the Bank's debt—often through strategic declarations of defaults or foreclosure postings designed to discourage prospective buyers. (*See* ROA.000459, 0004630-65.) The Bank also ignored or refused to approve at least *nine* different offers to lease space in the building, further preventing the Debtor from raising funds to pay off the loan. (ROA.000459, 000462.)

The parties initiated and then settled litigation over these conflicts through a Confidential Settlement Agreement, which reduced the principal amount due under the loan. (Bankr. Dkt. No. 403-4; ROA.000020.) But the Bank breached the terms of the Confidential Settlement Agreement by disclosing the new loan balance to potential purchasers of the Property, thereby revealing the Debtor's financial

3

struggles, improperly impacting these prospective buyers' evaluation of the property's market value, "chill[ing] the market" for the Property, and converting these potential buyers of the Property from the Debtor into potential purchasers of the Bank's note. (ROA.000462, 000472-73.)

The Bank also actively attempted to wrest control of the Debtor and the Property from Choudhri by interfering with Choudhri's control of Naissance Galleria, LLC, which controlled the Debtor. The Bank worked in league with Azeema Zaheer, Choudhri's ex-girlfriend, who acted as his agent in running Naissance until Choudhri exercised his right to take over control of the company from her. (*See* ROA.000465-68.) And these efforts by the Bank and Zaheer were part of a larger effort by Choudhri's disgruntled business partner, Osama Abdullatif, to seize Choudhri's business interests by brute force and fraud.

This interference eventually made it impossible for the Debtor to keep operating, and it filed for Chapter 11 reorganization on December 5, 2023. (ROA.00001.) The Debtor, Naissance, and Choudhri himself all brought lawsuits against the Bank and others for driving the Debtor into bankruptcy and interfering with their attempts to manage the property (the "Challenged Litigation"), under the assumption that the proceeds from the lender liability claims against the bank would fund the reorganization. (ROA.000439, 000454.)

4

The Bank countered these mounting liabilities by wresting control of the reorganization process from the Debtor and using the bankruptcy process to avoid liability for the Debtor's demise. The Bank sought the appointment of a Chapter 11 Trustee, depriving Choudhri of control over the Debtor. (ROA.000072.) And on April 7, 2010, the Bank proposed the Plan, which prioritized its own interests over everyone else's—and specifically sought to disadvantage Choudhri and the entities he owns and controls. (Bankr. Dkt. No. 194.)

The centerpiece of the Bank's Plan was a series of provisions designed to prevent the Bank and those associated with it from being held accountable by anyone (including the Debtor, Choudhri, Naissance, or other creditors) for driving the Debtor into bankruptcy simply as its reward for proposing the Plan.

The Plan includes an "Exculpation" provision that protects certain "Exculpated Parties"—which originally included the Bank (Plan art. I(A)(39)) (Bankr. Dkt. 566 at 12)[1]—from any liability for their conduct during the bankruptcy

---

[1] As originally proposed, the Plan defined "Exculpated Party" to mean "(a) the Chapter 11 Trustee; (b) [the Bank]; (c) the Liquidation Trustee; (d) the Distribution Agent; (e) the Purchaser [of the Property]; (f) each current and former Affiliate of each Entity in clause (a) through the following clause (g)" along with every "Related Party," which includes "a Person, that Person's current and former, direct or indirect, directors, members, managers, officers, control persons, equity holders, partners, participants, managed accounts or funds, fund advisors or managers, investment managers, management companies, affiliates, predecessors, successors, assigns, subsidiaries, principals, employees, agents, trustees, financial advisors, attorneys, accountants, investment bankers, consultants, representatives,

5

itself, including for such acts as "filing, negotiating, prosecuting, administering, formulating, implementing, soliciting support or acceptance of, confirming or consummating" the Plan (*id*. art. IX(C), (Bankr. Dkt. 566 at 27)).[2]

The Plan also contains "Estate Releases" that protect all "Released Parties," which also include the Bank (Plan, art. I(A)(78))[3], from any claims that might be brought by the Debtor or the Estate—both before and after the commencement of

---

and other professionals and advisors, but does not include the Chapter 11 Trustee or Professionals employed by the Chapter 11 Trustee." (Plan, art. I(39), (Bankr. Dkt. 566 at 12); *id*., art. I(77), Bankr. Dkt. 566 at 15.)

[2] The full version of the Plan's "Exculpation" clause provides that "to the maximum extent permitted by the Bankruptcy Code and applicable law, no Exculpated Party shall have or incur any liability to any Person, including, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, filing, negotiating, prosecuting, administering, formulating, implementing, soliciting support or acceptance of, confirming or consummating this Plan, the Purchase Agreement, or the property to be distributed under this Plan, including all activities leading to the promulgation and Confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtor or this Chapter 11 Case; *provided*, *however*, that the foregoing exculpation shall not apply to any act of gross negligence or willful misconduct." (Plan, art. IX(C), Bankr. Dkt. 566 at 27.)

