# **<u>EXHIBIT 17</u>**

```
 1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3                              )  CASE NO: 23-34815
        GALLERIA 2425 OWNER, LLC,   )  Houston, Texas
 4                              )
               Debtor.          )  Friday, September 6, 2024
 5                              )  9:00 AM to 11:37 AM
        ------------------------------)
 6                              TRIAL

 7            BEFORE THE HONORABLE JEFFREY P. NORMAN
                 UNITED STATES BANKRUPTCY JUDGE
 8      APPEARANCES:

 9      For Christopher Murray:  R.J. SHANNON
                                 Shannon & Lee LLP
10                               2100 Travis Street
                                 Houston, TX 77002
11
        For Ali Choudhri:        H. GRAY BURKS, IV
12                               Law Office of H Gray Burks IV
                                 950 Echo Lane
13                               Houston, TX 77024

14      For Jetall Capital:      JAMES Q. POPE
                                 The Pope Law Firm
15                               6161 Savoy Drive
                                 Houston, TX 77036
16
        For National Bank        ANDREW M. TROOP
17      of Kuwait:               CHARLES CONRAD
                                 PATRICK FITZMAURICE
18                               Pillsbury Winthrop Shaw Pittman LLP
                                 31 West 52nd St
19                               New York, NY 10019

20      Court Reporter:          UNKNOWN

21      Courtroom Deputy:        UNKNOWN

22      Transcribed by:          Veritext Legal Solutions
                                 330 Old Country Road, Suite 300
23                               Mineola, NY 11501
                                 Tel: 800-727-6396
24
        Proceedings recorded by electronic sound recording;
25      Transcript produced by transcription service.
```

```
 1                          INDEX

 2   WITNESSES              DIRECT    CROSS    REDIRECT    RECROSS

 3   AZEEMEH ZAHEER           20       39

 4   CHRISTOPHER WYATT        60       68

 5

 6

 7   EXHIBITS                                            RECEIVED

 8   ECF 692-1 through ECF 692-14                          18

 9   ECF 692-16 through ECF 692-27                         18

10   ECF 692-15                                            25

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          HOUSTON, TEXAS; FRIDAY, SEPTEMBER 6, 2024; 9:00 AM

 2                         (Call to Order)

 3          THE COURT:  All right.  Good morning.  It is 9

 4    a.m., and we're on the record for Friday, September the 6th,

 5    2024.  There are a number of matters set at 9 a.m., but they

 6    all revolve around Galleria 2425 Owner LLC, 23-34815.  Let

 7    me take appearances of counsel please.

 8          MR. SHANNON:  Good morning, Your Honor.  RJ

 9    Shannon on behalf of Christopher Murray, formerly the

10    Chapter 11 trustee and now the trustee of the liquidated

11    trust pursuant to the plan.

12          THE COURT:  Thank you, Mr. Shannon.

13          MR. BURKS:  Good morning, Judge.  My name is Gray

14    Burks, B-U-R-K-S, on behalf of the claimants on the various

15    set of claims and objections.

16          THE COURT: All right.  Thanks, Mr. Burks.  Mr.

17    Shannon, I'm -- oh, other parties?  Come on.  Come to the

18    podium please.  That's what it's there for.

19          MR. POPE:  Good morning, Your Honor.  James Pope

20    here on behalf of Jetall Companies.

21          THE COURT:  Thank you, Mr. Pope.

22          MR. POPE:  Thank you.

23          MR. TROOP:  Good morning, Your Honor.  On behalf

24    of National Bank of Kuwait Andrew Troop, Charles Conrad, and

25    Patrick Fitzmaurice.  Nice new clock.
```

1          THE COURT:  Thank you.  It's specifically bought

2     by me.  The government did not pay for it.  It is an atomic

3     clock so it registers exactly the time because I am always

4     punctual.  So you could rely on that clock.  I took the

5     other clocks down.  They were horrible.  But it's the exact

6     time.  You could look at your Apple watch.  It'll match up.

7     It connects to the atomic clock every night.  It's always

8     going to be right.  All right.  Thank you, sir.  Thank you

9     for noticing.

10          MR. TROOP:  And for those of you who weren't here,

11     I believe on the date of the confirmation hearing your other

12     clock broke at the end of the day, so --

13          THE COURT:  At $65 from Amazon, it's the best

14     purchase I've ever made.  Other appearances?

15          MR. TANG:  Your Honor, I'll just come up here.

16     Good morning, Your Honor.  How are you?  David Tang.  We

17     were subpoenaed.  "We" being Azeemeh Zaheer.  She was

18     subpoenaed to be here today, so just wanted to announce that

19     we're here for a subpoena, Your Honor.

20          THE COURT:  Thank you.

21          MR. TANG:  Thank you, Your Honor.

22          THE COURT:  Mr. Shannon, I'm assuming that you are

23     ready to go?

24          MR. SHANNON:  Yes, Your Honor.

25          THE COURT:  Okay.  So let me address I guess ECF

1    705, which Mr. Burks filed at 10:05 last night and I saw for

2    the first time this morning about 6:00.  I didn't see your

3    response until I got to the office.  But I'm going to deny

4    ECF Number 705, but I think I need to at least read on the

5    record why I'm going to do that.  So you can have a seat,

6    Mr. Shannon.  I'll read onto the record why I'm going to

7    deny his motion and then we can proceed in whatever order

8    you see fit, all right?

9         Mr. Burks, when I read your motion about 6:00 this

10   morning, I was -- a couple of things came to mind right off

11   the bat.  The first is that this is the second request for a

12   continuance and that you agreed to the date and the time of

13   the hearings today.  The second thing is what could you have

14   not known before 10:05 p.m. last night when you filed this

15   motion?  If Mr. Choudhri was sick, he was sick well before

16   10:05 p.m., less than 11 hours before this hearing.

17        You're a smart guy.  You're aware of the plan.

18   You objected to it.  You have appealed the confirmation

19   order.  So the fact that you may be surprised by its terms

20   and how I would rule is just beyond me, okay?  All right?  I

21   expect, Mr. Burks, you to vigorously represent your client,

22   okay?  What I don't expect after I read the response from

23   Mr. Shannon is for you to take inconsistent legal positions,

24   okay?

25        And I say this with all due respect, and I really

```
 1    do mean it with all due respect because I've known you for a
 2    long time, okay?  If you want to damage your reputation with
 3    the Court, feel free to do so, but I've got a long memory
 4    and I don't think it suits you.  I really don't, okay?  So
 5    take that as a warning.  Take that as advice.  But you're
 6    going to appear in front of me for a long period of time.
 7    And if you want to make arguments that are rational and
 8    reasonable, I want to hear them.  But if you want to make
 9    arguments that aren't rational and aren't rational and
10    aren't reasonable, that doesn't suit you.  It really
11    doesn't, okay?  So the motion's denied.  All right, Mr.
12    Shannon.  How do you want to proceed?
13              MR. SHANNON:  Thank you, Your Honor.  I think we
14    would start with the trustee's objection to Claim Number 7,
15    and that is Docket Number 402.
16              THE COURT:  All right.
17              MR. SHANNON:  It's the objection.
18              THE COURT:  So you have the burden, so I'll let
19    you basically -- if you want to make your opening argument,
20    then I'll let anyone respond to it who wants to respond.
21              MR. SHANNON:  Yes, Your Honor.  And if I can share
22    the screen...
23              THE COURT:  Sure.  I'll give it to the podium.  It
24    should be connected now.
25              MR. SHANNON:  Your Honor, I'll just kind of start
```

1    with the -- what the relevant filings are here.  Proof of

2    Claim Number 7 was filed timely.  It is by 2425 WL LLC.

3    Subsequently to the trustee's objection, there was an

4    amended proof of claim filed that did add some additional

5    information.  There's no objection to that additional

6    information that was provided.  Essentially what was -- the

7    additional information was a -- was a copy of the note and

8    was a settlement statement.

9           Again, the trustee objected.  That is at ECF

10   Number 402.  2425 WL responded to the trustee's objection.

11   That's at ECF 595.  And the trustee filed an omnibus reply,

12   and that's at 6 -- ECF Number 632.  The two witness and

13   exhibit lists that are active for this claim objection are

14   the trustee's witness and exhibit list at ECF Number 692 and

15   2425 WL's witness and exhibit list at ECF Number 637.  That

16   one was filed back in (indiscernible).

17          The asserted basis of Claim Number 7 is a

18   purported note that was dated May 23, 2018.  It's also

19   secured by a deed of trust that allegedly of the same date.

20   Those two things reference each other, and particularly the

21   note references the deed of trust.  According to the

22   response, those are allegedly part of the same May 23, 2018

23   transaction that you've heard a lot about in this case.

24          There was -- as part of that May 23, 2018

25   transaction, there was property sold from the claimant here

1    in 2425 WL to the debtor.  There was a $51.6 million loaned

2    by MBK.  There was also $16.1 million loaned by Naissance

3    Galleria as a mezzanine financing to the sole member of the

4    debtor.  And the last part of that transaction was that

5    there was $13.7 million of cash that went to the claimant

6    2425 WL.  So that's all part of that transaction that

7    everyone agrees to.

8            Really what the trustee says is this note was not

9    part of it.  This note did not exist at that time.  It was

10   not part of that transaction.  Not only does the response

11   say that this claim and this note were part of that

12   transaction.  We have that from Mr. Choudhri's testimony at

13   the January 31 hearing before this court.

14           So the trustee's objection really breaks down into

15   three different parts.  The first objection is that the

16   purported note is unenforceable because there was no

17   consideration provided.  What we're going to see in

18   evidence, Judge, there's first going to be evidence by the

19   documents.  There's the settlement statement for that sale

20   of that property and the related financing that Mr. Choudhri

21   pointed to back on May -- or back on January 31.

22           He pointed to that and said that's where it is.

23   It's shown there.  I think the evidence is going to show it

24   does not show that.  The other transaction documents from

25   that May 23, 2018 transaction also indicate that there is no

1   other debt.  Now that's circumstantial evidence, Judge.

2   It's not necessarily binding, but it shows that at the time

3   the parties did not have -- did not contemplate this as part

4   of that transaction.

5          The deed of trust that is attached to the proof of

6   claim, and we have it as a separate exhibit as well that I

7   believe will be admitted, also says it's a (indiscernible)

8   date.  I think when we look at the document that you're

9   going to see that that document, that deed of trust was

10  created in 2021.

11         The next groups of documents are going to show is

12  that the -- every other document that was executed in

13  connection with that May 23, 2018 transaction was signed

14  differently than this purported note and this purported deed

15  of trust.  They were all signed by Azeemeh Zaheer and they

16  are documents that establish why that was the case.  The

17  note and deed of trust that are behind Proof of Claim Number

18  7 were signed by Mr. Choudhri.

19         The other thing the documents are going to show is

20  that Mr. Choudhri did not have any authority to sign on

21  behalf of the debtor until 2021.  And I say that we're going

22  to get these documents in, and most of them have been

23  admitted to.  The trustee served written discovery.  There

24  was no response.  There were requests for admissions, copies

25  of the documents were attached, and again, there was no

1    response to those documents.  The genuineness of them has

2    been admitted, and some questions about those documents have

3    been admitted.

4         In addition to the documents -- and that's what we

5    were going to go forward with and -- on July 24th, since

6    then the trustee's also found some witnesses that can speak

7    to the existence of that note prior to -- I believe it's

8    going to be October of 2020.  We know the testimony's going

9    to say that wasn't there beforehand, wasn't there on that

10   date.  It was not there in 2018.  Again, I think you're

11   going to hear testimony to that effect.

12        The second basis for the trustee's objection is

13   that even if we're wrong about that, even if this document

14   was created in 2018, even if that is the case and it was

15   just secret and it was just hidden and no one knew about it

16   and it wasn't in those documents, it would still be

17   unenforceable because Mr. Choudhri did not have authority to

18   sign on behalf of the debtor.  Again, it's going to be

19   established by documents, and it's going to be established

20   by testimony, in particular the documents that deal with the

21   corporate authority of the debtor.

22        The third basis for the trustee's objection is

23   that the purported note is unenforceable because the

24   doctrine of quasi estoppel should apply and should prevent

25   2425 WL from even being able to assert that the basis of

1    this note was a loan in connection with that May 23, 2018

2    transaction.  Again, it's going to be shown in the

3    documents, and I think you're going to get some of that from

4    the testimony of Ms. Zaheer.  The documents, again the

5    settlement statement, what was said in there, and that was

6    executed by 2425 WL.

7            You're going to see that it was important to the

8    other lenders in this transaction that they did -- that the

9    other debt that was part of that transaction mattered to

10   them, and that's going to be shown in those documents.  It's

11   going to be shown in an internal NBK loan memo that Mr.

12   Choudhri pointed to back in January 31 of this year for this

13   court.  He pointed to that and said that describes the

14   transaction.  When you look at that document that Mr.

15   Choudhri pointed to back then, it doesn't have this note

16   that 2425 WL is now asserting is the basis of their claim.

17           And the same thing with the mezzanine loan

18   agreement.  There were again limitations on what was allowed

19   to be -- what debt was allowed to be, what liens were

20   allowed to be on the property.  So those are the bases of

21   the objection, Your Honor.

22           I do want to say that one of the things that

23   puzzled me in this was why.  Why any of this?  And I think

24   we've kind of -- this is what I think the evidence is going

25   to show.  It's not entirely the basis of the objection, but

1    I think it's going to be what the evidence shows.  It's not

2    the seller credit in the settlement statement, which is

3    where -- is what was pointed to as the basis of the claim,

4    is that was Mr. Choudhri's equity in the property.  Went

5    through this transaction, that was the equity.

6         What happened was back in 2020, two years

7    thereabouts after the transaction where the debtor acquired

8    the property from the claimant here, there was the main

9    tenant of the building Stage Stores and its affiliated

10   Specialty Retailers, they filed bankruptcy and they rejected

11   the lease with the property.  That caused all kinds of

12   problems for the debtor.