[3] The "Released Parties" include: (a) the Chapter 11 Trustee; (b) NBK; (c) the Liquidation Trustee, and (d) each Related Party of each Entity in clause (a) through this clause (d). For avoidance of doubt, the Debtor, its current and former equity holders and their Affiliates and Related Parties are not Released Parties." (Plan, art. I(78), Bankr. Dkt. 566 at 15.)

the bankruptcy. Among other things, these Releases granted the Bank protection from claims that concern "the money borrowed by the Debtor" (*id*. art. IX(D), Bankr. Dkt. 566 at 20.).

The Plan also contains a "Gatekeeper" provision that is broader than both the Exculpation and Release provisions combined. It prevents *anyone*, *anywhere*, from commencing or continuing any lawsuit against the Bank that relates in any way to the Property without first obtaining bankruptcy court approval. This Gatekeeping provision pertains to any "Person who has held, holds, or may hold Claims" that are "in any way *related* to the Debtor," so long as they are brought "against any Released *Party*" (which includes the Bank)—even if the claims themselves are not covered under the Estate Releases. (Plan, art. IX(E), Bankr. Dkt. 566 at 20-21) (emphasis added).) [4] This provision does not merely apply to claims arising *during* the

---

[4] The Gatekeeper provision is included in the Plan's "Injunction" clause, which provides: "Except as otherwise provided herein, on the Effective Date, the Confirmation Order shall constitute an injunction permanently enjoining any Person (excluding the Liquidation Trustee) that has held, currently holds or may hold a Claim, Action or liability that is released pursuant to Article IX(D) from enforcing or attempting to enforce any such Claim, Action or liability against any Released Party or any of their respective Property; *provided*, *further*, that no Person who has held, holds, or may hold Claims, Interests, or Action may commence or pursue a Claim or Action, as applicable, of any kind in any way related to the Debtor against any Released Party that arose before the Petition Date or arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the Debtor's business, the administration of the Liquidation Trust, or the transactions in furtherance of the foregoing without the Court (i) first determining, after notice and

7

bankruptcy but also covers claims that "arose *before* the Petition Date." (*Id.*) (emphasis added).

For all claims covered by the Gatekeeper provision, a party seeking to pursue claims against the Bank must give "notice" and obtain a "hearing" whereby it must demonstrate to the Bankruptcy Court that the claims asserted are valid before they can proceed. (Plan, art. IX(E), Dkt.566 20-21.) To demonstrate the validity of that claim, the party must show that the claim is "colorable" and that the party "has standing and is otherwise entitled to assert" it. (*Id.*)

The Gatekeeper provision therefore purports to convey to the Bankruptcy Court the authority to approve, control, adjudicate, and ultimately terminate claims in pending litigation—including cases pending in other courts—merely because that litigation is "related to the Debtor," according to a procedure appearing nowhere in the Code or the federal rules. And it allows the Bank to make use of this power to have the Bankruptcy Court dismiss claims that are not even released under the Plan.[5]

---

a hearing, that such claim or cause of action represents a colorable claim of any kind, including, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Released Party that such person has standing and is otherwise entitled to assert such claim or cause of action and (ii) specifically authorizing such Releasing Party to bring such claim or cause of action against any such Released Party." (Plan, art. IX(E), Bankr. Dkt. 566 at 20-21).)

[5] The Plan's Release, Exculpation, Injunction, and Gatekeeper provisions have all been challenged in an appeal that is pending before the United States Circuit

8

After the Bankruptcy Court approved the Plan (which automatically extinguished the Debtor's claims against the Bank), the Bank demanded that the remaining plaintiffs in the Challenged Litigation seek bankruptcy court approval before further pursuing those claims. (ROA.000009.) In response, the plaintiffs dismissed one of the cases, *Naissance Galleria, LLC v. NBK*, Cause No. 2023-41091. (ROA.000087.) Choudhri then filed a motion seeking Bankruptcy Court approval to pursue claims against the Bank that had been raised in the remaining cases. (ROA.000417.)

As the result of an injunction entered in state court which is presently on appeal, Choudhri was not permitted to take action on Naissance's behalf. (ROA.000105 n.1) (citing Appellant's Opening Br. at 12, *Naissance Galleria, LLC v. Zaheer*, No. 01-23-00727-CV (Tex. App. Dec. 18, 2023)). For that reason, Choudhri filed the motion for gatekeeping approval solely on his own behalf but provided information on the claims brought by Naissance for informational purposes. And because of the factually intertwined nature of the claims asserted by Choudhri and Naissance, Choudhri asked the Bankruptcy Court to give Naissance's claims the same treatment as Choudhri's for purposes of satisfying the gatekeeping provision.

---

Court for the Fifth Circuit, *2425 WL, LLC v. Nat'l Bank of Kuwait, S.A.K.P., New York Branch*, No. 24-20541.