13        I don't know if it's in evidence in front of you

14   up until now.  It will likely be today.  But it caused the

15   debtor not to be able to service its debt to NDK, to not be

16   able to make its payments, and it reduced the value of the

17   property.  After that I think what the evidence is going to

18   show that Mr. Choudhri sought to fabricate obligations that

19   were secured by junior liens.  I think the natural inference

20   from that evidence will be that they did that to hinder

21   efforts to obtain the property by NBK and by other parties.

22        Ms. Zaheer was pressured to do that, and she

23   refused to participate.  Later in 2021 Gallery West Loop

24   Investments 2, which is up the chain of the corporate

25   ownership of the debtor, that became the managing member of

1      the sole member of the debtor.  So it became in control.

2      And Mr. Choudhri controlled that entity.

3             After that happened, that's when this note, this

4      purported note underlying the claim was created.  It's when

5      the deed of trust was created after they had these -- this

6      dispute brewing with NBK.  Later in 2021 the claimant here

7      2425 WL sought to foreclose on that second lien, the one

8      that was created by the deed of trust, and they even caused

9      a secret unrecorded trustee's deed to issue in that year.

10            While that litigation with NBK was getting

11     underway, it was never reported, but that was filed.  And I

12     think the goal of all of that was to delay and tie up the

13     property in the event that NBK was actually successful in

14     foreclosing.  They weren't.  But also to gain leverage in

15     the bankruptcy.

16            Based on all of that, judge, and based on the

17     arguments, Claim Number 7 should be disallowed.  This

18     purported note that underlies the claim did not create and

19     doesn't reflect an enforceable obligation against the

20     debtor.  This specific provision of the bankruptcy code that

21     it should be disallowed under is Section 502(b)(1), and that

22     says that a claim should be disallowed if it is

23     unenforceable against the debtor and property of the debtor.

24            I'll also say, Judge, I think it kind of changes a

25     lot of the character of what happened in this case, but

1   that's not really an issue for today.  The issue for today

2   is, is that note an enforceable obligation.  Thank you, Your

3   Honor.

4           THE COURT:  Thank you.  Mr. Baker?

5           MR. BURKS:  Your Honor, although I disagree with

6   the recitation of what this case is about, and although I

7   take to great heart and I understand exactly what the Court

8   is saying, the bottom line is that we can't defend this

9   objection to claim (indiscernible).  We can't.

10          It's true I took the position on July 25 that the

11  complaint was not binding, it was subject to appeal, and it

12  was not -- the effective date had not occurred.  There were

13  contingency on the sale whether or not it was actually

14  (indiscernible) or not, and also, was not substantively

15  consummated.  But things have changed in the last five

16  weeks, and I cannot defend this objection to claim, Judge.

17          Number one, the sale completely changed.  It was

18  not sold to the primary buyer.  It was sold to the backup

19  buyer.  That changed what effective provisions of the plan.

20  You see the notice of sale.  That's number one.  Number two

21  you see NBK's notice of effective consummation and effective

22  date.  And number three, you see a plan provision that says

23  that this claim is cancelled and extinguished.

24          I'm standing here in -- I'm standing in front of

25  you listening to the argument on a proof of claim that's

1    been cancelled and extinguished.  I can't defend that

2    because it's cancelled and extinguished.  I disagree with

3    the recitations.  I disagree with the conclusions.  I wish

4    my client was here, but the bottom line is whether he's sick

5    or not, whether the adversary proceeding should be -- have

6    been invoked, I'm stuck with the plan that has cancelled and

7    extinguished by client's claim.

8             Judge, you said something about zealous

9    representation.  I've read the case law on the effective --

10   binding effect of a plan that's subject to appeal, and I was

11   hoping that I could make a distinction legally between those

12   things in a plan that are subject to statutory limitations

13   such as cash collateral, such as credit, and claims

14   allowance.  But from what I think about it, and frankly your

15   ruling yesterday, I told him -- I got on the phone at 3:30

16   with Mr. Shannon and said I'm -- my claims are extinguished.

17   He said we're going forward anyhow.

18             I said, well, do you want to think about it?  Do

19   you want to talk about it?  Do you want to continue the

20   hearing?  No.  Okay.  But I'm standing in front of you with

21   a cancelled and extinguished claim.  So I'm not sure what

22   I'm supposed to do in defense of my client when his claim

23   has been cancelled and extinguished.

24             Remember what the objection's saying.  The prayer

25   for -- the requested relief is disallow the claim in full.

1    It's been cancelled and extinguished.  I don't know what

2    justiciable issue you have in front of you now.  Is the

3    going to be reversed (indiscernible)?  I don't know.  I hope

4    so.  There are a lot of different points.  There's certainly

5    affirmed on some issues and reversed on the liability issue,

6    frankly.  The release issue, the gatekeeper issue, but with

7    respect to the sale no.  With respect to the disallowance or

8    cancelling the claim there are no.

9         But judge I have an obligation to tell you that

10   circumstances have changed.  I didn't flip-flop.  I flipped

11   on what the facts were a month ago and I (indiscernible) --

12        THE COURT:  My point to you, Mr. Burks, was you

13   knew this five weeks ago.  You've already admitted you knew

14   it five weeks ago, yet you file a motion at 10:05 p.m. less

15   than 11 hours before the hearing.  That's what I don't

16   understand.  Okay?  And there's no excuse for that.  Okay?

17   You can't make one up.  All right?

18        MR. BURKS:  I'm not trying to excuse that.

19        THE COURT:  Okay.

20        MR. BURKS:  I'm not trying to excuse that.  I am

21   trying to tell you that I stand before you unable to defend

22   my client because the claims are cancelled and extinguished.

23        THE COURT:  All right.  Thank you.

24        MR. BURKS:  That's all I can --

25        THE COURT:  All right.

1          MR. BURKS:  That's all I can tell you, Judge.

2          THE COURT:  All right.  Thank you.  Mr. Shannon,

3     you may call your first witness.

4          MR. SHANNON:  Thank you, Your Honor.  And I'll

5     start, Your Honor, by seeking the admission of some exhibits

6     that have been at least admitted as parts through discovery.

7     I'll seek the admission of Exhibits 1 -- and these are at

8     Docket Number 692, 692-1 through 692-14.

9          MAN:  (Indiscernible).

10         THE COURT:  Mr. Burks, do you have any objection

11    to the entry of 692-1 through 692-14?  And if you need a few

12    minutes to review them you can.

13         MR. SHANNON:  Okay.  And then --

14         MR. BURKS:  (Indiscernible).

15         THE COURT:  All right.  Go ahead, Mr. Burks.

16         MR. BURKS:  Your Honor, I do not object to the

17    admission of these exhibits as far as providing the

18    testimony that he -- counsel wants to elicit from them.

19    Obviously I reserve objections to that.  I do want to tell

20    this court that we've got a witness that I am totally

21    unprepared.  And without knowing what these witnesses will

22    testify to, I am totally unprepared.

23         I'm being told that we do have a justiciable issue

24    in front of you.  I thought you did not.  So I'll do the

25    best I can on cross-examination and on objections, but I am

1    totally uncertain why we're going forward with an

2    evidentiary hearing where you don't have an issue of

3    controversy in front of you.

4             THE COURT:  All right.  Thank you.  All right.

5             MR. BURKS:  Thank you.

6             THE COURT:  Exhibits 1 through 14 are admitted.

7             (Exhibits ECF 692-1 through ECF 692-14 admitted

8    into evidence)

9             MR. SHANNON:  Yes, Your Honor.  And we had just

10   talked about 16 -- again, Docket Number 692-16 through 27 as

11   well.

12            THE COURT:  So are there any objections to those,

13   Mr. Burks?

14            MR. BURKS:  No objection that I can make today,

15   Judge.

16            THE COURT:  All right.  Then they're admitted.

17   Thank you.

18            (Exhibits ECF 692-16 through ECF 692-27 admitted

19   into evidence)

20            MR. SHANNON:  Thank you, Your Honor.  I'd like to

21   call Azeemeh Zaheer.

22            THE COURT:  Ms. Zaheer, do you want to come

23   forward?  If you come to the podium, I'll swear you in.

24   Once I've sworn you in you can be seated in the witness

25   stand.  Please come to this microphone right here, ma'am.

1   Please raise your right hand to be sworn.  Do you swear or

2   affirm to tell the truth, the whole truth, and nothing but

3   the truth so help you God?

4            THE WITNESS:  Yes.

5            THE COURT:  You need to speak up, ma'am.

6            THE WITNESS:  Yes.

7            THE COURT:  Okay.  Come on up.  Be seated.  You're

8   soft-spoken.  Make sure you speak into the microphone.  Mr.

9   Shannon, you may proceed.

10           MR. BURKS:  Your Honor, I object to the calling of

11  this witness.  There is -- Your Honor, I have two objections

12  to the calling of this witness.  The first one only is on

13  the July 24 witness and exhibit list she was not included.

14  I had no notice that she was going to be called as a witness

15  until two days ago.

16           I'm talking about not being able to prepare for

17  what a witness may or may not say.  I had no idea that she

18  was being called even though counsel had since, well, before

19  July 24th and all that time leading up to that.  I have a

20  second objection, but I'll wait for your ruling on that

21  objection, Your Honor.

22           THE COURT:  I'll overrule that objection.  Go

23  ahead.  Make your second objection.

24           MR. BURKS:  The testimony which she's about to be

25  asked to elicit would go to what Mr. Ali Choudhri knew or

```
1    did or didn't do and what his intent was.  And there --

2            THE COURT:  I think you can make those objections

3    during the examination.

4            MR. BURKS:  (Indiscernible).  Thank you.

5            THE COURT:  Mr. Shannon, go ahead.

6            MR. TANG:  Your Honor, may I have that table to

7    counsel's table?

8            THE COURT:  Sure.  Come on up.

9            MR. TANG:  Just in case I need to make objections.

10           THE COURT:  That's fine.

11           MR. TANG:  Thank you, Your Honor.

12           THE COURT:  Just stay next to a microphone and

13   stand up and be loud.

14           MR. TANG:  Okay, Your Honor.  I'll sit over here.

15           THE COURT:  All right.

16           MR. TANG:  Thank you, Your Honor.

17              DIRECT EXAMINATION OF AZEEMEH ZAHEER

18   BY MR. SHANNON:

19   Q    Good morning, Ms. Zaheer.  Can you spell your name for

20   the record?  First and last.

21   A    A-Z-E-E-M-E-H.  Last name is Zaheer, Z-A-H-E-E-R.

22   Q    And Ms. Zaheer, you are here understand a subpoena,

23   correct?

24   A    That's correct.

25   Q    I guess just for the record back in July 24 of this
```

1    year, were you in the country?

2    A    July?

3    Q    24, 2024.

4    A    No.

5    Q    And where were you at, Ms. Zaheer?

6    A    I think I was in Egypt.

7    Q    Thank you.  Ms. Zaheer, if you could just -- I want to

8    get an idea of your background and your knowledge of things

9    we're going to talk about.  Could you describe any

10   background or connection you have with Galleria 2425 Owner

11   LLC?

12   A    Yes.  In 2018, we structured a transaction to acquire

13   2425 and secured lending from NBK.  I brought lending in

14   through a mezzanine entity I created called Naissance

15   Galleria and acquired the asset.

16   Q    And when you say you set it up, were you acting again

17   through that entity Naissance Galleria?  Is that what you

18   said?

19   A    Naissance Galleria is the mezzanine lender.

20   Q    Okay.  And was it created for that purpose?

21   A    Sole purpose.

22   Q    Okay.  And did you have any connection with Galleria

23   2425 JV LLC?

24   A    Yes.

25   Q    And how does that fit in with the -- with -- I'm going

1    to refer to Galleria 2425 Owner LLC as the debtor.

2    A    Okay.

3    Q    And so how does Galleria 2425 JV fit in with the

4    debtor?

5    A    Galleria 2425 JV was the sole owner of the debtor.

6    Q    Okay.  And so who -- or if you know, who controlled or

7    who had ownership interest in Galleria 2425 JV?

8    A    The ownership interest was Naissance Capital Real

9    Estate based in Delaware and GW2 as the limited partner.

10    Q    And when you say GW2, do you -- are you referring to

11    Galleria West Loop Investments 2?

12    A    That's correct.

13    Q    Okay.  And were you involved in setting up that

14    corporate structure?

15    A    I was.

16    Q    And how were you involved in doing that?

17    A    I structured it with our law firm.

18    Q    Okay.  And did you have conversations with anyone else

19    that was involved with the debtor in doing that structure,

20    setting up that structure?

21    A    Yes, of course.  Brad Parker, Ali Choudhri, who was

22    instructing Brad Parker.

23    Q    Okay.  And so you talked about that transaction.  Are

24    you familiar with the transaction with NBK and acquiring the

25    property?  Do you know what I'm talking about when I say

1    that?

2    A    Yes.  No, 100 percent.  I'm very familiar with it.  It

3    was a property that we acquired I structured with our law

4    firms and...

5    Q    And did you acquire that property from 2425 WL LLC?

6    A    Yes.

7    Q    Okay.  And there was financing in connection with that

8    acquisition of the property, correct?

9    A    That's correct.

10   Q    And just so the record's clear, when you're speaking of

11   the property, which property are you talking about?

12   A    2425 West Loop South.

13   Q    Okay.  And that property -- or what entity actually

14   held title to that property?

15   A    2425 Owner LLC.

16   Q    Okay.  And that's the entity that I had described as

17   the debtor before, correct?

18   A    That's correct.

19   Q    Okay.  I want to talk about that financing transaction.

20   Can you tell me I guess what was part of that financing

21   transaction to acquire the property?

22   A    The senior lender the National Bank of Kuwait provided

23   all -- a senior loan for 51 and a half -- 51.2 million and

24   Naissance Galleria provide a mezzanine loan for 16.1

25   million.  And that was the two financing vehicles.

1    Q    And was there any other financing that was part of that

2    transaction?

3    A    No, absolutely not.

4         MR. SHANNON:  I'm going to pull up an exhibit,

5    Judge.  And before it gets admitted...

6    BY MR. SHANNON:

7    Q    I'm pointing to your screen right there.  Do you see

8    that up there?

9    A    Yes.

10   Q    Do you recognize that image?

11   A    Yes.

12   Q    What is that image?

13   A    That's the structure I drew out in your office.

14   Q    Okay.  And we just described the structure.  Is -- does

15   this basically describe the structure we just talked about?