The Bankruptcy Court denied that motion and denied Choudhri leave to pursue the Challenged Litigation against the Bank. (ROA.001080.) The Court rejected the "factual and legal issues" in the Challenged Litigation without discussion, "stress[ing]" that the very purpose of the Plan and its Gatekeeping provision was to end the Challenged Litigation. (*Id*.) The Court also raised "doubts" that Choudhri had the right to pursue relief under the Gatekeeping provision—even though he was a party to that litigation, Naissance was a party to the same litigation, Choudhri owned and controlled Naissance, the Claims that Naissance and Choudhri had both raised were virtually identical, and both he and Naissance were clearly parties aggrieved by the Bank's actions. (*Id*.) The Bankruptcy Court prohibited any "ongoing litigation" against the Bank in the Challenged litigation. (ROA.001082.)

## SUMMARY OF THE ARGUMENT

The Court should vacate the Bankruptcy Court's order denying Choudhri leave to pursue the Challenged Litigation because the Bankruptcy Court erred as a matter of law both in concluding that the Bank could make use of the Gatekeeper provision and in concluding that the court could bar claims against the Bank in that litigation.

Gatekeeper provisions certainly have their uses. And the Plan's Gatekeeper provision may have some legitimate use in protecting the Trustee in this case. But the Bank's demand to invoke that protection for itself is a bridge too far. A

10

Bankruptcy Court's gatekeeping services are not a party favor that the Bank can obtain simply by participating in the bankruptcy. Nor are they a convenience whereby the Bank can shed liabilities simply because it would like to be rid of them. The only legitimate purposes for a gatekeeping order include protecting the Debtor, the estate, and the implementation of a bankruptcy plan. None of those purposes are served here. The Bankruptcy Court's decision to allow the Bank to make use of the Plan's Gatekeeper provision therefore contravened longstanding precedent, exceeded the confines of the Bankruptcy Code, and violated fundamental limits on bankruptcy courts' jurisdiction. Accordingly, the Plaintiffs should not have even been forced to satisfy the Plan's gatekeeping provision before proceeding.

But even if the Bankruptcy Court could stretch its gatekeeping powers to protect the Bank, there should be no doubt that each of the remaining cases in the Challenged Litigation satisfies the Gatekeeper provision's requirements. None of the cases concern claims that were properly released under the Plan. And all three concern a core set of operative facts regarding uncontroversial lender-liability claims that are colorable under any standard, which is why no *other* court has dismissed them. The Bankruptcy Court should not have been the first. The Challenged Litigation should be permitted to proceed.

11

## ARGUMENT

**I.    The Bank cannot invoke the Plan's Gatekeeper provision to dismiss any of the claims against the Bank in the Challenged Litigation.**

The Bankruptcy Court first erred in dismissing claims asserted against the Bank in the Challenged Litigation because none of those claims can properly be subject to the Plan's gatekeeping provision. So the Choudhri should not be required to obtain the Court's approval before pursuing them. And even if the Choudhri was required to obtain the Court's gatekeeping approval to proceed on these claims, he readily made the showing required to obtain that approval, because Plaintiffs' claims are grounded in theories of lender liability personal to them that have long been recognized under Texas law that were not extinguished by the Plan or other law. That makes the claims against the Bank in the Challenged Litigation colorable under any standard.

**A.    Bankruptcy courts' gatekeeping powers can only be invoked to protect trustees and other court-appointees— not private parties serving in no official bankruptcy capacity like the Bank.**

The first problem with the Bankruptcy Court's invocation of gatekeeping authority is that exercising that authority to benefit the Bank exceeds the limited authority that bankruptcy courts possess to approve, control, adjudicate, or terminate claims in pending litigation. There is nothing in the Bankruptcy Code that conveys such gatekeeping power to bankruptcy courts. Instead, that power is derived from a century-old Supreme Court case, *Barton v. Barbour*, 104 U.S. 126 (1881). "Under

12

the '*Barton* doctrine,' the bankruptcy court may require a party to 'obtain leave of the bankruptcy court before initiating [or maintaining] an action in district court ***when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity***.'" *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 439 (5th Cir. 2022) (quoting *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015) (emphasis added)). The *Barton* doctrine was created to "prevent trustees from being subject to legal proceedings that interfere with their ability to administer the estate." *In re Cir. City Stores, Inc.*, 557 B.R. 443, 447 (Bankr. E.D. Va. 2016); *see also generally* COLLIER ON BANKRUPTCY ¶ 10.01 (16th ed. 2023) (citing and discussing cases). The doctrine therefore serves to protect trustees and other bankruptcy-court appointees from vexatious and harassing litigation that could drain the estate and hamper bankruptcy plan implementation.