16   A    Yes.  It does.

17   Q    Okay.

18   A    It shows...

19        MR. SHANNON:  Okay.  Judge, and just for the

20   record what I pulled up was ECF 692-15.  Judge, at this time

21   I'd ask for Docket Number 692-15 to be admitted.

22        THE COURT:  Any objections, Mr. Burks?

23        MR. BURKS:  I don't know what it's being admitted

24   for.  I object to that, Judge.  I don't know what that is.

25        THE COURT:  It's basically a demonstrative of her

1    testimony.   Do you have an objection to that?

2                 MR. BURKS:  Yes, Your Honor.

3                 THE COURT:  Then I'll overrule the objection.

4                 (Exhibit ECF 692-15 admitted into evidence)

5                 MR. SHANNON:  Thank you.

6    BY MR. SHANNON:

7    Q    Ms. Zaheer, on this chart there is a part of the top

8    there that says AC 14 M.  Can you explain what that means?

9    A    AC stands for Ali Choudhri, and then he received nearly

10   $14 million in cash for the transaction.

11   Q    Okay.  And was there any equity as part of this deal in

12   the property after all the financing transactions?

13                THE BURKS:  Objection.  No predicate that she

14   knows the value of the property at the time.  She's being

15   asked was there equity in the value of the property at the

16   time of the transaction.  There's no predicate for that.

17                THE COURT:  I'll sustain the objection.  You can

18   ask -- or lay a foundation.  Thank you.

19   BY MR. SHANNON:

20   Q    Do you have an idea of what the value of the property

21   was back then in 2018 when this transaction happened?

22   A    Yes.  The appraisal came in around almost 90 million as

23   I recall.

24   Q    And so if we're going to add up all these numbers, so

25   52, 16, and 14, do those add up to 92?

1          MR. BURKS:  Objection, Your Honor.  The -- she's

2     now testifying her value -- her opinion of equity, her value

3     that she's asserting is based on an appraisal which has not

4     been admitted into evidence.  She can't do that.

5          THE COURT:  I'll overrule the objection.  Go

6     ahead.

7     BY MR. SHANNON:

8     Q    Do you need me to reask that question?

9     A    Yeah.  You're just asking if it adds up to this number.

10    Yeah.

11    Q    So was there any -- based on that appraisal, was there

12    any additional value in the property that was owned?  Again,

13    just based on that appraisal.

14    A    Based on the appraisal, yes.  It would be -- the value

15    would be based on for financing in place and any additional

16    amount over that left.

17    Q    Okay.  Thank you.  I'm going to talk about this -- the

18    documents related to that May 23, 2018 transaction.  Are you

19    generally -- or were you at the time familiar with those

20    documents?

21    A    Yes.

22    Q    And did you sign those documents on behalf of the

23    debtor?

24    A    Yes, I did.

25          MR. BURKS:  Objection.  I don't know what "those

1    documents" are at this point.

2            THE COURT:  Okay.  I sustain the objection.  Let's

3    -- they're already in evidence I'm assuming, but let's go

4    ahead show them to him.

5    BY MR. SHANNON:

6    Q    Okay.  Ms. Zaheer, I'm going to pull up Docket 692-7.

7    And sorry.  Let me draw that back.  I'm going to pull up

8    692-8.  Can you make that out on the screen?  Is that large

9    enough for you to see?

10   A    Yes.

11   Q    Okay.  And you see at the top there where it says Loan

12   Agreement dated as of May 23, 2018 among Gallery Owner LLC

13   as borrower, National Bank of Kuwait SAKP New York branch as

14   administrative agent, and it continues on after that?

15   A    Yes.

16   Q    And do you know what this document is?

17   A    Yes.  This is our loan agreement with the National Bank

18   of Kuwait.

19   Q    Okay.  And I'm going to scroll down to the signature

20   page and I'm going to ask if that's your signature.  Pull it

21   up there.  Ms. Zaheer, is that your signature there at the

22   bottom of that call-out?

23   A    Yes.

24   Q    And it says that you were signing -- you're at the

25   bottom, and then above that it says Naissance Capital Real

1  Estate LLC, correct?

2  A    That's correct.

3  Q    And then above that Galleria 2425 JV LLC.

4  A    Yes.

5  Q    And then above that is the entity that we referred to

6  as the debtor, correct?

7  A    Correct.

8  Q    Ms. Zaheer, why did -- why was it you -- why were you

9  the one that was signing this document, this loan agreement?

10 A    Because I was the general partner.  I was the sole

11 managing member.  I am the sole managing member of Naissance

12 Capital Real Estate.  There was the general partner of

13 Galleria 2425 JV (indiscernible) 2425 Owner.

14 Q    And we talked I think before.  So Galleria 2425 JV LLC,

15 it is as exists here.  The sole member of the debtor,

16 correct?

17 A    That's correct.

18 Q    And then Naissance Capital Real Estate LLC, is this

19 correct where it says that was the managing of that -- the

20 JV entity?

21 A    That is correct.

22 Q    Okay.  I'm going to pull up ECF 692-9.  And again do

23 you see at the top there where it says promissory note?

24 A    I do.

25 Q    And it says 51,675,000 there on the left, right?

1   A    Yes.

2   Q    And the date is May 23, 2018?

3   A    Correct.

4   Q    Do you know what this document is?

5   A    Yes, it's part of our closing documents.  It's our

6   promissory note to pay the loan back to NBK.

7   Q    Okay.  This is the note that was issued to NBK,

8   correct?

9   A    That's correct.

10  Q    Okay.  I'm going to scroll down to the end again.  Ms.

11  Zaheer, is this your signature at the bottom there?

12  A    It is.

13  Q    And it's the same kind of structure as the loan

14  agreement we just looked at, right?  So you on behalf of

15  Naissance Capital Real Estate on behalf of Galleria 2425 JV

16  on behalf of the debtor, correct?

17  A    That's correct.

18  Q    Okay.  I'm going to pull up Docket Number 692-10 also

19  been admitted.  Ms. Zaheer, do you see at the top there

20  where it says the -- starts with deed of trust on the

21  screen?

22  A    Yes.

23  Q    And do you have -- do you know what this document

24  represents?

25  A    Yes.  It's the deed of trust --

1    Q    Okay.

2    A    -- that was submitted at the time of closing.

3    Q    Okay.  And it's the deed of trust.  Do you know -- who

4    was it issued to?  If you remember.

5    A    It was on the benefit of -- for the benefit of NBK.

6    Q    Okay.  I'm going to scroll to Page 22 of this document.

7    And just the same question, Ms. Zaheer.  Is that your

8    signature right there?

9    A    It is.

10    Q    Okay.  I'm going to pull up ECF 692-11.  And Ms.

11    Zaheer, I'm going to point it out to you.  Well, I'll just

12    ask you.  Do you -- take a look at it and tell me if you

13    know what this document is.

14    A    Yes, it's the assignment of rights and leases to the

15    senior lender.

16    Q    Okay.  And that senior lender is NBK, correct?

17    A    That's correct.

18    Q    Okay.  Again, I'm going to scroll to Page 7 here and

19    kind of just ask you the same question, Ms. Zaheer.  Is that

20    your signature right there?

21    A    It is.

22    Q    And I'll ask you one more thing.  So Ms. Zaheer, I'm

23    not going to talk about that exhibit right now.  You said

24    that there was also a mezzanine loan.  Can you just explain

25    what a mezzanine loan is for the record?

1   A    Yes.  It's a subordinated loan to the senior lender

2   that provides financing to the property.  It's a loan that

3   is slightly higher in risk than a senior loan and lower than

4   equity, and it's kind of like a hybrid between debt and

5   equity.

6   Q    And to what entity would a mezzanine loan be -- and let

7   me just ask you this.  The mezzanine loan here in this case,

8   to what entity was that loan made if you know?

9   A    The mezzanine loan was provided to JV, 2425 JV LLC.

10  Q    Okay.  And so that loan would've been -- and that was

11  the parent company of the debtor, correct?

12  A    That's correct.

13  Q    And why -- and your -- do you have experience with

14  mezzanine loans other than this one transaction?

15  A    I have, but not within outside of a bank that I work

16  for.  Uh-uh.  But yes.

17  Q    Okay.  Well, even for a bank, what is the -- is there a

18  reason that the senior lender might want a loan to be a

19  mezzanine loan?

20       MR. BURKS:  Objection.  General question

21  irrelevant to this transaction, Your Honor.

22       THE COURT:  I'll overrule the objection.  Go

23  ahead.

24  BY MR. SHANNON:

25  A    Well, the senior lender doesn't want -- usually he

1    doesn't even want a mezzanine loan.  They just want to be

2    the only loan on the transaction.  But should there be a

3    case of having a secondary mezzanine loan, the reason is to

4    provide the additional financing for the property.

5    Q    Okay.  Thank you.  I'm going to pull up ECF Number 692-

6    12.  Do you see that in front of you right now, Ms. Zaheer?

7    A    I do.

8    Q    And do you know what this document is?

9    A    Yes.  It's our mezzanine loan agreement.

10   Q    And Ms. Zaheer, do you remember signing this agreement

11   as well?

12   A    I do.

13   Q    Okay.  So Ms. Zaheer, if I've asked you this before I

14   apologize, but so was there any $14.7 million second lien

15   loan that was part of that 2018 transaction?

16   A    No.

17   Q    Did you at some later point ever learn of any attempt

18   to assert that there was such a loan?

19   A    Yes.

20   Q    Okay.  What -- can you explain what that was then?

21   A    Mr. Choudhri approached me to sign a document after the

22   Stage bankruptcy, and it was to sign like an additional lien

23   on the property, a deed of trust, and I didn't feel

24   comfortable with it.  I asked to send it to a lawyer, and I

25   asked for a (indiscernible), which he never provided.  And I

1    never signed it.  I never saw it after that until later I

2    learned that he had filed a deed.

3    Q    And around what time was that?  What date?

4    A    That I -- that he...

5    Q    Yeah, that he would've reached out to you and asked you

6    to do that.

7    A    It was after the Stage bankruptcy, so probably like the

8    end of 2020.  Something like that.

9    Q    Okay.

10   A    I think.  It was after that, but I can't remember the

11   exact date.

12   Q    Now, Ms. Zaheer, I want to talk a little bit about the

13   corporate authority here.  Oh, actually let me ask you one

14   more thing.  I'm going to pull up a document that has been

15   admitted.  And for the record, this is ECF Number 692-13.

16   And it's already been admitted, but Ms. Zaheer, I'm going to

17   ask you if you recognize this signature.

18   A    I do.

19   Q    Whose signature is that?

20   A    Moussa Hussein.

21   Q    And does he have a relationship with Naissance Capital

22   Real Estate?

23   A    He did.  He was supporting -- I lived between here and

24   London, so he was an authorized person to act on behalf of

25   our entity for a period of time.

1   Q    Okay.  Thank you.  I'm going to pull up ECF Number 692-

2   14 and I'm going to ask you the same question with the

3   signature that's pulled up there.  Is that also the same

4   person?

5   A    Yes.

6   Q    And at that time at least had a relationship with

7   Naissance Capital Real Estate LLC.

8   A    That's correct.

9   Q    Okay.  And just so we're clear, though, I mean, by that

10  time -- the time that I'm referring to specifically is in

11  January of 2020.

12  A    Yes.

13  Q    Okay.  Thank you.  Ms. Zaheer, I'm going to switch

14  topics a little bit.  When was -- do you know when the

15  debtor entity we talked about was created?

16  A    Owner -- 2425 Owner LLC was created in 2018.

17  Q    And so before that time in 2018, it just did not have

18  any corporate existence?

19  A    That's correct.

20  Q    Okay.  I'm going to put up ECF Number 692-16.  Do you

21  recognize this document here?

22  A    Yes.

23  Q    Okay.  What is this document?

24  A    This is our filing of the company.

25  Q    And I'm going to pull out this part.  It might not save

1    a lot of space.  Do you see the top there?  It says the name

2    and address of each governing person is.

3    A    Yes.

4    Q    And this document, is this one that you would have

5    approved for whoever filed it?

6    A    Yes.

7    Q    And this was the only governing person of the debtor at

8    the time, correct?

9    A    Yes.

10   Q    Now I'm going to ask you one more question about this.

11   Now I -- well, I guess I'll ask you.  I see a signature

12   there with your name on it.  That's not your physical

13   written signature, is it?

14   A    No.

15   Q    But did -- you did authorize this signature to be

16   placed here, right?

17   A    Yes, I think it's a DocuSign from our -- for our

18   attorneys.

19   Q    Okay.

20   A    Or our -- yeah, or the accountant who -- one of them

21   filed it.

22   Q    I'm going to pull up ECF 692-17 now.  Also been

23   admitted.  Same question.  Do you recognize what this

24   document is?

25   A    Yes.

1    Q    And what is the document?

2    A    It's registering the entity Galleria 2425 JV LLC.

3    Q    And this would've been the same kind of thing, a

4    document that you authorized and approved, correct?

5    A    Yes.

6    Q    Thank you.  I'm going to pull up ECF Number 692-18.  Do

7    you -- Ms. Zaheer, do you recognize what this document is?

8    A    It's the LLC agreement or -- yes.

9    Q    Okay.  And so is it the company agreement for Galleria

10   2425 JV LLC?

11   A    Yes.

12   Q    And that is the sole member of the debtor, correct?

13   A    That's correct.

14   Q    Okay.  Do you remember this document being created?

15   A    Yes.

16   Q    And do you remember when this document was executed?

17   A    In 2018.

18   Q    Okay.  And bear with me.  I'm going to find the

19   signature page here.  And Ms. Zaheer, is that your signature

20   there on this company agreement?

21   A    Yes, it is.

22   Q    Ms. Zaheer, based on your understanding of this

23   agreement, did anyone other than Naissance Capital Real

24   Estate have the authority to act on behalf of this entity,

25   the JV entity back in 2018?

1    A    No.

2    Q    So only Naissance Capital Real Estate could.

3    A    That's correct.

4    Q    And did you ever authorize Mr. Choudhri to act -- to

5    sign documents on behalf of that entity, the JV entity?