There are several reasons why the Bank cannot legitimately invoke the *Barton* doctrine to have the Bankruptcy Court terminate any claims against the Bank in the Challenged Litigation. For one thing, because the *Barton* doctrine exists only to protect trustees and other bankruptcy-court appointees, it cannot be invoked by private parties like the Bank that are not serving in any official court-appointed capacity. Indeed, in *Highland Capital*, the Fifth Circuit refused to "extend gatekeeping protections to non-debtors," including Highland's interim CEO. *Matter*

13

*of Highland Cap.*, 48 F.4th at 435–39 (vacating gatekeeping provision "as to all parties *except* Highland Capital, the Committee and its members, and the Independent Directors for conduct within the scope of their duties"). And the Fifth Circuit's only recent opinion that actually applies the *Barton* doctrine did so in the context of a trustee, not a private corporation with no official bankruptcy role. *See In re Foster*, No. 22-10310, 2023 WL 20872, at *5–*6 (5th Cir. Jan. 3, 2023) (per curiam). For this reason alone, the Bankruptcy Court erred in invoking its gatekeeping authority to benefit the Bank.

Furthermore, not only are *Barton*'s gatekeeping protections reserved for actors appointed to serve in official bankruptcy capacities, they only protect those actors for actions taken within the scope of their "official duties."[6] But the Bank has no official duties in implementing the Plan or overseeing the Debtor's dissolution. The foreclosure sale at the center of the bankruptcy was conducted and overseen by a Liquidation Trustee. (*See* Plan, art. VI(A)) The only duties that the Plan specifically assigned to the Bank were purely ministerial. And the only substantive

---

[6] *In re Ondova Ltd. Co.,* 914 F.3d 990, 993 (5th Cir. 2019); *see also In re Christensen*, 598 B.R. 658, 665 (Bankr. D. Utah 2019); *Phoenician Mediterranean Villa, LLC v. Swope (In re J & S Props., LLC)*, 545 B.R. 91, 105 (Bankr. W.D. Pa. 2015). A typical example is litigation against a receiver who seizes or otherwise attempts to administer property that is not receivership property but actually belongs to a third party. *See In re DMW Marine, LLC*, 509 B.R. 497, 506 (Bankr. E.D. Pa. 2014) (citations omitted).

14

right that the Plan provides to the Bank is the completely voluntary (and unofficial) right to credit bid the amount of its debt at the foreclosure sale for its own private benefit, which comes with a contractual promise to pay certain junior claims if its bid is successful. (*See* Plan, Introduction.) The Challenged Litigation does not contest the Bank's exercise of any of these powers, rights, or responsibilities conveyed under the Plan. That litigation pertains only to the Bank's *pre*-bankruptcy conduct that arose long before the Plan was ever proposed. For this additional reason, *Barton* does not apply.

Indeed, the only reason the Plan's Gatekeeper protections even purport to extend to the Bank is that the Bank *proposed* the Plan—and thus snuck that protection into the Plan for itself, demanding it as a condition to undertaking its minimal responsibilities in funding and implementing the Plan. And the Bank did not seek this protection to benefit the estate, but simply to allow it to escape litigation it would rather not face. That is not a legitimate use of *Barton* gatekeeping powers. The Fifth Circuit has held that even when private parties face "exposure" to truly "vexatious" and frivolous litigation, bankruptcy courts are not empowered to use gatekeeping powers to halt it. *See Highland Capital Mgmt.*, 48 F.4th at 430, 440 n.19. And as explained below—the Challenged Litigation is neither vexatious nor frivolous.

15

**B.     Bankruptcy courts' gatekeeping powers have been significantly constrained by the Supreme Court's decision in *Purdue Pharma*.**

In any event, whatever gatekeeping and litigation-extinguishing powers bankruptcy courts possess have been significantly curtailed by the Supreme Court's recent decision in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024) ("*Purdue Pharma*"), which held that "[t]he bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seek to discharge claims against a nondebtor without the consent of affected claimants." *Id*. The Fifth Circuit has held that bankruptcy court's exercise of its gatekeeping authority to dismiss litigation against non-debtors is the functional equivalent of the non-consensual releases outlawed by *Purdue Pharma*. Both involve exercises of authority to control, adjudicate, and ultimately terminate claims in litigation without consent and without consideration—"similarly act[ing] to shield persons and entities from liability" without entering bankruptcy themselves. *Highland Capital I*, 132 F.4th at 359. For this reason, this Court has "never extended the *Barton* doctrine to give bankruptcy courts gatekeeping power over claims against non-debtors." *Highland Capital Mgmt. Fund Advisors, L.P. v. Highland Capital Mgmt., L.P.,* 132 F.4th 353, 359 (5th Cir. 2025). For all these reasons, allowing the Bank to terminate the Challenged Litigation would exceed the Court's legitimate authority to impose gatekeeping conditions under *Barton*. If the Bank wants to halt

16

this litigation, it can do so through established procedural mechanisms in the Challenged Litigation.