6         MR. BURKS:  Objection.

7    BY MR. SHANNON:

8    A    No.

9         MR. BURKS:  Assumes -- that assumes that she had

10   either the authority or the duty to authorize and the --

11        THE COURT:  I think that's clear from the

12   evidence, Mr. Burks.  If you want to -- I'll let you respond

13   to that, but I think it's clear from the evidence that

14   that's the case.

15        MR. SHANNON:  I think she's already testified that

16   he could --

17        THE COURT:  I'll overrule that objection.  Thank

18   you.

19   BY MR. SHANNON:

20   Q    And Ms. Zaheer, your answer to that was no, correct?

21   A    That's correct.  No, he did not.

22   Q    Okay.  And at some point did the managing member of

23   that JV entity change?

24   A    Yes.

25   Q    Do you remember when that happened?

```
1    A      In -- around 2021.

2    Q      Okay.  I'm going to pull up ECF Number 692-19.  Do you

3    recognize this document?

4    A      I do.

5    Q      And is this the document that made that change or who

6    had the authority to act on behalf of the JV entity?

7    A      Yes.

8    Q      And this is -- Ms. Zaheer, is this your signature right

9    here on the document?

10   A      It looks like my signature, but...

11   Q      Okay.  And I'm going to pull up one other thing.  There

12   is a date there that -- do you know what that date is right

13   there?

14   A      January 18, 2021.

15   Q      Okay.  It's January.  Thank you.

16   A      Yeah, it looks like June or January.

17   Q      If it was between June or January, which one do you

18   think better fits your recollection of when --

19   A      Oh, no, no.  It was January.

20   Q      Okay.

21   A      It was January.

22   Q      Ms. Zaheer, last line of questions I'll have for you.

23   You mentioned a little bit before the Stage bankruptcy.  And

24   you were involved in the management of the debtor through

25   those other entities at the time, correct?
```

1    A    Yes.

2    Q    And was that around 2021?  Or I'm sorry, 2020.

3    A    Yes.

4    Q    Did that cause any financial issues for the debtor?

5    A    Yes.

6    Q    How so?

7    A    Stage Stores occupied around seven floors of the eleven

8    of the asset.  So when they went into insolvency or into

9    bankruptcy, we could no longer afford to pay our debts.

10    Q    And would you describe that as financial distress after

11    that bankruptcy?

12    A    Yes.

13    Q    Okay.  Thank you.

14         MR. SHANNON:  No further questions, Your Honor.

15         THE COURT:  All right, Mr. Baker.

16         MR. BURKS:  Mr. Burks?

17         THE COURT:  Mr. Burks.  I'm sorry.  I apologize

18    deeply.

19         MR. BURKS:  No, it's all right.

20         THE COURT:  No, it's not.

21              CROSS-EXAMINATION OF AZEEMEH ZAHEER

22    BY MR. BURKS:

23    Q    Hello.

24    A    Hello.

25    Q    Did you sign an agency agreement with Ali Choudhri?

1   A    I signed an agency agreement with Ali Choudhri on a

2   different entity.

3   Q    So your testimony today is that you never signed any

4   agency agreement with Ali Choudhri in connection with the

5   acquisition of this property.

6   A    That's correct.

7   Q    Isn't it true that all the documents that we just

8   looked at were signed by you but on behalf of sometimes two,

9   sometimes three or four (indiscernible)?

10  A    Yes, I signed the documents on behalf of Naissance, on

11  behalf of owner, as a general partner, and I signed the

12  documents as the mezzanine lender.

13  Q    And who else?

14  A    And that's it.

15  Q    So do we need to go back up and look at the documents

16  and see the signature -- you know, your signature's there on

17  Naissance, but under two or three entities below each one

18  (indiscernible)?

19  A    So sure.  We can pull up the documents that you're

20  referencing and I can explain it to you.

21  Q    All right.  I don't have control of those documents

22  right now.  So explain why there were multiple entities but

23  only Naissance was -- had a signature for you.  What -- who

24  was signing on behalf of all those other entities?

25  A    Okay.  So we have Gallery owner, right?  Gallery owner

1    is owned by the JV entity.  The JV entity is managed by

2    Naissance Capital Real Estate LLC.  This is a U.S. entity

3    based in Delaware and that entity was the general partner of

4    the ownership of the 2425 Owner LLC.

5    Q    Did Naissance own the property?

6    A    Naissance Capital Real Estate LLC owned 1.3 or 2

7    percent of the exact amount, something like that, of the

8    property, yes.

9    Q    But Naissance was acting on behalf of the actual owners

10   of the property, correct?

11   A    Naissance Capital was the general partner for the JV.

12   Q    So Naissance in all of these documents was acting on

13   behalf of other entities.

14   A    So you're --

15   Q    Yes or no.

16   A    There's a couple of different Naissances.  There is a

17   Naissance Capital based in the U.K.  That U.K. entity is a

18   foreign entity that manages Naissance Galleria, which is the

19   mezzanine lender.

20   Q    You didn't answer my question, did you?

21   A    I did.

22   Q    Oh.

23   A    Naissance --

24   Q    All right.

25   A    -- Capital Real Estate is a separate entity from

```
 1   Naissance Capital Real Estate LTD, which is a U.K. entity.

 2   So it's not all one Naissance.  There are multiple

 3   Naissances.

 4   Q    Did Naissance own the property?

 5            THE COURT:  Which one are you talking about?

 6            MR. SHANNON:  Objection.

 7            MR. BURKS:  The other one.  The other Naissance

 8   entity.

 9            THE COURT:  Okay.

10   BY MR. BURKS:

11   A    Naissance owned 1.28 something percent of the property,

12   yes.

13   Q    But I want to focus on the Naissance (indiscernible) on

14   (indiscernible), okay?  Is that all right?

15   A    On behalf of the lender or the equity?

16   Q    On behalf of who you signed.  You signed these

17   documents, correct?

18   A    Yes.

19   Q    And you signed them on behalf of Naissance, correct?

20   A    Yes.

21   Q    And if there are 3 or 4 or 500 Naissances, I want to

22   refocus on the one that you signed on behalf of, all right?

23   A    I signed on behalf of both Naissance Capital entities.

24   Q    Okay.  And it says that on the document.

25   A    It does, yes.
```

```
1   Q    And was Naissance the borrower?

2   A    Galleria 2425 Owner LLC was the borrower.

3   Q    Okay.  Was Naissance the owner of the property other

4   than one percent?

5   A    No.

6   Q    So who signed on behalf of Galleria and who owned the

7   property before it was sold?

8   A    Who owned the property?  This -- who was the seller?

9   Q    Yeah.

10  A    It was the entity -- I think it's called -- also like a

11  WL, 2425 WL LLC.

12  Q    Oh, the claimant on this claim you're testifying about

13  owned the property.

14  A    It's the seller.

15  Q    Okay.  2425 WL sold the property.  Did you sign it on

16  behalf of them?

17  A    No.  Adam Broder signed on behalf of them.

18  Q    And the buyer was Galleria the debtor here.

19  A    Mm-hmm.

20  Q    Did you sign on behalf of them?

21  A    Yes.  That's correct.  I signed as managing member of

22  Naissance Capital.

23  Q    An agent?

24  A    Not an agent.

25  Q    What were you?
```

1    A    I was a general partner.

2    Q    Of Naissance.

3    A    Yes.  Would you like me to go over the structure with

4    you?

5    Q    No, I'd like to understand how if you weren't the agent

6    of Galleria, I'd like to know how you were sign on behalf of

7    Galleria.

8         THE COURT:  Let's be clear for the record.  You're

9    talking about Galleria 2425 Owner?  Because there are

10   multiple Gallerias, okay?

11        MR. BURKS:  You're right.

12        THE COURT:  So let's make the record clear.

13   BY MR. BURKS:

14   Q    Galleria 2425 Owner.

15   A    Yes.  Galleria 2425 Owner is owned by 2425 JV --

16   Q    Mm-hmm.

17   A    -- 100 percent shares.  That JV entity has a general

18   partner and a limited partner.  Naissance Capital is a

19   general partner.

20   Q    All right.  And isn't it true, though, that you are the

21   agent of Ali Choudhry is --

22   A    Absolutely not.  (Indiscernible).

23   Q    (Indiscernible)?

24   A    Yes, I'm sorry.

25   Q    Isn't it true that you were the agent of Ali Choudhry

1    in this transaction?

2    A    No.

3    Q    Were you the agent of Ali Choudry in any other

4    transactions?

5    A    Balio.

6    Q    Which?

7    A    Balio.

8    Q    Spell that please.

9    A    B-A-L-I-O.

10    Q    So your position is that when you executed for

11    Naissance, you were not acting as an agent for 2425 WL.

12    A    That's 100 percent correct.  I was acting as a general

13    partner for 2425 JV LLC.

14    Q    And who was the other general partner?  Were there any

15    other partners in that (indiscernible)?

16    A    There was a limited partner.

17    Q    Who was it?

18    A    JW2.  Brad Parker.

19    Q    Brad Parker.  2425 WL is the owner of the property.

20    Who were the managing members or owners of the entity?

21    A    Brad Parker.

22    Q    Did Ali Choudhri have any ownership in that?

23    A    Later assigned the company over to him from Brad

24    Parker.

25    Q    Who assigned what to whom?

1    A    Brad Parker assigned the company to Ali Choudhry.

2    Q    When did he do that?

3    A    I don't know that.  You have to ask them.

4    Q    I think I found -- no, I didn't.  I didn't really

5    follow your chart, but I think I have a vague idea of where

6    counsel's going with it.  How much cash in this transaction

7    -- refresh the Court's memory who was the buyer, the debtor,

8    2425 Galleria Owner --

9    A    Correct.

10    Q    -- how much cash did they put in?

11    A    Nothing.

12    Q    Nothing.  Okay.  And -- but isn't it true that there

13    was $14,730 cash paid to Ali Choudhri?  That's what you

14    testified to.

15    A    He received the money as the seller.

16    Q    Who?

17    A    Ali Choudhri.  Adam --

18    Q    I thought you said he wasn't the seller.

19    A    Adam Broder who later found out had an agency

20    (indiscernible) and he was a proxy for Ali Choudhri.

21    Q    Okay.  So let's refresh our memory.  The $14,730 --

22    A    You mean 14 million?

23    Q    Yeah, 14 million, thank you for correcting me, we're

24    dealing with millions of dollars here.  I apologize.  Thank

25    you.

1    A    It's okay.

2    Q    So the 14 million, where did it come from?  It went to

3    Ali you just testified, but where did it come from?

4    A    It came from the 51.6 million plus the 16.1 million

5    that I provided to buy the asset.

6    Q    So it was a loan from 2425 WL.

7    A    No.  It's not a loan.

8    Q    Where did it come from?

9    A    There was no --

10   Q    The buyer didn't pay it.

11   A    So the -- if you look at the settlement statement,

12   you'll see --

13   Q    Right.

14   A    -- that the previous loan for Bank of America, looks

15   like 40 something million, the surplus went back to the

16   seller's entity, which was more than 14 -- 13 point

17   something million dollars.

18   Q    So it went back to whom?

19   A    The beneficial owner is Ali Choudhri.

20   Q    And you're saying that's not a loan the way it's set up

21   in the closing statement?

22   A    I mean...

23   Q    Let's forget about the note.  I'm going to ask you a

24   question.

25   A    My --

1    Q    Forget about the note.

2    A    I get paid for my house.  Does that mean that was a

3    loan or was that a payment for buying my house?  It -- I

4    don't understand your question.  It makes no sense.

5    Q    What was the purpose of the $14,700 --

6    A    14 million?

7    Q    -- $14,700,000 on the closing statement?  What does

8    that --

9    A    I don't --

10    Q    -- represent?

11    A    The seller sold the property.

12    Q    2425 WL sold the property.

13    A    Correct.  And in return they received cash of $14.6

14    million.

15    Q    From the buyer?

16    A    From the proceeds that were surplus from the

17    acquisition.

18    Q    All right.  So the surplus of the acquisition.  What

19    did you say the value of the property was?

20    A    Around 90 something million.

21    Q    And how much was the (indiscernible) note?

22    A    51.6.  Could I reference the settlement statement?

23    It's been --

24    Q    Sure.  You have it (indiscernible).

25    A    Otherwise I'm happy to just ballpark the numbers, which

```
1    is 51 point something million.  My loan, the mezzanine loan
2    that we brought (indiscernible) for was 16.1 million.  This
3    was all cash.  NBK brought 51.6 million.  I brought 16.1
4    million, and that paid off the previous loan, the previous
5    liens, and it had a surplus of almost $14 million.  And that
6    $14 million went into the pocket ultimately of Ali Choudhri.
7    Q    Isn't it true that the $14.7 million actually came from
8    2425 WL?
9    A    What?
10        MR. SHANNON:  I'm going to object.  We're throwing
11   numbers around here that aren't the same, Your Honor.  It
12   looks like --
13   BY MR. BURKS:
14   A    This is like a completely -- this is such a strange --
15   sorry.
16   Q    Go ahead.
17        MR. SHANNON:  No, just wait.
18        MR. BURKS:  There's no question, but if you'd like
19   to speak --
20        MR. SHANNON:  Mr. Burks --
21        THE COURT:  No, I don't want anyone to ask a
22   question that's not on the record.  Mr. Burks, I understand
23   the transaction.  I don't think you're making any headway.
24   If you're trying to make headway, I'd like you to get on
25   with it.  Because I understand the transaction.  It's not
```

```
1    unfortunately that complicated a transaction.  And all

2    you're doing is muddying the record with questions that

3    really, to my mind, don't make any sense.

4            MR. BURKS:  All right.  I need the closing

5    statement up on the screen, Judge.  Is --

6            THE COURT:  Well, that's your --

7            MR. BURKS:  Yes, it is.

8            THE COURT:  -- duty and your prerogative, and you

9    can put it up, but I'm not going to aid you.

10           MR. BURKS:  I don't want you to --

11           THE COURT:  You should be ready --

12           MR. BURKS:  I don't want you to --

13           THE COURT:  -- okay?

14           MR. BURKS:  I don't want you to aid me.

15           THE COURT:  You have the -- I mean, there's a

16   connection right there.  Connect -- put up whatever you

17   want.

18           MR. BURKS:  Judge, I'm on cross.  It's their

19   Exhibit 5, but it's also my Exhibit 8.  I believe that Mrs.

20   Bates is on the line.  If Mrs. Bates will put it up, I'll

21   look at it, Judge.

22           THE COURT:  The problem is that you're connected

23   to an internal system.  So you have to project from inside

24   the courtroom.

25           MR. BURKS:  Well, counsel won't put it back up.  I
```

1    can't put it up and question the witness.