### C. The Court exceeded its jurisdiction by dismissing the Challenged Litigation.

The Bankruptcy Court also exceeded its jurisdiction by using the gatekeeping powers provided under the Plan to adjudicate and dismiss the Challenged Litigation. The Bank seeks only to dismiss litigation against itself, and a dismissal of that litigation would affect only the Bank—having no conceivable effect on the Debtor or the estate. Indeed, on January 11, 2024, this Court remanded one of the proceedings among the Challenged Litigation—Cause No. 2023-43755—back to the 80th District Court of Harris County because it determined that "all the causes of action constitute claims rooted in Texas state law," "there are no bankruptcy issues or claims in the state court litigation," and "there has been no showing that the remand would affect assets of the bankruptcy estate." (Case No. 23-03259 [Dkt No. 24] (Bankr. S.D. Tex. Jan. 11, 2024)) The same is true of the other cases in the Challenged Litigation—because, as the Bank insists, these cases all share the same "basic facts and claims." (Bankr. Dkt. No. 758 at 4.) But that shared lack of connection to the estate deprived the Bankruptcy Court of jurisdiction to resolve any of these cases through its gatekeeping powers.

As the Fifth Circuit recognized in *Highland Capital*, the question of whether a claim may be resolved by a bankruptcy court through exercise of gatekeeping

17

powers under *Barton* is entirely separate from the question of whether the Court has *jurisdiction* to resolve that litigation. 48 F.4d at 439 (holding, after approving of a gatekeeping provision to protect certain court-appointed officials, that "the bankruptcy court, faced with pre-approval of a claim" on remand, would still have "to determine whether it had subject matter jurisdiction over that claim in the first instance."). That makes sense, because the mere fact that the Plan contains a gatekeeping provision does not confer jurisdiction to resolve claims under that gatekeeping power: "[P]arties cannot confer subject matter jurisdiction on federal courts," including through a bankruptcy plan. *Randall & Blake Inc. v. Evans*, 196 F.3d 579 (5th Cir. 1999).

Instead, "[j]urisdiction for bankruptcy cases is rooted in the provisions of 28 U.S.C. § 1334." *Matter of Walker*, 51 F.3d 562, 568 (5th Cir. 1995) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 303 (U.S.1995) (stating that "[t]he jurisdiction of the bankruptcy courts ... is grounded in and limited by statute")). And a "third-party action" between two non-debtors "does not create 'related to' jurisdiction" under section 1334 "when the asset in question is not property of the estate and the dispute has no effect on the estate." *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 753 (5th Cir. 1995). Accordingly, because the claims against the Bank asserted in the Challenged Litigation do not have any effect on the estate, the Bankruptcy Court lacked jurisdiction to hear them—much less dismiss them.

18

It does not matter that the Plan's gatekeeper provision requires that the dispute must be "related to the Debtor" to fall within its scope. (Plan, art. IX(E)). Mere "shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action 'related to' the bankruptcy." *In re Zale Corp.*, 62 F.3d at 753. Accordingly, a mere factual interrelationship between the Challenged Litigation and the arguments asserted in the bankruptcy does not convey jurisdiction to the Court to resolve that litigation.

The Bankruptcy Court therefore lacked the power to require the plaintiffs in the Challenged Litigation to comply with the gatekeeping orders to maintain that litigation, and those plaintiffs should not have been required to obtain Bankruptcy Court permission before pursuing it. *See Tufts v. Hay*, 977 F.3d 1204, 1210-11 (11th Cir. 2020) ("Thus, under the 'conceivable effects' test for section 1334(b), the Bankruptcy Court did not have jurisdiction to consider Tufts's action, and Tufts counsel were not required to obtain leave from that court before filing this action in the District Court.").

## II. The claims raised against the Bank satisfy the Plan's gatekeeping provision because they raise colorable lender-liability claims that the Plaintiffs have standing to pursue.

Yet even if the plaintiffs' remaining claims against the Bank in the Challenged Litigation are properly subject to the Plan's gatekeeping provision, those claims satisfy the Gatekeeper provision's low threshold and therefore should be allowed to

continue.

Two of these cases originated in state court, and one was remanded last January. *See* Case No. 23-03259 [Dkt No. 24] (Bankr. S.D. Tex. Jan. 11, 2024)). The final case is an adversary proceeding that the Debtor filed in this court in conjunction with its original bankruptcy. *See* (ROA.000439) (Original Complaint, No. 23-06009 (Bankr. S.D. Tex. Sept. 19, 2023) [Dkt. No. 1].) And the claims raised against the Bank in all these cases are "colorable."