2              THE COURT:  Then move along please.

3              MR. BURKS:  Yes, Your Honor.  (Indiscernible).  Is

4    there a way to project this, Judge?

5              THE COURT:  It's already on, Mr. Burks.

6              MR. BURKS:  Thank you, Your Honor.

7              THE COURT:  This is why we allow you to come and

8    test before you come to court.

9              MR. BURKS:  Excuse me, Judge?

10             THE COURT:  This is why we allow you to come and

11   test the system before you come to court so that you can be

12   prepared.

13             MR. BURKS:  Noted.  Thank you.

14             THE COURT:  You're welcome.

15   BY MR. BURKS:

16   Q    Will you -- I direct your attention to 303, cash from

17   borrower.

18             THE COURT:  So first of all, you want to tell me

19   what it is for the record, Mr. Burks?

20             MR. BURKS:  Yes, Your Honor.  This is the

21   settlement statement, which has been --

22             THE COURT:  I just need an ECF number.  Your

23   exhibits, their exhibits, I don't care.

24             MR. BURKS:  637 dash probably 5.

25             THE COURT:  All right.  Thank you.  Go ahead.

```
 1                 MR. BURKS:  Thank you, Your Honor.

 2    BY MR. BURKS:

 3    Q     I direct your attention to line 303.  You see it?

 4    A     Yes.

 5    Q     $14,730,000 and change, correct?

 6    A     That's correct.

 7    Q     And where did that cash some from?

 8    A     Well, it came from the senior lender and the mezzanine

 9    lender.  And once the liens were paid off, that was the

10    surplus of funding.

11    Q     And where did that cash go to?

12    A     It went ultimately to Ali Choudhri.

13    Q     When you say ultimately Ali Choudhri, what entity did

14    it go to?

15    A     It went to the seller's entity.

16    Q     And what was that entity?

17    A     The WL entity.

18    Q     The claimant on this proof of claim, correct?  Isn't it

19    true the 14,730 actually came from 2425 WL on this

20    transaction?

21    A     Unless I don't know how to do math, no.

22    Q     Okay.

23                 MR. BURKS:  One moment, Your Honor.

24    BY MR. BURKS:

25    Q     Were you present at the closing?
```

1    A    I was.

2    Q    You referenced the deed of trust.  Do you know when it

3    was executed?

4    A    It was executed in 2018.

5    Q    The deed of trust for the purported $14,700,000 and

6    change note to (indiscernible) 2425 WL, do you know when

7    that deed of trust was executed?

8    A    I understand --

9    Q    Right.

10   A    -- that -- I don't know because I didn't execute it.

11   It was --

12   Q    Do you know when the note was executed?

13   A    There was no note.

14   Q    There was no promissory note to 2425 WL for 14.7

15   million and change.

16   A    I am not part of WL and I am not part of GW2.  There

17   was no note.

18   Q    If the deed of trust was executed --

19        MR. BURKS:  One moment.  I want to use this up

20   (indiscernible) again.  I like that.  Thank you, Mr. Pope.

21   BY MR. BURKS:

22   Q    You recognize this document?

23   A    I have seen it in files subsequent.

24   Q    And when did you first see it?

25   A    I --

1              THE COURT:  Again, Mr. Burks, what ECF number are

2    we making a reference to for the record?

3              MR. BURKS:  Yes, Your Honor.  We're referencing

4    637-2, the attachments.

5              THE COURT:  All right.  Thank you.

6              MR. BURKS:  Thank you, Your Honor.

7    BY MR. BURKS:

8    Q    You ever seen this deed of trust before?

9    A    I think when you guys filed it looking through your --

10   the case documents.

11   Q    And so the first time you saw this deed of trust was

12   when?

13   A    Sometime looking over case documents.

14   Q    All right.  So you don't know when it was filed, when

15   it was signed, do you?

16             MR. TANG:  Your Honor, I'm going to object.  This

17   is an incomplete document.  Can he show the rest maybe?

18             MR. BURKS:  Sure.

19             THE COURT:  And I'll sustain the objection.

20             MR. TANG:  Thank you, Your Honor.

21             THE COURT:  It's an incomplete document.

22   BY MR. BURKS:

23   Q    You testified that the -- Mr. Choudhri asked you to

24   sign the document, correct?

25   A    That's correct.

```
 1   Q    But what document did he ask you to sign?

 2   A    So it was to sign a document to put a lien on the

 3   building.

 4   Q    And what document is what?  Do you have it with you?

 5   A    I have an email -- a text message to him asking for a

 6   soft copy of it and asked to be reviewed and he never sent

 7   it to me.

 8   Q    He never sent you the document?

 9   A    Nope.

10   Q    So what are we talking about?  What was the document?

11   How do you know it was a lien on the building?

12   A    Because I heard.

13   Q    You heard what?

14   A    I heard that he filed a fake lien.

15   Q    When did you hear that?

16   A    2021, '22.  Something like that.  I can't remember, but

17   it was sometime afterward.  I was litigating against him.

18   Q    Who characterized it as a fake lien?

19   A    I just did.

20   Q    Okay.  And -- but you said you didn't know what was

21   signed back in 2018.  You said you didn't sign anything.

22   Isn't that true?

23   A    I said that I did not sign -- that there was no other

24   notes at the time of closing.  During the time that I was a

25   managing member the only documents that were liens --
```

1    probably a lien on the property was from NBK.  We

2    subsequently had a tax lien, but this is -- it didn't exist.

3    Q    You're a lawyer, correct?

4    A    No.

5    Q    So would you agree with me that there's a difference

6    between the date a document, such as a deed of trust, is

7    signed versus the date it is recorded?

8              MR. TANG:  Objection, Your Honor.  That calls for

9    a legal conclusion.

10             THE COURT:  I'll sustain the objection.

11   BY MR. BURKS:

12   Q    Do you know when the deed of trust, the fake deed of

13   trust that you referred to, do you know when it was signed?

14   A    I do not.

15             MR. TANG:  Objection, Your Honor.  That's been

16   asked and answered.

17             THE COURT:  I'll sustain the objection.

18             MR. BURKS:  Let the record reflect that she said

19   no and shook her head no, Your Honor.

20             THE COURT:  I sustained the objection.

21             MR. BURKS:  I understand.

22   BY MR. BURKS:

23   Q    Do you know who recorded the "fake deed of trust"?

24   A    I can have a look at this document if you can show me.

25   Q    Sure.

1          MR. TANG:  Your Honor, I'm going to also object to

2    foundation.  I don't think there's ever been any testimony

3    it was filed.  And I think Mr. RJ, the arguments that this

4    was hidden in the pocket --

5          THE COURT:  I know for a fact that it was

6    recorded.

7          MR. TANG:  Okay.

8          THE COURT:  So -- because I've had a long history

9    with this case, so while I understand your objection, I've

10   got some knowledge you're not privy to.

11         MR. TANG:  (Indiscernible), Your Honor.

12         THE COURT:  So -- okay.  Thank you.  No, that's

13   fine.  Raise your objections please.

14         MR. TANG:  Thank you.

15         MR. BURKS:  May I approach the witness with a hard

16   copy?

17         THE COURT:  No, you can do it right there.  What's

18   what it's for, Mr. Burks.

19         MR. BURKS:  Are ECF 637 (indiscernible)?

20         THE COURT:  You talking about 637-2?

21         MR. BURKS:  2.

22   BY MR. BURKS:

23   Q    I'm showing you -- what I'm reflecting to you is the

24   signature page on the "fake deed of trust".  The buyer of

25   the property was Galleria 2425 Owner, correct?

```
 1    A    That's correct.
 2    Q    Was Ali Choudhri the manager of either Galleria West
 3    Loop Investments?  Yes or no.
 4              THE COURT:  When?
 5              MR. BURKS:  At the time of -- good question,
 6    Judge.  Thank you.
 7    BY MR. BURKS:
 8    Q    Are you aware of -- as of May 23, 2018, are you aware
 9    of what entities Ali Choudhri was the manager or owner of?
10    A    I'm still not aware of all of the entities he's a
11    manager or the owner of.
12    Q    Okay.  Thank you.
13              MR. BURKS:  Your Honor, I may be done on cross if
14    I can have 45 seconds to ensure that.
15              THE COURT:  You may have exactly 45 seconds.
16              MR. BURKS:  Thank you for that, Your Honor.
17              THE COURT:  And I'm watching the clock.
18              MR. BURKS:  On the atomic clock.
19              THE COURT:  On the atomic clock.  You've got 20
20    seconds left.
21              MR. BURKS:  And I can give you a countdown.
22    BY MR. BURKS:
23    Q    Did you sign any of the Naissance entities' ownership
24    over to Ali Choudhri?
25    A    No.
```

```
 1   Q    Do you believe that in the corporate structure of

 2   things that you were a fiduciary of some sort to Ali

 3   Choudhri?

 4           MR. TANG:  Objection, Your Honor.  Probably calls

 5   for a legal (indiscernible).

 6           THE COURT:  I'll sustain the objection.  Thank

 7   you.

 8           MR. BURKS:  Nothing further, Your Honor.

 9           THE COURT:  Thank you.  Mr. Shannon?

10           MR. SHANNON:  I have no further questions, Your

11   Honor.

12           THE COURT:  Ma'am, thank you for coming and

13   testifying.  I appreciate it (indiscernible).

14           MR. POPE:  Your Honor, I did have two questions.

15           THE COURT:  Are you a part of this objection?  I

16   don't think you are.  I think you're excused.  Thank you.

17   Can I excuse this witness, Mr. Shannon?

18           MR. SHANNON:  Yes, Your Honor.

19           THE COURT:  All right.  Thank you, ma'am.  You're

20   free to leave.

21           MR. SHANNON:  Thank you (indiscernible).

22           THE COURT:  Thank you.  Thank you for appearing.

23   All right, Mr. Shannon.  Next witness?

24           MR. SHANNON:  Yes, Your Honor.  I'd like to call

25   Christopher Wyatt.
```

1          THE COURT:  Mr. Wyatt, do you want to come

2    forward?  If you could go to the podium, sir, I'll swear you

3    in.  Please raise your right hand.  Do you swear or affirm

4    to tell the truth, the whole truth, and nothing but the

5    truth so help you God?

6          THE WITNESS:  I do.

7          THE COURT:  All right.  Please be seated, sir.

8    Yeah.  Just make sure you speak into the microphone.  Thank

9    you.

10          THE WITNESS:  Yeah, sure.

11          DIRECT EXAMINATION OF CHRISTOPHER WYATT

12    BY MR. SHANNON:

13    Q    Good morning, Mr. Wyatt.  Could you spell your first

14    and last name for the record please?

15    A    It's Christopher, C-H-R-I-S-T-O-P-H-E-R, last name's

16    Wyatt, W-Y-A-T-T.

17    Q    And Mr. Wyatt, are you here under a subpoena today?

18    A    Yes.

19    Q    I want to start off kind of with your background and

20    your knowledge of things.

21          MR. BURKS:  Your Honor, at this time I would

22    object to the calling of this witness.  I was not aware that

23    he'd be called as a witness in this case.  I don't -- until

24    two days ago.

25          THE COURT:  The fact that you're not ready, Mr.

1    Burks, is not grounds for objection.  It's overruled.  Thank

2    you.

3              MR. BURKS:  Yes, Your Honor.

4    BY MR. SHANNON:

5    Q    Mr. Wyatt, did you ever work with or for any entity

6    related to Mr. Ali Choudhri?

7    A    Yes.

8    Q    Can you explain what entities you had involvement with?

9    A    Well, you know, a lot of entities.  But purportedly I

10   was hired by Jetall Companies Inc. as an employee but paid

11   through another company they had called Balio.  So it kind

12   of mixes, matches everything with respect to entities.

13   Q    And can you explain what your role is with whichever

14   entity you were working for?

15   A    During that time probably I think I started there in

16   July 2019 and -- until October -- around October 20th of

17   2020.  And during that time I was -- the title I was given

18   is chief operating (indiscernible).

19   Q    And in that role, did you become familiar with Mr.

20   Choudhri's businesses beyond just Jetall Companies Inc.?

21   A    Yes.

22   Q    Did you become familiar with 2425 W -- I'm sorry, 2425

23   -- excuse me.  I'm sorry.  Let me just restart over.

24   Galleria 2425 Owner LLC.

25   A    Yes.

1    Q    Did you become familiar with an entity referred to as

2    2425 WL LLC?

3    A    Yes.

4    Q    And how did you become familiar with those different

5    entities?

6    A    Well, there were a lot of transactions going in

7    connection with those.  Like the Galleria 2425 became

8    involved because there was a Stage bankruptcy at least

9    pending for them, and you know, caused economic problems for

10    that entity.

11    Q    And were you familiar with the financials of all these

12    different entities in that role?

13    A    I saw financials.  As far as being familiar with, you

14    know, monthly operating reports and stuff like that, no.

15         MR. BURKS:  Your Honor, I'm going to object to

16    again this witness on grounds that there is no foundation

17    that he worked for the debtor, worked for 2425 WL, or that

18    he has any knowledge about the transaction that we --

19         THE COURT:  I don't know what he's going to

20    testify to yet, Mr. Burks.  This is all preliminary.  If you

21    have an objection to what he testifies to when he actually

22    says something, please raise your objection, okay?

23         MR. BURKS:  Yes, Your Honor.

24         THE COURT:  Thank you.

25    BY MR. SHANNON:

1    Q     And Mr. Wyatt, you are no longer involved in Jetall

2    Companies or any of these entities, correct?

3    A     Correct.

4    Q     And when did that happen?  When were you no longer

5    involved with them?