The term "colorable" is not defined in the Plan or in the gatekeeping provision, but it nevertheless invokes the exceptionally low standard for determining whether a defendant has been fraudulently joined to avoid diversity jurisdiction. *See Overholt v. Purina Animal Nutrition LLC*, Case No. 1:14-CV-1216, 2015 WL 1631855, at *2 (W.D. Mich. Apr. 13, 2015) ("Under the fraudulent joinder rule, courts may disregard the citizenship of parties against whom there is no 'colorable' cause of action."). This standard is "similar to, but more lenient than, the analysis applicable to a Rule 12(b)(6) motion to dismiss." *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 433 (6th Cir. 2012). To be "colorable," a claim need not meet "the "stricter 12(b)(6) pleading requirements" under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Overholt*, 2015 WL 1631855, at *7-8. And even under the 12(b)(6) standard, a court must evaluate the sufficiency of plaintiff's complaint by "accept[ing] all well-pleaded facts as true, viewing them

20

in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and alteration omitted). The Court must resolve all disputed questions of fact and ambiguities in the controlling state law in favor of the non-removing party. *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999).

Plaintiffs' remaining claims against the Bank in the Challenged Litigation readily meet this lenient standard. The claims concern a common core of operative facts underlying all three cases in the Challenged Litigation relating to the Bank's efforts to foreclose on the Debtor's property so it could obtain that property for itself. The Bank loaned the Debtor over $50 million to refinance the property, but throughout the life of the loan, the Bank made it progressively more difficult for the Debtor to pay that loan back. As the plaintiffs have alleged in the state court proceedings, the Bank inserted itself directly into the Debtor's business operations, interfering with those business operations in numerous unjustified ways. (ROA.000454; Plaintiff's Sixth Amended Petition, No, 2023-22748 (Harris County Dist. Ct. Dec. 18, 2023). And the pleadings in Case No. 23-6009, the adversary proceeding which remains pending in the Bankruptcy Court, contain similar allegations of interference by the Bank. (ROA.000441-46.)

For example, the plaintiffs alleged that the Bank thwarted the Debtor's efforts on at least *five* different occasions to sell interests in the building that would have

21

cleared the Bank's debt—often through strategic declarations of defaults or foreclosure postings designed to discourage prospective buyers. (ROA.000459, 000463-64.) The Bank likewise refused to approve or ignored at least *nine* different offers to lease space in the building, thereby preventing the Debtor from raising funds to pay off the loan, eventually forcing the Debtor to bring suit. (ROA.000459, 000462.)

After the parties settled their litigation through a Confidential Settlement Agreement (Dkt. No. 403-4) that reduced the principal amount due under the loan, the plaintiffs alleged that the Bank improperly disclosed the terms of that agreement in direct violation of its express confidentiality obligations by disclosing the new loan balance to potential purchasers of the property, thereby revealing the Debtor's financial struggles, improperly impacting these prospective buyers' evaluation of the property's market value, "chill[ing] the market" for the property, and converting these potential buyers who would have negotiated a sale with the Debtor into potential purchasers of the Bank's note. (ROA.000462, 000472-73)

The Bank also actively attempted to wrest control of the Debtor and its property from Choudhri by interfering with Choudhri's control of Naissance. The Bank worked in league with Azeema Zaheer, Choudhri's ex-girlfriend, who acted as his agent in running Naissance until Ali exercised his right to take over control of the company from her. (ROA.000465-68.) And these efforts by the Bank and Zaheer

22

were all part of a larger effort by Choudhri's disgruntled business partner, Osama Abdullatif, to seize Choudhri's business interests by brute force and fraud. Abdullatif has arranged to have hard drives seized from Choudhri's companies (ROA.000487.) He has also even arranged for Choudhri to be accused of a murder-for-hire plot to kill Abdullatif himself, which authorities dismissed as "a hoax." (*Id*.; *see also* ROA.000489.) And Omar Khawaja, an attorney and close business associate of Abdullatif, admits to representing Abdullatif and Zaheer in furtherance of Abdullatif's avowed goal of seizing all of Choudhri's business interests through litigation—under their theory: "If [Ali] own[s] it, we own it." (ROA.000515, 000522, 000655-57.

The plaintiffs in the Challenged Litigation supported these allegations with voluminous documentary evidence, including examples of lease proposals that were rejected or ignored and elicit communications between Bank representatives and Zaheer. (*See* ROA.000459-62.) Indeed, the plaintiffs produced a key document in their pleadings in which the Bank encouraged Zaheer to "stay on" until the Bank could find a "suitable replacement for her," even after Choudhri had exercised his right to regain control over the company, thereby demonstrating the Bank's intentional efforts to interfere with Choudhri's management of Naissance. (*See* Bankr. Dkt. No. 88-29 at 1-2.) These allegations give rise to numerous claims against the Bank, including breach of contract, tortious interference, fraud, business

23

disparagement, breach of the duty of good faith and fair dealing, unjust enrichment, and conspiracy. (ROA.000472-81.)

The plaintiffs in the Challenged Litigation have also alleged how the Debtor, Naissance, and Choudhri all experienced independent injuries from the Bank's conduct: While the Debtor was deprived of its right to survive and thrive as an ongoing business, Naissance and Choudhri suffered their own loss of a significant asset. And this establishes that Naissance and Choudhri each have standing to pursue claims against the Bank independently. And Choudhri had possessed the right to obtain relief under the Gatekeeper provision on behalf of Naissance.