6    A     Around October 18th or October 20th of 2020.

7    Q     And I guess why did you kind of leave your involvement

8    with those entities?

9    A     Well, there were a number of things.  One is I started

10   to independently investigate through business records of

11   transactions that were being made on behalf of Mr. Choudhri.

12   And (indiscernible) found that I was extremely uncomfortable

13   with those transactions.  He asked me to go into an

14   arbitration trial and lie before an arbitration panel and

15   say that he had no ownership of an entity called Balio, he

16   never had an ownership interest in it when in fact I know he

17   did.  And I had the agency agreement where he was the

18   principal, and I had the original.  It caused a lot of rift.

19         MR. BURKS:  Move to strike.  He's testifying from

20   documents not in the record.  Probably based on a lot of

21   hearsay.

22         THE COURT:  He can testify on his personal

23   knowledge.  Thank you.  You're overruled.

24         MR. BURKS:  Yes, Your Honor.

25   BY MR. SHANNON:

1    Q    And I guess in the course of those role and in the --

2    just based on your personal knowledge from that role, did

3    you have any knowledge of the sale of the property located

4    at 2425 West Loop in the Galleria?

5    A    I became familiar with that transaction around June

6    2020.  And the reason why I became familiar with it is that

7    Mr. Choudhri directed me to draft a note and deed of trust

8    for that entity.  And I went back and looked at closing

9    documents to try to figure out was there a $14 million loan

10   made on the property, although I had drafted these note and

11   deeds of trust for him that he wanted to submit to Azeemeh

12   Zaheer, sign.  I went back and started looking at the

13   closing documents and found out that there was never a loan.

14   There was never a note.

15   Q    And did you ever discuss that with Mr. Choudhri?

16   A    I told him that I didn't think it was proper to try to

17   after-the-fact create a document and file it and record it

18   to try to get leverage in a bankruptcy case.

19   Q    And the bankruptcy case you were talking about was at

20   that time the Stage bankruptcy case, correct?

21   A    Correct.

22   Q    And the timing of those conversations, when would those

23   have been?

24   A    Those were in June of 2023.

25   Q    Of 2023?

```
 1    A    Oh, 2020.  I'm sorry.

 2    Q    And you said you looked at a closing statement in

 3    connection with that transaction, correct?

 4    A    Yes.

 5    Q    I'm going to pull up a document 692-4, which has been

 6    previously admitted.

 7              MR. SHANNON:  And Your Honor, I believe I -- you

 8    need to --

 9              THE COURT:  Oh, excuse me.  I'll put it back

10    (indiscernible).

11              MR. SHANNON:  That's okay.

12              THE COURT:  I apologize.

13    BY MR. SHANNON:

14    Q    So Mr. Wyatt, I'm going to -- and I know it's small but

15    we'll pull it up, but I'm just going to go to slide through

16    it and tell me if this is the document that you looked at,

17    at that time.

18    A    You're going a little bit quick for me.

19    Q    Okay.  Let me slow down.  I'll go back to the

20    beginning.

21    A    Okay.  Okay.  Okay.  Yes.

22    Q    And you reference or there is reference in this

23    document a $14.7 million amount.  Are you aware of kind of

24    that amount being a relevant amount?

25    A    Yes.
```

1    Q    And did you ever talk with Mr. Choudhri about that

2    amount?

3    A    We talked about it, and when he asked me to draft a --

4    the note and deed of trust to be representative of a lien

5    that he said he was owed money on.

6    Q    And did Mr. Choudhri ever refer to that amount as

7    anything in particular?

8    A    He told it was his equity out of the closing.

9    Q    And your understanding was that not a loan.  It was

10   equity.  Are those things different in your mind?

11   A    I worked in banking for a long time, and based on this

12   settlement statement, the $14 million seems to be cash paid

13   back to the seller.

14   Q    And do you have an understanding, I'm going to pull it

15   out, of what a seller credit means in a closing statement

16   like this or a settlement statement?

17   A    I certainly haven't seen the word "credit" used.

18   Q    Okay.  So you talked about Mr. Choudhri asking you to

19   create this note and deed of trust.

20   A    Correct.

21   Q    If there was a note that had already existed based on

22   what was available to you at the time in your looking at the

23   documents, would you have seen such a document that existed

24   in 2020?

25   A    Yes.  I would have.

1    Q    And so the fact that you -- did you see one at that

2    time?

3    A    No.  I searched everywhere for it.  I couldn't find it.

4    Q    And so at least as of 2020, that document did not exist

5    as far as you could tell.

6    A    As far as I know, I couldn't find it anywhere.  I asked

7    him about it and he said we're just going to do the new

8    note.

9    Q    I believe you mentioned that -- or are you aware of a

10   time in which Mr. Choudhri talked to Ms. Azeemeh Zaheer to

11   execute a note?

12   A    So --

13        MR. BURKS:  So calls for hearsay, Your Honor.

14   Classic hearsay.

15        THE COURT:  I want you to respond to that.

16        MR. SHANNON:  Well, I'm asking about Mr. Choudhri.

17   Mr. Choudhri is the -- at least a vice principal, but

18   probably the principal of the claimant.  He signed the proof

19   of claim.

20        THE COURT:  I'll sustain the objection.

21   BY MR. SHANNON:

22   Q    Did you ever personally hear, personally and not today

23   and not in court, did you ever personally hear Mr. Choudhri

24   do that?

25        MR. BURKS:  Objection.  Do what?

1    BY MR. SHANNON:

2    Q    Pressure Ms. Zaheer to execute a note.

3    A    No.

4    Q    And when you -- again, just to recap, as far as you

5    know, there was not $14.7 million loan made as part of that

6    2018 transaction.

7    A    No.

8            MR. SHANNON:  Thank you, Your Honor.  No more

9    questions, Your Honor.

10           THE COURT:  Mr. Burks?

11           MR. BURKS:  Thank you, Judge.

12              CROSS-EXAMINATION OF CHRISTOPHER WYATT

13    BY MR. BURKS:

14    Q    When did you come onto work for -- which entity did you

15    say you worked for, sir?

16    A    Well, I was told Jetall Companies Inc.

17    Q    All right.  And when did you first -- establish a

18    timeline for me.  When did you first come onto work with

19    Jetall?

20    A    July 2019.  Probably the first week.

21    Q    So actually the transaction, correct?

22           THE COURT:  What transaction, Mr. Burks?

23    BY MR. BURKS:

24    Q    After the sale of the property at issue by 2425 WL to

25    Galleria 2425 Owner, correct?

1    A    Correct.

2    Q    So you have no personal knowledge of what happened at

3    the time of the transaction.

4    A    When?  In 2018?

5    Q    Correct.

6    A    No, I do not.

7    Q    Well, when did you leave working for whichever entity

8    you thought you were working for?

9    A    October 2020.

10    Q    October 2020.

11    A    Mm-hmm.

12    Q    At the time that you left -- let me rephrase that.

13    Isn't it true that...

14         MR. BURKS:  Can we see that on the screen, Your

15    Honor?  I don't want your help, but I can't turn it on.

16         THE COURT:  That's fine.

17    BY MR. BURKS:

18    Q    Isn't it true that you just said you have no idea what

19    a seller credit to buyer is?

20    A    That's correct.

21    Q    So what do you think the $14,730,000 is?

22    A    That looks like it was paid to the seller.  If you look

23    at line 603, cash to seller $13,718,000.

24    Q    Paid to the seller by whom?

25    A    The buyer as part of the closing statement.  Buyer's

1    got funding.  Seller.

2    Q    So now that you've decided to give your opinion on

3    that, did you hear the testimony earlier that the buyer put

4    in no money?

5    A    That's correct.

6    Q    All right.  Did you understand the 2018 transaction

7    when Mr. Choudhri approached you to draft the document?

8    A    Not initially, no.

9    Q    Oh, but you learned afterward.

10    A    After he asked me to draft a note and a deed of trust

11    in connection with $14 million that was never loaned.  Yeah,

12    I went back and started looking at his transaction because

13    he sent me a voicemail message from Azeemeh Zaheer where she

14    said, look, I'm not comfortable with this.  I'm not going to

15    sign it.  I think I need a lawyer to look at it.

16    Q    Okay.

17    A    That's when I started to go back and look and say what

18    is really going on here.

19    Q    Isn't it true that Mr. Choudhri told you that the

20    seller credit to buyer of $14,730,000 was in fact a loan

21    from WL back to the buyer?

22    A    Nope.

23    Q    So what is a credit to the buyer?

24    A    Not sure.

25    Q    Who's the seller?

```
1    A    The seller in what this transaction?

2    Q    Yeah.

3    A    The seller was 2425 WL I believe.

4    Q    And who was the buyer?

5    A    Galleria 2425 Owner.

6    Q    So the seller credits the buyer $14,730,000, correct?

7    A    I don't know.  I'm not -- like I said, I don't know

8    what that seller credit to buyer is.

9    Q    Isn't that a loan?

10   A    No.

11   Q    You just said you didn't know what it was, sir.

12   A    There's been no -- there was never any money loaned in

13   connection with the $14 million.  This deed of trust and

14   note that Mr. Choudhri wanted drafted in June 2023 was

15   clearly an intent to fraudulently put a lien on this

16   property so he could leverage in the Stage Stores

17   bankruptcy.  That's my opinion.  That's the way I took it.

18   Q    Isn't it true that you're basing your opinion after

19   saying that you don't know what a seller credit to buyer is

20   and you had no knowledge whatsoever of a transaction at the

21   time because you weren't there?

22   A    I wasn't there.  You're correct.

23   Q    And you don't know what a seller credit to buyer is.

24   A    Nope.

25   Q    But you formed your opinion.
```

1    A    Formed my opinion because I know exactly how he works,

2    and he was trying to put a lien --

3        THE COURT:  Mr. Burks --

4    BY MR. BURKS:

5    A    -- on this property that was fraudulent.

6        THE COURT:  -- I'm going to -- bear with me for

7    one second, okay?  You're not the village idiot.  I'm not

8    the village idiot, okay?  I can read a settlement statement.

9    I know what a settlement statement means.  You should.

10    You're proposing an argument that has no basis in law or

11    fact --

12        MR. BURKS:  Your Honor --

13        THE COURT:  -- okay?  You can continue with that,

14    and if you do I'll sanction you, okay?

15        MR. BURKS:  Well, it was --

16        THE COURT:  That settlement statement is pretty

17    damn clear to me, and I think that you're on a course that

18    I've warned you against at the beginning of the hearing.

19    You're now crossing that line.

20        MR. BURKS:  All right.

21        THE COURT:  Okay?

22        MR. BURKS:  I hear you.

23        THE COURT:  So move along --

24        MR. BURKS:  I hear you.

25        THE COURT:  -- or you will not like the results.

```
 1                    MR. BURKS:  I will move along and I will not cross

 2      the line.

 3                    THE COURT:  Thank you.

 4                    MR. BURKS:  Thank you, Your Honor.  No further

 5      questions, Your Honor.

 6                    THE COURT:  Thank you.  Mr. Shannon?

 7                    MR. SHANNON:  I have no further questions, Your

 8      Honor.

 9                    THE COURT:  Thank you, sir.  Thank you for coming.

10      You may step down.

11                    THE WITNESS:  Thank you, Your Honor.

12                    THE COURT:  And you're excused by the way.

13                    THE WITNESS:  Thank you.

14                    THE COURT:  Mr. Shannon?

15                    MR. SHANNON:  No further witnesses from us, Your

16      Honor.

17                    THE COURT:  Thank you.  Mr. Burks?

18                    MR. BURKS:  Your Honor, I do not have Mr. Choudhri

19      here and I'm not prepared to put on a case.  So --

20                    THE COURT:  You rest?

21                    MR. BURKS:  -- no witnesses.  I rest.

22                    THE COURT:  All right.  Thank you.  Mr. Shannon,

23      you want to make some argument?

24                    MR. SHANNON:  Yes, Your Honor.  And I do have a

25      presentation that hopefully will not take too long here, but
```

1   I just want to summarize what the documents said.  I didn't

2   want to go through with the witnesses through all the

3   documents, but they are admitted and I'd like to talk about

4   what they show.  If I can have the screen, Your Honor.

5   Again, Your Honor, the evidence, and I think especially with

6   the exhibits that we'll go through, showed what we said it

7   would.  The purported note that underlies this Claim Number

8   7 is unenforceable, and the reason why is because there was

9   no consideration provided in exchange.

10          I think what the evidence shows is absolutely that

11   the note did not exist and it was not part of the May 23,

12   2018 transaction.  The seller credit, although the witnesses

13   didn't know what it means, we'll talk about what it means

14   and we have some case law that will talk about what it

15   means, but we do know and Mr. Wyatt testified is that Mr.

16   Choudhri talked about that as the equity in the property.

17   And I believe that's what the documents are going to show.

18          The note just wasn't part of that transaction and

19   it didn't exist 2020.  Frankly, it didn't exist until 2021,

20   and again that's going to be supported by the documents that

21   we go through and talk about.  That note was just created in

22   2021.  But again, even if that's not right, we talked about

23   the authority to execute the recorded note.  Ms. Zaheer said

24   that Mr. Choudhri did not have authority to act on behalf of

25   the debtor.  Did not have the authority to execute documents

1    in 2018.

2            Naissance Capital Real Estate LLC was the managing

3    member until 2021.  And as the documents will show when you

4    go through them, Galleria 2425 JV company agreement said

5    that only the managing member could act on behalf of that JV

6    entity, which was the sole member of the debtor.  And again,

7    Judge, there is the quasi-estoppel argument.

8            Where that money came from is obvious.   It came

9    from the funds that were made by NBK and by the mezzanine

10   loan.  And those representations were important to the other

11   lenders, and the documents, as we'll go through that have

12   already been admitted, show that that was important to those

13   lenders.

14           Let's talk about the settlement statement first.

15   It was actually attached to Claim Number 7.  Mr. Burks

16   brought it up at ECF 637-5, and it's been admitted as 692-4.

17   First of all, why it's relevant, ECF Number 692-5 is the

18   transcript of the January 31, 2024 hearing.  Although Mr.