The Bankruptcy Court had no reason to conclude otherwise. Obviously Choudhri had the right to seek permission to pursue the Challenged Litigation under the Gatekeeping provision on his own behalf when he is himself a party to that litigation. And he should be entitled to obtain permission on Naissance's behalf— even though he does not currently control Naissance—because the claims that Naissance and Choudhri had both raised were virtually identical, and both he and Naissance were clearly parties aggrieved by the Bank's actions. (*Id.*) In any event, nothing in the Plan prohibits one party from obtaining relief under the Gatekeeping provision on another's behalf.

Furthermore, while the facts alleged in the Challenged Litigation paint an extraordinary factual picture, they nevertheless present classic lender liability claims

24

that have long been recognized under Texas law. Such lender-liability claims frequently involve both breach-of-contract *and* tort claims. *See Williams v. National Mortg. Co.*, 903 S.W.2d 398, 404 (Tex. Ct. App. 1995); *Jones v. First Nat'l Bank of Anson*, 846 S.W.2d 107, 109 (Tex. Ct. App. 1992, no writ) (concerning causes of action for breach of duty of good faith and fair dealing, breach of fiduciary duty, negligent misrepresentation, conversion, estoppel, and violations of the Deceptive Trade Practices Act); *Lamar Sav. Ass'n v. White*, 731 S.W.2d 715, 717-18 (Tex. Ct. App. 1987) (causes of action for breach of contract, breach of fiduciary duty, usury, duress, estoppel, and tortious interference).

And courts have found such lender-liability claims to be viable under factual circumstances that are virtually identical to those at issue in this case. Texas courts have found that lenders can be held liable for wrongful defaults and wrongful acceleration. *See, e.g.*, *Rey v. Acosta*, 860 S.W.2d 654 (Tex. Ct. App. 1993); *Dixon v. Brooks*, 604 S.W.2d 330, 334 (Tex. Ct. App. 1980). Courts also routinely permit lenders to be held liable in the context of improper refusals to approve leases.[7] And courts have even allowed borrowers to maintain claims alleging that banks have conspired with others to interfere with their borrowers' businesses. *See, e.g.*, *State Nat'l Bank v. Farah Mfg. Co.*, 678 S.W.2d 661 (Tex. Ct. App. 1984). Indeed, the

---

[7] *See, e.g.*, Metropolitan Corporate Counsel, *Liability Awaits the Unwary: Lenders and Leasing Decisions* (Dec. 13, 2004), https://bit.ly/4e6fGe7.

Bankruptcy Court for the Northern District of Texas recently found a lender liable under factual circumstances that are equally extreme to this case. *See Bailey Tool & Mfg. Co., et al. v. Republic Bus. Credit (In re Bailey Tool & Mfg. Co.)*, Adv. No. 16-03025-SGJ (Bankr. N.D. Tex. December 23, 2021) (holding lender liable under numerous theories for, among other things, taking aggressive action to protect its interests, impacting the company's liquidity, and communicating in secret with the company's customers to have them pay the bank instead of the company). These cases demonstrate that the legal theories that Plaintiffs have asserted are well-grounded in Texas law, and the allegations, while extraordinary, are hardly implausible. And that is why no court has ever dismissed them. That makes them colorable.

And while, during plan confirmation, the Bankruptcy Court concluded that the plaintiffs' claims against the Bank were "implausible" and "not viable" (Dkt. No. 565 at 17), those determinations should not preclude a determination that they are colorable. During plan confirmation, the Plaintiffs were not permitted to present, and the Court was not permitted to hear, a full airing of the evidence to support the Plaintiffs' claims. It heard a mere summary. But even in that limited summary, the Court heard testimony from two of the state's most respected attorneys, Tom Phillips, former Chief Justice of the Texas Supreme Court, and Jerry Alexander, both of whom felt the claims were so strong that they were both willing to take the case

26

on contingency. (*See* Bankr. Dkt. No. 570.) While the Court discounted that testimony because the lawyers explained only that the Debtor "had claims" but never "explained how or why these claims arose," those questions are answered by the operative pleadings in the pending litigation, which provide extensive factual detail and evidence regarding the origin and basis for these claims. (Bankr. Dkt. No. 565 at 17.)

The Bankruptcy Court made barely any mention of the factual or legal merits of those claims. Instead, the Bankruptcy Court simply found the claims incredible, questioning why the Debtor had "never been able" to pay the note, determining that it was unlikely likely that the Bank had "breached" the Settlement Agreement first, excusing the Debtor's own failure to pay, and challenging Choudhri's credibility as a witness. (Bankr. Dkt. No. 565 at 17.) But the first of these holdings ignore the Plaintiffs' factual allegations—which the Court must accept as true—that the Bank interfered with the Debtor's ability to pay the note. And the latter two should not weigh in the balance in determining whether Plaintiffs' claims against the Bank are "colorable," which requires examining solely the allegations pleaded and setting aside questions of witness credibility. Indeed, the fact that two well-respected Texas attorneys are willing to pursue the litigation on a contingency basis provides ample evidence that the claims are in fact "colorable."