19   Choudhri's not here, we do have his testimony from that

20   hearing in front of this court in this case, it can't be

21   considered.

22           He said in that transcript that, on Page 73, he

23   said that the loan over the claim was based -- was "one

24   account of what was on the closing statement the bank

25   approved plus accrued interest," which is accounted for.

1    Again, in that same transcript in that same hearing at Page

2    94 to the beginning of Page 95.  It was Ms. Whitworth that

3    was questioning Mr. Choudhri, and he said kind of about the

4    different claims that he asserted.  And Mr. Choudhri said

5    that there are two totally separate things.

6            So there's three related.  Let me see, four

7    related.  One is the selling entity, which is 2425 WL, which

8    is the second lien holder.  Mr. Choudhri would go on to say

9    that it's reflected on the closing statement that the bank

10   approved when the loan was obtained.  When you actually look

11   at the closing statement, I have an excerpt of it up on the

12   screen, what he's referring, that $14.7 million number, it

13   is.  It's referenced as a seller credit to the buyer.

14           But what that means is it's a reduction in the

15   amount due to the seller, not a loan.  There is case law

16   that we put in our briefing and I have it up here, that

17   Johnson v. Kamisi case, 2024 Delaware CP Lexis 13.  It talks

18   about -- and the whole case was about a seller credit is,

19   and it's a reduction in the amount due the seller.  We can

20   say, look, it's still -- we're still selling the property

21   for this, but we're going to reduce.  And it makes sense in

22   this transaction because Mr. Choudhri, whether through an

23   agent or whatever, was on both sides of it.  We heard that

24   from the testimony.

25           There was no loan by 2425 WL indicated.  When you

 1    look at the lines 200 through 209, it lists NBK.  It lists

 2    that $51 million loan.  It lists the $16.1 million mezzanine

 3    loan, but it doesn't list a second lien or any loan from the

 4    seller there.  And it was required to.  It was -- they

 5    filled out a HUD 1 settlement statement, and there is --

 6    there are regulations on how to fill that out.  There are

 7    instructions that are promulgated by regulatory agencies and

 8    we have them up here, the critical aspect of it.  And

 9    there's also an exhibit.

10        We filed it just so it was in front the Court, but

11    it has to be on Lines 204 through 209.  It's supposed to

12    indicate any financing arrangements for other new loans not

13    listed otherwise at Line 202.  And it includes financing

14    from the seller.  That's where it's supposed to be.  It

15    should also be listed in Lines 506 through 509.  And again,

16    we go back, Judge, and that is not there.  It's simply not

17    where it's supposed to be.  And that's what they say when --

18    where it was supposed to be.  That's what Mr. Choudhri said

19    it is indicated and it's not.

20        There are also the admissions and the

21    (indiscernible) discovery that was served on the claimant

22    here 2425 WL is at ECF 692-25.  There were a number of

23    requests for admission that we had, and it just covers that

24    those things are not listed on there.  The loans from NBK

25    and the mezzanine lender are listed.  The loan -- that loan

1    from 2425 WL is not listed.  And I believe -- yeah, and it

2    even went on in those admissions.  Request Number 15 says

3    that those regulations matter.  What was deemed admitted

4    because there was no response.  Request Number 16, that it

5    should have been listed there.  That was admitted.

6         Request Number 17 that any seller financing

7    should've been listed in Lines 204 through 209.  Again, that

8    was admitted.  So the settlement statement doesn't show it

9    as a loan.  I'll also point out what the settlement

10   statement does show is that there was cash going out in 2425

11   WL LLC.  That was the $13.7 million.  And I understand that

12   the witnesses got confused when we were talking about 14 --

13   you know, 13.7, 14.7, but the settlement statement is clear

14   what happened.  The settlement statement is clear, and it

15   was attached to the proof of claim.  It's what the claimant

16   says happened.

17        That cash went out to the claimant here, so they

18   are going to be bound by quasi estoppel.  That's why they're

19   bound.  They wouldn't be bound if they didn't get anything

20   out of it, but they did, and they used the settlement

21   statement as part of the -- how that was induced.  And it

22   was also just -- it was signed by the claimant here through

23   Adam Broder as you also heard in testimony.

24        Again, these are all supported by admissions as

25   well.  It has been admitted that 2425 WL received $13.7

1   million.  No actual dispute about that.  It's been admitted.

2   And it's been admitted that the source of those funds were

3   from the loans.  So that's the settlement statement and

4   that's what they based it on, but when you actually get into

5   the transactional documents, it tells the same story.  The

6   NBK loan agreement admitted at 692-8.  I think it's also

7   been admitted previously in this case.

8           Sections 5.26 and 6.1 they talk about other

9   indebtedness, and they say there is no other indebtedness

10  except for this loan, the NBK loan, and in other places it

11  talks about the mezzanine loan.  But it says that's all

12  there can be.  It is a breach of this agreement to have any

13  other amounts owed.  And while that doesn't bind the

14  claimant necessarily, it is -- it's circumstantial evidence

15  about what was part of that transaction.

16          There's no reason that anyone else that's part of

17  that transaction would make it up and pretend that this loan

18  wasn't made.  They would have said that the loan was in

19  there if it was.  We don't have any reason to think that

20  they would not put it in there.  Again, that's admitted.

21  It's admitted that the NBK loan agreement prohibits a second

22  lien and prohibits this note that underlies Claim Number 7.

23          It goes on.  There's other provisions of the NBK

24  loan agreement.  Very standard provisions that say, hey, no

25  contractual obligations.  Those contractual obligations

1    include things that would be covered by the note, by the

2    purported note underlying Claim Number 7.  Again, it's a

3    belt-and-suspenders type of thing.

4            Also attached as part of that NBK loan agreement

5    is a -- the borrower's organizational structure.  That was

6    part of the loan agreement.  It comports exactly with what

7    you heard in testimony today from Ms. Zaheer.  That was the

8    understanding then, it's the understanding now.  That

9    description even includes the loans that were made.  It

10   includes the senior debt.  It includes the mezzanine debt.

11   And it also includes the equity in the property right there

12   at the top.  And that's been -- at least that this is an

13   accurate description has actually been admitted.

14           The next thing is the NBK loan memo ECF 692-7,

15   particularly Slide 10.  We didn't get to talk about it with

16   the witness because Mr. Choudhri wasn't here, but again, it

17   describes the loans that were taken out.  It describes the

18   loan to value.  It describes that it was important to NBK

19   that there was no lien at the debtor level, at the property

20   level.  And that even the mezzanine debt was at a parent

21   level, and that made a difference.

22           Mr. Choudhri had talked about this loan agreement

23   before or this loan memo before at the January 31, 2024

24   transcript.  And at that hearing that's reflected in the

25   transcript Mr. Choudhri testified at that hearing that that

1   memo was created by the bank and it broke all of -- I'll

2   quote it, that they did before they closed the loan, that

3   broke all the -- a lot of the structure down.  That's -- Mr.

4   Choudhri was talking about the loan memo when he referenced

5   that.  Again, this is -- it's a common thing throughout the

6   loan documents, the mezzanine loan agreement.

7          It talks about the mortgage lender, the mortgage

8   borrower because again, the other debt mattered to that

9   transaction, what other debt there mattered for a mezzanine

10  lender especially because even unsecured debt at the

11  subsidiary level comes before the mezzanine loan.  It

12  mattered.  They talked about the mortgage borrower.

13         Particularly they talked about that the borrower,

14  which was the JV entity, had to ensure that the mortgage

15  borrower, which was the debtor, observe, perform, and

16  fulfill each and every covenant, term, and provision of each

17  mortgage loan document.  Again, it's important because the

18  requirements for that transaction -- the requirements from

19  the mezzanine loan transaction really incorporated in the

20  NBK loan agreement again that there was no other debt.  It

21  was important to that transaction.

22         Another section that includes that is Section

23  4.2.1 of the mezzanine loan agreement.  Same kind of idea.

24  Talks about the mortgage borrower who is the debtor.  And it

25  says it cannot mortgage, grant, bargain, encumber, pledge,

1    assign, or transfer the property.  Property was at issue in

2    that.  And again, for Claim Number 7 to be accurate, this --

3    all these documents had to be inaccurate.  They had to be

4    hiding something that they had no reason to hide.

5            4.2.2 of the mezzanine loan agreement, same thing.

6    It talks about leads, no leads.  Although we're not

7    challenging the deed of trust per se, the note and the deed

8    of trust together constitute a lien.  It was not a permitted

9    encumbrance under that agreement.

10           Lastly, Judge -- or maybe not lastly, but we have

11   the deed of trust running into a problem here.  It's only

12   letting me go one way.  That's fine, Judge.  When you

13   actually look at the deed of trust, when you actually look

14   at the document, it indicates that -- it indicates in the

15   jurat that it is executed in 2021.  Let's see if I can get

16   this another way.  We had the deed of trust up here.

17           Critically, this jurat indicates that this deed of

18   trust was created in 2021 and it gets it right here.  That

19   is when this document was acknowledged.  It's -- and frankly

20   it's when it was created.  And you can see that by the

21   document control numbers throughout the document.  This

22   document control number is the same throughout.  The jurat

23   was at the same time as the document was created, and it

24   purports to be of even date with the note.  The note says

25   that it's of even date.

1             It references the deed of trust in the note.  And

2      it says that it actually incorporates the terms referring

3      the deed of trust into the note.  It couldn't have done that

4      if the deed of trust was not yet created.  That's why the

5      deed of trust is relevant.  It's relevant because it's

6      referenced in the note, and that note and deed of trust were

7      created the same day.  They were created in 2021.

8             Going as far as -- the last thing I think from the

9      documents is going to be the signatures, one other material

10     document.  Every other material document that was related to

11     the May 23, 2018 transaction that's signed by Azeemeh

12     Zaheer, these two documents, and we have two of them, were

13     executed by Ali Choudhri.  And at least with the deed of

14     trust, it was executed by Galleria West Loop Investments 2

15     LLC.  We know that they didn't become the managing member of

16     the JV entity until 2021.

17            I think that was actually accurate.  I think it

18     was Ali Choudhri as manager of Galleria West Loop

19     Investments 2 LLC, the managing member of the JV entity.  I

20     think that was true, but it was in 2021.  The purported note

21     also signed by Ali Choudhri doesn't say that.  Is of even

22     date.  I think it was also -- I think the evidence shows it

23     was also the same date.  I think that's the only inference

24     that can be drawn.  Again, every document signed by Azeemeh

25     Zaheer, including the settlement statement.

1          What the claimant wants you to believe is that

2     this one exception that isn't reflected in the documents

3     that these witnesses have testified did not exist or were

4     not part of this 2018 transaction did not exist in 2020,

5     that this exception -- this is the exception.  We don't have

6     any reason to believe that, Judge.  And that again included

7     documents after the May 23, 2018 transaction.  The tax lien,

8     the tax lien contract with Moussa Hussein signing it.  Those

9     were signed in 2020 again through Naissance Capital Real

10    Estate LLC as Ms. Zaheer testified was part of that

11    Naissance Capital Real Estate entity.

12         So from 2018 through 2020, same -- again, always

13    Naissance Capital Real Estate signing it.  These were

14    admitted.  I mean, the signatures were admitted.  It was

15    admitted that Choudhri didn't sign and give those other

16    documents.

17         The corporate authority, Judge, as we've talked

18    about, you heard Azeemeh Zaheer testify about, we went

19    through some of these.  Mr. Choudhri did not have authority

20    prior to 2021.  The management agreement or the 2425 JV LLC

21    company agreement talked about the managing member and said

22    it's the Naissance member.  And it also said that only the

23    Naissance member, only the managing member could take any

24    actions on behalf of that JV entity.  And I know this can't

25    be a surprise because it's going to argued in our brief.

1            Again, Ms. Zaheer confirmed that, confirmed that

2    was actually the case.  But as, you know, it's reflected in

3    the documents as well.  Wasn't until 2021 that it changed as

4    reflected in the unanimous consent at ECF 692-19 as Ms.

5    Zaheer testified to and clarified that it was on January 18

6    of that year that the change happened.  Again, admitted

7    through the request for admission.  These can't be disputed.

8            And I think we also heard a little bit about the

9    motive for all of this.  We heard about the Stage Doors'

10   bankruptcy.  Admitted as ECF Number 692-20 is the notice of

11   rejection that we -- that is a document that effectuated

12   what we heard about losing that tenant.  We have the

13   document from another judge in this court, I guess former

14   judge.  So you have that in -- it's reflected in documents

15   exactly what you heard the witnesses talk about.

16           After that is when the dispute with NBK started.

17   The document admitted as 692-21 is when NBK did their

18   foreclosure.  This was in September of 2021, only a few

19   months after the -- you know, after the deed of trust was

20   actually filed, whenever it was.  The petition was assigned

21   from that litigation.  It was ultimately removed up here

22   that you've heard a lot about, Judge.  That happened in

23   September of 2021 as well, only a few months after the deed

24   of trust was recorded.

25           The other thing that it shows is why this was

1    being done.  Soon after around the same time in September of

2    2021, 2425 WL filed a notice of foreclosure sale.  They knew

3    they were second lien, but they went and they did their

4    notice of foreclosure sale.  That's at ECF Number 692-23.

5    The critical thing is what happened after because that was

6    one thing.  At 692-24 is an unrecorded trustee's deed.  Not

7    only did 2425 WL do their notice of foreclosure, they

8    actually went through with it.  I think they didn't record

9    it, and that's what happened.  It's an unrecorded deed right

10   now.  And that's at 692-24.

11          I think they did all that, Judge.  And the reason

12   this claim was filed was to get an advantage in this

13   bankruptcy case.  You've seen all the actions that happened

14   in this case, and the reason for the claim was to have the

15   guise of a junior lienholder, a junior secured creditor or

16   potentially secured creditor and the advantage that would

17   give in bankruptcy.

18          It was designed to say this is a serious creditor

19   that needs to be really taken into account, and it was.  It

20   was taken into account by this court.  It was taken into

21   account by everybody.  But that was the reason for it even

22   though it was entirely wholly unsecured.  Even though they

23   weren't going to get anything in the case, that's why it was

24   done.  But at the bottom line, it is just an unenforceable

25   claim.  There is no enforceable claim against the debtor or

1    the debtor's estate, and for that reason Claim Number 7

2    should be disallowed.  Thank you, Your Honor.