During Plan confirmation, the Bankruptcy Court also expressed concern about

the motivations behind these various pieces of litigation, concluding that they were primarily meant "to postpone a real estate foreclosure" (Bankr. Dkt. No. 565 at 16), those concerns are unfounded. Lender liability claims are frequently asserted in efforts to halt foreclosure. *See, e.g.*, *Williams*, 903 S.W.2d at 404; *Jones*, 846 S.W.2d at 109. And the factual context in which those claims arose does not undercut their viability.

Finally, there is no argument that these claims were released under the Plan. By the Plan's terms, these Releases do not appear to reach the claims asserted in the Challenged litigation, because the Releases cover only claims against the "Debtor" and the "Estate"—and neither Choudhri nor Naissance fall in those categories.

The Bank nonetheless contends that the Plan's Estate Releases *would* require dismissal of claims belonging to non-debtors like them against the Bank. The Bank has claimed that similar lawsuits brought by other Choudhri-owned or controlled entities were covered by the Estate Releases because it is not "independent" of the claims that the Debtor brought against the Bank. *See* No. 23-34815 [Dkt. 195 at 4] (Bankr. S.D. Tex.). This seems to be a suggestion that the claims 2425 WL claims are "derivative" of the Debtor's claims against the Bank and therefore fall within the Estate Releases as belonging to the "Estate."  In bankruptcy, a "derivative" action is one in which the "named plaintiff 'is only a nominal plaintiff'" and 'the substantive claim belongs to the corporation"—the debtor in bankruptcy. *Purdue Pharma*, 603

28

U.S. at 219 (quoting 2 J. Macey, *Corporation Laws* § 13.20[D], p. 13–140 (2020–4 Supp.)).

Under *Purdue Pharma*, so-called "derivative claims" can properly be released under a bankruptcy plan, because even when asserted by non-debtors, they nonetheless belong to the estate. *Id.* ("[N]o one questions that Purdue may address in its own bankruptcy plan claims 'wherever located and by whomever held,'— including those claims derivatively asserted by another on its behalf") (quoting 11 U.S.C. § 541(a)).

But the claims against the Bank in the Challenged Litigation are not derivative—because Choudhri and Naissance are not solely seeking to recover for injuries suffered by the Debtor through the litigation, but also for their own *personal* injuries they suffered from the Bank's interference, which caused them to lose a significant asset. That means the claims against the Bank were not properly dismissed under the Gatekeeper Provision.

## PRAYER

For these reasons, Appellant Ali Choudhri respectfully requests that the Court reverse the Court's order on his Motion to Comply with the Gatekeeping Provisions of the Confirmed Chapter 11 Plan, and render judgment that all of the remaining claims against the Bank asserted by Choudhri and Naissance in the Challenged Litigation should be allowed to proceed.

Respectfully submitted,

*/s/ J. Carl Cecere*

J. Carl Cecere
State Bar No. 13268300
(admitted pro hac vice)
**Cecere PC**
6035 McCommas Blvd.
Dallas, TX 75206
Telephone: 469-600-9455
ccecere@cecerepc.com

*Counsel for Appellant Ali Choudhri*

30

# CERTIFICATE OF SERVICE

The undersigned certifies that on June 23, 2025, a true and correct copy of the foregoing was served via the Court's CM/ECF system to all parties who are deemed to have consented to ECF electronic service, and via email to those listed below.

Christopher R Murray
Jones Murray LLP
602 Sawyer St
Ste 400
Houston, TX 77007
832-529-1999
Fax : 832-529-3393
chris@jonesmurray.com

Charles C. Conrad
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

R. J. Shannon
Shannon & Lee LLP
2100 Travis Street, STE 1525
Houston, TX 77002
713-714-5770
rshannon@shannonleellp.com

Andrew M. Troop
Patrick E. Fitzmaurice
 Kwame O. Akuffo
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com

*/s/ J. Carl Cecere*
J. Carl Cecere

31

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

*Certificate of Compliance with Type-Volume Limit,*
*Typeface Requirements, and Type-Style Requirements*

1. This brief complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(B)(i) because, excluding the parts of the brief exempted by Fed. R. Bankr. 8015(g), it contains 7,317 words.

2. This brief complies with the typeface and type-style requirements of Fed. R. Bankr. P. 8015(a)(5) because: it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman (and 14 point for footnotes).

Dated: July 23, 2025                          */s/ J. Carl Cecere*
                                             J. Carl Cecere

                                             *Attorney of Record for Appellant*

32