3           THE COURT:  Thank you.  Mr. Burks?

4           MR. BURKS:  Thank you, Judge.  Your Honor, as I

5    stand here now I stand in the same position I stood in two

6    hours and eight minutes ago, and that is proof of Claim

7    Number 7 has been cancelled and extinguished by the plan.

8    The requested relief by the trustee is to deny the claim

9    against the estate in full.  That request I believe is moot

10   because it's already been cancelled and extinguished.

11          With respect to the various commentary, I want to

12   first personally apologize for taking the courses of action

13   that angered the Court.  Or concerned the Court is a better

14   word I believe.  And I do personally apologize for that.

15   You're right.  I have a zealous representation of my client

16   in mind, and I've tried to balance that zealousness with

17   comments the Court has made.  And if I stepped on or near a

18   line, I do apologize, Your Honor.

19          One thing, though, there was comments made, and

20   the question becomes at 3:30 yesterday I feel on my sword.

21   I said, you know, I've read the judge's opinion in another

22   case.  I've looked at the plan.  I've looked at the fact

23   that it's substantively consummated and in effect.  Well, I

24   don't have a claim anymore.  And then after 3:30 we're still

25   going forward.  So why are we going forward?  Well, I don't

1    know.  But I will tell you this.  It's all right for me to

2    tell the Court that Mr. Choudhri, if he had been here, his

3    position in filing the proof of claim was he believed that

4    seller credit was a loan.  That's what he says.

5           It's all right for me to say that.  It's all right

6    for someone to disagree or overrule that position.  It's all

7    right for me to question witnesses in support of my client's

8    position.  And I've done the best I can.  Of course I'm

9    unprepared because I came here with a cancelled and

10   extinguished claim.  So I did not and would not and could

11   not come before you and say, Judge, I want a trial to allow

12   my claim that's been cancelled and extinguished.  I don't

13   want to do that, Your Honor.

14          So I think the ruling here is it started with

15   cancelled and extinguished.  Everything else I don't know

16   that you have justiciable cause of action to actually

17   adjudicate.  And I don't know what all the testimony was

18   about.  That said, I accept that there is a confirmed plan,

19   which is subject to appeal, but which is binding on the

20   parties that has cancelled and extinguished this claim.  And

21   I thank you for your patience, Judge, and I thank you for

22   your time.

23          THE COURT:  All right.  Thank you.  All right.  So

24   before the Court is the objection and proof of claim, which

25   is at ECF Number 402.  After considering the pleadings,

1    evidence, testimony, and the arguments of the parties, the

2    Court makes the following findings of fact and conclusions

3    of law under Federal Rules of Civil Procedure 52 as

4    incorporated by the Federal Rules of Bankruptcy Procedure

5    7052 and 9014.  To the extent that any finding of fact is

6    construed to be a conclusion of law, it is adopted as such.

7    To the extent that any conclusion of law is construed to be

8    a finding of fact, it is adopted as such.

9         The Court reserves the right to make any

10   additional findings and conclusions as may be necessary or

11   as requested by any party.  The Court further reserves the

12   right to supplement the findings of fact and conclusions of

13   law and to issue a written opinion.  I'm going to ask Mr.

14   Shannon to draft proposed findings of fact and conclusions

15   of law, and I specifically reserve the right to issue a

16   written opinion after I've received those.  All right?

17        Let me note for the record that there is a

18   shifting of the burden of proof at various times during an

19   objection to claim.  A proof of claim has evidentiary

20   effect.  The objecting party has to come forth with

21   sufficient evidence to overcome the evidentiary effect and

22   then the burden moves back to the claimant.

23        I think quite clearly there is clear and

24   convincing evidence that the claim should be disallowed, all

25   right?  The claim, which amended at ECF Claim 7-2 is for

1    22,968,231.58.  The Court makes the following findings.  As

2    to the promissory note that's attached to 7-2, which is

3    dated May 23, 2018, the Court finds that it is not part of

4    the 2018 transaction which was the purchase of the property,

5    which is reflected in the transactions at ECF 692-8 to 692-

6    12.

7           The Court also finds there is no consideration for

8    the promissory note, that it is in fact a fraudulent note,

9    and that Mr. Choudhri at the time that it was purportedly

10   signed had no authority to sign it.

11          I also will make the same conclusions about the

12   deed of trust.  The deed of trust, which is attached to the

13   proof of claim, was not part of the 2018 transactions

14   referenced by the ECF numbers I mentioned earlier 692-8 and

15   692-12.  There was no consideration for the deed of trust.

16   There was no loan.  It is in fact a fraudulent transaction.

17   Mr. Choudhri had no authority to sign it.  All right?

18          I also think by clear and convincing evidence that

19   this is a false proof of claim, and I'm going to remind the

20   parties that it is a criminal offense to file a false proof

21   of claim under 18 USC 152(4).  And I intend to make a

22   criminal recommendation on this case based on the proof of

23   claim that's been filed.  I understand why Mr. Choudhri

24   didn't show up for trial.  If he had been put on the stand,

25   he would've been crucified by the testimony that I heard

1    today.

2         And I think that more than anything, Mr. Burks, it

3    confirms my prior opinion that I've written about, the prior

4    opinion I've written about by Mr. Murray, that Mr.

5    Choudhri's a person whose truth and voracity is subject to

6    great doubt, all right?  And I'll make that finding on the

7    record.  All right?  So I'll enter an order after I see Mr.

8    Shannon's proposed findings of fact and conclusions of law.

9    That concludes the objection to Claim Number 7.

10        Mr. Shannon, let's take a short break.  We'll come

11   back with whichever claim you want to go on next.  Thank

12   you.  Thank you all for appearing.

13        BAILIFF:  All rise.

14        THE COURT:  I'll come back at 11:30.

15        (Recess)

16        BAILIFF:  All rise.

17        THE COURT:  Please be seated.  All right.  It's

18   11:30 a.m. and we're back on the record on Friday, September

19   the 6th.  Mr. Shannon, which claim objection do you want to

20   take up next?

21        MR. SHANNON:  Your Honor, we'll go to Claim Number

22   22 asserted by Ali Choudhri.

23        THE COURT:  All right.  Thank you.  You want to

24   make an opening statement at it relates to that.

25        MR. SHANNON:  Your Honor, we have talked.  Me and

1    Mr. Burks have talked.  He has agreed that based on the

2    pleadings we have rebutted the presumption and that he is

3    going to go first.  He's going to agree that we have

4    rebutted the presumption that we will --

5           THE COURT:  So the burden's just back to him, so

6    we're going to let him go first.  All right.  Mr. Burks, do

7    you want to make an opening statement?

8           MR. BURKS:  No opening statement, Judge.  May I

9    just -- which one are we on?

10          MR. SHANNON:  22.

11          MR. BURKS:  May I just move into it, Your Honor?

12          THE COURT:  Well, if you want to call witnesses.

13   If you don't want to make an opening, then call witnesses.

14          MR. BURKS:  Well, at this point before calling any

15   witnesses, Judge, I offer into evidence Exhibits 1, 2, and

16   3.

17          THE COURT:  ECF number?

18          MR. BURKS:  ECF Numbers 676-1, 2, and 3.

19          MR. MURRAY:  And Your Honor, we -- the trustee

20   objects to the admission of those exhibits at this time.

21          THE COURT:  All right.  Then you need a witness.

22          MR. BURKS:  Your Honor, I do agree on the base of

23   the proof of claim and on the pleadings that the burden of

24   proof has shifted to me.  I've offered my exhibits.

25          THE COURT:  Call your witness.

1           MR. BURKS:  I don't have a witness, and therefore

2      --

3           THE COURT:  You lose.

4           MR. BURKS:  -- I concede.  Yes.

5           THE COURT:  Okay.  All right.  So at this point in

6      time --

7           MR. BURKS:  I concede that --

8           THE COURT:  -- based on the representation that

9      the trustee has met their burden and the representation that

10     you have no witnesses to call to rebut that burden, I am

11     going to by order sustain the objection to Claims Number 21

12     and 22 of Ali Choudhri at ECF Number 43.  I'll do that --

13     402 -- I'll do that by order.  All right.  Thank you.

14          MR. BURKS:  Excuse me.  There is one housekeeping

15     matter.  21 is not before you today.  21 was previously

16     withdrawn by specific terms under an order signed by you.

17          THE COURT:  Mr. Shannon, do you agree with that?

18          MR. SHANNON:  Yes, Your Honor.

19          THE COURT:  All right.  Then I'll only deny Claim

20     Number 22.  Thank you.  All right.  You want to move onto

21     the next claim?

22          MR. SHANNON:  Yes, Your Honor.  And just so you

23     know, for Claims Number 23 and 24 we have also agreed that

24     the trustee has rebutted the presumption based on the papers

25     and the proof of claim.  And I suspect it's going to go the

1    same way, Your Honor.

2         THE COURT:  Mr. Pope, I think you represent

3    Jetall, do you not?

4         MR. POPE:  I do, Your Honor.  Except I --

5         THE COURT:  Come to the podium, please.

6         MR. POPE:  I do, Your Honor.  And I had this

7    morning to retain to appear on behalf of Jetall.  After

8    further looking at the proof of claims beyond the claims

9    register, they were actually filed Jetall Capital and not

10   Jetall Company, and I do not represent Jetall Capital.  So

11   we left it up to Mr. Burks who's representing the other

12   party.

13        THE COURT:  Mr. Burks, you going to make an

14   appearance for Jetall Capital?

15        MR. BURKS:  Yes, Your Honor.  My name is Greg

16   Burks, B-U-R-K-S, on behalf of claimant Jetall Capital, and

17   I'm taking them one at a time.  I think we're on Claim 23.

18   Is that correct?

19        THE COURT:  There are -- it's an objection to

20   Claim 23 and 24.  Claim 23 is the claim by -- it says Jetall

21   Companies Inc. and 24 says Jetall Companies Inc. too, at

22   least on the claims register.

23        MR. BURKS:  Yeah.  I don't know why it says that.

24   They are separate claims, Your Honor.

25        THE COURT:  Bear with me for one second.  Let me

1    look at the original claims.  The docket could be right.

2    Jetall Capital LLC filed the first claim at 23, and Jetall

3    Capital LLC filed the second claim at Claim Number 24.  And

4    it looks like for purposes of the docket entry, Mr. Baker is

5    at error in how he entered the claim.

6            MR. BURKS:  Probably.

7            THE COURT:  Yeah.

8            MR. BURKS:  With respect to 23 and 24, Your Honor,

9    I do stipulate that on the proof of claims and pleadings the

10   burden of proof has shifted to the claimant.  I agree with

11   Mr. RJ Shannon on that point.  At this time I offer -- on

12   Claim 23 I offer Exhibits 1 through 3.

13           THE COURT:  Again, what ECF number?

14           MR. BURKS:  Thank you, Judge.  ECF Number 696-1,

15   -2, -3.

16           THE COURT:  Is there any objection to those

17   exhibits?

18           MR. MURRAY:  Yes, Your Honor.  The trustee objects

19   to the admission at this time.

20           THE COURT:  All right.  Then you need a witness,

21   Mr. Burks.

22           MR. BURKS:  We don't have a witness.

23           THE COURT:  Do you have a witness or don't have a

24   witness?

25           MR. BURKS:  I do not have a witness.

1          THE COURT:  All right.  Then based on that

2    announcement and your inability to overcome the presumption

3    that you stipulate on the record, I will deny the claim --

4    or sustain the objection to Claim Number 23.  Let's move

5    onto Claim Number 24.

6          MR. BURKS:  Yes, Your Honor.  Your Honor, as Mr.

7    Shannon said a moment ago on 23, and for the record let me

8    make it clean, Mr. Shannon stated that he and I had talked.

9    And that based on the proof of claim, the face of the proof

10   of claim, and the documents offered by both -- that would be

11   offered by both parties, that he and I stipulate that the

12   trustee has met its initial burden of proof, and that burden

13   of proof has shifted to the claimant.  Therefore, I waive

14   opening statement and I offer Claimant's Exhibits 1, 2, 3,

15   4, and 5 found at ECF Numbers 695-1, -2, -3, -4, -5.

16         THE COURT:  Is there any stipulation to the

17   admissibility?

18         MR. MURRAY:  No, Your Honor.  The trustee objects

19   to the admission at this time.

20         THE COURT:  All right.  So you need a witness, Mr.

21   Burks.

22         MR. BURKS:  Your Honor, I do not have a witness.

23         THE COURT:  All right.  So based on that

24   announcement, based on the fact that there are no witnesses

25   shifting the burden back to the claimant, I'm going to

1    disallow the Claim at 24-1.  I'll enter an order as soon as

2    I step down from the bench.  All right.

3          MR. BURKS:  That concludes?

4          THE COURT:  I think that concludes, but let me go

5    to Mr. Shannon first to make sure there's nothing else.

6          MR. SHANNON:  That is correct, Your Honor.

7          THE COURT:  All right.  Let me just make this

8    comment on the record, okay?  I'm really, really, really

9    concerned when people just file claims and they think they

10   can file a claim and there's no rational basis for it, Mr.

11   Burks, okay?  And like I said on the first claim, I think

12   the evidence is pretty clear.  I think it's not only clear,

13   it's crystal clear.

14          And if parties are going to make false claims on

15   the record, then they can expect that I'm going to make a

16   referral, a very, very hearty referral to the attorney

17   general and ask that these matters be prosecuted.  So just

18   make your clients aware that there is criminal liability for

19   filing false proofs of claim, all right?  Thank you.

20          MR. BURKS:  Understood.

21          THE COURT:  All right.  We're adjourned.  Thank

22   you.

23          MR. SHANNON:  Thank you, Your Honor.

24      (Proceedings adjourned at 11:37 a.m.)

25

1                              CERTIFICATION

2

3    I certify that the foregoing is a correct transcript from

4    the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7    *Sonya M. Ledanski Hyde*

8

9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  September 16, 2024